# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ATLANTIC UROLOGICAL ASSOCIATES, P.A.,<br>545 Health Blvd.<br>Daytona Beach, FL  32114, | ) ) ) ) ) | |
| SAM MICHAELS, M.D.<br>4980 Gardiners Bay Circle<br>Sarasota, FL  34238, | ) ) ) ) | |
| REBECCA PAGE<br>724 Evergreen Court<br>Burleson, TX  76028, | ) ) ) ) | |
| UROLOGY CARE, INC.<br>3207 W. Truman Boulevard<br>Jefferson City, MO  65109, | ) ) ) ) | Civil Action No. _____ |
| UROLOGY CENTER OF ALABAMA, P.C.<br>3485 Independence Drive<br>Homewood, AL  35209, | ) ) ) ) | |
| UROPATH, LLC<br>3939 Green Oaks Boulevard West<br>Suite 100<br>Arlington, TX  76016, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| MICHAEL O. LEAVITT, in his official capacity as<br>Secretary, United States Department of Health and<br>Human Services<br>Department of Health & Human Services<br>200 Independence Avenue, SW<br>Washington, D.C. 20201, | ) ) ) ) ) ) ) ) | |
| Defendant. | ) ) | |

- 1 -

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

For their complaint against Michael O. Leavitt, Secretary of Health and Human Services ("Defendant" or "Secretary"), Plaintiffs Atlantic Urological Associates, P.A.; Sam Michaels, M.D.; Rebecca Page; Urology Care, Inc.; Urology Center of Alabama, P.C.; and Uropath, LLC ("Plaintiffs") allege as follows:

**NATURE OF THE CASE**

1.     This is an action for declaratory and injunctive relief, to prevent the Secretary from enforcing a final rule that was issued without notice and comment and that, without explanation, selectively imposed unlawful Medicare requirements on Plaintiffs that will cause irreparable harm to the Plaintiffs and others.

2.     Uropath, LLC ("Uropath") is a Texas limited liability company that assists professional urology physician practices in developing, implementing, managing and operating urology pathology laboratories.  Uropath currently has management agreements with 52 urology practices, including Atlantic Urological Associates, P.A., Urology Center of Alabama, P.C., and Urology Care, Inc. ("Plaintiff Physician Groups") who are Plaintiffs in this case.

3.     These Plaintiff Physician Groups participate in the Medicare program, and bill the Medicare program for services performed in their own, Uropath-managed laboratories.  These physician owned and operated laboratories are located in four geographic locations:  Leesburg, Florida; Sarasota, Florida; San Antonio, Texas; and Collegeville, Pennsylvania.  Uropath is not a participant in the Medicare program, does not itself perform any laboratory tests or interpretations, and does not bill the Medicare program.  Instead, these tests are directed and interpreted by M.D. pathologists who independently contract with the Plaintiff Physician Groups and under applicable law are considered physicians in the group practices.  Plaintiff Sam Michaels, M.D. is one of these pathologists.

4.    On January 3, 2008, the Secretary published without prior notice and comment a final rule in the Federal Register (73 Fed. Reg. 404 (Jan. 3, 2008)), which became effective on January 1, 2008 ("Final Rule").  The Final Rule delayed the implementation for one year of a revised "anti-markup" regulation contained in a prior rule published on November 27, 2007 (the "Physician Fee Schedule Rule").  72 Fed. Reg. 66,222 (Nov. 27, 2007).  The revised "anti-markup" regulation (42 C.F.R. § 414.50, as revised in the Physician Fee Schedule Rule) would have imposed severe limitations on the way physician groups in general could bill Medicare for a wide range of diagnostic testing services performed by them, including anatomic pathology services.  Because of the disruption and harm that these changes would have caused, and the revised "anti-markup" rule's admitted lack of clarity, the Secretary in the Final Rule delayed implementation of the revised "anti-markup" provision from January 1, 2008, to January 1, 2009.

5.    However, the Final Rule singles out physician groups that provide anatomic pathology diagnostic testing services in laboratories that are located in a "centralized building," instead of the "same building" as the main physician practice, and without explanation or justification selectively imposes the revised "anti-markup" rule on them ("Anatomic Pathology Prohibition").  The revised "anti-markup" rule requires that the physician practice bill Medicare using an undefined "net charge" that is guaranteed to make the physician practice lose money on each anatomic pathology diagnostic testing service provided for a Medicare beneficiary.  The Final Rule's effect in practice is to deny Medicare reimbursement for arrangements such as those that exist for the three Plaintiff Physician Groups, and for the other 49 Uropath-managed physician group laboratories, which are located in a "centralized building" apart from the main physician group practice building.

6.     By selectively applying the "anti-markup" rule to anatomic pathology diagnostic testing services performed in a "centralized building" (while exempting all others), the Secretary's Final Rule administratively eliminates a provision in the Stark Law that specifically allows physician practices to bill for these services when performed in a separate "centralized building."  See 42 U.S.C. § 1395nn(b)(2)(A)(ii).  The revised "anti-markup" rule, selectively applied to diagnostic anatomic pathology services by the Final Rule, 73 Fed. Reg. at 404, also violates the Congressional statute establishing the physician fee schedule amounts that are required to be paid to physicians under Medicare.  42 U.S.C. § 1395w-4.  Furthermore, the revised "anti-markup" rule is also without authority and contrary to the terms of the Medicare anti-markup statute.  42 U.S.C. § 1395u(n).

7.     There is no justification, and the Secretary has offered none in the Final Rule, to single out anatomic pathology diagnostic testing services for immediate application of this unlawful rule.  There is also no basis for the Secretary to effectively prohibit billing for anatomic pathology lab services based upon whether a lab is located in the same building, or in a different building, and in the Final Rule the Secretary has offered no justification for doing so.

8.     The revised "anti-markup" provision in the Physician Fee Schedule Rule was purportedly prompted by concerns about potential overutilization of diagnostic testing services resulting from arrangements structured to comply with the Stark Law's "in-office ancillary services exception."  Alone among all of the types of in-office ancillary services arrangements, the anatomical pathology arrangements between Uropath and the Plaintiff Physician Groups have been demonstrated not to result in overutilization of laboratory services.  Three separate audits by the HHS Office of Inspector General of Uropath-managed labs have shown that virtually 100% of the physician referrals for laboratory services are, in fact, medically necessary.

- 4 -

That showing has not been made for the physician groups whose in-office services were exempted from immediate application of the Final Rule.  Other data and facts about Uropath-managed labs also demonstrate the lack of any overutilization.

9.    Unless enforcement of the Anatomic Pathology Prohibition is enjoined, the Final Rule will destroy the existing business of Uropath, and eliminate the jobs of its 91 employees, including Plaintiff Rebecca Page.  The Final Rule will also disrupt business relationships that exist between the Plaintiff Physician Groups, their pathologists and Uropath, which promote efficient, high quality patient care.  Implementation of the Final Rule will cause large and irreparable losses of income to the Plaintiff Physician Groups, wipe out the investment of physician groups in Uropath, and inflict other irreparable harm.  Unless enjoined, the Final Rule will also cause destruction of or severe injury to the existing medical practices of twelve pathologists who perform interpretations for physician groups in their Uropath-managed labs

10.    Accordingly, the Plaintiffs seek to have the immediate implementation of the Anatomic Pathology Prohibition in the Final Rule enjoined to prevent imminent, irreparable harm, and to receive the benefit of the same delay until January 1, 2009, afforded to all other physician groups providing diagnostic testing services under the in-office ancillary services exception.

## JURISDICTION AND VENUE

11.    The Court has jurisdiction pursuant to 28 U.S.C. § 1331.  The Court also has the power under the All Writs Act, 28 U.S.C. § 1651, to issue injunctive relief necessary to preserve its jurisdiction.

12.    Pursuant to the Court's jurisdiction under these statutes, relief is sought, inter alia, under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 et seq., specifically including

5 U.S.C. §§ 553 and 706, the Regulatory Flexibility Act, 5 U.S.C. § 601 et seq., and the Declaratory Judgment Act, 28 U.S.C. § 2201.

13. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (e).

## **PARTIES**

14. Plaintiff Uropath, LLC is a privately held, limited liability company organized and existing under the laws of the State of Texas. Its principal place of business is 3939 Green Oaks Boulevard West, Suite 100, Arlington, Texas 76016.

15. Plaintiff Atlantic Urological Associates, P.A. is a professional association organized and existing under the laws of the State of Florida. Its principal place of business is 545 Health Boulevard, Daytona Beach, Florida 32114.

16. Plaintiff Urology Center of Alabama, P.C. is a professional corporation organized and existing under the laws of the State of Alabama. Its principal place of business is 3485 Independence Drive, Homewood, Alabama 35209.

17. Plaintiff Urology Care, Inc. is an S corporation organized and existing under the laws of the State of Missouri. Its principal place of business is 3207 W. Truman Boulevard, Jefferson City, Missouri 65109.

18. Plaintiff Sam Michaels, M.D. is a self-employed pathologist licensed in the states of Florida, Ohio, Indiana, Kansas, Colorado, Texas, and North Carolina.

19. Plaintiff Rebecca Page is Director of Clinical Operations for Uropath and is employed by Uropath at its headquarters office in Arlington, Texas.

20. Defendant Michael O. Leavitt is named herein in his official capacity as the Secretary of the Department of Health and Human Services ("HHS"), an agency of the United States Government. The Centers for Medicare and Medicaid Services ("CMS") is the operating component of HHS charged with the administration of the Medicare program.

## REGULATORY FRAMEWORK

### Medicare Act

21.    The Medicare program was established by Title XVIII of the Social Security Act (the "Act"), 42 U.S.C. §§ 1395 – 1395hhh, and provides payment for the provision of medical care services, equipment, and supplies to aged and disabled persons.

22.    Part B of the Medicare Act, 42 U.S.C. §§ 1395j – 1395w-4, provides supplementary medical insurance for covered medical services and supplies, including physicians' services. Physicians and physicians' group practices are sometimes referred to as "suppliers" under Part B.

23.    The Plaintiff Physician Groups participate in Part B of the Medicare program and are entitled to receive Medicare reimbursement for services they provide to their patients who are Medicare beneficiaries.    Plaintiff Sam Michaels, M.D., also participates in Part B of the Medicare program and his services are billed to Medicare through five physician practice groups for which he performs pathology services.

### Stark Law

24.    The services at issue here are furnished by the Plaintiffs in compliance with a statutory exception in the Physician Self-Referral Statute ("Stark Law"), 42 U.S.C. § 1395nn.

25.    The Stark Law provides that if a physician has a financial relationship with an entity: (1) the physician may not make a referral to the entity for the furnishing of Designated Health Services paid for by Medicare or Medicaid, and (2) the entity may not bill Medicare or Medicaid for Designated Health Services furnished pursuant to a prohibited referral, unless the financial relationship fits within an exception to the Stark Law.  See 42 U.S.C. § 1395nn(a)(1).

26.    Anatomic pathology diagnostic testing services, the services at issue in this case, are "Designated Health Services" under the Stark Law.  Thus, these services are subject to the self-referral prohibition under the Stark Law.  The Plaintiff Physician Groups are able to refer

these services to their own laboratories because they comply with the Stark Law's "in-office ancillary services exception." 42 U.S.C. § 1395nn(b)(2).

27.    The in-office ancillary services exception covers Designated Health Services (including pathology, radiology, and other diagnostic testing services, as well as clinical laboratory services) furnished by a physician in his or her office. 42 U.S.C. § 1395nn(b)(2). Examples of these services, besides diagnostic pathology services, include magnetic resonance imaging ("MRI") tests, ultrasound services, computed tomography ("CT") scans, and x-ray examinations.

28.    In order to qualify for this exception, the referring physician, or another physician in the same group practice, must either perform or directly supervise the performance of the service. 42 U.S.C. § 1395nn(b)(2)(A)(i).

29.    To be exempt from the self-referral prohibition, the statute provides that these services must be furnished either: (1) "in a building in which the referring physician (or another physician who is a member of the same group practice) furnishes physicians' services unrelated to the furnishing of designated health services"; or (2) ". . . in another building which is used by the group practice for the centralized provision of the group's designated health services (other than clinical laboratory services)." 42 U.S.C. § 1395nn(b)(2)(A)(ii) (emphasis added).

30.    CMS has interpreted this statutory exception to require that Designated Health Services be furnished in either: (i) a building in which the referring physician (or another physician who is a member of the same group practice) furnishes physicians' services unrelated to the furnishing of designated health services or (ii) "a centralized building that is used exclusively by the group practice for the provision of some or all of the group's Designated Health Services (other than clinical laboratory services)." 42 C.F.R. § 411.355(b). CMS defines

- 8 -

a "centralized building" as "all or part of a building that is owned or leased on a full-time basis (that is, 24 hours a day, 7 days a week, for a term of not less than 6 months) by a group practice and that is used exclusively by the group practice."  42 C.F.R. § 411.351.  The Uropath-managed, physician owned laboratories at issue in this case comply with this requirement.

31.    The Stark Law specifically provides that the Secretary may expand but not limit the application of the in-office ancillary services exception. 42 U.S.C. § 1395nn(b)(2)(A).

### The Physician Fee Schedule Statute

32.    The Physician Fee Schedule Statute, 42 U.S.C. § 1395w-4, mandates that a specific methodology be used by CMS to reimburse physicians for services provided by them to Medicare beneficiaries.

33.    The Physician Fee Schedule Statute requires all physicians' services to be reimbursed by Medicare at the lower of:  (1) the physician's actual charge for the service; or (2) the amount determined under the physician fee schedule ("fee schedule amount").  42 U.S.C. § 1395w-4(a)(1).  The "actual charge" is an amount charged to the patient by the physician, and is set by the physician.  It is not the physician's cost of providing the service.

34.    Because the actual charge is almost always higher than the fee schedule amount, nearly all Medicare physician services are reimbursed at the fee schedule amount.

35.    The Physician Fee Schedule Statute requires that the Secretary set the fee schedule amount for each service based in part on the "relative value" for the service.  42 U.S.C. § 1395w-4(b)(1)(A).  The Statute divides the relative value for each physician service into three components:  (1) a work component; (2) a practice expense component; and (3) a malpractice expense component.  42 U.S.C. § 1395w-4(c).  These components are referred to as Relative Value Units ("RVUs").

36.    The Statute requires the Secretary to develop a methodology for combining the work, practice expense, and malpractice expense national RVUs for each service in order to determine a single relative value for that service.  42 U.S.C. § 1395w-4(c)(2)(A).

37.    Medicare reimbursement for diagnostic testing services is composed of a professional component ("PC"), which is the amount paid for the physician's interpretation and report, and a technical component ("TC"), which is the amount paid for performing the test itself. When combined and paid to the same individual or entity, this amount is referred to as the total or global reimbursement.  Diagnostic testing services furnished in a physician's office may be billed globally or by components.

38.    The dollar amounts to be paid under the fee schedule are derived from a service's RVU.  The fee schedule amount is a flat amount.  It does not vary depending on whether the work is performed in a physician's office or in an outside lab.  It does not vary depending on whether it is performed in the "same building" or a "centralized building."  The dollar amount is adjusted, however, depending on the geographical region of the country in which the work is performed.

39.    The practice expense component captures overhead expenses and is defined as "the portion of resources used in furnishing the service that reflects the general categories of expenses (such as office rent and wages of personnel, but excluding malpractice expenses) comprising practice expenses."  42 U.S.C. § 1395w-4(c)(1)(B).

40.    CMS collects data regarding the following categories to calculate a service's practice expense:  (1) clinical payroll expenses; (2) administrative payroll expenses; (3) office expenses, which include expenses for rent, mortgage interest, depreciation on medical buildings, utilities and telephones; (4) medical material and supply expenses; (5) medical equipment

expenses, which include depreciation, leases and rent of medical equipment used in the diagnosis or treatment of patients; and (6) all other expenses, which include any professional services not previously mentioned.  See 72 Fed. Reg. 66,222, 66,228 (Nov. 27, 2007).

### Anti-Markup Statute

41.    In 1987, Congress enacted Section 1842(n) of the Social Security Act (the "Anti-Markup Statute"), now codified as 42 U.S.C. § 1395u(n).

42.    This statute provides that if a physician's request for payment from Medicare for a diagnostic test "does not indicate that the billing physician personally performed or supervised the performance of the test or that another physician with whom the billing physician shares a practice personally performed or supervised the performance of the test," the billing physician will receive reimbursement for the test that is the lower of:  (1) the supplier's actual charge to the billing physician; or (2) the supplier's reasonable charge to the billing physician for the test.  42 U.S.C. § 1395u(n)(1).

43.    As the name suggests, the Anti-Markup Statute is intended to eliminate the opportunity to profit by purchasing tests performed by outside suppliers and then billing Medicare at a higher rate.  It was never intended and has never been applied to limit the reimbursement available to physician groups who perform diagnostic tests as part of their own medical practice.  However, the Physician Fee Schedule Rule issued by CMS in November 2007 implemented changes to 42 C.F.R. § 414.50 which fundamentally altered and unlawfully expanded the scope of the anti-markup rule.

### FACTS

44.    Uropath assists physician practices, usually physician group practices, in developing, constructing, equipping, and operating pathology laboratories.  Uropath is not a Medicare provider or supplier, and does not itself perform or bill for any laboratory tests or

interpretations. Instead, it provides managerial and operational expertise and efficiencies which permit a medical group practice to provide superior pathology services and better patient care. Uropath enters into a management agreement with each physician practice. The laboratories, which are an extension of, and owned and controlled by, the physician practices, are located in four centers around the United States. These four centers are Leesburg, Florida; Sarasota, Florida; San Antonio, Texas; and Collegeville, Pennsylvania.

45. In these centers, multiple independently owned physician laboratories are established. Uropath leases the premises for these labs, and then subleases the space for the separate pathology laboratories to each physician group. All laboratory equipment, office equipment, supplies, and other tangible property for each physician practice's lab is owned by the physician practice. Each group practice independently contracts with a board certified pathologist for the provision of professional medical services, including service as Medical Director of the lab and providing interpretations of test results. The physician group which owns and operates the laboratory also contracts with Uropath for the provision of non-professional medical, administrative, and managerial services. Depending upon the specific laboratory, these may include the services of personnel such as histotechnologists, cytotechnologists, medical technologists, lab administrators, lab assistants, clerical personnel and transcriptionists. Each group practice bills and collects for all pathology services that they provide in their Uropath-managed laboratories, including billing Medicare for services performed for Medicare patients.

46. Currently, 52 group practices own and operate pathology laboratories under management agreements with Uropath. These laboratories provide pathology services to approximately 450 physicians in the group practices that own them. Uropath is wholly owned by 23 group practices from among the 52 practices with which it has management agreements. The

physician urology practices that have Uropath-managed labs range in size from solo medical practitioners, to small and medium size urology practices, to Urology Associates of North Texas, which has approximately 50 urologists and which is, on information and belief, the largest urology specialty practice in the United States.   Uropath-managed labs provide pathology services for tens of thousands of patients per year.

47.   The vast majority of tests performed in the 52 labs are tissue examinations and interpretations stemming from prostate needle biopsies.  Data collected internally by Uropath demonstrate that for calendar year 2007 the percentage of prostate needle biopsies was 77% for the Leesburg location, 95% for San Antonio, 80% for Sarasota, and 85% for Collegeville.

48.   The Uropath business model provides a number of advantages in terms of quality. Typically, insurance companies and managed care plans will reimburse a group practice for pathology services provided as part of their practice.  However, if the physician group does not provide pathology services, most insurance companies and managed care plans require that specimens be sent to a particular outside laboratory with which the insurance company has contracted.[1]   Since, under these arrangements, specimens are shipped to several different labs, each with multiple pathologists, there is inherently a lack of consistency in specimen grading and interpretation.  Because outside laboratories frequently employ many pathologists, there are few opportunities for the referring physician to consult with the pathologist.   In addition, the physicians have no control over the pathologists' work load or priorities, so there is no way to expedite the handling of particular specimens.   A similar situation exists with respect to Medicare beneficiaries when their tissue samples are sent by a physician group to outside labs.

---

[1]  HMOs generally require that an outside lab of their choice be used, but HMOs typically represent a small portion of the patients seen by the 52 physician groups.

49.    By contrast, under the Uropath model, a group practice with its own pathology laboratory uses the same pathologist for urologic pathology work.  First, this means that a group practice is able to minimize the inconsistencies in grading and interpreting specimens inherent in using more than one pathologist.  Second, most general pathologists examine a wide range of samples relating to a broad spectrum of diseases or diagnoses.  The pathologists employed by the physician practices in Uropath-managed facilities are genitourinary ("GU") pathologists, often with specialized training or fellowships in that field.  Even if they did not have prior specialized training, they quickly develop GU experience and expertise, due to the large volume of needle biopsy specimens and other GU related specimens they review.  Third, by utilizing its own pathologist a group practice enjoys more meaningful consultative benefits with that pathologist with respect to specimens reviewed and interpreted.  They can easily contact the pathologist to discuss any questions or problems regarding a particular patient.  There are generally multiple pathologists on site at a Uropath center, who can and do informally consult with each other on close, difficult, or unusual cases.  Finally, the group practice can make special requests and prioritize samplings sent to their own pathology laboratory.  All of these factors promote quality patient care services for the relatively few, specialized tests for which the urology practices utilize their own pathologist in a Uropath-managed lab.

50.    Quality is also improved by each physician group having its own pathologist.  Over time, the urologists become familiar with the pathologist's interpretations and what they mean, rather than having to deal with interpretations from multiple pathologists in outside labs who are not known to the physician group members.

51.    Furthermore, quality is enhanced because the pathologists providing services to the Uropath-managed physician labs are specialists, by training, experience, or both, in GU

pathology.  Seven have completed fellowships in GU pathology or other advanced pathology disciplines.  Several were educated or trained at national centers of excellence relating to treatment of cancer, including the M.D. Anderson Cancer Center in Houston.  Dr. William Murphy, who practices in the Leesburg location, is a graduate of the Harvard Medical School, has written and lectured extensively, and has written a textbook on Uropathology.  He has an international reputation and is generally considered one of the three leading GU pathologists in the country.

**Proposed Physician Fee Schedule Rule**

52.  On July 12, 2007, CMS published in the Federal Register a proposed rule ("Proposed Physician Fee Schedule Rule").  72 Fed. Reg. 38,122 (July 12, 2007).  This rule contained provisions related to the 2008 Medicare Physician Fee Schedule and, in particular, proposed to impose an anti-markup provision on the technical and professional components of diagnostic tests.  The agency also announced that it was considering imposing an anti-markup provision on the technical component of a diagnostic test that is performed in a centralized building.  However, CMS did not propose actual revisions to the anti-markup rule implementing such a provision, and thus did not allow interested parties to comment on any specific proposed change in this regard.  Instead, CMS only sought comments on "whether we should have such a provision and, if so, how we should effect such a provision . . ."  72 Fed. Reg. at 38,180.

53.  In this publication, CMS alluded to its concerns regarding self-referral of services furnished within a centralized building.  See 72 Fed. Reg. at 38,179, 38,181.  Once again, CMS did not issue a specific proposal, on which affected persons would have the opportunity to comment, for amending regulations regarding the in-office ancillary services exception.  Instead,

it solicited comments as to whether changes were necessary and, if so, what those changes should be.  See 72 Fed. Reg. at 38,181.

54.   In none of the rulemaking proceedings described in this Complaint did CMS actually amend its regulatory interpretations of the Stark Law in-office ancillary rule exception. Instead, as described below, it has attempted to eliminate a statutory Stark Law exception by applying a revised "anti-markup" rule that eliminates the availability of this exception for anatomic pathology services.

**Physician Fee Schedule Rule**

55.   On November 27, 2007, CMS issued the 2008 Medicare Physician Fee Schedule Final Rule (the "Physician Fee Schedule Rule"), 72 Fed. Reg. 66,222 (Nov. 27, 2007), which made sweeping changes in the way Physician Groups could bill Medicare for certain diagnostic testing services.  As noted, these changes were made, not by amending the Stark Law regulations themselves, but by altering the anti-markup regulation at 42 C.F.R. § 414.50.

56.   This rule was scheduled to go into effect on January 1, 2008.  However, the revised "anti-markup" provision met with such opposition and public outcry that implementation of the "anti-markup" provision was delayed for a year, with one unexplained exception.   (See discussion of Final Rule below.)

57.   Prior to the Physician Fee Schedule Rule, the anti-markup provision applied only to the Technical Component ("TC") of diagnostic tests purchased from an outside supplier.  The physician practices with Uropath-managed labs did not purchase diagnostic tests from Uropath, and this rule did not apply.   The Physician Fee Schedule Rule extends the anti-markup prohibitions not only to the TC but also to the Professional Component ("PC") of diagnostic tests, utilizing a novel "location" test that had never before been proposed or implemented.

Under the revised "anti-markup" provision, the billing physician may not mark up the TC or PC of a diagnostic test if either is ordered by the billing physician and performed at a site other than the "office of the billing physician or other supplier."  See 72 Fed. Reg. at 66,307.

58.    For physician organizations, the "office of the billing physician or other supplier" is defined as the space where the organization furnishes "substantially the full range of services that the physician organization provides generally."  72 Fed. Reg. at 66,308.  This definition is different from and does not correspond to the "same building" or "centralized building" definitions applicable to the Stark Law's in-office ancillary services exception.

59.    In billing Medicare for lab tests, physician practices with Uropath-managed labs do not "mark up" some charge made to them by Uropath or an outside supplier.  Instead, they simply perform the work in their own lab, incurring costs for the services of the pathologist, technicians, and other personnel; management fees; costs for space, equipment, and supplies; and other costs of operation.  They then bill Medicare and receive the same fee schedule amount as any other physician group or outside lab would receive.

60.    The revised "anti-markup" provision in the Physician Fee Schedule Rule, however, requires that physicians be reimbursed for certain services at amounts that are less than physician fee schedule amounts established pursuant to statute.  The rule provides that if the revised anti-markup provision applies, the physician's reimbursement for the service is limited to the lower of:  (1) the performing supplier's "net charge" to the billing physician or other supplier; (2) the billing physician or other supplier's actual charge; or (3) the fee schedule amount for the test that would be allowed if the performing supplier billed directly.  72 Fed. Reg. at 66307.  "Net charge" is a new, undefined term introduced by CMS in the Physician Fee Schedule Final Rule. CMS refused to provide specific guidance on how to calculate net charge, but did state that it

must be determined "without regard to any charge that is intended to reflect the cost of equipment or space leased to the performing supplier by or through the billing physician or other supplier." See 42 C.F.R. § 414.50(a)(2)(i), as revised in the Physician Fee Schedule Rule. Thus, a physician practice cannot recoup its overhead expenses for providing the service, contrary to the Physician Fee Schedule Statute, which mandates that such expense be included in the fee schedule amount.

61.    Moreover, the Physician Fee Schedule Rule requires that the billing physician be responsible for calculating the performing supplier's "net charge." See 72 Fed. Reg. at 66,318. Again, the preamble to the Physician Fee Schedule Rule neither provides guidance nor sets forth a specific formula for calculating the net charge. Instead, physicians are told only to calculate the net charge "in a reasonable manner . . . that yields an accurate net charge." Id.

62.    Because of the limitations it imposed on expenses that may be included in the "net charge," CMS recognizes that it is "unlikely" that the net charge will be higher than the applicable fee schedule amount or the physician's actual charge. See 72 Fed. Reg. at 66,319. In fact, the exclusion of overhead expenses from the "net charge" for the service would force the Plaintiff Physician Groups to provide these services at a loss, making it impossible for these groups to continue providing these services to Medicare beneficiaries.

**Final Rule**

63.    The Physician Fee Schedule Rule's new "anti-markup" provisions led to substantial opposition in the physician and supplier community. By requiring physician groups to bill at a loss for existing service arrangements that complied with the Stark Law, but were not performed in the "office of the billing physician," many of these existing diagnostic testing arrangements

for radiology services, pathology services, and other services would have to be shut down.  See 73 Fed. Reg. at 404.

64.    On January 3, 2008, CMS published the Final Rule.  73 Fed. Reg. 404 (Jan. 3, 2008).  For the overwhelming majority of diagnostic testing services, the Final Rule delays until January 1, 2009, the applicability of the revised "anti-markup" provisions announced in the Physician Fee Schedule Rule.  See 73 Fed. Reg. at 404.

65.    However, there is one exception.  The Final rule immediately applies the "anti-markup" provisions only to anatomic pathology diagnostic testing services furnished in space that:  (i) is utilized by a physician group practice as a "centralized building" (as defined at 42 C.F.R. § 411.351) for purposes of complying with the physician self-referral rules; and (ii) does not qualify as a "same building" under 42 C.F.R. § 411.355(b)(2)(i).[2]  See 73 Fed. Reg. at 404.  This test is new and was never before proposed by CMS.

66.    Plaintiffs are only contesting the Final Rule's immediate application of the "anti-markup" rule with respect to anatomic pathology diagnostic testing services furnished in a "centralized building" that is not the "same building" under Stark definitions.  This "Anatomic Pathology Prohibition" prohibits physicians rendering such services in a centralized billing from billing for the fee schedule amount, and requires them to instead bill only at an actual loss.  It is this portion of the Final Rule that Plaintiffs challenge, and that will cause them irreparable harm if not enjoined.  Plaintiffs do not seek to enjoin the delay of the revised "anti-markup" rule as to other diagnostic services, and in fact believe they are entitled to the same delay as for all other services and arrangements.

---

[2] The Final Rule also immediately applies the anti-markup provisions with respect to the technical component of a purchased diagnostic test.  However, this portion of the Final Rule is unrelated to the case at bar, and is not challenged by Plaintiffs.

67.   The Physician Fee Schedule Rule would have applied the revised "anti-markup" provision regardless of the type of in-office ancillary service involved.  See 72 Fed. Reg. at 66,309.  At no point in the Physician Fee Schedule Rule did CMS propose to apply the "anti-markup" only to anatomic pathology services provided in a centralized building.  In fact, CMS explicitly rejected a similar proposal to apply the "anti-markup" provisions exclusively to gastroenterology, dermatology and urology physician group practices that order pathology tests.  Instead, CMS expressly found that "making the rule applicable to all suppliers ensures fair and equitable treatment among types of suppliers . . ."  See 72 Fed. Reg. at 66,309.  However, in the Final Rule, CMS abandoned this position and imposed the "anti-markup" provision only on a narrow class of services never before proposed.

### Rulemaking Proceedings

68.   An agency must publish notice of a proposed rule in the Federal Register, and allow interested parties to submit comments on the proposed rule.  5 U.S.C. § 553 and 42 U.S.C. § 1395hh.

69.   Under the APA, the publication or service of a substantive rule must be made not less than 30 days before its effective date.  5 U.S.C. § 553(d).

70.   The Final Rule's effective date was January 1, 2008, two days prior to the January 3, 2008 date of publication.

71.   CMS implemented the Final Rule without notice and comment rulemaking procedure.  CMS noted that notice and comment rulemaking is "not required . . . if the rule is interpretive or procedural," and further noted that a delayed effective date is not required "if the rule is procedural or interpretive."  73 Fed. Reg. at 405.

72.    However, CMS did not contend that the Final Rule is interpretive or procedural, and did not base its implementation of the Final Rule without notice and comment and without a delayed effective date on such a contention.  Id.

73.    Instead, CMS stated that "[o]ur implementation of this action without opportunity for public comment and without a delayed effective date is based on the good cause exceptions in 5 U.S.C. § 553(b)(3)(B) and (d), respectively."  Id.

74.    5 U.S.C. § 553(b)(3)(B) allows waiver of notice and comment rulemaking when "the agency for good cause finds (and incorporates the finding and a brief statement of the reasons therefore in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."

75.    CMS made a finding that seeking public comment on the Final Rule was "impracticable and contrary to the public interest."  73 Fed. Reg. at 405.  However, the statement of reasons CMS provided in support of that finding related to the immediate disruption of patient care that would occur if the revised anti-markup rule were not delayed.  Those reasons therefore supported a one year delay, but did not justify the immediate imposition of the Anatomic Pathology Prohibition.

76.    CMS made no good cause finding whatsoever in connection with the waiver of proposed rulemaking regarding why the anti-markup rule should not be delayed for anatomic pathology diagnostic services provided in a centralized building.  It made no finding why those services were different from all other services.  It made no finding regarding why the harm to patient care that would occur for all other services would not also occur for anatomic pathology diagnostic services.  It made no finding regarding any other types of harm or effects that would occur from the immediate imposition of the Anatomic Pathology Prohibition.

77.    With regard to good cause for dispensing with the delayed effective date pursuant to 5 U.S.C. § 553(d), CMS stated only that if it did not make the delay for all other services effective immediately, "patient care may be significantly disrupted during the interim period between the issuance of the rule and a delayed effective date."  73 Fed. Reg. at 406.

78.    CMS made no finding whatsoever regarding the effect of immediate application of the anti-markup rule on anatomic pathology services furnished in a centralized building.  It provided no reason or rationale regarding why the same disruptive effect on patient care would not occur immediately for anatomic pathology diagnostic services as for other services.  It made no analysis at all regarding the effect on physician groups, patients and others who <u>would</u> be affected by the immediate imposition of the anti-markup rule, but instead addressed only the effects on those who would be <u>exempted from</u> immediate application of the rule.

79.    The Final Rule is not "procedural" within the meaning of 5 U.S.C. § 553(b)(3)(A); that is, it is not a rule of "agency organization, procedure, or practice."

80.    Similarly, the Final Rule is not interpretive.  It does not simply state what the administrative agency thinks the statute means.

81.    Instead, the Final Rule is a substantive or legislative rule that can be implemented only by notice and comment rulemaking.  The Final Rule imposes an "anti-markup" provision on a class of services and locations never before proposed (anatomic pathology diagnostic services provided in a "centralized building" that is not the "same building").  It imposes obligations and produces other significant effects on private interests, and otherwise qualifies as a substantive rule under prevailing case law.

82.    The Final Rule is also a "rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing . . . the payment for services" under

Medicare, and is therefore required to undergo notice and comment rulemaking.  42 C.F.R. § 1395hh.

83.    An agency must incorporate in rules adopted a concise general statement of their basis and purpose. 5 U.S.C. § 553(c).

84.    The sole reason given by CMS in the Final Rule for not delaying the applicability of the revised "anti-markup" rule for physician groups subject to the Anatomic Pathology Prohibition, is that anatomic pathology diagnostic services "precipitated" its proposal for revision of the anti-markup provisions and remain its "core concern."  See 73 Fed. Reg. at 405. That is a wholly inadequate basis for immediately applying the "anti-markup" rule solely to anatomic pathology diagnostic services, while exempting all other services.

85.    CMS also provided no basis for its decision to single out services performed in a "centralized building" as opposed to the "same building."

86.    There is in fact no basis to apply an "anti-markup" rule to anatomic pathology diagnostic services performed in a centralized building as opposed to all other services.  CMS's expressed concern relates to the potential for overutilization when a physician group refers diagnostic tests to members of its own practice.  The incentives for potential overutilization are the same, however, regardless of whether the lab facilities, for example, are located in the same building or a different building.  In addition, CMS has provided no explanation or basis for concluding that the incentives for potential overutilization are different for anatomic pathology services as opposed to other types of diagnostic services.

87.    In fact, Uropath-managed labs are the only physician group owned labs that have been demonstrated not to cause overutilization.

88.    In its 2005 work plan, the Office of Inspector General of the Department of Health and Human Services announced that it would perform audits of "pathology services performed in physicians' offices."   The Office of Audit Services of the OIG thereafter performed audits of physician owned, Uropath-managed pathology laboratory in each of the geographic locations where Uropath then managed pathology laboratories (Leesburg, FL; Sarasota, FL; San Antonio, TX).   On information and belief, only Uropath-managed labs were audited—no other physician owned laboratories were audited.

89.    In each audit, the OIG found that medical necessity was clearly established for either nearly 100% or actually 100% of the biopsies taken and processed by the physician groups laboratories.   For Plaintiff Atlantic Urological Associates ("AUA"), the OIG selected a random sample of 100 Medicare claims that had been paid during calendar year 2004, after establishment of AUA's Uropath-managed lab.   Working with a Medicare Program Safeguard Contractor ("PSC"), the OIG found that medical necessity was established for 96 of the 100 sample claims, and that for four claims it could not "rule out" the appropriateness of the biopsy and therefore did not recommend that these claims be denied.

90.    A similar OIG audit relating to Florida Urology Physicians, P.A. was also performed for its laboratory in the Sarasota location.   The OIG examined 51 paid claims for the period September-December 2004, which was the period immediately after the physician group had established its Uropath-managed lab.   The stated purpose of the review was to determine "whether the pathology services billed for were reasonable, necessary, and in accordance with Medicare Part B requirements."   Again, working with a PSC, the OIG report found that medical necessity for the biopsy procedure was established for 100% of the 51 claims reviewed.

91.    A similar OIG audit was performed at the lab operated by Urology Tyler, P.A., for the period May-December 2004, the period immediately following the opening of that group practice's lab in San Antonio.  The OIG, again working with a PSC, reviewed a random sample of 100 paid claims during this period to determine "whether pathology services were reasonable, medically necessary, and supported by adequate documentation."  The report found that the physician group's "claims for pathology laboratory services generally complied with Medicare Part B medical necessity and documentation requirements for 99 of 100 reviewed claims."  The sole exception was for a claim that was improperly billed and paid due to a clerical error, which was corrected during the audit.

92.    Thus, for all three laboratories audited, medical necessity was established to a remarkably high level, thereby indicating no overutilization with respect to the number of patients biopsied.  In all three reports, the OIG made no recommendations whatsoever.  Instead, the labs were found to be in compliance with Medicare Part B requirements.

93.    Objective data supports the fact that Uropath-managed laboratories do not lead to overutilization.  These include:

(a)    The national average of positive biopsies is in the low- to mid-thirties percent range.  A recently published study of data regarding 10,429 Medicare beneficiaries found that the positive biopsy rate for cancer was 32%.  Data collected by Uropath shows that for AUA the positive biopsy percentage in 2006 was 48%, suggesting, if anything, AUA was doing too few instead of too many prostate biopsies.  In Uropath-managed labs in 2006 the positive biopsy rate was 40.9% for all of the physician groups combined.  This is above the national average, and strongly supports the

conclusion that biopsy procedures are not being overutilized by these physician groups.

(b)    When the pathologist is unsure of a finding, he/she may order "special stains" that are used to help make a diagnosis, but that increase the cost of the evaluation. Special stains are a separate billable code under Medicare. A pathologist who specializes in genitourinary pathology is more frequently able to make a diagnosis without the necessity of resorting to special stains. The industry standard special stain rate is in the area of 20% or possibly more. Data collected by Uropath shows that Plaintiff Atlantic Urology Associates' ("AUA") pathologist uses special staining techniques to make the diagnosis only 1.82% of the time for AUA's patients. For Uropath-managed labs as a whole, the same data shows an overall special stain rate of only 5.50%. Thus, this improvement in interpretations due to pathologist specialization and expertise in Uropath-managed labs saves patients and third party payers (including Medicare) the added costs resulting from higher special stain rates.

(c)    A study conducted at Urology Associates of North Texas ("UANT"), a very large urology specialty practice in the Dallas area, shows that after UANT established its Uropath-managed lab on January 1, 2003, the ratio of biopsies to the number of men seen in the practice who are over 50 years of age; who have selected diagnosis codes indicating prostate cancer, enlarged prostate, or potential prostate cancer; or who are over 50 years and also have such diagnosis codes; actually <u>decreased</u> substantially.

(d)    Similarly, another physician group with a Uropath-managed lab, Urology San Antonio, has had a significant decline in the number of biopsies per 1,000 patient visits since it opened its own lab.  The biopsy rate per 1000 patient visits declined from 27.93 in 2003, the year Urology San Antonio opened its Uropath-managed lab, to 21.36 in 2006.  Thus, instead of causing overutilization, the establishment of a Uropath-managed lab resulted in a decrease in the ratio of biopsies to patient visits.

94.    CMS recognizes that the revised "anti-markup" rule may result in disruption of patient care and that the definition of "office of the building physician or other supplier" may "not be clear" and may have "unintended consequences."  73 Fed. Reg. at 405.  As a result, in order to study the issues further, CMS states that it is delaying the application of revised § 414.50 for one year.  In the interim, it plans to issue clarifying guidance as to what constitutes the "office of the billing physician or other supplier," propose additional rulemaking, or both.  Id.

95.    CMS did not in the Final Rule explain why an admittedly unclear rule with the potential for unintended consequences should nevertheless be immediately applied to anatomic pathology diagnostic services.

96.    Physician groups and others affected by Anatomic Pathology Prohibition will not receive the benefit of this additional guidance and/or rulemaking.  Instead, the physician groups will be forced to immediately stop billing for pathology testing services they provide.  They are immediately subject to a rule that will cause them, Uropath, and others irreparable harm, and that rule may never apply to anyone else since CMS has stated its intent to revisit it and possibly issue further rulemaking.

97.     Should the Plaintiff Physician Groups be able to establish a lab on their main urology practice premises, and begin billing again for these services, they will have to do so under an admittedly unclear rule, and without the one year delay and additional guidance and rulemaking afforded to physician groups providing other in-office ancillary services or in other locations.  They may set up these new arrangements only to find that CMS will change the rules that apply to them once again.

### Regulatory Flexibility Act

98.     Plaintiff Urology Care, Inc., is a small entity within the meaning of the Regulatory Flexibility Act.  It is a physician office with annual receipts of approximately $3.7 million in 2007.

99.     The Regulatory Flexibility Act required the Secretary to prepare and make available for public comment an initial regulatory flexibility analysis ("IRFA") regarding the effect of the Proposed Physician Fee Schedule Rule on small entities.  5 U.S.C. § 603(a).

100.    The Regulatory Flexibility Act also required the Secretary to prepare a final regulatory flexibility analysis ("FRFA") of the impact of the November 27 Physician Fee Schedule Rule on small entities and publish such an analysis or a summary thereof in the Federal Register.  5 U.S.C. § 604.

101.    The Secretary did publish such an analysis, acknowledging that small entities would be affected by the Physician Fee Schedule Rule.  72 Fed. Reg. at 66,388.

102.    5 U.S.C. § 604 requires, <u>inter alia</u>, that the Secretary's regulatory flexibility analysis shall contain a "description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available."  5 U.S.C. § 604(a)(3).

103. The agency must also describe "the steps the agency has taken to minimize the significant impact on small entities . . . including a statement of the factual, policy and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." 5 U.S.C. § 604(a)(5)

104. No such analysis was conducted in the November 27 rulemaking regarding a rule that would apply only to anatomic pathology diagnostic services furnished in a centralized building, because CMS expressly rejected any rule that would apply only to one medical specialty such as pathology. 72 Fed. Reg. at 66,309.

105. The Regulatory Flexibility Act excuses the Secretary from providing an IRFA or FRFA if the Secretary publishes a certification in the Federal Register at the time of publication of general notice of proposed rulemaking for the rule or at the time of publication of the final rule that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities, along with a statement providing the factual basis for such certification. 5 U.S.C. § 605(b).

106. In the January Final Rule, the Secretary summarily stated: "We do not believe that this delay in the date of applicability will result in any significant economic impact on any small entity. Until January 1, 2009, the majority of billing suppliers affected by the revised § 414.50 do not have to comply with the revised requirements in § 414.50." 73 Fed. Reg. at 406.

107. This statement does not constitute a valid "certification" for purposes of 5 U.S.C. § 605(b), because it does not address whether the Final Rule will have a significant economic impact on a substantial number of small entities that <u>will</u> be subject to the revised anti-markup provisions.

**Lack of Remedy and Irreparable Harm**

108. In taking the actions described in this Complaint, the Secretary is acting as an officer of the United States and, unless waived, the doctrine of sovereign immunity prevents any recovery of monetary damages by Plaintiffs against the Secretary or against CMS. The United States has not waived the doctrine of sovereign immunity with respect to the kinds of injuries alleged in this Complaint, and the Secretary and CMS are therefore not answerable in damages to the Plaintiffs.

109. In addition to the lack of availability of monetary damages, Plaintiffs have no adequate administrative remedy that would permit the types of injuries alleged herein to be redressed. The Plaintiff Physician Groups would expose themselves to large civil monetary penalties, possible criminal liability, and other civil sanctions if they attempt to avail themselves of any alleged administrative process, since billing at the fee schedule amount could be considered a false claim. Billing at a "net charge" would not preserve their right to appeal.

110. In addition, no administrative remedy is available to the Plaintiff Physician Groups because, if the Anatomic Pathology Prohibition is not enjoined, Uropath will have its existing business destroyed almost immediately, and the physician group labs will have to be dismantled. Tissue specimens will have to be sent to outside labs, and the outside labs, not the physician groups, will bill for those services. Thus, there will be nothing for the Plaintiff Physician Groups to appeal. The effect will be the practical equivalent of a total denial of judicial review.

111. Unless the Anatomic Pathology Prohibition in the Final Rule is enjoined, the Plaintiffs will suffer imminent irreparable harm, including without limitation the following:

      (a)      The existing business of Uropath will be destroyed.

(b)     The Plaintiff Physician Groups will suffer an immediate loss of income from operation of their own laboratories, which cannot be recovered in any appeal or action for damages.

(c)     The Plaintiff Physician Groups will lose their initial investment in the laboratories, because those laboratories will have to be shut down.

(d)     In the case of Urology Associates, Inc., at least, the loss of income will be permanent, because it does not have sufficient volume to attempt to set up its own laboratory on its main office premises.

(e)     The Plaintiff Physician Groups' equity in the ownership of Uropath will be wiped out, and additional expense, amounting to approximately $1.2 million to $3.5 million, will be assessed against the physician groups who are owners of Uropath, including Plaintiffs Atlantic Urological Associates and Urology Associates, Inc.

(f)     High quality patient care services and business relationships among the Plaintiff Physician Groups, pathologists, and Uropath will be destroyed, to the detriment of patient care.

(g)     Twelve pathologists, including Plaintiff Sam Michaels, M.D., who provide services to physician owned Uropath-managed laboratories will have their medical practices either destroyed, or severely injured, due to their inability to provide services to the physician group owned laboratories.

(h)    The competitive position of the Plaintiff Physician Groups will be injured due to loss of revenue, and increased difficulties in recruitment of qualified physicians because of the absence of their own laboratory.

(i)    Ninety-one people, including Plaintiff Rebecca Page, will lose their jobs with Uropath.

## COUNT I
### (Arbitrary and Capricious Agency Action)

112.   The allegations contained in paragraphs 1-111 and 115-155 are realleged and incorporated by reference herein.

113.   The Anatomic Pathology Prohibition in the Final Rule must be set aside pursuant to 5 U.S.C. § 706, because it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; and is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.  The Final Rule is invalid under 5 U.S.C. § 706, without limitation, for the following reasons:

(a)    An agency must incorporate in rules adopted a concise general statement of their basis and purpose.  5 U.S.C. § 553(c).

(b)    In the Final Rule, CMS stated no adequate basis for immediately imposing the revised "anti-markup" provision, 42 C.F.R. § 414.50 (revised November 27, 2007), on diagnostic anatomic pathology services, while deferring such provision for all other services.

(c)    CMS stated no adequate basis for immediately imposing the revised "anti-markup" provision on anatomic pathology diagnostic services performed

in a "centralized building," as opposed to the "same building," under Stark definitions.

(d)    The only basis stated by CMS for the immediate imposition of the Anatomic Pathology Prohibition is that these kinds of services "precipitated" its proposal for revision of the anti-markup rule and remain its "core concern."  That statement is wholly inadequate to justify the immediate imposition of the Anatomic Pathology Prohibition while deferring, perhaps forever, application of the revised "anti-markup" rule for all other services and locations.

(e)    CMS cited no basis for concluding that anatomic pathology diagnostic testing services performed in a "centralized building" present a greater risk of overutilization than all other types of diagnostic services, or services performed in other locations, for which the application of the "anti-markup" rule was deferred.

(f)    In fact, evidence known to CMS demonstrated that overutilization by Uropath-managed laboratories in a "centralized building" was not present, and that the anatomic pathology diagnostic services furnished in those locations were medically necessary.

(g)    It is arbitrary and capricious to require that physician groups performing anatomic pathology diagnostic services in a "centralized building" be forced to bill at a "net charge" for these services, when physicians

performing identical services in other locations will still receive the full physician fee schedule amount for the same services.

(h)     CMS recognized in the Final Rule that immediate application of the revised anti-markup provision would likely result in disruption of patient care for the provision of diagnostic services generally, but provided no explanation why patient care would not be similarly disrupted for anatomic pathology diagnostic services to which it immediately applied the revised anti-markup rule.

(i)     In fact, high quality patient care services provided by the Plaintiff Physician Groups in their Uropath-managed laboratories will not only be disrupted, but will be eliminated, as the result of the Final Rule.

(j)     CMS stated that the definition of "office of the billing physician or other supplier" in the revised anti-markup rule may "not be clear" and may have "unintended consequences."  CMS provided no explanation why it was imposing an admittedly unclear rule on anatomic pathology diagnostic services in a "centralized building," while allowing time for clarification for all other diagnostic services and locations.

(k)     The immediate imposition of the revised "anti-markup" rule requires the Plaintiff Physician Groups to shut down their existing Uropath-managed labs, but if they attempt to open a lab on their main office premises they will be subject to great regulatory uncertainty.

(l)    The Anatomic Pathology Prohibition, if not enjoined, will destroy Uropath's existing business and require the physician-owned laboratories to be immediately closed, thereby depriving Plaintiffs of the ability to participate in the further rulemaking or clarification on this subject in which CMS says it will engage.

(m)    The Anatomic Pathology Prohibition is arbitrary, capricious, and not in accordance with law because it administratively eliminates the "centralized building" exception in the Stark Law (see Count IV).

(n)    The Anatomic Pathology Prohibition is arbitrary, capricious, and not in accordance with law because it violates the Physician Fee Schedule Statute (see Count V).

(o)    The Anatomic Pathology Prohibition is arbitrary, capricious, and not in accordance with law because it has been imposed without authority under the Anti-Markup Statute, and violates that statute.

114.  The Anatomic Pathology Prohibition is therefore unlawful, arbitrary, and capricious under the APA and must be set aside pursuant to 5 U.S.C. § 706.

## COUNT II
### (Invalidity of Agency Action Under 5 U.S.C. § 553)

115.  The allegations contained in paragraphs 1-114 and 125-155 are realleged and incorporated by reference herein.

116.  An agency must publish notice of a proposed rule in the Federal Register, and allow interested parties to submit comments on the proposed rule. 5 U.S.C. § 553 and 42 U.S.C. § 1395hh.

117.  The publication or service of a substantive rule must be made not less than 30 days before its effective date. 5 U.S.C. § 553(d).

118.  The Final Rule is a new substantive rule issued by Defendant without notice and the opportunity for comment in violation of the Administrative Procedure Act, 5 U.S.C. § 553(b), and the special Medicare rulemaking statute, 42 U.S.C. § 1395hh.

119.  Defendant relied on the waiver provisions of 5 U.S.C. § 553(b)(3)(B) to attempt to waive notice and comment rulemaking.  The only reasons given for waiver were that immediate imposition of the revised "anti-markup" rule would disrupt patient care, thereby justifying the one year delay.

120.  Defendant gave no reasons why rulemaking should be waived for the Anatomic Pathology Prohibition, which immediately imposes the "anti-markup" rule on anatomic pathology diagnostic services performed in a "centralized building."  Defendant gave no reason why those services are different from any other services, or why the harm to patient care that would occur for all other services would not also occur for anatomic pathology diagnostic services.

121.  Defendant contended that good cause existed under 5 U.S.C. § 553(d) for making the Final Rule effective immediately rather than providing for a delayed effective date. Defendant stated that if the delay for all other services did not go into effect immediately, "patient care may be significantly disrupted during the interim period between the issuance of the rule and delayed effective date."

122.  Defendant made no analysis at all regarding the effect on physician groups and others who would be affected immediately without a delay in effective date, but instead addressed only the effects on those who would be exempted from immediate application of the revised anti-markup rule.

123.  Defendant accordingly did not provide an adequate statement of good cause for waiving notice and comment rulemaking for the Anatomic Pathology Prohibition under 5 U.S.C. § 553(b)(3)(B), or for waiving the delayed effective date under 5 U.S.C. § 553(d).

124.  Therefore, the Final Rule was issued without observance of the requirements of the Administrative Procedure Act, 5 U.S.C. § 553, and must be set aside pursuant to 5 U.S.C. § 706.

### COUNT III
### (Agency Rule Contrary to Regulatory Flexibility Act)

125.  The allegations contained in paragraphs 1-124 and 136-155 are realleged and incorporated by reference herein.

126.  Plaintiff Urology Care, Inc., is a small entity within the meaning of the Regulatory Flexibility Act.

127.  The Regulatory Flexibility Act requires an agency to prepare a final regulatory flexibility analysis ("FRFA") of the impact of a final rule on small entities and publish such an analysis or a summary thereof in the Federal Register.  5 U.S.C. § 604.

128.  No analysis of the effects on small entities of the revised "anti-markup" rule on anatomic pathology diagnostic services provided in a centralized building has previously been performed by Defendant, because such a rule had never been proposed before the Final Rule went into effect without notice and comment.

129.  The Final Rule did not contain an FRFA, and did not contain a description of an estimate of the number of small entities affected, as required by 5 U.S.C. § 604(a)(3).

130.  The Final Rule did not contain a statement of the "factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives . . . which affect the impact on small entities was rejected."  5 U.S.C. § 604(a)(5).

131.  Specifically, the Final Rule did not state why the delay in the revised anti-markup rule until January 1, 2009, for physician groups who provide other diagnostic services was not applied to physician groups who are small entities and who provide anatomic pathology diagnostic services in a centralized building.

132.  The Regulatory Flexibility Act excuses the Secretary from providing an IRFA or FRFA if the Secretary publishes a certification in the Federal Register at the time of publication of general notice of proposed rulemaking for the rule or at the time of publication of the final rule that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities, along with a statement providing the factual basis for such certification. 5 U.S.C. § 605(b).

133.  In the Final Rule, the Secretary only stated he did not "believe that this delay in the date of applicability will result in any significant economic impact on any small entity."

134.  This statement is not a valid certification for purposes of 5 U.S.C. § 605(b) because it does not address the economic impact on small entities that will be subject to the newly-devised Anatomic Pathology Prohibition.

135.  Therefore, the Anatomic Pathology Prohibition in the Final Rule violates the Regulatory Flexibility Act, has been imposed by the Secretary without statutory authority, and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; and is in excess of statutory jurisdiction, authority or limitation or short of statutory right.

<u>COUNT IV</u>
**(Agency Rule Contrary to Stark Statute)**

136.  The allegations contained in paragraphs 1-135 and 142-155 are realleged and incorporated by reference herein.

137.  The Stark Law, 42 U.S.C. § 1395nn, contains an exception allowing physicians to bill for in-office ancillary services furnished in the same building in which the referring physician or his or her group practice furnishes medical services, or in another building which is used by the group practice for the centralized provision of some or all of the group's Designated Health Services.  42 U.S.C. § 1395nn(b)(2)(A)(ii).

138.  The Stark Law specifically provides that the Secretary may expand but not limit the application of this exception.  42 U.S.C. § 1395nn(b)(2)(A).

139.  The Anatomic Pathology Prohibition in the Final Rule, by immediately applying the revised "anti-markup" regulation (42 C.F.R. § 414.50, revised November 27, 2007), requires physicians to bill at a loss for anatomic pathology testing services furnished in a "centralized building" which are in compliance with the in-office ancillary services exception.  The Final Rule and revised 42 C.F.R. § 414.50 thereby administratively eliminate this exception to the Stark Law for the Plaintiff Physician Groups in this case.

140.  Because it administratively eliminates this exception, the Final Rule and revised 42 C.F.R. § 414.50 are contrary to 42 U.S.C. § 1395nn(b)(2)(A)(ii), are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; and are in excess of statutory jurisdiction, authority or limitation, or short of statutory right.

141.  Accordingly, the Anatomic Pathology Prohibition in the Final Rule is unlawful and must be set aside pursuant to 5 U.S.C. § 706.

## COUNT V
### (Agency Rule Contrary to the Physician Fee Schedule Statute)

142. The allegations contained in paragraphs 1-141 and 151-155 are realleged and incorporated by reference herein.

143. The Physician Fee Schedule Statute requires the Secretary to develop a methodology for combining the work, practice expense, and malpractice expense national relative value units for each service in order to determine a single relative value for that service, which determines the fee schedule payments to be made. 42 U.S.C. § 1395w-4(c)(2)(A).

144. Congress specified that a physician's practice expense will include overhead expenses. 42 U.S.C. § 1395w-4(c)(1)(B).

145. The Final Rule, by applying the revised anti-markup rule (42 C.F.R. § 414.50, revised November 27, 2007), mandates that physicians who furnish anatomic pathology testing services in a "centralized building" are limited to the lower of: (1) the performing supplier's "net charge" to the billing physician or other supplier; (2) the billing physician or other supplier's actual charge; or (3) the fee schedule amount for the test. 73 Fed. Reg. at 404 (applying revised 42 C.F.R. § 414.50).

146. There is no "performing supplier" with respect to the Plaintiff Physician Groups who are plaintiffs in this case. Nevertheless, CMS intends to apply this "net charge" provision to the Plaintiff Physician Groups.

147. According to CMS, the "net charge" must be determined without including the physician's overhead expenses incurred when furnishing the Services. 42 C.F.R. § 414.50(a)(2)(i) (revised November 27, 2007).

148. The Secretary has no authority to depart from the Physician Fee Schedule Statute methodology, and instead require Plaintiff Physician Groups to bill Medicare for a lower "net charge" that does not include overhead expenses.

149. Consequently, the Anatomic Pathology Prohibition in the Final Rule, and revised 42 C.F.R. § 414.50, which purport to require physicians to bill at a loss and not receive the physician fee schedule amount, violate 42 U.S.C. § 1395w-4, are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; and are in excess of statutory jurisdiction, authority or limitation, or short of statutory right.

150. Accordingly, the Anatomic Pathology Prohibition in the Final Rule and 42 C.F.R. § 414.50 as revised on November 27, 2007, are unlawful and must be set aside pursuant to 5 U.S.C. § 706.

## <u>COUNT VI</u>
### (Agency Rule Contrary to Anti-Markup Statute)

151. The allegations contained in paragraphs 1-150 are realleged and incorporated by reference herein.

152. The statute granting CMS the authority to impose anti-markup regulations in certain instances expressly excludes from its scope diagnostic tests "performed or supervised by the billing physician or a physician with whom the billing physician shares a practice."  42 U.S.C. § 1395u(n)(1).

153. The Anatomic Pathology Prohibition and revised 42 C.F.R. § 414.50 extend the anti-markup prohibition to anatomic pathology diagnostic testing services performed in a "centralized building" by the Plaintiff Physician Groups even though those services are performed by the billing physician or a physician with whom the billing physician shares a practice.

154. The Secretary has no authority under the Anti-Markup Statute to extend the anti-markup rule to diagnostic tests performed by the billing physician or a physician with whom the billing physician shares a practice.

155. The Anatomic Pathology Prohibition, and 42 C.F.R. § 414.50 (as revised on November 27, 2007) are therefore contrary to 42 U.S.C. § 1395u(n), have been imposed by CMS without statutory authority, and are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; and are in excess of statutory jurisdiction, authority or limitation, or short of statutory right.

## **PRAYER FOR RELIEF**

Unless the Anatomic Pathology Prohibition in the Final Rule is declared invalid and set aside under the APA, and unless enforcement of it is enjoined by this Court, Plaintiffs will suffer irreparable injury.

WHEREFORE, the Plaintiffs respectfully request that the Court enter an Order:

1. Declaring that the portions of the Secretary's Final Rule (73 Fed. Reg. 404 (Jan. 3, 2008)), which purport to immediately apply the revised "anti-markup" rule (42 C.F.R. § 414.50, as revised on November 27, 2007) to anatomic diagnostic pathology services furnished in a "centralized building" as opposed to the "same building" ("the Anatomic Pathology Prohibition") are null, void, and of no effect;

2. Declaring that in the Final Rule the Secretary did not support the Anatomic Pathology Prohibition with a statement of factual findings and reasoning sufficient under 5 U.S.C. § 553(c) and § 706 to justify the Anatomic Pathology Prohibition, and that it is arbitrary, capricious, and not in accordance with law;

3. Declaring that the Anatomic Pathology Prohibition in the Final Rule was issued without the opportunity for public notice and comment, contrary to 5 U.S.C. § 553 and 42

U.S.C. § 1395hh, and that the Secretary's published reasons in the Final Rule for dispensing with public rulemaking are insufficient;

4.  Declaring that the Secretary's published reasons in the Final Rule for the absence of a delayed effective date are insufficient under 5 U.S.C. § 553;

5.  Declaring that the Final Rule was issued in violation of Regulatory Flexibility Act, particularly 5 U.S.C. § 604;

6.  Declaring that the Anatomic Pathology Prohibition and 42 C.F.R. § 414.50, as revised by the Secretary on November 27, 2007, are contrary to the Stark Law statute, 42 U.S.C. § 13953nn(b)(2)(A)(ii)(II);

7.  Declaring that the Anatomic Pathology Prohibition and 42 C.F.R. § 414.50, as revised by the Secretary on November 27, 2007, are contrary to and without authority under the Medicare Fee Schedule Statute, 42 U.S.C. § 1395w-4;

8.  Declaring that the Anatomic Pathology Prohibition and 42 C.F.R. § 414.50, as revised by the Secretary on November 27, 2007, are contrary to and without authority under the Anti-Markup Statute, 42 U.S.C. § 1395u(n);

9.  Enjoining Defendant from enforcing the Anatomic Pathology Prohibition in the Final Rule;

10. Ordering that the same delay granted in the Final Rule to other diagnostic services also be granted for anatomic pathology diagnostic services, no matter where performed;

11. Awarding Plaintiffs such other and further relief as the Court may deem just and proper.

Dated:  January 24, 2008                    Respectfully submitted,

                                            FULBRIGHT & JAWORSKI L.L.P


                                            By:   /s/ Dan M. Peterson
                                                Dan M. Peterson
                                                D.C. Bar No. 418360

                                                Wendy Butler Curtis
                                                D.C. Bar No. 475464
                                                Caroline Mew
                                                D.C. Bar No. 467354
                                                801 Pennsylvania Avenue N.W.
                                                Washington, D.C. 20004
                                                Telephone:  (202) 662-0200
                                                Facsimile:  (202) 662-4643
                                                Attorneys for Plaintiffs

                                                Greg A. Cardenas
                                                Byrne, Cardenas & Smitherman, LLP
                                                5400 LBJ Freeway, Suite 1325
                                                Dallas, TX 75240
                                                Telephone:  (972) 371-5264
                                                Facsimile:  (972) 371-5270
                                                Of Counsel

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Atlantic Urological Associates; Sam Michaels, M.D.; Rebecca Page; Urology Care, Inc.; Urology Center of Alabama, P.C.; Uropath, LLC | Michael O. Leavitt in his Official Capacity as Secretary, United States Department of Health and Human Services |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    88888 <br> (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____ <br> (IN U.S. PLAINTIFF CASES ONLY) <br> NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) <br><br> Dan M. Peterson <br> Caroline Mew <br> Wendy Butler Curtis <br> Fulbright & Jaworski LLP <br> 801 Pennsylvania Avenue, N.W. <br> Washington, DC 20004 <br> 202-662-0200 | ATTORNEYS (IF KNOWN) |
|---|---|

| II. BASIS OF JURISDICTION <br> (PLACE AN X IN ONE BOX ONLY) | III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!** |
|---|---|

II. BASIS OF JURISDICTION (PLACE AN X IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 3 Federal Question (U.S. Government Not a Party)
- ◉ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

| ○ A. *Antitrust* | ○ B. *Personal Injury/ Malpractice* | ○ C. *Administrative Agency Review* | ◉ D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane <br> ☐ 315 Airplane Product Liability <br> ☐ 320 Assault, Libel & Slander <br> ☐ 330 Federal Employers Liability <br> ☐ 340 Marine <br> ☐ 345 Marine Product Liability <br> ☐ 350 Motor Vehicle <br> ☐ 355 Motor Vehicle Product Liability <br> ☐ 360 Other Personal Injury <br> ☐ 362 Medical Malpractice <br> ☐ 365 Product Liability <br> ☐ 368 Asbestos Product Liability | ☒ 151 Medicare Act <br><br> **Social Security:** <br> ☐ 861 HIA ((1395ff) <br> ☐ 862 Black Lung (923) <br> ☐ 863 DIWC/DIWW (405(g) <br> ☐ 864 SSID Title XVI <br> ☐ 865 RSI (405(g)) <br> **Other Statutes** <br> ☐ 891 Agricultural Acts <br> ☐ 892 Economic Stabilization Act <br> ☐ 893 Environmental Matters <br> ☐ 894 Energy Allocation Act <br> ☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment. <br><br> *(If Antitrust, then A governs)* |

| ○ E. *General Civil (Other)* | OR | ○ F. *Pro Se General Civil* |
|---|---|---|

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General** ☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment** (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) *(If pro se, select this deck)* | ☐ **895 Freedom of Information Act** ☐ **890 Other Statutory Actions** (if Privacy Act) *(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans (excluding veterans)** |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act** ☐ **720 Labor/Mgmt. Relations** ☐ **730 Labor/Mgmt. Reporting & Disclosure Act** ☐ **740 Labor Railway Act** ☐ **790 Other Labor Litigation** ☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)** ☐ **443 Housing/Accommodations** ☐ **444 Welfare** ☐ **440 Other Civil Rights** ☐ **445 American w/Disabilities-Employment** ☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance** ☐ **120 Marine** ☐ **130 Miller Act** ☐ **140 Negotiable Instrument** ☐ **150 Recovery of Overpayment & Enforcement of Judgment** ☐ **153 Recovery of Overpayment of Veteran's Benefits** ☐ **160 Stockholder's Suits** ☐ **190 Other Contracts** ☐ **195 Contract Product Liability** ☐ **196 Franchise** | ☐ **441 Civil Rights-Voting (if Voting Rights Act)** |

**V. ORIGIN**

◉ **1 Original Proceeding**   ○ **2 Removed from State Court**   ○ **3 Remanded from Appellate Court**   ○ **4 Reinstated or Reopened**   ○ **5 Transferred from another district (specify)**   ○ **6 Multi district Litigation**   ○ **7 Appeal to District Judge from Mag. Judge**

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Claims for declaratory and injunctive Relief pursuant to 5 U.S.C. Sections 551 et seq. including 551, 553, 601 and 706

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ _N/A_   Check YES only if demanded in complaint   JURY DEMAND:   YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE _January 14, 2008_   SIGNATURE OF ATTORNEY OF RECORD _[signature]_

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.