**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ATLANTIC UROLOGICAL ASSOCIATES, P.A.; SAM MICHAELS, M.D.; REBECCA PAGE; UROLOGY CARE, INC.; UROLOGY CENTER OF ALABAMA, P.C.; and UROPATH, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:08-cv-00141-RMC |
| MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Services, | ) ) ) ) | |
| Defendant. | ) ) | |

**PLAINTIFFS' APPLICATION FOR PRELIMINARY
INJUNCTION AND REQUEST FOR EXPEDITED HEARING**

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs Atlantic Urological Associates, P.A.; Sam Michaels, M.D.; Rebecca Page; Urology Care, Inc.; Urology Center of Alabama, P.C.; and Uropath, LLC ("Plaintiffs"), hereby request an order preliminarily enjoining Defendant, Michael O. Leavitt in his Official Capacity as Secretary, United States Department of Health and Human Services, pending the hearing on the merits in this case.

Plaintiffs respectfully request that this Court enjoin the Secretary from enforcing that portion of the Final Rule published in the Federal Register on January 3, 2008 (73 Fed. Reg. 404) that permits or requires the application of the anti-markup rule in 42 C.F.R. § 414.50, as revised by the final rule published on November 27, 2007 (72 Fed. Reg. 66,222), to anatomic pathology diagnostic testing services furnished in a centralized building, as defined in the Stark Law (42 U.S.C. § 1395nn(b)(2)(A)), until trial on the merits of this case, or until further order of the Court.

70186718.1

Absent this relief, the Plaintiffs will suffer irreparable harm before a final decision can be rendered in this case. The Plaintiffs have no adequate remedy at law. A preliminary injunction maintaining the status quo ante is necessary to preserve the Court's power to render a meaningful decision on the merits of this case. The facts and law which form the basis for this motion are set forth in the Complaint and in the Statement of Points and Authorities accompanying this application.

Pursuant to Local Rule 65.1(d), Plaintiffs request an expedited oral hearing no later than 20 days after the filing of this Application. Expedition is essential because without a preliminary injunction the laboratories owned by the physician group plaintiffs will be forced to close, investments in these laboratories will be permanently lost, plaintiff Uropath's existing business will be destroyed, and 91 Uropath employees will lose their jobs. Without a preliminary injunction the medical practices of twelve pathologists will be destroyed or severely injured. For none of these injuries do Plaintiffs have any administrative remedy, and neither Defendant nor any other person is answerable in damages for these injuries. Consequently, the Plaintiffs request that this Court grant expedited hearing of this application for preliminary injunctive relief.

Pursuant to Local Rule 7(m), Dan M. Peterson, counsel for Plaintiffs, hereby certifies as follows: At 3:30 p.m. on Thursday, January 24, I spoke with Marcus Christ, an attorney with the HHS Office of General Counsel. I advised Mr. Christ of the nature of the Application for Preliminary Injunction to be filed by Plaintiffs. Mr. Christ said that he could not state whether Defendant would oppose the Application, and referred this question to Mark Polston of the HHS Office of General Counsel. Mr. Polston called me back at mid-day on Friday, January 25, and

stated that he would have to ask the agency, and at present could not state whether Defendant

would oppose this Application for Preliminary Injunction.

January 25, 2008                                        Respectfully submitted,

                                                       FULBRIGHT & JAWORSKI, L.L.P.


                                                        /s/ Dan M. Peterson_____
                                                       Dan M. Peterson
                                                       D.C. Bar No. 418360

                                                       Wendy Butler Curtis
                                                       D.C. Bar No. 475464
                                                       Caroline Mew
                                                       D.C. Bar No. 467354
                                                       801 Pennsylvania Avenue N.W.
                                                       Washington, D.C. 20004
                                                       Telephone:  (202) 662-0200
                                                       Facsimile:  (202) 662-4643
                                                       Attorneys for Plaintiffs

                                                       Greg A. Cardenas
                                                       Byrne, Cardenas & Smitherman, LLP
                                                       5400 LBJ Freeway, Suite 1325
                                                       Dallas, TX 75240
                                                       Telephone:  (972) 371-5264
                                                       Facsimile:  (972) 371-5270
                                                       Of Counsel

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ATLANTIC UROLOGICAL ASSOCIATES, P.A.; SAM MICHAELS, M.D.; REBECCA PAGE; UROLOGY CARE, INC.; UROLOGY CENTER OF ALABAMA, P.C.; and UROPATH, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Civil Action No. 1:08-cv-00141-RMC |
| | ) | |
| MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Services, | ) ) ) | |
| | ) | |
| Defendant. | ) ) | |

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION**

**SUMMARY OF CASE**

On January 3, 2008, the Secretary of Health and Human Services published without prior notice and comment a Final Rule (73 Fed. Reg. 404 (Jan. 3, 2008)) (Ex. 1) which, if not preliminarily enjoined by the Court, will immediately cause the destruction of the existing business of Plaintiff Uropath, LLC ("Uropath"), cause numerous physician owned laboratories to close, and cause extensive, irreparable harm to the other Plaintiffs in this case. Besides Uropath, the Plaintiffs are three urology physician group practices that own and operate pathology laboratories, a pathologist (Sam Michaels, M.D.) who provides medical services to laboratories owned by physician groups, and an employee of Uropath (Rebecca Page).

Uropath provides management services to 52 anatomic pathology laboratories that are owned and operated by urology physician practices including Plaintiffs Atlantic Urological

Associates, P.A., Urology Center of Alabama, P.C., and Urology Care, Inc. ("Plaintiff Physician Groups"). The Final Rule has selectively imposed a so-called "anti-markup" rule on anatomic pathology diagnostic testing services that are performed in a building that is separate from the main building in which the physician practice sees patients. The Final Rule requires that if the Plaintiff Physician Groups bill Medicare for testing services performed in their existing, Uropath-managed laboratories, which are in buildings that are separate from their clinical offices, they must do so at a rate that is certain to cause an actual monetary loss to the Plaintiff Physician Groups for every test they bill. Obviously, no medical practice can afford to bill for its services at a guaranteed loss.

The result is that, unless the relevant part of the Final Rule is enjoined, the Plaintiff Physician Groups will be forced to stop using their own labs for anatomic pathology testing for Medicare patients, and must begin sending specimens for Medicare patients to outside labs not owned by them. This will result in a drastic reduction in volume for the laboratories, which will therefore become uneconomical to operate. Of the 52 physician groups that operate Uropath-managed labs, many of the larger ones will seek to establish new labs on their main physician office premises. Smaller physician groups will be unable to establish their own, in-house labs due to cost and lack of volume, and will simply start sending tissue specimens to outside labs. As labs close and volume of business decline, pathologists who provide services to the existing labs will leave, and a downward spiral will occur in which Uropath's business will be destroyed, the physician groups will lose high quality patient care arrangements and be forced to close their labs at a loss, twelve pathologists will have their medical practices destroyed or severely injured, and 91 employees will lose their jobs with Uropath.

There are six principal reasons why the part of the Final Rule that is complained of is invalid and must be preliminarily enjoined.  These six reasons correspond to the six Counts in the Complaint:

1.     The Final Rule delayed for one year the implementation of a revised "anti-markup" rule (42 C.F.R. § 414.50), which was revised in November of 2007, (Ex. 2) and which would have originally applied to a broad class of diagnostic testing services.  This revised "anti-markup" rule requires physicians to bill Medicare at an actual loss for certain diagnostic services. But while deferring this onerous rule for most diagnostic testing services, the Final Rule immediately imposed the revised "anti-markup" provision on an extremely narrow class of services:  anatomic pathology diagnostic testing services that are performed in a building that is a "centralized building" but is not the "same building" in which the physician group's main practice is located ("Anatomic Pathology Prohibition").   In the Final Rule, the Secretary provided no facts or reasoned explanation to justify this arbitrary treatment.  In fact, the reasons articulated by the Secretary to delay application of the "anti-markup" rule for other types of diagnostic services (namely, disruption of patient care) apply to anatomic pathology diagnostic services as well, and the Secretary offered no explanation whatsoever why those reasons supporting delay did not also apply to anatomic pathology diagnostic services.

2.     The Final Rule was issued without public notice and comment rulemaking proceedings.  The application of the revised "anti-markup" rule to anatomic pathology diagnostic services performed in a "centralized building," while exempting all other services, is clearly a substantive rule.   The Secretary sought to avoid public notice and comment rulemaking by invoking the "good cause" exception in 5 U.S.C. § 553.  However, the reasons offered by the Secretary to support good cause all related to good cause for the <u>delay</u> granted for other types of

services.  None of the reasons even mentioned any purported good cause to impose the revised "anti-markup" rule solely and immediately on anatomic pathology services without public notice and comment proceedings.

3.      The Final Rule was issued without publishing a Regulatory Flexibility Analysis under 5 U.S.C. § 604 to ascertain the Final Rule's effect on small entities, and to ensure that adverse effects on small entities are minimized.  The Secretary stated that there would be no effect on small entities for which the revised "anti-markup" rule was <u>delayed</u>.  He failed to address the effect on small entities, such as Plaintiff Urology Care, Inc., for which the revised "anti-markup" rule was <u>actually and immediately imposed</u>, and has immediate harmful effects.

4.      The Physician Self-Referral Statute, commonly known as the Stark Law, 42 U.S.C. § 1395nn, prohibits physicians from ordering certain services (called Designated Health Services) for Medicare patients from entities with which the physician (or an immediate family member) has a financial relationship.  However, the Stark Law contains an express exception for services provided by a physician group in a "centralized building."    42 U.S.C. § 1395nn(b)(2)(A)(ii)(II).   The Final Rule is an attempt to administratively eliminate for anatomic pathology services that exception mandated by Congress, by the simple expedient of requiring billing for those services at an actual loss under revised 42 C.F.R. § 414.50, thereby making the exception unavailable.  The Secretary does not have the power to eliminate by administrative fiat a law passed by Congress.

5.      The revised "anti-markup" rule announced on November 27, 2007, and imposed on a limited class of services by the Final Rule, is a flagrant violation of the Medicare Fee Schedule Statute, 42 U.S.C. § 1395w-4.  That statute provides that Medicare must reimburse physicians according to a "fee schedule amount" which is published each year, and which is a

flat amount for each particular service.  The revised "anti-markup" rule substitutes an entirely novel, different way of calculating how physicians are to be reimbursed for anatomic pathology diagnostic services provided in a "centralized building."  Essentially, it requires those services, and those services only, to be "reimbursed" according to a vague scheme based on the physicians' costs.  It requires, in fact, that the physicians be "reimbursed" at less than their cost of providing the service, by eliminating the costs of office overhead.  That is a completely unjustified departure from the comprehensive, mandatory methodology that Congress has required be used, and in which defined, flat rate fee schedule amounts are impartially paid to all physicians and for all services.

6.    The "anti-markup" rule as revised on November 27, 2007, is utterly without authority under the statute that allows the Secretary to apply an anti-markup rule in limited instances.  The Anti-Markup Statute expressly excludes from its scope diagnostic tests "performed or supervised by the billing physician or a physician with whom the billing physician shares a practice."  The tests at issue in this case, however, are performed or supervised by the billing physician or a physician with whom the billing physician shares a practice, and the Anatomic Pathology Prohibition in the Final Rule, and revised 42 C.F.R. § 414.50 itself, are contrary to and without authority under the Anti-Markup Statute.

A court may enter an injunction to preserve the status quo until a trial on the merits can be held.  Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981).  In the case at bar, there will be no trial on the merits unless a preliminary injunction issues, because the physician group laboratories will be closed, Uropath's business will be destroyed, and there will be no judicial review.

## FACTS

Uropath assists professional urology physician practices in developing, implementing, managing and operating urology pathology laboratories. (See Compl. pp. 12-15.) Uropath currently has management agreements with 52 urology practices, including Plaintiffs Atlantic Urological Associates, P.A., Urology Center of Alabama, P.C., and Urology Care, Inc. (Decl. Flowers ¶ 6, Ex. 3; Decl. Sorrells ¶ 4, Ex. 4; Decl. Creggar ¶ 4, Ex. 5; Decl. Severance ¶ 3, Ex. 6.)

Uropath assists physician practices, usually physician group practices, in developing, constructing, equipping, and operating pathology laboratories. Uropath is not a Medicare provider or supplier, and does not itself perform or bill for any laboratory tests or interpretations. Instead, it provides managerial and operational expertise and efficiencies which permit a medical group practice to provide superior pathology services and better patient care. Uropath enters into a management agreement with each physician practice. The laboratories, which are an extension of, and are owned and controlled by, the physician practices, are located in four centers around the United States. These four centers are Leesburg, Florida; Sarasota, Florida; San Antonio, Texas; and Collegeville, Pennsylvania. (Decl. Flowers ¶ 4, Ex. 3.) See Ex. 7 for a brief description of these lab centers.

In these centers, multiple independently owned physician laboratories are established. Uropath leases the premises for these labs, and then subleases the space for the separate pathology laboratories to each Physician Group. All laboratory equipment, office equipment, supplies, and other tangible property for each physician practice's lab is owned by the physician practice. Each group practice independently contracts with a board certified pathologist, such as Plaintiff Dr. Sam Michaels, for the provision of professional medical services, including serving as Medical Director of the lab and providing interpretations of test results. The physician groups

also contract with Uropath for histotechnologists, cytotechnologists, medical technologists, lab administrators, lab assistants, clerical personnel and transcriptionists to work in their labs. Each group practice bills and collects for all pathology services that they provide in their Uropath-managed laboratories, including billing Medicare for services performed for Medicare patients. (Decl. Flowers ¶ 5, Ex. 3; Decl. DeGuenther ¶ 4, Ex. 8; Decl. Grable ¶ 5, Ex. 9; Decl. Severance ¶ 4, Ex. 6.)

Uropath-managed labs are limited to genitourinary ("GU") pathology. The vast majority of tests performed in the Uropath-managed labs are tissue examinations and interpretations stemming from prostate needle biopsies; these biopsies are billed to Medicare using CPT code 88305. The pathologists employed by the physician practices in Uropath-managed facilities are GU pathologists, often with specialized training or fellowships in that field. Even if the pathologists did not have prior specialized training, they quickly develop GU experience and expertise due to the large volume of needle biopsy specimens and other GU related specimens they review. (Decl. Flowers ¶¶ 8 and 10, Ex. 3; Decl. DeGuenther ¶ 6, Ex. 8.)

The labs are set up in compliance with a provision in the Stark Law, 42 U.S.C. § 1395nn, that specifically allows physician practices to bill for these services when performed in a separate "centralized building." (See Compl. pp. 7-9.) Until the Final Rule was published, the Plaintiff Physician Groups were reimbursed for these services under the physician fee schedule established by statute, which applies to all physician services. The fee schedule amount is a flat amount. It does not vary depending on whether the work is performed in a physician's office or in an outside lab. It does not vary depending on whether it is performed in the "same building" or a "centralized building." (See Compl. pp. 9-11.)

This all changed on January 3, 2008, when the Secretary published without notice and comment a final rule in the Federal Register (73 Fed. Reg. 404 (Jan. 3, 2008)), which became effective on January 1, 2008 ("Final Rule").  (See Compl. pg. 18-20.)  The Final Rule delayed the implementation for one year of a revised "anti-markup" regulation contained in a prior rule published on November 27, 2007 (the "Physician Fee Schedule Rule").  72 Fed. Reg. 66,222 (Nov. 27, 2007).  (See Compl. pp. 16-18.)[1]

The Final Rule singles out physician groups that provide anatomic pathology diagnostic testing services in laboratories that are located in a "centralized building," instead of the "same building" as the physicians' clinical offices, and without explanation or justification selectively imposes a revised "anti-markup" rule on them ("Anatomic Pathology Prohibition").  The revised "anti-markup" rule, 42 C.F.R. § 414.50, requires that the physician practice bill Medicare using an undefined "net charge" that is designed to and will make the physician practice lose money on each anatomic pathology diagnostic testing service performed for Medicare beneficiaries.  The Final Rule's effect in practice is to deny Medicare physician fee schedule reimbursement for arrangements such as those that exist for the three Plaintiff Physician Groups, and for the other 49 Uropath managed physician group laboratories, which are located in a "centralized building" apart from their clinical offices.  Thus, the Final Rule's effect is to put these physician group owned labs, and Uropath, out of business.

## STANDARD FOR INJUNCTIVE RELIEF

Four factors are considered when determining whether to grant a preliminary injunction: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between the harm to the movant if a preliminary injunction is denied and

---

[1] Previously, on July 12, 2007, CMS sought comments on whether CMS should have such a provision and, if so, how they should effect such a provision. (See Compl. pp. 15-16).

the harm to the non-movant if a preliminary injunction is granted; and (4) the impact a preliminary injunction would have on the public interest. Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (quoting CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).

The four factors should be balanced on a sliding scale, and a party can compensate for a lesser showing on one factor by making a very strong showing on another factor. CSX Transp., Inc. v. Williams, 406 F.3d 667, 670 (D.C. Cir. 2005). "An injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." CityFed Fin. Corp., 58 F.3d at 747. "[T]he test is a flexible one. Injunctive relief may be granted with either a high likelihood of success and some injury, or vice versa." Population Inst. v. Mcpherson, 797 F.2d 1062, 1078 (D.C. Cir. 1986); see also Stewart v. District of Columbia Armory Bd., 789 F. Supp. 402, 404 (D.D.C. 1992). Absolute certainty of success on the merits is not required for temporary relief:

> It will "ordinarily be enough that the Plaintiff raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation."

Ramirez v. United States Customs & Border Prot., 477 F. Supp. 2d 150, 155 (D.D.C. 2007) (citing Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc. 559 F.2d 841, 843 (D.C. Cir. 1977); see also Massachusetts Law Reform Inst. v. Legal Servs. Corp., 581 F. Supp 1179, 1184 (D.D.C.), aff'd, 737 F.2d 1206 (D.C. Cir 1984) ("In the event that the last three factors favor the issuance of an injunction, a movant can satisfy the first by raising a serious question on the legal merits of the case."); Serono Labs. v. Shalala, 158 F.3d 1313, 1318 (D.C. Cir. 1998) ("if the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak") (internal citations omitted).

Granting a preliminary injunction allows the court to maintain the status quo of the parties and preserves the court's ability to grant effective relief. Honeywell, Inc. v Consumer Prod. Safety Comm'n, 582 F. Supp. 1072, 1074 (D.D.C. 1984).

In sum, "5n order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant." Washington Metro. Area Transit Comm'n, 559 F.2d at 844.

## ARGUMENT

I.    **PLAINTIFFS HAVE RAISED SERIOUS QUESTIONS ON THE MERITS OF THE CASE.**

    A.    **The Secretary Has Not Provided Even A Minimally Adequate Statement Of Reasons For Imposing The Anatomic Pathology Prohibition Immediately While Deferring Application Of The Revised Anti-Markup Rule For All Other Services.**

The APA requires that an agency "shall incorporate in rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c). The recent rulemaking case of Maritel, Inc. v. Collins, 422 F. Supp. 2d 188, 195 (D.D.C. 2006), sets forth the standard employed to review the adequacy of the agency's rationale for a published rule:

> The APA entitles "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . to judicial review thereof." Under the APA, a reviewing court must set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." In making this inquiry, the reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." At a minimum, the agency must have considered relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made."

(Internal citations omitted). An agency action usually is arbitrary or capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  Maritel, 422 F. Supp. 2d at 195  (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also County of L.A. v. Shalala, 192 F.3d 1005, 1021 (D.C. Cir. 1999) ("Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action").

In the Final Rule, CMS stated that it was "delaying until January 1, 2009 the applicability of the anti-markup provisions in § 414.50, as revised at 72 Fed. Reg. 66222."  73 Fed. Reg. 404, 405 (Jan. 3, 2008).  It went on to state:

> Because anatomic pathology diagnostic testing arrangements precipitated our proposal for revision of the anti-markup provisions and remain our core concern, we are not delaying the date of applicability with respect to anatomic pathology diagnostic testing services furnished in space that:  (1) is utilized by a physician group practice as a "centralized building" (as defined at §411.351 of this chapter) for purposes of complying with the physician self-referral rules; and (2) does not qualify as a "same building" under §411.355(b)(2)(i) of this chapter.

Id.  The foregoing paragraph constitutes the entirety of the facts, findings, and reasoned explanation offered by CMS in support of carving out the Anatomic Pathology Prohibition. Thus, the sum of the justification offered by CMS for the Anatomic Pathology Prohibition is that these kinds of services "precipitated our proposal for revision of the anti-markup provisions and remain our core concern."  This naked assertion of "concern" is wholly insufficient to justify the exclusion of anatomic pathology diagnostic services provided in a centralized building from the delay that was granted to all other services, locations, and physician groups who provide diagnostic testing services in connection with their practice.

Why did CMS impose the revised "anti-markup" provision (which itself violates multiple statutes – <u>see</u> Parts I.D., I.E., and I.F., below) only on anatomic pathology diagnostic testing services while deferring application for all other services?  Why is anatomic pathology different from, say, radiology services?  CMS does not say.  It has not even attempted an explanation regarding why it treated these other diagnostic services differently.  "If an agency treats similarly situated parties differently, its action is arbitrary and capricious and in violation of the [Administrative Procedure Act]."  <u>Allergan, Inc. v. Shalala</u>, No. 94-1223, 1994 U.S. Dist. LEXIS 21716, at *10 (D.D.C. Nov. 10, 1994).

What is the agency's basis for imposing the revised anti-markup rule only on services performed in a "centralized building" which is not the "same building"?  The agency has provided no factual basis or rationale whatsoever, besides the bare assertion that they are, for some unstated reason, "concerned" about services in that location, whereas they are apparently not concerned about those services when performed in the "same building."  The services are the same no matter where they are performed; the economics are the same (except that services in a "centralized building" might actually be more efficient); and the fee schedule amount mandated by Congress is also the same.  CMS provided no explanation at all in the Final Rule why identical services should be treated differently, just because they are provided in a different building.  As stated in <u>Bracco Diagnostics, Inc. v. Shalala</u>, "Our court of appeals has repeatedly held that 'an agency must treat similar cases in a similar manner unless it can provide a legitimate reason to do so.'" 963 F. Supp. 20, 27-28 (D.D.C. 1997) (citing <u>Independent Petroleum Association of America v. Babbitt</u>, 92 F.3d 1248, 1258 (D.C. Cir. 1996)).

It is not so much that CMS has failed to articulate "an explanation establishing a 'rational connection between the facts found and the choice made.'"  <u>Maritel</u>, 422 F. Supp 2d at 195.

Instead, it has entirely "failed to provide a reasoned explanation" at all.  L.A. v. Shalala, 192 F.3d at 1021.

Not only did CMS utterly fail to cite any evidence or engage in any reasoned explanation for singling out anatomic pathology diagnostic testing services performed in a "centralized building," it blatantly contradicted its own reasoning in the discussion of the Physician Fee Schedule Rule that produced the revised "anti-markup" rule just a little more than a month before.  In the discussion of comments in the November 27, 2007, Physician Fee Schedule Rule, CMS explicitly rejected a proposal to apply the "anti-markup" provisions exclusively to gastroenterology, dermatology and urology physician group practices that order pathology tests. Instead, CMS stated that "making the rule applicable to all suppliers ensures fair and equitable treatment among types of suppliers . . ."  See 72 Fed. Reg. at 66,309.  However, in the Final Rule, CMS abandoned this position and imposed the "anti-markup" provision only on a narrow class of services never before proposed.

An agency's action must be upheld, if at all, "on the basis articulated by the agency itself."  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50, (1983). Although the revised "anti-markup" rule was the product of a rulemaking proceeding in which a supposed risk of overutilization of diagnostic services by physicians was discussed, CMS did not even mention overutilization as a basis for singling out anatomic pathology diagnostic testing services in the Final Rule.  It is worth mentioning, moreover, that alone among physician provided pathology services, the anatomic pathology services provided in Uropath-managed labs have been found by government audits to be entirely medically necessary—that is, there is actual proof of no overutilization.

In its 2005 Work Plan, the Office of Inspector General of the Department of Health and Human Services ("OIG") announced that it would perform audits of "pathology services performed in physicians' offices." (Ex. 10) The Office of Audit Services of the OIG thereafter performed audits of physician owned, Uropath-managed pathology laboratory in each of the geographic locations where Uropath then managed pathology laboratories (Leesburg, FL; Sarasota, FL; San Antonio, TX). (Decl. Flowers ¶ 15, Ex. 3.)

In each audit, the OIG found that medical necessity was clearly established for either nearly 100%, or actually 100%, of the biopsies taken and processed by the physician groups' laboratories. For Plaintiff Atlantic Urological Associates ("AUA"), the OIG selected a random sample of 100 Medicare claims that had been paid during calendar year 2004, after establishment of AUA's Uropath-managed lab. (Ex. 11). Working with a Medicare Program Safeguard Contractor ("PSC"), the OIG found that medical necessity was established for 96 of the 100 sample claims. For the remaining four claims the PSC could not "rule out" the appropriateness of the biopsy and the OIG therefore did not recommend that these claims be denied. (Ex. 11).

A similar OIG audit relating to Florida Urology Physicians, P.A., was also performed of its laboratory in Sarasota. (Ex. 12). The OIG examined 51 paid claims for the period September-December 2004, which was the period immediately after the physician group had established its Uropath-managed lab. (Ex. 12). The stated purpose of the review was to determine "whether the pathology services billed for were reasonable, necessary, and in accordance with Medicare Part B requirements." (Ex. 12). Again, working with a PSC, the OIG report found that medical necessity for the biopsy procedure was established for 100% of the 51 claims reviewed. (Ex. 12).

The OIG also audited the lab operated by Urology Tyler, P.A., for the period May-December 2004, the period immediately following the opening of that group practice's lab in San Antonio. (Ex. 13). The OIG, again working with a PSC, reviewed a random sample of 100 paid claims during this period to determine "whether pathology services were reasonable, medically necessary, and supported by adequate documentation." (Ex. 13). The report found that the physician group's "claims for pathology laboratory services generally complied with Medicare Part B medical necessity and documentation requirements for 99 of 100 reviewed claims." (Ex. 13). The sole exception was for a claim that was improperly billed and paid due to a clerical error, which was corrected during the audit. (Ex. 13).

Thus, for all three laboratories audited, medical necessity was established to a remarkably high level, thus indicating no overutilization with respect to the number of patients biopsied. In all three reports, the OIG made no recommendations whatsoever. Instead, the labs were found to be in compliance with Medicare Part B requirements.[2]

These reports were known to CMS during its formulation of the revised "anti-markup" rule in the fall of 2007. See 72 Fed. Reg. at 66,312. CMS also considered several other studies that purported to support the contention that physician ownership of diagnostic test providers can lead to overutilization. See id. at 66,311. These studies, however, were not limited to anatomic pathology services and did not investigate whether a particular building location caused

---

[2] The OIG noted a purported increase at all three labs in the number of "units per claim" after the labs opened. See, e.g., Ex. 11 regarding Plaintiff Atlantic Urological Associates, P.A. However, as discussed in some detail in the Declaration of Michael Grable, M.D. (Ex. 9), these audits took place at the time when the "12 core" prostate biopsy was becoming a nationwide standard (up from the previously accepted "sextant" or six core biopsy). According to CMS data, the number of prostate biopsy codes (CPT Code 88305) rose by 62% between 1995 and 2004, probably reflecting the increased number of cores being sampled. (Ex. 14.) In his Declaration Dr. Grable discusses a number of medical articles that show increased cancer detection by a 12 core biopsy, and the fact that it is becoming a national standard. (Exhibits 15, 16. See also Exhibits 17 and 18 discussed in Dr. Grable's Declaration.) As noted in paragraph 7 of Dr. Grable's Declaration, both the American Cancer Society and the American Urological Association recognize that most physicians will now take approximately twelve cores for a prostate biopsy. See Exhibits 19 and 20. For none of the three group practices audited did the average number of units per claim exceed twelve, and the OIG made no recommendations on this subject.

overutilization.  See id.  As such, any connection between these studies and CMS's decision to impose an "anti-markup" prohibition solely upon anatomic pathology services performed in a "centralized building" is dubious.  If anything, this data argues for imposing the "anti-markup" rule upon all diagnostic testing services that are self-referred.  Instead, CMS got it backward, choosing to impose the "anti-markup" rule on a select group of physician services without citing a shred of proof in the Final Rule that different treatment was warranted.  Because the agency's decision to single out these services is not moored to any concrete evidence, the Final Rule's Anatomic Prohibition is arbitrary and capricious.

There is copious additional data to show that overutilization (that is, the performance of unnecessary biopsies) does not occur at the physician owned labs managed by Uropath.[3]  This data includes the following:

- A recently published study of data regarding 10,429 Medicare beneficiaries found that the positive biopsy rate for cancer was 32%.  However, data collected by Uropath shows that for Plaintiff Atlantic Urology Associates the positive biopsy percentage in 2006 was 48%, and the same study showed that for all physician groups with labs managed by Uropath, the positive biopsy rate for the groups combined was 40.9%.  (Decl. Grable ¶ 11, Ex. 9.)

- Data collected by Uropath shows that the special stain rate for both AUA's pathologist and for Uropath-managed labs as a whole is well below the industry standard.  (Decl. Grable ¶ 15, Ex. 9; Ex. 21.)  Because special stains are a separate billable code under Medicare, this improvement in interpretations saves patients and third party payers (including Medicare) the added costs resulting from higher special stain rates.  (Decl. Grable ¶ 15, Ex. 9.)[4]

---

[3] For fuller discussion of the data supporting the absence of overutlization, see Decl. Grable ¶¶ 11, 15, 19-20; Ex. 9; Ex. 22; Ex. 21; and Ex. 23.

[4] Uropath-managed laboratories also save Medicare money because, in general, its laboratories are located in low cost areas in which the Medicare Fee Schedule, adjusted for geographical differences, produces a lower Medicare reimbursement to those laboratories.(Flowers Decl. ¶ 23 Ex. 3; Ex. 25).

- Data gathered in the summer of 2007 shows that, for a substantial number of physician practices with Uropath-managed labs, the percentage of patients who were biopsied actually <u>decreased</u> for these groups combined in the years after they opened their own laboratories.  (<u>See</u> Decl. Page ¶ 11, Ex. 24; Ex. 22.)

- A study conducted at Urology Associates of North Texas ("UANT"), a very large urology specialty practice located in the Dallas/Fort Worth area, reveals that, after UANT established its Uropath-managed lab on January 1, 2003, the ratio of biopsies to the number of men seen in the practice who are over 50 years of age; who have selected diagnosis codes indicating prostate cancer, enlarged prostate, or potential prostate cancer; or who are over 50 years of age and also have such diagnosis codes, actually <u>decreased</u> substantially.  (<u>See</u> Decl. Grable ¶ 19, Ex. 9; Ex. 23.)

- A study conducted at Urology San Antonio shows a significant decline in the number of biopsies per 1,000 patient visits after the physician group started its Uropath-managed lab.  (<u>See</u> Decl. Grable ¶ 20, Ex. 9; Exhibit 23.)

In the Final Rule, CMS recognizes that application of the revised "anti-markup" rule may result in disruption of patient care and that the definition of "office of the billing physician or other supplier" may "not be clear" and may have "unintended consequences."  73 Fed. Reg. at 405.  As a result, in order to study the issues further, CMS states that it is delaying the application of revised § 414.50 for one year.  In the interim, it plans to issue clarifying guidance as to what constitutes the "office of the billing physician or other supplier," propose additional rulemaking, or both.  <u>Id.</u>

Once again, this is an arbitrary and nonsensical position.  CMS is requiring Plaintiff Physician Groups to provide pathology services at a guaranteed loss for Medicare patients simply because their lab is in a separate building, which will result in closure of those labs. CMS states that it will issue clarifying guidance or engage in additional rulemaking, presumably

before January 1, 2009.  Thus, physician groups who are trying to establish their own lab in a manner that will meet the "office of the billing physician or other supplier" rule find themselves (having lost their existing lab) trying to establish new arrangements under a definition that CMS admits it will probably change or reinterpret.  Suppliers of other types of diagnostic services can simply wait and see what CMS does in this regard.  But physician groups who must change their arrangements now, make investments, and enter into contracts, are left to guess whether the current unclear definition of "office of the billing physician or other supplier" will remain as it is, will change drastically, or will never be applied by CMS at all.  Plaintiff Uropath is also denied the opportunity to participate in any further rulemaking related to the anti-markup rule because the Anatomic Pathology Prohibition guarantees that Uropath will be forced out of business in short order.  (Decl. Flowers ¶¶ 27 and 30, Ex. 3.)

### B.     The Final Rule Was Promulgated Without Public Notice And Comment As Required By 5 U.S.C. § 553.

Section 553 of the APA prescribes the general notice and comment procedures an agency must follow when promulgating a rule.  As set forth in § 553(c):

> the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

As CMS noted in the Final Rule, notice and comment rulemaking is "not required . . . if the rule is interpretive or procedural…."  73 Fed. Reg. 405.  However, CMS did not contend that the Final Rule was interpretive or procedural.

The Final Rule is obviously not "procedural" within the meaning of 5 U.S.C. § 553(b)(3)(A); that is, it is not a rule of "agency organization, procedure, or practice."

Similarly, it is clearly not an interpretive rule.  An interpretive rule is one that is "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers."  <u>GCI Health Care Ctrs. v. Thompson</u>, 209 F. Supp. 2d 63, 68 (D.D.C. 2002); <u>see also</u> <u>General Motors Corp. v. Ruckelshaus</u>, 742 F.2d 1561, 1565 (D.C. Cir. 1984) ("an interpretive rule simply states what the administrative agency thinks the statute means….").

The Final Rule is quite clearly a substantive rule.  A substantive rule "implements" a statute and has the "force and effect of law."  <u>GCI Health Care Ctrs.</u> 209 F. Supp. 2d at 68 (internal citation omitted).  Substantive rules "grant rights, impose obligations, or produce other significant effects on private interests" or "effect a change in existing law or policy."  <u>Beverly Health & Rehab. Servs. v. Thompson</u>, 223 F. Supp. 2d 73, 99 (D.D.C. 2002) (internal citations omitted).

The Final Rule has the force and effect of law, imposes obligations, effects a change in existing policy, and produces significant effects on private interests.  It creates two distinct categories of services and locations.  Those covered by the Anatomic Pathology Prohibition will not be able to bill and receive the Medicare physician fee schedule amounts; all others will.  In the words of the special Medicare rulemaking statute, the Final Rule directly changes "a substantive or legal standard governing" the "payment for services" under the Medicare program.  <u>See</u> 42 U.S.C. § 1395hh(a)(2).  Thus, this is the kind of rule that must be promulgated through notice and comment rulemaking.

> The Court of Appeals for the District of Columbia Circuit has interpreted the APA notice requirements to serve three basic purposes. First, the notice-and-comment procedure improves the quality of agency rulemaking by testing proposed rules through exposure to public comments. Second, the notice requirements provide an opportunity to be heard, which is basic to fundamental fairness. Third, notice and comments allow affected parties to develop a record of objections for judicial review.

United Church Bd. for World Ministries v. SEC, 617 F. Supp. 837, 839 (D.D.C. 1985) (internal citation omitted).  The basis and purpose statement serves the primary function of permitting the courts to scrutinize "why and how the regulations were actually adopted."  Amoco Oil Co. v. EPA, 501 F.2d 722, 739 (D.C. Cir. 1974).

In addition, the APA requires publication or service of a substantive rule be made not less than 30 days before its effective date.  5 U.S.C. § 553(d).  CMS published the Final Rule on January 3, 2008, announcing an effective date of January 1, 2008, two days prior.  Not only were Plaintiffs provided no advance notice, by the time the rule was published it had been in effect for two days.

5 U.S.C. § 553 contains a very limited exception to the requirement for notice and comment.  An agency may suspend general notice and comment procedures if the agency "for good cause finds (and incorporates the finding and a brief statement of reasons therefore in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b)(3)(B).

CMS did not base its implementation of the Final Rule without notice and comment and without a delayed effective date on a contention that the Final Rule was procedural or interpretive.  73 Fed. Reg. at 405.  Instead, CMS simply stated that "[o]ur implementation of this action without opportunity for public comment and without a delayed effective date is based on the good cause exceptions in 5 U.S.C. § 553(b)(3)(B) and (d), respectively."  Id.  It asserted that seeking public comment on this action was "impracticable and contrary to the public interest."  Id.

The agency's burden for showing good cause is a heavy one.  As stated in Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutrition Serv., 416 F. Supp. 2d 92, 104-105 (D.D.C. 2006):

> Agency attempts to avoid the notice and comment procedure under the APA are closely scrutinized.  See New Jersey Dept. of Environmental Protection v. EPA, 200 U.S. App. D.C. 174, 626 F.2d 1038, 1045 (D.C. Cir. 1980) (holding that exceptions under § 533 must be "narrowly construed and only reluctantly countenanced" in order to assure that "an agency's decisions will be informed and responsive"); Asiana Airlines et al., v. Federal Aviation Administration, 134 F.3d 393, 396 (D.C. Cir. 1998) ("we have looked askance at agencies' attempts to avoid the standard notice and comment procedures"); Council of the Southern Mountains v. Donovan, 653 F.2d 573, 580 (D.C. Cir. 1981) (noting that the court had "recently admonished agencies that circumstances justifying reliance on [the good cause exception] are indeed rare and will be accepted only after the court has examined closely proffered rationales justifying the elimination of public procedures").  In fact, "just because the agency itself adopted the requirements of section 553(b) and (c). . . does not mean that it may follow the procedure arbitrarily, or use good cause to manipulate the procedures to its own uses."  Alcaraz v. Block, 746 F.2d 593, 612 (9th Cir. 1984).

CMS contended that seeking public comment on the Final Rule is "impracticable and contrary to the public interest" because:

> patient access for common diagnostic tests may be significantly disrupted unless we delay the effective date of revised § 414.50, except with respect to anatomic pathology diagnostic testing services.

73 Fed. Reg. at 405-406.[5]

The 42 Uropath-managed labs provide over 400,000 test results to tens of thousands of patients per year.  The physicians who use those labs believe that they provide outstanding, high quality patient care, for a host of reasons.  (Decl. DeGuenther ¶¶ 5-9, Ex. 8; Decl. Flowers ¶ 35,

---

[5]  CMS issued a correction notice on January 15, 2007, effective January 1, 2008, changing the phrase "revised Sec. 414.50 with respect to . . ." to read "revised Sec. 414.50 except with respect to. . ."  See 73 Fed. Reg. 2433 (Ex. 26). We have inserted the word "except" into the above quote to reflect CMS's correction.

Ex. 3; Decl. Sorrells ¶ 17, Ex. 4; Decl. Severance ¶¶ 5 and 12, Ex. 6.)  CMS made no finding

regarding why the harm to patient care that would occur for all other services would not also

occur for anatomic pathology services.  There may have been good cause for delay for all other

services; CMS did not also even attempt to offer a reason under the good cause exception as to

why it should not also be delayed for anatomic pathology services furnished in a centralized

building.

       With regard to good cause found for dispensing with the delayed effective date pursuant

to 5 U.S.C. § 553(d), CMS stated only that if it did not make the delay for all other services

effective immediately, "patient care may be significantly disrupted during the interim period

between the issuance of the rule and a delayed effective date."  73 Fed. Reg. at 406.  CMS made

no finding whatsoever regarding the effect of immediate application of the anti-markup rule on

anatomic pathology services furnished in a centralized building.  It provided no reason or

rationale regarding why the same disruptive effect would not occur immediately for anatomic

pathology diagnostic services as for other services.  It made no analysis at all regarding the effect

on physician groups, patients and others who would be affected by the immediate imposition of

the anti-markup rule, but instead addressed only the effects on those who would be <u>exempted</u>

from the rule.

### C.      The Final Rule Violates The Regulatory Flexibility Act

       The Secretary failed to satisfy the requirements of the Regulatory Flexibility Act

("RFA"), 5 U.S.C. § 601 <u>et seq.</u>, in promulgating the Final Rule.  5 U.S.C. § 604 requires, <u>inter</u>

<u>alia</u>, that the Secretary's regulatory flexibility analysis shall contain a "description of and an

estimate of the number of small entities to which the rule will apply or an explanation of why no

such estimate is available."  5 U.S.C. § 604(a)(3).  The agency must also describe "the steps the

agency has taken to minimize the significant impact on small entities . . . including a statement of

the factual, policy and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."   5 U.S.C. § 604(a)(5).   Small entities that are adversely affected by final agency action, including plaintiff Urology Care, Inc., may challenge the agency's failure to comply with the RFA through an APA lawsuit.  See 5 U.S.C. § 611(a).[6]

Although the Secretary did publish such an analysis in connection with the November 27 rule, acknowledging that small entities would be affected by the Physician Fee Schedule Rule, 72 Fed. Reg. at 66,388, there was no discussion regarding a rule that would apply only to anatomic pathology services furnished in a centralized building.  That is because CMS expressly rejected any rule that would apply only to one medical specialty such as pathology.  72 Fed. Reg. at 66,309.

The Final Rule itself did not contain a Regulatory Flexibility Analysis.  The Secretary also failed to provide a valid certification in the January Final Rule which would excuse the Secretary from his duties under the RFA.  The Regulatory Flexibility Act excuses the Secretary from providing an initial or final Regulatory Flexibility Analysis if the Secretary publishes a certification in the Federal Register that the rule will not have a significant economic impact on a substantial number of small entities, along with a statement providing the factual basis for such certification.  5 U.S.C. § 605(b).

In the January Final Rule, the Secretary summarily stated:  "We do not believe that this delay in the date of applicability will result in any significant economic impact on any small

---

[6] Urology Care, Inc. is a  "small entity" under the RFA.  The RFA defines "small entities" to include "small businesses" and "small organizations,"  5 U.S.C. § 601(6), and defines "small business" to have the same meaning as "small business concern" under the Small Business Act,  5 U.S.C. § 601(3).   Size standard regulations promulgated pursuant to the Small Business Act provide that offices of physicians with annual receipts of less than $9.0 million dollars qualify as "small business concerns."  See 15 U.S.C. § 632; 13 C.F.R. § 121.201 (subsector 621).  Urology Care, Inc. is a physician practice with annual receipts of less than $9.0 million dollars.  (Decl. Severance ¶ 2, Ex. 6.)

entity.  Until January 1, 2009, the majority of billing suppliers affected by the revised § 414.50 do not have to comply with the revised requirements in § 414.50."  73 Fed. Reg. at 406.  The Secretary's truncated analysis in the Final Rule is backwards—the impact to be addressed is not the impact on small entities that will <u>not</u> be adversely affected by the regulatory action, but on the small entities, such as Plaintiff Urology Care, Inc., that <u>will</u> be affected by imposing an anti-markup rule on anatomic pathology diagnostic testing services in a "centralized building."  The Secretary's statement is wholly insufficient for purposes of 5 U.S.C. § 605(b), and therefore the Secretary has "totally failed to comply" with the RFA.  <u>Nat'l Ass'n of Psychiatric Health Sys. v. Shalala</u>, 120 F. Supp. 2d 33, 44 (D.D.C. 2000).

### D.    The Final Rule Is Contrary To The Stark Law

The Stark Law provides that if a physician has a financial relationship with an entity: (1) the physician may not make a referral to the entity for the furnishing of Designated Health Services (which include anatomic pathology services) paid for by Medicare or Medicaid, and (2) the entity may not bill Medicare or Medicaid for Designated Health Services furnished pursuant to a prohibited referral, unless the financial relationship fits within an exception to the Stark Law.  <u>See</u> 42 U.S.C. § 1395nn(a)(1).  The Plaintiff Physician Groups are able to provide and bill for pathology services provided in their own laboratories because they comply with the Stark Law's "in-office ancillary services exception," 42 U.S.C. § 1395nn(b)(2), which covers Designated Health Services (including pathology, radiology, and other diagnostic testing services, as well as clinical laboratory services) furnished by a physician in his or her office.  42 U.S.C. § 1395nn(b)(2).

In order to qualify for this exception, the referring physician, or another physician in the same group practice, must either perform or directly supervise the performance of the service.  42 U.S.C. § 1395nn(b)(2)(A)(i).  In addition, the exception mandates that the service must be

furnished either:  (1) "in a building in which the referring physician (or another physician who is a member of the same group practice) furnishes physicians' services unrelated to the furnishing of designated health services"; or (2) ". . . in another building which is used by the group practice for the centralized provision of the group's designated health services (other than clinical laboratory services)."  42 U.S.C. § 1395nn(b)(2)(A)(ii) (emphasis added).  CMS has interpreted the statutory exception to require that Designated Health Services be furnished in either:  (i) a building in which the referring physician (or another physician who is a member of the same group practice) furnishes physicians' services unrelated to the furnishing of designated health services or (ii) "a centralized building that is used exclusively by the group practice for the provision of some or all of the group's Designated Health Services (other than clinical laboratory services)."  42 C.F.R. § 411.355(b).  CMS defines a "centralized building" as "all or part of a building that is owned or leased on a full-time basis (that is, 24 hours a day, 7 days a week, for a term of not less than 6 months) by a group practice and that is used exclusively by the group practice."  42 C.F.R. § 411.351.  The Uropath-managed, physician owned laboratories at issue in this case comply with the "centralized building" requirement of this exception.

At no time did Congress grant CMS the authority to limit the scope of the Stark Law's Congressionally-mandated exception for in-office ancillary services.  To the contrary, the Stark Law specifically provides that the Secretary may expand but not limit the application of this exception. 42 U.S.C. § 1395nn(b)(2)(A). The Final Rule, however, administratively limits this exception by applying the revised anti-markup rule (42 C.F.R. § 414.50) to anatomic pathology services performed in a "centralized building".

Although the revised anti-markup provision does not explicitly amend the Stark in-office ancillary services exception, it effectively prohibits physicians from billing Medicare for

anatomic pathology services provided in a "centralized building," by requiring these providers to bill at a "net charge" for the service that cannot include costs of overhead such as the cost of equipment and the space where the service takes place.  By requiring physicians to bill at a loss, it is not possible for physicians to provide such services. (Decl. Creggar ¶¶ 6 and 9, Ex. 5.; Decl. Sorrells ¶¶ 7 and 10, Ex. 4.; Decl. Grable ¶ 22, Ex. 9; Decl. Severance ¶¶ 6 and 7, Ex. 6.; Decl. DeGuenther ¶ 10, Ex. 8.)

In order for Physician Group Plaintiffs to continue to perform these services without losing money, they must either immediately relocate their technologists and diagnostic testing equipment in their:  (1) "office space"; or (2) in a "same building," as this term is defined in the Stark Law regulations.  See 73 Fed. Reg. at 404.  It follows, then, that the Secretary has eliminated the availability of the "centralized building" in satisfying the in-office ancillary services exception for anatomic pathology.  In so doing, he has exceeded his statutory authority by unlawfully narrowing this exception. "Courts can defer to the exercise of administrative discretion on internal management matters, but they cannot abdicate their responsibility to insure compliance with congressional directives setting the limits on that discretion."  See Aid Ass'n for Lutherans v. United States Postal Serv., 321 F.3d 1166, 1173 (D.C. Cir. 2003) (quoting Nat'l Ass'n of Postal Supervisors v. United States Postal Serv., 602 F.2d 420, 432 (D.C. Cir. 1979)).

### E.    The Final Rule Is Contrary To The Physician Fee Schedule Statute

The Physician Fee Schedule Statute requires that fee schedule amount payments be based, in part, on the service's "practice expense component," which includes expenses such as office rent and wages of personnel.  42 U.S.C. § 1395w-4(c)(1)(B).  The new anti-markup rule, however, does not allow for a physician's overhead expenses to be included in the "net charge."

Under the anti-markup regulation as revised on November 27, 2007, physicians who furnish anatomical pathology testing services in a "centralized building" are limited to the lower

of: (1) the performing supplier's "net charge" to the billing physician or other supplier; (2) the billing physician or other supplier's actual charge; or (3) the fee schedule amount for the test that would be allowed if the performing supplier billed directly. 42 C.F.R. § 414.50(a)(1). The "net charge" must be determined without regard to the cost of space or equipment leased to the performing supplier by or through the billing supplier. 42 C.F.R. § 414.50(a)(2)(i). CMS has explicitly stated that a billing supplier who furnishes a service subject to the revised anti-markup provision will not be able to recoup its overhead expenses related to furnishing the service. See 72 Fed. Reg. at 66,319.

Because physicians billing for anatomic pathology services are prohibited from including their overhead expenses in the "net charge" for performing the service, it is certain that the "net charge" for the service will be the lowest of the three reimbursement amounts. Id. Thus, the anti-markup rule forces them to bill in a manner that does not factor in the physician group's "practice expenses" associated with providing the anatomic pathology service.

Such a result is contrary to the Physician Fee Schedule Statute. This statute does not provide the Secretary with the discretion to exclude the practice expense component (i.e. reimbursement for overhead expenses such as space and equipment) from a physician's Medicare reimbursement. Nor does it authorize the Secretary to establish some new "net charge" method of reimbursement. Instead, it requires all physicians' services to be reimbursed by Medicare at the lower of: (1) the physician's actual charge for the service; or (2) the amount determined under the physician fee schedule ("fee schedule amount"). 42 U.S.C. § 1395w-4(a)(1). The revised "anti-markup" rule is utterly without authority, and directly contrary to the Physician Fee Schedule Statute.

### F.     The Final Rule Violates The Anti-Markup Statute

The Anti-Markup Statute, as stated above, excludes diagnostic tests that are performed personally by, or supervised by, the billing physician or another physician "with whom the billing physician shares a practice" from the anti-markup prohibition.     See 42 U.S.C. § 1395u(n)(1) (emphasis added).   Accordingly, prior to the enactment of the Final Rule, the anti-markup rule, 42 C.F.R. § 414.50,  prohibited the markup of only the technical component of tests that the billing physician purchased from an outside supplier.   The anti-markup rule did not apply to pathology services performed by a group practice in a Uropath-managed lab because the technical components of these diagnostic tests are supervised by a pathologist who "shares a practice" with the referring physician.

Under the Final Rule, however, the Anatomic Pathology Prohibition prohibits a billing physician from receiving the fee schedule amounts for the professional or technical component of anatomic pathology diagnostic testing services performed in a "centralized building," and applies this prohibition regardless of whether the physician group provides the service itself or uses an outside supplier.   See 73 Fed. Reg. at 404.   The Prohibition results in a bizarre scenario in which the billing physician practice is forced to attempt to calculate a "net charge" for the diagnostic test.   CMS's concept of a "net charge" is a misnomer.   In billing Medicare for lab tests, physician practices with Uropath-managed labs do not "mark up" some charge made to them by Uropath or an outside supplier.   Instead, they simply perform the work in their own lab, incurring costs for the services of the pathologist, technicians, and other personnel; management fees; costs for space, equipment, and supplies; and other costs of operation.   They then bill Medicare and receive the same fee schedule amount as any other physician group or outside lab would receive.   In short, there is no "net charge" from a "performing supplier" for these physician groups to "mark up."

The Anti-Markup Statute does not empower the Secretary to extend the anti-markup rule and limit reimbursement in such a manner. The Plaintiff Physician Groups do not use other suppliers to furnish anatomic pathology diagnostic testing services. Instead, they provide these services in their own laboratories and with their own equipment, using their own board-certified pathologists to both supervise the test and perform the test's interpretation. (Decl. Grable ¶ 4, Ex. 9; Decl. Michaels ¶ 3, Ex. 27; Decl. Severance ¶¶ 2 and 5, Ex. 6; Decl. DeGuenther ¶ 3, Ex. 8; Decl. Creggar ¶ 4, Ex. 5; Decl. Flowers ¶ 10, Ex. 3; Decl. Sorrells ¶ 4, Ex. 4.) These pathologists undoubtedly "share a practice" with the referring physician. Therefore, the plain language of the Statute exempts these services from the anti-markup rule.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IF THE ANATOMIC PATHOLOGY PROHIBITION IS NOT PRELIMINARILY ENJOINED.

The injury to [Plaintiffs] is "substantial, imminent, directly related to [the Secretary's] actions, and irreparable beyond mere recoverable monetary loss." Housing Study Group, 736 F. Supp. at 331. The Secretary is not answerable in monetary damages for Plaintiffs' irreparable harm. See Wheedlin v. Wheeler, 373 U.S. 647 (1963). Thus, the harm to the Plaintiffs and others cannot be redressed by a later suit for damages. Only the issuance of a preliminary injunction will prevent this certain and irreparable harm to the Plaintiffs.

### A.    Uropath's Existing Business And Dr. Sam Michaels' Professional Medical Practice Will Be Destroyed

The D.C. Circuit, among other courts, has held that the destruction of a business is irreparable harm sufficient to warrant the granting of injunctive relief. Griffith v. Ramsey, 06-01223, 2006 U.S. Dist. LEXIS 58151, *3-4 (D.D.C. 2006); Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977); Perpetual Building Limited Partnership v. District of Columbia, 618 F. Supp. 603, 616 (D.D.C. 1985); see also Hughes Network Sys. v. Interdigital Comms., 17 F.3d 691, 694 (4th Cir. 1994) ("Irreparable harm may

still exist where the moving party's business cannot survive absent a preliminary injunction")
(citing Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 386 (7th Cir. 1984)); Semmes
Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir. 1970); Art-Metal-USA, Inc. v.
Solomon, 473 F. Supp. 1, 4 (D.D.C. 1978) (preliminary injunction issued preventing government
from terminating contract that represented "approximately one-third of its total government
sales," which sales were "the vast majority of its business"); Virginia Petroleum Jobbers
Assoc. v. Federal Power Comm'n, 259 F.2d 921, 925 (D.C. Cir. 1950) (the loss of a business "is
precisely the type of harm which necessitates the granting of preliminary injunctive relief").
Proof of "such severe financial hardship," with sufficient likelihood of success, reasonably
entitles a plaintiff to a preliminary injunction where delay "would render a later judgment on the
merits meaningless." See Art-Metal USA, Inc. v. Solomon, 473 F. Supp. 1, 4 (D.D.C. 1978).

   The "anti-markup" provision, which requires that physician groups incur an actual loss
on each test performed in their own labs, is designed to prevent any referrals of Medicare–
reimbursed specimens to those labs. If not enjoined, it will have the desired effect. Medicare
accounts for over half of the business of these labs. Decl. Flowers ¶ 26, Ex. 3; Ex. 28. In the
case of Plaintiff Atlantic Urological Associates, approximately 70% of the dollar volume derived
from its lab is for services provided to Medicare beneficiaries. Decl. Creggar ¶ 8, Ex. 5. If a
preliminary injunction does not issue, Uropath's existing business will be destroyed. It is not
financially feasible for physician groups to bill at a loss for roughly half of their patient or test
volume. Consequently, many physician groups will undoubtedly discontinue their Uropath-
managed laboratories, and set up or attempt to set up laboratories in existing buildings in which
they see patients in order to recapture the lost revenue stream from Medicare. It would not make
sense for these groups to attempt to have their own in-house lab for Medicare only, and continue

to send private pay patients to their Uropath-managed lab. In the meantime, many physician groups will shut down their labs as soon as possible, and in the interim send their specimens to other labs. Decl. Flowers ¶ 27, Ex. 3.

For groups with smaller volume, who may not be able to establish their own laboratories, the elimination of Medicare revenue will likely make the labs unprofitable due to loss of volume. Accordingly smaller groups will discontinue unprofitable laboratories, and begin sending their specimens to other laboratories. Decl. Flowers, ¶ 28, Ex. 3.

Due to the publication of the January 3, 2008, Final Rule, the volume of specimens sent to Uropath managed labs has already dropped dramatically for some of the physician groups, which indicates that they are already sending samples to outside labs because of CMS's regulatory action. Decl. Flowers, ¶ 29, Ex. 3.

As labs are discontinued or their imminent closure becomes apparent, the pathologists who currently provide services in Uropath-managed labs will leave and seek other positions. As pathologists depart due to a drop in their business and the closure of laboratories, it will be virtually impossible to replace them with qualified pathologists. Thus, even if a physician group wished to retain its Uropath-managed lab, it is highly unlikely that they would be able to do so because of the inability to obtain a qualified pathologist. Thus, a "snowball effect" will occur, with labs closing and pathologists and other staff departing, until there is nothing left. Decl. Flowers, ¶ 30, Ex. 3.

Plaintiff Dr. Michaels' entire professional medical practice consists of providing pathology services for five physician groups who operate Uropath-managed labs. Decl. Michaels, ¶¶ 3, 5. Ex. 27. His independent medical practice will disappear, and that damage to his life and career cannot be repaired, especially since the Defendant is not answerable in

damages.  Thus, this case is like <u>Ahmed v. United States</u>, 47 F. Supp. 2d 389, 400 (W.D.N.Y. 1999), in which the prospective loss of 50 percent of gross revenue upon being barred from food stamp program and the averment that the store would be forced out of business established irreparable harm.  <u>See also</u> <u>Atwood Turnkey Drilling, Inc. v. Petroleo Brasiliero, S.A.,</u> 875 F.2d 1174, 1179 (5th Cir. 1989) (potential economic harm so great as to threaten existence of plaintiff's business constitutes irreparable harm).

### B.    Loss of Employment for Pathologists, Physician Group Technicians, and Uropath Employees

A permanent loss of employment is irreparable harm.  <u>Local Union 2426, United Mine Workers v. District 29, United Mine Workers,</u> 864 F. Supp. 545, 549 (D. W. Va. 1994); <u>Operating Engineers, Local 12 v. Arciero Bros., Inc.,</u> 1980 U.S. Dist. LEXIS 13799 (D. Cal. 1980); <u>Sundstrand Corp. v. Marshall</u>, 1978 U.S. Dist. LEXIS 18247 (D. Ill. 1978).  "5s in other cases involving preliminary injunctive relief, [w]e ask whether the termination will harm the plaintiff in a way that cannot be remedied through money."  <u>East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.,</u> 414 F.3d 700, 705  (7th Cir. 2005).

If Uropath's business is destroyed, 91 individuals will lose their jobs with Uropath, including Plaintiff Rebecca Page (Decl. Page ¶¶ 5-6, Ex. 24).  Without the application of the revised anti-markup rule, all of these individuals would remain employed for an indeterminable amount of time, making the calculations of damages nearly impossible.  In this case, calculation of damages is irrelevant.  Due to the doctrine of sovereign immunity the Secretary is not answerable in monetary damages for the harm that the Plaintiffs will sustain. <u>See</u> <u>Wheedlin v. Wheeler,</u> 373 U.S. 647 (1963).  Thus, the harm to the Plaintiffs and others cannot be redressed by a later suit for damages.  <u>See</u> <u>Jessen v. Vill. of Lyndon Station</u>, 519 F. Supp. 1183, 1189 (W.D. Wis. 1981) (finding irreparable injury because sovereign immunity issues made it

questionable whether plaintiff could collect back pay); <u>Faulkner v. N.C. Dep't of Corr.</u>, 428 F. Supp. 100, 104 (W.D.N.C. 1977) (same)).  Therefore, loss of employment in these circumstances is irreparable harm.

      **C.    Destruction of business relationships**

      The loss of customers and permanently damaged relationships with customers is irreparable harm.  <u>Morgan Stanley DW Inc. v. Rothe,</u> 150 F. Supp. 2d 67, 78 (D.D.C. 2001). Injunctive relief is appropriate where it would be "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come."  <u>Register.com, Inc. v. Verio, Inc.</u>, 356 F.3d 393, 404 (2d Cir. 2004) (citing <u>Ticor Title Ins. Co. v. Cohen</u>, 173 F.3d 63, 69 (2d Cir. 1999)); <u>see also</u> <u>Jacobson & Co. v. Armstrong Cork Co.</u>, 548 F.2d 438, 445 (2d Cir. 1977) (affirming finding of irreparable harm because plaintiff "presented ample evidence to show a threatened loss of good will and customers, both present and potential, neither of which could be rectified by monetary damages"); <u>Performance Unlimited, Inc. v. Questar Publishers, Inc.</u>, 52 F.3d 1373, 1382 (6th Cir. 1995); <u>cf.</u> <u>Basicomputer Corp. v. Scott, 973 F.2d 507, 511-12 (6th Cir. 1992)</u> (holding that competitive losses and losses of customer goodwill constitute irreparable harm).

      If the Anatomic Pathology Prohibition is not enjoined, valuable professional relationships will be lost between:   (1) Uropath and physician groups (Decl. Flowers ¶ 27, Ex. 3 (Decl. DeGuenther ¶ 10, Ex. 8; Decl. Sorrells ¶ 17, Ex. 4; Decl. Creggar ¶ 6, Ex. 5); and (2) Dr. Sam Michaels and other pathologists and the physician groups for which they provide pathology services.  (Decl. Michaels ¶¶ 5 and 6, Ex. 27).

      These relationships have been instrumental in providing efficient, responsive, and high quality medical care.  (Decl. DeGuenther ¶¶ 5-10, Ex. 8; Decl. Flowers ¶ 35, Ex. 3; Decl. Sorrells ¶ 17, Ex. 4; Decl. Severance ¶¶ 5 and 12, Ex. 6.)  If specimens are shipped to several

different labs, each with multiple pathologists, there is an inherent lack of consistency in specimen grading and interpretation.    (Decl. Grable ¶¶ 16, 17, Ex. 9.)    Because outside laboratories frequently employ many pathologists, there are few opportunities for the referring physician to consult with the pathologist.  (Decl. Grable ¶ 16, Ex. 9.  In addition, the physicians have no control over the pathologists' work load or priorities, so there is no way to expedite the handling of particular specimens.  (Decl. Flowers ¶ 9, Ex. 3.)

By contrast, under the Uropath model, a group practice with its own pathology laboratory uses the same pathologist for urologic pathology work.  (Decl. DeGuenther ¶ 3, Ex. 8; Decl. Flowers ¶ 10, Ex. 3; Decl. Severance ¶ 5, Ex. 6.)  First, this means that a group practice is able to minimize the inconsistencies in grading and interpreting specimens inherent in using more than one pathologist. (Decl. DeGuenther ¶¶ 6 and 8, Ex. 8; Decl. Flowers ¶ 10, Ex. 3; Decl. Severance ¶ 5, Ex. 6.)

Second, most general pathologists examine a wide range of samples relating to a broad spectrum of diseases or diagnoses.  (Decl. DeGuenther ¶ 6, Ex. 8; Decl. Flowers ¶ 10, Ex. 3.) The pathologists employed by the physician practices in Uropath managed facilities are genitourinary ("GU") pathologists, often with specialized training or fellowships in that field. (Decl. DeGuenther ¶ 6, Ex. 8; Decl. Flowers ¶ 10, Ex. 3; Decl. Severance ¶ 5, Ex. 6.)  For example, Dr. William Murphy, who practices in the Leesburg location, is a graduate of Harvard Medical School, has written and lectured extensively, and has written a textbook on Uropathology.  He has an international reputation and is generally considered to be one of the three leading GU pathologists in the country.  (Decl. Flowers ¶ 11 Ex. 3; Ex. 29.)  Other Uropath pathologists also have compelling credentials.  (Decl. Flowers ¶ 11 Ex. 3, Ex. 29.)  Even if they did not have prior specialized training, they quickly develop GU experience and expertise, due to

the large volume of needle biopsy specimens and other GU related specimens they review. (Decl. DeGuenther ¶ 6, Ex. 8; Decl. Flowers ¶ 10, Ex. 3.)  Third, by utilizing its own pathologist a group practice enjoys more meaningful consultative benefits with that pathologist with respect to specimens reviewed and interpreted.  (Decl. DeGuenther ¶ 8, Ex. 8; Decl. Flowers ¶ 10, Ex. 3; Decl. Severance ¶ 5, Ex. 6.)  Atlantic Urological Associates, P.A., Uropath-managed lab has full access to the patient's charts, via electronic medical records.  (Decl. Grable ¶ 14, Ex. 9.)  They can easily contact the pathologist to discuss any questions or problems regarding a particular patient.  (Decl. Flowers ¶ 10, Ex. 3.)  There are generally multiple pathologists on site at a Uropath center, who can and do informally consult with each other on close, difficult, or unusual cases.  (Id.)

Finally, the group practice can make special requests and prioritize samplings sent to their own pathology laboratory.  (Id.)  All of these factors promote quality patient care services for the relatively few, specialized tests for which the urology practices utilize their own pathologist in a Uropath-managed lab. (Decl. Severance ¶ 5, Ex. 6; Decl. DeGuenther ¶¶ 5, 6 and 8, Ex. 8; Decl. Flowers ¶ 10, Ex. 3; Decl. Grable ¶¶ 16-18, Ex. 9.)

These business and professional relationships will be terminated, and their benefits will be permanently lost, if the Anatomic Pathology Prohibition is not enjoined.

### D.    Damage to competitive position

This court has recognized that agency action resulting in a plaintiff's loss of market share may constitute irreparable injury.  Bracco Diagnostics v. Shalala, 963 F. Supp. 20, 29 (D.D.C. 1997).  Here, if the Final Rule remains in effect and Plaintiffs' business relationships are destroyed as described above, physicians with in-house laboratories not otherwise subject to the Anatomic Pathology Prohibition will suddenly have a distinct competitive advantage over the Physician Group Plaintiffs.  Not only will these practices will be able to provide (and profit

from) the very same services that Physician Group Plaintiffs are forced to provide at a loss, but as a result they will be at a distinct advantage when competing to recruit and retain talented physicians. (Decl. Sorrells ¶ 18, Ex. 4.; Decl. Severance ¶ 9, Ex. 6.)

> E.    **Loss Of Investment Value, Loss Of Revenue, And Other Harm That Will Not Be Compensated.**

No reasonable physician group would bill Medicare for the "net charge" for an anatomic pathology service, thereby losing money on every service performed.  Accordingly, if the Anatomic Pathology Prohibition is not enjoined, the Plaintiff Physician Groups must send specimens for their Medicare patients to an outside lab that will then bill Medicare directly for the physician fee schedule amounts.  (Decl. Creggar ¶¶ 9 and 10, Ex. 5; Decl. Severance ¶ 7, Ex. 6; Decl. DeGuenther ¶ 10, Ex. 8; Decl. Sorrells ¶ 11, Ex. 4.)  The Plaintiff Physician Groups will thereby be forced to forgo revenue for anatomic pathology diagnostic testing services that they would have received were they able to provide services in their own laboratories and receive the fee schedule amount for each service.  This income is lost forever because the Plaintiff Physician Groups will not be billing for these tests, outside labs will.

It is no answer to say that a physician group could simply open a new in-house lab on its main premises.  The creation of a new laboratory is subject to substantial delay and uncertainty. (Decl. Sorrells ¶¶ 15 and 16, Ex. 4; Decl. Grable ¶ 22, Ex. 9.)  To open such a lab, the groups must be able to comply with the location requirements of the Stark Law and the Final Rule.  <u>See</u> 73 Fed. Reg. at 405.  The physician group must spend time and money attempting to free up and renovate space in an existing building for the new lab.  (Decl. Creggar ¶ 13, Ex. 5; Decl. Grable ¶ 22, Ex. 9; Decl. Sorrells ¶¶ 15 and 16, Ex. 4.)  Plaintiffs must equip any such laboratory to meet CLIA certification requirements and undergo further delay and an on-site inspection in order to obtain CLIA certification for the laboratory.  (Decl. Creggar, ¶ 16, Ex. 5; Decl. Sorrells

¶ 16, Ex. 4.)    Smaller practices such as Plaintiff Urology Care do not have the option of establishing their own in-house lab due to insufficient volume of tests, and will therefore be permanently foreclosed from providing these services.  (Decl. Severance ¶ 8, Ex. 6.)

The Plaintiff Physician Groups must close their existing laboratories because it will no longer be financially feasible for them to provide services in these labs.  (Decl. Sorrells ¶¶ 10 and 18, Ex. 4; Decl. Grable ¶ 21, Ex. 9; Decl. Creggar ¶¶ 6, 9 and 17, Ex. 5; Decl. Severance ¶ 6, Ex. 6.)  There are numerous costs associated with closing the labs, including the satisfaction of ongoing lease obligations.  (Decl. Creggar ¶ 12, Ex. 5.; Decl. Severance ¶ 11, Ex. 6; Decl. Sorrells ¶ 14, Ex. 4.)  Uropath is the Lessee on five major leases, only one of which expires in 2008.  The rest extend out for two to five years.  (Decl. Flowers ¶ 32, Ex. 3, and Ex. 30).

Plaintiff Physician Groups also will permanently lose a portion of the investment made to establish their own Uropath-managed labs, which included construction costs, equipment costs and other start-up costs.  (Decl. Severance ¶ 12, Ex. 6; Decl. Creggar ¶ 11, Ex. 5; Decl. Sorrells ¶ 14, Ex. 4.)  The physician groups that own Uropath will also lose their equity investment in Uropath.    Assuming a six month buy-out of the leases could be negotiated, it will cost approximately $2,245,131 to close Uropath, thereby destroying the members' original equity of $998,000.  (Decl. Flowers ¶¶ 31, 33, Ex. 3; Ex. 31).  The 23 physician group owners of Uropath must then contribute another $1.2 million in order to fulfill Uropath's obligations on closure. (Decl. Flowers ¶ 33, Ex. 3 and Ex. 32.)  If this assumption proves incorrect and Uropath's leases cannot be bought out, the cost to shut down Uropath increases to $4,512,958.  (Decl. Flowers ¶ 34, Ex. 3 and Ex. 33.)

An irreparable injury is defined as a harm that a court would be unable to remedy even if the movant would prevail in the final adjudication.  See Basicomputer Corp. v. Scott, 973 F.2d

507, 511-512 (6th Cir. 1992); <u>Roland Mach. Co. v. Dresser Indus. Inc.</u>, 749 F.2d 380, 386 (7th Cir. 1984).  Even if money damages were sufficient to redress the kinds of harm described herein, no monetary award is available.  Where the government is immune to suit for money damages, the movant's harm is not compensable through monetary relief and thus is irreparable. See <u>Allen v. Minnesota</u>, 867 F. Supp. 853, 859 (D. Minn. 1994); <u>see also</u> <u>Jessen v. Vill. of Lyndon Station</u>, 519 F. Supp. 1183, 1189 (W.D. Wis. 1981) (finding irreparable injury because sovereign immunity issues made it questionable whether plaintiff could collect back pay); <u>Faulkner v. N.C. Dep't of Corr.</u>, 428 F. Supp. 100, 104 (W.D.N.C. 1977) (same).  Plaintiffs are foreclosed from recovering money damages from CMS to address any of these injuries.  As such, Plaintiffs' injuries are irreparable and can only be redressed through an injunction.

## III.    DELAYING ENFORCEMENT OF THE ANATOMIC PATHOLOGY PROHIBITION PENDING A HEARING ON THE MERITS WILL NOT CAUSE HARM TO THE SECRETARY.

The Secretary's interest in this case will not be compromised by the issuance of a preliminary injunction such as the one requested here.  CMS has already delayed the revised anti-markup provision for most diagnostic services.  CMS will not be injured by extending this same delay to physician groups with labs subject to the Anatomic Pathology Prohibition.  There is no evidence that physician groups that operate Uropath-managed labs are performing medically unnecessary services.  In fact, three OIG audits, as well as other data described in Part I above, demonstrate that no overutilization is occurring  Even if this Court grants the preliminary injunction and then decides in favor of Defendant after a full consideration of the merits, Defendant will not suffer harm as a result.  That outcome would simply mean that the Defendant would apply the Anatomic Pathology Prohibition at a somewhat later date.  Such a temporary delay to the agency's enforcement of a rule does not weigh in Defendant's favor.  <u>See</u>

National Med. Care v. Shalala, No. 95-0860, 1995 U.S. Dist. LEXIS 10074 at *10 (D.D.C. 1995).

## IV.   ISSUANCE OF A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST.

The public interest will be best served by enjoining the immediate application of the Anatomic Pathology Prohibition. CMS, in its decision to delay the revised anti-markup rule for most services, recognized that revised § 414.50 could disrupt patient care. As shown above, immediate enforcement of the Anatomic Pathology Prohibition will disrupt high quality patient care services, which will diminish the quality of available care in the community.

Further, an injunction will prevent disruption of high quality care for Medicare beneficiaries. Courts have found that they are entitled to look at the impact on Medicare beneficiaries when providers seek preliminary injunctions, even when the beneficiaries are not formally before the court. See Int'l Long Term Care, Inc. v. Shalala, 947 F. Supp 15, 20 (D.D.C. 1996). Here, Medicare beneficiaries served by the Plaintiffs would benefit at least equally, and perhaps more, from continuity of care, since prostate cancer tends to be a disease of older men.

CMS has itself recognized that the Uropath business model promotes higher quality patient care, conceding "there can be some advantages to a physician or group practice referring to the same pathologist, if the referring physician or group practice chooses the pathologist on the basis of his or her qualifications and experience, and the service that he or she provides." See 72 Fed. Reg. at 66,314. Because an injunction would allow Physician Plaintiffs to continue providing high quality care to their patients and would prevent disruption of care patterns that would be nearly impossible to re-establish, the public interest weighs strongly in favor of a preliminary injunction.

Finally, not all persons affected are before the Court. It is in the public interest to prevent the needless loss of 91 jobs. On information and belief, Uropath's Leesburg center is one of the largest private employers in Lake County, Florida, employing 32 people. (Decl. Flowers ¶ 36, Ex. 3.) The harm to the community caused by a mass loss of employment should be prevented if possible, and it would be in the public interest to do so.

## V.    THE COURT HAS SUBJECT MATTER JURISDICTION IN THIS CASE

Because the government typically challenges the Court's jurisdiction to hear Medicare cases if a years-long administrative review process has not occurred, Plaintiffs will briefly address why the Court's jurisdiction is clearly established under the facts of this case and relevant case law.

There is a "strong presumption that Congress intends judicial review of administrative action." AFGE TSA Local 1 v. Hawley, 481 F. Supp. 2d 72, 90-91 (D.D.C. 2006) (citing Springs v. Stone, 362 F. Supp. 2d 686, 702 (D. Va. 2005) (quoting Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 670 (1986)). Decisions of this Court make it clear that the Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1331. Jurisdiction is not defeated by the "administrative channeling" requirements of 42 U.S.C. § 405(h), as incorporated into the Medicare Act through 42 U.S.C. § 1395ii. Section 405(h) generally requires exhaustion of administrative remedies for all claims "arising under" the Medicare Act before a federal court can assert jurisdiction over the claims pursuant to 28 U.S.C. § 1331. See American Chiropractic Ass'n, Inc. v. Leavitt, 431 F.3d 812, 816 (D.C. Cir. 2005) (citations omitted). However, "the Supreme Court has recognized an exception to this rule where application of § 1395ii 'would not lead to a channeling of review through the agency, but would mean no review at all.'" Action Alliance of Senior Citizens v. Leavitt, No. 06-5295, 2007 U.S.

App. LEXIS 8691, at *18 (D.C. Cir. Apr. 17, 2007) (citing Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 17 (2000); Michigan Academy, 476 U.S. at 669-70).

Denial of federal question jurisdiction in this case would amount to the "practical equivalent of a total denial of judicial review." Illinois Council, 529 U.S. at 22 (quoting McNary v. Haitian Refugee Ctr., 498 U.S. 479, 497 (1991)). As this Court has recognized on more than one occasion, where a party must face "draconian" sanctions, the possibility of termination from the Medicare program, or certain financial ruin simply to pursue available administrative remedies, "application of § 405(h) would amount to the 'practical equivalent of a total denial of judicial review' because 'what appears to be simply a channeling requirement [turns] into complete preclusion of judicial review.'" Nat'l Ass'n of Psychiatric Health Sys. v. Shalala, 120 F. Supp. 2d 33, 38-39 (D.D.C. 2000) (citation omitted); see also American Lithotripsy Soc'y v. Thompson, 215 F. Supp. 2d 23, 29-30 (D.D.C. 2002).

In Psychiatric Health Systems, the plaintiffs challenged an interim final rule promulgated by HHS, which required physicians and other practitioners to conduct a face-to-face evaluation of a psychiatric patient within one hour after the patient had been placed in restraints or in seclusion. 120 F. Supp. 2d at 35. The plaintiffs explained that "in order to contest the validity of the one-hour rule a hospital must violate a condition of participation, or face the draconian sanction of termination from the Medicare program." Id. at 38-39 (citations omitted). The court agreed that requiring "administrative channeling" of the plaintiffs' challenge to the regulation would be the "practical equivalent" of the denial of judicial review, because the plaintiffs did "not have the option of incurring a minor penalty and receiving an administrative hearing before proceeding to federal court." Id. at 39.

In American Lithotripsy Society, the plaintiffs challenged two HHS regulations applicable to referrals for and valuation of lithotripsy services. 215 F. Supp. 2d at 24. HHS argued that plaintiffs' claims must be channeled through the administrative review process, and could not "be heard in federal court until sanctions have been imposed by the agency." Id. at 28. The court rejected HHS's jurisdictional argument, finding that application of § 405(h)'s "administrative channeling" requirements would have the "practical effect of denying plaintiffs judicial review." Id. at 29. Plaintiffs did not have a realistic option of simply violating the referral regulations in order to present an issue for administrative review; rather, "if plaintiffs' members were to refer patients for lithotripsy in violation of defendant's regulations, they would be subject to statutory penalties of up to $15,000 per bill submitted to CMS and disgorgement of profits received from hospitals." Id. (citation omitted). And "because a lithotripsy center typically performs hundreds of procedures annually, . . . these fines alone could subject a center to financial ruin. In addition, plaintiffs would be subject to criminal penalties and prohibition from participation in any federal health care program." Id. (citation omitted). The court also noted that, because the plaintiffs were not Medicare providers, they did not have the right to seek administrative review, and neither enrollees nor hospital "providers" had the incentive to challenge the regulations. See id. at 30. In sum, because of the possibility of "potential financial ruin" to plaintiffs and their lack of direct or "proxy" access to the administrative review process, the court concluded that § 405(h) did not limit federal question jurisdiction in that case. See id. at 30.

In the case at bar, there is no administrative remedy practically available to Plaintiffs, and unless a preliminary injunction is granted there will be no possibility of judicial review of the Secretary's action at all.

We note first that neither Uropath nor Rebecca Page participates in the Medicare program or bills Medicare. They therefore have no administrative process to invoke whatsoever. They cannot appeal through some channel and receive compensation from CMS for, in the case of Uropath, having its business destroyed or, in the case of Rebecca Page, for the loss of her job and very possibly her house and car. (Decl. Page ¶ 7, Ex. 24) The key fact here is that, absent a preliminary injunction, Uropath's business will not survive. Because the Anatomical Pathology Prohibition imposes a punitive – and illegal – "anti-markup" rule, that requires all of the labs which it manages to either bill at a loss for the bulk of their business, or send that business to an outside lab, CMS's action will make the operation of the labs uneconomical.

As labs close, pathologists will experience a large drop in income, see the handwriting on the wall, and begin to depart in very short order. So will other clinical and managerial personnel. Qualified pathologists will become virtually impossible to recruit. Uropath, left with substantial fixed expenses, will begin to bleed money, and it will be forced to shut down as quickly as possible.

The point here is that, even for the Plaintiff Physician Groups, there will be <u>nothing to appeal</u>. As soon as they start sending specimens to outside labs, they are no longer the billing physician and cannot bill Medicare. Whether that happens as a result of CMS's anti-markup rule that requires them to bill at a loss, or whether that happens as a result of closure of their own lab, or closure of Uropath itself, they will have no claims to appeal. There is therefore nothing to "channel" through an administrative process, and so no possibility of judicial review unless this court enjoins the agency's action now.

## <u>CONCLUSION</u>

For the reasons set forth above, the Plaintiffs respectfully request that this Court grant its

Application for Preliminary Injunction under Fed. R. Civ. Pro. 65 and Local R. Civ. Pro. 65, and

grant any other relief to which it may be entitled.

January 25, 2008                                 Respectfully submitted,

                                                 FULBRIGHT & JAWORSKI, L.L.P.


                                                 /s/ Dan M. Peterson
                                                 Dan M. Peterson
                                                 D.C. Bar No. 418360

                                                 Wendy Butler Curtis
                                                 D.C. Bar No. 475464
                                                 Caroline Mew
                                                 D.C. Bar No. 467354
                                                 801 Pennsylvania Avenue N.W.
                                                 Washington, D.C. 20004
                                                 Telephone:  (202) 662-0200
                                                 Facsimile:  (202) 662-4643
                                                 Attorneys for Plaintiffs

                                                 Greg A. Cardenas
                                                 Byrne, Cardenas & Smitherman, LLP
                                                 5400 LBJ Freeway, Suite 1325
                                                 Dallas, TX 75240
                                                 Telephone:  (972) 371-5264
                                                 Facsimile:  (972) 371-5270
                                                 Of Counsel

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true copies of the foregoing Plaintiffs' Application for Preliminary Injunction and Request for Expedited Hearing, Statement of Points and Authorities, Exhibits, and Proposed Order, were furnished via U.S. Mail on January 25, 2008 to the Secretary, Department of Health & Human Services c/o General Counsel Department of Health & Human Services 200 Independence Avenue, SW Washington, DC 20201; United States Attorney for the District of Columbia c/o Civil Process Clerk U.S. Attorney's Office - Civil Division 501 3rd Street, NW Washington, DC 20530; and Attorney General of the United States c/o Department of Justice Room B-103 950 Pennsylvania Avenue, NW Washington, DC 20530.


  /s/ Dan M. Peterson
Dan M. Peterson
D.C. Bar No. 418360

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ATLANTIC UROLOGICAL ASSOCIATES, P.A.; SAM MICHAELS, M.D.; REBECCA PAGE; UROLOGY CARE, INC.; UROLOGY CENTER OF ALABAMA, P.C.; and UROPATH, LLC,<br><br>    Plaintiffs,<br><br>    v.<br><br>MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Services,<br><br>    Defendant. | Civil Action No. 1:08-cv-00141-RMC |

## ORDER GRANTING
## PRELIMINARY INJUNCTION

WHEREFORE, having considered the Application for Preliminary Injunction filed by Plaintiffs, Atlantic Urological Associates, P.A.; Sam Michaels, M.D.; Rebecca Page; Urology Care, Inc.; Urology Center of Alabama, P.C.; and Uropath, LLC ("Plaintiffs"), the Exhibits in support thereof, the evidence in this matter, and the arguments of counsel, and any opposition thereto, this Court is of the opinion that absent preliminary injunctive relief Plaintiffs will suffer irreparable injury, Plaintiffs have a likelihood of success on the merits, the Secretary will not suffer significant harm if the injunction is granted, that the balance of harm favors Plaintiffs and the public interest favors the grant of an injunction.    Accordingly, the Application for Preliminary Injunction is GRANTED.

70186668.1

IT IS, therefore, ORDERED that:

The Secretary of the Department of Health and Human Services is hereby enjoined from enforcing that portion of the Final Rule published in the Federal Register on January 3, 2008 (73 Fed. Reg. 404) that permits or requires the application of the anti-markup rule in 42 C.F.R. § 414.50, as revised by the final rule published on November 27, 2007 (72 Fed. Reg. 66,222), to anatomic pathology diagnostic testing services furnished in a centralized building, as defined in the Stark Law (42 U.S.C. § 1395nn(b)(2)(A)).   Enforcement by the Secretary of 42 C.F.R. § 414.50, as so revised, in relation to anatomic pathology diagnostic services is enjoined until trial on the merits of this case, or until further order of the Court.

SIGNED on this the _____ day of _____, 2008

_____

United States District Judge

Upon entry, this order is to be served upon the following:

Dan M. Peterson
Wendy Curtis
Caroline Mew
Fulbright & Jaworski L.L.P.
Suite 500
801 Pennsylvania Avenue, N.W.
Washington, DC  20004-2604

Michael O. Leavitt,
Secretary, United States Department of Health and
Human Services
c/o General Counsel
Department of Health & Human Services
200 Independence Avenue, SW
Washington, D.C. 20201

70186668.1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ATLANTIC UROLOGICAL ASSOCIATES, P.A.;<br>SAM MICHAELS, M.D.; REBECCA PAGE;<br>UROLOGY CARE, INC.; UROLOGY CENTER<br>OF ALABAMA, P.C.; and UROPATH, LLC,<br><br>       Plaintiffs,<br><br>       v.<br><br>MICHAEL O. LEAVITT, in his official capacity as<br>Secretary, United States Department of Health and<br>Human Services,<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 1:08-cv-00141-RMC<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**LIST OF EXHIBITS**

1     Final Rule, 73 Fed. Reg. 404 (Jan. 3, 2008)

2     Excerpts from 2008 Physician Fee Schedule Final Rule (Nov. 27, 2007)

3     Declaration of Kenneth Flowers, M.B.A., F.A.C.H.E.

4     Declaration of David Sorrells

5     Declaration of Jerri Creggar

6     Declaration of Michael S. Severance, M.D.

7     Uropath lab locations

8     Declaration of Mark DeGuenther, M.D.

9     Declaration of Michael Grable, M.D.

10    Excerpt from Department of Health and Human Services Office of Inspector General's
       Work Plan Fiscal Year 2005

11    OIG report regarding Atlantic Urological Associates, P.A.

12      OIG report regarding Florida Urology Physicians, P.A.

13      OIG report regarding Urology Tyler, P.A.

14      CMS BESS Data regarding number of CPT Codes 88305, 1995-2004

15      Medical articles and abstracts relating to 12 core prostate biopsy standard

16      Summary of articles taken from Contemporary Urology, Nov. 1, 2007, including review
        of large study of Medicare patients showing 32% positive biopsy rate

17      Abstract of article entitled "Two Consecutive Sets of Transrectal Ultrasound Guided
        Sextant Biopsies of the Prostate for the Detection of Prostate Cancer"

18      Abstract of February 2008 Journal of Urology article entitled "The 20 Core Prostate
        Biopsy: A New Gold Standard?"

19      American Cancer Society webpage printout entitled "Detailed Guide:  Prostate Cancer;
        How is Prostate Cancer Diagnosed?"

20      Excerpts from American Urological Association webpage entitled "Causes, Natural
        History & Diagnosis of Prostate Cancer"

21      Positive biopsy rates and special stain rates for Uropath managed labs

22      Patients biopsied before and after lab opening

23      Analyses of biopsies at Urology Associates of North Texas and Urology San Antonio

24      Declaration of Rebecca Page

25      2007 Medicare reimbursement rates for selected CPT Codes, by location

26      Correction to Final Rule, 73 Fed. Reg. 2433 (Jan. 15, 2007)

27      Declaration of Sam Michaels, M.D.

28      Medicare percentage for group practices

29      Summaries of pathologist qualifications

30      Lease terms

31      Uropath LLC Income Statement for the Twelve Months Ending December 31, 2007

32      Anticipated cost of closing Uropath based on assumption of six month lease buyout

33      Anticipated cost of closing Uropath if leases cannot be bought out

# EXHIBIT 1

**404**     **Federal Register** / Vol. 73, No. 2 / Thursday, January 3, 2008 / Rules and Regulations

immediately follow the subheading: "[Bullet] side effects occur. You may report side effects to FDA at 1–800–FDA–1088.'' The telephone number must appear in a minimum 6–point bold letter height or type size.

\* \* \* \* \*

## PART 208—MEDICATION GUIDES FOR PRESCRIPTION DRUG PRODUCTS

■ 3. The authority citation for 21 CFR part 208 continues to read as follows:

**Authority:** 21 U.S.C. 321, 331, 351, 352, 353, 355, 356, 357, 360, 371, 374; 42 U.S.C. 262.

■ 4. Amend § 208.20 by adding paragraph (b)(7)(iii) to read as follows:

**§ 208.20   Content and format of a Medication Guide.**

\* \* \* \* \*

(b) \* \* \*

(7) \* \* \*

(iii) For drug products approved under section 505 of the act, the following verbatim statement: "Call your doctor for medical advice about side effects. You may report side effects to FDA at 1–800–FDA–1088.''

\* \* \* \* \*

■ 5. Add part 209 to read as follows:

## PART 209—REQUIREMENT FOR AUTHORIZED DISPENSERS AND PHARMACIES TO DISTRIBUTE A SIDE EFFECTS STATEMENT

**Subpart A—General Provisions**

Sec.
209.1   Scope and purpose.
209.2   Definitions.

**Subpart B—Requirements**

209.10   Content and format of the side effects statement.
209.11   Dispensing and distributing the side effects statement.

**Authority:** 21 U.S.C. 321, 331, 351, 352, 353, 355, 360, 371; 42 U.S.C. 241.

**Subpart A—General Provisions**

**§ 209.1   Scope and purpose.**

(a) This part sets forth requirements for human prescription drug products approved under section 505 of the Federal Food, Drug, and Cosmetic Act and dispensed by authorized dispensers and pharmacies to consumers. This part requires distribution of a side effects statement and applies to new and refill prescriptions. This part is not intended to apply to authorized dispensers dispensing or administering prescription drug products to inpatients in a hospital or health care facility under an order of a licensed practitioner, or as part of supervised home health care.

(b) The purpose of providing the side effects statement is to enable consumers to report side effects of prescription drug products to FDA.

**§ 209.2   Definitions.**

For the purposes of this part, the following definitions apply:

*Act* means the Federal Food, Drug, and Cosmetic Act (sections 201–907 (21 U.S.C. 301–397)).

*Authorized dispenser* means an individual licensed, registered, or otherwise permitted by the jurisdiction in which the individual practices to provide drug products on prescription in the course of professional practice.

*Consumer medication information* means written information voluntarily provided to consumers by dispensing pharmacists as part of patient medication counseling activities.

*Medication Guide* means FDA-approved patient labeling conforming to the specifications set forth in part 208 of this chapter and other applicable regulations.

*Pharmacy* includes, but is not limited to, a retail, mail order, Internet, hospital, university, or clinic pharmacy, or a public health agency, regularly and lawfully engaged in dispensing prescription drugs.

*Side effects statement* means the following verbatim statement: "Call your doctor for medical advice about side effects. You may report side effects to FDA at 1–800–FDA–1088.''

**Subpart B—Requirements**

**§ 209.10   Content and format of the side effects statement.**

(a) *Content.* The side effects statement provided with each prescription drug product approved under section 505 of the act must read: "Call your doctor for medical advice about side effects. You may report side effects to FDA at 1–800–FDA–1088.''

(b) *Format.* The side effects statement must be in a single, clear, easy-to-read type style. The letter height or type size used for the side effects statement in accordance with paragraphs (b)(1) and (b)(2) of § 209.11 must be no smaller than 6 points (1 point = 0.0138 inch). The letter height or type size for the side effects statement under paragraphs (b)(3), (b)(4), and (b)(5) of § 209.11 must be no smaller than 10 points.

**§ 209.11   Dispensing and distributing the side effects statement.**

(a) Each authorized dispenser or pharmacy must distribute the side effects statement with each prescription drug product approved under section 505 of the act and dispensed. The side

effects statement must be distributed with new and refill prescriptions.

(b) An authorized dispenser or pharmacy must choose one or more of the following options to distribute the side effects statement:

(1) Distribute the side effects statement on a sticker attached to the unit package, vial, or container of the drug product;

(2) Distribute the side effects statement on a preprinted pharmacy prescription vial cap;

(3) Distribute the side effects statement on a separate sheet of paper;

(4) Distribute the side effects statement in consumer medication information; or

(5) Distribute the appropriate FDA-approved Medication Guide that contains the side effects statement.

Dated: December 21, 2007.

**Jeffrey Shuren,**
*Assistant Commissioner for Policy.*

[FR Doc. E7–25426 Filed 1–2–08; 8:45 am]

**BILLING CODE 4160–01–S**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Centers for Medicare & Medicaid Services

## 42 CFR Part 414

[CMS–1385–F2]

RIN 0938–AO65

## Medicare Program; Revisions to Payment Policies Under the Physician Fee Schedule, and Other Part B Payment Policies for CY 2008; Delay of the Date of Applicability of the Revised Anti-Markup Provisions for Certain Services Furnished in Certain Locations (§ 414.50)

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), HHS.

**ACTION:** Final rule.

---

**SUMMARY:** This final rule delays until January 1, 2009 the applicability of the anti-markup provisions in § 414.50, as revised at 72 FR 66222, except with respect to the technical component of a purchased diagnostic test and with respect to any anatomic pathology diagnostic testing services furnished in space that: Is utilized by a physician group practice as a "centralized building" (as defined at § 411.351 of this chapter) for purposes of complying with the physician self-referral rules; and does not qualify as a "same building" under § 411.355(b)(2)(i) of this chapter.
**DATES:** The provisions of this final rule are effective January 1, 2008. However,

the date of applicability of the provisions of § 414.50, as revised at 72 FR 66222, with respect to certain services furnished in certain locations, as described herein, are delayed until January 1, 2009.

**FOR FURTHER INFORMATION CONTACT:**
Donald Romano, (410) 786–1401.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

The final rule with comment period, entitled "Medicare Program; Revisions to Payment Policies Under the Physician Fee Schedule, and Other Part B Payment Policies for CY 2008; Revisions to the Payment Policies of Ambulance Services Under the Ambulance Fee Schedule for CY 2008; and the Amendment of the E-Prescribing Exemption for Computer Generated Facsimile Transmissions," that appeared in the November 27, 2007 **Federal Register** (72 FR 66222), amended the anti-markup provisions for certain diagnostic tests in § 414.50.

**II. Provisions of the Final Regulations**

As amended, the anti-markup provisions in § 414.50 will apply to the technical and professional components of diagnostic tests covered under section 1861(s)(3) of the Social Security Act (the Act) and paid for under part 414 (other than clinical diagnostic laboratory tests paid under section 1833(a)(2)(D) of the Act, which are subject to the special billing rules set forth in section 1833(h)(5)(A) of the Act). If a physician or other supplier bills for the technical component or professional component of a diagnostic test that was ordered by the physician or other supplier (or ordered by a party related to such physician or other supplier through common ownership or control) and the diagnostic test is either purchased from an outside supplier or performed at a site other than the office of the billing physician or other supplier, the payment to the billing physician or other supplier (less the applicable deductibles and coinsurance paid by the beneficiary or on behalf of the beneficiary) for the technical component or professional component of the diagnostic test may not exceed the lowest of the following amounts:

• The performing supplier's net charge to the billing physician or other supplier.

• The billing physician or other supplier's actual charge.

• The fee schedule amount for the test that would be allowed if the performing supplier billed directly.

In revised § 414.50(a)(2)(iii), we define the "office of the billing

physician or other supplier" as medical office space where the physician or other supplier regularly furnishes patient care. With respect to a billing physician or other supplier that is a physician organization (as defined at § 411.351 of this chapter), the "office of the billing physician or other supplier" is space in which the physician organization provides substantially the full range of patient care services that the physician organization provides generally.

Subsequent to the publication of the final rule with comment period, we received informal comments from various stakeholders who allege that the application of the rule is unclear with respect to whether certain types of space arrangements meet the definition of the "office of the billing physician or other supplier." Further, some of these stakeholders assert that patient access may be significantly disrupted due to the alleged inability of physician groups to render services in a cost-effective manner if medical office space that satisfies the "same building" test in § 411.355(b)(2)(i) of this chapter for purposes of the physician self-referral rules in Part 411, Subpart J of this chapter and other medical office space in which patients are seen and that complies with the physician self-referral rules are subject to the anti-markup provisions in revised § 414.50. That is, physician groups allege that, in situations in which they are subject to the anti-markup provisions and are limited to billing Medicare for the amount of the net charge imposed by the performing supplier, because they will not be able to realize a profit and will not be able to recoup their overhead costs, they will not be able to continue to provide diagnostic testing services to the same extent that they are currently providing such services.

We are concerned that the definition of "office of the billing physician or other supplier" may not be entirely clear and could have unintended consequences. Accordingly, in order for us to study the issues further, we are delaying until January 1, 2009, the applicability of the revised anti-markup provisions in § 414.50, except for anatomic pathology diagnostic testing services furnished in space that: (1) Is utilized by a physician group practice as a "centralized building" (as defined at § 411.351 of this chapter) for purposes of complying with the physician self-referral rules; and (2) does not qualify as a "same building" under § 411.355(b)(2)(i) of this chapter. During the next 12 months, we plan to issue clarifying guidance as to what constitutes the "office of the billing

physician or other supplier" or propose additional rulemaking, or both. Because anatomic pathology diagnostic testing arrangements precipitated our proposal for revision of the anti-markup provisions and remain our core concern, we are not delaying the date of applicability with respect to anatomic pathology diagnostic testing services furnished in space that: (1) Is utilized by a physician group practice as a "centralized building" (as defined at § 411.351 of this chapter) for purposes of complying with the physician self-referral rules; and (2) does not qualify as a "same building" under § 411.355(b)(2)(i) of this chapter. In addition, we are not delaying the applicability of the revised anti-markup rule with respect to the technical component of any purchased diagnostic test. The anti-markup prohibition with respect to the technical component of purchased diagnostic tests is longstanding and was incorporated into the expanded and revised provision of § 414.50. Accordingly, it will remain applicable to the technical component of any purchased diagnostic test.

**III. Waiver of Proposed Rulemaking**

We ordinarily publish a notice of proposed rulemaking and invite public comment on the proposed rule. The notice and comment rulemaking procedure is not required, however, if the rule is interpretive or procedural in nature, and it may be waived if there is good cause that it is impracticable, unnecessary, or contrary to the public interest and we incorporate in the rule a statement of such a finding and the reasons supporting that finding. Likewise, we ordinarily provide for a delayed effective date of a final rule, but we are not required to do so if the rule is procedural or interpretive. Where a delayed effective date is required, this requirement may be waived for good cause. We set forth below our finding of good cause for the waiver of notice and comment rulemaking and the waiver of a delayed effective date.

Our implementation of this action without opportunity for public comment and without a delayed effective date is based on the good cause exceptions in 5 U.S.C. 553(b)(3)(B) and (d), respectively. We find that seeking public comment on this action is impracticable and contrary to the public interest. We are implementing this delay of effective date as a result of our review of the informal comments on the final rule with comment period from various stakeholders. As discussed above, we understand from those comments that patient access for common diagnostic tests may be significantly disrupted

unless we delay the effective date of revised § 414.50 with respect to anatomic pathology diagnostic testing services furnished in space that: (1) Is utilized by a physician group practice as a "centralized building" (as defined at § 411.351 of this chapter) for purposes of complying with the physician self-referral rules; and (2) does not qualify as a "same building" under § 411.355(b)(2)(i) of this chapter. Likewise, if we do not make this final rule effective upon publication, patient care may be significantly disrupted during the interim period between the issuance of the rule and a delayed effective date.

**IV. Collection of Information Requirements**

This document does not impose information collection and recordkeeping requirements. Consequently, it need not be reviewed by the Office of Management and Budget under the authority of the Paperwork Reduction Act of 1995 (44 U.S.C. 35).

**V. Regulatory Impact Statement**

We do not believe that this delay in the date of applicability will result in any significant economic impact on any small entity. Until January 1, 2009, the majority of billing suppliers affected by the revised § 414.50 do not have to comply with the revised requirements in § 414.50.

(Catalog of Federal Domestic Assistance Program No. 93.773, Medicare—Hospital Insurance; and Program No. 93.774, Medicare—Supplementary Medical Insurance Program)

Dated: December 18, 2007.

**Kerry Weems,**

*Acting Administrator, Centers for Medicare & Medicaid Services.*

Approved: December 27, 2007.

**Michael O. Leavitt,**

*Secretary.*

[FR Doc. 07–6280 Filed 12–28–07; 1:17 pm]

**BILLING CODE 4120–01–P**

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric Administration**

**50 CFR Parts 600 and 622**

**[Docket No. 070518142–7238–02]**

**RIN 0648–AV45**

**Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Gulf of Mexico Vermilion Snapper Fishery Management Measures**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Final rule.

**SUMMARY:** NMFS issues this final rule to implement a regulatory amendment to the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico (FMP) prepared by the Gulf of Mexico Fishery Management Council (Council). This final rule reduces the minimum size limit for vermilion snapper to 10 inches (25.4 cm) total length (TL), eliminates the 10–fish recreational bag limit for vermilion snapper within the existing 20–fish aggregate reef fish bag limit, and eliminates the 40-day commercial closed season for vermilion snapper (from April 22 through May 31 each year). NMFS is also implementing through this rule clarifications for the Gulf of Mexico red snapper individual fishing quota (IFQ) program, as well as non-substantive changes to codified text, including removing obsolete language regarding the use of fish traps in the Gulf of Mexico, removing outdated and redundant language, revising phone numbers and an outdated definition, and revising incorrect references. The intended effects of this final rule are to help achieve optimum yield (OY) by reducing vermilion snapper harvest limitations consistent with the findings of the recent stock assessment and to clarify and update existing regulations.

**DATES:** This rule is effective February 4, 2008, except for the amendments to§ 622.16(c)(3)(i) and (ii) which are effective January 3, 2008 and the amendment to § 622.39(b)(1)(x) which is effective February 4, 2008 through March 28, 2008.

**ADDRESSES:** Copies of the final regulatory flexibility analysis (FRFA) may be obtained from Sarah DeVido, NMFS, Southeast Regional Office, 263 13th Avenue South, St. Petersburg, FL 33701; telephone 727–824–5305; fax

727–824–5308; email *sarah.devido@noaa.gov.*

**FOR FURTHER INFORMATION CONTACT:** Sarah DeVido, telephone 727–824–5305; fax 727–824–5308; e-mail *sarah.devido@noaa.gov.*

**SUPPLEMENTARY INFORMATION:** The reef fish fishery of the Gulf of Mexico is managed under the FMP. The FMP was prepared by the Council and is implemented through regulations at 50 CFR part 622 under the authority of the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act).

In accordance with the FMP's framework procedure, the Council recommended, and NMFS published, a proposed rule to implement the regulatory amendment and requested public comment through May 14, 2007 (72 FR 20980, April 27, 2007). The rationale for the measures contained in the regulatory amendment, is provided in the preamble to the proposed rule and the responses to comment below and is not repeated here. A summary of the public comments received by NMFS on the proposed rule and NMFS' responses are provided below.

**Comments and Responses**

A total of 83 individuals submitted comments during the comment period on the proposed rule to reduce the size limit, relax the recreational bag limit, and remove a commercial closure. Of these, 68 of the commenters expressed support for one, two or all three of the proposed actions, and did not express any specific objections. The remaining 15 commenters opposed one or more of the proposed actions.

*Comment 1:* The regulations for vermilion snapper should remain as they are. Of special concern is the proposal to remove the 10–fish bag limit restriction. Such an action is not in line with a conservation-oriented approach to recreational fishing. The upcoming reductions in bag limits for red snapper and gray triggerfish may cause an effort shift to vermilion snapper, which could lead to increased harvests of this species. Optimistic assumptions regarding current low fishing mortality should not be relied upon. Effort shifts could substantially increase fishing mortality, and the regulations would have to be revised to ensure the vermilion snapper stock does not become overfished or undergo overfishing.

*Response:* Fishery stocks should be managed conservatively, with a goal of achieving optimum yield (OY) from the fishery. The 2006 stock assessment for vermilion snapper incorporated new

# EXHIBIT 2

In the CY 2007 PFS proposed rule (71 FR 48982), we stated that recent changes to our rules on reassignment concerning the right to receive Medicare payment may have led to some confusion as to whether the anti-markup and purchased interpretation requirements apply in certain situations where a reassignment has occurred pursuant to a contractual arrangement. In addition, we expressed concern about the existence of certain arrangements that we believe are not within the intended purpose of the physician self-referral exception for in-office ancillary services, which permits physician group practices to bill for certain services referred by group physicians and furnished by a contractor physician in a "centralized building." We also expressed concern that allowing physician group practices or other suppliers to purchase or otherwise contract for the provision of diagnostic testing services and to then realize a profit when billing Medicare may: (1) Lead to program and patient abuse in the form of overutilization of services; and (2) result in higher costs to the Medicare program (71 FR 49054). In the CY 2007 PFS proposed rule, we proposed to amend § 424.80 to provide that, if the TC of a diagnostic test (other than a clinical diagnostic laboratory test paid under section 1833(a)(2)(D) of the Act, which is subject to the special rules set forth in section 1833(h)(5)(A) of the Act) is billed by a physician or medical group (the "billing entity") under a reassignment involving a contractual arrangement with a physician or other supplier who performs the service, the amount billed to Medicare by the billing entity would be limited. We also proposed that, to bill for the TC, the billing entity would be required to perform the interpretation. In addition, we considered imposing certain conditions on when a physician or medical group can bill for the reassigned PC of a diagnostic test. For our physician self-referral rules, we proposed to modify the definition of "centralized building" at § 411.351. Finally, we solicited comments on the specific application of our proposals. (See the CY 2007 and CY 2008 PFS proposed rules for more information on these proposals (71 FR 49054 through 49057 and 72 FR 38179 through 38180, respectively).)

We received numerous comments on the proposals in the CY 2007 PFS proposed rule. Because we decided to study the issues further, we did not finalize our proposals in the CY 2007 PFS final rule with comment period. Rather, based on the comments received and other information that we

considered, in the CY 2008 PFS proposed rule, we proposed to impose an anti-markup limitation on the TC and PC of diagnostic tests. We stated that we would apply the anti-markup provision irrespective of whether: (1) The billing entity outright purchases the TC or the PC; or (2) the physician or other supplier performing the TC or PC reassigns his or her right to bill the Medicare program to the billing entity (unless the performing supplier is a full-time employee of the billing entity). That is, we proposed to limit the payment to the billing entity to the lowest of: (1) The performing physician's or other supplier's net charge to the billing entity; (2) the billing entity's actual charge; or (3) the fee schedule amount for the service that would be allowed if the physician or other supplier performing the service billed directly. To prevent gaming, whereby the performing physician's or other supplier's net charge to the billing entity is inflated to cover the cost of equipment or space that is leased by the billing entity to the performing physician or other supplier, we stated that we would define "net charge" as exclusive of any amount that takes into consideration such charges.

We also stated that we were concerned that overutilization of diagnostic tests could continue despite our proposal to apply an anti-markup provision to TCs that are reassigned to, or outright purchased by, group practices. That is, we intended to address the situation in which the TC is performed by a part-time or leased employee of the group practice in a "centralized building," and the group neither receives a reassignment from the employee technician (if the technician is not able to bill for the TC in his or her own right), nor purchases the TC outright from the technician. Therefore, we proposed to apply an anti-markup provision to TCs that are performed in a centralized building, and sought comments on whether we should have such a provision and, if so, how we should effect such a provision (for example, by amending the definition of "centralized building" or through some other means). We stated that we would except from the anti-markup provision PCs performed by a physician pursuant to an arrangement with an independent laboratory as we do not believe that such PCs ordered by an independent laboratory pose a significant risk of program abuse because the independent laboratory does not order the diagnostic test. We proposed revisions to § 424.80 (reassignments) and § 414.50 (purchased diagnostic tests). (We did not propose

regulatory text revisions for our proposals to apply an anti-markup provision to TCs that are performed in a centralized building, and not apply the anti-markup provision to PCs billed by independent laboratories whose personnel do not order the diagnostic test.)

Many commenters supported our proposals to prohibit the markup of the TC and PC of diagnostic tests in order to prevent physicians, physician group practices, and medical groups from profiting through the ordering of such tests. Commenters that supported our proposals often cited a concern about overutilization. Many commenters were opposed to our proposals. These commenters stated that the Medicare program and its beneficiaries are better served by physicians who refer tests to specialists (such as pathologists who contract directly with group practices), instead of physicians who use large reference laboratories. These commenters asserted that, because physicians develop a working relationship with particular pathologists, and because the pathologists "specialize" in a particular type of biopsy (for example, prostate biopsies), results are obtained more quickly and quality is enhanced. Finally, most commenters who responded to our proposal to apply an anti-markup to reassignments from part-time employees, irrespective of whether they were in support generally of our proposals, opposed this specific proposal.

After careful consideration of all of the comments, we are adopting our proposals, with modification. We are imposing an anti-markup provision on TCs of diagnostic tests that are ordered by the billing physician or other supplier (or ordered by a party related by common ownership or control to such billing supplier), if the TC is outright purchased or if the TC is performed at a site other than the office of the billing physician or other supplier.[1] (For purposes of the anti-markup provisions, the "office of the billing physician or other supplier" has its common meaning. The term is defined at revised § 414.50(a)(2)(iii) as space where the physician or other supplier regularly furnishes patient care. With respect to a billing physician or other supplier that is a physician

---

[1] We note that, in our proposals, we used the term "billing entity" to refer to a billing physician or medical group. In this final rule with comment period, the anti-markup provisions potentially apply to TCs and PCs billed by *any supplier; therefore, we use the terms "billing physician or other supplier" and "billing supplier." These terms are used interchangeably.*

organization (as defined at § 411.351 of this chapter), the "office of the billing physician or other supplier" is space in which the physician organization provides substantially the full range of patient care services that the physician organization provides generally.) We are also imposing an anti-markup provision on PCs of diagnostic tests that are ordered by the billing physician or other supplier (or ordered by a party related by common ownership or control to such billing supplier), if the PC is outright purchased or if the PC is not performed in the office of the billing physician or other supplier. Also, part-time employees are treated no differently than full-time employees or contractors who reassign benefits.

We are primarily revising § 414.50, although we have also revised § 424.80 by adding (d)(3) to alert the reader that, in the case of the reassignment of the TC or PC of a diagnostic test, the reader should consult § 414.50 to investigate whether the anti-markup provisions apply to the TC or PC. We are also revising our definition of "entity" at § 411.351, which is relevant to our rules on physician self-referral. Currently, the definition of "entity" provides an exception for a physician's practice when it bills Medicare for a diagnostic test in accordance with § 414.50. We are revising the definition of "entity" at § 411.351 to exclude a physician's practice when it bills Medicare for the TC or PC of a diagnostic test in accordance with § 414.50.

Examples of the application of the final provisions to particular facts appear immediately below, followed by a discussion of the specific comments we received on our proposals. We note that the following examples are intended only to illustrate the application of the anti-markup provisions of this final rule with comment period; they are not intended to address whether the physician self-referral rules would prohibit payment due to financial relationships that may exist between the billing supplier and any physician ordering a test or performing the TC or PC of a test.

*Example 1.* A urology group practice contracts with a leasing company that supplies a technician and a pathologist to perform testing on prostate samples. The technician performs the tissue sampling and the pathologist reads the slides. All work is done outside of the office of the billing group practice, and instead is performed in space that is rented exclusively "24/7" by the group practice (thus meeting the definition of a "centralized building" at § 411.351) for the sole purpose of providing pathology services for the group's patients. Because the centralized building does not qualify as "the office of the billing physician or other

supplier," the anti-markup provisions apply to both the TC and the PC, and the group may bill Medicare the lowest of the following: (1) The leasing company's net charge to the group; (2) the group's actual charge; or (3) the fee schedule amounts for the TC and interpretation that would be allowed if the leasing company were enrolled in and billed Medicare directly.

*Example 2.* Same as Example 1, except that the TC and PC are performed by the group practice's employee technician and a pathologist who is an independent contractor of the group practice, respectively. Here, the anti-markup provisions apply only to both the TC and the PC because the work was not done in the "office of the billing physician or other supplier" (that is, the office of the group practice). It does not matter that the technician is an employee and the pathologist is an independent contractor because the work was not performed in the office of the billing group practice.

*Example 3.* A physician in a group practice orders a diagnostic test and a technician who is a part-time employee of the group performs the test in the group's office. A physician who is an independent contractor of the group performs the PC in the group's office and reassigns his or her right to payment to the group. The anti-markup provisions do not apply to the group's billing of the TC or the PC.

*Example 4.* Same as Example 3, except that the independent contractor physician performs the PC in his or her home and reassigns his or her right to payment to the group. The group's billing of the TC is not subject to the anti-markup provision, but the group's billing of the PC is subject to the anti-markup provision because the work was not performed in the office of the billing supplier.

*Example 5.* A group practice purchases both a diagnostic test and its interpretation from a laboratory and bills the TC and PC to Medicare. The anti-markup provisions apply to both the TC and the PC. Because the TC and the PC were purchased, the location(s) at which the TC and the PC were performed does not matter.

*Example 6.* A group practice orders a diagnostic test from an independent laboratory. The laboratory performs the test and contracts with a physician to perform the PC. The laboratory bills Medicare for both the TC and the PC. The laboratory is not subject to the anti-markup provision for the PC, because the laboratory did not order the test.

*Example 7.* Same as Example 6, except that a physician orders a diagnostic test from an independent diagnostic testing facility (IDTF). The IDTF bills Medicare for both the TC and the PC of the test. The anti-markup provisions do not apply because the IDTF did not order the test.

**a. Authority**

*Comment:* Several commenters questioned whether we have the authority pursuant to section 1842(n) of the Act to impose an anti-markup provision as described in the CY 2008 PFS proposed rule. The commenters specifically noted that, in section

1842(n) of the Act, the Congress directed the Secretary to impose an anti-markup on the TC of diagnostic tests, yet our proposal applied to the TC and the PC of diagnostic tests. Commenters stated that the interpretation of a diagnostic test is a physician service, and that section 1848 of the Act mandates that physician services be paid the lesser of the billing physician's actual charge or the fee schedule amount, and therefore, we have no authority to extend the anti-markup rule to physician services.

*Response:* We believe that several provisions of the Medicare statute provide us with the requisite authority to impose anti-markup provisions on the TC and PC of certain diagnostic tests. Section 1842(n)(1)(A) of the Act, which was enacted as part of the Omnibus Budget Reconciliation Act of 1987, provides that, if the diagnostic test was not performed or supervised by the billing physician and also was not performed or supervised by a physician with whom the billing physician shares a practice, the Medicare payment is the lower of the costs (net of any discount) charged by the performing supplier to the billing physician, or the performing supplier's reasonable charge (or other applicable limit). This is commonly known as the anti-markup provision. Although, to date, this statutory provision has been implemented through the regulation in § 414.50 that imposes an anti-markup provision on the TC only of a diagnostic test, nothing in this section limits our authority to apply this section to the PC of a diagnostic test.

Moreover, we believe that we can interpret the language "shares a practice" as giving us the authority to impose an anti-markup provision on the TC of tests that are outright purchased by a billing physician or group, as well as on the TC of tests for which payment is reassigned to the billing physician or group. Although we previously implemented this statutory provision through regulation in § 414.50 by enacting an anti-markup provision on the TC of "purchased" diagnostic tests from an outside supplier, the statutory provision does not speak in terms of "purchased" tests. In the intervening time since CMS promulgated the regulation in § 414.50, other changes to the Medicare program, in particular, the changes made by section 952 of the MMA to the reassignment exceptions authority, have created incentives for conduct that we believe increases the risk of overutilization and abuse of the Medicare program. We believe that the language "shares a practice" in section 1842(n)(1) of the Act can cover not just

tests that are outright purchased, but also tests for which payment is reassigned to the billing supplier. We are amending § 414.50 in this final rule to provide that TCs and PCs that are not performed in the office of the billing physician or other supplier are subject to the anti-markup provision. We believe that, if the TC or PC is not purchased and is performed in the office of the billing supplier by an employee (whether full-time or part-time) or an independent contractor who reassigns benefits, a sufficient nexus with the practice of the billing supplier (that is, the billing physician or group) is established such that the employee or independent contractor may be viewed as ''sharing a practice'' with the billing supplier for purposes of section 1842(n)(1) of the Act. In addition, we believe that we have authority under sections 1102(a) and 1871(a) of the Act (our general rulemaking authority) to impose anti-markup provisions on the TC and PC of diagnostic tests in order to fully effectuate the Congress' intent in enacting section 1842(n)(1) of the Act.

We find additional authority in section 1842(b)(6) of the Act. This section generally prohibits Medicare payment to anyone other than the Medicare beneficiary or the physician or other person who furnished the item or service to the beneficiary. We allow a physician or other supplier to bill for tests and test interpretations that are purchased from an outside supplier because we have deemed the test or interpretation to be performed by the billing supplier; however, we are not *required* to deem the test or interpretation as having been performed by the billing supplier, nor are we required to do so without placing limits on the amount the purchasing supplier may bill. Likewise, whereas section 1842(b)(6) of the Act also provides exceptions (known as the reassignment exceptions) to the general rule that payment may be made only to the beneficiary or the physician or other person who furnished the item or service, such exceptions allow us (''payment may be made''), but do not require us, to make payment to an individual or an entity other than the beneficiary or the physician or other person who furnished the item or service to the beneficiary. (We note that the Congress specifically provided for CMS to implement safeguards in the context of reassignments pursuant to a contractual arrangement. Section 952 of the MMA permitted Medicare to pay a physician or entity billing for an item or service as a result of a reassignment created pursuant to a contractual

arrangement, regardless of the site of service. However, in section 952 of the MMA, the Congress specifically authorized the Secretary to subject such arrangements to ''such program integrity and other safeguards as the Secretary may determine to be appropriate.'') Therefore, we believe that we have ample authority under section 1842(b)(6) of the Act to place restrictions on the billing of tests and interpretations when the tests or interpretations were performed by someone other than the billing supplier, particularly with respect to situations in which there is the potential for overutilization.

We do not view the application of the anti-markup provision to the PC of diagnostic tests as representing a conflict with section 1848 of the Act as stated by the commenters. Although section 1848 of the Act does outline how physician services will be paid in the typical situation, section 1848 of the Act does not preclude us from setting conditions on physician payment or from deviating from the payment methodology outlined in section 1848 of the Act where a physician or other supplier is seeking to take advantage of a special situation made available to physicians or other suppliers by CMS. Payment pursuant to the terms of section 1848 of the Act is available for all the diagnostic tests in question. Physicians and other suppliers are free not to take advantage of the purchased test option or the reassignment option, and bill and receive payment only for tests they have personally performed. Where physicians and other suppliers choose to take advantage of these options, for purposes of convenience or for other reasons, we have the authority under our general rulemaking authority in sections 1102(a) and 1871(a) of the Act, as well as under our authority to set conditions for the payment of purchased and reassigned tests in section 1842(b)(6) of the Act, to promulgate rules to ensure that these options do not increase the likelihood of Medicare program abuse.

*b. Scope of Application of the Anti-Markup Provisions*

*Comment:* One commenter offered alternatives to our proposals. The commenter stated that, at least initially, the anti-markup provisions should apply exclusively to gastroenterology, dermatology, and urology physician group practices because those specialties order a significant number of pathology tests. The commenter suggested that we could subsequently broaden application of the anti-markup provisions to the extent that ''new

abusive'' arrangements develop. Alternatively, according to the commenter, CMS could define the specialties to which the anti-markup provisions would apply on the basis of objective criteria. For example, the anti-markup provisions could apply to group practices billing for pathology services where at least 75 percent of the members are from a single nonpathology specialty and where at least 75 percent of the pathology services billed by the group practice were ordered by members of the group. The commenter asserted that such a definition should cover most of the abusive arrangements that have developed in recent years. The commenter urged us to impose a broad prohibition on profiting from pathology tests, which would apply without regard to whether the histotechnologists are full-time employees or independent contractors of the group practice. According to the commenter, a prohibition on profiting could be accomplished by prohibiting any markup over the direct costs incurred by the group practice in providing such services, and direct costs should be limited to the compensation paid to the persons providing the services and the cost of the equipment and supplies utilized in performing the services. Finally, the commenter suggested the alternative of amending the requirements for ''group practices'' in § 411.352 to prohibit gastroenterology, dermatology and urology group practices from profiting from Medicare payments for pathology services performed within the group practice.

*Response:* We decline to adopt any of the approaches suggested by the commenter. The anti-markup provisions in this final rule with comment period apply to group practices (as well as all other suppliers) regardless of specialty. We believe that making the rule applicable to all suppliers ensures fair and equitable treatment among types of suppliers and also ensures that the potential for overutilization is addressed regardless of the particular type of supplier involved. As we discuss in greater detail below, we agree with the commenter that it should not matter whether the person performing the TC is a full-time employee, part-time employee or independent contractor. If the TC (or PC) is purchased, or if it is performed in a place other than the office of the billing supplier, the anti-markup provision will apply, irrespective of the employment status of the person performing the TC (or PC). We are not revising the requirements for ''group practices'' at § 411.352 at this time. We did not propose to amend

these provisions and believe that such a change would be outside the scope of the proposed rulemaking.

*Comment:* A commenter suggested that we consider an anti-markup provision that would apply to any group practice where at least 90 percent of the practice is comprised of a single specialty other than pathology that orders the pathology tests billed by the group. The anti-markup rule should prohibit the markup of the direct costs incurred by the group (such as compensation paid to the histotechnologists and pathologists, and equipment and supplies utilized).

*Response:* We believe that the commenter's suggestion would be cumbersome and difficult to administer, and therefore, we are not persuaded to adopt it. We believe that the anti-markup rules that we have finalized are much more practical and will be an effective deterrent to the ordering of medically unnecessary tests.

*Comment:* One commenter stated that the anti-markup provisions should apply equally to all physicians, including pathologists. The commenter noted that, in some cases, a pathologist performing the PC purchases the TC from a hospital or another pathology laboratory and bills globally. In addition, the commenter asserted that it is a myth to say that pathologists do not order tests and, therefore, should be exempt from the proposed anti-markup provision applicable to the PC of a diagnostic test. Another commenter stated that there is no more likelihood of abuse in specialty physician-owned pathology laboratories than with pathology groups ordering expensive and unneeded special tests and stains on specimens that they then interpret in the pathology group-owned histology laboratory.

*Response:* The revisions to § 414.50 and § 424.80 concerning the anti-markup requirements apply equally to all physicians, including pathologists. We recognize that, in some situations, a pathologist may order additional tests to be performed by an outside pathologist. Where a pathologist orders and bills for a test that he or she did not personally perform, the anti-markup provisions may apply to the TC or PC, or both (depending on whether the TC or PC was purchased or, if not, whether the TC or PC was performed in the pathologist's office). If the pathologist did not order the test, the anti-markup rules do not apply.

*Comment:* One commenter requested clarification that § 414.50 applies only to physicians and medical groups, and not to suppliers, such as medical foundations, that, under State laws

governing the corporate practice of medicine, are required to enroll in Part B as a clinic or group practice. The commenter asserted that, in States prohibiting the corporate practice of medicine, many suppliers enrolled as a clinic or group practice are unable to directly employ the radiologist or other physician who performs a test interpretation.

*Response:* In this final rule with comment period, we are revising § 414.50 to apply to all suppliers. However, the anti-markup provisions do not apply to TCs and PCs that are not purchased and that are performed in the office of the billing physician or other supplier. Therefore, in the commenter's example, if clinic personnel order, for example, the TC and PC, and the TC and PC are performed in the clinic's office, neither the TC nor the PC will be subject to the anti-markup provisions.

*Comment:* Two commenters asserted that IDTFs operate similarly to independent laboratories in that the tests are ordered by a financially independent physician. The commenters also said that the physician performing the interpretation sees the patient. Therefore, the commenters recommended that we provide an exception to the proposed anti-markup rules for purchased interpretations for imaging suppliers, such as IDTFs, if the current purchased interpretation rules are met.

*Response:* We are not persuaded to provide an exception to the final anti-markup provisions for purchased interpretations for imaging suppliers if the current purchased interpretation rules are met. We note that, if the interpreting physician sees the patient, the purchased interpretation rules are not fully met. Therefore, the imaging supplier is not satisfying all of the purchased interpretation rules, and the imaging supplier should only bill for the TC portion of the test.

*Comment:* One commenter requested clarification that the anti-markup proposals do not apply to radiologists who have contractual arrangements with IDTFs. The commenter asserted that radiologists and IDTFs are not in a position to refer to each other or to themselves because both are dependent upon referrals from other physicians in the community. Another commenter asked us to clarify that the anti-markup for the PC will not apply to an IDTF that purchases the PC from the interpreting physician, particularly in States in which the corporate practice of medicine doctrine applies. Another commenter stated that the anti-markup provision for the PC should not be applied to physicians or group practices

that bill for the professional services performed by an independent contractor or part-time employee if those services were performed pursuant to the order of another practitioner who is independent of the group, and thus would not profit from his or her referral.

*Response:* As finalized, the anti-markup provisions are applicable to all types of suppliers. However, in the situation in which an IDTF, radiology practice, or other supplier does not order the diagnostic test, the anti markup provisions do not apply.

*Comment:* A few commenters questioned whether the proposed anti-markup provision, for the PC of diagnostic tests, would apply to IDTFs that purchase the PC from an interpreting physician, particularly in States where the corporate practice of medicine prohibits an IDTF from hiring the physician as an employee.

*Response:* The anti-markup rules will not apply to entities that are enrolled as an IDTF where the IDTF does not order the test. If the IDTF orders the test, the anti markup provisions will apply to the same extent that they apply to other suppliers.

*Comment:* A few commenters urged us to clarify in § 424.80 that the anti-markup provisions apply to reassignments under both the contractual arrangement exception as well as the employee reassignment exception. The commenters also suggested that § 424.80 and § 414.50 should state that the anti-markup provisions are limited to claims submitted by physicians and medical groups and do not apply to claims submitted by independent laboratories. The commenters were concerned that the preamble language on the applicability of the anti-markup provisions to independent laboratories was not carried over and included in the regulatory text in § 424.80 and § 414.50.

*Response:* We have determined to revise § 414.50, with a cross reference in new § 424.80(d)(3). As finalized, the anti-markup provisions apply to reassignments under both the employee exception and the contractual arrangements exception, to the extent that the services for which payment is reassigned are not performed in the office of the billing physician or other supplier. The anti-markup provisions apply to a billing supplier only if the billing supplier orders the TC. Therefore, if an independent laboratory does not order the TC, the anti-markup provisions will not apply to the laboratory billing of the TC or the PC.

*Comment:* Two commenters urged us to create an exception for entities that are located off-campus from a hospital

which are jointly owned by radiologists and the hospital and which have an exclusive contract for the provision of professional interpretations to the hospital. According to the commenters, it is important to allow such joint ventures to exist, because the profits generated by the ventures give financial stability to community hospitals that otherwise would be financially impaired as outpatient imaging continues to migrate away from the hospital. In States in which the corporate practice of medicine doctrine exists, the joint ventures do not directly employ the physicians, but rather typically contract with the professional radiology practice to provide the PC. The commenter stated that the radiologists providing the professional reads are neither full-time employees nor exclusively employed by the joint venture imaging center to which they reassign their right to Medicare payment.

*Response:* We do not believe that it is necessary to create such an exception. The comment is unclear as to which entity, the joint venture imaging center or the hospital, is billing for the service; however, if the imaging center is billing for the PC, the anti-markup provision will not apply if the physician performs the PC in the imaging center's office. If the imaging center, or an entity related to it by common ownership or control, orders the TC, and the physician does not perform the PC in the imaging center's office, the anti-markup provision will apply.

*Comment:* Some commenters believed that the anti markup provisions should not apply to imaging suppliers that meet the purchased test rules in CMS manuals.

*Response:* In the CY 2007 PFS proposed rule, we stated that we were considering placing restrictions on the ordering of PCs that would be similar to the purchased interpretation rules in our manuals. After giving the matter considerable thought, we believe that an anti-markup billing provision is necessary to guard against potential overutilization and that it would not be sufficient simply to require that billing entities meet the purchased interpretation rules in our manuals.

*Comment:* In the proposed rule, we proposed to add new § 424.80(d)(3) to require that, in order to bill for the TC, the billing entity must directly perform the PC of the service. Two commenters asked that we clarify what we meant by "directly perform." Other commenters recommended that we clarify in § 424.80 the requirement to bill for the TC of a diagnostic test, and clarify in § 414.50 the requirement that a billing

entity must directly perform the PC of the service.

*Response:* We are not finalizing the proposed change to § 424.80(d)(3). We note that the requirement continues to appear in our manuals at CMS Internet-Only Manual, Pub. 100–04, Chapter 1, section 30.2.9. Currently, we are considering whether to retain this requirement in the manuals or to withdraw it.

*Comment:* One commenter supported generally the establishment of an anti-markup provision on purchased interpretations, but voiced concerns that our proposal to incorporate the billing rules for purchased diagnostic testing services to all reassigned services (unless performed by a full-time employee of the group) could adversely affect the billing practices of pathologists and pathology groups who often depend upon the reassignment rules to bill for services performed by independent contractor and part-time pathologists. Therefore, the commenter requested an exception from our proposed rules for independent laboratories and single-specialty pathology physician groups.

The commenter also asserted that reassignment arrangements between pathology groups do not raise the same threat of abuse because the vast majority of pathology services are initiated by a request for a consultation from a referring physician of another specialty, and the pathologist is not in a position to influence the referrals from ordering physicians. The commenter further stated that a broader exception for single-specialty pathology physician groups and independent laboratories that covers both the TC and PC of a pathology service is supported by the existing physician self-referral law and regulations. The commenter stated that, the "Congress recognized that certain physicians, specifically pathologists, diagnostic radiologists and radiation oncologists, who order certain services pursuant to a consultation with another physician do not have the same risk of abuse and, consequently, will not be treated as having made a restricted referral to an entity with which they have a financial interest." The commenter urged us, for this same policy reason, to recognize an exception for single-specialty pathology physician groups and independent laboratories that bill for pathology services performed or supervised by another pathologist, whether an independent contractor or full-time or part-time employee.

*Response:* In order to be fair and to avoid the appearance of giving preferential treatment to one physician

specialty group over another, the anti-markup provisions on the TC and PC of diagnostic tests are potentially applicable to all physician specialty groups that order tests and wish to bill for the TC or PC, or both, performed by another person or group and billed as a purchased test or billed through a reassignment. (Whether the anti-markup provision for the TC or the anti-markup provision for the PC will, in fact, apply depends on whether the TC or the PC was purchased, or, if not purchased, whether the TC or the PC was performed in the office of the billing physician or other supplier.) Therefore, we are not recognizing an exception for single-specialty pathology physician groups that bill for pathology services performed or supervised by another pathologist, unless the single-specialty pathology physician group does not order the test. If a pathologist in the single-specialty pathology physician group orders and bills for the test performed by another supplier, the anti-markup rules apply. If the pathologist does not order the test and wishes to bill for the test, which is performed by another supplier, the anti-markup rules will not apply. Finally, we note that clinical diagnostic laboratory tests performed by independent laboratories and paid under section 1833(a)(2)(D) of the Act are not subject to the anti-markup provisions pertaining to diagnostic tests.

*c. Overutilization*

*Comment:* Many commenters in favor of the proposed rulemaking cited overutilization as a concern in the existing billing and payment environment. Commenters opposed to our proposals denied that contractual arrangements for pathology services lead to overutilization.

In support of their contention that current arrangements facilitate overutilization, some commenters cited various studies for the proposition that physician self-referral leads to increased utilization. For example, one commenter cited 1989 studies from the OIG and GAO that found that physicians who had an ownership or investment interest in a laboratory ordered more tests than those physicians who did not have such an interest. This commenter also noted that an analysis by the Florida Cost Containment Board in 1998 found that physician-owned clinical laboratories, diagnostic imaging centers, physical therapy centers, and rehabilitation centers performed more procedures on a per-patient basis than those facilities that were not physician-owned. The commenter also cited the 2007 study by

the McKinsey Global Institute that found that the United States spends more of its wealth on health care than any other developed country, and that one reason for the difference in spending is due to profit incentives in physician ownership of medical facilities. Other commenters mentioned the 2007 OIG studies of three urology practices, which the commenters described as finding that all three practices substantially increased the number of biopsies ordered per patient after entering into an arrangement for contracted pathology services, and that, after entering into such an arrangement, all three practices billed significantly more biopsies than what their respective carriers paid on average to other suppliers. One commenter cited a study by the Center for Health Policy Studies that examined the effects of State "direct billing" laws. Under such laws, the pathologist or entity performing the ordered pathology services is required to bill for the services. This study found that laboratory charges per enrollee under private health insurance programs were 41 percent higher in non-direct billing States than in direct billing States. Another commenter stated that a study in the American Journal of Roentgenology in 2002 confirmed that physician self-referral may be contributing to the uncontrolled growth in imaging services. According to the commenter, that study reported that, when a managed care organization prohibited certain non-radiologist specialties from billing for imaging services, total billings for imaging declined 20 to 25 percent from the amount of billings that were expected based on the previous trend in imaging growth.

One commenter stated that it is unaware of any evidence of overutilization by gastroenterologists who have entered into contractual arrangements for pathology services. Another commenter stated that its managed "pod labs" are vital to the accurate detection and treatment of prostate cancer and do not expose Medicare to an undue risk of program abuse. The commenter asserted that no data supports the accusation that its managed laboratories facilitate the generation of medically unnecessary biopsies, and in any event, clinical indications for prostate biopsy are not subject to manipulation.

Another commenter stated that urological pathology volume is based upon objectively demonstrated medical necessity, and is not affected by profit margin or who is billing for services. This commenter suggested that specific requirements could be placed on

contractual arrangements to address overutilization concerns, while preserving the benefits of these types of arrangements. The commenter stated that the best way to ensure that contractual arrangements are maximizing their potential for improving care and outcomes, while discouraging overutilization, is to prohibit arrangements that are merely passive investments of the treating physicians. The commenter asserted that physicians who own off-site pathology laboratories should be actively involved in their direction and supervision, and responsible for the services provided by the laboratory. The commenter offered several specific recommendations, including: (1) If a group practice intends to bill for the TC, it must also perform the PC; (2) consistent with CLIA regulations, a pathologist may not be the medical director of more than five laboratories; and (3) refined credentialing criteria for pathologists. In its comments to the CY 2008 PFS proposed rule, MedPAC stated that it agrees that allowing physicians to purchase or contract for the provision of diagnostic tests and to realize a profit when billing Medicare could lead to overuse of services and higher program costs.

One commenter discussed available types of diagnostic tests for prostate cancer and stated that there does not appear to be any added benefit to the patient from receiving a 12-part biopsy series instead of a smaller number. According to the commenter, this method of biopsy results only in increased diagnosis of minimal prostate disease or atypical small acinar proliferations, which leads only to further biopsies and increased medical costs. The commenter stated that the argument of urologists, that 12 biopsies is the standard of care, is shown to be fallacious by the fact that, when members of a particular urology group perform prostate biopsies in local hospitals, they are doing only two-part biopsies. However, another commenter stated that he knows of more than one urologist who routinely submitted two core biopsies for review, but after employing a pathologist, switched to 12 core biopsies. Another commenter stated that patient care improves with contractual arrangements because the test results are timelier and are of higher quality. Faster results, together with the opportunity to collaborate with pathologists, permit urologists to better manage their patients' care. According to the commenter, the number of cores taken for each prostate biopsy is a direct result of the evolving understanding of

the nature of prostate cancer, rather than, as some state, the formation of urology specialty laboratory arrangements between urologists and pathologists. One commenter stated that, whereas it understood our concern of overutilization, the current malpractice system creates far more incentive to perform unnecessary tests.

Two commenters stated that the incessant complaints of profits being made at the expense of the Medicare program do not serve any purpose. The commenters claimed that, unless a profit can be achieved, no one will perform services needed by Medicare or any other program. The commenters suggested that, regardless of who collects the fees for pathology and laboratory services and makes a profit, whether an individual pathologist, a commercial laboratory, or a physician specialty practice, this should not be a focus of CMS. Rather, CMS should review the standards of care and hold suppliers to those standards. The commenters pointed out that the National Comprehensive Cancer Network developed standards for a patient with early prostate cancer. At first, the standard was only two cores. In the mid 1990s, the standard was increased to six cores, then, with additional research, the standard was increased to ten cores, and, recently, the recommendation was further increased to 12 cores. The research has shown a dramatic increase in prostate cancer detection with increased core sampling. The commenters stated that it is hypocritical that pathologists are claiming overutilization of services by physician specialty groups, when these same pathologists accepted 12 core biopsies without a whisper of discontent. These commenters asserted that overutilization would cease to be an issue if CMS actively pursued those practitioners, including pathologists, who do not follow the accepted and published standards of care.

*Response:* It is difficult to determine whether and the extent to which overutilization is due to, or facilitated by, arrangements that allow the referring physician or group practice to bill for the TC and the PC of diagnostic tests. Our proposals were not predicated upon a belief that there was a correlation between the size of the group practice and the volume of diagnostic tests and the risk of program abuse. We appreciate that, for a particular practice specialty, an increase in biopsies ordered may be due to a change in business arrangements that produces profits for the referring physician or group practice, or it may be due to a change in the standard protocols (or in

the referring physician's or group's perception of the appropriate standard of care). Nevertheless, studies have shown that, in the aggregate, utilization of diagnostic tests increases in the case of physician self-referral. We believe it is appropriate to guard against the potential for overutilization through an anti-markup provision on the TC and PC of diagnostic tests. We decline to use a specific number of prostate biopsies as a trigger point for application of the anti-markup provisions, as we believe the appropriate number of biopsies is largely patient-specific.

*Comment:* Several commenters stated that contractual arrangements for anatomic pathology testing pose no risk of overutilization because Medicare patients would not be subjected to unnecessary testing due to the invasive nature of test procedures such as colon or prostate biopsies.

*Response:* We are skeptical that the risk of overutilization for biopsies is appreciably less than that of other types of diagnostic tests. In any event, in enacting the anti-markup provision in section 1842(n)(1) of the Act, the Congress made no exception for biopsies or other minimally invasive tests, and in order to effectuate Congressional intent we are not providing for such an exception.

**d. Quality and Patient Access**

*Comment:* Many commenters, both in favor of and against the proposed rulemaking, focused on the issue of the quality of the diagnostic testing, particularly pathology services.

Two commenters stated that the financial incentive inherent in some arrangements can result in physicians selecting laboratories not on the basis of quality but on the potential for profit from these arrangements. One commenter believes that "by reducing pathologists to the status of indentured servants of clinicians who 'own' the patients and their biopsies, the autonomy and quality of the pathology services provided is fatally eroded." According to one commenter, aspects of pathology practice, such as the adequacy of the biopsy, the sampling procedure, the need for deeper or additional sections, the severity of a process, the adequacy of margins, the need for re-excision, the appropriateness of special studies, and the need for outside expert consultation despite increased expense, ultimately are decided based on what provides the maximum economic benefit to the ordering and billing physician. The other commenter stated that a gastroenterology group practice that had been sending its pathology work to his

pathology practice ended the relationship because it entered into an arrangement with another pathology group under which the gastroenterology group practice could bill for the TC. The commenter stated that the gastroenterology group said that there was no dissatisfaction with quality or the service of the commenter's work, but rather it was purely a business decision that enabled the gastroenterology group practice to capture additional revenue in an environment of shrinking reimbursement. Another commenter stated that he received a biopsy for review that was performed on a urologist who routinely sent his (the urologist's) patients' biopsies to his (the urologist's) employed pathologist. The commenter stated that what was good enough for the urologist's patients was not good enough for the urologist.

One commenter stated that captive pathology arrangements are detrimental to patient care. The commenter stated that a local gastroenterology group was able to locate a pathologist who was desperate for work and who reads the biopsies only once a week. The commenter called the turn-around time of once per week "atrocious." The commenter claimed that pathologists who are not willing to work for less than fair market value are being put out of work by physicians who are ignorant of the value of quality pathology services and who hire anyone willing to read slides for any price under any condition. Another commenter asserted that, although gastroenterologists claim they get better service from pathologists who allow the gastroenterologists to bill for the pathology services, the "better service" is, in reality, more money for the gastroenterologists.

One commenter stated that surgeons and surgical pathologists need to work in close contact with each other, and that the pathologist in a "pod lab" has little or no interaction with surgeons and other clinicians. Hospital-based pathologists meet on a regular basis with surgeons and other clinicians to share insights and perspectives on cases, sometimes with immeasurable patient benefit. The "pod lab" arrangement impacts negatively upon the "pod" pathologist's professional growth. Another commenter suggested that we should be aware that the "current campaign" against so-called "pod labs" is led by a few self-interested private pathologists, some in leadership positions in their national organizations, who wish to monopolize the outpatient biopsy market. The commenter stated that these pathologists are using scare tactics to paint with the same brush any nontraditional pathology arrangement,

without regard to any real demonstration of quality problems. The commenter suggested that, instead of focusing on the "straw man" of "pod labs," we should require all suppliers of pathology services to demonstrate quality of service and appropriateness of utilization in order to end the ongoing abusive pathology practices that are occurring in traditional pathology groups, independent laboratories and academic medical centers.

One commenter asserted that the use of contractual arrangements allows specialization by pathologists that otherwise would be seen only in the largest medical centers or reference laboratories. Moreover, the commenter stated that pathologists who work together in contractual arrangements with various groups have the unique opportunity to consult with each other on a regular basis. An entity that manages "pod labs" stated that internal data generated by group practices that refer to their own managed laboratories show a higher positive incidence of prostate cancer now than before they contracted with the commenter. One commenter contended that most gastroenterologists who enter into contractual arrangements with pathology laboratories do so in order to achieve a higher quality of patient care through timely diagnoses and the use of pathology personnel who are experts in gastrointestinal and liver pathology. The commenter expressed certainty that our proposal would have an adverse effect on practice efficiency and the quality of patient care.

A commenter stated that large corporate laboratories do not always provide the highest level of care available. According to the commenter, large laboratories have an incentive to hire the cheapest physician labor in order to "churn out" a high volume of services. The commenter argued that the interaction between the urologists in a group practice and a dedicated pathologist in that practice will lead to better outcomes. Another commenter stated that some gastrointestinal group practices have opened their own pathology laboratories because they believed that the pathology reports they received from general laboratory companies were in some ways lacking. A commenter echoed that sentiment, and added that the fact that the pathologist was practicing in its office meant that the group can easily discuss the pathologist's findings with him and even review slides together.

One commenter contended that, based on her experience gained from working for large, national laboratories, sections are poorly processed there and, often,

much of the tissue is lost. According to the commenter, extra ribbons are not collected at these laboratories and immunostains often do not contain the area suspicious for carcinoma. There is no communication with the physician's office and usually no clinical information is exchanged. She further asserted that group practices that send tissue samples to large laboratories run the risk that an inexperienced pathologist could be performing the work. The commenter related a personal experience in which biopsies were read at a large national laboratory as showing HGPIN, a precursor to adenocarcinoma. The commenter stated that the slides she reviewed on re-biopsy showed no HGPIN, and, not only was the patient made to worry unnecessarily, but the mistaken biopsy review led to the expense of a re-biopsy and another reading. Another commenter stated that its clients say that it provides better quality services and in a timelier manner than do the national commercial laboratories. According to the commenter, this is because physician practices that send anatomic pathology specimens to large commercial laboratories do not choose the pathologists who interpret the slides and thus do not know the qualifications of the pathologist.

*Response:* We believe that, everything else being equal, there can be some advantages to a physician or group practice referring to the same pathologist, if the referring physician or group practice chooses the pathologist on the basis of his or her qualifications and experience, and the service that he or she provides. However, we also believe that, where there is a financial reward for choosing a pathologist or other diagnostic specialist based on financial self-interest, there is the potential to disregard, or at least subordinate, quality considerations. This final rule with comment period eliminates the profit incentive in choosing a pathologist or other specialist while preserving the referring physician or group practice's right to continue to use the pathologist or other specialist of its choosing. That is, if a billing group practice currently has a contractual arrangement with a particular histotechnologist and particular pathologist because it believes that the histotechnologist and the pathologist provide superior quality and service, it may continue to refer to them; it only will be prevented from marking up the TC and PC (unless the TC and PC are not purchased and are provided in the office of the group practice).

*Comment:* Many commenters asserted that there would be no adverse effect on patient access if the proposal was adopted. Other commenters stated that patient care would be significantly disrupted if the proposal was adopted. Specifically, commenters stated that the proposed changes would limit access to multiple urologic services in a local area, namely, radiation therapy, lithotripsy, and many in-office procedures such as thermal ablative procedures for prostate obstruction. These commenters contended that many in-office procedures are never performed in hospitals, and that, if the proposed changes to the reassignment and purchased diagnostic test rules become effective, it would be difficult, if not impossible, to provide these services to Medicare beneficiaries.

*Response:* We are skeptical that our proposal would cause any patient access problem. There appear to be adequate choices throughout the country for physicians and group practices to obtain timely access to diagnostic testing. No evidence was brought to our attention that a patient access problem previously existed and was somehow alleviated when physicians and group practices began entering into contractual arrangements for the provision of pathology and other diagnostic services. In any event, as noted above, our proposal as finalized does not prohibit physicians and group practices from continuing to use the same diagnostic services that they have been using to date.

e. Purchased Tests as They Relate to Reassigned Tests

*Comment:* We received comments stating that physician contractual arrangements with pathologists constitute an attempt to evade the restrictions of the physician self-referral law. Several commenters stated that there is no practical distinction between a purchased service and a reassigned service. One commenter stated that the proposal effectively eliminates the reassignment rules. The commenter argued that, although CMS states that, under section 952 of the Act, it is required to recognize contractual reassignments only to the extent they meet program integrity and other standards determined by the Secretary, the commenter asserts that the Congress surely did not mean that this statutory provision could be administratively repealed by merging it into the already existing purchased diagnostic test rules. Another commenter stated that our proposal appears to be mixing the purchased diagnostic test policies with contractual reassignments, which could

result in confusion for the imaging industry.

*Response:* We are concerned that some current arrangements are not in accord with the spirit or the letter of the anti-markup provision in section 1842(n)(1) of the Act. Section 1842(n)(1)(A) of the Act, which was enacted as part of the Omnibus Budget Reconciliation Act of 1987 (Pub. L. 100–203), provides that, if a diagnostic test described in section 1861(s)(3) of the Act (other than a clinical diagnostic laboratory test) was not performed or supervised by the billing physician and also was not performed or supervised by a physician with whom the billing physician "shares a practice," Medicare payment is the lower of the costs (net of any discount) charged by the performing supplier to the billing physician, or the performing supplier's reasonable charge (or other applicable limit). We implemented the anti-markup provision of section 1842(n)(1) of the Act by promulgating current § 414.50, "Physician billing for purchased diagnostic tests." The current version of § 414.50 applies to TCs performed by an "outside supplier," but that term is undefined. We acknowledge that some have understood § 414.50 as applying only to TCs that are outright purchased, instead of reassigned, but as we indicated in the CY 2007 PFS proposed rule (71 FR 49056), and as some commenters have noted, reassigned tests are functionally the equivalent of purchased tests. When section 1842(n)(1) of the Act was enacted, there was perhaps more of a difference between purchased tests and reassigned tests, but subsequent events have blurred the distinction between tests that are outright purchased and tests for which payment is reassigned.

At the time section 1842(n)(1) of the Act was enacted, reassignments under the contractual arrangement reassignment exception in section 1842(b)(6)(A)(ii) of the Act were permitted only to the extent the work was performed on the premises of the billing supplier. Therefore, at that time, a physician reassigning benefits to another physician was either an employee of the billing supplier or a contractor who was furnishing the services on the premises of the billing supplier. However, in our January 4, 2001 (Phase I) final rule with comment period, we provided that, for purposes of our rules on physician self-referral, an independent contractor physician is a "physician in the group practice," as defined at § 411.351, during the time the physician is providing care to the group practice's patients "in the group practice's facilities" (66 FR 885 through

886, 955). Further, in that same rulemaking, we provided that a group practice's facilities (again, for purposes of our rules on physician self-referral) can include a "centralized building" (66 FR 888 through 889). As defined at § 411.351, space qualifies as a group practice's "centralized building" if it is leased "24/7" by the group practice, irrespective of the amount of square footage of the space and irrespective of the proximity (or lack thereof) to the group's facilities. Following that rulemaking, a group practice could, in compliance with our rules on physician self-referral, refer patients for designated health services (DHS) (such as diagnostic testing) to an independent contractor physician, and such physician could perform or supervise the performance of diagnostic tests in a centralized building, provided that all requirements of an exception were satisfied. Further, the independent contractor physician arguably satisfied the "on the premises" requirement of section 1842(b)(6)(A)(ii) of the Act and, thus, was permitted to reassign benefits to the group practice for the work performed in the centralized building, because we considered a centralized building to be the group practice's facilities. In any event, in section 952 of the MMA of 2003, the Congress amended section 1842(b)(6)(A)(ii) of the Act to remove the requirement that the services must be performed on the premises of the billing supplier in order to utilize the contractual arrangement exception. Therefore, following the MMA amendment, it is clear that independent contractor physicians who perform or supervise the performance of diagnostic tests in a centralized building may reassign payment for such tests to the group practice that owns or leases the centralized building.

Being mindful of the Congress' intent to impose an anti-markup on the TC of diagnostic tests that are not performed or supervised by a physician who "shares a practice" with the billing physician, we are amending § 414.50 in this final rule with comment period to provide that TCs that are not performed in the office of the billing physician or other supplier are subject to the anti-markup provision. With respect to a physician organization (such as a group practice), we consider the "office of the billing physician or other supplier" to be medical office space in which the physician organization provides substantially the full range of patient care services that the physician organization provides generally. Therefore, with respect to group practices, we do not consider space to

be the "office of the physician or other supplier" if that space does not meet the requirement regarding patient care services in revised § 414.50(a)(2)(iii) (for example, space that is utilized as a "centralized building" for purposes of the exceptions for physician services and in-office ancillary services in § 411.355(a) and (b), respectively, but in which the group practice provides diagnostic testing services only).

We believe that, if the TC is performed by an employee (full-time or part-time), or by an independent contractor who reassigns benefits, in the office of the billing physician or other supplier, a sufficient nexus with the practice of the billing supplier is established. (In this regard, we note that, if the TC is performed by someone other than an employee or a contractor who reassigns benefits, that is, someone who sells the test to the billing physician or other supplier, the anti-markup provision will apply regardless of where the service is performed.) Further, we see no reason to distinguish between the TC and the PC of diagnostic tests for purposes of the anti-markup provisions. Although the Congress did not establish an anti-markup provision in section 1842(n)(1) of the Act or elsewhere for the PC of diagnostic tests, the omission may have been inadvertent. That is, it is not immediately clear why the Congress, if it wished to prevent overutilization of diagnostic testing, would not have desired an anti-markup on the PC, because without such a provision, the incentive to order unnecessary tests (and profit on the PC) remains. We believe that, in order to fully effectuate the Congress' intent to prevent or limit the ordering of unnecessary diagnostic tests, it is necessary to impose an anti-markup provision on the PC of diagnostic tests. Accordingly, our revisions to § 414.50 apply to PCs to the same extent as they apply to TCs.

We see no reason to distinguish between physicians and physician group practices on the one hand, and other types of suppliers on the other hand, that bill for diagnostic tests. In the proposed rule, we used the terminology "physician or medical group," which we borrowed from the existing manual provisions on purchased tests and purchased test interpretations. However, the term "medical group" is not defined and is not commonly used elsewhere. We are amending § 414.50 so that it applies to a billing "physician or other supplier." Any enrolled supplier that bills for a diagnostic test or its interpretation is potentially subject to the anti-markup provisions in § 414.50.

f. Definition of "Entity"

*Comment:* One commenter stated that, although we proposed to expand the purchased diagnostic test rule in § 414.50 to apply also to the purchased PC of a diagnostic test, it was not entirely clear whether we proposed to expand the scope of the exception in the definition of "entity" at § 411.351 for purposes of our rules on physician self-referral. The commenter noted that the definition of "entity" at § 411.351 provides that a physician's practice is not acting as an "entity" when it bills Medicare for "a diagnostic test in accordance with § 414.50." The commenter contended that the phrase "diagnostic test" is currently interpreted to mean only the TC, in part because § 414.50 currently applies only to the TC. The commenter also stated that if the scope of § 414.50 is expanded to cover both the TC and the PC, one could interpret the phrase in § 411.351, "diagnostic test in accordance with § 414.50," to mean that a physician practice is not an entity when it bills Medicare for either the TC or the PC in accordance with § 414.50. The commenter suggested that, if we finalize our proposal to apply an anti-markup provision to purchased TCs and PCs, we should revise the definition of "entity" at § 411.351 to clarify that the exception for purchased diagnostic tests applies to both the TC and the PC. Another commenter also supported changing the definition of "entity" at § 411.351 to except from that definition a supplier that is billing for the PC in accordance with the anti-markup provisions of § 414.50.

*Response:* Under our physician self-referral rules in part 411, subpart J of this chapter, a physician may not refer a patient for certain designated health services (DHS) to an entity with which the physician (or an immediate family member) has a financial relationship, and the entity may not bill Medicare for such DHS, unless an exception applies. The definition of "entity" at § 411.351 "does not include a physician's practice when it bills Medicare for a diagnostic test in accordance with § 414.50." The rationale for excluding from the definition of "entity," and hence from the application of our physician self-referral rules, a physician practice that is billing for a TC that is subject to the anti-markup provision, is that there is no risk of overutilization arising from a financial relationship between the referring physician and the physician's practice billing for the service. We believe the same rationale should apply to PCs made subject to an anti-markup provision under this final rule with

comment period. We are amending slightly the definition of "entity" at § 411.351 to make clear that the exclusion applies to both TCs and PCs. As amended, the pertinent language reads "does not include a physician's practice when it bills Medicare for the TC or the PC of a diagnostic test for which the anti-markup provision is applicable in accordance with § 414.50."

We note that, under our physician self-referral rules, an independent contractor physician is a "physician in the group" for purposes of the physician services exception in § 411.355(a) and the in-office ancillary services exception in § 411.355(b), only with respect to services performed on the group's premises (including a "centralized building" as defined at § 411.351). Therefore, one practical effect of the change in the definition of "entity" is that a group practice that currently may not bill for a PC performed by an independent contractor physician, because the independent contractor physician is not performing the PC on the group's premises, will be able to do so without running afoul of the physician self-referral rules if the PC is billed in accordance with the anti-markup provisions of this final rule with comment period.

g. Employment Status

*Comment:* A commenter that supported our proposed changes to the reassignment rules pertaining to diagnostic tests stated that it was appropriate for CMS to focus on the billing of diagnostic tests performed by someone other than a full-time employee. The vast majority of commenters that addressed the employment status issue, however, opposed applying the anti-markup provisions to part-time employees and independent contractors based simply on their employment status. Three commenters asserted that the proposed changes are unnecessary and would negatively impact the way physicians provide care to patients, possibly resulting in the termination of part-time physicians or a prohibition on part-time physicians furnishing diagnostic tests. Many commenters claimed that, if the proposed changes to the purchased diagnostic test rules are implemented, physicians and group practices would not be able to provide certain routine medical procedures if limited to using full-time employees. One commenter requested that we exempt part-time employees and independent contractors from the anti-markup rules provided that the billing supplier satisfies a physician self-referral exception and the

services are furnished in the billing supplier's office. A few commenters proposed that CMS not apply the anti-markup requirements to technicians who work on-site at the medical group and who work at least half-time for that specific group.

One commenter stated that limiting reimbursement for the PC of diagnostic tests performed by outside suppliers would create an incentive to hire full-time staff and then overutilize pathology services in an attempt to recoup the costs of such personnel. The commenter urged us not to penalize physician groups by having the anti-markup rules apply when using part-time employees or independent contractors who furnish services on less than a full-time basis. Two commenters considered our proposal to be premised on the unsupported belief that group practices that perform a lower volume of diagnostic tests and, therefore, need only employ pathologists on a part-time basis, present more risk of program abuse. Another commenter stated that forcing suppliers and their staff into full-time relationships will impose needless costs and will require forgoing efficiencies that are available through more flexible supplier-staff relationships. Several commenters believed that applying an anti-markup provision based upon the employment status of the technician or physician would unfairly disadvantage individuals who want to work only part-time (for example, mothers of young children). One of these commenters stated that we essentially placed a hurdle in front of group practices that wish to accommodate the professional and personal needs of its employees, and that, given the shortage of qualified health professionals in many areas, we should be making it easier, and not more difficult, for professionals to provide care.

*Response:* We agree that it is not necessary or advisable to premise the application of the anti-markup provisions on the employment status of the person performing the TC or PC. We are revising the language in § 414.50 to clarify that an outside supplier is someone who is not an employee of the billing physician or other supplier and who does not furnish the test or interpretation to the billing supplier under a reassignment that meets the requirements of § 424.80. Therefore, diagnostic testing services furnished by part-time employees and independent contractors in the office of the billing supplier will not be subject to the anti-markup rules, unless the services of the independent contractor are billed as a purchased diagnostic test.

*Comment:* One commenter stated that the anti-markup provisions should apply only when the diagnostic service is provided in a centralized building outside of the physician's primary office site where he or she provides his or her professional services, and should not apply based on the employment status of the individual performing the TC.

*Response:* We agree generally and have revised § 414.50 and § 424.80 to specify that the anti-markup rules apply to purchased tests and interpretations (regardless of site of service) and to TCs and PCs performed at a site other than the office of the billing supplier. With respect to physician group practices, the group's "office" is the medical office space in which the physician organization provides substantially the full range of patient care services that the physician organization provides generally. The group's office does not include space utilized by the group as a "centralized building" (or other space) where only (or primarily) diagnostic testing is performed by radiologists or pathologists.

*Comment:* One commenter found the proposed definition of an outside supplier as someone other than a full-time employee of the billing physician or medical group to be confusing and inconsistent with the definitions at § 411.351. Thus, the commenter recommended replacing the term "full-time employee of the billing physician or medical group" with the defined term "member of the group or member of a group practice."

*Response:* In the CY 2007 PFS proposed rule (71 FR 49054), we proposed that TCs and PCs that are reassigned under the contractual arrangements exception in section 1842(b)(6)(A)(ii) of the Act would be subject to an anti-markup provision. We received comments expressing concern that our proposals would be ineffective to the extent that contractors who performed TCs and PCs for multiple group practices would now become part-time employees of the same group practices. In response, in the CY 2008 PFS proposed rule, we proposed that the anti-markup provisions would apply to reassigned TCs and PCs that are not performed by full-time employees. However, we believe we can guard adequately against potential overutilization by imposing an anti-markup provision on purchased PCs and TCs, and, with respect to non-purchased TCs and PCs, imposing an anti-markup provision on the TCs and PCs that are performed outside of the office of the billing physician or other supplier, without regard to the employment status of the person

performing the TC or PC, thus leaving intact the part-time employment arrangements that have traditionally existed. Therefore, we believe it is unnecessary and inadvisable to adopt the commenter's suggestion.

*Comment:* Several commenters requested that we clarify what is meant by a "full-time employee." They urged us to use the Department of Labor's Bureau of Labor Statistics standard, which is 35 hours per week.

*Response:* For the reasons stated above, we do not believe it is necessary to define "full-time employee."

*Comment:* Several commenters suggested that we exempt TCs and PCs furnished by part-time employees of the billing supplier from the anti-markup provisions, provided that the employees are working exclusively for one billing supplier, such as a single health care organization. Other commenters suggested that, instead of providing that the anti-markup provisions would apply to the TCs and PCs performed by part-time employees, we apply an anti-markup provision to work performed by employees who work for more than a certain number of physician practices.

*Response:* We considered creating an exception from the anti-markup provisions for services provided by part-time employees who work exclusively for one billing supplier. We also considered restricting the application of the anti-markup provision to work performed by employees who work for more than a certain number of physicians' practices. We rejected both approaches as unnecessary given our decision to base the application of the anti-markup primarily on the site of service, as well as because we believe that each approach would add undue complexity to the rule and would be difficult for both billing suppliers and for us to administer. We will monitor the effectiveness of our site-of-service approach in addressing our concerns regarding potential overutilization. If arrangements that currently are taking place at a site other than the office of the billing physician or other supplier simply migrate to the "office of the billing physician or other supplier" in order to escape the application of the anti-markup provisions, we may revisit the idea of imposing an anti-markup provision for services performed by a technician or physician who works for more than a certain number of physician practices.

h. Deductibles and Coinsurance

*Comment:* Several commenters observed that there appeared to be a drafting error regarding the application of deductibles and coinsurance to the

anti-markup limits in proposed § 414.50 and § 424.80. In both sections, the maximum payment is set as an amount that is net of deductibles and coinsurance, that is, "less the applicable deductibles and coinsurance." The commenters noted that the price limitation should represent the Medicare allowable amount, which should include any coinsurance or deductibles to be paid by the Medicare beneficiary. One of the commenters stated that the current language could be interpreted such that the combined Medicare and beneficiary payment to the physician could exceed the amount that a physician paid an outside supplier of a TC or PC by 20 percent, the applicable coinsurance for PFS services. The commenter recommended that the language be revised to read "the payment to the billing physician or medical group, *including applicable deductibles and coinsurance,* may not exceed the lowest of the following amounts."

*Response:* Proposed § 414.50 and proposed § 424.80 stated that, payment to the billing supplier, "less the applicable deductibles and coinsurance" may not exceed the lowest of the following amounts: (1) The supplier's net charge to the physician; (2) the physician's actual charge; or (3) the fee schedule amount for the test that would be allowed if the supplier billed directly. The quoted language referenced above is identical to that in current § 414.50 and is virtually identical to that in section 1842(n)(1) of the Act. We read the statute and regulations as saying that the contractor's payment to the billing supplier, in the situation in which the anti-markup provision applies, is the lowest of the performing supplier's net charge, or the billing supplier's actual charge, or the applicable fee schedule amount, *less* any applicable deductible and coinsurance amounts.

We agree with the commenters that the *total* payment (that is, by the contractor and the beneficiary or third party payor on behalf of the beneficiary) is limited to the lowest of the three amounts specified above. This interpretation represents historical Medicare policy, and we believe that this policy has been implemented correctly by the carriers. However, we are refining the language of the regulation as suggested by the commenter for greater clarity. We do not consider this a substantive change. We are revising § 414.50 to read "the payment to the billing physician or other supplier (*including applicable deductibles and coinsurance paid by the beneficiary or on behalf of the*

*beneficiary*) for the technical or professional component of the test may not exceed the lowest of the following amounts * * *"

i. Net Charge

*Comment:* Several commenters addressed the question of how to determine the net charge for purposes of applying the anti-markup provisions. Commenters asserted that most physicians are paid an aggregate monthly or annual amount for their services and therefore there is no "charge" to report on a claim. One commenter stated that independent contractors are frequently paid based on time spent furnishing the services, as opposed to a per-interpretation price. Alternatively, payment may be made at a fixed rate per month or year. Yet another model is a per-service price reflecting a blended rate of different payor pricing, not just the Medicare allowable amount. Employees, including part-time employees, are often salaried. Consequently, according to the commenter, there is no cost or charge per professional interpretation, and it would be impossible for a group practice to determine the unit price for purposes of the anti-markup provision. The commenter contended that all of the various types of employment relationships would have to be restructured, at great cost and administrative burden, to practices.

One commenter stated that it would not be administratively feasible to determine the net charge per test in order to apply the anti-markup provisions to part-time employees or independent contractors who are paid on an hourly basis or a per-diem rate. Other commenters complained that the proposed rules do not address how the billing entity is supposed to determine the net charge per service on the claim. According to these commenters, it causes confusion as well as the risk of false claims liability to require physician practices to include a charge for all diagnostic test services. Another commenter pointed to what it saw as difficulties in allocating charges between the TC and the PC when a billing supplier purchases both the TC and the PC.

A few commenters urged us to provide guidance on how to determine the "net charge" for a service. One commenter requested that we clearly state that the billing entity must calculate its net unit price, which may reflect payments divided by the number of slides referred; for example, if the billing entity pays a supplier a set amount per month or per year to prepare and read all the slides that were

referred. One commenter stated that it agreed with the proposed approach of not allowing the net charge to reflect the cost incurred by the performing supplier of leasing equipment or space from the billing supplier. The commenter expressed concern, however, that participants in some joint venture laboratories may inappropriately attempt to inflate the acquisition cost of the service, and suggested that we not permit other related costs, such as separately purchased or leased equipment, supplies, insurance, etc., to be included when determining the amount charged by the person performing the TC or PC. If these costs were included, it would have the effect of raising the net charge, and permit the billing suppliers to charge Medicare a higher price.

*Response:* We are leaving the responsibility for determining the net charge for a test with the billing supplier. The anti-markup provision imposed on the PC through this final rule with comment period is similar to the longstanding provision for prohibiting a markup on the TC. Thus, we do not believe that most suppliers will experience significant difficulty in calculating the net charge, despite the fact that some physicians are paid an aggregate monthly or annual amount for their services. Suppliers that incur difficulty in calculating the net charge may structure arrangements so that the anti-markup provisions do not apply (for example, by ensuring that tests and interpretations are not purchased and are performed in the office of the billing physician or other supplier), may allow the performing supplier to bill for the TC or PC, or may use a payment method (such as per-procedure) that yields an easily ascertainable net charge. Suppliers must calculate the net charge in a reasonable manner. This final rule with comment period does not prevent suppliers from using any particular method that yields an accurate net charge. For example, in some situations, it may be appropriate to divide a technician's weekly compensation by the number of procedures performed to arrive at the net charge for each procedure performed during that week. Because suppliers would have the burden of establishing that the charge billed was the net charge, suppliers should retain contemporaneous documentation of the methodology and information used to calculate the net charge.

We are not adopting at this time the commenter's suggestion that, to guard against parties artificially inflating the cost of the TC or PC, we specifically prohibit the performing supplier to take into account, when calculating its net charge, the costs of equipment or services (such as insurance), obtained from the billing supplier. However, we note that, to the extent that a billing supplier would sell goods or services at an inflated price so as to game the application of the anti-markup provisions, such excess compensation may constitute a violation of our rules on physician self-referral and may also be a violation of the anti-kickback statute (section 1128B(b) of the Act). We will monitor financial relationships between billing and performing suppliers and, if it appears that parties are attempting to evade application of the anti-markup provisions through the sale of goods and services, we may modify the provisions.

*Comment:* One commenter expressed concern about expanding the anti-markup provision to cover the PC, noting that, because a per-interpretation price is not the most efficient method of compensation for purchased PCs, practices would likely develop a system of compensation that would pay the reading physician differently depending on the patient's payor. For example, practices might pay the reading physician on a salary basis for reads for patients of private and non-Medicare payors and on a per-read basis for Medicare patients. According to the commenter, this could result in lower costs associated with non-Medicare patients than with Medicare patients, depending on the way in which the physician and the practice negotiate payment for the different groups of patients. The commenter questioned whether it is appropriate to charge Medicare more on a per-procedure basis than other payors.

*Response:* Nothing in this final rule with comment period requires practices to pay for professional services for Medicare patients on a per-procedure basis or using any particular payment method. What is important is that the practice calculates an accurate net charge for purposes of these regulations. In reviewing the accuracy of the net charges of a practice that pays differently for professional services based on the payor status of the patients, we would look to see whether the use of different payment structures results in inappropriate shifting of costs to Medicare (that is, by paying physicians more for Medicare reads than non-Medicare reads, the practice is able to collect more reimbursement under the anti-markup provisions). Moreover, we note that section 1128(b)(6)(A) of the Act provides for the permissive exclusion of providers or suppliers that submit bills or requests for payment based on charges or costs to Medicare that are substantially in excess of the party's usual charges or costs, absent a finding of good cause for the differential. Responsibility for that statute is delegated to the OIG.

*Comment:* One commenter questioned whether the anti-markup provisions would apply to diagnostic tests performed through block lease arrangements. This commenter (and another commenter) also stated that it would be difficult to calculate the per-test charge on tests performed in block lease arrangements.

*Response:* The anti-markup rules do apply to diagnostic tests performed through block lease arrangements, and the burden is on the billing entity to determine how to calculate its net charge per test.

*Comment:* Several commenters urged us to ensure that the calculation of the payment level under the anti-markup rules will not impose new administrative burdens on the billing supplier. A few commenters stated that the billing supplier should be able to mark up the PC between 7 and 10 percent to cover the costs of billing. A few commenters asserted that the proposed anti-markup provisions will adversely affect group practices that wish to bill globally for interpretations performed by teleradiologists located outside of the billing group practice's office. The commenters were concerned that billing physicians or other suppliers would not be able to include administrative expenses in the price paid for the interpretation. One commenter stated that, by limiting reimbursement to a practice's actual acquisition cost, we are ignoring the role of the RBRVS system to appropriately establish a proper payment amount for services.

*Response:* Where the anti-markup provisions are applicable, the billing supplier will be responsible for calculating the net charge. Suppliers that do not wish to contend with calculating the net charge will have to structure arrangements so that the anti-markup provisions do not apply (for example, by requiring the suppliers performing the TC and PC to bill for them, or by ensuring that the TC and PC are performed in the office of the billing physician or other supplier), or utilize a per-procedure method of payment or other method that yields an easily ascertainable net charge. Similarly, suppliers that do not wish to incur the cost of billing without being able to mark up the TC or PC, should structure arrangements so that the anti-markup provisions do not apply.

*Comment:* One commenter contended that, in a medical foundation context, there is no way to determine the net charge to the foundation for the services of the interpreting physician. The commenter stated that the anti-markup proposal would result in the need to generate artificial invoices, greatly complicating and needlessly burdening medical foundations.

*Response:* A medical foundation, or any other medical group practice, billing for the TC or PC of a diagnostic test that it did not perform will need to calculate its own net charge per test. We perceive no need to generate artificial invoices. The purpose of this requirement is to address potential program abuse where physicians and other suppliers order tests and bill for tests that they did not perform at a markup from the price paid for the test.

*Comment:* Several commenters inquired how we would be able to verify the true cost of purchasing a TC or PC of a diagnostic test. The commenters questioned our rationale for this proposal and asserted that the proposal would be detrimental because it would have the effect of precluding suppliers from recouping overhead costs. The commenters voiced concerns that we are trying to eliminate purchased diagnostic tests entirely.

*Response:* We can verify the true cost of a purchased TC or PC by requesting supporting documentation from the provider or supplier. The burden of proof in substantiating the validity of a claim rests with the billing provider or supplier. The anti-markup provisions finalized in this rule are not designed to prevent the billing supplier from recovering overhead expenses or to eliminate purchased diagnostic tests entirely, but rather to minimize program and patient abuse. Where the TC or PC is performed in the office of the billing physician or other supplier, the billing supplier will be able to recoup some or all of the overhead it incurs in the performance of the TC or PC by billing at the fee schedule amount (or at the Medicare limiting charge amount). If, however, the billing supplier has incurred overhead expenses for a TC or PC that was performed at a site other than the office of the billing supplier (such as in space leased by a billing group practice and utilized by the group practice as a "centralized building" that does not meet the definition of "office of the billing physician or other supplier" at § 414.50(a)(2)(iii)), the billing supplier will not be able to recoup the overhead, but rather will be limited to the lowest of the performing supplier's net charge, the billing supplier's actual charge, or the

applicable fee schedule amount. (In the unlikely event that the lowest of the three amounts is either the billing supplier's actual charge or the applicable fee schedule amount, the billing supplier may be able to recoup its overhead but nevertheless would be receiving less payment than the performing supplier's net charge.) We believe that this result is appropriate. If billing suppliers were able to recoup overhead incurred for TCs and PCs that are performed at sites other than their offices, the effectiveness of the anti-markup provisions would be undermined, because there would be an incentive to overutilize to recover the overhead incurred for purchasing or leasing space.

*Comment:* One commenter recommended that we require, as a condition for reassignment of a purchased interpretation, that the parties to the arrangement calculate a net charge for the service. The commenter stated that, if this condition applied, per-diem or other time-based arrangements, which are more susceptible to markups, would not be permitted.

*Response:* We realize that, in most circumstances, a group practice would not want to pay an independent contractor more for a service than the payment it receives from an insurer for furnishing the service. However, we are under the impression that some physician group practices that have exclusive contracts with hospitals under which the group practice furnishes all PCs of inpatient and outpatient radiology services often hire independent contractors to provide PCs that are needed at night or on weekends. We have been informed that, in some of these cases, the group practice willingly pays its independent contractors more for their services than the group practice receives in reimbursement so that the group practice physicians do not have to provide services late at night. There may also be other reasons (for example, as an improper inducement for referrals) why parties could agree to an amount that does not accurately reflect the true net charge.

As explained above, we believe that a group practice may pay an independent contractor on a per-diem or hourly basis, and also arrive at an appropriate amount to bill Medicare for each service based on the number and differing work intensities of the services provided.

*Comment:* One commenter recommended that we prohibit any mark-up over the direct costs incurred by the group practice in providing diagnostic testing services. Direct costs would be defined as limited to the

compensation paid to the persons providing the services and the cost of equipment and supplies utilized in performing the services. One commenter asserted that the proposed restrictions would not allow a billing practice to be paid for its legitimate overhead costs. Two commenters requested that we permit employers to include in the calculation of a supplier's net charge the lower of the following: (1) A reasonable practice expense (PE) derived from its own relative value cost; or (2) the actual overhead costs attributable to the supplier. The commenters suggested that this would permit a group to utilize part-time diagnostic physicians without financially penalizing the employer, and at the same time safeguard against artificially inflated overhead costs.

*Response:* In effect, the commenters requested that we adopt a "net charge plus" approach. In order for the anti-markup provisions to have real effect, it is necessary that payment by Medicare be limited to the lowest of: (1) The physician's or other supplier's net charge to the billing supplier; (2) the billing supplier's actual charge; or (3) the fee schedule amount for the service that would be allowed if the physician or other supplier billed directly. If we were to allow billing suppliers to include costs in addition to the performing supplier's net charge, we would defeat the purpose of the anti-markup provisions.

*Comment:* A few commenters requested that we ensure consistency in the language in § 414.50 and § 424.80. For example, proposed § 414.50(a)(3)(i) states that net charge does not include "any charge that is intended to reflect the cost of equipment or space leased to the outside supplier," whereas § 424.80 states that it does not include "any charge that is intended to cover or address the cost of this equipment."

*Response:* As noted above, we have effectuated the anti-markup provisions by revising § 414.50, and by placing a cross reference to that section in new § 424.80(d)(3). The language of proposed § 414.50(a)(3)(i), "reflect the cost of equipment or space leased" survives.

*Comment:* One commenter recommended that we include in the net charge the costs incurred by the purchasing supplier to facilitate test interpretations, specifically, the cost of teleradiography to transmit images to the interpreting physician and the cost of producing a written report of the interpretation.

*Response:* To the extent that costs such as those noted by the commenter are incurred by the billing supplier, as opposed to the performing supplier, we are not persuaded to permit the inflation

of the net charge to include such costs. As discussed above with respect to the recoupment of overhead costs, we believe that allowing billing suppliers to recoup the costs suggested by the commenter would defeat the purpose of the anti-markup provisions.

i. Miscellaneous

*Comment:* One commenter suggested that, as an alternative to an anti-markup provision, we prescribe a fixed dollar amount (for example, based on a percentage of what Medicare would pay for the PC if billed directly), as a ceiling for Medicare payment. The ceiling would be adjusted for certain PEs such as *bona fide* collection costs and bad debt.

*Response:* We believe that setting a fixed dollar amount for diagnostic tests and interpretations performed under particular circumstances is problematic. There would be difficulties in determining what the fixed dollar amount should be, and what, if any, PEs should be taken into consideration to augment the fixed dollar amount. In addition, we did not propose such an approach, and believe it may be outside the logical outgrowth test for issuing final rules to adopt the commenter's approach in this final rule with comment period. Moreover, even if we were able to adopt such an approach without first specifically proposing one, it would take us considerable time to study the feasibility of prescribing a payment ceiling for TCs and PCs under particular circumstances, and we believe that it is important to issue a final rulemaking on this subject without further delay in order to address our current concerns with potential overutilization.

*Comment:* Two commenters stated that, in addition to restrictions contained in the proposed rule, we should also require that: (1) A pathologist not be allowed to work for more than one physician group practice; (2) a pathologist not be allowed to work for, or have any arrangement with, independent reference laboratories; and (3) medical liability insurance for the pathologist should be paid by the physician group practice billing for the pathologist's services. (The commenters explained that the purpose of the second proposed requirement is to eliminate the possibility that a reference laboratory could provide a pathologist to a physician group practice in return for receiving the right to bill for the TC.) One of the commenters was also concerned that, if a single pathologist is performing work for the billing physician practice, appropriate or optimal quality assurance will not take

place. The commenter stated that, in her pathology group practice, all malignancies are reviewed by at least two pathologists.

*Response:* With respect to the commenters' first suggested requirement, we proposed that an anti-markup provision would apply to PCs that are reassigned by someone who is not a full-time employee of the supplier billing for the PC, because we were concerned with the potential for overutilization where a single physician performs interpretations for more than one group practice in contiguous centralized buildings (such as in "pod" or "condo" laboratories). Specifically, we were concerned that a physician who formerly reassigned benefits under the contractual arrangements reassignment exception could simply be made a part-time employee of a number of group practices. As noted above, in response to public comments, we are not imposing an anti-markup on the PC of a diagnostic test simply because the PC was performed by someone other than a full-time employee of the billing supplier. Rather, we are addressing our concerns regarding potential overutilization by imposing an anti-markup on the PC of a diagnostic test if it is purchased or if it is not performed in the office of the billing physician or other supplier. We believe our decision to impose an anti-markup provision on PCs that are ordered by the billing supplier and performed at a site other than the office of the billing supplier (for example, in space that the billing supplier utilizes as a "centralized building" but that does not meet the definition of "office of the billing physician or other supplier" in revised § 414.50(a)(2)(iii)), regardless of the employment status of the physician, will adequately address our concerns with overutilization. As for the other two proposed requirements and the second commenter's implied proposed requirement, we do not believe it is within the scope of this rule to attempt to restrict a pathologist from working for more than one supplier, or to require a group practice to pay for a pathologist's malpractice premiums, or to impose quality standards for pathologist performed PCs.

*Comment:* A commenter recommended that we revise the definition of "centralized building" at § 411.351 to include the following language: "In the case of a space used for the performance of the [TC] of a diagnostic test, which is billed by a group practice, such space can qualify as a centralized building only if the group complies with the requirements of § 414.50 or § 424.80(d)(3) when

billing for the [TC]." The commenter also suggested that, by changing the definition of "centralized building," a physician or medical group would be prohibited from marking up what it paid for the TC of a test that was performed in a centralized building, unless it was performed by a full-time employee.

*Response:* We are not revising the definition of "centralized building" in this rule. Because the anti-markup provisions will apply to all TCs and PCs that are both: (1) Ordered by a group practice (or an entity related to the group practice by common ownership or control; *see* § 413.17 regarding "common ownership or control"); and (2) performed at a site other than the office of the physician or other supplier, it is not necessary at this time to narrow the definition of a "centralized building" in order to guard against potential overutilization.

*Comment:* One commenter expressed concern regarding physicians who have invested heavily in in-office equipment and have followed CMS guidelines established for the in-office ancillary services exception in § 411.355(b) for purposes of the physician self-referral rules. The commenter recommended that we regulate the usage of ancillary services through medical necessity guidelines and by requiring that the services be provided at fair market value, rather than by the proposed changes to the reassignment and purchased test rules.

*Response:* As finalized, the anti-markup provisions do not apply to non-purchased TCs and PCs performed in the office of the billing physician or other supplier. We note that in the CY 2008 PFS proposed rule, we sought comments as to whether we should narrow the in-office ancillary services exception, including whether we should exclude certain types of services from the protection of the exception. We received many comments on this issue, and if we are inclined to make any changes to the in-office ancillary services exception we will first propose such changes in a notice of proposed rulemaking.

*Comment:* One commenter urged us to require that imaging technology be provided only by physicians trained in modality-specific interpretation of imaging procedures who follow the guidelines of specialty organizations such as the American College of Cardiology and the American Society of Echocardiography. In addition, the commenter supported the accreditation of facilities that provide such imaging services, provided that we allow adequate time for practices to become accredited by relevant organizations that

are dedicated to improving the quality of imaging services.

*Response:* The comment is outside the scope of the proposed rule. Moreover, currently we do not have the statutory authority to restrict payment for these procedures to physicians who possess the training and accreditation recommended by the commenter.

*Comment:* One commenter urged us to enforce the anti-markup requirements on purchased diagnostic tests by auditing pathology practices and laboratories. The commenter contended that there is widespread ordering of unnecessary tests by pathologists with no regulatory oversight by CMS. The commenter suggested that effective enforcement and application of current anti-markup rules to the pathology community would obviate the need to add new regulations that would limit physician practices from providing quality pathology services to their Medicare patients. The commenter also suggested that we adopt reasonable protocols and standards for the review of Pap smears, among other tests, which, according to the commenter, would significantly reduce unnecessary testing by pathologists and result in tremendous cost savings to the Medicare program.

*Response:* Our contractors perform pre-pay and post-pay reviews of services, including reviews to determine if the services were reasonable and necessary. However, the extremely large number of claims that contractors must handle each year, as well as the difficulty in sometimes knowing whether services were reasonable and necessary, underscores the need to adopt rules to address the potential for overutilization in other ways, rather than relying solely on reviews for medical necessity. The proposed anti-markup provisions would apply equally to all physicians, including pathologists. However, section 1842(n)(1) of the Act does not authorize the anti-markup on diagnostic tests to apply to clinical laboratory tests, and we did not propose to extend the anti-markup provisions to such tests. We are concerned with preventing the billing supplier from ordering unnecessary tests for profit. Laboratories typically do not order tests, and therefore, there has not been a concern about abuse by laboratories in purchasing diagnostic tests. The comment that we should adopt protocols or standards for the review of Pap smears and other tests is outside the scope of the proposed rule.

*Comment:* One commenter urged us to prohibit any markup of the TC of surgical pathology specimens and let each physician decide where the TC is

performed in addition to where the PC is performed.

*Response:* Section 414.50 and section 30.2.9 of Pub. 100–04, Chapter 1, CMS Internet-Only Manual, currently prohibit markups of the TC of a diagnostic test if the TC is performed by an outside supplier. As finalized, our revisions to § 414.50 will prohibit the markup of a TC if the TC is ordered by the billing supplier and is either purchased or performed somewhere other than the office of the billing supplier. Physicians are permitted to determine where the TC and PC are performed, provided that the arrangement is in compliance with the purchased test rules and physician self-referral rules.

*Comment:* One commenter stated that the proposed anti-markup provisions are unfair and would interfere with existing business relationships. The commenter asserted that medical practices should have the freedom to hire in-house professionals or contract with other practices to perform services without fear of financial penalty.

*Response:* We are not persuaded that our anti-markup proposals, as finalized in this final rule with comment, are unfair. The proposals as finalized are designed to reduce overutilization of diagnostic tests, so that tests are ordered because they are medically necessary and are not ordered because a profit can be made on each test. Practices can maintain relationships with other professionals on a part-time or contractual basis. If the services are furnished in the office of the billing supplier, the anti-markup rules will not apply, unless the services of an independent contractor are billed as a purchased test.

### N. Beneficiary Signature for Ambulance Transport Services

Section 424.36 requires that a beneficiary's signature must appear on all claims submitted for Medicare services, unless the beneficiary has died, or another exception applies. However, ambulance suppliers and providers have stated that, in emergency situations, it is often impossible or impractical for ambulance providers or suppliers to obtain a beneficiary's or other authorized person's signature on a claim to properly bill Medicare for ambulance transport services because: (1) Many beneficiaries are incapable of signing claims due to their medical condition at the time of transport; (2) another person authorized to sign the claim under § 424.36(b) is not available, or is unwilling to sign the claim at the time of transport; and (3) if an individual listed in § 424.36(b) is not

available or is unwilling to sign a claim on behalf of the beneficiary at the time of transport, it is impractical later to locate the beneficiary (or the beneficiary's authorized representative) to obtain a signature on the claim form before submitting it to Medicare for payment.

As stated in the CY 2008 PFS proposed rule (72 FR 38187), we are sympathetic to the concerns of ambulance providers and suppliers insofar as emergency transport services are involved. Therefore, we proposed to revise § 424.36 to provide that, for emergency ambulance transport services, where the ambulance provider or supplier documents that the beneficiary was physically or mentally incapable of signing a claim form at the time the service was provided and that none of the individuals listed in § 424.36(b)(1) through (b)(5) [2] was available or willing to sign a claim on behalf of the beneficiary, the ambulance provider or supplier could submit the claim without a beneficiary signature. Under our proposal, such claim submission would be permitted only if: (1) The beneficiary was physically or mentally incapable of signing the claim form at the time the service was provided; (2) none of the individuals listed in § 424.36(b)(1) through (b)(4) was available or willing to sign the claim form on behalf of the beneficiary at the time the service was provided; and (3) the ambulance provider or supplier maintains in its files for a period of at least 4 years from the date of service certain documentation. Required documentation would include: (1) A signed contemporaneous statement, made by an ambulance employee present during the trip to the receiving facility, that the beneficiary was physically or mentally incapable of signing a claim form and that none of the individuals listed in § 424.36(b)(1) through (b)(4) was available or willing to sign the claim form on behalf of the beneficiary at the time the service was provided; (2) the date and time the beneficiary was transported, and the name and location of the facility where the beneficiary was received; and (3) a signed contemporaneous statement from a representative of the facility that received the beneficiary, which documents the name of the beneficiary and the time and date that the beneficiary was received by that facility. For non-emergency ambulance transport services, the ambulance

---

[2] We are making a technical change in the final rule. The references in the proposed rule to § 424.36(b)(5) were in error, as individuals are specified only in § 424.36(b)(1) through (b)(4).

■ 13. Section 410.105 is amended by revising paragraphs (b)(3)(i), (b)(3)(ii), (c)(1) introductory text, and (c)(2) to read as follows:

**§410.105   Requirements for coverage of CORF services.**

\* \* \* \* \*

(b) \* \* \*

(3) \* \* \*

(i) Physical therapy, occupational therapy, and speech-language pathology services may be furnished away from the premises of the CORF including the individual's home when payment is not otherwise made under Title XVIII of the Act.

(ii) The single home environment evaluation visit specified in § 410.100(m) is also covered.

(c) \* \* \*

(1) The service must be furnished under a written plan of treatment that—

(i) \* \* \*

(ii) Indicates the diagnosis and rehabilitation goals, and prescribes the type, amount, frequency, and duration of the skilled rehabilitation services, including physical therapy, occupational therapy, speech-language pathology and respiratory therapy services, and indicates the other CORF services to be furnished that relate directly to such rehabilitation goals.

(2) The plan must be reviewed at least every 60 days for respiratory therapy services and every 90 days for physical therapy, occupational therapy and speech-language pathology services by a facility physician or the referring physician who, when appropriate, consults with the professional personnel providing the services.

\* \* \* \* \*

**Subpart G—Medical Nutrition Therapy**

■ 14. Section 410.132 is amended by revising paragraph (a) to read as follows:

**§410.132   Medical nutrition therapy.**

(a) *Conditions for coverage of MNT services.* Medicare Part B pays for MNT services provided by a registered dietitian or nutrition professional as defined in § 410.134 when the beneficiary is referred for the service by the treating physician. Except as provided at § 410.78, services covered consist of face-to-face nutritional assessments and interventions in accordance with nationally-accepted dietary or nutritional protocols.

\* \* \* \* \*

**PART 411—EXCLUSIONS FROM MEDICARE AND LIMITATIONS ON MEDICARE PAYMENT**

■ 15. The authority citation for part 411 continues to read as follows:

**Authority:** Secs. 1102, 1860D–1 through 1860D–42, 1871, and 1877 of the Social Security Act (42 U.S.C. 1302, 1395w–101 through 1395w–152, 1395hh, and 1395nn).

**Subpart A—General Exclusions and Exclusion of Particular Services**

■ 16. Section 411.15 is amended by—
■ A. Revising paragraph (a)(1).
■ B. Adding paragraphs (k)(13) and (k)(14).

The revision and additions read as follows:

**§411.15   Particular services excluded from coverage.**

\* \* \* \* \*

(a) \* \* \*

(1) Examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint, or injury, except for screening mammography, colorectal cancer screening tests, screening pelvic exams, prostate cancer screening tests, glaucoma screening exams, initial preventive physical exams, ultrasound screening for abdominal aortic aneurysms (AAA), cardiovascular disease screening tests, or diabetes screening tests that meet the criteria specified in paragraphs (k)(6) through (k)(14) of this section.

\* \* \* \* \*

(k) \* \* \*

(13) In the case of cardiovascular disease screening tests for the early detection of cardiovascular disease or abnormalities associated with an elevated risk for that disease, subject to the conditions specified in § 410.17 of this chapter.

(14) In the case of diabetes screening tests furnished to an individual at risk for diabetes for the purpose of the early detection of that disease, subject to the conditions specified in § 410.18 of this chapter.

\* \* \* \* \*

**Subpart J—Financial Relationships Between Physicians and Entities Furnishing Designated Health Services**

■ 17. Section 411.351 is amended by revising the definition of "entity" to read as follows:

**§411.351   Definitions.**

\* \* \* \* \*

*Entity* means—

\* \* \* \* \*

(3) For purposes of this subpart, "entity" does not include a physician's practice when it bills Medicare for the technical component or professional component of a diagnostic test for which the anti-markup provision is applicable in accordance with § 414.50 of this chapter and section 30.2.9 of the CMS Internet-only Manual, publication 100–04, Claims Processing Manual, Chapter 1 (general billing requirements).

**PART 413—PRINCIPLES OF REASONABLE COST REIMBURSEMENT; PAYMENT FOR END-STAGE RENAL DISEASE SERVICES; PROSPECTIVELY DETERMINED PAYMENT RATES FOR SKILLED NURSING FACILITIES**

■ 18. The authority citation for part 413 continues to read as follows:

**Authority:** Secs. 1102, 1812(d), 1814(b), 1815, 1833(a), (i), and (n), 1861(v), 1871, 1881, 1883, and 1886 of the Social Security Act (42 U.S.C. 1302, 1395d(d), 1395f(b), 1395g, 1395l(a), (i), and (n), 1395x(v), 1395hh, 1395rr, 1395tt, and 1395ww); and sec. 124 of Pub. L. 106–133 (113 Stat. 1501A–332).

**Subpart A—Introduction and General Rules**

**§413.1   [Amended]**

■ 19. Section 413.1 is amended by—
■ A. Removing paragraphs (a)(2)(iv) and (vi).
■ B. Redesignating paragraphs (a)(2)(v) and (vii) as paragraphs (a)(2)(iv) and (v), respectively.

**Subpart H—Payment for End-Stage Renal Disease (ESRD) Services and Organ Procurement Costs**

■ 20. Section 413.184 is amended by revising the section heading as set forth below:

**§413.184   Payment exception: Pediatric patient mix.**

\* \* \* \* \*

**PART 414—PAYMENT FOR PART B MEDICAL AND OTHER HEALTH SERVICES**

■ 21. The authority citation for part 414 continues to read as follows:

**Authority:** Secs. 1102, 1871, and 1881(b)(l) of the Social Security Act (42 U.S.C. 1302, 1395hh, and 1395rr(b)(l)).

**Subpart B—Physicians and Other Practitioners**

■ 22. Section 414.50 is revised to read as follows:

## § 414.50  Physician or other supplier billing for diagnostic tests performed or interpreted by an outside supplier or at a site other than the office of the billing physician or other supplier.

(a) *General rules.* (1) The services covered under section 1861(s)(3) of the Act and paid for under part 414 of this chapter (other than clinical diagnostic laboratory tests paid under section 1833(a)(2)(D) of the Act, which are subject to the special billing rules set forth in section 1833(h)(5)(A) of the Act), if a physician or other supplier bills for the technical component or professional component of a diagnostic test that was ordered by the physician or other supplier (or ordered by a party related to such physician or other supplier through common ownership or control as described in § 413.17 of this chapter) and the diagnostic test is either purchased from an outside supplier or performed at a site other than the office of the billing physician or other supplier, the payment to the billing physician or other supplier (less the applicable deductibles and coinsurance paid by the beneficiary or on behalf of the beneficiary) for the technical component or professional component of the diagnostic test may not exceed the lowest of the following amounts:

(i) The performing supplier's net charge to the billing physician or other supplier.

(ii) The billing physician or other supplier's actual charge.

(iii) The fee schedule amount for the test that would be allowed if the performing supplier billed directly.

(2) The following requirements are applicable for purposes of paragraph (a) of this section:

(i) The net charge must be determined without regard to any charge that is intended to reflect the cost of equipment or space leased to the performing supplier by or through the billing physician or other supplier.

(ii) An "outside supplier" is someone who is not an employee of the billing physician or other supplier and who does not furnish the test or interpretation to the billing physician or other supplier under a reassignment that meets the requirements of § 424.80.

(iii) The "office of the billing physician or other supplier" is medical office space where the physician or other supplier regularly furnishes patient care. With respect to a billing physician or other supplier that is a physician organization (as defined at § 411.351 of this chapter), the "office of the billing physician or other supplier" is space in which the physician organization provides substantially the full range of patient care services that

the physician organization provides generally.

(b) *Restriction on payment.* (1) The billing physician or other supplier must identify the performing supplier and indicate the performing supplier's net charge for the test. If the billing physician or other supplier fails to provide this information, CMS makes no payment to the billing physician or other supplier and the billing physician or other supplier may not bill the beneficiary.

(2) Physicians and other suppliers that accept Medicare assignment may bill beneficiaries for only the applicable deductibles and coinsurance.

(3) Physicians and other suppliers that do not accept Medicare assignment may not bill the beneficiary more than the payment amount described in paragraph (a) of this section.

■ 23. Section 414.65 is amended by revising paragraph (a)(1) to read as follows:

### § 414.65  Payment for telehealth services.

(a) * * *

(1) The Medicare payment amount for office or other outpatient visits, consultation, individual psychotherapy, psychiatric diagnostic interview examination, pharmacologic management, end stage renal disease related services included in the monthly capitation payment (except for one visit per month to examine the access site), individual medical nutrition therapy, and neurobehavioral status exam furnished via an interactive telecommunications system is equal to the current fee schedule amount applicable for the service of the physician or practitioner.

*    *    *    *    *

## Subpart G—Payment for New Clinical Diagnostic Laboratory Tests

■ 24. Section § 414.502 is amended by adding the definition, "New test" in alphabetical order to read as follows:

### § 414.502  Definitions.

*    *    *    *    *

*New test* means any clinical diagnostic laboratory test for which a new or substantially revised Healthcare Common Procedure Coding System Code is assigned on or after January 1, 2005.

■ 25. Section 414.506 is amended by revising the introductory text to read as follows:

### § 414.506  Procedures for public consultation for payment for a new clinical diagnostic laboratory test.

For a new test, CMS determines the basis for and amount of payment after performance of the following:

*    *    *    *    *

■ 26. Section 414.508 is amended by revising paragraph (b)(3) to read as follows:

### § 414.508  Payment for a new clinical diagnostic laboratory test.

*    *    *    *    *

(b) * * *

(3) For a new test for which a new or substantially revised HCPCS code was assigned on or before December 31, 2007, after the first year of gapfilling, CMS determines whether the carrier-specific amounts will pay for the test appropriately. If CMS determines that the carrier-specific amounts will not pay for the test appropriately, CMS may crosswalk the test.

■ 27. Section 414.509 is added to read as follows:

### § 414.509  Reconsideration of basis for and amount of payment for a new clinical diagnostic laboratory test.

For a new test for which a new or substantially revised HCPCS code was assigned on or after January 1, 2008, the following reconsideration procedures apply:

(a) *Reconsideration of basis for payment.* (1) CMS will receive reconsideration requests in written format for 60 days after making a determination of the basis for payment under § 414.506(d)(2) regarding whether CMS should reconsider the basis for payment and why a different basis for payment would be more appropriate. If a requestor recommends that the basis for payment should be changed from gapfilling to crosswalking, the requestor may also recommend the code or codes to which to crosswalk the new test.

(2)(i) A requestor that submitted a request under paragraph (a)(1) of this section may also present its reconsideration request at the public meeting convened under § 414.506(c), provided that the requestor requests an opportunity to present at the public meeting as part of its written submission under paragraph (a)(1) of this section.

(ii) If the requestor presents its reconsideration request at the public meeting convened under § 414.506(c), members of public may comment on the reconsideration request verbally at the public meeting and may submit written comments after the public meeting (within the timeframe for public comments established by CMS).

# EXHIBIT 3

## DECLARATION OF KENNETH FLOWERS, M.B.A., F.A.C.H.E.

NOW COMES Kenneth Flowers, M.B.A., F.A.C.H.E., and pursuant to 28 U.S.C. § 1746 declares under oath as follows:

1.     My name is Kenneth Flowers, and I am the Chief Executive Officer of Uropath L.L.C. I am over twenty-one years of age, and am fully competent to make this Declaration.

2.     I hold the Master of Business Administration degree in Health Service Management from the University of Dallas, and I am a Fellow of the American College of Healthcare Executives. I began working in the health care field in 1969, serving as a medic in the U.S. Army in Vietnam. I resumed work in the health care field after obtaining a B.S. degree in Radiological Technology in 1979. After further experience in the health care and financial services fields, including service as Associate Administrator of a 374 bed hospital, I was President and Chief Executive Officer of my own health care consulting firm from 1995 to 2004. I am familiar with the health care field, including the operation of physician practice groups and the management, operation, and regulatory and financial aspects of pathology laboratories.

3.     Uropath LLC is a Texas limited liability company that was formed in May 2003. I have been Chief Executive Officer of Uropath since May of 2004.

4.     Uropath assists physician practices, usually physician group practices, in developing, constructing, equipping, and operating pathology laboratories. Uropath is not a Medicare provider or supplier, and does not itself perform or bill for any laboratory tests or interpretations. Instead, it provides managerial and operational expertise and efficiencies which permit a medical group practice to provide superior pathology services and better patient care. Uropath enters into a management agreement with each physician practice. The laboratories,

70189405.4                                    1

which are an extension of, and owned and controlled by the physician practice, are located in four centers around the United States. These four centers are Leesburg, Florida; Sarasota, Florida; San Antonio, Texas; and Collegeville, Pennsylvania.

5.    In these centers, multiple independently owned physician laboratories are established. Uropath leases the premises for these labs, and then subleases the space for the separate pathology laboratories to each physician group. All laboratory equipment, office equipment, supplies, and other tangible property for each physician practice's lab is owned by the physician practice. Each group practice independently contracts with a board certified pathologist for the provision of professional medical services, including service as Medical Director of the lab and providing interpretations of test results. The physician group which owns and operates the laboratory also contracts with Uropath for the provision of non-professional medical, administrative, and managerial services. Depending upon the specific laboratory, these may include the services of personnel such as histotechnologists, cytotechnologists, medical technologists, lab administrators, lab assistants, clerical personnel and transcriptionists. Each group practice bills and collects for all pathology services that they provide in their Uropath-managed laboratories, including billing Medicare for services performed for Medicare patients.

6.    Currently, 52 group practices own and operate pathology laboratories under management agreements with Uropath. These laboratories provide pathology services to approximately 450 physicians in the group practices that own them. Uropath is wholly owned by 23 group practices from among the 52 practices with which it has management agreements. The physician urology practices that have Uropath-managed labs range in size from solo medical practitioners, to small and medium size urology practices, to Urology Associates of North Texas,

which has approximately 50 urologists and which is, to the best of my information and belief, the largest urology specialty practice in the United States.

7.    Uropath-managed labs performed over 400,000 lab tests in 2007, and provided quality services to tens of thousands of individual patients.

8.    The vast majority of tests performed in the 52 labs are tissue examinations and interpretations stemming from prostate needle biopsies.  See Declaration of Michael Grable, M.D., for a description of this medical procedure.  Data collected internally by Uropath shows that for calendar year 2007 the percentage of prostate needle biopsies was 77% for the Leesburg location, 95% for San Antonio, 80% for Sarasota, and 85% for Collegeville.

9.    The Uropath business model provides a number of advantages in terms of quality. Typically, insurance companies and managed care plans will reimburse a group practice for pathology services provided as part of their practice.  However, if the physician group does not provide pathology services, most insurance companies and managed care plans require that specimens be sent to a particular outside laboratory with which the insurance company has contracted.[1]  Since, under these arrangements, specimens are shipped to several different labs, each with multiple pathologists, there is inherently a lack of consistency in specimen grading and interpretation.  Because outside laboratories frequently employ many pathologists, there are few opportunities for the referring physician to consult with the pathologist.  In addition, the physicians have no control over the pathologists' work load or priorities, so there is no way to expedite the handling of particular specimens.  A similar situation exists with respect to Medicare beneficiaries when their tissue samples are sent by a physician group to outside labs.

_____

[1] HMOs generally require that an outside lab of their choice be used, but HMOs typically represent a small portion of the patients seen by the 52 physician groups.

10.    By contrast, under the Uropath model, a group practice with its own pathology laboratory uses the same pathologist for urologic pathology work.  First, this means that a group practice is able to minimize the inconsistencies in grading and interpreting specimens inherent in using more than one pathologist.  Second, most general pathologists examine a wide range of samples relating to a broad spectrum of diseases or diagnoses.  The pathologists employed by the physician practices in Uropath managed facilities are genitourinary ("GU") pathologists, often with specialized training or fellowships in that field.  Even if they did not have prior specialized training, they quickly develop GU experience and expertise, due to the large volume of needle biopsy specimens and other GU related specimens they review.  Third, by utilizing its own pathologist a group practice enjoys more meaningful consultative benefits with that pathologist with respect to specimens reviewed and interpreted.  They can easily contact the pathologist to discuss any questions or problems regarding a particular patient.  There are generally multiple pathologists on site at a Uropath center, who can and do informally consult with each other on close, difficult, or unusual cases.  Finally, the group practice can make special requests and prioritize samplings sent to their own pathology laboratory.  All of these factors promote quality patient care services for the relatively few, specialized tests for which the urology practices utilize their own pathologist in a Uropath-managed lab.

11.    The summaries of the education, training, and experience of pathologists in the Uropath-managed labs in Exhibit 29 reflect that seven have completed fellowships in GU pathology or other advanced pathology disciplines.  Several were educated or trained at national centers of excellence relating to treatment of cancer, including the M.D. Anderson Cancer Center in Houston.  Dr. William Murphy, who practices in the Leesburg location, is a graduate of the Harvard Medical School, has written and lectured extensively, and has written a textbook on

Uropathology. He has an international reputation and is generally considered one of the three leading GU pathologists in the country.

12.     Objective measures relating to prostate needle biopsies reflect the high quality of services provided in the Uropath-managed labs, and the lack of any overutilization. Several examples will illustrate.

13.     In 2006, the Uropath-managed labs had a positive biopsy rate of 40.9% for adenocarcinoma (prostate cancer).[2] Exhibit 21 is a summary, prepared under my supervision from information obtained from Uropath's laboratory management software, of the positive biopsy rate for all labs under Uropath management. Data from the Leesburg labs are also included separately in that Exhibit. On average nationwide, the positive biopsy rate is generally considered to be somewhere in the low to mid-thirties percent range. A very large study of Medicare beneficiaries conducted over multiple years found the positive biopsy rate to be 32%. See Exhibit 16, which is a report in the November 2007 issue of Contemporary Urology, summarizing that study. The high, 40.9% positive biopsy rate means that unnecessary biopsies were not being performed on patients by physician practices who have Uropath-managed labs (that is, that "overutilization" does not exist), because cancer was actually found in a higher than average percentage of patients who were biopsied.

14.     The same data reflects that the "special stain" rate for Uropath-managed laboratories overall was 5.50%. Exhibit 21. The low incidence of special stains reflects the high level of expertise of the specialized GU pathologists performing services at Uropath managed labs. Each special stain creates a separate billable code for Medicare (CPT Code 88342). Far

---

[2] Data is for three locations only. The Collegeville, Pennsylvania location was not operating in 2006.

from overutilizing services billed to Medicare, the special stains billed to Medicare at Uropath-managed labs are about a quarter of the national average, thus saving money to Medicare. See discussion of special stains in the Declaration of Michael Grable, M.D.

15.    In its 2005 work plan, the Office of Inspector General of the Department of Health and Human Services announced that it would perform audits of "pathology services performed in physicians' offices." The Office of Audit Services of the OIG thereafter performed audits of three physician owned, Uropath-managed pathology laboratory in each of the geographic locations where Uropath then managed pathology laboratories (Leesburg, FL; Sarasota, FL; San Antonio, TX). To the best of my knowledge, only Uropath-managed labs were audited—no other physician owned laboratories were audited.

16.    In each audit, the OIG found that medical necessity was clearly established for either nearly 100% or actually 100% of the biopsies taken and processed by the physician groups laboratories. For Atlantic Urological Associates ("AUA"), the OIG selected a random sample of 100 Medicare claims that had been paid during calendar year 2004, after establishment of AUA's Uropath-managed lab. Working with a Medicare Program Safeguard Contractor ("PSC"), the OIG found that medical necessity was established for 96 of the 100 sample claims, and that for four claims it could not "rule out" the appropriateness of the biopsy and therefore did not recommend that these claims be denied. A true copy of the OIG report is included as Exhibit 11.

17.    A similar OIG audit relating to Florida Urology Physicians, P.A. was also performed for its laboratory in the Sarasota location. A true copy of this OIG report is included as Exhibit 12. The OIG examined 51 paid claims for the period September-December 2004, which was the period immediately after the physician group had established its Uropath-

managed lab. The stated purpose of the review was to determine "whether the pathology services billed for were reasonable, necessary, and in accordance with Medicare Part B requirements." Again, working with a PSC, the OIG report found that medical necessity for the biopsy procedure was established for 100% of the 51 claims reviewed.

18.    A similar OIG audit was performed at the lab operated by Urology Tyler, P.A., for the period May-December 2004, the period immediately following the opening of that group practice's lab in San Antonio. A true copy of this OIG report is included as Exhibit 13. The OIG, again working with a PSC, reviewed a random sample of 100 paid claims during this period to determine "whether pathology services were reasonable, medically necessary, and supported by adequate documentation." The report found that they physician group's "claims for pathology laboratory services generally complied with Medicare Part B medical necessity and documentation requirements for 99 of 100 reviewed claims." The sole exception was for a claim that was improperly billed and paid due to a clerical error, which was corrected during the audit.

19.    Thus, for all three laboratories audited, medical necessity was established to a remarkably high level, thus indicating no overutilization with respect to the number of patients biopsied. In all three reports, the OIG made no recommendations whatsoever. Instead, the labs were found to be in compliance with Medicare Part B requirements.

20.    Although the OIG noted increases in the number of tissue samples taken per patient, in all cases the number of biopsy cores per patient was below the twelve core standard that was rapidly becoming industry practice during this time period.

21.    CMS data indicates that the overall number of CPT 88305 codes (prostate needle biopsy codes) performed has been generally increasing since 1995, and more rapidly increasing

after about the year 2000. Exhibit 14 reflects CMS data taken from the "BESS" system. It shows an increase in CPT Code 88305 nationwide from 9,665,688 procedures in 1995 to 15,615,521 procedures in 2004. This represents an increase of 62%, reflecting the upward trend in the number of cores taken as the twelve core sample became the national standard.

22.    The Medicare fee schedule payments for both the technical component and the professional component of the physician fee schedule amount are standardized amounts. Thus, the cost to Medicare is the same regardless of whether the services are performed in a physician-owned laboratory or in a reference lab that is independent from the physician group. There is also no difference in payment based on whether the services are performed in the "same building" as the physician groups' main office, or in a "centralized building" as with Uropath-managed labs.

23.    The only difference in the physician fee schedule amount is that Medicare adjusts for geographical location where the services are rendered. Taken as a whole, the Medicare fee schedule amounts for the geographic areas in which Uropath managed laboratories exist are less than the national average.

24.    Exhibit 25 is a spreadsheet prepared under my direction showing the physician fee schedule amounts for prostate needle biopsy (CPT Code 88305) and several other procedures performed in Uropath-managed laboratories. This document reflects data for 2007, prepared by Uropath internally under my direction from information on the CMS website. As can be seen from Exhibit 25, CMS recognizes 91 different geographical locations in setting the physician fee schedule amount based on geography. For three of the four regions in which Uropath laboratories are located (see highlighting) the geographically adjusted fee schedule amount for

CPT Code 88305 (prostate needle biopsy) is less than the national average. The mean national rate for all 91 regions (unweighted) is $103.96. For the San Antonio lab, by contrast, the fee schedule amount is $93.02; for the Sarasota and Leesburg labs, the rate is $98.59.[3] Only Philadelphia (Collegeville) is higher than the national average. That is a small, newly established lab, and represents approximately 1% of the volume of Uropath-managed laboratories. Thus, processing of laboratory tests in Uropath-managed laboratories actually saves money for the Medicare program.

25. It is not at all unusual—in fact, it is probably the norm—for laboratory samples to be shipped across state lines to national reference laboratories to be processed and interpreted by pathologists. Samples are collected by couriers from physician offices and then sent by expedited delivery to a central lab in another state for processing and interpretation. In this respect, Uropath-managed labs are no different from the large national reference labs. Some large national reference labs are located in high-reimbursement geographical areas. For example, a large urologic pathology lab operated by Ameripath is located in Warren, Michigan, a suburb of Detroit, where the geographically adjusted fee schedule amount for a prostate biopsy in 2007 was $112.33, higher than the fee schedule amount for any Uropath location.

26. Exhibit 28 shows the approximate volume of Medicare for 52 group practices, as compared to other payor sources. This document was prepared under my supervision from information collected from the 52 group practices. There may be some inconsistencies among groups as to how the Medicare percentage is computed, and some figures may be estimates. However, as a general matter, it can be seen that the percentage of Medicare business is

---

[3] Because the lab in Leesburg is located in a physician scarcity area, Medicare provides for a 5% bonus above the fee schedule amount for the professional component only, but not for the technical component.

approximately half or more. The numerical average of the percentages (unweighted) is 58%. Although this is not precise data in all instances, it suffices to show the general magnitude of the lab volume that would be lost by the physician practices if the Final Rule is not enjoined.

27.    If the Final Rule is not enjoined, Uropath's existing business will be destroyed. It is not financially feasible for physician groups to bill at a loss for roughly half of their patient volume. Consequently, many physician groups will undoubtedly discontinue their Uropath-managed laboratories, and set up or attempt to set up laboratories in existing buildings in which they see patients in order to recapture the lost revenue stream from Medicare. It would not make sense for these groups to attempt to have their own in-house lab for Medicare only, and continue to send private pay patients to their Uropath-managed lab. In the meantime, many physician groups will shut down their labs as soon as possible, and in the interim send their samples to outside labs.

28.    For groups with smaller volume, who may not be able to establish their own laboratories, the elimination of Medicare revenue will likely make the labs unprofitable due to loss of volume. Accordingly smaller groups will discontinue unprofitable laboratories, and begin sending their tissue samples to outside laboratories.

29.    Due to the publication of the January 3, 2008, final rule, volume of samples sent to Uropath managed labs has already dropped dramatically for some of the physician groups, which indicates that they are already sending samples to outside labs because of CMS's regulatory action.

30.    As labs are discontinued or their imminent closure becomes apparent, the pathologists who currently provide services in Uropath-managed labs will leave and seek other

positions.     As pathologists depart due to a drop in Medicare volume and the closure of laboratories, it will be virtually impossible to replace them with qualified pathologists.     Thus, even if a physician group wished to retain its Uropath-managed lab, it is highly unlikely that they would be able to do so because of the inability to obtain a qualified pathologist.     Thus, a "snowball effect" will occur, with labs closing and pathologists and other staff departing, until there is nothing left.

31.     Exhibit 31 is a true copy of Uropath's year-to-date income statement prepared for the twelve months ending December 31, 2007.     As shown on that document, the members' equity (that is, equity held by the 23 physician groups that own Uropath) at the end of the year was $998,182.95.

32.     Exhibit 30 shows the expiration date and the balance owed on the five major leases in which Uropath is the lessee.     These are for its corporate location, and for the four laboratory locations.     As shown on that exhibit, only one lease expires in 2008.     The rest extend out for two to five years.     Uropath L.L.C. remains liable on these leases unless a buy-out can be negotiated.

33.     Exhibit 32 is an analysis prepared by me for the Uropath Board of Managers in December of 2007.     At that point in time, it was widely understood by people familiar with the physician fee schedule rule published on November 27, 2007, that that rule would be delayed so far as the anti-markup provisions are concerned.     Nevertheless, the Board had me prepare an analysis of the anticipated costs of closing Uropath.     As can be seen from Exhibit 32, those costs would amount to approximately $2,245,131.     The costs of closure would wipe out the members' equity of $998,000, and cause the 23 physician group owners of Uropath to have to contribute

another $1.2 million in order to fulfill Uropath's obligations on closure. This analysis assumes that a six month buy-out of the leases could be negotiated.

34.     Exhibit 33 is a similar document, showing the entire lease cost if the leases cannot be bought out. Under this scenario, the cost of closing Uropath would be approximately $4,512,958.

35.     I am aware of no remedy by which CMS will compensate Uropath for the destruction of its business. I know of no way in which the high quality pathology services provided in Uropath-managed labs, which will be disrupted and destroyed for the 52 physician groups and their patients, can be replaced or redressed by CMS. The costs of terminating Uropath's operations, including the loss on the leases for space that will become useless to Uropath and the sublessors, will not be compensated by CMS, to my knowledge. I am aware of no method by which CMS will repair the damage done to our 91 employees who will lose their jobs immediately or very soon. The destruction of the practices of the pathologists performing services for Uropath-managed labs will not be repaired or compensated by CMS, so far as I know.

36.     On information and belief, the Leesburg facility is one of the largest private employers in Lake County, Florida. Thirty-two people are employed at that facility by Uropath, and four pathologists have their practice there as well The impact of the closure of the Uropath managed labs on Lake County will therefore be severe. Also, the qualified histotechnologists, cytotechnologists, and other lab personnel employed there will have to relocate because there are no comparable pathology labs nearby.

I declare under penalties of perjury that the foregoing is true and correct.

Executed on _/ - 2 /_____, 2008

_____
Kenneth Flowers, MBA, FACHE

# EXHIBIT 4

**DECLARATION OF DAVID SORRELLS**

NOW COMES David Sorrells and pursuant to 28 U.S.C. § 1746 declares under oath as follows:

1.      My name is David Wayne Sorrells, and I am the Administrator of Urology Centers of Alabama, P.C. ("UCA")  I am over twenty-one years of age, and am fully competent to make this Declaration.

2.      I have been employed in medical group management since completing my degree in Health Care Management at the University of Alabama in 1975. In addition to my current position with UCA, I have managed a surgery group, a pathology group and a multi-specialty group. I have also worked with a large regional medical laboratory that included a pathology group.

3.      I became Administrator of UCA in 1986.   UCA is a medical group providing urology services throughout central Alabama. We offer all modes of Prostate Cancer treatment including surgery, brachytherapy, LHRH treatment, Image Guided Radiation Treatment and Cryotherapy. We serve as a regional referral center for prostate cancer treatment. In addition we provide all other services in Urology including kidney stone management, incontinence therapy, erectile dysfunction, bladder cancer, and kidney cancer.  Our main office is located in Homewood, Alabama and we have 5 additional offices throughout the Birmingham metropolitan area. We provide treatment at 6 area hospitals.  There are 14 practicing urologists in our group.

4.      As part of our practice, UCA owns and operates a Uropath-managed pathology laboratory located in Leesburg, Florida.  The pathologist who provides pathology services for our group and who serves as Medical Director of the lab is Brian Schnell, M.D.  The Leesburg lab is not located in any of the buildings in which our urologists generally see patients.

5.      UCA participates in Part B of the Medicare Program, and is entitled to receive Medicare reimbursement pursuant to the Medicare physician fee schedule for services we provide to our patients who are Medicare beneficiaries.  Prior to January 1, 2008, we billed Medicare for the professional component and technical component of pathology services provided in our Leesburg laboratory.

6.      At UCA I have total responsibility for all aspects of the business including billing and collection, third party reimbursement, regulatory changes, supervision and training of employee and patient flow.  I am responsible for monitoring and responding to ongoing reimbursement issues and the evaluation of current and future contracts.  Some of my significant duties have included development of business, budget and marketing plans.  Other duties include implementation of data processing system with appointments, electronic claims processing and remittances, accounts payable and general ledger system.

7.      If the final rule promulgated on January 3, 2008, remains in effect and is not enjoined, UCA will be required to terminate its existing management agreement with Uropath and discontinue the operation of UCA's Uropath-managed laboratory in Leesburg, Florida.  It is not financially feasible for UCA to bill Medicare for a "net charge" that requires UCA to lose money on every laboratory test performed in the lab.

8.      If the final rule is not enjoined, UCA will immediately suffer harm that it believes to be irreparable.  The harm which I am personally qualified to describe is set forth in the following paragraphs.

9.      In prior years, UCA has been able to bill Medicare and receive the full fee schedule amount for both the technical component and professional component of the tests performed and interpreted at UCA's lab.  In 2007, the income stream attributable to services

rendered to Medicare amounted to approximately $268,000. That revenue will be immediately cut off, because UCA will no longer be able to receive the fee schedule amount.

10.    It is not feasible for UCA to bill at a "net charge" as the CMS final rule would require us to do if we continued to utilize our Uropath-managed lab in Leesburg. First, we do not know how to calculate the "net charge," which may fluctuate over different time periods, and may also depend upon volume. Second, by eliminating overhead costs for space and equipment from calculation of the "net charge," billing for a "net charge" under the CMS final rule would cause us to lose money on every test by requiring us to bill for an amount less than our actual costs for each test. Finally, CMS has not provided any directions on how we are to report the "net charge" on the CMS Form 1500 when it is billed. There is no place on the Form 1500 to report a "net charge" for a service that is not performed by an outside lab.

11.    Accordingly, if the rule is not enjoined, UCA will immediately be forced to send specimens for its Medicare patients to an outside reference lab. That lab will then bill Medicare directly for the physician fee schedule amounts. Once a specimen is sent to an outside lab, UCA will never have an opportunity to recover the income for the tests and interpretation for that specimen that it would have received had it been able to use its own lab. Therefore, that income is lost forever.

12.    UCA invested approximately $140,000 in construction costs, equipment costs, and other startup costs when it established its own Uropath-managed lab in Leesburg, Florida. Although the used equipment and some supplies might be able to sold off or otherwise put to use by UCA, the bulk of the value of that investment will be permanently destroyed if the rule is not enjoined. UCA will also incur costs of disposal, and costs of transportation for whatever is salvaged.

13.    UCA is not an owner of UroPath, LLC.

14.     If we close our Pathology Laboratory in Leesburg, UCA will nevertheless continue to have financial obligations under the management agreement, for our sublease of the building, for our Pathologist, and/or other contracts.  UCA has entered into a long term sublease of premises where its lab is housed.  UCA is contractually to make lease payments under this sublease regardless of whether it provides lab services in the premises.  We will have to discard approximately $26,000 in laboratory supplies as these can not be resold.  Even though we would no longer be operating the laboratory in Leesburg, we will remain obligated for a pro rata share of the ongoing expenses such as staff salaries, benefits, licenses, taxes, rent, utilities, professional fees and other items.  In 2007 these expenses were $61,469.00. In addition we will incur a one time write-off of $42,000.00 for leasehold improvements that we will be forced to abandon.

15.     It is not known at present whether it would be feasible for UCA ultimately to build a lab in the principal building in which it conducts its practice.  Assuming, without yet knowing, that it would be economically feasible to do so, there would be significant expense and delay associated with establishing such a lab in UCA's main building.  It would take at least six months to build out the laboratory, hire the staff and contract for a new pathologist.

16.     There is no extra office space in our existing building, so it would be necessary to move some other function or component off-site in order to set up a pathology suite in the same building that we provide other patient services.  That would require an additional lease and other expense for the offsite location. In addition, substantial sums would have to be spent to build out any existing space in the main building for use as a laboratory.  There would be significant delay while the space is being renovated or constructed.  The lab would have to be equipped to meet CLIA standards.  After the lab is set up and ready to function, there would have to be an on-site inspection to obtain CLIA certification, creating additional delay.  Most importantly, the ability to obtain a qualified uro-pathologist to serve as lab director and to interpret results is, at best,

doubtful.   Prior to starting our own pathology laboratory in Leesburg, we tried to negotiate contracts for the Pathology professional services with three different pathology groups in the Birmingham area.   One group declined to even meet and discuss a contract, another group declined to negotiate, stating they did not have adequate pathology staff to provide coverage. While we were able to meet with the third group, we were unable to reach an agreement that was satisfactory to both groups and they were not at that time able to provide on site services as required under the Stark law.

17.     The Uropath business model allows UCA to achieve substantial savings and efficiencies in providing pathology services, while at the same time enhancing the quality of care that our physicians are able to provide to our patients, at no additional cost to the Medicare program.   Forcing Uropath out of business, forcing UCA to shut down its existing Leesburg lab, and forcing UCA to sever its existing management agreement with Uropath would destroy the valuable, economically efficient, and profitable business relationship that UCA has had with Uropath since August 2006.

18.     Regardless of whether UCA could ever set up a lab on its main premises in the indefinite future, the additional, pointless expense resulting from shutting down its existing lab, and the immediate loss of income therefrom, will also injure UCA's competitive position. Under the final rule, those practices are currently able to continue to bill the full fee schedule amount, and retain the profit from such billings.   At present, the final rule prevents UCA from doing so, cuts off the stream of income from those billings, and creates additional expense as described above.   Physician groups compete with each other to recruit and retain talented physicians, and the groups that are the most profitable have a competitive advantage.   Furthermore, the competitive position of physician practices is affected by such things as whether they are able to afford the latest and best equipment.   Loss of its Leesburg lab, and the quality and monetary

benefits associated with it, will in the immediate short term injure UCA's competitive position relative to competitors who have a lab in their own local building.

I declare under penalties of perjury that the foregoing is true and correct.

Executed on _____, _8 ____, 2008

David Sorrells

# EXHIBIT 5

## DECLARATION OF JERRI CREGGAR

NOW COMES Jerri Creggar and pursuant to 28 U.S.C. § 1746 declares under oath as follows:

1.      My name is Jerri Creggar, and I am Chief Operations Officer for Atlantic Urological Associates, P.A. ("AUA").  I am over twenty-one years of age, and am fully competent to make this Declaration.

2.      I have been employed by AUA for over 20 years.  I have been Chief Operations Officer since 2002, and am familiar with the operations of AUA.  I oversee AUA's operations, including ancillary services such as pathology, and am familiar with its finances.  I report directly to the Executive Committee of AUA and to Dr. Michael Grable, AUA's President.

3.      AUA currently has twelve physicians practicing urology.  We have eight urology locations in northeast Florida, and our principal place of business is in Daytona Beach.

4.      As part of its medical practice, AUA owns and operates a Uropath-managed pathology laboratory in Leesburg, Florida.  The pathologist who provides pathology services for our group, and who serves as Medical Director of the lab, is Nick Maruniak, M.D.  The services of technologists (e.g., histotechnologists and cytotechnologists) and other non-medical personnel are provided to AUA as leased employees from Uropath.

5.      AUA participates in Part B of the Medicare Program, and is entitled to receive Medicare reimbursement pursuant to the Medicare physician fee schedule for services we provide to our patients who are Medicare beneficiaries.  Prior to January 1, 2008, we billed

Medicare for the professional component and technical component of pathology services provided in our Leesburg laboratory.

6.     If the final rule promulgated on January 3, 2008, remains in effect and is not enjoined, AUA will be required to terminate its existing management agreement with Uropath and discontinue the operation of AUA's Uropath-managed laboratory in Leesburg. It is not financially feasible for AUA to bill Medicare for a "net charge" that requires AUA to lose money on every pathology test and interpretation performed in the lab for Medicare patients.

7.     If the final rule is not enjoined, AUA will immediately suffer harm that it believes to be irreparable. That harm includes the following:

8.     Prior to January 1, 2008, when the final rule took effect, AUA was able to bill Medicare and receive the full Medicare physician fee schedule amount for both the technical component and professional component of the tests performed and interpreted at AUA's lab. In 2007, the revenue from Medicare and private pay patients amounted to approximately $2.6 million for all pathology work.[1] These pathology tests included prostate biopsies, urine cytologies, and FISH tests. We bill Medicare for the professional and technical components for prostate biopsies under CPT Code 88305.[2] Approximately 80-85% of the samples sent to the Leesburg lab by AUA are for prostate biopsies. Approximately 70% of our pathology lab revenue is Medicare.

9.     If the final rule is not enjoined, all Medicare revenue for pathology will be immediately cut off, because AUA cannot afford to bill Medicare at a loss for each test, and will

---

[1] In 2008, if AUA were still allowed to bill for the fee schedule amount for pathology services, that amount would be significantly smaller, because AUA has recently lost several physicians from the group.
[2] Because the lab is located in a physician scarcity area, AUA receives a physician scarcity bonus of 5% above the fee schedule amount for the professional component but not for the technical component of Medicare billings.

have to refer those specimens to an outside lab. Furthermore, CMS has not provided specific instructions as to how to calculate the net charge, and we are concerned that billing for a vaguely defined net charge could expose us to false claims liability and other potentially severe sanctions.

10.    Outside labs bill Medicare directly for the physician fee schedule amounts. Once specimens are sent to an outside lab for testing, AUA will never have an opportunity to recover the income for those tests, that it would have received had it been able to use its own lab. Accordingly, that income is lost forever.

11.    AUA invested approximately $60,000 in construction costs, equipment costs and other start-up costs when it established its own Uropath-managed lab in Leesburg. Although the used equipment and some supplies might be able to be sold off or otherwise put to use by AUA, a portion of that investment will be permanently destroyed if the rule is not enjoined. AUA will also incur costs of disposal, and costs of transportation for whatever is salvaged.

12.    Furthermore, AUA would have to incur costs to unwind its current arrangements for its lab. We have estimated the cost just for breaking our lease for the lab premises at $195,000.

13.    Should AUA attempt to establish its own lab at one of its current urology practice locations, the creation of such a new lab is subject to substantial delay, expense, and uncertainty. First, space would have to be freed up for the lab in an existing building, which would require displacement of personnel, and attempting to obtain space for them elsewhere. The space for the lab would have to be renovated and brought up to standards for use as a pathology laboratory, including installation of a hood for ventilation of fumes from substances used in the laboratory processes.

14.    Histotechnologists and cytotechnologists would have to be hired. They are in short supply, and it is difficult to locate qualified personnel on short notice.

15.    Furthermore, hiring a single histotechnologist and cytotechnologist is not necessarily sufficient to provide coverage for the lab. Employees get sick, take vacation time, take maternity leave, or otherwise have periods of time when they cannot serve. Temporary absence of a key employee would interrupt services in our own lab, cause lost revenue for time periods when tests must be sent to an outside lab, or delay patient care, all of which are undesirable. It is expensive and very difficult to maintain back up coverage by qualified technologists. Under the Uropath arrangement, which uses leased employees, back up technologists are available.

16.    After the lab space is renovated and brought up to standards, equipment is in place, and the lab is ready to function, there would have to be an on-site inspection to obtain CLIA certification, creating additional delay. On information and belief, there have been significant delays in obtaining CLIA certification in Florida in recent time periods.

17.    The Uropath business model allows AUA to achieve substantial savings and efficiencies in providing pathology services, while at the same time enhancing the quality of care that our physicians are able to provide to our patients, at no additional cost to the Medicare program. Forcing Uropath out of business, forcing AUA to shut down its existing Leesburg lab, and forcing AUA to sever its existing management agreement with Uropath will destroy the valuable, economically efficient, and profitable business relationships that AUA has had with Uropath, with its pathologist, and with clinical and support personnel.

I declare under penalties of perjury that the foregoing is true and correct.

Executed on _Jan. 15_ , 2008

_Jerri Creggar_
Jerri Creggar

# EXHIBIT 6

## DECLARATION OF MICHAEL S. SEVERANCE, M.D.

NOW COMES Michael S. Severance, M.D. and pursuant to 28 U.S.C. § 1746 declares under oath as follows:

1.      My name is Michael S. Severance.  I am over twenty-one years of age, and am fully competent to make this Declaration.

2.      I am a medical doctor, licensed to practice in the State of Missouri.  I received my M.D. degree in 1988 from Albany Medical College.  I completed by urology residency in 1994 at the University of Missouri Hospitals and Clinics.  I am a practicing urologist, and am board-certified in urology.  I am a shareholder of Urology Care, Inc., a physician practice group. Urology Care, Inc. is an S corporation, and is organized and existing under Missouri law.  Our group has four physicians, including myself, practicing urology in Jefferson City, Missouri.  The gross receipts of our practice from all sources was approximately $3.7 million in 2007.

3.       We own and operate, as part of our practice, a Uropath-managed pathology lab located in San Antonio, Texas.  The pathologist who provides pathology services for our group practice, and who serves as Medical Director of the lab, is Jaime Furman, M.D.

4.      Urology Care participates in Part B of the Medicare Program, and is entitled to receive Medicare reimbursement pursuant to the Medicare physician fee schedule for services we provide to our patients who are Medicare beneficiaries.  Prior to January 1, 2008, we billed Medicare for the professional component and technical component of pathology services provided in our San Antonio laboratory.

5.      By establishing our own pathology laboratory under Uropath management, we have been able to improve the quality of services that we provide to our patients. Since we have our own pathologist to provide interpretations and serve as Medical Director, we know the individual with whom we will be dealing. We chose him, we know where he was trained, we know what his qualifications are and, most importantly, he specializes in urologic pathology. Based upon repeated interactions with our pathologist and repeated review of interpretations furnished by him, we know what his interpretations mean. This enhances reliability, and we know we can always count on good reports from him. Furthermore, we are able to reach him in the event we need to consult on any medical issues. These advantages would not be present if we sent our samples to outside labs where we do not know the identity, experience, or qualifications of the pathologist performing the interpretation.

6.      If the January 3, 2008, final rule is not enjoined, we will be forced to shut down our laboratory. We cannot afford to lose money on every Medicare pathology test, as the January 3, 2008, rule requires us to do. Without being able to refer tissue samples for Medicare patients, which represent about 64% of our case mix, operation of our lab would not be financially feasible.

7.      Accordingly, if the final rule is not enjoined, we will have to immediately start sending all pathology specimens to outside labs rather than to our own lab. This means that those laboratories will bill Medicare for the physician fee schedule amount, rather than having our urology group be able to bill for those amounts. Thus, enforcement of the final rule will result in a permanent and ongoing loss of income that we will have no way to recover. It will also destroy our existing business relationship with Uropath, which allows a small practice like

ours to operate our own lab with relatively limited volume, and our existing business relationship with our pathologist, who provides high quality patient care services to Urology Care.

8.    The loss of income will, indeed, be permanent, because as a small practice we do not have the option of establishing our own in-house lab at our urology practice office in Jefferson City.  As a small practice, our volume of anatomic pathology testing is modest when compared with large urology practices.  There is no way we could recruit and pay the staff of histotechnologists and cytotechnologists that would be required, recruit and pay a qualified pathologist, and pay the necessary overhead.

9.    The inability to have our own laboratory puts a small practice such as ours at a competitive disadvantage with regard to recruitment of urologists to our practice.  Several years ago, before we had our own lab, we had to recruit a replacement physician for our practice, and it was a difficult endeavor.  Larger urology practices with which we compete for recruiting highly qualified urologists may be able to have their own labs on their own main office premises.  For several reasons, qualified urologists want to go to group practices that have their own laboratories:  for convenience, for the additional income, and for the quality reasons that I have mentioned.  Under the arrangements with Uropath, which are highly efficient, small practices, including Urology Care, are able to have their own laboratories.  Enforcement of the January 3, 2008 Final Rule will take that away from us, and put us at a competitive disadvantage compared to larger practices.

10.    The revenue received from being able to bill for our own pathology tests as part of our own practice in 2007 was approximately $314,000 for all payers.  As noted, this revenue, which is derived in part from tests ordinarily reimbursable to physician groups under Medicare,

will disappear forever under the January 3, 2008, rule. That is because we will no longer have our own lab, and without the efficiencies of the Uropath arrangements we will not be able to establish a new one.

11.    Enforcement of the rule will also cause us to lose much of our investment in setting up our own lab. The cost of establishing our lab in San Antonio was approximately $101,000. Discontinuance of the lab will require us to sell off the used equipment, furniture, and perhaps some supplies, resulting in the loss of much or most of our investment. Urology Care, Inc. is also a part owner of Uropath, and we will lose that investment if Uropath is shut down. In addition, there are on-going sublease costs for our lab that will have to be paid or settled, with no on-going revenue to cover that continuing cash outflow.

12.    The harm that will result to Urology Care from enforcement of the January 3, 2008 rule cannot be repaired. We will be forced to shut down our lab, and instead refer samples to outside labs. Thus, we will have no way to appeal these claims and recover money later, because we will not be billing for them. Instead, the outside lab will do the billing. I know of no way in which CMS will compensate Urology Care for the permanent loss of the revenue stream that we would have derived from operation of our laboratory had CMS not issued the final rule. I am also aware of no method by which we can recover from CMS the loss of our investment in our lab in San Antonio. CMS will not, to my knowledge, compensate Urology Care for the harm to our competitive position caused by the loss of our lab and associated revenue. There is also no way that they can compensate us for the loss of the high quality services of our pathologist and our business relationships with him and with other laboratory staff.

I declare under penalties of perjury that the foregoing is true and correct.

Executed on _____, 2008

_____
Michael S. Severance, M.D.

# EXHIBIT 7





WHO WE ARE
PATHOLOGISTS
PHYSICIAN SERVICES
LOCATIONS
ARLINGTON, TX

LEESBURG, FL

SAN ANTONIO, TX

SARASOTA, FL

PHILADELPHIA, PA

CONTACT US
NEWS
CAREERS
WHY UROPATH

## LABORATORY FACILITY - LEESBURG

Leesburg was the first location of labs to develop. Forty miles northwest of Orlando, this location was started in 2002. It initially consisted of three labs, one pathologist, Nicholas Maruniak, MD, and a staff of two. The technicians did everything from grossing to transcription. Today, we have fifteen labs, three pathologists, and a full and part time staff totaling thirty employees. Our customers represent nine states and one hundred sixty-two urologists.

In addition to reading Histology and Cytology, our labs also provide interpretation of PSA testing and Urine Cultures. We enjoy providing quality services for pathologists William Murphy, MD, Nicholas Maruniak, MD, and Brian Schnell, MD.

Since 2002, we have grown together as a family, taking pride in our work and working hard to give our clinics the best that we can, always remembering that we are a part of every clinic. "WE ARE YOUR LAB!"

WHO WE ARE | PATHOLOGISTS | PHYSICIAN SERVICES | LOCATIONS | NEWS | CAREERS
WHY UROPATH | ©2007 UROPATH LLC. | PRIVACY & TERMS | CONTACT US | 1.888.UROPATH





WHO WE ARE
PATHOLOGISTS
PHYSICIAN SERVICES
LOCATIONS

ARLINGTON, TX

LEESBURG, FL

SAN ANTONIO, TX

SARASOTA, FL

PHILADELPHIA, PA

CONTACT US
NEWS
CAREERS
WHY UROPATH

## LABORATORY FACILITY - SARASOTA

Uropath opened the Sarasota laboratory in mid-September 2004. Sarasota is a city of 350,000 about two thirds of the way down the gulf coast of Florida. It is a lovely, cosmopolitan community, known for its white sand beaches.

Uropath renovated a former medical facility on Sarasota's south side to create fifteen separate laboratories. The initial lab owners in this location were Florida practices with the addition of practices from North Carolina, Colorado, Kansas, Texas, Conneticut, Indiana and Ohio.

The Sarasota team includes pathologists, Dr. Salah Antar, Dr. Sam Michaels, Dr. Melissa Blount and technical recruits from all over the nation. We have had a lot of fun working hard to get the facility off the ground. It's a great group, a great facility, and the staff is geared up for consistent change and expansion of services.

**WHO WE ARE | PATHOLOGISTS | PHYSICIAN SERVICES | LOCATIONS | NEWS | CAREERS WHY UROPATH | ©2007 UROPATH LLC. | PRIVACY & TERMS | CONTACT US | 1.888.UROPATH**





WHO WE ARE
PATHOLOGISTS
PHYSICIAN SERVICES
LOCATIONS
ARLINGTON, TX

LEESBURG, FL

SAN ANTONIO, TX

SARASOTA, FL

PHILADELPHIA, PA

CONTACT US
NEWS
CAREERS
WHY UROPATH

### LABORATORY FACILITY - SAN ANTONIO

Uropath's second laboratory facility to open is in San Antonio, Texas. San Antonio is located less than one hour south of cosmopolitan Austin and only 130 miles from the Mexican border. It is a historic, very beautiful and friendly multicultural community. Everyone who visits remembers "The Alamo", one of five Spanish missions. The picturesque Riverwalk winds through the city showing the spirit of Fiesta and great Mexican food. We are also the proud home to the San Antonio Spurs basketball team.

Located in the heart of the Southwest Medical Center, the San Antonio facility opened in April 2004 and began receiving specimens in May 2004. We currently have fifteen laboratories operating here. Many Texas cities are represented within the San Antonio location as well as groups from Missouri. Over one hundred urologists send pathology for processing to this location. We have a staff of fourteen full time employees. The pathologists at this location include Jaime Furman, MD., Adriana Olivares, M.D., and Rita Tibbs, M.D.

The San Antonio Uropath team and our pathologists have experienced many transitions in our short time together. We appreciate challenges and enjoy learning with every new experience. We have assembled a seasoned technical staff that enjoys our top notch facility. We appreciate the business of our current customers and look forward to working with future clinics in their laboratories.

WHO WE ARE | PATHOLOGISTS | PHYSICIAN SERVICES | LOCATIONS | NEWS | CAREERS
WHY UROPATH | ©2007 UROPATH LLC. | PRIVACY & TERMS | CONTACT US | 1.888.UROPATH





WHO WE ARE
PATHOLOGISTS
PHYSICIAN SERVICES
LOCATIONS
ARLINGTON, TX

LEESBURG, FL

SAN ANTONIO, TX

SARASOTA, FL

PHILADELPHIA, PA

CONTACT US
NEWS
CAREERS
WHY UROPATH

## LABORATORY FACILITY - PHILADELPHIA

Uropath expanded it's national reach with the June opening of our latest laboratory in Philadelphia. The addition of this laboratory helps Uropath to service over 400 Urologists including more than 45 practices across 15 states.

Uropath is delighted to become a part of the Philadelphia area's outstanding medical community. The Philadelphia team is led by pathologist Dr. John Lei.

WHO WE ARE | PATHOLOGISTS | PHYSICIAN SERVICES | LOCATIONS | NEWS | CAREERS
WHY UROPATH | ©2007 UROPATH LLC. | PRIVACY & TERMS | CONTACT US | 1.888.UROPATH

# EXHIBIT 8

## DECLARATION OF MARK DEGUENTHER, M.D.

NOW COMES Mark DeGuenther, M.D., and pursuant to 28 U.S.C. § 1746 declares under oath as follows:

1.      My name is Mark DeGuenther.  I am over twenty-one years of age, and am fully competent to make this Declaration.

2.      I am a medical doctor licensed to practice in the state of Alabama.  I received my M.D. in 1989 from the Medical College of Georgia.  I am a practicing urologist, and am board-certified in urology.  I am a shareholder of Urology Centers of Alabama, P.C. ("UCA").  Urology Centers of Alabama is a professional corporation.  Our group currently has fourteen physicians, including myself, practicing urology.  Our practice is principally located in Homewood, Alabama and we have offices located throughout the metropolitan Birmingham area.

3.      As part of our practice, UCA owns and operates a Uropath-managed pathology laboratory located in Leesburg, Florida.  The pathologist who provides pathology services for our group and who serves as Medical Director of the lab is Brian Schnell, M.D.

4.      UCA participates in Part B of the Medicare program, and is entitled to receive Medicare reimbursement pursuant to the Medicare physician fee schedule for services we provide to our patients who are Medicare beneficiaries.  Prior to January 1, 2008, we billed Medicare for the professional component and technical component of the pathology services provided in our Leesburg laboratory.

5.     By having our own physician-owned and operated laboratory, with management services provided by Uropath, we are able to achieve several important quality advantages.

6.     First, our pathologist is a genitourinary ("GU") pathology specialist.  Rather than performing pathology work of a wide range of types, his practice is limited to GU pathology and he sees thousands of specimens a year.  Particularly, most of the tissue samples that we send to him are prostate needle biopsies for purposes of detecting prostate cancer.  Due to volume and specialization, he is expert at interpreting these, which leads to high quality interpretations and very definite results.

7.     Second, UCA has direct control over the histotechnologists and other employees in our lab.  We have the power to hire and fire people who work for us, and thus to ensure that qualified people who do excellent work are performing services for us.

8.     Third, if there is any issue relating to an interpretation, we can pick up the telephone and talk to Dr. Schnell, who will be readily available.  This is not typically the case if samples are sent to a large outside lab.  Because there are multiple pathologists on site at the Leesburg facility who are also GU pathology experts, they also can and do consult with each other when tissue sample results are difficult, unusual, or doubtful.

9.     UCA prides itself in being in the forefront in the provision of quality patient care. For example, UCA was an early adopter of the use of an electronic medical records system.  It cost us approximately $1.3 million as well as countless hours to implement the ele ctronic medical records system, but we felt it was worth it in order to enhance certainty, readability, communications, and timeliness, and to obtain the other clinical advantages of having an electronic medical record for high quality patient care.

10.    If the January 3, 2008, rule is enforced it will require us to close our Leesburg laboratory.  We cannot afford to sustain an actual loss on every anatomical pathology test for Medicare patients.  Accordingly, we would have to immediately begin sending our anatomical pathology samples to an outside lab to avoid losing money.  This would cause a disruption in the established, high quality business relationships that currently exist with Uropath, with our pathologist, and with the staff for our lab.

11.    The loss of these relationships is, in my view, irreparable.  We cannot simply reestablish our Uropath-managed lab, and obtain again the quality and efficiency that it provides, after it has been destroyed by regulatory action.

I declare under penalties of perjury that the foregoing is true and correct.

Executed on _Jan 16_, 2008

Mark DeGuenther, M.D.

# EXHIBIT 9

## DECLARATION OF MICHAEL GRABLE, M.D.

NOW COMES Michael Grable, M.D. and pursuant to 28 U.S.C. § 1746 declares under oath as follows:

1.      My name is Michael Grable.  I am over twenty-one years of age, and am fully competent to make this Declaration.

2.      I am a medical doctor, licensed to practice in the State of Florida.  I received my M.D. degree in 1981 from the University of Michigan Medical School.  I completed my residency in urology at the University of Florida School of Medicine in 1986.  I am a practicing urologist, and am board-certified in urology.  I am President and Chief Executive Officer of Atlantic Urological Associates, P.A. ("AUA"), a medical group practice with eight locations in northeast Florida.  AUA has 12 practicing urologists in the group.

3.      AUA is a part owner of Uropath L.L.C.  I am a member of the Board of Directors of Uropath.

4.      As part of our practice, AUA owns and operates a Uropath-managed pathology laboratory located in Leesburg, Florida.  The pathologist who provides pathology services for our group and who serves as Medical Director of the lab is Nick Maruniak, M.D.  The Leesburg lab is not located in any of the buildings in which our urologists generally see patients.

5.      AUA participates in Part B of the Medicare program, and is entitled to receive Medicare reimbursement pursuant to the Medicare physician fee schedule for services we provide to our patients who are Medicare beneficiaries.  Prior to January 1, 2008, AUA billed

and was reimbursed by Medicare for the professional component and technical component of the pathology services provided in our Leesburg laboratory.

6.    As part of their medical practice, urologists are frequently involved in diagnosing and treating cancer of various parts of the genitourinary system.  The most frequent cancer treated by the urologist is prostate cancer.  In fact, prostate cancer is the most common cancer in men.  An abnormality in the prostate specific antigen ("PSA") blood test and/or an abnormal digital rectal examination of the prostate is used to determine if there is a significant risk of prostate cancer. When prostate cancer is suspected, a prostate biopsy is performed.

7.    Prostate biopsy is a surgical  procedure, performed using local, regional or general anesthesia. Using an ultrasound probe, a small hollow needle is guided into the prostate to obtain a "core" of prostate tissue. Multiple cores are taken systematically from different areas of the prostate gland.  The standard number of cores now taken is twelve. For example, the American Cancer Society website entitled "Detailed Guide: Prostate Cancer; How Is Prostate Cancer Diagnosed?" states that the needle biopsy "is repeated from 8 to 18  times, although most urologists will take about 12 samples." A true copy of a printout from their website, http://www.cancer.org/docroot/CRI/content/CRI_2_4_3X_How_is_prostate_cancer_diagnosed_36.asp?sitearea= is included as Exhibit 19.  Similarly, the American Urological Association website page entitled "Causes, Natural History & Diagnosis of Prostate Cancer," states that "Generally, 10 to 12 (or more, depending upon the size of the prostate gland and the prior PSA and biopsy history of the patient) biopsies will  be performed." A true copy of a printout from their website, http://www.urologyhealth.org/adult/index.cfm?cat=09&topic=39, is included as Exhibit 20.

8.    The tissue samples are then examined by a pathologist, who is a physician whose specialty involves the examination of such tissue to determine the presence or absence of abnormalities such as cancer.  These specimens are first sliced into very thin sections and stained by a trained and licensed histotechnologist.  They are prepared on a microscope slide and the pathologist then views the tissue through the microscope.  His evaluation takes into account the patient's history and the findings of the urologist on examination.  The pathologist, among other things, identifies the type of abnormal cells and their quantity.  Pathologic evaluation of tissue is, by its nature, an interpretation of what is seen under the microscope.

9.    The evaluation of prostate cancer by the pathologist includes the "grading" of the tumor, producing a "Gleason score" of  two to ten.   A score of two is almost normal tissue whereas a score of ten implies a very aggressive cancer.  The Gleason score is used in planning subsequent therapy for the cancer.

10.    One measure of the appropriateness of the decision to biopsy the prostate is the percentage of instances in which prostate cancer is found.  If the percentage is very low, it could mean that too many prostates are being biopsied.  If the percentage is very high, it could mean that not enough prostates are being biopsied, that the index of suspicion is too low, and that prostates that contain cancer are not being biopsied.

11.    The national average of positive biopsies is generally in the low to mid-thirties percent range.  A recently published study of data regarding 10,429 Medicare beneficiaries found that the positive biopsy rate for cancer was 32%.  Exhibit 16.  Data collected by Uropath shows that for AUA the positive biopsy percentage in 2006 was 48%, suggesting, if anything, that we are doing too few instead of too many prostate biopsies.  See Exhibit 21.  For all physician

groups with labs managed by Uropath, the same study showed a positive biopsy rate of 40.9% for the groups combined. See Exhibit 21. This is above the national average, and strongly supports the conclusion that biopsy procedures are not being overutilized by these physician groups.

12.    Over the last twenty years, the number of core biopsies has gradually increased from the original six (sextant) biopsies used in the late 1980s. This increase was based on scientific data revealing that six cores missed cancers that were detected with more extensive biopsies. See, for example, the abstract of the article entitled "Two Consecutive Sets of Transrectal Ultrasound Guided Sextant Biopsies of the Prostate for the Detection of Prostate Cancer" in Exhibit 17 (second sextant biopsy--12 cores total--increased finding of cancer by 30% over single sextant biopsy).

13.    Since the time that the sextant prostate biopsy technique became standardized, biopsy techniques have been introduced that increase the detection of prostate cancer. These techniques involve from 8 to greater than 40 cores, and a 12 core technique is now quite common. Exhibit 15 consists of several medical articles and abstracts demonstrating that the national trend in accepted urologic practice has been to increase the number of cores taken. In addition to better detection of cancer, the extended biopsy technique reduces the need for re-biopsies of the prostate, with the attendant risk and cost of another separate procedure. The number of prostate cores needed to adequately diagnose prostate cancer continues to evolve upward, as evidenced by the title of a very recent February 2008 Journal of Urology article: "The 20 Core Prostate Biopsy Protocol – A New Gold Standard?". An abstract of the article is included as Exhibit 18. As the evolution continues, those medical practices on the "cutting edge"

of these technologies would be expected to be the first to adopt these new strategies to optimize patient care.

14.     The pathologist's interpretation of his findings can be affected by his awareness of any previous treatment for the prostate, such as radiation therapy, which can alter how the tissue looks under the microscope.  If the pathologist is not aware of certain details in the patient's history, his interpretations could be limited and less definitive.  By utilizing our own pathologist in AUA's Uropath-managed lab, availability of patient records and close contact and affiliation with the urologist enhances this information exchange, thereby improving accuracy of the pathologists interpretations.  AUA's pathologist in AUA's Uropath-managed lab has full access to the patient's chart, via electronic medical records.  These are not available to outside laboratories.  In addition, it is my experience that frequent interactions by AUA's urologists with our pathologist is the norm, whereas it is the rare exception with outside large labs.

15.     When the pathologist is unsure of a finding, he/she may order "special stains" that are used to help make a diagnosis, but that increase the cost of the evaluation.  A pathologist who specializes in genitourinary pathology is more frequently able to make a diagnosis without the necessity of resorting to special stains.  Data collected by Uropath shows that our pathologist uses special staining techniques to make the diagnosis only 1.82% of the time for AUA patients. See Exhibit 21.  For Uropath-managed labs as a whole, the same data shows an overall special stain rate of only 5.50%. Exhibit 21.  Although I am not aware of hard data on this subject, based on my experience my impression is that the industry standard special stain rate is in the area of 20% or possibly more.   Thus, this improvement in interpretations due to pathologist specialization and expertise in Uropath managed labs saves patients and third party payers

(including Medicare) the added costs resulting from higher special stain rates. Special stains are a separate billable code under Medicare.

16.     Owning and operating our own lab under a management agreement with Uropath provides a number of advantages in terms of quality. Typically, insurance companies and managed care plans will reimburse a medical group practice for pathology services provided as part of their practice. However, if we did not have our own lab, most insurers would require that specimens be sent to a particular outside laboratory with which the insurance company has contracted. When specimens are shipped to several different labs, each with multiple pathologists, there is an uncertainty with regards to the particular pathologists level of experience with prostate pathology. Because large national laboratories employ many pathologists, there are few opportunities for the referring physician to consult with the pathologist. It is even quite difficult to find out where in the country these pathologists are located, and difficult to find out how to contact them. These pathologists do not have access to our patients charts. Our group does not have control over processing or turn around times for these specimens. Finally, the patients are faced with the increased complexity of receiving bills from one or more additional entities, through which the lab and pathologists bill.

17.     By contrast, by owning our own lab under management by Uropath, AUA consistently uses the same pathologist for urological pathology work. This means that we are able to minimize the potential for inconsistencies in interpretation of specimens inherent when interpretations are rendered by different pathologists. The close working relationship with our own pathologist allows us to have a much higher comfort level in assessing the pathologic interpretations rendered.

18.    In addition, most general pathologists examine a wide range of samples relating to a broad spectrum of diseases or diagnoses. The pathologist in our own lab specializes in genitourinary pathology, and reviews thousands of samples a year relating to prostate cancer and other urological diseases. Such specialization and experience translate into enhanced quality. By using our own pathologist, AUA physicians are freely able to consult with him regarding specimens reviewed and interpreted. AUA can make special requests and prioritize review of samples since it is our own lab and our own pathologist, rather than an outside entity. Finally, the patient has to deal with only one billing entity and billing staff when there are billing questions or concerns.

19.    In my position as Board member of Uropath, I am aware that various measures regarding quality and utilization were collected from physician groups with Uropath-managed labs in the recent past. Two such studies which were gathered under Uropath auspices and presented to the Uropath Board are included as Exhibit 23. The first of these is a study conducted at Urology Associates of North Texas ("UANT"), a very large urology specialty practice in the Dallas areas. That study shows that after UANT established its Uropath-managed lab on January 1, 2003, the ratio of biopsies to the number of men seen in the practice who are over 50 years of age; who have selected diagnosis codes indicating prostate cancer, enlarged prostate, or potential prostate cancer; or who are over 50 years of age and also have such diagnosis codes; actually <u>decreased</u> substantially. A true copy of that study is included as Exhibit 23.

20.    Similarly, another physician group with a Uropath-managed lab, Urology San Antonio, has had a significant decline in the number of biopsies per 1,000 patient visits. <u>See</u> Exhibit 23. The biopsy rate per 1000 patient visits declined from 27.93 in 2003, the year

Urology San Antonio opened its Uropath-managed lab, to 21.36 in 2006. Thus, instead of causing overutilization, the establishment of a Uropath-managed lab resulted in a decrease in the ratio of biopsies to patient visits. A likely cause of this reduction, at least in part, is that the high quality of interpretations by GU specialized pathologists reduces the need for repeat biopsies, which are more frequently necessary when interpretations are inconclusive.

21.    If the January 3, 2008, final rule is not enjoined, AUA would be required to bill at a loss for pathology services rendered in its own lab in Leesburg. Because it is not feasible to lose money on every Medicare pathology test, AUA is considering creating its own laboratory on existing premises in which its urology physicians see urology patients. However, without injunctive relief, there is uncertainty regarding what rules will apply in the immediate future, and whether those rules will be quickly changed once again. As noted above, AUA has eight practice locations. The revised anti-markup rule announced in the November 27, 2007, rule imposes a test based on whether the space meets the definition of "office of the billing physician or other supplier." Application of this definition was postponed by CMS for other diagnostic services (except anatomic pathology diagnostic services) because the new definition was unclear, and might lead to discontinuance of services by physicians.

22.    Yet this admittedly unclear rule will apply immediately to any attempt by AUA to create a new lab in existing locations where its urologists practice. I understand that CMS has indicated that it may be issuing a new regulation or providing "clarifying guidance" on this subject during 2008, creating further uncertainty if AUA should try to establish a new lab. Thus, AUA is being forced to shut down its existing Uropath-managed lab. But if it attempts to establish its own lab, the rules may change yet again during the time period when AUA is

finding space, investing in construction, obtaining CLIA certification, and attempting to secure

the services of pathologists, technical personnel, and others needed to operate the lab.

I declare under penalties of perjury that the foregoing is true and correct.

Executed on _Sanuary 18_, 2008

_____
Michael Grable, M.D.

# EXHIBIT 10

# Medicare Physicians and Other Health Professionals

## Billing Service Companies

We will identify and review the relationships among billing companies and the physicians and other Medicare providers who use their services. We will also identify the various types of arrangements physicians and other Medicare providers have with billing services and determine the impact of these arrangements on the physicians' billings.
*(OAS; W-00-05-35162; various reviews; expected issue date: FY 2005; new start)*

## Medicare Payments to VA Physicians

We will assess the validity of Medicare reimbursement for services billed by physicians who receive remuneration from the Department of Veterans Affairs (VA) for the time the physicians reported as being on duty at a VA hospital. Physicians employed by VA may not bill Medicare for services rendered at other hospitals during the times they were on duty at a VA hospital. Our preliminary work has identified a number of VA physicians who received Medicare reimbursements totaling approximately $105 million for services rendered between January 1, 2001 and June 30, 2003. Using time reporting and payroll documentation from the VA, we will identify the services rendered while the physicians were reported as on duty at the VA hospitals and remunerated for such duty.
*(OAS; W-00-04-35155; A-00-00-0000; expected issue date: FY 2005; work in progress)*

## Care Plan Oversight

We will evaluate the efficacy of controls over Medicare payments for care plan oversight claims submitted by physicians. Under the Medicare home health and hospice benefits, care plan oversight is physician supervision of beneficiaries who need complex or multidisciplinary care requiring ongoing physician involvement. Reimbursement for care plan oversight increased from $15 million in 2000 to $41 million in 2001. We will assess whether these services were provided in accordance with Medicare regulations.
*(OAS; W-00-04-35114; A-02-00-00000; expected issue date: FY 2005; work in progress)*

## Ordering Physicians Excluded From Medicare

This review will quantify the extent of services, if any, ordered by physicians excluded from Federal health care programs and the amount paid by Medicare Part B. Under Federal regulation, physicians who are excluded from Federal health care programs generally are precluded from ordering or performing services for Medicare beneficiaries. During a current review, we identified a significant number of services that had been ordered by excluded physicians.
*(OAS; W-00-04-35116; various reviews; expected issue date: FY 2005; work in progress)*

## Physician Services at Skilled Nursing Facilities

We will examine Medicare Part A and Part B claims with overlapping services for skilled nursing facility patients and determine whether duplicate payments were made to either the physicians or the nursing homes for the same patient services. Physicians may bill Medicare only for the professional component of a service on behalf of skilled nursing facility patients. The technical component of physicians' services is covered under the patient's Medicare Part B stay in the skilled nursing facilities and should not be billed separately by the nursing home. Under an exception to this rule, nursing homes may receive Part B payments for both the professional and technical components of physicians' services if both parties have an agreement under which only the nursing home may bill and receive these Part B payments.
*(OAS; W-00-05-35163; various reviews; expected issue date: FY 2005; new start)*

## Physician Pathology Services

Our review will focus on pathology services performed in physicians' offices. Pathology services include the examination of cells or tissue samples by a physician who prepares a report of his findings. Medicare pays over $1 billion annually to physicians for pathology services. We will identify and review the relationships between physicians who furnish pathology services in their offices and outside pathology companies.
*(OAS; W-00-05-35164; various reviews; expected issue date: FY 2005; new start)*

## Cardiography and Echocardiography Services

We will review Medicare payments for cardiography and echocardiography services to determine whether physicians billed appropriately for the professional and the technical components of the services. Like many physician services, cardiography and echocardiography include both technical and professional components. When a physician performs the interpretation separately, the modifier 26 should be used to bill Medicare for professional services.
*(OAS; W-00-05-35165; various reviews; expected issue date: FY 2005; new start)*

## Physical and Occupational Therapy Services

We will review Medicare claims for therapy services provided by physical and occupational therapists to determine whether the services were reasonable and medically necessary, adequately documented, and certified by physician certification statements. Physical and occupational therapies are medically prescribed treatments concerned with improving or restoring functions, preventing further disability, and relieving symptoms.
*(OAS; W-00-04-35141; various reviews; expected issue date: FY 2005; work in progress)*

## Part B Mental Health Services

We will determine whether Medicare Part B mental health services provided in physicians' offices were medically necessary and billed in accordance with Medicare requirements.

# EXHIBIT 11



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**     Office of Inspector General
Office of Audit Services

REGION IV
61 Forsyth Street, S.W., Suite 3T41
Atlanta, Georgia 30303

JUN 2 5 2007

Report Number: A-04-05-03002

Michael Grable, M.D., President
Atlantic Urological Associates, P.A.
545 Health Boulevard
Daytona Beach, Florida 32114

Dear Dr. Grable:

Enclosed are two copies of the Department of Health and Human Services, Office of Inspector
General (OIG) final report entitled "Audit of Pathology Laboratory Services Claimed by Atlantic
Urological Associates, P.A. for Calendar Year 2004." The audit objectives were to determine
whether the Practice claimed reimbursement for pathology laboratory services in accordance
with Medicare Part B medical necessity and documentation requirements during calendar year
2004 and to analyze the Practice's utilization patterns for pathology services.

In accordance with the principles of the Freedom of Information Act, 5 U.S.C. § 552, as
amended by Public Law 104-231, OIG reports issued to the Department's grantees and
contractors are made available to members of the press and general public to the extent
information contained therein is not subject to exemptions in the Act which the Department
chooses to exercise. (See 45 CFR part 5.) As such, within 10 business days after the final report
is issued, it will be posted on the Internet at http://oig.hhs.gov.

If you have any questions or comments about this report, please do not hesitate to call John
Drake, Audit Manager, at (404) 562-7755. Please refer to report number A-04-05-03002 in all
correspondence.

Sincerely,

Peter J. Barbera
Regional Inspector General
   for Audit Services, Region IV

Enclosures

Department of Health and Human Services

**OFFICE OF
INSPECTOR GENERAL**

# AUDIT OF PATHOLOGY LABORATORY SERVICES CLAIMED BY ATLANTIC UROLOGICAL ASSOCIATES, P.A. FOR CALENDAR YEAR 2004



Daniel R. Levinson
Inspector General

June 2007
A-04-05-03002

# *Office of Inspector General*

http://oig.hhs.gov

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

## *Office of Audit Services*

The Office of Audit Services (OAS) provides all auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations. These assessments help reduce waste, abuse, and mismanagement and promote economy and efficiency throughout HHS.

## *Office of Evaluation and Inspections*

The Office of Evaluation and Inspections (OEI) conducts national evaluations to provide HHS, Congress, and the public with timely, useful, and reliable information on significant issues. Specifically, these evaluations focus on preventing fraud, waste, or abuse and promoting economy, efficiency, and effectiveness in departmental programs. To promote impact, the reports also present practical recommendations for improving program operations.

## *Office of Investigations*

The Office of Investigations (OI) conducts criminal, civil, and administrative investigations of allegations of wrongdoing in HHS programs or to HHS beneficiaries and of unjust enrichment by providers. The investigative efforts of OI lead to criminal convictions, administrative sanctions, or civil monetary penalties.

## *Office of Counsel to the Inspector General*

The Office of Counsel to the Inspector General (OCIG) provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support in OIG's internal operations. OCIG imposes program exclusions and civil monetary penalties on health care providers and litigates those actions within HHS. OCIG also represents OIG in the global settlement of cases arising under the Civil False Claims Act, develops and monitors corporate integrity agreements, develops compliance program guidances, renders advisory opinions on OIG sanctions to the health care community, and issues fraud alerts and other industry guidance.

# *Notices*

---

## THIS REPORT IS AVAILABLE TO THE PUBLIC
at http://oig.hhs.gov

In accordance with the principles of the Freedom of Information Act
(5 U.S.C. 552, as amended by Public Law 104-231), Office of Inspector
General, Office of Audit Services reports are made available to
members of the public to the extent the information is not subject to
exemptions in the act. (See 45 CFR Part 5.)

## OAS FINDINGS AND OPINIONS

The designation of financial or management practices as questionable
or a recommendation for the disallowance of costs incurred or claimed,
as well as other conclusions and recommendations in this report,
represent the findings and opinions of the HHS/OIG/OAS. Authorized
officials of the HHS divisions will make final determination on these
matters.

## EXECUTIVE SUMMARY

### BACKGROUND

Congress established Medicare under Title XVIII of the Social Security Act to provide health insurance coverage to people age 65 and over, the disabled, and people with end-stage renal disease. The Medicare program pays for expenses incurred for items or services that are reasonable and necessary for the diagnosis or treatment of illness or injury.

Sections 1833 and 1861 of the Social Security Act provide for payment of clinical diagnostic laboratory services, including pathology services, under Medicare Part B. The services must be ordered either by a physician or a qualified non-physician practitioner and may be furnished by certain entities including hospitals, skilled nursing facilities, and laboratories. A laboratory performing tests on human specimens must meet all applicable requirements of the Clinical Laboratory Improvement Amendments of 1988.

The Medicare program reimburses Medicare entities for pathology services based on the number of biopsies examined. Biopsies are excised tissue packaged and sent to a pathologist for a microscopic examination. Each tissue examination is billed as one unit of service, and each is reimbursed equally within the same Current Procedural Terminology (CPT) code. The majority of pathology services reviewed in this audit were billed under CPT code 88305, "Level IV – Surgical pathology, gross and microscopic examination, Prostate, Needle Biopsy."

Atlantic Urological Associates, P.A. (the Practice) is a physicians' group practice located in Daytona Beach, Florida, that provides urology services related to urinary infections, incontinence, kidney stones, infertility, bladder cancer, vasectomies, and prostate cancer. In 2003, the Practice contracted with a pathologist to provide pathology services on behalf of its patients. In July 2003, the Practice contracted with a management company to oversee the daily operations of its clinical laboratory, with responsibilities that included securing rental space, hiring non-physician personnel, purchasing laboratory supplies, and assisting in ordering furniture and equipment. The Practice's laboratory was one of 13 laboratories the management company operated within the same office building. The Practice's laboratory contained its own equipment and was in a separate room within this office building.

Through its contractual arrangements, the Practice received Medicare reimbursement totaling $378,154 during calendar year (CY) 2004 for pathology services performed at its laboratory in Leesburg, Florida. We contracted with a Medicare Program Safeguard Contractor (PSC) to review the Practice's medical records for a random sample of 100 paid claims during this period to determine whether pathology services provided were reasonable, medically necessary, and supported by adequate documentation.

**OBJECTIVES**

Our audit objectives were:

- to determine whether the Practice claimed reimbursement for pathology laboratory services in accordance with Medicare Part B medical necessity and documentation requirements during CY 2004 and

- to analyze the Practice's utilization patterns for pathology services.

**RESULTS OF REVIEW**

During our audit period, the Medicare program had not created any national or local coverage determinations or standards for the number of tissue samples that should be examined for urology patients with primarily prostate-related diagnoses. In the absence of these standards, the PSC medical reviewer determined that the Practice's claims for pathology laboratory services generally complied with Medicare Part B medical necessity and documentation requirements. The PSC stated that sufficient documentation existed for each of the sampled claims to indicate that the services billed to Medicare were actually provided. The PSC also stated that the medical necessity for a biopsy procedure could be established, within the realm of professional judgment, for 96 of the 100 sampled claims. For four of the sampled claims, the PSC concluded that the medical need for a biopsy was not established, but it could not definitively rule out the appropriateness of a biopsy. The PSC also had concerns about the volume of tissue samples taken in an additional three sampled claims. Because the Medicare program has not created any national standards or local coverage determinations for the number of tissue samples that are to be obtained or reimbursed on a single day, we elected not to question the Medicare payment for these seven claims.

We noted an increase in the number of pathology services requested and performed after the Practice contracted with a laboratory management company. In CY 2002, prior to the first full year of the Practice's contractual laboratory arrangement, the Practice's physicians requested from independent laboratories an average of seven tissue examinations per claim. In CY 2004, after completing the contractual arrangements for its laboratory operations, the Practice's physicians requested an average of nine tissue examinations per claim. In addition, the Medicare carrier, First Coast Service Options, Inc. (FCSO) reimbursed the Practice for more units of service of CPT 88305, on average, than it reimbursed other providers for CPT 88305.

The Practice acknowledged that its utilization increased and explained the increase by noting that industry standards were evolving. The Practice stated that it had increased the number of tissue examination requests from earlier years in an attempt to more fully meet the needs of its patients.

This report contains no recommendations.

# TABLE OF CONTENTS

Page

INTRODUCTION…………………………………………...………………………… 1

    BACKGROUND…………………………………………………………… 1
        Medicare Overview………………………………………….………… 1
        Anatomical Pathology Laboratory Services……………………….……… 1
        Atlantic Urological Associates, P.A…………………………………….... 1

    OBJECTIVES, SCOPE, AND METHODOLOGY……………………………… 2
        Objectives………………………………………………………… 2
        Scope………………………………………………………….... 2
        Methodology……………………………………………………… 3

    RESULTS OF REVIEW…………………...……………………………….…4

# INTRODUCTION

## BACKGROUND

### Medicare Overview

Congress established Medicare under Title XVIII of the Social Security Act to provide health insurance coverage to people age 65 and over, the disabled, and people with end-stage renal disease. The Medicare program pays for expenses incurred for items or services that are reasonable and necessary for the diagnosis or treatment of illness or injury. Medicare Part B reimburses for physician services, outpatient hospital services, medical equipment, supplies and clinical laboratory services. Within the Department of Health and Human Services, the Centers for Medicare & Medicaid Services (CMS) administers the Medicare program.

### Anatomical Pathology Laboratory Services

Sections 1833 and 1861 of the Social Security Act provide for payment of clinical diagnostic laboratory services, including pathology services, under Medicare Part B. The services must be ordered either by a physician, as described in 42 CFR § 410.32(a), or by a qualified non-physician practitioner, as described in 42 CFR § 410.32(a)(3), and may be furnished by any of the entities identified in 42 CFR § 410.32(d)(1), including hospitals, skilled nursing facilities, and laboratories. A laboratory seeking Medicare reimbursement for performing tests on human specimens must meet all applicable requirements of the Clinical Laboratory Improvement Amendments of 1988, as set forth at 42 CFR part 493.

The Medicare program reimburses for pathology services based on the number of biopsies examined. Biopsies are excised tissue packaged and sent to a pathologist for a microscopic examination. Each tissue examination is billed as one unit of service, and each is reimbursed equally within the same Current Procedural Terminology (CPT) code. The majority of pathology services reviewed in this audit were billed under CPT code 88305, "Level IV – Surgical pathology, gross and microscopic examination, Prostate, Needle Biopsy".

### Atlantic Urological Associates, P.A.

Atlantic Urological Associates, P.A. (the Practice) is a physicians' group practice licensed in the State of Florida. As of December 31, 2004, the Practice employed 16 physicians and 1 physician's assistant. The Practice's specialty is urology – the medical subspecialty that covers the diagnosis, surgical and medical treatment of diseases of the kidney, bladder, prostate and reproductive systems of males, and the urinary tract of females. The Practice has nine offices where patients are seen, including its main office in Daytona Beach, Florida. The Practice also maintains a central billing office through which all claims are processed.

1

In 2003, the Practice contracted with a pathologist to provide services on behalf of both Medicare and non-Medicare patients through an in-office laboratory. In July 2003, the Practice contracted with a management company to oversee the daily operations of its clinical laboratory, with responsibilities that included securing rental space, hiring non-physician personnel, purchasing laboratory supplies, and assisting in ordering furniture and equipment. The Practice's laboratory was one of 13 laboratories the management company operated within the same office building. The Practice's laboratory contained its own equipment and was in a separate room within this office building. The laboratory is located in Leesburg, Florida, approximately 71 miles from the Practice's main office. The contracted pathologist serves as the laboratory's director. The State of Florida conducted a licensure survey of the Practice's laboratory in January 2003, and renewed the laboratory's certificate on October 30, 2003, expanding the testing specialties of the laboratory to bacteriology, routine chemistry, and endocrinology, in addition to the previous certifications for histopathology and cytology. The Clinical Laboratory certificate for the Practice's laboratory was renewed effective April 4, 2004, for the performance of tests related to bacteriology, cytology, endocrinology, histopathology, and routine chemistry.

The Practice received $378,154 in Medicare reimbursement for 590 claims for pathology services performed during calendar year (CY) 2004 through the contractual arrangements at its Leesburg, Florida laboratory. Prior to the contractual arrangements and establishing its laboratory, the Practice ordered these services from independent laboratories. First Coast Service Options, Inc. (FCSO) processed the Medicare claims for the Practice.

## OBJECTIVES, SCOPE, AND METHODOLOGY

### Objectives

Our audit objectives were:

- to determine whether the Practice claimed reimbursement for pathology laboratory services in accordance with Medicare Part B medical necessity and documentation requirements during CY 2004 and

- to analyze the Practice's utilization patterns for pathology services.

### Scope

We selected a random sample of 100 Medicare claims totaling $70,970 that FSCO paid during the CY 2004. We provided the associated medical records to the Program Safeguard Contractor (PSC) for medical review to ensure the pathology services billed for were reasonable, necessary, and in accordance with Medicare Part B requirements.

Our review of internal controls was limited to understanding the Practice's patient biopsy process, labeling and recording of biopsy tissue for shipment to its Leesburg laboratory, receipting and recording of tissue at the Leesburg laboratory, laboratory processing, bill processing, and receipting of Medicare payments.

2

We conducted our fieldwork at the Practice's office in Daytona Beach and its laboratory in Leesburg, Florida.

**Methodology**

To accomplish our objectives, we:

- reviewed applicable provisions of the Social Security Act, Code of Federal Regulations, and the Provider Reimbursement Manual;

- interviewed staff at the Practice's office and laboratory and gained an understanding of the procedures the Practice used at its office and laboratory;

- reviewed various contractual documentation regarding arrangements for laboratory services, including the employment of the contracted pathologist, rental of space, and management operations;

- identified and reviewed a sample of 100 claims that FCSO paid for the Practice's pathology services during CY 2004, to verify compliance with Medicare regulations, and calculated the average number of tissue samples per claim of CPT 88305 that the Practice examined;

- contracted with a PSC to review the Practice's medical records for the 100 claims to determine if pathology services were medically necessary, adequately documented, and performed at the level indicated on the claim;

- identified claims containing units of CPT 88305 that FCSO paid to independent laboratories that the Practice used during CY 2002;

- identified claims containing units of CPT 88305 that FCSO reimbursed to all other providers during CY 2004; and

- compared[1] the Practice's average units per claim of CPT 88305 before and after it contracted with a laboratory management company, and compared the Practice's average units per claim of CPT 88305 after it opened its own laboratory to the average units per claim of CPT 88305 that FCSO paid to all other providers.

We performed our review in accordance with generally accepted government auditing standards.

## RESULTS OF REVIEW

---

[1] We limited the claims that were compared to those that contained a diagnosis code the Practice billed during CY 2004 and with a place of service code of 11 or 81 ("in-office" or "independent laboratory," respectively).

3

During our audit period, the Medicare program had not created any national or local coverage determinations or standards for the number of tissue samples that should be examined for urology patients with primarily prostate-related diagnoses. In the absence of these standards, the PSC medical reviewer determined that the Practice's claims for pathology laboratory services generally complied with Medicare Part B medical necessity and documentation requirements. The PSC stated that sufficient documentation existed for each of the sampled claims to indicate that the services billed to Medicare were actually provided. The PSC also stated that the medical necessity for a biopsy procedure could be established, within the realm of professional judgment, for 96 of the 100 sampled claims. For four of the sampled claims, the PSC concluded that the medical need for a biopsy was not established, but it could not definitively rule out the appropriateness of a biopsy. The PSC also had concerns about the volume of tissue samples taken in an additional three sampled claims. Because the Medicare program has not created any national standards or local coverage determinations for the number of tissue samples that are to be obtained or reimbursed on a single day, we elected not to question the Medicare payment for these seven claims.

We noted an increase in the number of pathology services requested and performed after the Practice opened its own laboratory. In addition, as shown below, FCSO reimbursed the Practice for more units per claim of CPT 88305, on average, than it reimbursed other providers for CPT 88305.

| | |
|---|---|
| Average units of CPT 88305 requested *before* opening its own laboratory and claiming reimbursement for services | 7.09 |
| Average units of CPT 88305 requested *after* opening its own laboratory and claiming reimbursement for services | 8.90 |
| Average units of CPT 88305 FCSO paid to all other providers | 5.40 |

The Practice acknowledged that its utilization increased and explained the increase by noting that industry standards were evolving. The Practice stated that it had increased the number of tissue examination requests from earlier years in an attempt to more fully meet the needs of its patients. The Practice provided some industry literature in support of its contention that an increased number of tissue examinations may improve patient outcomes.

This report contains no recommendations.

4

# EXHIBIT 12



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Office of Inspector General
Office of Audit Services

JUN 2 8 2007

REGION IV
61 Forsyth Street, S.W., Suite 3T41
Atlanta, Georgia 30303

Report Number: A-04-05-03005

Dr. Ira A. Zucker, President
Florida Urology Physicians, P.A.
7451 Gladiolus Drive, Suite A
Fort Myers, Florida 33908

Dear Dr. Zucker:

Enclosed are two copies of the Department of Health and Human Services, Office of
Inspector General (OIG) final report entitled "Audit of Pathology Laboratory Services
Claimed by Florida Urology Physicians, P.A. for the Period September Through December
2004." The objectives of this review were to determine whether the Practice claimed
reimbursement for pathology laboratory services in accordance with Medicare Part B
medical necessity and documentation requirements from September through December
2004 and to analyze the Practice's utilization patterns for pathology services.

In accordance with the principles of the Freedom of Information Act, 5 U.S.C. § 552, as
amended by Public Law 104-231, OIG reports issued to the Department's grantees and
contractors are made available to members of the press and general public to the extent
information contained therein is not subject to exemptions in the Act which the
Department chooses to exercise. (See 45 CFR part 5.) As such, within 10 business days
after the final report is issued, it will be posted on the Internet at http://oig.hhs.gov.

If you have any questions or comments about this report, please do not hesitate to call John
Drake, Audit Manager, at (404) 562-7755. Please refer to report number A-04-05-03005
in all correspondence.

Sincerely,

Peter J. Barbera
Regional Inspector General
 for Audit Services, Region IV

Enclosures

Department of Health and Human Services

**OFFICE OF
INSPECTOR GENERAL**

# AUDIT OF PATHOLOGY LABORATORY SERVICES CLAIMED BY FLORIDA UROLOGY PHYSICIANS, P.A. FOR THE PERIOD SEPTEMBER THROUGH DECEMBER 2004



Daniel R. Levinson
Inspector General

June 2007
A-04-05-03005

# *Office of Inspector General*

http://oig.hhs.gov

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

## *Office of Audit Services*

The Office of Audit Services (OAS) provides all auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations. These assessments help reduce waste, abuse, and mismanagement and promote economy and efficiency throughout HHS.

## *Office of Evaluation and Inspections*

The Office of Evaluation and Inspections (OEI) conducts national evaluations to provide HHS, Congress, and the public with timely, useful, and reliable information on significant issues. Specifically, these evaluations focus on preventing fraud, waste, or abuse and promoting economy, efficiency, and effectiveness in departmental programs. To promote impact, the reports also present practical recommendations for improving program operations.

## *Office of Investigations*

The Office of Investigations (OI) conducts criminal, civil, and administrative investigations of allegations of wrongdoing in HHS programs or to HHS beneficiaries and of unjust enrichment by providers. The investigative efforts of OI lead to criminal convictions, administrative sanctions, or civil monetary penalties.

## *Office of Counsel to the Inspector General*

The Office of Counsel to the Inspector General (OCIG) provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support in OIG's internal operations. OCIG imposes program exclusions and civil monetary penalties on health care providers and litigates those actions within HHS. OCIG also represents OIG in the global settlement of cases arising under the Civil False Claims Act, develops and monitors corporate integrity agreements, develops compliance program guidances, renders advisory opinions on OIG sanctions to the health care community, and issues fraud alerts and other industry guidance.

# *Notices*

---

## THIS REPORT IS AVAILABLE TO THE PUBLIC
### at http://oig.hhs.gov

In accordance with the principles of the Freedom of Information Act (5 U.S.C. 552, as amended by Public Law 104-231), Office of Inspector General, Office of Audit Services reports are made available to members of the public to the extent the information is not subject to exemptions in the act. (See 45 CFR Part 5.)

## OAS FINDINGS AND OPINIONS

The designation of financial or management practices as questionable or a recommendation for the disallowance of costs incurred or claimed, as well as other conclusions and recommendations in this report, represent the findings and opinions of the HHS/OIG/OAS. Authorized officials of the HHS divisions will make final determination on these matters.

# EXECUTIVE SUMMARY

## BACKGROUND

Congress established Medicare under Title XVIII of the Social Security Act to provide health insurance coverage to people age 65 and over, the disabled, and people with end-stage renal disease. The Medicare program pays for expenses incurred for items or services that are reasonable and necessary for the diagnosis or treatment of illness or injury.

Sections 1833 and 1861 of the Social Security Act provide for payment of clinical diagnostic laboratory services, including pathology services, under Medicare Part B. The services must be ordered either by a physician or a qualified non-physician practitioner and may be furnished by certain entities including hospitals, skilled nursing facilities, and laboratories. A laboratory performing tests on human specimens must meet all applicable requirements of the Clinical Laboratory Improvement Amendments of 1988.

The Medicare program reimburses Medicare entities for pathology services based on the number of biopsies examined. Biopsies are excised tissue packaged and sent to a pathologist for a microscopic examination. Each tissue examination is billed as one unit of service, and each is reimbursed equally within the same Current Procedural Terminology (CPT) code. The majority of pathology services reviewed in this audit were billed under CPT code 88305, "Level IV – Surgical pathology, gross and microscopic examination, Prostate, Needle Biopsy."

Florida Urology Physicians, P.A. (the Practice) is a physicians' group practice located in Fort Myers, Florida, that provides urology services to its patients. Prior to 2004, the Practice ordered pathology services from independent laboratories. In September 2004, the Practice began operating its own laboratory by contracting with a pathologist to provide pathology services and with a management company to oversee the daily operations of the laboratory, with responsibilities that included securing rental space, hiring non-physician personnel, purchasing laboratory supplies, and assisting in ordering furniture and equipment. The Practice's laboratory was one of 15 laboratories operated by the management company within the same office building. The Practice's laboratory contained its own equipment and was in a separate room within this office building.

Through its contractual arrangements, the Practice received Medicare reimbursement totaling $33,587 from September through December of 2004 for pathology services performed at its laboratory in Sarasota, Florida. We contracted with a Medicare Program Safeguard Contractor (PSC) to review the Practice's medical records for 51 paid claims during this period to determine whether pathology services provided were reasonable, medically necessary, and supported by adequate documentation.

i

**OBJECTIVES**

Our audit objectives were:

- to determine whether the Practice claimed reimbursement for pathology laboratory services in accordance with Medicare Part B medical necessity and documentation requirements from September through December 2004 and

- to analyze the Practice's utilization patterns for pathology services.

**RESULTS OF REVIEW**

During our audit period, the Medicare program had not created any national or local coverage determinations or standards for the number of tissue samples that should be examined for urology patients with primarily prostate-related diagnoses. In the absence of these standards, the PSC medical reviewer determined that the Practice's claims for pathology laboratory services generally complied with Medicare Part B medical necessity and documentation requirements. The reviewer stated that the medical necessity for a biopsy procedure could be established, within the realm of professional judgment, for each of the 51 claims reviewed. The reviewer also stated that sufficient documentation existed for each of the claims to indicate that the services billed to Medicare were actually provided.

We noted an increase in the number of pathology services requested and performed after the Practice opened its own laboratory. Prior to the Practice opening its own laboratory in September 2004, the Practice's physicians requested pathology services from independent laboratories on an average of one tissue examination per claim. After establishing its own laboratory, the Practice's physicians requested pathology services on an average of nine tissue examinations per claim. In addition, the Medicare carrier, First Coast Service Options, Inc. (FCSO), reimbursed the Practice for more units of service of CPT 88305, on average, than other providers who were reimbursed by FCSO.

The Practice acknowledged that its utilization increased and explained the increase by noting that industry standards were evolving. The Practice stated that it had increased the number of tissue examination requests from earlier years in an attempt to more fully meet the needs of its patients.

This report contains no recommendations.

**TABLE OF CONTENTS**

<u>Page</u>

INTRODUCTION…………………………………………...…………………………1

    BACKGROUND………………………………………………………….... 1
        Medicare Overview…………………………………………………....1
        Anatomical Pathology Laboratory Services…………………………..1
        Florida Urology Physicians, P.A...………………………………….....1

    OBJECTIVES, SCOPE, AND METHODOLOGY……………………………...2
        Objectives………………………………………………………… 2
        Scope………………………………………………………………..... 2
        Methodology……………………………………………………3

    RESULTS OF REVIEW…………………...…………………………………….3

# INTRODUCTION

## BACKGROUND

### Medicare Overview

Congress established Medicare under Title XVIII of the Social Security Act to provide health insurance coverage to people age 65 and over, the disabled, and people with end-stage renal disease. The Medicare program pays for expenses incurred for items or services that are reasonable and necessary for the diagnosis or treatment of illness or injury. Medicare Part B reimburses for physician services, outpatient hospital services, medical equipment, supplies and clinical laboratory services. Within the Department of Health and Human Services, the Centers for Medicare & Medicaid Services (CMS) administers the Medicare program.

### Anatomical Pathology Laboratory Services

Sections 1833 and 1861 of the Social Security Act provide for payment of clinical diagnostic laboratory services, including pathology services, under Medicare Part B. The services must be ordered either by a physician, as described in 42 CFR § 410.32(a), or by a qualified non-physician practitioner, as described in 42 CFR § 410.32(a)(3), and may be furnished by any of the entities identified in 42 CFR § 410.32(d)(1), including hospitals, skilled nursing facilities, and laboratories. A laboratory seeking Medicare reimbursement for performing tests on human specimens must meet all applicable requirements of the Clinical Laboratory Improvement Amendments of 1988, as set forth at 42 CFR part 493.

The Medicare program reimburses for pathology services based on the number of biopsies examined. Biopsies are excised tissue packaged and sent to a pathologist for a microscopic examination. Each tissue examination is billed as one unit of service, and each is reimbursed equally within the same Current Procedural Terminology (CPT) code. The majority of pathology services reviewed in this audit were billed under CPT code 88305, "Level IV – Surgical pathology, gross and microscopic examination, Prostate, Needle Biopsy".

### Florida Urology Physicians, P.A.

Florida Urology Physicians, P.A. (the Practice) is a physicians' group practice licensed in the State of Florida. As of December 31, 2004, the Practice employed five physicians. Two of the five physicians owned the Practice while the other three physicians were employees of the group. The Practice has been in existence since 2001 and has offices where patients are seen in Cape Coral, Bonita Springs, and Lehigh Acres, Florida, in addition to the main office in Fort Myers, Florida.

In 2004 the Practice started providing pathology laboratory services on behalf of both Medicare and non-Medicare patients through an in-office laboratory. A management company oversaw the daily operations of the laboratory, with responsibilities that included securing rental space, hiring non-physician personnel, purchasing laboratory supplies, and assisting in ordering furniture and equipment. The Practice's laboratory was one of 15 laboratories operated by the

management company within the same office building. The Practice's laboratory contained its own equipment and was in a separate room within this office building. The laboratory is located in Sarasota, Florida, approximately 83 miles from the Practice's main office. The Practice contracted with a physician to serve as the laboratory's pathologist and director. The State of Florida issued a Clinical Laboratory certificate for the Practice's laboratory, effective September 3, 2004, for the performance of tests related to cytology and histopathology.

The Practice received $33,587 in Medicare reimbursement for 51 claims for pathology services performed from September through December 2004 through the contractual arrangements at its Sarasota laboratory. Prior to the contractual arrangements and establishing its laboratory, the Practice ordered these services from independent laboratories. First Coast Service Options, Inc. (FCSO) processed the Medicare claims for the Practice.

## OBJECTIVES, SCOPE, AND METHODOLOGY

### Objectives

Our audit objectives were:

- to determine whether the Practice claimed reimbursement for pathology laboratory services in accordance with Medicare Part B medical necessity and documentation requirements from September through December 2004 and

- to analyze the Practice's utilization patterns for pathology services.

### Scope

We reviewed the 51 Medicare claims totaling $33,587 that FSCO paid during the 4-month period September through December 2004 and provided the associated medical records to the Program Safeguard Contractor (PSC) for medical review to determine whether the pathology services billed for were reasonable, necessary, and in accordance with Medicare Part B requirements.

Our review of internal controls was limited to understanding the Practice's patient biopsy process, labeling and recording of biopsy tissue for shipment to their Sarasota laboratory, receipting and recording of tissue samples at the Sarasota laboratory, laboratory processing, bill processing, and receipting of Medicare payments.

We conducted our fieldwork at the Practice's office in Fort Myers and its laboratory in Sarasota, Florida.

**Methodology**

To accomplish our objectives, we:

- reviewed applicable provisions of the Social Security Act, Code of Federal Regulations, and the Provider Reimbursement Manual;

- interviewed staff at the Practice's office and laboratory and gained an understanding of the procedures the Practice used at its office and laboratory;

- reviewed various contractual documentation regarding arrangements for laboratory services, including the employment of the contracted pathologist, rental of space, and management operations;

- identified and reviewed the universe of 51 claims that FCSO paid for the Practice's pathology services during the period September through December 2004, to verify compliance with Medicare regulations, and calculated the average number of tissue samples per claim of CPT 88305 that the Practice examined;

- contracted with a PSC to review the Practice's medical records for the 51 claims to determine if pathology services were medically necessary, adequately documented, and performed at the level indicated on the claim;

- identified the units of CPT 88305 per claim for which FSCO paid to independent laboratories that the Practice used during the period September through December 2003;

- identified the units of CPT 88305 per claim that FCSO reimbursed to all other providers during calendar year (CY) 2004; and

- compared[1] the Practice's average units of CPT 88305 per claim before and after it opened its own laboratory and compared the Practice's average units of CPT 88305 after it opened its own laboratory to the average units of CPT 88305 FCSO paid to all other providers.

We performed our review in accordance with generally accepted government auditing standards.

## RESULTS OF REVIEW

During our audit period, the Medicare program had not created any national or local coverage determinations or standards for the number of tissue samples that should be examined for urology patients with primarily prostate-related diagnoses. In the absence of these standards, the PSC medical reviewer determined that the Practice's claims for pathology laboratory services

---

[1]We limited the claims that were compared to those that contained a diagnosis code the practice billed during CY 2004 and with a place of service code of 11 or 81 ("in-office" or "independent laboratory," respectively).

generally complied with Medicare Part B medical necessity and documentation requirements. The reviewer stated that the medical necessity for a biopsy procedure could be established, within the realm of professional judgment, for each of the 51 claims reviewed. The reviewer also stated that sufficient documentation existed for each of the claims to indicate that the services billed to Medicare were actually provided.

We noted an increase in the number of pathology services requested and performed after the Practice opened its own laboratory. In addition, as shown below, the Practice was reimbursed by FCSO for more units of CPT 88305, on average, than other providers who also received reimbursement from FCSO.

| | |
|---|---|
| Average units of CPT 88305 requested *before* opening its own laboratory and claiming reimbursement for services | 1.09 |
| Average units of CPT 88305 requested *after* opening its own laboratory and claiming reimbursement for services | 8.71 |
| Average units of CPT 88305 FCSO paid to all other providers | 5.50 |

The Practice acknowledged that its utilization increased and explained the increase by noting that industry standards were evolving. The Practice stated that it had increased the number of tissue examination requests from earlier years in an attempt to more fully meet the needs of its patients. The Practice provided some industry literature in support of its contention that an increased number of tissue examinations may improve patient outcomes.

This report contains no recommendations.

# EXHIBIT 13



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
OFFICE OF AUDIT SERVICES
233 NORTH MICHIGAN AVENUE
CHICAGO, ILLINOIS 60601

REGION V
OFFICE OF
INSPECTOR GENERAL

June 28, 2007

Report Number:  A-05-05-00037

Ms. Carol Lusk
Administrator
Urology Tyler, P.A.
700 Olympic Plaza, Suite 700
Tyler, TX 75701

Dear Ms. Lusk:

Enclosed are two copies of the U.S. Department of Health and Human Services (HHS), Office of
Inspector General (OIG) final report entitled "Review of Pathology Services Claimed by
Urology Tyler, Tyler, Texas, From May Through December 2004."  Should you have any
questions or comments concerning the matters commented on in this report, please direct them to
the HHS official named below.

In accordance with the principles of the Freedom of Information Act (5 U.S.C. § 552, as
amended by Public Law 104-231), OIG reports issued to the Department's grantees and
contractors are made available to the public to the extent information is not subject to
exemptions in the Act (see 45 CFR Part 5).

Please refer to report number A-05-05-00037 in all correspondence.

Sincerely,

Marc Gustafson
Regional Inspector General
  for Audit Services

Enclosures

**Direct Reply to HHS Action Official:**

Ms. Jackie Garner
Regional Administrator
Centers for Medicare & Medicaid Services, Region V
233 North Michigan Avenue
Suite 600
Chicago, Illinois 60601

# Department of Health and Human Services

## OFFICE OF
## INSPECTOR GENERAL

# REVIEW OF PATHOLOGY SERVICES CLAIMED BY UROLOGY TYLER, P.A. TYLER, TEXAS FROM MAY THROUGH DECEMBER 2004



Daniel R. Levinson
Inspector General

June 2007
A-05-05-00037

# *Office of Inspector General*

http://oig.hhs.gov

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

## *Office of Audit Services*

The Office of Audit Services (OAS) provides all auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations. These assessments help reduce waste, abuse, and mismanagement and promote economy and efficiency throughout HHS.

## *Office of Evaluation and Inspections*

The Office of Evaluation and Inspections (OEI) conducts national evaluations to provide HHS, Congress, and the public with timely, useful, and reliable information on significant issues. Specifically, these evaluations focus on preventing fraud, waste, or abuse and promoting economy, efficiency, and effectiveness in departmental programs. To promote impact, the reports also present practical recommendations for improving program operations.

## *Office of Investigations*

The Office of Investigations (OI) conducts criminal, civil, and administrative investigations of allegations of wrongdoing in HHS programs or to HHS beneficiaries and of unjust enrichment by providers. The investigative efforts of OI lead to criminal convictions, administrative sanctions, or civil monetary penalties.

## *Office of Counsel to the Inspector General*

The Office of Counsel to the Inspector General (OCIG) provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support in OIG's internal operations. OCIG imposes program exclusions and civil monetary penalties on health care providers and litigates those actions within HHS. OCIG also represents OIG in the global settlement of cases arising under the Civil False Claims Act, develops and monitors corporate integrity agreements, develops compliance program guidances, renders advisory opinions on OIG sanctions to the health care community, and issues fraud alerts and other industry guidance.

# *Notices*

---

## THIS REPORT IS AVAILABLE TO THE PUBLIC
at http://oig.hhs.gov

In accordance with the principles of the Freedom of Information
Act (5 U.S.C. 552, as amended by Public Law 104-231), Office of
Inspector General, Office of Audit Services reports are made available to
members of the public to the extent the information is not subject to
exemptions in the act. (See 45 CFR Part 5.)

## OAS FINDINGS AND OPINIONS

The designation of financial or management practices as questionable
or a recommendation for the disallowance of costs incurred or claimed,
as well as other conclusions and recommendations in this report, represent
the findings and opinions of the HHS/OIG/OAS.  Authorized officials of the
HHS divisions will make final determination on these matters.

# EXECUTIVE SUMMARY

## BACKGROUND

Congress established Medicare under Title XVIII of the Social Security Act to provide health insurance coverage to people age 65 and over, the disabled, and people with end-stage renal disease. The Medicare program pays for expenses incurred for items or services that are reasonable and necessary for the diagnosis or treatment of illness or injury.

Sections 1833 and 1861 of the Social Security Act provide for payment of clinical diagnostic laboratory services, including pathology services, under Medicare Part B. The services must be ordered either by a physician or a qualified non-physician practitioner and may be furnished by certain entities including hospitals, skilled nursing facilities, and laboratories. A laboratory performing tests on human specimens must meet all applicable requirements of the Clinical Laboratory Improvement Amendments of 1988.

The Medicare program reimburses Medicare entities for pathology services based on the number of biopsies examined. Biopsies are excised tissue packaged and sent to a pathologist for a microscopic examination. Each tissue examination is billed as one unit of service, and each is reimbursed equally within the same Current Procedural Terminology (CPT) code. The majority of pathology services reviewed in this audit were billed under CPT code 88305, "Level IV – Surgical pathology, gross and microscopic examination, Prostate, Needle Biopsy."

Urology Tyler, P.A. (the Practice) is a physicians' group practice located in Tyler, Texas, that provides urology services to its patients. Prior to May 2004, the Practice ordered pathology services from independent laboratories. In May 2004, the Practice began operating its own laboratory by contracting with a pathologist to provide prostate-related pathology services and a management company to oversee the daily operations of the laboratory, with responsibilities that included securing rental space, hiring non-physician personnel, purchasing laboratory supplies, and assisting in ordering furniture and equipment. The Practice's laboratory was one of 15 laboratories operated by the management company within the same office building. The Practice's laboratory contained its own equipment and was in a separate room within this office building.

Through its contractual arrangements, the Practice received Medicare reimbursement totaling $257,632 from May through December 2004 for prostate-related pathology services performed at its laboratory in San Antonio, Texas. We contracted with a Medicare Program Safeguard Contractor (PSC) to review the Practice's medical records for a random sample of 100 paid claims during this period to determine whether pathology services provided were reasonable, medically necessary, and supported by adequate documentation.

**OBJECTIVES**

Our audit objectives were:

- to determine whether the Practice claimed reimbursement for pathology laboratory services in accordance with Medicare Part B medical necessity and documentation requirements from May through December 2004 and

- to analyze the Practice's utilization patterns for pathology services.

**RESULTS OF REVIEW**

During our audit period, the Medicare program had not created any national or local coverage determinations or standards for the number of tissue samples that should be examined for urology patients with prostate-related diagnoses. The PSC medical reviewer stated that medical necessity for biopsies cannot be determined in the absence of national or local coverage determinations by Medicare. However, in the absence of these standards, but within the realm of his professional judgment, the PSC medical reviewer was satisfied that the Practice's claims for pathology laboratory services generally complied with Medicare Part B medical necessity and documentation requirements for 99 of 100 reviewed claims. The one exception was improperly billed and paid due to a clerical error, which was corrected during our audit.

We noted an increase in the number of prostate-related pathology services requested and performed after the Practice opened its own laboratory. Prior to the Practice opening its own laboratory in May 2004, the Practice's physicians requested pathology services from independent laboratories on an average of four tissue examinations per claim. After establishing its own laboratory, the Practice's physicians requested pathology services on an average of 12 tissue examinations per claim. In addition, the Medicare carrier, TrailBlazer Health Enterprises, LLC, reimbursed the Practice for more units of service of CPT 88305, on average, than it reimbursed to other providers for CPT 88305.

The Practice's staff stated that research at the time that they established the laboratory indicated that 12 tissue examinations were the industry standard. The Practice's staff stated that they increased the number of tissue examinations requested to be comparable to the standard industry practice.

This report contains no recommendations.

# TABLE OF CONTENTS

**Page**

**INTRODUCTION** ............................................................................................................1

   BACKGROUND ............................................................................................................1
      Medicare Overview........................................................................................1
      Anatomical Pathology Laboratory Services .................................................1
      Urology Tyler, PA .........................................................................................1

   OBJECTIVES, SCOPE, AND METHODOLOGY ......................................................2
      Objectives .....................................................................................................2
      Scope.............................................................................................................2
      Methodology .................................................................................................2

**RESULTS OF REVIEW** .................................................................................................3

# INTRODUCTION

## BACKGROUND

### Medicare Overview

Congress established Medicare under Title XVIII of the Social Security Act to provide health insurance coverage to people age 65 and over, the disabled, and people with end-stage renal disease. The Medicare program pays for expenses incurred for items or services that are reasonable and necessary for the diagnosis or treatment of illness or injury. Medicare Part B reimburses for physician services, outpatient hospital services, medical equipment, supplies and clinical laboratory services. Within the Department of Health and Human Services, the Centers for Medicare & Medicaid Services (CMS) administers the Medicare program.

### Anatomical Pathology Laboratory Services

Sections 1833 and 1861 of the Social Security Act provide for payment of clinical diagnostic laboratory services, including pathology services, under Medicare Part B. The services must be ordered either by a physician, as described in 42 CFR § 410.32(a), or by a qualified non-physician practitioner, as described in 42 CFR § 410.32(a)(3), and may be furnished by any of the entities identified in 42 CFR § 410.32(d)(1), including hospitals, skilled nursing facilities, and laboratories. A laboratory seeking Medicare reimbursement for performing tests on human specimens must meet all applicable requirements of the Clinical Laboratory Improvement Amendments of 1988, as set forth at 42 CFR Part 493.

The Medicare program reimburses for pathology services based on the number of biopsies examined. Biopsies are excised tissue packaged and sent to a pathologist for a microscopic examination. Each tissue examination is billed as one unit of service, and each is reimbursed equally within the same Current Procedural Terminology (CPT) code. The majority of pathology services reviewed in this audit were billed under CPT code 88305, "Level IV – Surgical pathology, gross and microscopic examination, Prostate, Needle Biopsy."

### Urology Tyler, P.A.

Urology Tyler, P.A. (the Practice) is a group practice of physicians who are licensed in the State of Texas. As of December 31, 2004, the Practice employed 9 physicians, consisting of 8 partners and 1 employed physician. The Practice has been in existence since 1994 and its office is located in Tyler, Texas where urology services are provided to its patients.

In May 2004, the Practice started providing prostate-related pathology services on behalf of both Medicare and non-Medicare patients through an in-office laboratory. A management company oversaw the daily operations of the laboratory with responsibilities that included securing rental space, hiring non-physician personnel, purchasing laboratory supplies and assisting in ordering furniture and equipment. The Practice's laboratory was one of 15 laboratories the management company operated within the same office building. The Practice's laboratory contained its own

equipment and was in a separate room within this office building. The laboratory is located in San Antonio, Texas, approximately 365 miles from its group practice office. The Practice contracted with a physician to serve as the laboratory's pathologist and director. The State of Texas issued a Clinical Laboratory certificate for the Practice's laboratory, effective May 2004.

The Practice received $257,632 in Medicare reimbursement for 296 claims for prostate-related pathology services performed from May through December of 2004 through the contractual arrangements at its San Antonio laboratory. Prior to the contractual arrangements and establishing its laboratory, the Practice ordered these services from independent laboratories. TrailBlazer Health Enterprises, LLC (TrailBlazer) processed the Medicare claims for the Practice.

## OBJECTIVES, SCOPE, AND METHODOLOGY

### Objectives

Our audit objectives were:

- to determine whether the Practice claimed reimbursement for pathology laboratory services in accordance with Medicare Part B medical necessity and documentation requirements from May through December 2004 and

- to analyze the Practice's utilization patterns for pathology services.

### Scope

We selected and reviewed a random sample of 100 Medicare claims totaling $86,197 that TrailBlazer paid during the eight-month period May through December 2004. We provided the associated medical records to the Program Safeguard Contractor (PSC) for medical review to determine whether the pathology services billed for were reasonable, necessary, and in accordance with Medicare Part B requirements.

Our review of internal controls was limited to understanding the Practice's patient biopsy process, labeling and recording of biopsy tissue for shipment to its San Antonio laboratory, receipting and recording of tissue samples at the San Antonio laboratory, laboratory processing, bill processing, and receipting of Medicare payments.

We conducted our fieldwork at the Practice's office in Tyler and its laboratory in San Antonio, Texas.

### Methodology

To accomplish our objectives, we:

- reviewed applicable provisions of the Social Security Act, Code of Federal Regulations, and the Provider Reimbursement Manual;

- interviewed staff at the Practice's office and laboratory and gained an understanding of the procedures the Practice used at its office and laboratory;

- reviewed various contractual documentation regarding arrangement for laboratory services, including the employment of the contracted pathologist, rental of space, and management operations;

- identified and reviewed a random sample of 100 claims that TrailBlazer paid for the Practice's prostate-related pathology services during the period May through December 2004, to verify compliance with Medicare regulations, and calculated the average number of tissue samples per claim of CPT 88305 the Practice examined;

- contracted with a PSC to review the Practice's medical records for the 100 sampled claims to determine if pathology services were medically necessary, adequately documented, and performed at the level indicated on the claim;

- identified claims containing units of CPT 88305 for which TrailBlazer paid to independent laboratories that the Practice used during the period September 2003 through April 2004;

- identified claims containing units of CPT 88305 that TrailBlazer reimbursed to all other providers during the period May through December 2004; and

- compared[1] the Practice's average units per claim of CPT 88305 claimed before and after it opened its own laboratory and compared the Practice's average units per claim of CPT 88305 after it opened its own laboratory to the average units per claim of CPT 88305 TrailBlazer paid to all other providers.

We performed our review in accordance with generally accepted government auditing standards.

## RESULTS OF REVIEW

During our audit period, the Medicare program had not created any national or local coverage determinations or standards for the number of tissue samples that should be examined for urology patients with prostate-related diagnoses. The PSC medical reviewer stated that medical necessity for biopsies cannot be determined in the absence of national or local coverage determinations by Medicare. However, in the absence of these standards, but within the realm of his professional judgment, the PSC medical reviewer was satisfied that the Practice's claims for pathology laboratory services generally complied with Medicare Part B medical necessity and

---

[1] We limited the claims that were compared to those that contained a diagnosis code the Practice billed with a place of service code of 11 or 81 ("in-office" or "independent laboratory," respectively).

documentation requirements for 99 of 100 reviewed claims. The one exception was improperly billed and paid due to a clerical error, which was corrected during our audit.

We noted an increase in the number of prostate-related pathology services requested and performed after the Practice opened its own laboratory. In addition, as shown below, TrailBlazer reimbursed the Practice for more units per claim of CPT 88305, on average, than it reimbursed other providers for CPT 88305.

| | |
|---|---|
| Average units of CPT 88305 requested *before* opening its own laboratory (September 2003 through April 2004) | 3.57 |
| Average units of CPT 88305 requested *after* opening its own laboratory and claiming reimbursement for services (May through December 2004) | 11.79 |
| Average units of CPT 88305 TrailBlazer paid to all other providers (May through December 2004) | 5.26 |

The Practice acknowledged that its utilization increased and stated that research at the time it established the laboratory indicated that 12 tissue examinations were the industry standard. The Practice's staff stated that they increased the number of tissue examinations requested to be comparable with industry standards. The Practice provided some industry literature to support the theory that taking more biopsies improves cancer detection.

This report contains no recommendations.

# EXHIBIT 14

## Medicare Volume for CPT Code 88305:  1995-2004

| Year | Number of 88305 CPT Codes | | | | |
|------|---------------------------|---|---|---|---|
| 1995 | 9,665,688 | | | | |
| 1996 | 10,187,241 | | | | |
| 1997 | 10,297,922 | | | | |
| 1998 | 10,880,683 | | | | |
| 1999 | 11,247,621 | | | | |
| 2000 | 11,877,983 | | | | |
| 2001 | 13,297,627 | | | | |
| 2002 | 14,449,710 | | | | |
| 2003 | 15,183,693 | | | | |
| 2004 | 15,615,521 | | | | |

B   E   S   S       D   A   T   A
(PART B EXTRACT AND SUMMARY SYSTEM)

```
***************************************************
* WE WANT TO CAUTION YOU ABOUT THE INFORMATION WE WILL BE SUPPLYING *
* YOU.  OUR INTERNAL VALIDATION OF THE BESS FILES CONSISTS OF BASIC *
* CONSISTENCY FIELD EDITS.  ALL RECORDS FAILING THESE EDITS HAVE    *
* BEEN FLAGGED WITH ERROR CODES    IDENTIFYING TYPE OF ERROR.       *
* HOWEVER, VALIDATION EFFORTS DO NOT PRECLUDE THE PRESENCE OF ERRORS *
* IN THE CARRIER'S CODING.  TO FURTHER INSURE THE VALIDITY OF ALL   *
* DATA SUBMITTED, WE HAVE INITIATED AND WILL CONTINUE TO DO INDE-   *
* PENDENT STUDIES TO VERIFY THAT CARRIERS HAVE SUBMITTED PROPERLY   *
* CODED DATA.  WE ARE CONCERNED THAT BECAUSE OF PROBLEMS THAT EXIST *
* IN THE FILES (NOT ALL OF WHICH WE ARE AWARE OF), DATA MAY LEAD TO *
* MISINTERPRETED OR INCORRECT RESULTS AND CONCLUSIONS.             *
***************************************************
```

PREPARED BY:   HEALTH CARE FINANCING ADMINISTRATION
               CENTER FOR HEALTH PLANS AND PROVIDERS
               PROGRAM DATA INTEGRITY GROUP

BESS DESCRIPTIVE STATISTICS
TYPE OF SERVICE BY PROCEDURE CODE

USER SELECTION CRITERIA:

HCPCS RANGE  FROM A0000 TO L9999
HCPCS
CARRIER         00000
TYPE OF SERVICE

BESS DS08          1995 BESS PROCEDURE DATA BY TYPE OF SERVICE          PAGE 59
COMPLETED YEAR

| HCPCS CARR | TYPE OF SERVICE | ALWD SERVICES | % TOT ALWSRV | NET SUB CHARGE | ALLOWED CHARGE | % OF TOT ALW CHRG | % OF SUB CHRG | AVG ALWD CHARGE |
|---|---|---|---|---|---|---|---|---|
| 88302 NAT | DIAGNOSTIC LABORATORY | 284,809 | 100.00 | $15,207,265 | $4,960,419 | 100.00 | 32.62 | $17.41 |
| | THERAPEUTIC RADIOLOGY | 1 | | $45 | $15 | | 33.33 | $15.00 |
| | TOTAL--ALL TYPES | 284,810 | 100.00 | $15,207,310 | $4,960,434 | 100.00 | 32.62 | $17.41 |
| 88304 NAT | DIAGNOSTIC LABORATORY | 1,595,013 | 100.00 | $118,170,399 | $40,248,653 | 100.00 | 34.06 | $25.23 |
| | THERAPEUTIC RADIOLOGY | 4 | | $264 | $115 | | 45.28 | $28.75 |
| | 3RD OPIN-ELECTIVE SURGIVE SURG | 17 | | $1,530 | $474 | | 30.98 | $27.88 |
| | TYPES OTHER THAN ABOVE | 3 | | $234 | $68 | | 29.06 | $22.66 |
| | TOTAL--ALL TYPES | 1,595,037 | 100.00 | $118,172,417 | $40,249,310 | 100.00 | 34.06 | $25.23 |
| 88305 NAT | DIAGNOSTIC LABORATORY | 9,665,554 | 100.00 | $919,530,039 | $497,305,383 | 100.00 | 54.08 | $51.45 |
| | THERAPEUTIC RADIOLOGY | 104 | | $7,543 | $4,626 | | 61.33 | $44.48 |
| | TYPES OTHER THAN ABOVE | 30 | | $3,369 | $1,447 | | 42.95 | $48.23 |
| | TOTAL--ALL TYPES | 9,665,688 | 100.00 | $919,540,951 | $497,311,456 | 100.00 | 54.08 | $51.45 |
| 88307 NAT | DIAGNOSTIC LABORATORY | 559,044 | 100.00 | $103,117,839 | $48,843,970 | 100.00 | 47.37 | $87.37 |
| | THERAPEUTIC RADIOLOGY | 3 | | $456 | $232 | | 50.88 | $77.33 |
| | TOTAL--ALL TYPES | 559,047 | 100.00 | $103,118,295 | $48,844,202 | 100.00 | 47.37 | $87.37 |
| 88309 NAT | DIAGNOSTIC LABORATORY | 251,042 | 100.00 | $64,279,424 | $29,806,948 | 100.00 | 46.37 | $118.73 |
| | THERAPEUTIC RADIOLOGY | 3 | | $746 | $325 | | 43.57 | $108.33 |
| | TOTAL--ALL TYPES | 251,045 | 100.00 | $64,280,170 | $29,807,273 | 100.00 | 46.37 | $118.73 |
| 88311 NAT | DIAGNOSTIC LABORATORY | 490,695 | 100.00 | $14,252,116 | $6,520,971 | 100.00 | 45.75 | $13.28 |
| | THERAPEUTIC RADIOLOGY | 2 | | $30 | $22 | | 73.33 | $11.00 |
| | TOTAL--ALL TYPES | 490,697 | 100.00 | $14,252,146 | $6,520,993 | 100.00 | 45.75 | $13.28 |
| 88312 NAT | DIAGNOSTIC LABORATORY | 572,563 | 100.00 | $22,517,652 | $13,082,037 | 100.00 | 58.10 | $22.84 |
| | THERAPEUTIC RADIOLOGY | 2 | | $74 | $44 | | 59.46 | $22.00 |
| | TOTAL--ALL TYPES | 572,565 | 100.00 | $22,517,726 | $13,082,081 | 100.00 | 58.10 | $22.84 |
| 88313 NAT | DIAGNOSTIC LABORATORY | 563,211 | 100.00 | $19,335,855 | $7,529,646 | 100.00 | 38.94 | $13.36 |
| | THERAPEUTIC RADIOLOGY | 9 | | $187 | $104 | | 55.61 | $11.55 |
| | TOTAL--ALL TYPES | 563,220 | 100.00 | $19,336,042 | $7,529,750 | 100.00 | 38.94 | $13.36 |
| 88314 NAT | DIAGNOSTIC LABORATORY | 45,118 | 100.00 | $2,197,427 | $1,485,605 | 100.00 | 67.61 | $32.92 |
| | TOTAL--ALL TYPES | 45,118 | 100.00 | $2,197,427 | $1,485,605 | 100.00 | 67.61 | $32.92 |
| 88318 NAT | DIAGNOSTIC LABORATORY | 5,691 | 100.00 | $207,296 | $110,283 | 100.00 | 53.20 | $19.37 |
| | TOTAL--ALL TYPES | 5,691 | 100.00 | $207,296 | $110,283 | 100.00 | 53.20 | $19.37 |
| 88319 NAT | DIAGNOSTIC LABORATORY | 14,115 | 100.00 | $765,704 | $423,008 | 100.00 | 55.24 | $29.96 |
| | TOTAL--ALL TYPES | 14,115 | 100.00 | $765,704 | $423,008 | 100.00 | 55.24 | $29.96 |
| 88321 NAT | CONSULTATION | 75,611 | 99.57 | $7,467,476 | $4,243,561 | 99.60 | 56.83 | $56.12 |
| | DIAGNOSTIC LABORATORY | 328 | .43 | $29,108 | $17,189 | .40 | 59.05 | $52.40 |
| | 2ND OPIN-ELECTIVE SURG | 1 | | $100 | $55 | | 55.00 | $55.00 |
| | TOTAL--ALL TYPES | 75,940 | 100.00 | $7,496,684 | $4,260,805 | 100.00 | 56.84 | $56.10 |
| 88323 NAT | CONSULTATION | 21,996 | 99.61 | $2,028,828 | $1,309,650 | 99.75 | 64.55 | $59.54 |

B E S S   D A T A
(PART B EXTRACT AND SUMMARY SYSTEM)

```
*****************************************************************
* WE WANT TO CAUTION YOU ABOUT THE INFORMATION WE WILL BE SUPPLYING *
* YOU. OUR INTERNAL VALIDATION OF THE BESS FILES CONSISTS OF BASIC  *
* CONSISTENCY FIELD EDITS.  ALL RECORDS FAILING THESE EDITS HAVE    *
* BEEN FLAGGED WITH ERROR CODES    IDENTIFYING TYPE OF ERROR.       *
* HOWEVER, VALIDATION EFFORTS DO NOT PRECLUDE THE PRESENCE OF ERRORS*
* IN THE CARRIER"S CODING.  TO FURTHER INSURE THE VALIDITY OF ALL   *
* DATA SUBMITTED, WE HAVE INITIATED AND WILL CONTINUE TO DO INDE-   *
* PENDENT STUDIES TO VERIFY THAT CARRIERS HAVE SUBMITTED PROPERLY   *
* CODED DATA.  WE ARE CONCERNED THAT BECAUSE OF PROBLEMS THAT EXIST *
* IN THE FILES (NOT ALL OF WHICH WE ARE AWARE OF), DATA MAY LEAD TO *
* MISINTERPRETED OR INCORRECT RESULTS AND CONCLUSIONS.             *
*****************************************************************
```

PREPARED BY:   HEALTH CARE FINANCING ADMINISTRATION
               BUREAU OF DATA MANAGEMENT AND STRATEGY
               OFFICE OF STATISTICS AND DATA MANAGEMENT

DATE:   07/21/97

```
--------------------------------------
|    BESS DESCRIPTIVE STATISTICS     |
|    TYPE OF SERVICE BY PROCEDURE CODE |
--------------------------------------
```

USER SELECTION CRITERIA:

HCPCS RANGE  FROM A0000 TO G9999
HCPCS
CARRIER          00000
TYPE OF SERVICE

BESS DS08        1996 BESS PROCEDURE DATA BY TYPE OF SERVICE

COMPLETED YEAR

PAGE 55

| HCPCS | CARR | TYPE OF SERVICE | ALWD SERVICES | % TOT ALWSRV | NET SUB CHARGE | ALLOWED CHARGE | % OF TOT ALW CHRG | % OF SUB CHRG | AVG ALWD CHARGE |
|---|---|---|---|---|---|---|---|---|---|
| | | TOTAL--ALL TYPES | 68 | 100.00 | $7,394 | $2,626 | 100.00 | 35.52 | $38.61 |
| 88299 | NAT | DIAGNOSTIC LABORATORY | 29 | 100.00 | $8,904 | $6,721 | 100.00 | 75.48 | $231.75 |
| | | TOTAL--ALL TYPES | 29 | 100.00 | $8,904 | $6,721 | 100.00 | 75.48 | $231.75 |
| 88300 | NAT | DIAGNOSTIC LABORATORY | 322,986 | 100.00 | $9,032,350 | $2,188,251 | 100.00 | 24.23 | $6.77 |
| | | TOTAL--ALL TYPES | 322,986 | 100.00 | $9,032,350 | $2,188,251 | 100.00 | 24.23 | $6.77 |
| 88302 | NAT | DIAGNOSTIC LABORATORY | 253,146 | 100.00 | $13,680,076 | $3,055,553 | 100.00 | 22.34 | $12.07 |
| | | TOTAL--ALL TYPES | 253,146 | 100.00 | $13,680,076 | $3,055,553 | 100.00 | 22.34 | $12.07 |
| 88304 | NAT | DIAGNOSTIC LABORATORY | 1,484,374 | 100.00 | $111,291,730 | $29,307,306 | 100.00 | 26.33 | $19.74 |
| | | TOTAL--ALL TYPES | 1,484,374 | 100.00 | $111,291,730 | $29,307,306 | 100.00 | 26.33 | $19.74 |
| 88305 | NAT | DIAGNOSTIC LABORATORY | 10,187,237 | 100.00 | $978,484,243 | $496,277,791 | 100.00 | 50.72 | $48.71 |
| | | TYPES OTHER THAN ABOVE | 4 | | $469 | $173 | | 36.89 | $43.25 |
| | | TOTAL--ALL TYPES | 10,187,241 | 100.00 | $978,484,712 | $496,277,964 | 100.00 | 50.72 | $48.71 |
| 88307 | NAT | DIAGNOSTIC LABORATORY | 576,284 | 100.00 | $107,612,926 | $48,680,700 | 100.00 | 45.24 | $84.47 |
| | | 2ND OPIN-ELECTIVE SURG | 1 | | $270 | $81 | | 30.00 | $81.00 |
| | | TOTAL--ALL TYPES | 576,285 | 100.00 | $107,613,196 | $48,680,781 | 100.00 | 45.24 | $84.47 |
| 88309 | NAT | DIAGNOSTIC LABORATORY | 239,504 | 100.00 | $62,916,314 | $27,489,728 | 100.00 | 43.69 | $114.77 |
| | | TOTAL--ALL TYPES | 239,504 | 100.00 | $62,916,314 | $27,489,728 | 100.00 | 43.69 | $114.77 |
| 88311 | NAT | DIAGNOSTIC LABORATORY | 500,895 | 100.00 | $14,917,568 | $6,315,037 | 100.00 | 42.33 | $12.60 |
| | | TOTAL--ALL TYPES | 500,895 | 100.00 | $14,917,568 | $6,315,037 | 100.00 | 42.33 | $12.60 |
| 88312 | NAT | DIAGNOSTIC LABORATORY | 625,214 | 100.00 | $25,469,577 | $14,782,116 | 100.00 | 58.04 | $23.64 |
| | | TOTAL--ALL TYPES | 625,214 | 100.00 | $25,469,577 | $14,782,116 | 100.00 | 58.04 | $23.64 |
| 88313 | NAT | DIAGNOSTIC LABORATORY | 620,868 | 100.00 | $21,109,114 | $8,136,002 | 100.00 | 38.54 | $13.10 |
| | | TOTAL--ALL TYPES | 620,868 | 100.00 | $21,109,114 | $8,136,002 | 100.00 | 38.54 | $13.10 |
| 88314 | NAT | DIAGNOSTIC LABORATORY | 23,087 | 100.00 | $1,134,373 | $727,617 | 100.00 | 64.14 | $31.51 |
| | | TOTAL--ALL TYPES | 23,087 | 100.00 | $1,134,373 | $727,617 | 100.00 | 64.14 | $31.51 |
| 88318 | NAT | DIAGNOSTIC LABORATORY | 5,842 | 100.00 | $206,178 | $110,545 | 100.00 | 53.62 | $18.92 |
| | | TOTAL--ALL TYPES | 5,842 | 100.00 | $206,178 | $110,545 | 100.00 | 53.62 | $18.92 |
| 88319 | NAT | DIAGNOSTIC LABORATORY | 15,618 | 100.00 | $881,773 | $457,121 | 100.00 | 51.84 | $29.26 |
| | | TOTAL--ALL TYPES | 15,618 | 100.00 | $881,773 | $457,121 | 100.00 | 51.84 | $29.26 |
| 88321 | NAT | CONSULTATION | 82,565 | 100.00 | $8,368,405 | $4,922,059 | 100.00 | 58.82 | $59.61 |
| | | 2ND OPIN-ELECTIVE SURG | 1 | | $100 | $58 | | 58.00 | $58.00 |
| | | TOTAL--ALL TYPES | 82,566 | 100.00 | $8,368,505 | $4,922,117 | 100.00 | 58.82 | $59.61 |
| 88323 | NAT | CONSULTATION | 25,282 | 100.00 | $2,433,402 | $1,527,156 | 100.00 | 62.76 | $60.40 |
| | | TOTAL--ALL TYPES | 25,282 | 100.00 | $2,433,402 | $1,527,156 | 100.00 | 62.76 | $60.40 |
| 88325 | NAT | CONSULTATION | 32,160 | 100.00 | $4,321,755 | $2,817,959 | 100.00 | 65.20 | $87.62 |

B   E   S   S       D   A   T   A
(PART B EXTRACT AND SUMMARY SYSTEM)

```
************************************************************
* WE WANT TO CAUTION YOU ABOUT THE INFORMATION WE WILL BE SUPPLYING  *
* YOU. OUR INTERNAL VALIDATION OF THE BESS FILES CONSISTS OF BASIC   *
* CONSISTENCY FIELD EDITS.  ALL RECORDS FAILING THESE EDITS HAVE     *
* BEEN FLAGGED WITH ERROR CODES    IDENTIFYING TYPE OF ERROR.        *
* HOWEVER, VALIDATION EFFORTS DO NOT PRECLUDE THE PRESENCE OF ERRORS *
* IN THE CARRIER'S CODING. TO FURTHER INSURE THE VALIDITY OF ALL     *
* DATA SUBMITTED, WE HAVE INITIATED AND WILL CONTINUE TO DO INDE-    *
* PENDENT STUDIES TO VERIFY THAT CARRIERS HAVE SUBMITTED PROPERLY    *
* CODED DATA.  WE ARE CONCERNED THAT BECAUSE OF PROBLEMS THAT EXIST  *
* IN THE FILES (NOT ALL OF WHICH WE ARE AWARE OF), DATA MAY LEAD TO  *
* MISINTERPRETED OR INCORRECT RESULTS AND CONCLUSIONS.               *
************************************************************
```

PREPARED BY:  HEALTH CARE FINANCING ADMINISTRATION
              BUREAU OF DATA MANAGEMENT AND STRATEGY
              OFFICE OF HEALTH CARE INFORMATION SYSTEMS

DATE:  06/09/98

BESS DESCRIPTIVE STATISTICS
PLACE OF SERVICE BY PROCEDURE CODE

USER SELECTION CRITERIA:

HCPCS RANGE  FROM 40000 TO 49999
HCPCS
CARRIER             00000
PLACE OF SERVICE

DSO9    1997 BESS PROCEDURE DATA BY PLACE OF SERVICE
JAN THRU MAR (1998)

| HCPCS CARR | PLACE OF SERVICE | ALWD SERVICES | % TOT ALWSRV | NET SUB CHARGE | ALLOWED CHARGE | % OF TOT ALW CHRG | % OF SUB CHRG | AVG ALWD CHARGE |
|---|---|---|---|---|---|---|---|---|
| | SKILLED NURSING FAC | 141 | .06 | $16,233 | $2,917 | .12 | 17.97 | $20.68 |
| | NURSING FACILITY | 2 | | $101 | $31 | | 30.69 | $15.50 |
| | CUSTODIAL CARE FAC | 2 | | $76 | $20 | | 26.32 | $10.00 |
| | AMBULANCE - LAND | 3 | | $142 | $32 | | 22.54 | $10.66 |
| | INPATIENT PSYCH FAC | 3 | | $206 | $41 | | 19.90 | $13.66 |
| | PSYCH FAC PARTIAL HOSP | 3 | | $158 | $23 | | 14.56 | $11.50 |
| | RURAL HEALTH CLINIC | 10 | | $480 | $113 | | 23.54 | $11.30 |
| | INDEPENDENT LABORATORY | 27,060 | 12.38 | $1,599,737 | $440,575 | 17.50 | 27.54 | $16.28 |
| | OTHER UNLISTED FACILITY | 174 | .08 | $3,071 | $2,233 | .09 | 27.67 | $12.83 |
| | TOTAL--ALL PLACES | 218,616 | 100.00 | $12,229,527 | $2,516,982 | 100.00 | 20.58 | $11.51 |
| 88304 NAT | OFFICE | 181,307 | 13.26 | $10,567,074 | $4,072,547 | 16.03 | 38.54 | $22.46 |
| | HOME | 76 | .01 | $6,118 | $1,421 | | 23.23 | $18.69 |
| | INPATIENT HOSPITAL | 537,005 | 39.29 | $45,637,336 | $9,109,090 | 35.84 | 19.96 | $16.96 |
| | OUTPATIENT HOSPITAL | 414,887 | 30.35 | $34,264,260 | $6,993,826 | 27.52 | 20.41 | $16.85 |
| | EMERGENCY ROOM-HOSPITAL | 6,350 | .46 | $480,881 | $102,244 | .40 | 21.26 | $16.10 |
| | AMBULATORY SURGICAL CNT | 4,952 | .36 | $398,075 | $95,859 | .38 | 24.08 | $19.35 |
| | BIRTHING CENTER | 396 | .03 | $31,367 | $6,347 | .02 | 20.23 | $16.03 |
| | MILITARY TREATMENT FAC | 13 | | $1,019 | $223 | | 21.88 | $17.15 |
| | SKILLED NURSING FAC | 346 | .03 | $35,761 | $8,713 | .03 | 24.36 | $25.18 |
| | NURSING FACILITY | 35 | | $2,075 | $773 | | 37.25 | $22.08 |
| | CUSTODIAL CARE FAC | 3 | | $234 | $47 | | 20.09 | $15.66 |
| | HOSPICE | 1 | | $59 | $16 | | 27.12 | $16.00 |
| | AMBULANCE - LAND | 17 | | $1,079 | $353 | | 32.72 | $20.76 |
| | AMBULANCE-AIR OR WATER | 1 | | $74 | $17 | | 22.97 | $17.00 |
| | INPATIENT PSYCH FAC | 6 | | $322 | $107 | | 33.23 | $17.83 |
| | PSYCH FAC PARTIAL HOSP | 12 | | $1,206 | $207 | | 17.16 | $17.25 |
| | INTER CARE FAC-MEN RET | 1 | | $60 | $16 | | 26.67 | $16.00 |
| | RES SUB ABUSE TREAT FAC | 1 | | $69 | $16 | | 23.19 | $16.00 |
| | COMP INPAT REHAB FAC | 6 | | $605 | $101 | | 16.69 | $16.83 |
| | ST/LCL PUB HEALTH CLIN | 7 | | $501 | $154 | | 30.74 | $22.00 |
| | RURAL HEALTH CLINIC | 59 | | $4,134 | $1,008 | | 24.38 | $17.08 |
| | INDEPENDENT LABORATORY | 217,901 | 15.94 | $13,433,097 | $4,984,422 | 19.61 | 37.11 | $22.87 |
| | OTHER UNLISTED FACILITY | 3,526 | .26 | $91,400 | $35,412 | .14 | 38.74 | $10.04 |
| | TOTAL--ALL PLACES | 1,366,908 | 100.00 | $104,955,806 | $25,412,919 | 100.00 | 24.21 | $18.59 |
| 88305 NAT | OFFICE | 2,742,908 | 26.64 | $194,540,117 | $127,495,149 | 26.95 | 65.54 | $46.48 |
| | HOME | 351 | | $31,254 | $14,308 | | 45.78 | $40.76 |
| | INPATIENT HOSPITAL | 1,672,145 | 16.24 | $214,621,625 | $70,828,254 | 14.97 | 33.00 | $42.35 |
| | OUTPATIENT HOSPITAL | 3,017,156 | 29.30 | $365,852,159 | $126,863,465 | 26.82 | 34.68 | $42.04 |
| | EMERGENCY ROOM-HOSPITAL | 29,286 | .28 | $3,547,328 | $1,205,827 | .25 | 33.99 | $41.17 |
| | AMBULATORY SURGICAL CNT | 29,404 | .29 | $3,420,370 | $1,338,329 | .28 | 39.13 | $45.51 |
| | BIRTHING CENTER | 2,042 | .02 | $249,304 | $83,414 | .02 | 33.46 | $40.84 |
| | MILITARY TREATMENT FAC | 65 | | $6,010 | $2,540 | | 42.26 | $39.07 |
| | SKILLED NURSING FAC | 1,581 | .02 | $153,855 | $70,450 | .01 | 45.79 | $44.56 |
| | NURSING FACILITY | 381 | | $28,404 | $16,915 | | 59.55 | $44.39 |
| | CUSTODIAL CARE FAC | 1 | | $1,486 | $778 | | 52.36 | $43.22 |
| | HOSPICE | 1 | | $135 | $60 | | 44.44 | $60.00 |
| | AMBULANCE - LAND | 103 | | $11,789 | $5,332 | | 45.23 | $51.76 |
| | AMBULANCE-AIR OR WATER | 9 | | $877 | $383 | | 43.67 | $42.55 |

PAGE  298

DS09        1997 BESS PROCEDURE DATA BY PLACE OF SERVICE
            JAN THRU MAR (1998)

| HCPCS CARR | PLACE OF SERVICE | ALWD SERVICES | % TOT ALWSRV | NET SUB CHARGE | ALLOWED CHARGE | % OF TOT ALW CHRG | % OF SUB CHRG | AVG ALWD CHARGE |
|---|---|---|---|---|---|---|---|---|
| | INPATIENT PSYCH FAC | 82 | | $6,477 | $3,336 | | 51.51 | $40.68 |
| | PSYCH FAC PARTIAL HOSP | 66 | | $9,898 | $2,728 | | 27.56 | $41.33 |
| | INTER CARE FAC-MEN RET | 1 | | $85 | $41 | | 48.24 | $41.00 |
| | RES SUB ABUSE TREAT FAC | 3 | | $266 | $180 | | 67.67 | $60.00 |
| | PSYCH RES TREATMENT CNT | 7 | | $184 | $153 | | 83.15 | $21.85 |
| | COMP INPAT REHAB FAC | 189 | | $15,384 | $7,915 | | 51.45 | $41.87 |
| | ESRD TREATMENT FAC | 1 | | $19 | $19 | | 100.00 | $19.00 |
| | ST/LCL PUB HEALTH CLIN | 174 | | $19,339 | $7,958 | | 41.15 | $45.73 |
| | RURAL HEALTH CLINIC | 195 | | $24,686 | $8,087 | | 32.76 | $41.47 |
| | INDEPENDENT LABORATORY | 2,790,804 | | $221,153,163 | $144,739,514 | 30.60 | 65.45 | $51.86 |
| | OTHER UNLISTED FACILITY | 10,950 | | $796,560 | $331,746 | .07 | 41.65 | $30.29 |
| | TOTAL--ALL PLACES | 10,297,922 | 100.00 | $1,004,490,774 | $473,026,881 | 100.00 | 47.09 | $45.93 |
| 88307 NAT | OFFICE | 41,546 | 7.60 | $5,935,908 | $3,513,420 | 8.18 | 59.19 | $84.56 |
| | HOME | 7 | | $1,708 | $779 | | 45.61 | $86.55 |
| | INPATIENT HOSPITAL | 327,541 | 59.94 | $85,541,489 | $25,192,655 | 58.67 | 38.45 | $76.91 |
| | OUTPATIENT HOSPITAL | 127,305 | 23.30 | $25,444,806 | $9,798,216 | 22.82 | 38.51 | $76.96 |
| | EMERGENCY ROOM-HOSPITAL | 1,669 | .31 | $309,815 | $123,222 | .29 | 39.77 | $73.83 |
| | AMBULATORY SURGICAL CNT | 1,268 | .23 | $258,151 | $103,904 | .24 | 39.86 | $81.15 |
| | BIRTHING CENTER | 187 | .03 | $37,122 | $13,991 | .03 | 37.69 | $74.81 |
| | MILITARY TREATMENT FAC | 7 | | $1,391 | $592 | | 42.56 | $84.57 |
| | SKILLED NURSING FAC | 49 | .01 | $12,059 | $5,976 | .01 | 49.56 | $81.14 |
| | NURSING FACILITY | 48 | .01 | $8,935 | $4,509 | .01 | 50.46 | $93.93 |
| | CUSTODIAL CARE FAC | 2 | | $233 | $146 | | 62.66 | $73.50 |
| | AMBULANCE - LAND | 2 | | $501 | $147 | | 29.34 | $73.50 |
| | AMBULANCE-AIR OR WATER | 1 | | $162 | $79 | | 48.77 | $79.00 |
| | INPATIENT PSYCH FAC | 3 | | $304 | $218 | | 71.71 | $72.66 |
| | PSYCH FAC PARTIAL HOSP | 8 | | $2,354 | $670 | | 28.46 | $83.75 |
| | INTER CARE FAC-MEN RET | 2 | | $476 | $147 | | 30.88 | $73.50 |
| | COMP INPAT REHAB FAC | 3 | | $385 | $151 | | 39.22 | $50.33 |
| | COM OUTPAT REHAB FAC | 1 | | $193 | $79 | | 40.93 | $79.00 |
| | ST/LCL PUB HEALTH CLIN | 2 | | $252 | $144 | | 57.14 | $72.00 |
| | RURAL HEALTH CLINIC | 19 | | $3,699 | $1,425 | | 38.52 | $75.00 |
| | INDEPENDENT LABORATORY | 46,184 | 8.45 | $8,415,450 | $4,142,088 | 9.65 | 49.22 | $89.68 |
| | OTHER UNLISTED FACILITY | 550 | .10 | $68,935 | $40,405 | .09 | 58.69 | $73.46 |
| | TOTAL--ALL PLACES | 546,406 | 100.00 | $106,017,238 | $42,939,763 | 100.00 | 40.50 | $78.58 |
| 88309 NAT | OFFICE | 10,020 | 4.46 | $2,284,159 | $1,185,619 | 4.96 | 51.91 | $118.32 |
| | HOME | 103 | .05 | $1,092 | $696 | | 63.74 | $6.75 |
| | INPATIENT HOSPITAL | 171,275 | 76.29 | $47,305,038 | $18,004,328 | 75.31 | 38.06 | $105.11 |
| | OUTPATIENT HOSPITAL | 24,730 | 11.02 | $6,502,552 | $2,509,039 | 10.49 | 38.59 | $101.45 |
| | EMERGENCY ROOM-HOSPITAL | 634 | .28 | $168,460 | $64,864 | .27 | 38.50 | $102.30 |
| | AMBULATORY SURGICAL CNT | 107 | .05 | $28,178 | $11,499 | .05 | 40.81 | $107.46 |
| | BIRTHING CENTER | 83 | .04 | $22,471 | $8,586 | .04 | 38.21 | $103.44 |
| | MILITARY TREATMENT FAC | 3 | | $1,009 | $307 | | 30.43 | $102.33 |
| | SKILLED NURSING FAC | 20 | .01 | $8,329 | $2,459 | .01 | 29.52 | $122.95 |
| | NURSING FACILITY | 5 | | $1,060 | $640 | | 60.38 | $128.00 |
| | CUSTODIAL CARE FAC | 1 | | $277 | $101 | | 36.46 | $101.00 |
| | AMBULANCE - LAND | 1 | | $200 | $127 | | 63.50 | $127.00 |
| | INPATIENT PSYCH FAC | 3 | | $812 | $309 | | 38.05 | $103.00 |

```
                      B    E    S    S         D    A    T    A
                        (PART B EXTRACT AND SUMMARY SYSTEM)


*****************************************************************
* WE WANT TO CAUTION YOU ABOUT THE INFORMATION WE WILL BE SUPPLYING *
* YOU.  OUR INTERNAL VALIDATION OF THE BESS FILES CONSISTS OF BASIC  *
* CONSISTENCY FIELD EDITS.  ALL RECORDS FAILING THESE EDITS HAVE    *
* BEEN FLAGGED WITH ERROR CODES    IDENTIFYING TYPE OF ERROR.       *
* HOWEVER, VALIDATION EFFORTS DO NOT PRECLUDE THE PRESENCE OF ERRORS *
* IN THE CARRIER'S CODING.  TO FURTHER INSURE THE VALIDITY OF ALL    *
* DATA SUBMITTED, WE HAVE INITIATED AND WILL CONTINUE TO DO INDE-    *
* PENDENT STUDIES TO VERIFY THAT CARRIERS HAVE SUBMITTED PROPERLY    *
* CODED DATA.  WE ARE CONCERNED THAT BECAUSE OF PROBLEMS THAT EXIST  *
* IN THE FILES (NOT ALL OF WHICH WE ARE AWARE OF),DATA MAY LEAD TO   *
* MISINTERPRETED OR INCORRECT RESULTS AND CONCLUSIONS.              *
*****************************************************************


                    PREPARED BY:  HEALTH CARE FINANCING ADMINISTRTION
                                  CENTER FOR HEALTH PLANS AND PROVIDERS
                                  PROGRAM DATA INTEGRITY GROUP
```

BESS DESCRIPTIVE STATISTICS
TYPE OF SERVICE BY PROCEDURE CODE

USER SELECTION CRITERIA:

HCPCS RANGE   FROM A0000 TO D9999
HCPCS
CARRIER          00000
TYPE OF SERVICE

BESS DS08    1998 BESS PROCEDURE DATA BY TYPE OF SERVICE COMPLETED YEAR

PAGE 59

| HCPCS CARR | TYPE OF SERVICE | ALWD SERVICES | % TOT ALWSRV | NET SUB CHARGE | ALLOWED CHARGE | % OF TOT ALW CHRG | % OF SUB CHRG | AVG ALWD CHARGE |
|---|---|---|---|---|---|---|---|---|
| | TOTAL--ALL TYPES | 66 | 100.00 | $12,357 | $12,356 | 100.00 | 99.99 | $187.21 |
| 88250 NAT | DIAGNOSTIC LABORATORY | 14 | 100.00 | $1,112 | $931 | 100.00 | 83.72 | $66.50 |
| | TOTAL--ALL TYPES | 14 | 100.00 | $1,112 | $931 | 100.00 | 83.72 | $66.50 |
| 88260 NAT | DIAGNOSTIC LABORATORY | 47 | 100.00 | $16,120 | $6,504 | 100.00 | 40.35 | $138.38 |
| | TOTAL--ALL TYPES | 47 | 100.00 | $16,120 | $6,504 | 100.00 | 40.35 | $138.38 |
| 88261 NAT | DIAGNOSTIC LABORATORY | 575 | 100.00 | $146,604 | $128,153 | 100.00 | 87.41 | $222.87 |
| | TOTAL--ALL TYPES | 575 | 100.00 | $146,604 | $128,153 | 100.00 | 87.41 | $222.87 |
| 88262 NAT | DIAGNOSTIC LABORATORY | 6,309 | 100.00 | $1,816,841 | $1,081,930 | 100.00 | 59.55 | $171.49 |
| | TOTAL--ALL TYPES | 6,309 | 100.00 | $1,816,841 | $1,081,930 | 100.00 | 59.55 | $171.49 |
| 88263 NAT | DIAGNOSTIC LABORATORY | 15 | 100.00 | $5,771 | $3,116 | 100.00 | 53.99 | $207.73 |
| | TOTAL--ALL TYPES | 15 | 100.00 | $5,771 | $3,116 | 100.00 | 53.99 | $207.73 |
| 88267 NAT | DIAGNOSTIC LABORATORY | 86 | 100.00 | $33,823 | $20,405 | 100.00 | 60.33 | $237.26 |
| | TOTAL--ALL TYPES | 86 | 100.00 | $33,823 | $20,405 | 100.00 | 60.33 | $237.26 |
| 88269 NAT | DIAGNOSTIC LABORATORY | 35 | 100.00 | $10,780 | $7,832 | 100.00 | 72.65 | $223.77 |
| | TOTAL--ALL TYPES | 35 | 100.00 | $10,780 | $7,832 | 100.00 | 72.65 | $223.77 |
| 88280 NAT | DIAGNOSTIC LABORATORY | 2,281 | 100.00 | $118,038 | $78,417 | 100.00 | 66.43 | $34.37 |
| | TOTAL--ALL TYPES | 2,281 | 100.00 | $118,038 | $78,417 | 100.00 | 66.43 | $34.37 |
| 88283 NAT | DIAGNOSTIC LABORATORY | 107 | 100.00 | $15,353 | $8,367 | 100.00 | 54.50 | $78.19 |
| | TOTAL--ALL TYPES | 107 | 100.00 | $15,353 | $8,367 | 100.00 | 54.50 | $78.19 |
| 88285 NAT | DIAGNOSTIC LABORATORY | 2,135 | 100.00 | $52,767 | $37,075 | 100.00 | 70.26 | $17.36 |
| | TOTAL--ALL TYPES | 2,135 | 100.00 | $52,767 | $37,075 | 100.00 | 70.26 | $17.36 |
| 88289 NAT | DIAGNOSTIC LABORATORY | 81 | 100.00 | $8,322 | $3,511 | 100.00 | 42.19 | $43.34 |
| | TOTAL--ALL TYPES | 81 | 100.00 | $8,322 | $3,511 | 100.00 | 42.19 | $43.34 |
| 88299 NAT | DIAGNOSTIC LABORATORY | 15 | 100.00 | $3,469 | $2,722 | 100.00 | 78.47 | $181.46 |
| | TOTAL--ALL TYPES | 15 | 100.00 | $3,469 | $2,722 | 100.00 | 78.47 | $181.46 |
| 88300 NAT | DIAGNOSTIC LABORATORY | 262,617 | 100.00 | $7,928,206 | $1,825,868 | 100.00 | 23.03 | $6.95 |
| | TOTAL--ALL TYPES | 262,617 | 100.00 | $7,928,206 | $1,825,868 | 100.00 | 23.03 | $6.95 |
| 88302 NAT | DIAGNOSTIC LABORATORY | 191,728 | 100.00 | $10,982,789 | $2,391,936 | 100.00 | 21.78 | $12.47 |
| | TOTAL--ALL TYPES | 191,728 | 100.00 | $10,982,789 | $2,391,936 | 100.00 | 21.78 | $12.47 |
| 88304 NAT | DIAGNOSTIC LABORATORY | 1,285,366 | 100.00 | $101,524,811 | $24,085,866 | 100.00 | 23.72 | $18.73 |
| | TOTAL--ALL TYPES | 1,285,366 | 100.00 | $101,524,811 | $24,085,866 | 100.00 | 23.72 | $18.73 |
| 88305 NAT | DIAGNOSTIC LABORATORY | 10,880,683 | 100.00 | $1,083,605,665 | $532,112,324 | 100.00 | 49.11 | $48.90 |
| | TOTAL--ALL TYPES | 10,880,683 | 100.00 | $1,083,605,665 | $532,112,324 | 100.00 | 49.11 | $48.90 |
| 88307 NAT | DIAGNOSTIC LABORATORY | 560,437 | 100.00 | $112,570,444 | $47,407,182 | 100.00 | 42.11 | $84.59 |

B   E   S   S        D   A   T   A
(PART B EXTRACT AND SUMMARY SYSTEM)

```
*****************************************************
* WE WANT TO CAUTION YOU ABOUT THE INFORMATION WE WILL BE SUPPLYING *
* YOU.  OUR INTERNAL VALIDATION OF THE BESS FILES CONSISTS OF BASIC *
* CONSISTENCY FIELD EDITS.  ALL RECORDS FAILING THESE EDITS HAVE    *
* BEEN FLAGGED WITH ERROR CODES    IDENTIFYING TYPE OF ERROR.       *
* HOWEVER, VALIDATION EFFORTS DO NOT PRECLUDE THE PRESENCE OF ERRORS *
* IN THE CARRIER'S CODING.  TO FURTHER INSURE THE VALIDITY OF ALL   *
* DATA SUBMITTED, WE HAVE INITIATED AND WILL CONTINUE TO DO INDE-   *
* PENDENT STUDIES TO VERIFY THAT CARRIERS HAVE SUBMITTED PROPERLY   *
* CODED DATA.  WE ARE CONCERNED THAT BECAUSE OF PROBLEMS THAT EXIST *
* IN THE FILES (NOT ALL OF WHICH WE ARE AWARE OF), DATA MAY LEAD TO *
* MISINTERPRETED OR INCORRECT RESULTS AND CONCLUSIONS.             *
*****************************************************
```

PREPARED BY:   HEALTH CARE FINANCING ADMINISTRTION
               CENTER FOR HEALTH PLANS AND PROVIDERS
               PROGRAM DATA INTEGRITY GROUP

BESS DESCRIPTIVE STATISTICS
TYPE OF SERVICE BY PROCEDURE CODE

USER SELECTION CRITERIA:

HCPCS RANGE  FROM A0000 TO D9999
HCPCS
CARRIER      00000
TYPE OF SERVICE

BESS DS08    1999 BESS PROCEDURE DATA BY TYPE OF SERVICE
JAN THRU MAR (2000)

PAGE 61

| HCPCS CARR | TYPE OF SERVICE | ALWD SERVICES | % TOT ALWSRV | NET SUB CHARGE | ALLOWED CHARGE | % OF TOT ALW CHRG | % OF SUB CHRG | AVG ALWD CHARGE |
|---|---|---|---|---|---|---|---|---|
|  | TOTAL--ALL TYPES | 5 | 100.00 | $998 | $707 | 100.00 | 70.84 | $141.40 |
| 88300 NAT | DIAGNOSTIC LABORATORY | 236,406 | 100.00 | $7,434,885 | $1,556,415 | 100.00 | 20.93 | $6.58 |
|  | TOTAL--ALL TYPES | 236,406 | 100.00 | $7,434,885 | $1,556,415 | 100.00 | 20.93 | $6.58 |
| 88302 NAT | DIAGNOSTIC LABORATORY | 176,367 | 100.00 | $10,307,886 | $2,047,053 | 100.00 | 19.86 | $11.60 |
|  | TOTAL--ALL TYPES | 176,367 | 100.00 | $10,307,886 | $2,047,053 | 100.00 | 19.86 | $11.60 |
| 88304 NAT | DIAGNOSTIC LABORATORY | 1,204,365 | 100.00 | $98,859,169 | $21,589,105 | 100.00 | 21.84 | $17.92 |
|  | TOTAL--ALL TYPES | 1,204,365 | 100.00 | $98,859,169 | $21,589,105 | 100.00 | 21.84 | $17.92 |
| 88305 NAT | DIAGNOSTIC LABORATORY | 11,247,619 | 100.00 | $1,145,380,465 | $537,914,886 | 100.00 | 46.96 | $47.82 |
|  | TYPES OTHER THAN ABOVE | 2 |  | $100 | $49 |  | 49.00 | $24.50 |
|  | TOTAL--ALL TYPES | 11,247,621 | 100.00 | $1,145,380,565 | $537,914,935 | 100.00 | 46.96 | $47.82 |
| 88307 NAT | DIAGNOSTIC LABORATORY | 587,668 | 100.00 | $123,583,317 | $50,435,521 | 100.00 | 40.81 | $85.82 |
|  | TOTAL--ALL TYPES | 587,668 | 100.00 | $123,583,317 | $50,435,521 | 100.00 | 40.81 | $85.82 |
| 88309 NAT | DIAGNOSTIC LABORATORY | 204,686 | 100.00 | $60,538,986 | $23,859,272 | 100.00 | 39.41 | $116.56 |
|  | TOTAL--ALL TYPES | 204,686 | 100.00 | $60,538,986 | $23,859,272 | 100.00 | 39.41 | $116.56 |
| 88311 NAT | DIAGNOSTIC LABORATORY | 469,257 | 100.00 | $15,413,454 | $6,014,013 | 100.00 | 39.02 | $12.81 |
|  | TOTAL--ALL TYPES | 469,257 | 100.00 | $15,413,454 | $6,014,013 | 100.00 | 39.02 | $12.81 |
| 88312 NAT | DIAGNOSTIC LABORATORY | 715,209 | 100.00 | $32,485,982 | $17,754,101 | 100.00 | 54.65 | $24.82 |
|  | TOTAL--ALL TYPES | 715,209 | 100.00 | $32,485,982 | $17,754,101 | 100.00 | 54.65 | $24.82 |
| 88313 NAT | DIAGNOSTIC LABORATORY | 658,358 | 100.00 | $24,803,540 | $8,782,830 | 100.00 | 35.41 | $13.34 |
|  | TOTAL--ALL TYPES | 658,358 | 100.00 | $24,803,540 | $8,782,830 | 100.00 | 35.41 | $13.34 |
| 88314 NAT | DIAGNOSTIC LABORATORY | 18,885 | 100.00 | $1,031,775 | $607,098 | 100.00 | 58.84 | $32.14 |
|  | TOTAL--ALL TYPES | 18,885 | 100.00 | $1,031,775 | $607,098 | 100.00 | 58.84 | $32.14 |
| 88318 NAT | DIAGNOSTIC LABORATORY | 2,659 | 100.00 | $141,792 | $54,027 | 100.00 | 38.10 | $20.31 |
|  | TOTAL--ALL TYPES | 2,659 | 100.00 | $141,792 | $54,027 | 100.00 | 38.10 | $20.31 |
| 88319 NAT | DIAGNOSTIC LABORATORY | 12,899 | 100.00 | $815,887 | $370,504 | 100.00 | 45.41 | $28.72 |
|  | TOTAL--ALL TYPES | 12,899 | 100.00 | $815,887 | $370,504 | 100.00 | 45.41 | $28.72 |
| 88321 NAT | CONSULTATION | 90,007 | 100.00 | $10,290,188 | $5,785,155 | 100.00 | 56.22 | $64.27 |
|  | TOTAL--ALL TYPES | 90,007 | 100.00 | $10,290,188 | $5,785,155 | 100.00 | 56.22 | $64.27 |
| 88323 NAT | CONSULTATION | 28,533 | 100.00 | $2,894,681 | $1,751,259 | 100.00 | 60.50 | $61.37 |
|  | TOTAL--ALL TYPES | 28,533 | 100.00 | $2,894,681 | $1,751,259 | 100.00 | 60.50 | $61.37 |
| 88325 NAT | CONSULTATION | 21,205 | 100.00 | $3,880,619 | $2,092,636 | 100.00 | 53.93 | $98.68 |
|  | TOTAL--ALL TYPES | 21,205 | 100.00 | $3,880,619 | $2,092,636 | 100.00 | 53.93 | $98.68 |
| 88329 NAT | CONSULTATION | 50,883 | 100.00 | $4,853,595 | $1,872,596 | 100.00 | 38.58 | $36.80 |
|  | TOTAL--ALL TYPES | 50,883 | 100.00 | $4,853,595 | $1,872,596 | 100.00 | 38.58 | $36.80 |

B  E  S  S          D  A  T  A
(PART B EXTRACT AND SUMMARY SYSTEM)

```
*************************************************
* WE WANT TO CAUTION YOU ABOUT THE INFORMATION WE WILL BE SUPPLYING  *
* YOU. OUR INTERNAL VALIDATION OF THE BESS FILES CONSISTS OF BASIC   *
* CONSISTENCY FIELD EDITS.  ALL RECORDS FAILING THESE EDITS HAVE     *
* BEEN FLAGGED WITH ERROR CODES   IDENTIFYING TYPE OF ERROR.         *
* HOWEVER, VALIDATION EFFORTS DO NOT PRECLUDE THE PRESENCE OF ERRORS *
* IN THE CARRIER'S CODING. TO FURTHER INSURE THE VALIDITY OF ALL     *
* DATA SUBMITTED, WE HAVE INITIATED AND WILL CONTINUE TO DO INDE-    *
* PENDENT STUDIES TO VERIFY THAT CARRIERS HAVE SUBMITTED PROPERLY    *
* CODED DATA. WE ARE CONCERNED THAT BECAUSE OF PROBLEMS THAT EXIST   *
* IN THE FILES (NOT ALL OF WHICH WE ARE AWARE OF), DATA MAY LEAD TO  *
* MISINTERPRETED OR INCORRECT RESULTS AND CONCLUSIONS.               *
*************************************************
```

PREPARED BY:   HEALTH CARE FINANCING ADMINISTRATION
               CENTER FOR HEALTH PLANS AND PROVIDERS
               PROGRAM DATA INTEGRITY GROUP

```
---------------------------------------
-     BESS DESCRIPTIVE STATISTICS     -
-  TYPE OF SERVICE BY PROCEDURE CODE  -
---------------------------------------
```

USER SELECTION CRITERIA:

HCPCS RANGE  FROM A0000 TO L9999
HCPCS
CARRIER        00000
TYPE OF SERVICE

PAGE 60

BESS DS08          2000 BESS PROCEDURE DATA BY TYPE OF SERVICE
                   JAN THRU MAR (2001)

| HCPCS CARR | TYPE OF SERVICE | ALWD SERVICES | % TOT ALWSRV | NET SUB CHARGE | ALLOWED CHARGE | % OF TOT ALW CHRG | % OF SUB CHRG | AVG ALWD CHARGE |
|---|---|---|---|---|---|---|---|---|
| | TOTAL--ALL TYPES | 34 | 100.00 | $13,030 | $7,756 | 100.00 | 59.52 | $228.11 |
| 88271 NAT | DIAGNOSTIC LABORATORY | 1,482 | 100.00 | $115,435 | $42,208 | 100.00 | 36.56 | $28.48 |
| | TOTAL--ALL TYPES | 1,482 | 100.00 | $115,435 | $42,208 | 100.00 | 36.56 | $28.48 |
| 88272 NAT | DIAGNOSTIC LABORATORY | 5 | 100.00 | $493 | $185 | 100.00 | 37.53 | $37.00 |
| | TOTAL--ALL TYPES | 5 | 100.00 | $493 | $185 | 100.00 | 37.53 | $37.00 |
| 88273 NAT | DIAGNOSTIC LABORATORY | 148 | 100.00 | $16,284 | $5,281 | 100.00 | 32.43 | $35.68 |
| | TOTAL--ALL TYPES | 148 | 100.00 | $16,284 | $5,281 | 100.00 | 32.43 | $35.68 |
| 88274 NAT | DIAGNOSTIC LABORATORY | 679 | 100.00 | $77,382 | $32,809 | 100.00 | 42.40 | $48.32 |
| | TOTAL--ALL TYPES | 679 | 100.00 | $77,382 | $32,809 | 100.00 | 42.40 | $48.32 |
| 88275 NAT | DIAGNOSTIC LABORATORY | 497 | 100.00 | $79,960 | $25,404 | 100.00 | 31.77 | $51.11 |
| | TOTAL--ALL TYPES | 497 | 100.00 | $79,960 | $25,404 | 100.00 | 31.77 | $51.11 |
| 88280 NAT | DIAGNOSTIC LABORATORY | 2,911 | 100.00 | $202,157 | $100,087 | 100.00 | 49.51 | $34.38 |
| | TOTAL--ALL TYPES | 2,911 | 100.00 | $202,157 | $100,087 | 100.00 | 49.51 | $34.38 |
| 88283 NAT | DIAGNOSTIC LABORATORY | 23 | 100.00 | $3,414 | $1,517 | 100.00 | 44.43 | $65.95 |
| | TOTAL--ALL TYPES | 23 | 100.00 | $3,414 | $1,517 | 100.00 | 44.43 | $65.95 |
| 88285 NAT | DIAGNOSTIC LABORATORY | 1,487 | 100.00 | $55,342 | $36,896 | 100.00 | 66.67 | $24.81 |
| | TOTAL--ALL TYPES | 1,487 | 100.00 | $55,342 | $36,896 | 100.00 | 66.67 | $24.81 |
| 88289 NAT | DIAGNOSTIC LABORATORY | 123 | 100.00 | $6,970 | $4,321 | 100.00 | 61.99 | $35.13 |
| | TOTAL--ALL TYPES | 123 | 100.00 | $6,970 | $4,321 | 100.00 | 61.99 | $35.13 |
| 88291 NAT | DIAGNOSTIC LABORATORY | 6,898 | 100.00 | $469,179 | $144,308 | 100.00 | 30.76 | $20.92 |
| | TOTAL--ALL TYPES | 6,898 | 100.00 | $469,179 | $144,308 | 100.00 | 30.76 | $20.92 |
| 88299 NAT | DIAGNOSTIC LABORATORY | 4 | 100.00 | $409 | $213 | 100.00 | 52.08 | $53.25 |
| | TOTAL--ALL TYPES | 4 | 100.00 | $409 | $213 | 100.00 | 52.08 | $53.25 |
| 88300 NAT | DIAGNOSTIC LABORATORY | 220,006 | 100.00 | $7,110,646 | $1,571,160 | 100.00 | 22.10 | $7.14 |
| | TOTAL--ALL TYPES | 220,006 | 100.00 | $7,110,646 | $1,571,160 | 100.00 | 22.10 | $7.14 |
| 88302 NAT | DIAGNOSTIC LABORATORY | 161,776 | 100.00 | $9,782,858 | $2,266,556 | 100.00 | 23.17 | $14.01 |
| | TOTAL--ALL TYPES | 161,776 | 100.00 | $9,782,858 | $2,266,556 | 100.00 | 23.17 | $14.01 |
| 88304 NAT | DIAGNOSTIC LABORATORY | 1,198,532 | 100.00 | $100,928,786 | $22,443,111 | 100.00 | 22.24 | $18.72 |
| | TOTAL--ALL TYPES | 1,198,532 | 100.00 | $100,928,786 | $22,443,111 | 100.00 | 22.24 | $18.72 |
| 88305 NAT | OTHER TYPES OF SERVICE | 2 | 100.00 | $310 | $90 | 100.00 | 29.03 | $45.00 |
| | DIAGNOSTIC LABORATORY | 11,877,981 | 100.00 | $1,277,049,441 | $627,796,048 | 100.00 | 49.16 | $52.85 |
| | TOTAL--ALL TYPES | 11,877,983 | 100.00 | $1,277,049,751 | $627,796,138 | 100.00 | 49.16 | $52.85 |
| 88307 NAT | DIAGNOSTIC LABORATORY | 622,314 | 100.00 | $136,060,399 | $58,303,398 | 100.00 | 42.85 | $93.68 |
| | TOTAL--ALL TYPES | 622,314 | 100.00 | $136,060,399 | $58,303,398 | 100.00 | 42.85 | $93.68 |

B  E  S  S  D  A  T  A
(PART B EXTRACT AND SUMMARY SYSTEM)

```
*****************************************************
* WE WANT TO CAUTION YOU ABOUT THE INFORMATION WE WILL BE SUPPLYING *
* YOU.  OUR INTERNAL VALIDATION OF THE BESS FILES CONSISTS OF BASIC *
* CONSISTENCY FIELD EDITS.  ALL RECORDS FAILING THESE EDITS HAVE    *
* BEEN FLAGGED WITH ERROR CODES   IDENTIFYING TYPE OF ERROR.        *
* HOWEVER, VALIDATION EFFORTS DO NOT PRECLUDE THE PRESENCE OF ERRORS *
* IN THE CARRIER"S CODING.  TO FURTHER INSURE THE VALIDITY OF ALL   *
* DATA SUBMITTED, WE HAVE INITIATED AND WILL CONTINUE TO DO INDE-   *
* PENDENT STUDIES TO VERIFY THAT CARRIERS HAVE SUBMITTED PROPERLY   *
* CODED DATA.  WE ARE CONCERNED THAT BECAUSE OF PROBLEMS THAT EXIST *
* IN THE FILES (NOT ALL OF WHICH WE ARE AWARE OF), DATA MAY LEAD TO *
* MISINTERPRETED OR INCORRECT RESULTS AND CONCLUSIONS.              *
*****************************************************
```

PREPARED BY:   CENTERS FOR MEDICARE AND MEDICAID SERVICES
               CENTER FOR MEDICARE MANAGEMENT
               DIVISION OF DATA SYSTEMS

DATE:   06/05/03

BESS DESCRIPTIVE STATISTICS
PLACE OF SERVICE BY PROCEDURE CODE

USER SELECTION CRITERIA:

HCPCS RANGE   FROM 70000 TO 99999
HCPCS
CARRIER          00000
PLACE OF SERVICE

DS09        2002 BESS PROCEDURE DATA BY PLACE OF SERVICE (POS)                                    PAGE  303
            JAN THRU MAR (2003)

| HCPCS CARR | PLACE OF SERVICE | ALWD SERVICES | POS % TOT ALWSRV | ALLOWED CHARGE | PAYMENT AMOUNT | POS % OF TOT ALW CHRG | PMT AS % OF ALWD CHG | AVG ALWD CHARGE |
|---|---|---|---|---|---|---|---|---|
| | OTHER UNLISTED FACILITY | 592 | .05 | $8,263 | $6,460 | .03 | 78.18 | $13.95 |
| | TOTAL--ALL PLACES | 1,282,678 | 100.00 | $24,020,596 | $18,602,475 | 100.00 | 77.44 | $18.72 |
| 88305 NAT | OFFICE | 3,979,625 | 27.54 | $218,174,901 | $169,777,011 | 26.75 | 77.82 | $54.82 |
| | HOME | 268 | | $12,231 | $9,284 | | 75.91 | $45.63 |
| | INPATIENT HOSPITAL | 1,769,451 | 12.25 | $71,866,152 | $56,861,705 | 8.81 | 79.12 | $40.61 |
| | OUTPATIENT HOSPITAL | 4,088,082 | 28.29 | $165,201,221 | $129,083,141 | 20.26 | 78.14 | $40.41 |
| | EMERGENCY ROOM-HOSPITAL | 18,344 | .13 | $737,921 | $580,537 | .09 | 78.67 | $40.22 |
| | AMBULATORY SURGICAL CNT | 33,892 | .23 | $1,638,387 | $1,292,731 | .20 | 78.90 | $48.34 |
| | BIRTHING CENTER | 152 | | $6,008 | $4,823 | | 76.95 | $39.52 |
| | MILITARY TREATMENT FAC | 22 | | $993 | $795 | | 80.06 | $45.13 |
| | SKILLED NURSING FAC | 1,351 | | $84,955 | $66,635 | .01 | 78.44 | $62.88 |
| | NURSING FACILITY | 78 | | $4,022 | $3,199 | | 79.54 | $51.56 |
| | CUSTODIAL CARE FAC | 21 | | $1,290 | $1,000 | | 77.52 | $61.42 |
| | AMBULANCE - LAND | 67 | | $5,607 | $4,374 | | 78.01 | $83.68 |
| | INPATIENT PSYCH FAC | 24 | | $1,300 | $1,040 | | 80.00 | $54.16 |
| | PSYCH FAC PARTIAL HOSP | 31 | | $1,314 | $1,050 | | 79.91 | $42.38 |
| | RES SUB ABUSE TREAT FAC | 3 | | $84 | $67 | | 79.76 | $28.00 |
| | COMP INPAT REHAB FAC | 55 | | $3,114 | $2,427 | | 77.94 | $56.61 |
| | COM OUTPAT REHAB FAC | 2 | | $73 | $59 | | 80.82 | $36.50 |
| | ST/LCL PUB HEALTH CLIN | 8 | | $369 | $293 | | 79.40 | $46.12 |
| | RURAL HEALTH CLINIC | 28 | | $777 | $615 | | 79.15 | $27.75 |
| | INDEPENDENT LABORATORY | 4,537,062 | 31.40 | $356,946,899 | $277,485,400 | 43.77 | 77.74 | $78.67 |
| | OTHER UNLISTED FACILITY | 21,144 | .15 | $886,754 | $681,858 | .11 | 76.89 | $41.93 |
| | TOTAL--ALL PLACES | 14,449,710 | 100.00 | $815,857,372 | $635,857,844 | 100.00 | 77.96 | $56.44 |
| 88307 NAT | OFFICE | 44,664 | 5.96 | $5,067,907 | $4,003,384 | 7.42 | 78.99 | $113.46 |
| | HOME | 8 | | $823 | $660 | | 80.19 | $102.87 |
| | INPATIENT HOSPITAL | 409,943 | 54.72 | $35,180,020 | $27,885,443 | 51.53 | 79.27 | $85.81 |
| | OUTPATIENT HOSPITAL | 224,854 | 30.02 | $19,419,029 | $15,324,650 | 28.45 | 78.92 | $86.36 |
| | EMERGENCY ROOM-HOSPITAL | 1,541 | .21 | $130,007 | $103,144 | .19 | 79.34 | $84.36 |
| | AMBULATORY SURGICAL CNT | 2,444 | .33 | $219,067 | $173,677 | .32 | 79.28 | $89.63 |
| | BIRTHING CENTER | 17 | | $1,487 | $1,188 | | 79.89 | $87.47 |
| | MILITARY TREATMENT FAC | 1 | | $100 | $80 | | 80.00 | $100.00 |
| | SKILLED NURSING FAC | 31 | | $3,220 | $2,575 | | 79.97 | $103.87 |
| | NURSING FACILITY | 1 | | $83 | $67 | | 80.72 | $83.00 |
| | CUSTODIAL CARE FAC | 10 | | $834 | $667 | | 79.98 | $83.40 |
| | INPATIENT PSYCH FAC | 2 | | $164 | $131 | | 79.88 | $82.00 |
| | PSYCH FAC PARTIAL HOSP | 3 | | $252 | $203 | | 80.56 | $84.00 |
| | COMM MENTAL HEALTH CNT | 1 | | $139 | $111 | | 79.86 | $139.00 |
| | COMP INPAT REHAB FAC | 1 | | $159 | $127 | | 79.87 | $79.50 |
| | RURAL HEALTH CLINIC | 2 | | $164 | $132 | | 80.49 | $82.00 |
| | INDEPENDENT LABORATORY | 65,362 | 8.73 | $8,227,889 | $6,488,823 | 12.05 | 78.86 | $125.88 |
| | OTHER UNLISTED FACILITY | 220 | .03 | $16,388 | $13,039 | .02 | 79.56 | $74.49 |
| | TOTAL--ALL PLACES | 749,106 | 100.00 | $68,267,732 | $53,998,101 | 100.00 | 79.10 | $91.13 |
| 88309 NAT | OFFICE | 8,976 | 4.36 | $1,382,051 | $1,096,720 | 5.27 | 79.35 | $153.97 |
| | HOME | 2 | | $237 | $189 | | 79.75 | $118.50 |
| | INPATIENT HOSPITAL | 156,607 | 76.11 | $19,249,197 | $15,296,912 | 73.34 | 79.47 | $122.91 |

B   E   S   S        D   A   T   A
(PART B EXTRACT AND SUMMARY SYSTEM)

```
****************************************************
* WE WANT TO CAUTION YOU ABOUT THE INFORMATION WE WILL BE SUPPLYING *
* YOU.  OUR INTERNAL VALIDATION OF THE BESS FILES CONSISTS OF BASIC  *
* CONSISTENCY FIELD EDITS.  ALL RECORDS FAILING THESE EDITS HAVE     *
* BEEN FLAGGED WITH ERROR CODES     IDENTIFYING TYPE OF ERROR.       *
* HOWEVER, VALIDATION EFFORTS DO NOT PRECLUDE THE PRESENCE OF ERRORS *
* IN THE CARRIER"S CODING.  TO FURTHER INSURE THE VALIDITY OF ALL    *
* DATA SUBMITTED, WE HAVE INITIATED AND WILL CONTINUE TO DO INDE-    *
* PENDENT STUDIES TO VERIFY THAT CARRIERS HAVE SUBMITTED PROPERLY    *
* CODED DATA.  WE ARE CONCERNED THAT BECAUSE OF PROBLEMS THAT EXIST  *
* IN THE FILES (NOT ALL OF WHICH WE ARE AWARE OF), DATA MAY LEAD TO  *
* MISINTERPRETED OR INCORRECT RESULTS AND CONCLUSIONS.               *
****************************************************
```

PREPARED BY:   CENTERS FOR MEDICARE AND MEDICAID SERVICES
               CENTER FOR MEDICARE MANAGEMENT
               DIVISION OF DATA SYSTEMS

               DATE:   07/25/02

BESS DESCRIPTIVE STATISTICS
TYPE OF SERVICE BY PROCEDURE CODE

USER SELECTION CRITERIA:

HCPCS RANGE  FROM 50000 TO 69999
HCPCS
CARRIER       00000
TYPE OF SERVICE

BESS DS08        2001 BESS PROCEDURE DATA BY TYPE OF SERVICE
                           COMPLETED YEAR

PAGE 65

| HCPCS CARR | TYPE OF SERVICE | ALWD SERVICES | ALLOWED CHARGE | PAYMENT AMOUNT | PMT AS % OF ALWD CHG | AVG ALWD CHARGE |
|---|---|---|---|---|---|---|
| 88280 NAT | DIAGNOSTIC LABORATORY | 20,514 | $704,668 | $703,542 | 99.84 | $34.35 |
|  | TOTAL--ALL TYPES | 20,514 | $704,668 | $703,542 | 99.84 | $34.35 |
| 88283 NAT | DIAGNOSTIC LABORATORY | 23 | $1,443 | $1,419 | 98.34 | $62.73 |
|  | TOTAL--ALL TYPES | 23 | $1,443 | $1,419 | 98.34 | $62.73 |
| 88285 NAT | DIAGNOSTIC LABORATORY | 2,609 | $63,379 | $63,132 | 99.61 | $24.29 |
|  | TOTAL--ALL TYPES | 2,609 | $63,379 | $63,132 | 99.61 | $24.29 |
| 88289 NAT | DIAGNOSTIC LABORATORY | 122 | $4,478 | $4,446 | 99.29 | $36.70 |
|  | TOTAL--ALL TYPES | 122 | $4,478 | $4,446 | 99.29 | $36.70 |
| 88291 NAT | DIAGNOSTIC LABORATORY | 15,360 | $379,085 | $319,145 | 84.19 | $24.68 |
|  | TOTAL--ALL TYPES | 15,360 | $379,085 | $319,145 | 84.19 | $24.68 |
| 88299 NAT | DIAGNOSTIC LABORATORY | 11 | $565 | $565 | 100.00 | $51.36 |
|  | TOTAL--ALL TYPES | 11 | $565 | $565 | 100.00 | $51.36 |
| 88300 NAT | DIAGNOSTIC LABORATORY | 230,817 | $1,514,112 | $1,184,075 | 78.20 | $6.56 |
|  | TOTAL--ALL TYPES | 230,817 | $1,514,112 | $1,184,075 | 78.20 | $6.56 |
| 88302 NAT | DIAGNOSTIC LABORATORY | 159,394 | $2,246,067 | $1,745,520 | 77.71 | $14.09 |
|  | TOTAL--ALL TYPES | 159,394 | $2,246,067 | $1,745,520 | 77.71 | $14.09 |
| 88304 NAT | DIAGNOSTIC LABORATORY | 1,260,977 | $24,471,076 | $18,945,635 | 77.42 | $19.40 |
|  | TOTAL--ALL TYPES | 1,260,977 | $24,471,076 | $18,945,635 | 77.42 | $19.40 |
| 88305 NAT | OTHER TYPES OF SERVICE | 3 | $180 | $144 | 80.00 | $60.00 |
|  | DIAGNOSTIC LABORATORY | 13,297,617 | $751,484,049 | $585,303,495 | 77.89 | $56.51 |
|  | OTHER MED ITEMS/SERVS | 7 | $210 | $168 | 80.00 | $30.00 |
|  | TOTAL--ALL TYPES | 13,297,627 | $751,484,439 | $585,303,807 | 77.89 | $56.51 |
| 88307 NAT | DIAGNOSTIC LABORATORY | 700,904 | $66,688,814 | $52,696,497 | 79.02 | $95.14 |
|  | TOTAL--ALL TYPES | 700,904 | $66,688,814 | $52,696,497 | 79.02 | $95.14 |
| 88309 NAT | DIAGNOSTIC LABORATORY | 208,360 | $27,727,248 | $22,014,698 | 79.40 | $133.07 |
|  | TOTAL--ALL TYPES | 208,360 | $27,727,248 | $22,014,698 | 79.40 | $133.07 |
| 88311 NAT | DIAGNOSTIC LABORATORY | 543,252 | $7,560,205 | $5,984,290 | 79.16 | $13.91 |
|  | TOTAL--ALL TYPES | 543,252 | $7,560,205 | $5,984,290 | 79.16 | $13.91 |
| 88312 NAT | DIAGNOSTIC LABORATORY | 912,093 | $34,326,897 | $27,086,689 | 78.91 | $37.63 |
|  | OTHER MED ITEMS/SERVS | 2 | $57 | $46 | 80.70 | $28.50 |
|  | TOTAL--ALL TYPES | 912,095 | $34,326,954 | $27,086,735 | 78.91 | $37.63 |
| 88313 NAT | DIAGNOSTIC LABORATORY | 864,925 | $19,959,850 | $15,776,897 | 79.04 | $23.07 |
|  | TOTAL--ALL TYPES | 864,925 | $19,959,850 | $15,776,897 | 79.04 | $23.07 |
| 88314 NAT | DIAGNOSTIC LABORATORY | 20,865 | $790,815 | $626,455 | 79.22 | $37.90 |

|       |       |            |                  |                  |
|-------|-------|------------|------------------|------------------|
|       | 26    | 119,979    | $901,310.24      | $704,895.25      |
|       | GLOBL | 23,747     | $717,754.76      | $556,116.77      |
|       | TOTAL | 147,051    | $1,688,216.31    | $1,315,055.51    |
| 88304 | TC    | 78,949     | $2,128,010.66    | $1,659,990.52    |
|       | 26    | 970,569    | $11,984,895.60   | $9,397,294.51    |
|       | GLOBL | 276,926    | $11,143,850.30   | $8,514,038.47    |
|       | TOTAL | 1,326,444  | $25,256,756.56   | $19,571,323.50   |
| 88305 | TC    | 1,702,965  | $69,716,211.82   | $54,599,494.30   |
|       | 26    | 8,301,105  | $345,138,941.96  | $270,385,538.00  |
|       | GLOBL | 5,611,451  | $525,283,396.49  | $408,429,014.92  |
|       | TOTAL | 15,615,521 | $940,138,550.27  | $733,414,047.22  |
| 88307 | TC    | 18,560     | $1,193,685.42    | $948,874.51      |
|       | 26    | 744,584    | $65,600,289.48   | $51,910,300.71   |
|       | GLOBL | 74,619     | $11,540,151.79   | $9,105,038.06    |
|       | TOTAL | 837,763    | $78,334,126.69   | $61,964,213.28   |
| 88309 | TC    | 3,761      | $255,755.42      | $203,418.88      |
|       | 26    | 181,462    | $22,960,214.37   | $18,231,194.78   |
|       | GLOBL | 18,701     | $3,844,291.72    | $3,051,150.55    |
|       | TOTAL | 203,924    | $27,060,261.51   | $21,485,764.21   |
| 88311 | TC    | 17,785     | $61,163.10       | $48,543.59       |
|       | 26    | 540,974    | $7,314,909.93    | $5,797,755.79    |
|       | GLOBL | 87,713     | $1,479,562.59    | $1,170,998.19    |
|       | TOTAL | 646,472    | $8,855,635.62    | $7,017,297.57    |
| 88312 | TC    | 50,838     | $1,792,271.21    | $1,438,465.45    |
|       | 26    | 748,127    | $22,450,154.61   | $17,760,692.29   |
|       | GLOBL | 347,608    | $23,841,781.55   | $18,888,306.30   |
|       | TOTAL | 1,146,573  | $48,084,207.37   | $38,087,464.04   |
| 88313 | TC    | 49,978     | $1,546,183.95    | $1,223,413.49    |
|       | 26    | 694,841    | $9,376,092.66    | $7,430,556.96    |
|       | GLOBL | 337,995    | $16,664,109.58   | $13,091,422.53   |
|       | TOTAL | 1,082,814  | $27,586,386.19   | $21,745,392.98   |
| 88314 | TC    | 558        | $14,674.57       | $11,658.25       |
|       | 26    | 13,121     | $331,285.79      | $263,600.36      |
|       | GLOBL | 9,322      | $449,911.52      | $356,628.54      |
|       | TOTAL | 23,001     | $795,871.88      | $631,887.15      |
| 88318 | TC    | 115        | $2,336.10        | $1,835.71        |
|       | 26    | 1,112      | $26,173.63       | $20,754.37       |
|       | GLOBL | 335        | $16,061.01       | $12,427.97       |
|       | TOTAL | 1,562      | $44,570.74       | $35,018.05       |
| 88319 | TC    | 761        | $48,999.23       | $39,139.80       |
|       | 26    | 11,528     | $337,362.61      | $268,383.29      |
|       | GLOBL | 4,928      | $427,289.58      | $338,913.76      |
|       | TOTAL | 17,217     | $813,651.42      | $646,436.85      |
| 88321 | GLOBL | 155,206    | $12,081,813.41   | $9,457,792.13    |
|       | TOTAL | 155,206    | $12,081,813.41   | $9,457,792.13    |
| 88323 | TC    | 2,703      | $45,945.70       | $36,603.86       |
|       | 26    | 11,658     | $889,433.90      | $701,861.79      |
|       | GLOBL | 23,236     | $2,545,057.37    | $2,006,113.74    |
|       | TOTAL | 37,597     | $3,480,436.97    | $2,744,579.39    |
| 88325 | GLOBL | 21,479     | $3,635,367.94    | $2,884,546.38    |
|       | TOTAL | 21,479     | $3,635,367.94    | $2,884,546.38    |
| 88329 | 26    | 4          | $36.08           | $28.86           |

# EXHIBIT 15
# Part A

Transrectal Ultrasound and Biopsy in the Early Diagnosis of Prostate CA                http://www.medscape.com/viewarticle/409038_pri

**Medscape**

*☆ all + pg 5+6 ☆*

www.medscape.com

To Print: Click your browser's PRINT button.
NOTE: To view the article with Web enhancements, go to:
http://www.medscape.com/viewarticle/409038

# Transrectal Ultrasound and Biopsy in the Early Diagnosis of Prostate Cancer

Jeffrey C. Applewhite, MD, Brian R. Matlaga, MD, MPH, David L. McCullough, MD, and M. Craig Hall, MD, Department of Urology and Comprehensive Cancer Center, Wake Forest University Baptist Medical Center, Winston-Salem, NC.

Cancer Control 8(2):141-150, 2001. © 2001 H. Lee Moffitt Cancer Center and Research Institute, Inc

## Abstract and Introduction

### Abstract

**Background:** Historically, the prostate was evaluated for cancer by simple digital rectal examination, and biopsy to obtain a tissue diagnosis of cancer was performed blindly. The advent of ultrasound technology offered a new way to evaluate the prostate, and biopsy techniques were soon developed to incorporate ultrasound guidance.
**Methods:** The authors review the role of transrectal ultrasound (TRUS) of the prostate and ultrasound-guided biopsy of the prostate in the diagnosis of prostate cancer. These techniques are traced from their origins to the current standards of care, with attention paid to developments and controversies in recent literature.
**Results:** Early experience with TRUS led to the description of "classic" sonographic findings of prostate cancer. To obtain a tissue diagnosis of cancer, these regions were initially targeted in ultrasound-guided biopsies. Concomitant with the development of TRUS, though, was the development of the prostate-specific antigen (PSA) assay. Over the past decade, there has been a profound stage migration due to earlier detection of prostate cancer. Most patients now diagnosed with prostate cancer have no palpable abnormality or specific sonographic findings. In response, ultrasound-guided biopsies have become more systematic, rather than lesion-specific, in nature.
**Conclusions:** TRUS continues to play an important role in the evaluation of the prostate when malignancy is suspected. Although the optimal method of prostate biopsy is controversial, ultrasound is critical in ensuring accurate sampling of the gland.

## Introduction

Prostate cancer is the most commonly diagnosed cancer in American men, making this disease a significant public health issue. Unfortunately, the anatomic location of the prostate does not lend itself to straightforward examination. Historically, digital rectal examination has been the principal method of examination of the prostate. However, this technique has its own inherent limitations. The advent and refinement of ultrasound technology have provided a new, important method to examine the prostate. Transrectal ultra-sound with prostate biopsy, a generally well-tolerated outpatient procedure, in conjunction with the development of serum assays for prostate-specific antigen (PSA), has resulted in an impressive change in the manner of diagnosis and stage presentation of men with prostate cancer.

## Before Ultrasound: Digital Rectal Examination

Digital rectal examination (DRE) is the primary method of examination of the prostate. This technique allows the examiner to appreciate the gland's morphology, including any irregular, nodular, or indurated areas, that may be suspicious for malignancy. In 1971, Gilbertson [1] published a series of 5,856 men who underwent annual DRE as a screening for prostate cancer from 1948 through 1964. This study was the first of its type to document a survival advantage to DRE screening.

As a subjective examination, however, DRE has limitations. Not all prostatic malignancies are palpable on DRE. [2] When DRE findings are correlated to pathologic evaluation, understaging and overstaging are often found. [3] Ultimately, DRE fails to detect a significant number of malignancies, and of those that it does detect, a significant

number are at an advanced stage.

## History of Transrectal Ultrasound

Transrectal ultrasound (TRUS) was initially described as a technique to evaluate rectal pathology. [4,5] In 1963, Takahashi and Ouchi [6] were the first to describe the use of TRUS to evaluate the prostate. However, medical ultrasound was rather primitive at this time, so the images created with this array were of such poor quality that they carried little medical utility. [6,7] The first clinically applicable images of the prostate obtained with TRUS were described in 1967 by Watanabe et al. [8] They used a 3.5 MHz transducer, which at that time was considered to be state of the art, to obtain images that were clinically meaningful. As ultrasound technology has become more refined, the use of TRUS in the evaluation of prostatic disease has increased. By the mid 1980s, the 7 MHz ultrasound probe, which more clearly delineated the architecture of the prostate, had become a standard diagnostic instrument of the urologist.

## History of TRUS-Guided Prostate Biopsy

Ferguson [9] performed the first prostate needle biopsy in 1930. He described a transperineal approach with an 18-gauge needle in which he aspirated a sample of prostate tissue. Astraldi [10] performed the first transrectal biopsy in 1937. In the mid 1980s, a transperineal ultra-sound array was fitted with biopsy apparatus to allow direct correlation of the sonographic appearance of focal prostatic lesions with the histology of these lesions. Several years later, a spring-loaded core biopsy device was developed that operated via a TRUS probe.

In 1987, the first literature appeared describing the use of TRUS with transrectal biopsy. Since then, as ultrasound technology has become more refined, this technique has been described as a superior method of performing a core biopsy of the prostate. [11]

Since the initial reports of TRUS of the prostate by Wild and Reid, [4] substantial technologic advances have improved the diagnostic capabilities of this modality. The current state-of-the-art TRUS probe is a 5-8 MHz hand-held, high-resolution probe with multiaxial planar imaging capabilities, which has the capacity for both transverse and sagittal imaging of the prostate in real time. This probe can be fitted with an adapter that accepts the needle of a spring-loaded biopsy gun, thus allowing multiple cores of tissue to be easily obtained. The visualization provided by the new higher resolution transducers, coupled with the ability to direct the biopsy needle into various regions of interest and to provide uniform spatial separation of the areas to be sampled, has helped to make TRUS-guided prostate biopsy a standard technique in the diagnosis of prostate cancer.

## Other Modalities: Transperineal and Transabdominal Prostatic Ultrasound

Although TRUS is the current standard for ultra-sound imaging of the prostate, other modalities are available. Transabdominal ultrasound can image the prostate, as well as other abdominal organs. The primary advantage of this technique is that it is noninvasive and thus does not require special patient preparation. Similarly, transperineal ultrasound can image the prostate, is noninvasive, and does not require any special patient preparation. Despite their advantages, these techniques have fallen out of favor as tools with which to image the prostate, except in unusual cases (eg, a patient without a rectum after an abdominoperineal resection). These techniques provide images inferior to TRUS, primarily because of the anatomic consideration that the prostate is physically closer to the TRUS probe than it is to the probe in either of these other two methods.

## New Technology: Doppler Ultrasound and Intravenous Contrast Agents

TRUS technology has limits in specificity and sensitivity, which has led investigators to explore the potential use of color Doppler imaging with and without intravenous contrast administration. Doppler sonography is based on the principle that the frequency of a sound beam changes when that beam is reflected by a moving target. In the case of Doppler sonography of the prostate, the transducer generates the sound beam, and the moving target is blood. This technique allows real-time visualization of blood flow. The utility of color Doppler ultrasound rests on the theory that tumors in general, and prostate tumors in particular, have different blood flow characteristics from the surrounding normal tissue. Recent literature, however, fails to support this technique as being superior to traditional gray-scale imaging in the diagnosis of prostate cancer. [12]

Recognizing that traditional Doppler ultrasound is limited in its ability to display small, deep, and low-volume-flow blood vessels, such as those of the prostate, the addition of intravenous contrast agents have been used to promote

vascular visualization. Ultrasound scanning using contrast agents has been performed extensively in the heart, liver, and kidney, with good results. [13] Preliminary studies suggest that employing sonographic contrast agents enhances the visualization of neovascularity associated with prostatic cancer. [14]

## Indications for Prostate Biopsy

### Elevated Serum PSA

The most common indication for prostate biopsy is an elevated serum PSA. Although a level greater than 4 ng/mL is considered elevated, age-adjusted normal PSA values have been established (Table). Oesterling et al [15] demonstrated an 8% increase in the number of biopsies and organ-confined cancers detected in men with a normal DRE aged 50 years or less when these age-specific reference ranges were used. A rising PSA over time, though still less than 4 ng/mL, may also be an indication for biopsy, especially in high-risk groups. Carter et al [16] demonstrated that a change in PSA, or PSA velocity, of more than 0.75 ng/mL per year was a specific marker for the presence of prostate cancer. Furthermore, in their study, men diagnosed with cancer had significant-ly more rapid rates of a rise in PSA than men without prostate cancer when the PSA levels were normal.

### Abnormal DRE

An abnormal finding on DRE is an indication for prostate biopsy regardless of the patient's PSA value. Abnormalities include a discrete nodule, focal induration, a diffusely hard prostate and, in some cases, asymmetry.

## TRUS in Practice

### Patient Preparation

Full informed consent that outlines alternatives, consequences, and complications of biopsy is obtained prior to the procedure. Patients routinely receive either preprocedural enemas or a formal polyethylene glycol bowel preparation. Administration of prophylactic antibiotics around the time of biopsy has become standard of care. At our institution, we routinely use a 3-day course of a quinolone antibiotic beginning the day before biopsy. Patients with valvular heart disease are administered parenteral antibiotics as outlined by the American Heart Association. [17] Furthermore, patients are taken off anticoagulants and antiplatelet drugs for an appropriate time period.

There has been recent interest in techniques to reduce the morbidity associated with TRUS and prostate biopsy. A recent trial from Emory University [18] concluded that the use of intrarectal lidocaine gel is simple, safe, and efficacious in providing satisfactory anesthesia in men undergoing transrectal prostate biopsy. At our institution, patient comfort is provided by injecting a solution of 1% lidocaine (Xylocaine) along the neurovascular bundles of the prostate, beginning at the seminal vesicles and moving outward to the apex. This is accomplished with a 20-gauge spinal needle, and the injection is performed under TRUS guidance. This procedure is simple and inexpensive, and patients describe good anesthetic results.

### Imaging Techniques

A DRE is performed prior to insertion of the probe. The reason for this is 2-fold: (1) It rules out any rectal pathology that would contraindicate insertion of the probe, and (2) it allows the identification of any palpable prostatic abnormalities to which special attention could be paid during ultrasound examination.

The probe is introduced and the contrast of the console is adjusted to provide a uniform mid-gray image of the normal peripheral zone. The shading of the peripheral zone should be the homogenous gray standard by which other areas of the prostate are classified as hyperechoic, hypoechoic, or isoechoic. Imaging of the gland is then carried out, first in a transverse fashion. The right and left seminal vesicles are viewed, followed by the bladder neck, mid gland, and apex. After complete transverse imaging, the transducer is configured to provide for sagittal imaging, and the right, mid, and left aspects of the prostate are visualized. During this part of the examination, particular attention is paid to any regions that are hypoor hyper-echoic when compared to the peripheral zone of the prostate.

The console is reconfigured for volume measurement of the prostate. First, in the transverse view, an image of the prostate at its largest diameter is obtained, and this diameter is recorded. Then, in the sagittal view, the greatest cephalo-caudal and anterior-posterior dimensions of the prostate are recorded. These measurements are used to calculate the volume of the prostate. The volume of the prostate is based on the assumption that the gland is an

ellipsoid. [19] Thus, the formula for the prostate's volume is: (transverse diameter) X (cephalo-caudal diameter) X (anterior-posterior diameter) X (π/6) With the volume of the gland and the patient's PSA level, PSA density (PSAD) can be calculated (PSA divided by gland volume). PSAD recognizes that PSA originates not only from prostate cancer cells, but also from normal prostate epithelial cells, so it is not specific to prostate cancer. The concept of PSAD assumes that for any prostate volume, there is a finite number of normal prostate epithelial cells that can occupy that volume and thus an upper limit to PSA of benign origin. Once this critical PSA level has been passed, nonbenign epithelial cells must occupy the prostate gland; this is prostate cancer. [20] A PSAD of 0.15 has been proposed as a threshold for recommending prostate biopsy in men with mildly elevated PSA (4-10 ng/mL) and no suspicion of cancer on DRE or TRUS. [21]

## Sonographic Findings

The normal prostate gland has a homogenous, uniform echo pattern. The seminal vesicles are visualized at the base of the bladder and are hypoechoic compared with the remainder of the prostate. In contrast to the homogenous appearance of the normal prostate, a prostatic malignancy may take on unique ultrasound findings. Most ultrasound-detected lesions found to be carcinoma are described as hypoechoic regions with irregular borders. However, this is not a rule, and the appearance of carcinoma on ultrasound is variable. [22]

Evaluation of the prostate by TRUS requires a comprehensive knowledge of the anatomy of the prostate, as the current PSA-era phenomenon of stage migration has made most tumors nonpalpable at diagnosis. In 1968, McNeal [23] proposed that the prostate is composed of three distinct glandular zones (Fig 1). The transition zone surrounds the urethra and extends from the ejaculatory ducts proximally. The transition zone is surrounded by a discrete fibromuscular band of tissue, and it is the site of origin of benign prostatic hyperplasia. The peripheral zone encompasses the posterolateral aspect of the prostate from the base (superior) to the apex (inferior), and it accounts for the majority of the volume of the prostate. The majority (70%-80%) of prostate cancers arise from the peripheral zone. The central zone is composed of tissue immediately surrounding the ejaculatory ducts, and it expands inferiorly.





Fig 1 . Schematic depiction of the transition zone (TZ), peripheral zone (PZ), and central zone (CZ) in transverse (A) and sagittal (B) planes. The arrows represent the path of sextant biopsy needles. From Terris MK, McNeal JE, Stamey TA. Detection of clinically significant prostate cancer by transrectal ultrasound-guided systematic biopsies. J Urol. 1992; 148:829-832. Reprinted with permission.

The anatomic distinction between the central and peripheral zones is generally not appreciated by ultra-sound. In a normal man, these two zones are seen as a homogenous, isoechoic area in the posterior section of the prostate. Their normal echo pattern is used as a reference for defining other structures as hypoechoic or hyperechoic. [24] The normal transition zone in a young man comprises only a small percentage of the gland and thus is difficult to image. In an older man with benign prostatic hyperplasia, the transition zone expands, compressing its surrounding fibromuscular band of tissue. This compressed tissue gives rise to the "surgical capsule" of the prostate, which is a sono-graphic landmark of zonal demarcation. The transition zone itself is moderately hypoechoic when compared to the central and peripheral zones. [25]

Cancer of the prostate was initially thought to have a hyperechoic appearance on ultrasound. However, recent literature confirms that modern ultrasound technique displays prostate cancer as generally a hypoechoic area. Lee et al [26] reported that the most common sonographic appearance of prostate cancer was a hypoechoic peripheral-zone lesion. The highest predictive values for prostate cancer are seen in hypoechoic lesions that are well defined and are larger than 1 cm. [7] The etiology of this hypoechogenicity is currently believed to be due to the replacement of the prostatic stroma with infiltrating glandular elements. [5] However, not all hypoechoic regions in the peripheral zone are prostate cancer. Potential hypoechoic lesions also include prostatitis, prostatic infarction, dilated glands, smooth muscle bundles, scarring, and prostatic intraepithelial neoplasia. [7] Studies following Lee's work reported that a significant number of prostate carcinomas are isoechoic. [27] The average yield of a biopsy of a peripheral-zone hypoechoic lesion has been 30%-50%. [7] With these limitations, the sonographer should be able to recognize more subtle findings such as irregularity or asymmetry, extension of hypoechoic areas from the central zone into the seminal vesicle, or any area corresponding to an abnormality on DRE.

TRUS evaluation of the prostate is not without its weaknesses. Carter et al [28] were the first to suggest a relative lack of sensitivity with TRUS when they observed that only 54% of carcinomas identified on the nonclinically suspicious side of the prostate could be visualized with ultrasound. Another study found that in radical prostatectomy specimens, only 36% of nonpalpable tumors were visualized on ultrasound. [29] Others have also reported that up to 40% of prostate cancers are isoechoic on ultrasound and therefore "invisible" to TRUS. This number is probably much higher today with the stage-migration seen at presentation of prostate cancer.[27,28,30,31]

The specificity of the classic hypoechoic ultrasound finding of prostate cancer is low; a hypoechoic lesion can reflect anything along the continuum from normal prostate to prostatitis to infarct to prostatic intraepithelial neoplasia. [32]

## TRUS-Guided Prostate Biopsy Techniques

### Systematic Sextant Prostatic Biopsy

The limitations in cancer detection based on sono-graphic appearance and the stage migration during the PSA era have been driving forces in the evolution of TRUS and prostate biopsy. Patients are presenting earlier in the disease process, when tumors are more likely to be nonpalpable and isoechoic. The true utility of ultrasound in the modern era, therefore, is to enable sampling of all relevant areas of the prostate, including those that appear normal on sonography.

Hodge et al [33] published the landmark paper demonstrating the efficacy of systematic sampling of the prostate during TRUS-guided biopsy. They were the first to report that systematic sampling of the prostate guided by TRUS improved the detection rate of prostate cancer over merely sampling hypoechoic or other lesions. By taking sextant biopsies from the mid lobe (parasagittal) of each side of the prostate at the apex, middle, and base, the cancer detection rate was superior to lesion-directed biopsies in 136 men with palpable abnormalities. This technique was accepted at the time as the standard of care and helped to emphasize that TRUS was more useful for biopsy than for imaging (Fig 2).

Medscape®    www.medscape.com



Fig 2 . Transrectal ultrasound in sagittal plane demonstrating hyperechoic biopsy tracts (arrows) evenly spaced throughout the gland. From Eskew LA, Bare RL, McCullough DL. Systematic 5 region prostate biopsy is superior to sextant method for diagnosing carcinoma of the prostate. J Urol. 1997;157:199-203. Reprinted with permission.

More recent evidence, however, demonstrates that this technique may no longer be the standard of care. The sextant technique was recommended based on biopsies of men with palpable abnormalities. In the current PSA era, though, most men who are undergoing prostate biopsy do not have palpable abnormalities or hypoechoic lesions. Furthermore, mapping of radical prostatectomy specimens has shown that the majority of nonpalpable lesions lie in the far lateral peripheral zone of the prostate, which is not routinely sampled by the sextant technique. Literature has demonstrated undersampling by the sextant technique, notably in a study by Levine et al [34] in which 137 men underwent two consecutive sets of parasagittal sextant biopsies in a single setting. The initial biopsy revealed cancer in 30 men (22%), while 13 (10%) had cancer diagnosed only on the second set of biopsies.

### Optimizing Biopsy Methods

Increasing numbers of investigators are modifying the number and the areas of the prostate sampled. Based on cancer mapping of radical prostatectomy specimens, Stamey [35] suggested that biopsies near the middle or the base should be directed laterally into the anterior lateral crescent of the peripheral zone. As much as 75% of all prostate cancer originates from the peripheral zone. However, the standard sextant technique samples a limited portion of the peripheral zone and does not take advantage of the common extension of peripheral-zone cancers into the anterior lateral aspect of the peripheral zone.

A prospective study [36] from our institution assessed the yield of a 5-region biopsy method in which cores are obtained by ultrasound guidance from the far lateral peripheral zone and midline in addition to the standard sextant biopsies (Fig 3). By obtaining at least 13 cores (18 cores in glands greater than 50 g by ultrasound), the authors demonstrated a significant increase in prostate cancer detection over sextant biopsies. The overall cancer detection rate was 40%, with 35% of the cancers diagnosed by the additional regions only. The benefit of this technique was most notably seen in patients with a PSA <10 ng/ml, where 54% of the cancers diagnosed were found in the additional regions only. In a subsequent study, [37] the authors demonstrated no statistically significant difference in the tumor volume, Gleason's score, or pathologic stage between tumors diagnosed by the 5-region technique or those diagnosed by standard sextant biopsies. Ongoing data accrual has demonstrated this technique to be durable after 256 biopsy sessions. [38] Furthermore, other authors using clinical studies as well as computer-generated models have demonstrated results consistent with the increased yield of the 5-region technique.



In a subsequent paper, these authors used the same computer simulation to compare the ability of different biopsy regimens published in the literature to detect prostate cancer. [42] The cancer detection rate for cancers greater than 0.5 cc in volume was highest for an 11-core multisite-directed scheme (94%) followed by the 5-region peripheral zone (18 cores, 87%) and 5-region peripheral zone (13 cores, 86%). The 11-core multisite-directed scheme consists of sextant, one posterior mid-line, two transition zone, and two inferior anterior horn biopsies. This is similar to the above-mentioned 10-core scheme and has similar detection rates. Again, cancer yield was not related solely to the number of cores; strategic sampling of multiple regions of the prostate under ultrasound guidance is also important.

Babaian et al [43] tested the 11-core multisite-directed prostate biopsy strategy of Chen and colleagues. Over-all, a

prostatectomy specimens. Prostate. 1987;10:1-9.
32. Lee FI, Torp-Pedersen ST, Carroll JT, et al. Use of transrectal ultrasound and prostate-specific antigen in diagnosis of prostate intraepithelial neoplasia. Urology. 1989;34(suppl):4-8.



Fig 3 . Transverse and posterior views of the prostate showing the peripheral zone (PZ) and areas of biopsy. Shaded areas represent the additional regions of the 5-region biopsy technique. From Eskew LA, Woodruff RD, Bare RL, et al. Prostate cancer diagnosed by the 5-region biopsy method is significant disease. J Urol. 1998;160:794-796. Reprinted with permission.

Chang et al [39] prospectively evaluated the usefulness of adding four lateral biopsies of the peripheral zone to the routine sextant biopsy regimen for prostate cancer. Lateral biopsies of the peripheral zone were obtained just medial to the lateral border of the prostate, in addition to the routine lesion-directed and systematic sextant regimen in 273 patients. Forty-four percent of patients had cancer on biopsy. Routine sextant biopsies detected 82% of cancers, while the combination of sextant and lateral biopsies detected 96% of the cancers diagnosed. They concluded that the addition of lateral peripheral-zone biopsies increases the sensitivity for cancer detection while virtually eliminating the need for lesion-directed biopsies. Looking specifically at 6-core biopsy combinations, the regimen with greatest sensitivity was the combination of the two apical biopsies of routine sextant and four additional lateral cores. Their findings emphasized the importance of not only increasing the number of biopsies, but also specifying location.

In 2000, these same authors examined their 10-core biopsy regimen more closely as they performed a prospective trial of 483 consecutive patients in an attempt to identify the optimum systematic biopsy regimen to detect carcinoma of the prostate. [40] They believed that the biopsies of the base in the standard sextant regimen could be dropped without adversely affecting sensitivity. Eliminating these two cores would have decreased the cancer detection rates by only 1%-2%. Variations in cancer detection rates were most pronounced in patients with a PSA less than 10 ng/mL or prostate volume greater than 50 cc. The low yield from the mid lobar base may be due to the fact that this samples largely the central zone, where the incidence of cancer is low.

Chen et al [41] sought to determine the optimum biopsy strategy based on a stochastic computer simulation model of ultrasound-guided biopsies using mathematically reconstructed radical prostatectomy specimens. Sextant biopsies reliably detected cancer in only 107 (73%) of 147 patients in whom the total cancer volume was greater than 0.5 cc. The authors demonstrated that a 10-core biopsy regimen that included the parasagittal base and apex, the inferior anterior horn (far lateral peripheral zone), the midline peripheral zone, and the anterior transition zone reliably detected 96% of cancers. They suggested that sampling of these additional areas be incorporated into an initial or repeat biopsy regimen. They emphasized that biopsy localization must be described in a highly specific way to facilitate further clinical study and confirmation, and this is heavily reliant on TRUS guidance for standardization.

In a subsequent paper, these authors used the same computer simulation to compare the ability of different biopsy regimens published in the literature to detect prostate cancer. [42] The cancer detection rate for cancers greater than 0.5 cc in volume was highest for an 11-core multisite-directed scheme (94%) followed by the 5-region peripheral zone (18 cores, 87%) and 5-region peripheral (13 cores, 86%). The 11-core multisitedirected scheme consists of sextant, one posterior mid-line, two transition zone, and two inferior anterior horn biopsies. This is similar to the above-mentioned 10-core scheme and has similar detection rates. Again, cancer yield was not related solely to the number of cores; strategic sampling of multiple regions of the prostate under ultrasound guidance is also important.

Babaian et al [43] tested the 11-core multisite-directed prostate biopsy strategy of Chen and colleagues. Over-all, a

Transrectal Ultrasound and Biopsy in the Early Diagnosis of Prostate CA     http://www.medscape.com/viewarticle/469098_pri

33% increase in cancer detection over sextant in 362 patients was observed when this biopsy technique was utilized. The anterior horn was the most frequently positive biopsy site. This technique was significantly better in men whose DRE and TRUS were normal and in those with PSA between 4 and 10.

Another computer simulation by Bauer et al [44] comparing various published prostate biopsy regimens suggests that all the biopsy protocols using laterally placed biopsies based on the 5-region anatomic model are superior to the routinely used sextant prostate biopsy pattern. Of the lateral biopsy regimens, the authors suggest that the 10-core pattern that includes sextant plus far lateral mid and apical biopsies is the optimum. Lateral biopsies in the mid and apical aspects of the gland had higher yields than any other cores and, similar to reports by Chen and colleagues, sextant biopsies detected only 73% of cancers. Transition-zone biopsies added little to the detection rate, and the authors suggested that these biopsies are rarely required to detect cancer if lateral biopsies are used.

Interestingly, Naughton et al [45] recently reported a prospective, randomized trial to compare 6-core and 12-core biopsy protocols. Prostate cancer was found in 27% and 26% of patients after 6-core and 12-core biopsies, respectively. They concluded that the overall cancer detection was not improved by the addition of six additional laterally placed cores. However, 21% of men in the 12-core biopsy group would not have been detected without the addition of lateral biopsies. Furthermore, the authors acknowledge that there may have been a tendency to obtain the sextant biopsies alone a little more laterally, thus partially obscuring significant differences.

## The Role of Transition-Zone Biopsies

Although approximately 20% of prostate cancers originate in the transition zone, isolated transition-zone tumors detected on prostate biopsy are uncommon. The addition of transition-zone biopsies to the initial biopsy strategy increases detection rates by only 1.8%-4.3 %, and there is little evidence to support the recommendation for routine transition-zone sampling. [46- 49] In men undergoing repeat biopsies, though, the yield of malignancy from the transition zone is 10%-13%.

Thus, transition-zone biopsies may be indicated for patients in whom prior negative systematic sextant biopsies failed to reveal cancer but whose PSA is markedly elevated or rapidly increasing. [47]

In men with previously negative biopsies, the important question is whether the undiagnosed cancer is in the transition zone. In their study of patients undergoing repeat biopsy, Keetch and Catalona [50] found a yield of only 10% from transition-zone biopsies. However, certain subsets of patients may have a much higher incidence of transition-zone carcinoma. In repeat biopsies in men with a mean PSA of 32, a normal DRE, and a clinical picture suspicious for carcinoma, Lui et al [51] found that 53% of cancers were detected in the transition zone only.

TRUS is critical to ensure proper needle placement during biopsy of the transition zone. Imaging of the transition zone is not as reliable because the echo patterns are much more hypoechoic and heterogeneous, especially in the setting of benign prostatic hyperplasia. Fortunately, the posterior and posterolateral border of the transition zone is usually well seen on ultrasound and serves as an excellent marker for these biopsies. Chen et al [42] found that the highest detection rate for transition-zone biopsies in a computer-generated model was observed when the biopsies were initiated near the prostatic apex and the needles were inserted to a depth of 3 cm before firing. Lower rates of detection were noted when the needles were inserted to a depth of 1-2 cm and as they were moved more toward the base of the gland.

## The Impact of Prostatic Volume on Prostate Biopsy Technique

The most objective TRUS finding is prostatic volume. Calculating gland volume should be a routine part of every prostate biopsy session. Not only does prostatic volume have implications in future treatment planning in the setting of a positive biopsy and risk stratification using PSA density, but also an indirect relationship has been demonstrated between prostate size and the likelihood of finding prostate cancer. Recent studies have questioned the ability of the standard 6-core biopsy to provide optimal sampling in larger glands. The relative amount of gland that is sampled relies directly on the size of the gland, and thus the ideal number of cores to take may be dependent on the size of the gland calculated by TRUS.

Uzzo et al [52] reported on cancer detection rates and their variation with prostate size using a systematic sextant core biopsy regimen. Using a sextant regimen, the cancer detection in glands greater than 50 g was 23% vs 38% in glands less than 50 g. Their data suggest that significant sampling error may occur in men with large glands, and more biopsies may be needed under these circumstances.

Karakiewicz et al [53] also evaluated the positive rate of sextant biopsy according to gland size. The positive biopsy rate for glands less than 20 cc was 40% vs 10% for glands 80-90 cc. Their findings suggest that gland size represents an important determinant contributing to the yield of sextant biopsy in men at risk of harboring a nonpalpable, isoechoic cancer. They recommend an individualized approach to TRUS-guided biopsy based on prostate volume.

Levine et al [34] also contributed to the evidence of increased sampling error in larger glands. In their study population, cancer was detected in 43%, 27%, and 24% of men with prostate volumes of <30 cc, 30-50 cc, and >50 cc, respectively. Furthermore, data from our own institution [54] on the 5-region prostate biopsy method has also demonstrated a decreasing yield with increasing gland size. The cancer detection rate for glands <30 cc, 30-50 cc, and >50 cc was 49%, 42%, and 32%, respectively.

Vashi et al [55] created a mathematical model to determine the minimum number of cores necessary to detect clinically significant cancers in prostate glands 10-80 cc. Their data suggests that the sextant biopsy regimen optimally samples only a minority of prostate glands, and an approach to biopsy based on patient age and gland volume maximizes the detection of clinically significant cancer. They provided a table that indicates the number of cores to obtain based on patient age and gland volume. Their findings indicate that sextant biopsy does not provide adequate sampling of large prostate glands or the prostates of younger men who have normal or minimally elevated PSA.

Chen et al [56] used a computer-simulated model to compare the yield of the sextant technique in glands <= g and >50 g. The yield was 67% and 48%, respectively. However, they also found that smaller volume cancers were more prevalent in the larger glands. They concluded that the lower biopsy rates in larger glands may be driven by elevations in PSA from benign prostatic tissue. Contrary to other studies, they felt that increasing the number of cores solely to compensate for an increase in prostate size risks a disproportionate increase in the detection of small-volume tumors with a low clinical likelihood of progression. However, most of the cancers detected in the large glands were still >0.5 cc and thus clinically significant.

## Conclusions

TRUS maintains a critical role in the early diagnosis of prostate cancer. With the stage migration seen in the current PSA era, directed biopsies at lesions detected on ultrasound and DRE are becoming less common. However, ultrasound is essential in ensuring accurate sampling of the gland and can be helpful in tailoring the number of cores and their distribution based on the size of the gland and patient risk stratification. Although the ideal number of cores is not clear, TRUS is an integral facet of prostate biopsy and will continue to contribute to our understanding of the optimum regimen for the diagnosis of prostate cancer. With more patients presenting earlier for biopsy as a result of PSA screening, together with potentially earlier diagnosis resulting from increased gland sampling, prostate cancer may be diagnosed at an earlier and more treatable point in the disease process.

## Tables

## Table. Age-Specific Reference Ranges for Serum PSA

|  | Age (years) | | | |
| --- | --- | --- | --- | --- |
|  | 40-49 | 50-59 | 60-69 | 70-79 |
| Serum PSA (ng/mL) | 0.0-2.5 | 0.0-3.5 | 0.0-4.5 | 0.0-6.5 |

Adapted from Oesterling JE, Jacobsen SJ, Chute CG, et al. Serum prostate-specific antigen in a community-based population of healthy men: establishment of age-specific reference ranges. JAMA. 1993;270:860-864.

## References

1. Gilbertson VA. Cancer of the prostate gland: results of early diagnosis and therapy undertaken for cure of the

Transrectal Ultrasound and Biopsy in the Early Diagnosis of Prostate CA    http://www.medscape.com/viewarticle/409036_print

   disease. JAMA. 1971;215:81-84.

2. Cooner WH, Mosley BR, Rutherford CL Jr, et al. Prostate cancer detection in a clinical urological practice by ultrasonography, digital rectal examination and prostate specific antigen. J Urol. 1990;143:1146-1152.

3. Partin AW, Yoo J, Carter HB, et al. The use of prostate specific antigen, clinical stage and Gleason score to predict pathologic stage in men with localized prostate cancer. J Urol. 1993;150:110-114.

4. Wild JJ, Reid JM. Progress in techniques of soft tissue examination by 15 MC pulsed ultrasound. In: Kelley-Fry E, ed. Ultrasound in biology and medicine: a symposium sponsored by the Bioacoustics Laboratory of the University of Illinois and the Physiology Branch of the Office of Naval Research, Robert Allerton Park, Monticello, Ill; June 20-22, 1955. Washington, DC: American Institute of Biological Sciences; 1957:30-45.

5. Smith JA Jr. Transrectal ultrasonography for the detection and staging of carcinoma of the prostate. J Clin Ultrasound. 1996; 24:455-461.

6. Takahashi H, Ouchi T. The ultrasonic diagnosis in the field of urology. Proc Jpn Soc Ultrasonics Med. 1963;3:7.

7. Langer JE. The current role of transrectal ultrasonography in the evaluation of prostate carcinoma. Semin Roentgenol. 1999; 34:284-294.

8. Watanabe H, Igari D, Tanahasi Y, et al. Development and application of new equipment for transrectal ultrasonography. J Clin Ultrasound. 1974;2:91-98.

9. Ferguson RS. Prostatic neoplasms: their diagnosis by needle puncture and aspiration. Am J Surg. 1930;9:507.

10. Astraldi A. Diagnosis of cancer of the prostate: biopsy by rectal route. Urol Cutan Rev. 1937;41:421.

11. Weaver RP, Noble MJ, Weigle JW. Correlation of ultrasound guided and digitally directed transrectal biopsies of palpable prostatic abnormalities. J Urol. 1991;145:516-518.

12. Kelly IM, Lees WR, Rickards D. Prostate cancer and the role of color Doppler US. Radiology. 1993;189:153-156.

13. Aarnink RG, Beerlage HP, De La Rosette JJ, et al. Transrectal ultrasound of the prostate: innovations and future applications. J Urol. 1998;159:1568-1579.

14. Halpern EJ, Verkh L, Forsberg F, et al. Initial experience with contrast-enhanced sonography of the prostate. AJR Am J Roentgenol. 2000;174:1575-1580.

15. Oesterling JE, Jacobsen SJ, Chute CG, et al. Serum prostate-specific antigen in a community-based population of healthy men: establishment of age-specific reference ranges. JAMA. 1993;270:860-864.

16. Carter HB, Pearson JD, Metter EJ, et al. Longitudinal evaluation of prostate-specific antigen levels in men with and without prostate disease. JAMA. 1992;267:2215-2220.

17. Danjani AS, Bisno AL, Chung KJ, et al. Prevention of bacterial endocarditis: recommendations by the American Heart Association. JAMA. 1990;264:2919-2922.

18. Issa MM, Bux S, Chun T, et al. A randomized prospective trial of intrarectal lidocaine for pain control during transrectal prostate biopsy: the Emory University experience. J Urol. 2000;164:397-399.

19. Brawer MK, Chetner MP. Ultrasonography of the prostate and biopsy. In: Walsh PC, Retik AB, Vaughan ED, et al, eds. Campbell's Urology. 7th ed. Philadelphia, Pa: WB Saunders Co; 1997:2506-2517.

20. Benson MC, Whang IS, Pantuck A, et al. Prostate specific antigen density: a means of distinguishing benign prostatic hypertrophy and prostate cancer. J Urol. 1992;147:815-816.

21. Carter HB, Partin AW. Diagnosis and staging of prostate cancer. In: Walsh PC et al, eds. Campbell's Urology. 7th ed. Philadelphia, Pa: WB Saunders Co; 1998:2519-2537.

22. Smith EM, Resnick MI. Imaging of the prostate. In: Lepor H, Lawson RK, eds. Prostate Diseases. Philadelphia, Pa: WB Saunders Co; 1993:72-88.

23. McNeal JE. Regional morphology and pathology of the prostate. Am J Clin Pathol. 1968;49:347.

24. Hernandez AD, Smith JA Jr. Transrectal ultrasonography for the early detection and staging of prostate cancer. Urol Clin North Am. 1990;17:745-757.

25. Melchior SW, Brawer MK. Role of transrectal ultrasound and prostate biopsy. J Clin Ultrasound. 1996;24:463-471.

26. Lee F, Gray JM, McLeary RD, et al. Prostatic evaluation by transrectal sonography: criteria for diagnosis of early carcinoma. Radiology. 1986;158:91-95.

27. Ellis WJ, Brawer MK. The significance of isoechoic prostatic carcinoma. J Urol. 1994;152:2304-2307.

28. Carter HB, Hamper UM, Sheth S, et al. Evaluation of transrectal ultrasound in the early detection of prostate cancer. J Urol. 1989;142:1008-1010.

29. Rifkin MD, Choi H. Implications of small, peripheral hypoechoic lesions in endorectal US of the prostate. Radiology. 1988;166:619-622.

30. Dahnert WF, Hamper UM, Eggleston JC, et al. Prostatic evaluation by transrectal sonography with histopathologic correlation: the echopenic appearance of early carcinoma. Radiology. 1986;158:97-102.

31. Salo JO, Rannikko S, Makinen J, et al. Echogenic structure of prostatic cancer imaged on radical prostatectomy specimens. Prostate. 1987;10:1-9.

32. Lee FL, Torp-Pederson ST, Carroll JT, et al. Use of transrectal ultrasound and prostate-specific antigen in diagnosis of prostatic intraepithelial neoplasia. Urology. 1989;34(suppl):4-8.

33. Hodge KK, McNeal JE, Terris MK, et al. Random systematic versus directed ultrasound guided transrectal core biopsies of the prostate. J Urol. 1989;142:71-75.
34. Levine MA, Ittman M, Melamed J, et al. Two consecutive sets of transrectal ultrasound guided sextant biopsies of the prostate for the detection of prostate cancer. J Urol. 1998;159:471-476.
35. Stamey TA. Making the most out of six systematic sextant biopsies. Urology. 1995;45:2-12.
36. Eskew LA, Bare RL, McCullough DL. Systematic 5 region prostate biopsy is superior to sextant method for diagnosing carcinoma of the prostate. J Urol. 1997;157:199-203.
37. Eskew LA, Woodruff RD, Bare RL, et al. Prostate cancer diagnosed by the 5 region biopsy method is significant disease. J Urol. 1998;160:794-796.
38. Eskew LA, Applewhite JC, McCullough DL. Update of the 5 region prostate biopsy method: the durability of a decreased false negative rate of prostate biopsy. Proc Annu Meet Am Urol Assoc. 1999;1249:324.
39. Chang JJ, Shinohara K, Bhargava V, et al. Prospective evaluation of lateral biopsies of the peripheral zone for prostate cancer detection. J Urol. 1998;160:2111-2114.
40. Presti JC Jr, Chang JJ, Bhargava V, et al. The optimal systematic prostate biopsy scheme should include 8 rather than 6 biopsies: results of a prospective clinical trial. J Urol. 2000;163:163-167.
41. Chen ME, Troncoso P, Johnston DA, et al. Optimization of prostate biopsy strategy using computer based analysis. J Urol. 1997;158:2168-2175.
42. Chen ME, Troncoso P, Tang K, et al. Comparison of prostate biopsy schemes by computer simulation. Urology. 1999;53:951-960.
43. Babaian RJ,Toi A, Kamoi K, et al. A comparative analysis of sextant and an extended 11-core multisite directed biopsy strategy. J Urol. 2000;163:152-157.
44. Bauer JJ, Zeng J,Weir J, et al. Three-dimensional computer-simulated prostate models: lateral prostate biopsies increase the detection rate of prostate cancer. Urology. 1999;53:961-967.
45. Naughton CK, Miller DC, Mager DE, et al. A prospective randomized trial comparing 6 versus 12 prostate biopsy cores: impact on cancer detection. J Urol. 2000;164:388-392.
46. Karakiewicz PI, Bazinet M, Aprikian AG, et al. Value of systematic transition zone biopsies in the early detection of prostate cancer. J Urol. 1996;155:605-606.
47. Terris MK, Pham TQ, Issa MM, et al. Routine transition zone and seminal vesicle biopsies in all patients undergoing transrectal ultrasound guided prostate biopsies are not indicated. J Urol. 1997;157:204-206.
48. Fleshner NE, Fair WR. Indications for transition zone biopsy in the detection of prostatic carcinoma. J Urol. 1997;157:556-558.
49. Epstein JI, Walsh PC, Sauvageot J, et al. Use of repeat sextant and transition zone biopsies for assessing extent of prostate cancer. J Urol. 1997;158:1886-1890.
50. Keetch DW, Catalona WJ. Prostatic transition zone biopsies in men with previous negative biopsies and persistently elevated serum prostatic specific antigen values. J Urol. 1995;154:1795-1797.
51. Lui PD, Terris MK, McNeal JE, et al. Indications for ultrasound guided transition zone biopsies in the detection of prostate cancer. J Urol. 1995;153:1000-1003.
52. Uzzo RG, Wei JT, Waldbaum RS, et al. The influence of prostate size on cancer detection. Urology. 1995;46:831-836.
53. Karakiewicz PI, Bazinet M, Aprikian AG, et al. Outcome of sextant biopsy according to gland volume. Urology. 1997;49:55-59.
54. Applewhite JC, Metwalli AR, McCullough DL. Results of the five-region prostate biopsy method: the effect of gland size and number of cores on yield. In: Proceedings from the 64th Annual Meeting of the Southeastern Section of the American Urological Association, Inc; March 30-April 2, 2000; Orlando, Fla. P-2:131-132.
55. Vashi AP,Wojno KJ, Gillespie B, et al. A model for the number of cores per prostate biopsy based on patient age and prostate gland volume. J Urol. 1998;159:920-924.
56. Chen ME,Troncoso P, Johnston D, et al. Prostate cancer detection: relationship to prostate size. Urology. 1999;53:764-768.

**Reprint Address**

Address reprint requests to Julio M. Pow-Sang, MD, Genitourinary Oncology Program, H. Lee Moffitt Cancer Center & Research Institute, 12902 Magnolia Drive, Tampa, FL 33612. E-mail: powsang@moffitt.usf.edu

0022-5347/03/1691-0012/0
The Journal of Urology®
Copyright © 2003 by American Urological Association

Vol. 169, 12-19, January 2003
Printed in U.S.A.
DOI: 10.1097/01.ju.0000041826.84343.53

# Review Article

## PROSTATE BIOPSY: INDICATIONS AND TECHNIQUE

BRIAN R. MATLAGA, L. ANDREW ESKEW* AND DAVID L. McCULLOUGH†

From the Department of Urology, Wake Forest University School of Medicine, Winston-Salem, North Carolina

### ABSTRACT

Purpose: The last decade has seen numerous modifications in the way prostate cancer is diagnosed. We review the current indications for and methods of prostate biopsy.

Materials and Methods: The English language literature was reviewed regarding major indications for and methods of prostate biopsy. Pertinent peer reviewed articles were collated and analyzed.

Results: The most widely accepted indication for prostate biopsy is a prostate specific antigen (PSA) value of greater than 4.0 ng./ml. However, some investigators advocate prostate biopsy for men with a PSA value in the 2.5 to 4.0 ng./ml. range, believing that use of this parameter results in detection of a greater number of cases of curable disease. Age specific PSA range, percent free PSA and presence of prostatic intraepithelial neoplasia or atypia are all considered to be relative indications for prostate biopsy. The current literature describes a trend toward increasing the number of cores obtained and the sites biopsied beyond those of the standard sextant technique. The additional cores in many series are obtained from more lateral regions of the gland.

Conclusions: Although several criteria are used as indications for initial prostate biopsy, all are based on PSA level and/or abnormal digital rectal examination. Future improvements in currently used prostate cancer markers may result in better selection of cases to biopsy. There is no universally accepted technique of prostate gland biopsy. The current literature supports use of more extensive biopsy techniques to increase the likelihood of prostate cancer detection.

KEY WORDS: biopsy, needle; prostate-specific antigen; prostatic neoplasms; prostate

Diagnosis of prostate cancer requires obtaining cancerous tissue from the prostate gland during biopsy. The advent of transrectal ultrasound has revolutionized prostate biopsy techniques and has greatly increased the diagnostic accuracy of biopsy. The addition of prostate specific antigen (PSA) as a screening tool for prostate cancer has increased the application of transrectal ultrasound and prostate biopsy. With more than 175,000 new cases of prostate cancer diagnosed each year, and many more cases biopsied to rule out carcinoma, transrectal ultrasound with prostate biopsy has become a commonly performed urological procedure. We review the current indications for and methods of prostate biopsy, which have been refined in the last 10 years.

### GENERAL INDICATIONS FOR PROSTATE BIOPSY

*PSA greater than 4.0 ng./ml.* In early studies of prostate cancer detection biopsies were performed for abnormalities on digital rectal examination or transrectal ultrasound but not for PSA abnormalities alone.[1] It was not until 1991 that PSA alone was considered to be an indication for biopsy.[2] Following the introduction of PSA as an indication for prostate biopsy, there was debate regarding whether patients should undergo biopsy if PSA levels were 4 to 10 ng./ml. and no other risk factors, such as an abnormal digital rectal examination or transrectal ultrasound, were present. In 1992 the cancer detection rate for patients with PSA levels of 4 to 10 ng./ml. and normal digital rectal examination was re-

* Financial interest and/or other relationship with Microvasive and Alza Pharmaceuticals.
† Financial interest and/or other relationship with Bayer and Pharmacia.

ported to be 5.5%.[3] Recent data suggest that the current cancer detection rate is 20% to 30% for patients with a PSA of 4 to 10 ng./ml.[3, 4] For this reason, serum PSA greater than 4.0 ng./ml. is considered an indication for biopsy.

*Abnormal digital rectal examination.* Abnormal digital rectal examination is an absolute indication for prostate biopsy. Based on the report of Richie et al, in which 18% of patients with prostate cancer had the disease detected solely by abnormal digital rectal examination, a firm nodule or a diffusely firm prostate should prompt biopsy regardless of serum PSA level.[5] In 1998 Schroder et al reported that digital rectal examination has a poor predictive value in the detection of prostate cancer and should be replaced with a more sensitive test.[6] Since that time, the European Randomized Study of Screening for Prostate Cancer has abandoned use of digital rectal examination as a screening study.[7] However, Carvalhal et al suggest that digital rectal examination be performed in men with a PSA of 1.0 ng./ml. or greater, as an appreciable proportion (14% to 30%) of patients with a suspicious digital rectal examination and a PSA of 1 to 4 ng./ml. will have prostate cancer detected on initial prostate biopsy.[8] At our institution digital rectal examination is routinely performed, since some patients with a suspicious examination and a low PSA will have aggressive prostate cancer.

*Presence of high grade prostatic intraepithelial neoplasia or atypia on prostate biopsy.* While low grade prostatic intraepithelial neoplasia is not considered a precancerous lesion, it has been demonstrated that high grade prostatic intraepithelial neoplasia has a high predictive value for carcinoma on subsequent biopsy. Current data suggest that 27% to 79% of patients found to have prostatic intraepithelial neoplasia on

PROSTATE BIOPSY

14                                    PROSTATE BIOPSY

clinically significant disease with aggressive characteristics.[7,37,38] In contrast to these findings, Carter et al found a minimal difference (2% to 4%) in the probability of detecting curable cancer at PSA levels of 2.5 to 6.0 ng/ml. for all age groups.[39,40] Thus, relative indications for prostate biopsy in the patient with a PSA of 2.5 to 4.0 ng/ml, may include family history of prostate cancer, increased age adjusted PSA and abnormal physical examination.

## TECHNIQUE

*Patient preparation.* The ideal pre-biopsy preparation is efficacious, economical and simple. Although no randomized study has demonstrated the value of a cleansing enema before prostate biopsy, most urologists routinely include this procedure.[41] In addition, pre-biopsy antibiotic prophylaxis has been reported to decrease the rate of infectious complications.[1,42,43] However, there is currently wide discordance among practicing urologists regarding pre-biopsy preparation. A review by Shandera et al of 568 United States urologists revealed the use of 11 different antibiotics with 23 different timing/duration regimens, resulting in 253 possible combinations.[44] This number increases when one considers whether an enema was performed and what antibiotic dosage was used. We routinely use a 3-day course of a quinolone antibiotic beginning the day before biopsy. Patients with valvular heart disease are administered parenteral antibiotics as outlined by the American Heart Association. Cleansing enemas are administered the night before and the morning of the procedure.

In the past many urologists thought that the discomfort associated with prostate biopsy was so mild that local anesthesia was not necessary. However, 65% to 90% of patients undergoing transrectal ultrasound guided biopsy of the prostate claim to experience discomfort.[45,46] In response to these reports there has been interest in finding an effective local anesthetic to allow for a less painful biopsy. Nash et al[47] described transrectal ultrasound guided prostatic nerve blockade with 1% lidocaine, while Issa et al[48] described a local anesthetic technique using 2% lidocaine jelly instilled intrarectally before transrectal ultrasound guided prostate biopsy. A recent randomized trial has shown that periprostatic nerve block with 1% lidocaine provides anesthesia superior to that achieved with intrarectal lidocaine jelly.[49] Finally, intravenous sedation can be used in patients requiring more extensive biopsy sessions.[50,51]

*Sextant technique.* Introduced by Hodge et al in 1989, the sextant technique has been the worldwide gold standard prostate biopsy method.[52] As originally described, the sextant method takes 6 biopsies of the prostate, with specimens obtained from the base, middle and apex of the prostate in the mid lobar parasagittal planes bilaterally.

Although the sextant method was the first described systematic method of prostate biopsy, other methods have demonstrated that the sextant technique as originally described has a false-negative rate of approximately 30%.[53] This false-negative rate is understandable as this method not only involves taking fewer cores, but also samples a smaller percentage of the peripheral zone of the prostate, where 80% of prostatic adenocarcinomas are found. More recently the sextant method has been modified to include more laterally directed biopsies.[54] These biopsies, which have been described as "lateral biopsies" in several studies, include areas of the prostate that have been referred to as the "far lateral region" and "anterior horn."

*Increasing the number of core biopsies.* Multiple in vivo studies have revealed that increasing the number of prostate biopsies enhances prostate cancer detection,[50,51,53,55,56] while 1 study failed to show this phenomenon.[57] Importantly Eskew[58] and Chan[59] et al recently found that increased sampling of the prostate through extended biopsy techniques

does not increase the detection of potentially insignificant tumors, and it appears to detect earlier stage cancer.

*Five region prostate biopsy.* Because the cross-sectional anatomy of the prostate demonstrates an almost 3-fold increase in the peripheral zone of the lateral prostate compared with other areas of the gland, a more extensive method of biopsy was developed to sample the lateral area more thoroughly. Eskew et al performed the first prospective study comparing the sextant biopsy method to an alternative form of biopsy.[58] The 5 region method involves obtaining cores from the traditional sextant regions (6 cores) as well as 4 cores (2 from each side) from the far lateral regions ("anterior horn" or "lateral" biopsies) and 3 midline biopsies.[58,58] Thus, a total of 13 biopsies are obtained (fig. 1). When gland size is greater than 50 cc, an extra core from each region is often obtained. By increasing the number of peripheral zone biopsies, the 5 region technique decreases the false-negative rate by 35%. Eighty-eight percent of the additionally detected cancers are found in the far lateral regions of the prostate gland, which are composed entirely of peripheral zone tissue. More recently this method of biopsy has included taking 3 cores from all 5 biopsy regions. Other studies have used modifications of this technique.



FIG. 1. Cross-sectional and posterior views of prostate reveal peripheral zone (*PZ*) and areas of biopsy (circles). Shaded areas represent additional regions of biopsy using 5 region method. Reprinted with permission.[58]

*Two consecutive sextant biopsies.* Levine et al investigated performing 2 consecutive sextant biopsies in a single biopsy setting.[54] A total of 137 patients were enrolled in this study. The second set of biopsies provided clinically relevant information in 28% of patients as related to detection of high grade prostatic intraepithelial neoplasia or prostate cancer. In addition, the second set of biopsies increased the number of cancers detected by 30%.

*Eleven-core multisite directed biopsy.* Babaian et al investigated an 11-core biopsy method in 362 patients, which included sextant biopsies as well as 1 biopsy from the far lateral region (anterior horn), midline and bilateral transition zones (adjacent and anterior to the urethra) (fig. 2).[55] This study revealed an overall increase of 33% in the prostate cancer detection rate, which was statistically significant. The authors concluded that an extended method of biopsy was tolerated without conscious sedation, and enhanced cancer detection in men undergoing repeat biopsy. This method did not increase cancer detection significantly in patients who were undergoing an initial biopsy. However, only 1 core from the far lateral region and midline was obtained, which may account for this phenomenon.

*Eight systematic biopsies.* Presti et al evaluated systematic prostate biopsy in 483 patients.[56] This biopsy scheme obtains 10 samples from the prostate, 6 samples from the traditional sextant regions and 2 cores from each of the lateral regions (peripheral zones). This method is similar to the 5 region technique, with the exception that the midline biopsies are eliminated. The authors found that systematic cores taken from the traditional sextant region, and lateral base and lateral mid portion of the gland could detect 96% of the cancers diagnosed. Eliminating the mid lobar base core of the sextant biopsy, resulting in the 8-biopsy peripheral zone regimen, decreased cancer detection by only 1% (fig. 3). It is unknown whether 8 systematic biopsies is the optimal number. However, this study is useful in determining which cores can be safely omitted (sextant mid lobar base) without significantly affecting the cancer detection rate.[56] In this study the traditional sextant biopsies missed 20% of the cancers diagnosed. As other studies have shown that cancers are also found at midline aspects of the gland, this biopsy technique may have a higher false-negative rate than other techniques reported.[50,55]

*Saturation biopsy technique for repeat biopsy.* Stewart et al used a saturation prostate biopsy technique to evaluate 224 patients who previously had negative sextant biopsy results and persistent indications for repeat biopsy.[51] The repeat saturation biopsies were performed with the patients under general anesthesia, regional anesthesia or intravenous sedation. An average of 23 cores (range 14 to 45) were obtained during a biopsy session. Using an inward radial step ap-

 

FIG. 3. Initial 10-core technique and proposed final octet technique as recommended by Presti et al.[56] Reprinted with permission [Cookson, M.S.: Technical refinements of transrectal ultrasound-guided needle biopsy and repeat biopsy of the prostate. AUA Update Series, vol. 20, lesson 11, pp. 82–88, 2001].

proach, prostates were biopsied starting at the far lateral peripheral zone (anterior horn) and continuing until the mid gland was reached. The process was then repeated on the contralateral side. Larger prostates required more samples. Interestingly 34% of patients were found to have cancer with this technique. This result compares to 38.4% of patients who had previously undergone negative sextant biopsy who were found to have prostate cancer on repeat biopsy using the 5 region technique.[50] Median time from first negative sextant biopsy to positive saturation biopsy was 2.4 years. The location where cancer was ultimately detected within the prostate gland would be interesting to know but was not reported in this study.

*Relationship of prostate biopsy and gland volume in cancer detection.* There is an inverse relationship between prostate size and the likelihood of finding prostate cancer in a sampling.[61–63] The relative amount of gland that is sampled relies directly on the size of the gland and, thus, the ideal number of cores to take may be dependent on the size of the gland as calculated by transrectal ultrasound. Gland size can affect the yield of prostate biopsy, producing a higher false-negative rate in larger glands.

Stricker et al used the Bayesian theory to demonstrate that for a fixed percentage volume of prostate cancer the probability of finding cancer increases as the number of biopsies increases.[64] This mathematically derived hypothesis supposes that all prostates are of the same volume and, therefore, there is always a fixed percentage volume of cancer for any prostate volume. This approach indicates a bias for finding cancer in smaller glands while the same volume of cancer in a larger gland (smaller percentage volume of cancer) might otherwise remain undetected. If the volume of cancer in a gland is used for clinical decision making, more core samples should be taken when sampling larger glands.

The impact of prostate volume on prostate biopsy results is well described. Uzzo et al reported achieving a cancer detection rate of 23% in glands 50 cc or greater versus 38% in glands less than 50 cc using the sextant biopsy technique.[61] Levine et al also evaluated the positive rate of sextant biopsy according to gland size.[63] In their study population cancer was detected in 43%, 27% and 24% of men with prostate volumes less than 30 cc, 30 to 50 cc and greater than 50 cc, respectively. Applewhite et al used the 5 region technique and reported prostate cancer detection in 50%, 41% and 31% of men with prostate volumes less than 30 cc, 30 to 50 cc and greater than 50 cc, respectively.[65]

*Repeat biopsy population.* The decision regarding whether to perform a repeat biopsy in a patient with persistent indications is a common problem faced by urologists. Low yields from repeat sextant biopsies have been reported in many series, and the cancers missed in an initial biopsy are not necessarily small indolent tumors.[66–69] These cases present



FIG. 2. Schema of prostate depicts 11 sites of biopsy strategy. *R Base,* right base (sextant). *R Mid,* right mid (sextant). *R Apex,* right apex (sextant). *L Base,* left base (sextant). *L Mid,* left mid (sextant). *L Apex,* left apex (sextant). *RAH,* right anterior horn. *LAH,* left anterior horn. *RTZ,* right transition zone. *LTZ,* left transition zone. *ML,* midline. Reprinted with permission.[55]

16                                                    PROSTATE BIOPSY

FROM                                                    (WED)MAR 23 2005 11:35/ST. 11:23/NO. 6312259207 P  1

PROSTATE BIOPSY                                                                    17

confirm the absence of significant rectal hemorrhage. If sig-
nificant rectal bleeding is encountered, a well lubricated vag-
inal pack may be placed in the rectal space for several hours
to provide tamponade of the bleeding site. Alternatively en-
doscopy of the rectum for the treatment of severe rectal
bleeding following prostate biopsy has been described.[62]

Fortunately infectious complications are rare, accounting
for just 2.5% of the complications in the series of Rodriguez
and Terris.[42] Antibiotic prophylaxis ostensibly decreases the
likelihood of infection. Furthermore, individuals with infec-
tious complications, such as fever, chills and urinary tract
infection, can often be treated as outpatients.

CONCLUSIONS

Diagnosis of prostate cancer requires obtaining cancerous
tissue from the prostate gland. Transrectal ultrasound
guided biopsy has emerged as the preferred method and is
widely used in the diagnosis of prostate cancer. In an appro-
priately screened population general indications for prostate
biopsy include abnormal digital rectal examination, PSA
greater than 4.0 ng/ml., presence of high grade prostatic
intraepithelial neoplasia or atypia on prior biopsy, and pal-
pable abnormality and/or increasing PSA after "curative"
therapy for prostate cancer. Relative indications for biopsy
include age adjusted PSA increase, low percent free PSA
(25% or less) and a PSA velocity of greater than 0.75 ng/ml.
per year. Decreasing the PSA biopsy cut point to 2.5 ng/ml.
to increase the likelihood of detecting organ confined disease
has been advocated by some investigators. However, this
lower cut point has not yet been widely accepted as an indi-
cation for prostate biopsy. In addition, standard patient prep-
aration for biopsy varies. However, pre-biopsy enemas and
antibiotics are commonly used.

Once the gold standard method of biopsy, the sextant tech-
nique has been shown by several studies to yield a false-
negative rate of approximately 30%. Contemporary biopsy
strategies have consistently decreased the false-negative rate
of the sextant biopsy by taking additional laterally directed
samples. Larger prostate glands may require additional bi-
opsies to detect clinically significant cancer.

The literature supports increasing the number of cores in
the repeat biopsy population to maximize prostate cancer
diagnosis. It is rare to find isolated disease in transition zone
biopsies, although biopsy of this area may in some cases
demonstrate cancer. Finally, there is a need to standardize
the method and nomenclature of extended biopsy technique
in terms of reading and understanding the literature involv-
ing prostate biopsy.

REFERENCES

1. Cooner, W. H., Mosley, B. R., Rutherford, C. L., Jr., Beard, J. H.,
   Pond, H. S., Terry, W. J. et al: Prostate cancer detection in a
   clinical urological practice by ultrasonography. Digital rectal
   examination and prostate specific antigen. J Urol, 143: 1146,
   1990
2. Catalona, W. J., Smith, D. S., Ratliff, T. L., Dodds, K. M., Coplen,
   D. E., Yuan, J. J. et al: Measurement of prostate-specific
   antigen in serum as a screening test for prostate cancer.
   N Engl J Med, 324: 1156, 1991
3. Stamey, T. A. and McNeal, J. E.: Adenocarcinoma of the pros-
   tate. In: Campbell's Urology, 6th ed. Edited by P. C. Walsh,
   A. B. Retik, T. A. Stamey and E. D. Vaughan, Jr. Philadelphia:
   W. B. Saunders Co., 1992
4. Oesterling, J. E., Jacobsen, S. J., Chute, C. G., Guess, H. A.,
   Girman, C. J., Panser, L. A. et al: Serum prostate-specific
   antigen in a community-based population of healthy men.
   Establishment of age-specific reference ranges. JAMA, 270:
   860, 1993
5. Richie, J. P., Catalona, W. J., Ahmann, F. R., Hudson, M. A.,
   Scardino, P. T., Flanigan, R. C. et al: Effect of patient age on
   early detection of prostate cancer with serum prostate-specific
   antigen and digital rectal examination. Urology, 42: 365, 1993
6. Schroder, F. H., van der Maas, P., Beemsterboer, P., Kruger,
   A. B., Hoedemaeker, R., Rietbergen, J. et al: Evaluation of the
   digital rectal examination as a screening test for prostate
   cancer. Rotterdam section of the European Randomised Study
   of Screening for Prostate Cancer. J Natl Cancer Inst, 90: 1817,
   1998
7. Schröder, F. H., van der Cruijsen-Koeter, I., de Koning, H. J.,
   Vis, A. N., Hoedemaeker, R. F. and Kranse, R.: Prostate cancer
   detection at low prostate specific antigen. J Urol, 163: 806,
   2000
8. Carvalhal, G. F., Smith, D. S., Mager, D. E., Ramos, C. and
   Catalona, W. J.: Digital rectal examination for detecting pros-
   tate cancer at prostate specific antigen levels of 4 ng/ml. or
   less. J Urol, 161: 835, 1999
9. Aboseif, S., Shinohara, K., Weidner, N., Narayan, P. and Carroll,
   P. R.: The significance of prostate intra-epithelial neoplasia.
   Br J Urol, 76: 355, 1995
10. Raviv, G., Janssen, T., Zlotta, A. R., Descamps, F., Verhest, A.
    and Schulman, C. C.: Prostatic intraepithelial neoplasia: in-
    fluence of clinical and pathological data on the detection of
    prostate cancer. J Urol, 156: 1050, 1996
11. Langer, J. E., Rovner, E. S., Coleman, B. G., Yin, D., Arger, P. H.,
    Malkowicz, S. B. et al: Strategy for repeat biopsy of patients
    with prostatic intraepithelial neoplasia detected by prostate
    needle biopsy. J Urol, 155: 228, 1996
12. Wills, M. L., Hamper, U. M., Partin, A. W. and Epstein, J. I.:
    Incidence of high-grade prostatic intraepithelial neoplasia in
    sextant needle biopsy specimens. Urology, 49: 367, 1997
13. O'dowd, G. J., Miller, M. C., Orozco, R. and Veltri, R. W.:
    Analysis of repeated biopsy results within 1 year after a non-
    cancer diagnosis. Urology, 55: 553, 2000
14. Davidson, D., Bostwick, D. G., Qian, J., Wollan, P. C., Oesterling,
    J. E., Rudders, R. A. et al: Prostatic intraepithelial neoplasia is
    a risk factor for adenocarcinoma: predictive accuracy in needle
    biopsies. J Urol, 154: 1295, 1995
15. Bostwick, D. G., Amin, M. B., Dundore, P., Marsh, W. and Schultz,
    D. S.: Architectural patterns of high-grade prostatic intraepi-
    thelial neoplasia. Hum Pathol, 24: 298, 1993
15. Berner, A., Danielsen, H. E., Pettersen, E. O., Fossa, S. D., Reith,
    A. and Nesland, J. M.: DNA distribution in the prostate.
    Normal gland, benign and premalignant lesions, and subse-
    quent adenocarcinomas. Anal Quant Cytol Histol, 15: 247,
    1993
16. Chan, T. Y. and Epstein, J. I.: Follow-up of atypical prostate
    needle biopsies suspicious for cancer. Urology, 53: 351, 1999
17. Park, S., Shinohara, K., Grossfeld, G. D. and Carroll, P. R.:
    Prostate cancer detection in men with prior high grade pros-
    tatic intraepithelial neoplasia or atypical prostate biopsy.
    J Urol, 165: 1409, 2001
18. Iczkowski, K. A. and Bostwick, D. G.: Prostate biopsy interpre-
    tation. Current concepts, 1999. Urol Clin North Am, 26: 435,
    1999
19. Trapasso, J. G., deKernion, J. B., Smith, R. B. and Dorey, F.: The
    incidence and significance of detectable levels of serum pros-
    tate specific antigen after radical prostatectomy. J Urol, 152:
    1821, 1994
20. Foster, L. S., Jajodia, P., Fournier, G., Jr., Shinohara, K.,
    Carroll, P. and Narayan, P.: The value of prostate specific
    antigen and transrectal ultrasound guided biopsy in detecting
    prostatic fossa recurrences following radical prostatectomy.
    J Urol, 149: 1024, 1993
21. Koppie, T. M., Grossfeld, G. D., Nudell, D. M., Weinberg, V. K.
    and Carroll, P. R.: Is anastomotic biopsy necessary before
    radiotherapy after radical prostatectomy? J Urol, 166: 111,
    2001
22. Catalona, W. J., Hudson, M. A., Scardino, P. T., Richie, J. P.,
    Ahmann, F. R., Flanigan, R. C. et al: Selection of optimal
    prostate specific antigen cutoffs for early detection of prostate
    cancer: receiver operating characteristic curves. J Urol, 152:
    2037, 1994
23. Lilja, H., Christensson, A., Dahlen, U., Matikainen, M. T.,
    Nilsson, O., Pettersson, K. et al: Prostate-specific antigen in
    serum occurs predominantly in complex with alpha
    1-antichymotrypsin. Clin Chem, 37: 1618, 1991
24. Catalona, W. J., Smith, D. S., Wolfert, R. L., Wang, T. J.,
    Rittenhouse, H. C., Ratliffe, T. L. et al: Evaluation of percent-
    age of free serum prostate-specific antigen to improve speci-
    ficity of prostate cancer screening. JAMA, 274: 1214, 1995
25. Catalona, W. J., Partin, A. W., Slawin, K. M., Brawer, M. K.,
    Flanigan, R. C., Patel, A. et al: Use of the percentage of free
    prostate-specific antigen to enhance differentiation of prostate

FROM                                              (WED)MAR 23 2005 11:36/ST. 11:23/NO. 6312255920/ P  2

18                                    PROSTATE BIOPSY

cancer from benign prostatic disease: a prospective multi-center clinical trial. JAMA, 279: 1542, 1998

26. Chen, Y. T., Luderer, A. A., Thiel, R. P., Carlson, G., Cuny, C. L. and Soriano, T. F.: Using proportions of free to total prostate-specific antigen, age, and total prostate-specific antigen to predict the probability of prostate cancer. Urology, 47: 518, 1996

27. Carter, H. B., Pearson, J. D., Metter, E. J., Brant, L. J., Chan, D. W., Andres, R. et al: Longitudinal evaluation of prostate-specific antigen levels in men with and without prostate disease. JAMA, 267: 2215, 1992

28. Smith, D. S. and Catalona, W. J.: Rate of change of serum prostate specific antigen levels as a method for prostate cancer detection. J Urol, 152: 1163, 1994

29. Nadler, R. B., Humphrey, P. A., Smith, D. S., Catalona, W. J. and Ratliff, T. L.: Effect of inflammation and benign prostatic hyperplasia on elevated serum prostate specific antigen levels. J Urol, 154: 407, 1995

30. Seaman, E., Whang, M., Olsson, C. A., Katz, A., Cooner, W. H. and Benson, M. C.: PSA density (PSAD), Role in patient evaluation and management. Urol Clin North Am, 20: 653, 1993

31. Bare, R., Hart, L. and McCullough, D. L.: Correlation of prostate-specific antigen and prostate-specific antigen density with outcome of prostate biopsy. Urology, 43: 191, 1994

32. Brawer, M. K., Aramburu, E. A. G., Chen, G. L., Preston, S. D. and Ellis, W. J.: The inability of prostate specific antigen index to enhance the predictive value of prostate specific antigen in the diagnosis of prostatic carcinoma. J Urol, 150: 369, 1993

33. Catalona, W. J., Southwick, P. C., Slawin, K. M., Partin, A. W., Brawer, M. K., Flanigan, R. C. et al: Comparison of percent free PSA, PSA density, and age-specific PSA cutoffs for prostate cancer detection and staging. Urology, 56: 255, 2000

34. Catalona, W. J., Ramos, C. C., Carvalhal, G. F. and Yan, Y.: Lowering PSA cutoffs to enhance detection of curable prostate cancer. Urology, 55: 791, 2000

35. Catalona, W. J., Smith, D. S. and Ornstein, D. K.: Prostate cancer detection in men with serum PSA concentrations of 2.6 to 4.0 ng/ml and benign prostate examination. Enhancement of specificity with free PSA measurements. JAMA, 277: 1452, 1997

36. Smith, D. S., Carvalhal, G. F., Mager, D. E., Bullock, A. D. and Catalona, W. J.: Use of lower prostate specific antigen cutoffs for prostate cancer screening in black and white men. J Urol, 160: 134, 1998

37. Smith, D. S., Catalona, W. J. and Herschman, J. D.: Longitudinal screening for prostate cancer with prostate-specific antigen. JAMA, 276: 1309, 1996

38. Gann, P. H., Hennekens, C. H. and Stampfer, M. J.: A prospective evaluation of plasma prostate-specific antigen for detection of prostate cancer. JAMA, 273: 289, 1995

39. Carter, H. B.: A PSA threshold of 4.0 ng/mL for early detection of prostate cancer: the only rational approach for men 50 years old and older. Urology, 55: 796, 2000

40. Carter, H. B., Epstein, J. I. and Partin, A. W.: Influence of age and prostate-specific antigen on the chance of curable prostate cancer among men with nonpalpable disease. Urology, 53: 126, 1999

41. Carey, J. M. and Korman, H. J.: Transrectal ultrasound guided biopsy of the prostate. Do enemas decrease clinically significant complications? J Urol, 166: 82, 2001

42. Rodriguez, L. V. and Terris, M. K.: Risks and complications of transrectal ultrasound guided prostate needle biopsy: a prospective study and review of the literature. J Urol, 160: 2115, 1998

43. Kapoor, D. A., Klimberg, I. W., Malck, G. H., Wegenke, J. D., Cox, C. E., Patterson, A. L. et al: Single-dose oral ciprofloxacin versus placebo for prophylaxis during transrectal prostate biopsy. Urology, 52: 552, 1998

44. Shandera, K. C., Thibault, G. P. and Deshon, G. E., Jr.: Variability in patient preparation for prostate biopsy among American urologists. Urology, 52: 644, 1998

45. Clements, R., Aideyan, O. U., Griffiths, G. J. and Peeling, W. B.: Side effects and patient acceptability of transrectal biopsy of the prostate. Clin Radiol, 47: 125, 1993

46. Collins, G. N., Lloyd, S. N., Hehir, M. and McKelvie, G. B.: Multiple transrectal ultrasound-guided prostatic biopsies—true morbidity and patient acceptance. Br J Urol, 71: 460, 1993

47. Nash, P. A., Bruce, J. E., Indudhara, R. and Shinohara, K.: Transrectal ultrasound guided prostatic nerve blockade eases systematic needle biopsy of the prostate. J Urol, 155: 607, 1996

48. Issa, M. M., Bux, S., Chun, T., Petros, J. A., Labadia, A. J., Anastasia, K. et al: A randomized prospective trial of intrarectal lidocaine for pain control during transrectal prostate biopsy: the Emory University experience. J Urol, 164: 397, 2000

49. Alavi, A. S., Soloway, M. S., Vaidya, A., Lynne, C. M. and Cheiler, E. L.: Local anesthesia for ultrasound guided prostate biopsy: a prospective randomized trial comparing 2 methods. J Urol, 166: 1343, 2001

50. Eskew, L. A., Bare, R. L. and McCullough, D. L.: Systematic 5 region prostate biopsy is superior to sextant method for diagnosing carcinoma of the prostate. J Urol, 157: 199, 1997

51. Stewart, C. S., Leibovich, B. C., Weaver, A. L. and Lieber, M. M.: Prostate cancer diagnosis using a saturation needle biopsy technique after previous negative sextant biopsies. J Urol, 166: 86, 2001

52. Hodge, K. K., McNeal, J. E., Terris, M. K. and Stamey, T. A.: Random systematic versus directed ultrasound-guided transrectal core biopsies of the prostate. J Urol, 142: 71, 1989

53. Levine, M. A., Ittman, M., Melamed, J. and Lepor, H.: Two consecutive sets of transrectal ultrasound guided sextant biopsies of the prostate for the detection of prostate cancer. J Urol, 159: 471, 1998

54. Stamey, T. A.: Making the most out of six systematic sextant biopsies. Urology, 45: 2, 1995

55. Babaian, R. J., Toi, A., Kamoi, K., Troncoso, P., Sweet, J., Evans, R. et al: A comparative analysis of sextant and an extended 11-core multisite directed biopsy strategy. J Urol, 163: 152, 2000

56. Presti, J. C., Jr., Chang, J. J., Bhargava, V. and Shinohara, K.: The optimal systematic prostate biopsy scheme should include 8 rather than 6 biopsies: results of a prospective clinical trial. J Urol, 163: 163, 2000

57. Naughton, C. K., Miller, D. C., Mager, D. E., Ornstein, D. K. and Catalona, W. J.: A prospective randomized trial comparing 6 versus 12 prostate biopsy cores: impact on cancer detection. J Urol, 164: 388, 2000

58. Eskew, L. A., Woodruff, R. D., Bare, R. L. and McCullough, D. L.: Prostate cancer diagnosed by the 5 region biopsy method is significant disease. J Urol, 160: 794, 1998

59. Chan, T. Y., Chan, D. Y., Lecksell, K., Stutzman, R. E. and Epstein, J. I.: Does increased needle biopsy sampling of the prostate detect a higher number of potentially insignificant tumors? J Urol, 166: 2181, 2001

60. Applewhite, J. C., Matlaga, B. R. and McCullough, D. L.: Results of the 5 region prostate biopsy method: the repeat biopsy population. J Urol, 168: 500, 2002

61. Uzzo, R. G., Wei, J. T., Waldbaum, R. S., Perlmutter, A. P., Byrne, J. C. and Vaughan, E. D., Jr.: The influence of prostate size on cancer detection. Urology, 46: 831, 1995

62. Karakiewicz, P. I., Bazinet, M., Aprikian, A. G., Trudel, C., Aronson, S., Nachabe, M. et al: Outcome of sextant biopsy according to gland volume. Urology, 49: 55, 1997

63. Vashi, A. R., Wojno, K. J., Gillespie, B. and Oesterling, J. E.: A model for the number of cores per prostate biopsy based on patient age and prostate gland volume. J Urol, 159: 920, 1998

64. Stricker, H. J., Ruddock, L. J., Wan, J. and Belville, W. D.: Detection of non-palpable prostate cancer, A mathematical and laboratory model. Br J Urol, 71: 43, 1993

65. Applewhite, J. C., Matlaga, B. R. and McCullough, D. L.: Results of the 5 region prostate biopsy method: the repeat biopsy population. J Urol, 168: 500, 2002

66. Epstein, J. I., Walsh, P. C., Akingba, G. and Carter, H. B.: The significance of prior benign needle biopsies in men subsequently diagnosed with prostate cancer. J Urol, 162: 1649, 1999

67. Ellis, W. J. and Brawer, M. K.: Repeat prostate needle biopsy: who needs it? J Urol, 153: 1496, 1995

68. Keetch, D. W., Catalona, W. J. and Smith, D. S.: Serial prostatic biopsies in men with persistently elevated serum prostate specific antigen values. J Urol, 151: 1571, 1994

69. Fleshner, N. E., O'Sullivan, M. and Fair, W. R.: Prevalence and predictors of a positive repeat transrectal ultrasound guided needle biopsy of the prostate. J Urol, 158: 505, 1997

70. Borboroglu, P. G., Comer, S. W., Riffenburgh, R. H. and Amling,

FROM

(WED)MAR 23 2005 11:37/ST. 11:23/NO. 6312259207 P 3

C. L.: Extensive repeat transrectal ultrasound guided prostate biopsy in patients with previous benign sextant biopsies. J Urol, 163: 158, 2000

71. Perrotti, M., Han, K.-R., Epstein, R. E., Kennedy, E. C., Rabbani, F., Badani, K. et al: Prospective evaluation of endorectal magnetic resonance imaging to detect tumor foci in men with prior negative prostatic biopsy: a pilot study. J Urol, 162: 1314, 1999

72. Bazinet, M., Karakiewicz, P. I., Aprikian, A. G., Trudel, C., Aronson, S., Nachabé, M. et al: Value of systematic transition zone biopsies in the early detection of prostate cancer. J Urol, 155: 605, 1996

73. Terris, M. K., Pham, T. Q., Issa, M. M. and Kabalin, J. N.: Routine transition zone and seminal vesicle biopsies in all patients undergoing transrectal ultrasound guided prostate biopsies are not indicated. J Urol, 157: 204, 1997

74. Fleshner, N. E. and Fair, W. R.: Indications for transition zone biopsy in the detection of prostatic carcinoma. J Urol, 157: 556, 1997

75. Epstein, J. I., Walsh, P. C., Sauvageot, J. and Carter, H. B.: Use of repeat sextant and transition zone biopsies for assessing extent of prostate cancer. J Urol, 158: 1886, 1997

76. Koetch, D. W. and Catalona, W. J.: Prostatic transition zone biopsies in men with previous negative biopsies and persistently elevated serum prostatic specific antigen values. J Urol, 154: 1795, 1995

77. Lui, P. D., Terris, M. K., McNeal, J. E. and Stamey, T. A.: Indications for ultrasound guided transition zone biopsies in the detection of prostate cancer. J Urol, 153: 1000, 1995

78. Chen, M. E., Troncoso, P., Tang, K., Babaian, R. J. and Johnston, D.: Comparison of prostate biopsy schemes by computer simulation. Urology, 53: 951, 1999

79. Seaman, E. K., Sawczuk, I. S., Fatal, M., Olsson, C. A. and Shabsigh, R.: Transperineal prostate needle biopsy guided by transurethral ultrasound in patients without a rectum. Urology, 47: 353, 1996

80. Shinghal, R. and Terris, M. K.: Limitations of transperineal ultrasound-guided prostate biopsies. Urology, 54: 706, 1999

81. Norberg, M., Holmberg, L., Haggman, M. and Magnusson, A.: Determinants of complications after multiple transrectal core biopsies of the prostate. Eur Radiol, 6: 457, 1996

82. Brullet, E., Guevara, M. C., Campo, R., Falco, J., Puig, J., Prera, A. et al: Massive rectal bleeding following transrectal ultrasound-guided prostate biopsy. Endoscopy, 32: 792, 2000

# EXHIBIT 15
# Part B

BJU International (2002), 89, 33–39

# Improving prostate cancer detection with an extended-core transrectal ultrasonography-guided prostate biopsy protocol

G.C. DURKAN, N. SHEIKH, P. JOHNSON, A.J. HILDRETH* and D.R. GREENE
*Departments of Urology and *Clinical Audit, Sunderland Royal Hospital, Sunderland, UK*

**Objective** To investigate whether taking two transition zone (TZ) and four lateral peripheral zone (PZ) biopsies in addition to routine parasagittal sextant biopsies would improve detection rates in men with suspected prostate cancer.

**Patients and methods** The study included 493 consecutive men (mean age 68.7 years, sd 8.2) with elevated serum prostate-specific antigen (PSA) levels and/or abnormal findings on a digital rectal examination who underwent transrectal ultrasonography-guided prostate biopsy. In addition to sextant biopsies, six further biopsies were obtained, two from the TZ (mid-gland) and four from the lateral PZ (base and mid-gland). Pathological findings for the additional biopsies were compared with those of the sextant regions.

**Results** Prostatic adenocarcinoma was diagnosed in 164 of the 493 (33%) men biopsied. Men with cancer were older, had smaller prostates and higher median PSA levels than men with negative biopsies. Sextant biopsies were positive for cancer in 133 of 164 (81%) men. All three sets of biopsies were positive in 53 (32%) cases. In 50 (30%) men both the sextant

and lateral PZ biopsies were positive, while in six (4%) men, both sextant and TZ biopsies were positive. Thirty-one (19%) tumours were not detected by sextant biopsies, 10 (6%) where the lateral PZ biopsies alone were positive, 17 (10%) where the TZ biopsies alone were positive and four (3%) where both the TZ and lateral PZ together were positive. There were no differences in median PSA concentration, total prostate volume or TZ volume between men with an isolated TZ cancer and men with cancer elsewhere in the prostate. However, 77% of men with TZ cancer had a PSA of $>10$ ng/mL, compared with 60% of men with cancer at other sites within the prostate ($P = 0.015$).

**Conclusion** An extended-core biopsy protocol significantly improves the detection rate for prostate cancer when compared with the standard sextant biopsy protocol alone. Routine TZ biopsies should be considered for men with serum PSA levels of $>10$ ng/mL.

**Keywords** prostate, biopsy, diagnosis, ultrasonography, morbidity

## Introduction

TRUS-guided needle biopsy of the prostate has become the procedure of choice for obtaining high-quality tissue cores for histopathological assessment in the patient with suspected prostate cancer. The procedure is considered to be safe, well tolerated by patients and can be administered on an outpatient basis with no need for intravenous sedation or narcotic analgesia. In 1989, it was conclusively shown that random systematic sextant biopsies were superior to lesion-directed biopsies in detecting prostate cancer [1]. The sextant method has since become widely accepted as the 'gold standard' biopsy technique in which bilateral parasagittal tissue cores are obtained $\approx 1$ cm apart from the base, mid-gland and apical portions of the prostate, respectively [1]. However, concern has arisen that the sextant biopsy

method under-samples the prostate and consequently may fail to detect a significant proportion of clinically important tumours [2]. With this in mind, several issues arise when considering what constitutes the optimal biopsy strategy for the patient with suspected prostate cancer. How many biopsies should be taken to maximize cancer detection? What regions of the prostate should be biopsied? In addition, to maintain the reputation of TRUS-guided biopsy as a safe procedure, a compromise must be reached between the benefits of a definitive histological diagnosis and the potential for greater morbidity when taking more biopsy cores.

Levine et al. [3] reported an increase of 30% in cancer detection rates by taking two consecutive sets of sextant biopsies at a single visit, with no reported increase in morbidity. However, others have shown that taking more biopsies without altering the angle of the biopsy needle or changing the regions of the prostate sampled may not improve cancer detection rates. Ravery et al. [4] took

Accepted for publication 1 October 2001

© 2002 BJU International

(KED)/MAK 25 2003 11.37/31. 11.23/NO. 0312239207  P  5

34   G.C. DURKAN et al.

10 systematic biopsies in 162 patients with suspected prostate cancer (PSA >4 ng/mL, with or without an abnormal DRE). In addition to the standard sextant biopsy regimen, two further parasaggital biopsies were obtained bilaterally, one between the standard apical and mid-gland biopsy sites, the other between the mid-gland and basal biopsy sites. Five biopsies were taken from each side of the prostate, all in the same plane and at the same angle. The additional biopsies yielded only a 3% diagnostic improvement when compared with systematic sextant biopsies alone [4].

Most prostate cancers arise in the peripheral zone (PZ) [5], a region that may be compressed by the expanding transition zone (TZ) when there is significant BPH. To improve PZ sampling it has been proposed that needle placement for systematic biopsies be directed more laterally [6], so that the biopsy tract traverses more of the PZ and encompasses the lateral PZ. In prospective studies, the addition of lateral PZ biopsies to the standard sextant protocol detected an additional 14–31% of cancers that would have remained undetected by the sextant method alone [7,8]. The combination of sextant and lateral PZ biopsies significantly increased cancer detection while almost eliminating the need for lesion-directed biopsies [8].

Although most prostate cancers originate in the PZ, up to 24% may arise in the TZ [5] and would therefore be missed by any biopsy protocol that sampled only the PZ. Isolated TZ tumours are thought to have a favourable prognosis, being of low Gleason grade, infrequently associated with prostatic intraepithelial neoplasia (PIN) [9] and often discovered incidentally at TURP. Some have advocated routine TZ biopsies for all men presenting with a raised PSA level but a normal DRE [10]. In a prospective trial of 187 patients who underwent TZ and sextant biopsies, 26% of tumours detected were confined exclusively to the TZ [11]. However, the subgroup with the highest rates of isolated TZ cancer were those patients with a high suspicion of prostate cancer but a previous negative biopsy, suggesting that routine TZ biopsy be reserved for such individuals. Most other contemporary series examining the indications for TZ biopsy have reported significantly lower rates (1.8–2.9%) of cancer confined exclusively to the TZ and concluded that routine TZ biopsy in all patients with suspected prostate cancer is not indicated [12–15].

Many of the published studies examining the issues surrounding TRUS-guided prostate biopsy have been conducted on asymptomatic men with screening-detected tumours and relatively low serum PSA (<20 ng/mL) levels. In the UK, at present there is no national screening programme for prostate cancer (although a clinical trial has recently begun) and most tumours are detected on a 'case-finding' basis. In contemporary urological practice in the UK the largest group of patients referred with suspected prostate cancer are men presenting to their GP, or to a nurse-led prostate-assessment clinic, with bothersome LUTS and who subsequently undergo PSA testing. To determine the optimal biopsy strategy for such patients with suspected prostate cancer referred to our department for assessment, we undertook a prospective study to evaluate whether an extended-core biopsy protocol incorporating routine TZ biopsies and lateral PZ biopsies, in addition to the standard sextant technique, would improve the overall detection rate for prostate cancer.

## Patients and methods

After obtaining ethical committee approval, between June 1998 and August 2000, 493 consecutive men with suspected prostate cancer were prospectively enrolled in the study. Before attending for biopsy, all patients were provided with an information booklet that clearly explained the procedure of TRUS-guided biopsy and risk of common complications of prostate biopsy, including UTI, rectal bleeding, haematuria and haematospermia. The mean (SD, range) age of patients undergoing biopsy was 68.7 (8.2, 44–89) years. All patients consented to undergo an extended-core biopsy protocol before inserting the probe. The indications for TRUS were an elevated PSA (>4.0 ng/mL) and/or an abnormal DRE. All studies were performed using a diagnostic ultrasonography unit (system 3535®, Bruel and Kjaer, Denmark) with a 7-MHz biplanar transrectal probe (model 8551). All patients were thoroughly examined by TRUS before biopsy; accurate measurements to calculate prostate volume (using the prostate ellipsoid formula) were available for 424 patients studied.

Sextant biopsies were taken routinely ≈ 1 cm apart in the parasaggital plane bilaterally, at the base, mid-gland and apical regions of the prostate, as described by Hodge et al. [1]. In addition, six further biopsies were obtained, two from the TZ and four from the lateral PZ, as depicted in Fig. 1. The TZ biopsies were taken at the level of the mid-gland where the TZ was most prominent. The lateral PZ biopsies were taken by positioning the probe just medial to the lateral edge of the prostate at the base and mid-gland regions bilaterally, as described by Chang et al. [8]. This method generally allowed any area of DRE abnormality or suspicious hypoechoic lesion noted on TRUS to be incorporated into the biopsy protocol. All patients underwent the same biopsy strategy with no variance for gland size. Biopsies were obtained using an 18 G core-biopsy needle mounted on a spring-loaded automatic biopsy gun. All patients were placed in the left lateral decubitus ('knee-chest') position and all were examined with no prior bowel preparation. The

© 2002 BJU International 89, 33–39

PROSTATE CANCER DETECTION WITH EXTENDED-CORE TRUS-GUIDED BIOPSIES  35



Fig. 1. A schematic diagram of the prostate, depicting the 12-core extended biopsy protocol; circles, routine sextant biopsies; squares, transition zone biopsies; *, lateral peripheral zone biopsies.



Fig. 2. The clinical stage of extended-core biopsy-detected prostate cancers.



Fig. 3. The grade (Gleason sum) of extended-core biopsy-detected tumours.

procedure was generally well tolerated and no patient required intravenous sedation or narcotic analgesia. All TRUS was undertaken by the same operators (D.R.G. and N.S.), either personally, or when supervising a higher urological trainee.

Biopsy cores taken from the sextant regions, TZ and lateral PZ were labelled and submitted separately in formalin-filled containers to the Department of Pathology, Sunderland Royal Hospital, where they were processed, paraffin-embedded and examined histologically for the presence of cancer by consultant pathologists. All patients were given a metronidazole (1 g) suppository after biopsy and were prescribed a 3-day course of amoxicillin/clavulinic acid, or ciprofloxacin if penicillin-allergic. PSA was measured before biopsy in all cases using the Immulite 2000³⁰ assay (Diagnostic Products Corp., Gwynedd, Wales, UK). When the final histological diagnoses were available, the outcome and cancer detection rates for the various anatomical regions biopsied were determined and compared. The histological diagnoses in the case of patients with biopsies negative for cancer were also recorded. Serum PSA levels and prostate volumes for men with positive and negative biopsies were compared using nonparametric analyses, with $P < 0.5$ considered significant. Data for minor complications of biopsy were not available, because they were self-limiting and treated by either the patient or their GP. However, complication rates for any patient with major morbidity after biopsy that required in-patient treatment were recorded accurately.

## Results

Prostate cancer was detected in 164 of 493 patients, giving a cancer detection rate of 33%; 177 patients (36%) had an abnormal DRE and of these, 72 (40%) had positive biopsies. Most tumours detected (90%) were

clinically organ-confined (<T3) on DRE and 56% of tumours overall were stage T1c (Fig. 2). The commonest tumour grade (41%) was Gleason 3+3 (Fig. 3). Men with cancer on biopsy tended to be older, with higher serum PSA levels and smaller prostates than men with negative biopsies, although there was considerable overlap between the groups. The characteristics of patients with positive and negative biopsies are compared in Table 1. Where extended-core biopsies were negative for malignancy, the biopsy outcome fell into five main categories, i.e. BPH, 176 (53%); prostatitis, 118 (36%); atypical (suspicious), 21 (6%); high-grade PIN, six (2%); and low-grade PIN, eight (3%), with BPH the commonest histological diagnosis. Over the course of the study, 18 patients (3.6%) developed complications after biopsy serious enough to warrant hospital admission (Table 2). Most patients were discharged within 3 days although both patients with Gram-negative septicaemia required extended stays of 6 and 8 days, respectively. Eight patients required catheterization, four each (0.8%) for

© 2002 BJU International 89, 33–39

FROM

(WED)MAR 23 2005 11:38/ST. 11:23/NO. 6312259207 P  7

36  G.C. DURKAN *et al.*

Table 1 Characteristics of patient groups with positive (cancer detected) and negative (cancer not detected) prostate biopsies.

| Characteristic | Positive | Negative | P |
|---|---|---|---|
| Number (%) | 164 (33) | 329 (67) | — |
| Mean (m, range) age, years | 70.7 (8.2, 44–89) | 67.7 (8.0, 44–85) | <0.001 |
| Median (range): | | | |
| PSA, ng/mL | 14.5 (1.4–901) | 8.0 (0.5–59.9) | <0.001 |
| Prostate volume, mL | 36 (11–91) | 45 (12–172) | <0.001 |

36   G.C. DURKAN *et al.*

Table 1 Characteristics of patient groups with positive (cancer detected) and negative (cancer not detected) prostate biopsies.

| Characteristic | Positive | Negative | P |
|---|---|---|---|
| Number (%) | 164 (33) | 329 (67) | – |
| Mean (sd, range) age, years | 70.7 (8.2, 44–89) | 67.7 (8.0, 44–85) | <0.001 |
| Median (range): | | | |
| PSA, ng/mL | 14.5 (1.4–901) | 8.0 (0.5–59.9) | <0.001 |
| Prostate volume, mL | 36 (11–91) | 45 (12–172) | <0.001 |

Table 2 The incidence of serious complications requiring hospital admission after extended-core prostate biopsies

| Complication | Number (%) |
|---|---|
| Acute urinary retention | 4 (0.8) |
| Haematuria requiring catheterization | 4 (0.8) |
| Complicated UTI | 4 (0.8) |
| Epididymo-orchitis | 3 (0.6) |
| Septicaemia (culture-proven) | 2 (0.4) |
| Acute bacterial prostatitis | 1 (0.2) |
| Total | 18 (3.6) |

acute urinary retention and haematuria that required a bladder washout and overnight irrigation. All voided spontaneously after catheter removal.

Routine sextant biopsies detected 133 cancers (81% of all cancers detected). Cancer was confined exclusively to the sextant region in 24 (15%) men and was detected in all three biopsy regions (sextant, lateral PZ and TZ) in 53 (32%) men, indicating extensive tumour within the prostate. If lateral PZ biopsies only had been taken 117 (71%) cancers would have been detected, whereas taking biopsies in the TZ only would have detected 71 (49%) cancers. A biopsy protocol combining sextant and lateral PZ biopsies would have detected 90% of tumours, whereas 94% of cancers would have been diagnosed with a combination of sextant and TZ biopsies. The sextant method failed to detect 19% of cancers, 17 (10%) confined exclusively to the TZ and 10 (6%) confined exclusively to the lateral PZ. A further four (3%) cancers were detected in both TZ and lateral PZ biopsies where the sextant biopsies had been negative for cancer. Detection rates and number of positive biopsies from each anatomical region are shown in Fig. 4.

To assess the effect of prostate volume on biopsy outcome, the 424 patients in whom volume-based measurements were available were stratified into those with total prostate volumes either above or below 50 mL. Volume-based measurements were available for 137 of the 164 men with positive biopsies and 74% had prostates of <50 mL. Most (66%) of the additional tumours detected, that would have otherwise remained undetected with sextant biopsies, were in men with smaller



Fig. 4. The detection rates and anatomical location of extended-core prostate biopsies positive for cancer.

Table 3 The influence of prostate volume on cancer detection rates for each biopsy strategy. On the basis of prostate size, patients were been stratified into two subgroups of small (<50 mL) or large (>50 mL) prostate. Volume-based measurements were available for 424 of the 493 patients studied, including 137 of the 164 men with positive biopsies

| Category | <50 mL | >50 mL |
|---|---|---|
| Percentage of: | | |
| all patients studied | 65 | 35 |
| patients with positive biopsies | 74 | 26 |
| No. (%): | | |
| of positive sextant biopsies (108) | 82 (76) | 26 (24) |
| positive extended (TZ/lat PZ) biopsies (29) | 19 (66) | 10 (34) |
| exclusive positive TZ biopsies (16) | 13 (81) | 3 (24) |
| exclusive positive lat PZ biopsies (9) | 6 | 3 |
| biopsies where both TZ and lat PZ positive (4) | 2 | 2 |

(<50 mL) prostates. A summary of the influence of gland volume on cancer detection rates for each biopsy strategy is given in Table 3. Although patients with tumours confined exclusively to the TZ had slightly higher serum PSA levels than patients with tumours detected elsewhere

© 2002 BJU International 89, 33–39

PROSTATE CANCER DETECTION WITH EXTENDED-CORE TRUS-GUIDED BIOPSIES  37

Table 4 Characteristics of patients with isolated TZ tumours compared with patients with tumours detected in other regions of the prostate

|  | Exclusively TZ | Other location | P |
|---|---|---|---|
| Number (%) | 17 (10) | 147 (89) | – |
| PSA, ng/mL | 17.5 | 13.9 | 0.34 |
| Total volume, mL | 38 | 36 | 0.98 |
| TZ volume, mL | 20.6 | 19.7 | 0.94 |
| % with PSA >10 ng/mL | 77 | 60 | 0.015 |

within the prostate, this difference was not significant (17.5 vs 13.9 ng/mL, P=0.34). Also, there was no significant difference in total prostate or TZ volume between these groups. However, patients with isolated TZ tumours were significantly more likely to have serum PSA levels of >10 ng/mL than patients with tumours in other regions of the prostate (Table 4).

## Discussion

A greater awareness of prostate cancer by patients has lead to more men requesting a PSA test. Some are asymptomatic, but many undergo PSA testing as part of an evaluation for LUTS. This, in combination with recent government cancer directives, is likely to result in a significant increase in the numbers of men requiring prostate biopsy to exclude malignancy. The optimal biopsy protocol for such patients has not yet been determined, but it is unlikely that a 'one-biopsy protocol fits all' scenario will emerge. From the clinicians' and the patients' perspective, a biopsy protocol that maximises cancer detection with minimal discomfort and an acceptable complication rate is what is required. Some would argue that adopting an aggressive approach to prostate cancer detection by taking many biopsies risks detecting clinically insignificant disease. While that may be the case for a small proportion of tumours detected, most stage T1c prostate cancers have been shown to be clinically significant in terms of histological grade and tumour volume [16].

From studies of patients undergoing repeat biopsy for suspected prostate cancer where an initial set of sextant biopsies was negative, routine sextant biopsies give false-negative results in 19–31% of cases [17–19]. Taking more biopsy cores at the initial TRUS should improve cancer detection, reducing false-negative outcomes, patient anxiety, inconvenience and overall costs. Some have advocated reserving extended-core biopsies for men with larger prostates or for those undergoing repeat biopsy. However, mathematically, for a given volume of prostatic cancer, the likelihood of detecting

cancer increases as more biopsies are taken [20]. Most additional tumours (66%) detected in the present series were in men with prostates of <50 mL (Table 3), justifying the use of the extended biopsy protocol even in patients with smaller prostates. Overall, the number of tumours detected increased by 19% when the extended-core biopsy protocol was compared with the outcome of sextant biopsies alone. For the 493 men who underwent biopsy, this equates to a 6% increase in the rate of cancer detection from 27% (sextant only, 133/493) to 33% (extended biopsies, 164/493). This finding is in general agreement with other published extended biopsy protocols [7,21,22]. Although the present sampling technique may have differed from those in other reports, it is clear that prostate cancer detection can be significantly improved by taking more biopsies (within reason) and sampling regions of the prostate not incorporated in the routine sextant protocol.

Initially we were surprised at the relatively few additional tumours detected by lateral PZ biopsies, as many groups have reported a significant improvement in cancer detection rates with this technique [7,8,21]. However, the present detection rate of an additional 6% of tumours confined exclusively to the lateral PZ compares favourably with Ravery et al. [23], who noted a 6.6% overall improvement in prostate cancer detection with the addition of 4–6 lateral PZ biopsies, depending on prostate volume. In contrast, Naughton et al. [24] found no significant improvement (27% vs 26%) in cancer detection when a 12-core extended biopsy protocol incorporating the lateral PZ was prospectively compared with routine sextant biopsies alone.

TZ biopsies tend to cause greater discomfort than PZ biopsies as the needle needs to be advanced significantly further into the prostate. Accordingly, these biopsies were taken last during the extended-biopsy protocol, to ensure that patients tolerated the entire procedure. Given the low yield of routine TZ biopsies [12–15], it has been suggested that TZ biopsy be reserved for patients with previous negative biopsies undergoing repeat biopsy, where cancer detection rates can be increased by 10% [25]. However, 21 (13%) additional cancers not diagnosed with sextant biopsies were detected with TZ biopsies at the time of the initial TRUS, 17 of which (10% of all cancers detected) were confined exclusively to the transition zone. It is unclear why the present detection rates for TZ cancer were higher than those reported elsewhere. In the absence of screening, we continue to see a full spectrum of presentation with prostate cancer, from clinically localized disease to locally advanced and metastatic prostate cancer. The incidence of isolated TZ cancer seems to be lower in screen-detected (asymptomatic) men than in patients presenting with LUTS and a raised PSA, who represent a significant proportion of men

(MED/MAR 23 2005 12:35/ST. 11:23/NO. 6312259207 P 9)

38   G.C. DURKAN *et al.*

undergoing prostate biopsy in our unit. While we do not advocate that routine TZ biopsies be taken in all men with suspected prostate cancer, they may be appropriate for selected groups, such as those with serum PSA levels of > 10 ng/mL, as noted (Table 4). Evidence to support this approach comes from a study by Lui *et al.* [11], where a third of cancers detected in a subgoup of patients with a normal DRE but elevated PSA levels were confined exclusively to the TZ.

The incidence of major morbidity in the present series was 3.6%; this is somewhat higher than that reported in the only prospective study to examine the incidence of complications after TRUS-guided biopsy (in 128 men), where a major complication was defined as one requiring hospital admission [26]. All other complications were considered minor, the commonest being persistent haematuria (47%), which bore no relationship to the number of biopsies taken. Infectious complications (fever/rigors) were noted in 2.5% of patients but were treated on an outpatient basis. Only one patient required admission in that study for a seizure after a vasovagal episode. Similarly, major complications were classified in the present study as those requiring admission and inpatient treatment. No patient experienced a significant vasovagal episode but 2% of patients with infectious complications required admission for parenteral antibiotics. We have not prospectively compared complication rates for six vs 12 biopsies but others have reported no significant increase in pain or serious morbidity when men undergoing 12 biopsies were compared with men undergoing routine sextant biopsies [27]. In another study of 119 men undergoing a five-region extended-core biopsy protocol, no serious complications were reported, although 80% of patients reported self-limiting haematuria [7]. Extensive sampling of the prostate may result in acute urinary retention caused by transient prostatic oedema precipitating BOO. The incidence of acute urinary retention in the present series (0.8%) is similar to that reported by Rodriguez and Terris [26] (mean number of biopsies 8.26, range 6–13) but significantly less than the 10% incidence noted by Borborglu *et al.* [28] (mean number of biopsies 22.5, range 15–31) after an extensive repeat-biopsy protocol. In the present series there was no relationship between biopsy outcome (positive or negative) and the incidence of major complications.

The present extended-core prostate biopsy protocol incorporating sextant, lateral PZ and TZ regions was better than sextant biopsies in terms of cancer detection; it was well tolerated by patients and associated with a relatively low incidence of major complications. In selected men with suspected prostate cancer, routine TZ biopsy should be considered, particularly where the serum PSA level is > 10 ng/mL.

## Acknowledgements

This study is dedicated to the hard-working staff of the Urology Centre, Sunderland Royal Hospital, and especially to Staff Nurse David Dickinson, recently deceased. We are grateful to Ms Ruth Byrne, Mr James N'Dow, Ms Vivienne Tut and Ms Vivienne Kirchin, Specialist Registrars in Urology, for their assistance with this study.

## References

1 Hodge KK, McNeal JE, Terris MK, Stamey TA. Random systematic versus directed ultrasound guided transrectal core biopsies of the prostate. *J Urol* 1989; 142: 71–4

2 Naughton CK, Smith DS, Humphrey PA, Catalona WJ, Keetch DW. Clinical and pathologic tumor characteristics of prostate cancer as a function of the number of biopsy cores: a retrospective study. *Urology* 1998; 52: 808–13

3 Levine MA, Ittman M, Melamed J, Lepor H. Two consecutive sets of transrectal ultrasound guided sextant biopsies of the prostate for the detection of prostate cancer. *J Urol* 1998; 159: 471–5

4 Ravery V, Billebaud T, Toublanc M *et al.* Diagnostic value of ten systematic TRUS-guided prostate biopsies. *Eur Urol* 1999; 35: 298–303

5 McNeal JE, Redwine EA, Freiha FS, Stamey TA. Zonal distribution of prostatic adenocarcinoma. Correlation with histologic pattern and direction of spread. *Am J Surg Pathol* 1988; 12: 897–906

6 Stamey TA. Making the most out of six systematic sextant biopsies. *Urology* 1995; 45: 2–12

7 Eskew LA, Bare RL, McCullough DL. Systematic 5 region prostate biopsy is superior to sextant method for diagnosing carcinoma of the prostate. *J Urol* 1997; 157: 199–202

8 Chang JJ, Shinohara K, Bhargava V, Presti JC Jr. Prospective evaluation of lateral biopsies of the peripheral zone for prostate cancer detection. *J Urol* 1998; 160: 2111–4

9 Greene DR, Wheeler TM, Egawa S, Dunn JK, Scardino PT. A comparison of the morphological features of cancer arising in the transition zone and in the peripheral zone of the prostate. *J Urol* 1991; 146: 1069–76

10 Cupp MR, Oesterling JE. Detecting early prostate cancer. *AUA Update Series* 1993; 258–63

11 Lui PD, Terris MK, McNeal JE, Stamey TA. Indications for ultrasound guided transition zone biopsies in the detection of prostate cancer. *J Urol* 1995; 153: 1000–3

12 Bazinet M, Karakiewicz PI, Aprikian AG *et al.* Value of systematic transition zone biopsies in the early detection of prostate cancer. *J Urol* 1996; 155: 605–6

13 Terris MK, Pham TQ, Issa MM, Kabalin JN. Routine transition zone and seminal vesicle biopsies in all patients undergoing transrectal ultrasound guided prostate biopsies are not indicated. *J Urol* 1997; 157: 204–6

14 Morote J, Lopez M, Encabo G, de Torres I. Value of routine transition zone biopsies in patients undergoing ultrasound-guided sextant biopsies for the first time. *Eur Urol* 1999; 35: 294–7

© 2002 BJU International 89, 33–39

(WED)MAR 23 2005 12:36/ST. 11:23/NO. 6312259207 P 10

PROSTATE CANCER DETECTION WITH EXTENDED-CORE TRUS-GUIDED BIOPSIES 39

15 Epstein JI, Walsh PC, Sauvageot J, Carter HB. Use of repeat sextant and transition zone biopsies for assessing extent of prostate cancer. *J Urol* 1997; 158: 1886–90

16 Lerner SE, Seay TM, Blute MT, Bergstralh EJ, Barrett D, Zincke H. Prostate specific antigen detected prostate cancer (clinical stage T1c): an interim analysis. *J Urol* 1996; 155: 821–6

17 Roehrborn CG, Pickens GJ, Sanders JS. Diagnostic yield of repeated transrectal ultrasound-guided biopsies stratified by specific histopathologic diagnoses and prostate specific antigen levels. *Urology* 1996; 47: 347–52

18 Fleshner NE, O'Sullivan M, Fair WR. Prevalence and predictors of a positive repeat transrectal ultrasound guided needle biopsy of the prostate. *J Urol* 1997; 158: 505–8

19 Durkan GC, Greene DR. Elevated serum prostate specific antigen levels in conjunction with an initial prostatic biopsy negative for carcinoma: who should undergo a repeat biopsy? *BJU Int* 1999; 83: 34–8

20 Stricker HJ, Ruddock LJ, Wan J, Belville WD. Detection of non-palpable prostate cancer. A mathematical and laboratory model. *Br J Urol* 1993; 71: 43–6

21 Babaian RJ, Toi A, Kamoi K et al. A comparative analysis of sextant and an extended 11-core multisite directed biopsy strategy. *J Urol* 2000; 163: 152–7

22 Presti JC Jr, Chung JJ, Bhargava V, Shinohara K. The optimal systematic prostate biopsy scheme should include 8 rather than 6 biopsies. results of a prospective clinical trial. *J Urol* 2000; 163: 163–6

23 Ravery V, Goldblatt L, Royer B, Blanc E, Toublanc M, Boccon-Gibod L. Extensive biopsy protocol improves the detection rate of prostate cancer. *J Urol* 2000; 164: 393–6

24 Naughton CK, Miller DC, Mager DE, Ornstein DK, Catalona WJ. A prospective randomized trial comparing 6 versus 12 prostate biopsy cores. impact on cancer detection. *J Urol* 2000; 164: 388–92

25 Keetch DW, Catalona WJ. Prostatic transition zone biopsies in men with previous negative biopsies and persistently elevated serum prostate specific antigen values. *J Urol* 1995; 154: 1795–7

26 Rodriguez LV, Terris MK. Risks and complications of transrectal ultrasound guided prostate needle biopsy: a prospective study and review of the literature. *J Urol* 1998; 160: 2115–20

27 Naughton CK, Ornstein DK, Smith DS, Catalona WJ. Pain and morbidity of transrectal ultrasound guided prostate biopsy: a prospective randomized trial of 6 versus 12 cores. *J Urol* 2000; 163: 168–71

28 Borboroglu PG, Comer SW, Riffenburgh RH, Amling CL. Extensive repeat transrectal ultrasound guided prostate biopsy in patients with previous benign sextant biopsies. *J Urol* 2000; 163: 158–62

## Authors

G.C. Durkan, FRCSI, Specialist Registrar in Urology.
N. Sheikh, FRCSI, Associate Specialist in Urology.
P. Johnson, MS, FRCS(Urol), Consultant Urologist.
A.J. Hildreth, MSc, Statistician.
D.R. Greene, MCh, FRCS(Urol), Consultant Urologist.
Correspondence: D.R. Greene, Department of Urology, Sunderland Royal Hospital, Kayll Road, Sunderland SR4 7TP, UK.

Abbreviations: PZ, peripheral zone; TZ, transitional zone; PIN, prostatic intraepithelial neoplasia.

FROM .

(WED)MAR 23 2005 12:37/ST.11:23/NO.6312259207 P 13

LWWOnline | LOGIN | eALERTS | REGISTER | CUSTOMER SUPPORT



# THE JOURNAL
*of* **UROLOGY**®

Official Journal of the American Urological Association



Home    Search    Current Issue    Archive

Return to the search results

ARTICLE LINKS:
Fulltext | PDF (63 K)

## EXTENSIVE REPEAT TRANSRECTAL ULTRASOUND GUIDED PROSTATE BIOPSY IN PATIENTS WITH PREVIOUS BENIGN SEXTANT BIOPSIES.

Journal of Urology. 163(1):158, January 2000.

BORBOROGLU, PRODROMOS G.; COMER, STEWART W.; RIFFENBURGH, ROBERT. H.; AMLING, CHRISTOPHER L. *

**Abstract:**

Purpose: Standard sextant prostate biopsy may underestimate cancer in men in whom clinical findings are suspicious for localized prostate cancer. We describe our experience with extensive transrectal ultrasound guided prostate biopsy in men in whom previous sextant biopsy was negative.

Materials and Methods: Between November 1997 and March 1999, 57 men 47 to 72 years old (mean age 61.4) underwent extensive transrectal ultrasound guided biopsy of the prostate using intravenous sedation at our institution. An average of 22.5 cores (range 15 to 31) were obtained depending on prostate size. Biopsies were obtained from each of 6 sagittal regions, including samples from the far lateral and mid transitional zones. Each patient had undergone at least 1 previous benign transrectal ultrasound guided sextant biopsy (mean 2.1, range 1 to 4). Indications for repeat biopsy were persistently elevated prostate specific antigen (PSA) in 89% of the cases, increased PSA velocity in 63%, suspicious free-to-total PSA in 39% and a previous suspicious biopsy finding in 32%. Clinical factors (PSA, PSA velocity, free-to-total PSA and previous suspicious biopsy) were analyzed for the ability to predict positive biopsy, and tumor parameters were assessed pathologically in patients undergoing radical prostatectomy.

Results: Adenocarcinoma was identified in 17 of the 57 men (30%). Biopsy revealed a Gleason score of 6 to 8 (mean 6.4). In 7 of the 17 patients (41%) in whom cancer was identified only 1 biopsy core was positive. Of the 15 patients in whom previous sextant biopsy had demonstrated high grade prostatic intraepithelial neoplasia or atypical small acinar proliferation extensive biopsy revealed cancer in 7 (47%). Although serum PSA was higher and free-to-total PSA was lower in those with cancer, the only statistically significant predictor of positive biopsy was PSA velocity (p <0.001). Prostate cancer was noted in 64% of the men with PSA velocity 1 ng./ml. or greater. Of the 13 patients undergoing radical prostatectomy pathologically significant disease was identified in all but 1 (92%). Complications of extensive biopsy included urinary retention in 6 patients and limited rectal bleeding in 1.

Conclusions: Extensive prostate biopsy identifies significant prostate cancer in many men in whom previous sextant biopsy was benign. This procedure should be considered when findings are suspicious for adenocarcinoma despite previously negative sextant biopsy.

Copyright (C) 2000 by American Urological Association, Inc.

3/22/2005 8:48 PM

LWWOnline | LOGOUT | ●ALERTS | PROFILE | CUSTOMER SUPPORT          MICHAEL GRABLE




## *of* THE JOURNAL *of* UROLOGY®
Official Journal of the American Urological Association

Home    Search    Current Issue    Archive

Return to the search results

**ARTICLE LINKS:**
Fulltext | PDF (280 K)

**THE PROCEDURE OF TRANSRECTAL ULTRASOUND GUIDED BIOPSY OF THE PROSTATE: : A SURVEY OF PATIENT PREPARATION AND BIOPSY TECHNIQUE.**
Journal of Urology. 167(2, Part 1 of 2):566-570, February 2002.
DAVIS, MICHAEL; SOFER, MARIO; KIM, SANDY S. ; SOLOWAY, MARK S.

**Abstract:**
Purpose: We surveyed urologists in community and academic practice regarding their standard approach to patient preparation and their technique of transrectal ultrasound guided prostate biopsy.

Materials and Methods: We mailed 110 surveys to community urologists in Florida and urological oncologists at academic centers across the United States. Responses were calculated per group.

Results: Of the 88 respondents 34% were at academic centers and 66% were community urologists. Overall 79% of respondents prescribe an enema in preparation for biopsy, 81% administer an oral fluoroquinolone before biopsy, 50% give some type of analgesia, usually an oral agent, 63% obtain 8 or more cores per biopsy session, 36% biopsy the lateral and midline locations, and 83% do not use prostate specific antigen density to plan the biopsy strategy.

Conclusions: The majority of urologists who responded to our survey ask their patients to use an enema in preparation for a transrectal biopsy procedure, prescribe an oral antibiotic and administer some type of analgesia. Few urologists administer a periprostatic nerve block. The majority obtain at least 8 biopsies and only 17% perform sextant biopsy. Some of these practices are not consistent with the literature. This survey provides insight into the practice patterns of urologists in regard to one of the most commonly performed office procedures.

Copyright (C) 2002 by American Urological Association, Inc.

Copyright © 2005, American Urological Association. All rights reserved.
Published by Lippincott Williams & Wilkins.
Copyright/Disclaimer Notice • Privacy Policy
folsom
Release 2.6.4

The Journal of Urology - Abstract: Volume 171(1) January 2004 p 19...          http://www.jurology.com/pt/re/juro/abstract;00005392-200401000-000

LWWOnline | LOGIN | eALERTS | REGISTER | CUSTOMER SUPPORT





THE JOURNAL *of* UROLOGY®
Official Journal of the American Urological Association

Home    Search    Current Issue    Archive

Return to the search results

ARTICLE LINKS:
Fulltext | PDF (80 K)

**The Incidence of Prostate Cancer in Men With Prostate Specific Antigen Greater Than 4.0 Ng/Ml:: A Randomized Study Of 6 Versus 12 Core Transperineal Prostate Biopsy.**
Journal of Urology. 171(1):197-199, January 2004.
*EMILIOZZI, PAOLO; SCARPONE, PAOLO; DePAULA, FRANCESCO; PIZZO, MAURIZIO; FEDERICO, GIORGIO; PANSADORO, ALBERTO; MARTINI, MARCO; PANSADORO, VITO*

**Abstract:**

Purpose: The prostate cancer detection rate in patients with elevated prostate specific antigen (PSA) increases with extended needle biopsy protocols. Transperineal biopsy under transrectal ultrasound guidance is rarely reported, although notable cancer diagnoses are obtained with this technique. We describe the results of 6 and 12 core transperineal biopsy.

Materials and Methods: A total of 214 patients with PSA greater than 4.0 ng/ml were prospectively randomized to undergo 6 or 12 core transperineal biopsy. Each group of 107 patients was comparable in terms of clinical characteristics. The procedure was performed on an outpatient basis using local anesthesia. Specimens were obtained with a fan technique with 2 puncture sites slightly above the rectum (1 per lobe) under transrectal ultrasound guidance. Cores were taken from all peripheral areas, including the far lateral aspect of the prostate.

Results: The overall cancer detection rate was 38% and 51% for 6 and 12 core biopsy, respectively. In patients with PSA between 4.1 and 10 ng/ml the cancer detection rate was 30% and 49% for 6 and 12 core biopsy, respectively.

Conclusions: The 12 core transperineal prostate biopsy is superior to 6 core biopsy. The technique provides optimal prostate cancer diagnosis. About half of the patients with PSA greater than 4.0 ng/ml and a slightly lower percent with PSA between 4.1 and 10 ng/ml have prostate cancer.

Copyright (C) 2004 by American Urological Association, Inc.

Copyright © 2006, American Urological Association. All rights reserved.
Published by Lippincott Williams & Wilkins.
Copyright/Disclaimer Notice • Privacy Policy

soledad
Release 2.5.4

LWWOnline | LOGIN | eALERTS | REGISTER | CUSTOMER SUPPORT





*of* THE JOURNAL *of* UROLOGY®
Official Journal of the American Urological Association

LIPPINCOTT
WILLIAMS & WILKINS

Home    Search    Current Issue    Archive

Return to the search results

ARTICLE LINKS:
Fulltext | PDF (44 K)

## EXTENSIVE BIOPSY PROTOCOL IMPROVES THE DETECTION RATE OF PROSTATE CANCER.

Journal of Urology. 164(2):393-396, August 2000.
*RAVERY, VINCENT; GOLDBLATT, LAURENT; ROYER, BENOIT; BLANC, EMMANUEL; TOUBLANC, MARIANNE; BOCCON-GIBOD, LAURENT*

Abstract:
Purpose: We evaluated improvement in the rate of prostate cancer detection when using an extensive biopsy protocol involving peripheral cores.

Materials and Methods: We prospectively evaluated 303 consecutive men who underwent transrectal ultrasound guided biopsy due to elevated prostate specific antigen (PSA) and/or abnormal digital rectal examination. Ten biopsies were performed, including at least 5 at the base and middle of each lobe. In addition to standard biopsy at a 45-degree angle, a more peripheral 30-degree angle biopsy was obtained. At the apex only 1 standard biopsy was done. However, when prostate volume was greater than 50 cm.3, an additional peripheral biopsy was obtained at the apex.

Results: The complication rate in this biopsy protocol was 1% (3 patients). Prostate cancer was detected in 118 of the 303 men (38.9%). Overall this extensive protocol resulted in 6.6% improvement in the detection rate. Improvement was 6.5% in men with PSA 10 ng./ml. or less and 7% in those with PSA greater than 10 (not significant).

Conclusions: Increasing the number of biopsy cores and improving prostate peripheral zone sampling resulted in a significant improvement in the detection of prostate cancer.

Copyright (C) 2000 by American Urological Association, Inc.

Copyright © 2005, American Urological Association. All rights reserved.
Published by Lippincott Williams & Wilkins.
Copyright/Disclaimer Notice • Privacy Policy
soledad
Release 2.5.4

# EXHIBIT 16



# Urology news items

By the Numbers; Literature Review; Laparoscopic partial nephrectomy: Positive margin rate; IC patients often have history of abuse; Finasteride unlikely to induce high-grade Pca; Experience key to limiting Pca recurrence; Receptor gene may identify susceptibility to acute pyelonephritis; Yield of initial and subsequent prostate biopsy; FDA approves first human thrombin since 1954.

Nov 1, 2007
Contemporary Urology

## By the NUMBERS

**Sexual activity and problems in older adults**

**IC patients often have history of abuse**

Researchers at William Beaumont Hospital in Michigan compared surveys of 215 patients with interstitial cystitis (IC), 121 with suspected cystitis, and 464 controls, and found that 37% of IC patients reported abuse compared with 22% of controls. Of the 76 IC patients, 49% reported abuse, including emotional (92%), physical (78%), sexual (68%), and domestic violence (49%). Given the association between IC and abuse, urologists should be aware that referrals to psychologists or health care workers may be warranted in cases of IC or pelvic pain.

By the Numbers

*J Urol.* 2007;178(3 pt 1):891-895.

## Finasteride unlikely to induce high-grade PCa

Two recent studies suggest that the increased rate of high-grade prostate cancer associated with finasteride reported in the Prostate Cancer Prevention Trial (PCPT) is likely due to increased detection of cancers due to decreased prostate size rather than finasteride-induced stimulation of high-grade tumors.

Analyzing PCPT data, researchers in Jerusalem found that mean prostate volume was 25% lower among men taking finasteride compared with placebo. After controlling for prostate volume, there was no significant difference in the detection of high-grade tumors in the 2 groups. Several researchers in this study were paid employees of Merck & Co.

Investigators at the University of Colorado Health Sciences Center in Denver examined prostatectomy and biopsy specimens in men treated with finasteride or placebo. They found that prostate volumes were lower in the finasteride group and that tumor features were similar in the 2 groups. The researchers postulated that tumors were more likely to be detected in the finasteride group because the prostates were usually smaller. The study was partially funded by Merck & Co.

*JNCI.* 2007;99(18):1366-1374 and *JNCI.* 2007;99(18):1375-1383.

**Experience key to limiting PCa recurrence**

To assess the role that surgeon experience plays on survival after radical prostatectomy (RP), a recent study analyzed data from 7,765 patients undergoing RP by 1 of 72 surgeons at 4 major US academic medical centers between 1987 and 2003. In men whose surgeon had performed 10 prior operations, the probability of recurrence of malignancy at 5 years was 17.9% compared with 10.7% when the surgeon had performed 250 prior operations.

The authors conclude that the large number of cases required before the learning curve plateaus suggests the need to expand opportunities for training in surgical technique for surgeons in the early years after residency training.

*J Natl Cancer Inst.* 2007;99(15):1171-1177.

**Receptor gene may identify susceptibility to acute pyelonephritis**

The IL-8 receptor gene *CXCR1* may help identify susceptibility to acute pyelonephritis. When investigators at Lund University in Sweden looked at patients identified as prone to acute pyelonephritis, they found that 54% had *CXCR1* sequence variants, including 3 unique mutations and 2 known gene polymorphisms. In the same study, UTI-prone children were found to express less CXCR1 protein than pediatric controls.

*CXCR1* was initially identified as a candidate gene when mice lacking the IL-8 receptor developed acute pyelonephritis. Previous studies based on animal experiments have shown that the gene is protective against renal pelvic inflammation.

*PLoS ONE.* 2007;2(9):e825.

**Yield of initial and subsequent prostate biopsy**

To determine the yield of prostate needle biopsy and the likelihood and yield of subsequent biopsies, researchers studied data regarding 10,429 needle biopsies performed on 8,273 Medicare beneficiaries from 1993 to 2001. Overall, 32% of biopsies detected cancer, and the yield increased with age. More than a third of men whose first biopsy did not detect prostate cancer had a subsequent biopsy within 5 years. The probability of a positive result increased with subsequent biopsies, with 50% of men receiving a prostate cancer diagnosis after 2 biopsies, 62% after 3 biopsies, and 68% after 4 biopsies.

The authors discuss the ongoing controversy regarding prostate cancer screening, and write that data is needed to show that "the benefits for the few exceed the harms of exposing so many to biopsy and treatment."

*JNCI.* 2007;99(18):1395-1400.

**FDA approves first human thrombin since 1954**

Evithrom, a blood-clotting protein derived from human plasma, was recently approved by the FDA for control of surgical bleeding. Approval was granted in response to a clinical trial of several hundred patients, which found that Evithrom was as safe and effective as bovine-derived thrombin.

Evithrom is obtained from carefully screened US donors and is subjected to further testing to reduce the risk of transmitting blood-borne diseases. It is manufactured by Omrix Biopharmaceuticals, Ltd. (Ramat Gan, Israel) and distributed by Johnson & Johnson Wound Management (Somerville, NJ).

**LITERATURE Review**

**Laparoscopic partial nephrectomy: Positive margin rate**

In an attempt to better assess the oncologic efficacy of laparoscopic partial nephrectomy (LPN), Breda and colleagues examined practice patterns and pathologic data in 855 LPN cases performed at 17 centers [*J Urol.* 2007;178(1):47-50].

At 10 centers, intraoperative frozen sections were selectively performed based on clinical suspicion of positive margins on excised tumor. At 5 centers, random biopsies were routinely performed on the resection bed. Frozen sections were never performed at 2 centers.

The mean tumor size was 2.7 cm. Positive margins were noted on final pathology in 21 cases, yielding an overall positive margin rate of 2.5%. Of the 21 cases, 14 underwent immediate radical nephrectomy based on the frozen section and 7 were followed expectantly.

The authors conclude that this multicenter study of early experience with LPN demonstrated oncologic efficacy comparable to that of open partial nephrectomy with respect to the incidence of positive margins. The practice of intraoperative frozen sections varied among centers and is not definitive in guiding the optimal surgical treatment.

**Editorial Comment**

The study confirms the low positive margin rate following LPN. Frozen section pathologic evaluation is of limited value, especially since renal reconstruction and hemostasis are usually achieved before the pathologic report is available.

Optimal preoperative imaging and intraoperative ultrasonography help achieve negative margins at the initial attempt at excision of the tumor. There are significant limitations in a study based on a survey of multiple institutions with data collected retrospectively. Furthermore, data that was not provided—such as complications of hemorrhage, urine leak and renal impairment—should be considered when evaluating the results following LPN. This technique is best suited for small exophytic tumors unless the surgical team has extensive experience with advanced reconstructive laparoscopic surgery.

**Chandru P. Sundaram, MD**
Associate Professor and Director of Minimally Invasive Surgery
Department of Urology
Indiana University School of Medicine
Indianapolis, IN

# EXHIBIT 17

A service of the U.S. National Library of Medicine
and the National Institutes of Health

My NCBI [?]
[Sign In] [Register]

| All Databases | PubMed | Nucleotide | Protein | Genome | Structure | OMIM | PMC | Journals | Books |

Search PubMed           for                              Go    Clear

Limits    Preview/Index    History    Clipboard    Details

Display  AbstractPlus              Show   20    Sort By        Send to

All: 1    Review: 0

**1:** J Urol. 1998 Feb;159(2):471-5; discussion 475-6.

Comment in:
     J Urol. 2000 Oct;164(4):1321-2.

FULL-TEXT ARTICLE                                                                 Links

**Two consecutive sets of transrectal ultrasound guided sextant biopsies of the prostate for the detection of prostate cancer.**

Levine MA, Ittman M, Melamed J, Lepor H.

Department of Urology, New York University Medical Center, New York, USA.

PURPOSE: We investigated the role of performing 2 consecutive sets of transrectal ultrasound guided sextant biopsies of the prostate in a single office visit as the protocol for detecting prostate cancer in men presenting for the first time with an abnormal digital rectal examination and/or elevated serum prostate specific antigen (PSA). MATERIALS AND METHODS: A total of 137 consecutive men presenting for the first time with a clinically localized prostate nodule on digital rectal examination and/or elevated serum PSA based upon age specific reference ranges underwent 2 consecutive sets of sextant prostate biopsies under transrectal ultrasound guidance in a single office visit. The 2 sets of biopsies were processed and analyzed separately by pathologists. RESULTS: Adenocarcinoma of the prostate was diagnosed in 43 of the patients (31%) undergoing biopsy. Adenocarcinoma of the prostate was diagnosed in only the second set of biopsies in 13 cases (10%). High grade prostatic intraepithelial neoplasia without adenocarcinoma of the prostate was observed in 18 of the first set of biopsies (15%). High grade intraepithelial neoplasia without adenocarcinoma of the prostate was the only pathological diagnosis in the second set of biopsies in 3 cases. The second set of biopsies provided important new clinical information related to prostate cancer in 20 cases (28%) and increased the number of cancers detected by 30%. In addition, 14 patients with high grade intraepithelial neoplasia who would have required a second set of biopsies were found not to have adenocarcinoma of the prostate. Prostate cancer was detected in 43, 27 and 24% of men with prostate volumes less than 30, 30 to 50 and greater than 50 cc, respectively. The percentage of prostate cancers detected only in the second set of biopsies was not significantly related to prostate size. CONCLUSIONS: Two consecutive sets of transrectal ultrasound guided sextant biopsies of the prostate performed in a single office visit represent a cost-effective biopsy strategy for men presenting with an abnormal digital rectal examination and/or elevated serum PSA. The benefits include increasing the detection of adenocarcinoma of the prostate and providing the recommended second set of biopsies for high grade intraepithelial neoplasia without increased morbidity or cost.

PMID: 9649265 [PubMed - indexed for MEDLINE]

Display  AbstractPlus              Show   20    Sort By        Send to

**Related Links**

Extensive repeat transrectal ultrasound guided prostate biopsy in patients with previous benign sextant biopsies.            [J Urol. 2000]

Improving prostate cancer detection with an extended-core transrectal ultrasonography-guided prostate biopsy protocol.   [BJU Int. 2002]

Transrectal ultrasound guided biopsy for detecting early prostate cancer: An Indian experience.            [Indian J Cancer. 2005]

Prostate cancer diagnosis using a saturation needle biopsy technique after previous negative sextant biopsies.            [J Urol. 2001]

Predictors of prostate cancer on repeat transrectal ultrasound-guided systematic prostate biopsy.      [Int J Urol. 2003]

See all Related Articles...

Write to the Help Desk
NCBI | NLM | NIH
Department of Health & Human Services
Privacy Statement | Freedom of Information Act | Disclaimer

http://www.ncbi.nlm.nih.gov/pubmed/9649265                    1/22/2008

# EXHIBIT 18



**unbound** MEDLINE

Home   Advanced Search   EBM Search

Search

**Abstract**   Full Citation   Full Text   Related Articles   Email this Abstract

Advertise on this site.

Ravery V, Dominique S, Panhard X, Toublanc M, Boccon-Gibod L, Boccon-Gibod L
The 20-Core Prostate Biopsy Protocol-A New Gold Standard? [JOURNAL ARTICLE]
*J Urol 2007 Dec 10.*

**PURPOSE:**  We investigated the ability of a 20-core prostate biopsy protocol to enhance the prostate cancer diagnosis rate.
**MATERIALS AND METHODS:**  We compared the diagnosis rate of prostate biopsies in 2 groups of consecutive patients, including group 1-10 cores and group 2-20 cores. The prostate specific antigen range in the 2 groups was 3 to 30 ng/ml and biopsies were performed because of increased prostate specific antigen (more than 3 ng/ml) and/or abnormal digital rectal examination. To analyze the results we divided each group into 3 subgroups according to prostate specific antigen, including group 1-3 to less than 6 ng/ml, group 2-6 or greater to less than 10 ng/ml and group 3-10 or greater to up to 30 ng/ml. Multivariate analysis was performed to assess the difference in the diagnosis rate among the subgroups according to the number of cores taken.
**RESULTS:**  The percent of positive biopsies was 39.7% in group 1 and 51.7% in group 2. Multivariate analysis confirmed that the number of biopsies taken was a factor that independently and significantly correlated with the prostate cancer diagnosis. The 20-core biopsy protocol was more efficient than the 10-core protocol in the 3 subgroups with 47.2% vs 28.1% of patients diagnosed in group 1 (OR 3.26, p = 0.001), 40.5% vs 36.1% in group 2 (OR 2.37, p = 0.009) and 69.8% vs 39.7% in group 3 (OR 2.01, p = 0.015).
**CONCLUSIONS:**  The 20-core biopsy protocol was more efficient than the 10-core biopsy protocol, especially in patients with prostate specific antigen between 3 and 6 ng/ml. Nevertheless, it is mandatory to confirm whether detected tumors are clinically significant on pathological examination of the radical prostatectomy specimens.

**More from this journal**
  J Urol

**Prostate Cancer Treatment**
Noninvasive Procedure. No Surgery or Radiation. Outpatient Procedure.
HIFU.ca/ProstateCancerT

**Prostate Cancer**
Top 5 Websites For Prostate Cancer
www.FasterZone.com

**Prostate Cancer Treatment**
Monotherapy - Fast & 96% Effective Less Invasive, Less Side Effects
Cetmc.com

**PSA Test - Special Report**
Don't Trust Your PSA, Dr. Douglass Reveals the Myth of the PSA
www.douglassreport.com

# EXHIBIT 19

Home | Community | Get Involved | Donate | Contact Us | Site Index | Search [        ] [Go ▶]

Cancer Reference Information



My Planner

Register | Sign In ▶

**Cancer Reference Information**

All About This Topic

Other Information Sources

Glossary

Cancer Drug Guide

Treatment Options

Treatment Decision Tools

Detailed Guide: Prostate Cancer
# How Is Prostate Cancer Diagnosed?

If certain symptoms or the results of early detection tests -- the prostate-specific antigen (PSA) blood test and/or digital rectal exam (DRE) -- suggest that you might have prostate cancer, your doctor will do a prostate biopsy to find out if the disease is present.

## The Prostate Biopsy

A *biopsy* is a procedure in which a sample of body tissue is removed and then looked at under a microscope. A *core needle biopsy* is the main method used to diagnose prostate cancer. It is usually done by a urologist, a surgeon who treats cancers of the genital and urinary tract, which includes the prostate gland. Using transrectal ultrasound (described in the section, "Can Prostate Cancer Be Found Early?") to "see" the prostate gland, the doctor quickly inserts a needle through the wall of the rectum into the prostate gland. When pulled out, the needle removes a small cylinder of tissue, usually about 1/2-inch long and 1/16-inch across. This is repeated from 8 to18 times, although most urologists will take about 12 samples. These are sent to the lab to see if cancer is present.

Though the procedure sounds painful, it typically causes only a very brief, uncomfortable sensation because it is done with a special spring-loaded biopsy instrument. The device inserts and removes the needles in a fraction of a second. Most doctors who do the biopsy will numb the area first with local anesthetic. You might want to ask your doctor if he or she plans to do this.

Some doctors will do the biopsy through the perineum, the skin between the rectum and the scrotum. The doctor will place his or her finger in your rectum to feel the prostate and then insert the biopsy needle through a small incision in the skin of the perineum. The doctor will also use a local anesthetic to numb the area.

The biopsy itself takes about 15 minutes and is usually done in the doctor's office. You will likely be given antibiotics to take before the biopsy and for a day or 2 after to reduce the risk of infection.

For a few days after the procedure, you may feel some soreness in the area and will likely notice blood in your urine. You may also have some light bleeding from your rectum. Many men also see some blood in their

🖶 Printer-Friendly Page

✉ Email this Page

▸ **Overview**

▸ **Detailed Guide**

  **What Is It?**  ▾

  **Causes, Risk Factors and Prevention**  ▾

  **Early Detection, Diagnosis, Staging**  ▾

  ▸ Can Prostate Cancer Be Found Early?

  ▸ How Is Prostate Cancer Diagnosed?

  ▸ How Is Prostate Cancer Staged?

  **Treating Prostate Cancer**  ▾

  **Talking With Your Doctor**  ▾

  **More Information**  ▾

**Related Tools & Topics**

▸ Prevention & Early Detection

▸ Bookstore

Sign In

Not registered yet? Register now or see reasons to register.

semen, which can last for several weeks after the biopsy.

Your biopsy samples will be sent to a pathology lab. There, a *pathologist* (a doctor who specializes in diagnosing disease in tissue samples) will see if there are cancer cells in your biopsy by looking at the samples under the microscope. If cancer is present, the pathologist will also assign it a *grade* (see below). Getting the results usually takes 1 to 3 days, but it can take longer.

Even with many samples, biopsies can still sometimes miss a cancer if none of the biopsy needles pass through it. This is known as a "false negative" result. If your doctor still strongly suspects prostate cancer (due to a very high PSA level, for example) a repeat biopsy may be needed to help be sure.

## Grading the Prostate Cancer

Almost all pathologists grade prostate cancers according to the Gleason system. This system assigns a Gleason grade, using numbers from 1 to 5 based on how much the cells in the cancerous tissue look like normal prostate tissue.

- If the cancerous tissue looks much like normal prostate tissue, a grade of 1 is assigned.
- If the cancer lacks these normal features and its cells seem to be spread haphazardly through the prostate, it is called a grade 5 tumor.
- Grades 2 through 4 have features in between these extremes.

Because prostate cancers often have areas with different grades, a grade is assigned to the 2 areas that make up most of the cancer. These 2 grades are added together to yield the *Gleason score* (also called the Gleason sum) between 2 and 10. The higher your Gleason score, the more likely it is that your cancer will grow and spread quickly.

## Other Elements of a Biopsy Report

Aside from the grade of the cancer (if it is present), the pathologist's report often contains other pieces of information that may give a better idea of the scope of the cancer. These can include:

- the number of biopsy core samples that contain cancer (for example, "7 out of 12")
- the percentage of cancer in each of the cores
- whether the cancer is on one side (left or right) or both sides of the prostate

## "Suspicious" Results

Sometimes when the pathologist looks at the prostate cells under the microscope, they don't look cancerous, but they're not quite normal, either. These results are often reported as "suspicious." They generally fall into 2 categories -- either "prostatic intraepithelial neoplasia" (PIN) or "atypical small acinar proliferation" (ASAP).

In PIN, there are changes in how the prostate cells look under the microscope, but the cells are basically still in place -- they don't look like

they've invaded into other parts of the prostate (like cancer cells would). PIN is often divided into low-grade and-high grade. Many men begin to develop low-grade PIN at an early age and do not necessarily develop prostate cancer. The importance of low-grade PIN in relation to prostate cancer is still unclear.

If high-grade PIN is found on a biopsy, there is about a 20% chance that cancer may already be present somewhere else in the prostate gland. For this reason, doctors often watch men with high-grade PIN carefully and may advise a repeat prostate biopsy, especially if the original biopsy did not take samples from all parts of the prostate.

Another finding that is sometimes reported on a prostate biopsy is *atypical small acinar proliferation (ASAP)*, which is sometimes just called atypia. In ASAP, the cells look like they might be cancerous when viewed under the microscope, but there are too few of them to be sure. If ASAP is found, there's about a 40% to 50% chance that cancer is also present in the prostate, which is why many doctors recommend getting a repeat biopsy within a few months.

Revised: 06/14/2007

Help | About ACS | Employment & Volunteer Opportunities | Legal & Privacy Information | ACS Gift Shop | Press Room
Copyright 2007 © American Cancer Society, Inc.

All content and works posted on this website are owned and copyrighted by the American Cancer Society, Inc. All rights reserved.

# EXHIBIT 20

Case 1:08-cv-00441-RMC   Document 1-24   Filed 01/25/2008   Page 2 of 5



# UrologyHealth.org
### American Urological Association

Home   Urology Spotlight   Site Feedback

Search [ ]  

About this Site

Find a Urologist

Adult Conditions

Pediatric Conditions

En Español



## Search:  Results

Go Back to Search Results

## Causes, Natural History & Diagnosis of Prostate Cancer

Prostate cancer is the third-leading cause of cancer deaths among men in the United States. Yet, when detected in its early stages, prostate cancer can be effectively treated and cured. What are its causes and symptoms? How is it diagnosed? The following information should help answer such questions.

      

PRINT THIS INFORMATION   FIND A UROLOGIST   SITE FEEDBACK   SHOW ME PICTURES   CLINICAL TRIALS   DONATE NOW   LET YOUR VOICE BE HEARD   FREE NEWSLETTER

Click to Hear AUA Experts Speak on This Topic

 Increase T

### What is the prostate?

The prostate gland is a small, walnut-sized gland in men. It is located below the bladder and surrounds the upper portion of the urethra. The prostate gland lies in front of the rectum, and its posterior surface can be felt during a rectal examination. The function of the prostate is to secrete a fluid that makes up part of the semen. The prostate gland may be a source of many health problems in men, the most common being benign prostatic hyperplasia (BPH), prostatitis and cancer.

### What is prostate cancer?

Prostate cancer is a significant health-care problem in the United States due to its high incidence. It is the most common non-skin cancer in men affecting approximately 234,000 American men each year with approximately 27,000 of these men dying each year. Prostate cancer is different from most cancers in that an appreciable percentage of men, particularly older men with a shorter life expectancy, may have a silent form of this cancer—it will not cause symptoms or progress beyond the prostate gland during their lifetime. Sometimes this cancer can be small, slow growing and present limited risk to the patient. Clinically important prostate cancers can be defined as those that threaten the well-being or life span of a man.

### What are the causes and risks associated with prostate cancer?

What causes prostate cancer is a subject of intensive research. It is likely that prostate cancer occurs due to many reasons. Predominately a disease of elderly men, the diagnosis of prostate cancer is rare before age 40 but increases dramatically thereafter. In the United States, it is estimated that one in 55 men between the ages of 40 and 59 will be diagnosed with prostate cancer. This incidence climbs almost to one in six for men between ages 60 and 79. This association is also reflected in mortality as prostate cancer accounts for about 10 percent of cancer-related deaths in men between the ages of 60 and 79 and nearly 25 percent in those over the age of 80.

Worldwide, prostate cancer ranks third in cancer incidence and sixth in cancer mortality among men. There is, however, a notable variability in incidence and mortality among world regions. The incidence is low (but rapidly increasing in recent years) in Japan and intermediate in regions of Central America and Western Africa. The incidence is higher in North America and Northern Europe. Although some of these differences may be accounted for by differences in screening for prostate cancer and the risk of other diseases among world regions, it is likely that they can be accounted for, in part, by genetic predisposition as well as diet and other environmental factors.

There are also ethnic determinants of risk. Blacks are in the highest risk group, with an incidence of more than 200 cases per 100,000 black men. The incidence in Caucasian and Asian men is slightly more than half that of blacks. In addition, blacks tend to present with more advanced disease and have poorer overall prognosis than Caucasian or Asian men.

Men with a family history of prostate cancer are at an increased risk of developing the disease. The risk correlates with the number of first-degree relatives (father, brother or uncle) affected by prostate cancer and the age at onset. Men with a family history of disease may have a risk of developing prostate cancer 2 to 11 times greater than men without a family history of prostate cancer.

There is also considerable evidence showing that prostate cancer is more common in men with a high intake of fat in their diets. The worldwide difference in prostate cancer incidence may be associated with dietary intake of soy proteins. In Asian countries such as Japan and the Republic of Korea where prostate cancer incidence and mortality are just a fraction of that in North America, soy consumption in the form of tofu, soymilk and miso is up to 90 times higher than that consumed in the United States. In a study of more than 40 nations, researchers found soy, on a per calorie basis, to be the most protective dietary factor. This protective role may be associated with two of soy's components, genistein and daidzein that may act as weak estrogens or through other mechanisms. Estrogens are female hormones that inhibit prostate cancer growth. Some experts have suggested that the worldwide differences in prostate cancer incidence may also be explained by the high intake of green tea by residents of Asia.

The intake of other certain dietary factors may also reduce the risk of developing prostate cancer. Such substances include lycopene and selenium. Cooked tomatoes are rich sources of lycopene. Lycopenes are antioxidants that may protect cells from becoming cancerous. Several studies have shown that the likelihood of developing prostate cancer is reduced by high intake of lycopene. Researchers found that men ingesting two or more servings of tomato sauce per week had a 36 percent reduction in cancer risk compared to those who did not. Selenium intake has also been reported to lower prostate cancer risk. In a clinical trial designed to determine if selenium could lower skin cancer recurrences, men who took selenium had a 63 percent reduction in prostate cancer incidence compared to those who took a sugar pill (placebo). Attention has also focused on vitamin D's effect on the prostate. Epidemiologic evidence shows an inverse relationship between prostate cancer risk and ultraviolet radiation, the primary source for vitamin D production. This observation has led some to suggest that higher rates of prostate cancer in the elderly may be partly due to decreased sun exposure or a decline in the body's ability to make vitamin D with aging.

Finally, the correlation of vasectomy and prostate cancer risk remains controversial. Although some studies have suggested that men who have undergone a vasectomy are at an increased risk of developing prostate cancer, many other studies have failed to show such a correlation.

**What are the symptoms of prostate cancer?**

In its early stages, prostate cancer often causes no symptoms. When symptoms do occur, they may include any of the following: dull pain in the lower pelvic area; frequent urination; problems with urination such as the inability, pain, burning, weakened urine flow; blood in the urine or semen; painful ejaculation; general pain in the lower back, hips or upper thighs; loss of appetite and/or weight; and persistent bone pain.

**How is prostate cancer diagnosed?**

Currently, digital rectal examination (DRE) and prostate specific antigen (PSA) are used for prostate cancer detection. The age at which time screening for prostate cancer should begin is not known with certainty. However, most experts agree that healthy men over the age of 50

should consider prostate cancer screening with a DRE and PSA test. Screening should occur earlier, at age 40, in those who are at a higher risk of prostate cancer such as African-American men or those with a family history of prostate cancer.

DRE: The DRE is performed with the man either bending over, lying on his side or with his knees drawn up to his chest on the examining table. The physician inserts a gloved finger into the rectum and examines the prostate gland, noting any abnormalities in size, contour or consistency. DRE is inexpensive, easy to perform and allows the physician to note other abnormalities such as blood in the stool or rectal masses, which may allow for the early detection of rectal or colon cancer. However, DRE is not the most effective way to detect an early cancer, so it should be combined with a PSA test.

PSA Test: The PSA test is usually performed in addition to DRE and increases the likelihood of prostate cancer detection. The test measures the level of PSA, a substance produced only by the prostate, in the bloodstream.

This blood test can be performed in a clinical laboratory, hospital or physician's office and requires no special preparation on the part of the patient. Ideally, the test should be taken before a DRE is performed or any catheterization or instrumentation of the urinary tract. Furthermore, because ejaculation can transiently elevate the PSA level for 24 to 48 hours, the patient should abstain from sexual activity for two days prior to having a PSA test. A tourniquet or rubber strap is tied around the upper arm to mildly restrict the flow of blood and keep blood in the vein. Then, a needle with a tube-like container attached is inserted into a vein, usually in the bend of the elbow or top of the hand. After a sufficient sample of blood is obtained, the needle is withdrawn, a bandage is placed on the puncture site and firm pressure is held until the bleeding stops. The entire test takes less than five minutes and produces only mild discomfort. After, the patient may experience slight bruising at the puncture site.

Very little PSA escapes from a healthy prostate into the bloodstream, but certain prostatic conditions can cause larger amounts of PSA to leak into the blood. One possible cause of a high PSA level is benign (non-cancerous) enlargement of the prostate, otherwise known as BPH. Inflammation of the prostate, called prostatitis, is another common cause of PSA elevation, as is recent ejaculation. Prostate cancer is the most serious possible cause of an elevated PSA level. The frequency of PSA testing remains a matter of some debate. The American Urological Association (AUA) encourages men to have annual PSA testing starting at age 50. The AUA also recommends annual PSA testing for men over the age of 40 who are African-American or have a family history of the disease (for example, a father or brother who was diagnosed with prostate cancer), or for those who are interested in early risk assessment. Some experts have suggested that men with an initial normal DRE and PSA level of less than 2.5 ng/ml can have PSA testing performed every two years. However, a disadvantage of infrequent testing is that it limits the ability to detect a rapidly rising PSA level that can signal aggressive prostate cancer. Recently, several refinements have been made in the PSA blood test in an attempt to determine more accurately who has prostate cancer and who has false-positive PSA elevations caused by other conditions like BPH. These refinements include PSA density, PSA velocity, PSA age-specific reference ranges and use of free-to-total PSA ratios. Such refinements may increase the ability to detect cancer and these should be discussed with your physician.

Currently, it is recommended that both a DRE and PSA test be used for the early detection of prostate cancer. It is important to realize that in most cases an abnormality in either test is not due to cancer but to benign conditions, the most common being BPH or prostatitis. For instance, it has been shown that only 18 to 30 percent of men with serum PSA values between 4 and 10 ng/ml have prostate cancer. This number rises to approximately 42 to 70 percent for those men whose PSA values exceeding 10 ng/ml.

Biopsy: Prostate biopsy is best performed under transrectal ultrasound guidance using a spring-loaded biopsy device coupled to the transrectal probe. The patient is prepared with an enema and an antibiotic. The lubricated ultrasound probe is inserted into the rectum. Some lubricating gels include a topical anesthetic. Patients are positioned on their side for this procedure. The physician will first image the prostate using ultrasound noting the prostate gland's size and shape and whether or not any other abnormalities exist, the most common of which are shadows which might signify the presence of prostate cancer. However, not all prostate cancers are visible. After the prostate gland has been anesthetized with an injection of a local anesthetic through a long fine needle that is passed through the probe, the physician performs the biopsy. Using the spring-loaded biopsy device attached to the ultrasound probe, the physician performs multiple biopsies of the prostate gland. Generally, 10 to 12 (or more,

depending upon the size of the prostate gland and the prior PSA and biopsy history of the patient) biopsies will be performed. Each biopsy removes a cylinder of prostate tissue approximately 3/4 inch in length and 1/16 inch in width. The entire procedure takes 20 to 30 minutes. The biopsy tissue taken will then be examined by a pathologist (a physician who specializes in examining human tissue to determine whether it is normal or diseased). The pathologist will be able to confirm if cancer is present in the biopsy tissue. If cancer is present, the pathologist will also be able to grade the tumor. The grade indicates the tumor's degree of aggressiveness—how quickly it is likely to grow and spread. The Gleason grading system is the most widely used system. In this system, the majority tumor pattern is assigned a score from 1 to 5 and the minority pattern is similarly assigned a score, using the same scale. The majority and minority scores are added together to give a Gleason sum ranging between 2 and 10. Scores of 2 to 4 designate low aggressiveness, 5 to 6 mildly aggressive, 7 moderately aggressive and scores of 8 to 10 highly aggressive.

The transrectal ultrasound guided prostate biopsy is usually well tolerated. Injecting local anesthetics into the area before biopsy may minimize this discomfort. Blood in the ejaculate (hematospermia) and blood in the urine (hematuria) occur in most patients.. High fever is rare, occurring in only 1 to 2 percent of patients. The antibiotic is continued for at least 48 hours after the biopsy procedure.

**Why is prostate cancer staged?**

Once prostate cancer has been diagnosed by a prostate biopsy, the physician must stage the disease to determine the extent of the cancer (i.e., the "T" stage) and whether it has spread beyond the prostate gland to the surrounding tissues, the seminal vesicles, the lymph nodes and/or the bones. The T stage is determined by the DRE and other imaging studies of the prostate gland and surrounding tissues, such as the ultrasound scan, CT scan, MRI scan, or MR spectroscopy scan. The T stage is divided into the following categories:

T1: Doctor is unable to feel the tumor or see it with imaging (e.g., transrectal ultrasound)

T1a: Cancer is found incidentally during a transurethral resection (TURP) for benign prostatic enlargement. Cancer is present in less than 5% of the tissue removed and is low grade (Gleason < 6).

T1b: Cancer is found after TURP but is present in more than 5% of the tissue removed or is of a higher grade (Gleason > 6)

T1c: Cancer is found by needle biopsy that was done because of an elevated PSA

T2: Doctor can feel the tumor when a digital rectal exam (DRE) is performed but the tumor still appears to be confined to the prostate

T2a: Cancer is found in one half or less of only one side (left or right) of the prostate

T2b: Cancer is found in more than half of only one side (left or right) of the prostate

T2c: Cancer is found in both sides of the prostate

T3: Cancer has begun to spread outside the prostate and may involve the seminal vesicles

T3a: Cancer extends outside the prostate but not to the seminal vesicles

T3b: Cancer has spread to the seminal vesicles

T4: Cancer has spread to adjacent organs, such as the urethral sphincter, rectum and/or wall of the pelvis

To determine if the cancer has spread to the lymph nodes or bones, the physician may order a CT or MRI scan of the pelvis. A bone scan may be obtained to rule out metastases to the bone. Sometimes follow-up imaging studies are needed to further evaluate abnormalities found on

# EXHIBIT 21

## Uropath, LLC Combined 2006 Volume by DX Category

| LAB NAME | Avg # of Cores | Total Cases | Total Slides | Total IHC | % IHC to Slides | Benign | Adenocarcinoma | Suspicious | PIN | Chronic Inflam | BPH | A Typical | Abnormal | Other | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Leesburg | 10.95 | 8094 | 88652 | 1480 | 1.67% | 3340 | 3410 | 210 | 1013 | 32 | 75 | | | 14 | 8094 |
| San Antonio | 11.82 | 7262 | 85861 | 2796 | 3.26% | 2881 | 3013 | 10 | 1190 | | | 122 | | 46 | 7262 |
| Sarasota | 10.90 | 5652 | 61584 | 8706 | 14.14% | 2096 | 2169 | 302 | 927 | | | 74 | 84 | | 5652 |
| | | | | | | | | | | | | | | | |
| TOTAL | 11.24 | 21008 | 236097 | 12982 | 5.50% | 8317 | 8592 | 522 | 3130 | 32 | 75 | 196 | 84 | 60 | 21008 |

### Combined 2006 Volume by DX Category

| | Benign | Adenocarcinoma | Suspicious | PIN | Chronic Inflam | BPH | A Typical | Abnormal | Other | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| Uropath | 39.59% | 40.90% | 2.48% | 14.90% | 0.15% | 0.36% | 0.93% | 0.40% | 0.29% | 100.00% |

**Percentage of Special Stains**

| Total Slides | Total IHC | % IHC to Slides |
|---|---|---|
| 236097 | 12982 | 5.50% |

## Leesburg 2006 Volume by DX Category

| LAB NAME | Avg # of Cores | Total Cases | Total Slides | Total IHC | % IHC to Slides | Benign | Adenocarcinoma | Suspicious | PIN | Chronic Inflam | BPH | Other | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Advanced Urology | 12.92 | 124 | 1602 | 38 | 2.37% | 33 | 80 |  | 9 | 1 |  |  | 124 |
| Atlantic Urological Assoc | 10.54 | 903 | 9515 | 173 | 1.82% | 313 | 433 | 9 | 120 | 4 | 23 | 1 | 903 |
| Assoc for Urology Care | 11.58 | 474 | 5487 | 111 | 2.02% | 169 | 202 | 5 | 96 | 2 |  |  | 474 |
| Citrus Urology | 10.26 | 700 | 7185 | 122 | 1.70% | 316 | 262 | 6 | 114 | 2 |  |  | 700 |
| Conrad Pearson | 9.53 | 875 | 8342 | 300 | 3.60% | 366 | 406 | 16 | 79 | 6 | 1 | 1 | 875 |
| Grand Strand | 10.94 | 301 | 3293 | 81 | 2.46% | 93 | 158 | 6 | 27 | 9 | 8 |  | 301 |
| Kansas City Urology | 10.93 | 984 | 10759 | 63 | 0.59% | 400 | 402 | 36 | 120 | 3 | 14 | 9 | 984 |
| McIver Urological Clinic | 11.10 | 453 | 5028 | 36 | 0.72% | 175 | 194 | 22 | 46 | 4 | 10 | 2 | 453 |
| Uro Assoc of Lancaster | 11.90 | 212 | 2523 | 59 | 2.34% | 74 | 95 | 4 | 39 |  |  |  | 212 |
| Uro Assoc of No TX | 11.62 | 1850 | 21492 | 160 | 0.74% | 846 | 705 | 90 | 190 |  | 18 | 1 | 1850 |
| Uro Group of Western NE | 11.93 | 366 | 4368 | 92 | 2.11% | 189 | 135 | 1 | 41 |  |  |  | 366 |
| Urology Heath Center | 13.74 | 308 | 4232 | 97 | 2.29% | 131 | 110 | 3 | 62 | 1 | 1 |  | 308 |
| Urology Treatment Ctr | 6.70 | 310 | 2077 | 81 | 3.90% | 136 | 132 | 3 | 39 |  |  |  | 310 |
| Uro Centers of AL | 11.75 | 234 | 2749 | 67 | 2.44% | 99 | 96 | 8 | 31 |  |  |  | 234 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 0 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 0 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 0 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | 0 |
| TOTAL | 10.95 | 8094 | 88652 | 1480 | 1.67% | 3340 | 3410 | 210 | 1013 | 32 | 75 | 14 | 8094 |

## Leesburg 2006 Volume by DX Category

|  | Benign | Adenocarcinoma | Suspicious | PIN | Chronic Inflam | BPH | Other | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Uropath | 41.27% | 42.13% | 2.59% | 12.52% | 0.40% | 0.93% | 0.17% | 100.00% |
| Dianon | 54.70% | 38.60% | 1.60% | 5.10% | NA | NA | NA | 100.00% |

# EXHIBIT 22

## UROPATH COMPARISON OF PATIENTS BIOPSIED COMPARED TO TOTAL PATIENTS SEEN

| Practice | Date Started | 2001 | | | 2002 | | | 2003 | | | 2004 | | | 2005 | | | 2006 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Patients Seen | Patients Biopsied | Percent | Patients Seen | Patients Biopsied | Percent | Patients Seen | Patients Biopsied | Percent | Patients Seen | Patients Biopsied | Percent | Patients Seen | Patients Biopsied | Percent | Patients Seen | Patients Biopsied | Percent |
| 1 | Jul-03 | 63,369 | 1,885 | 2.97% | 68,327 | 1,735 | 2.54% | 73,145 | 1,508 | 2.06% | 74,340 | 1430 | 1.92% | 76,500 | 1,595 | 2.08% | 88,752 | 1,400 | 1.58% |
| 2 | Apr-02 | | | | 65,844 | 2,225 | 3.38% | 75,636 | 2,081 | 2.75% | 82,600 | 1,774 | 2.15% | 109,615 | 2,122 | 1.94% | 121,374 | 2,703 | 2.23% |
| 3 | Jul-05 | | | | | | | | | | 25,405 | 428 | 1.68% | 26,589 | 465 | 1.75% | 29,740 | 615 | 2.07% |
| 4 | May-06 | | | | | | | | | | | | | 21,920 | 473 | 2.16% | 21,936 | 519 | 2.37% |
| 5 | Jul-06 | | | | | | | | | | | | | 9,707 | 369 | 3.80% | 10,040 | 426 | 4.24% |
| 6 | Feb-04 | | | | | | | 10,182 | 438 | 4.30% | 13,356 | 616 | 4.61% | | | | | | |
| 7 | May-04 | | | | | | | 19,676 | 762 | 3.87% | 20,788 | 787 | 3.79% | 20,591 | 646 | 3.14% | 21,050 | 734 | 3.49% |
| 8 | Jun-02 | 44,442 | 1,096 | 2.47% | 50,910 | 1,257 | 2.47% | 53,543 | 971 | 1.81% | 58,667 | 681 | 1.16% | 76,073 | 933 | 1.23% | 102,671 | 1,245 | 1.21% |
| 9 | Jun-04 | | | | | | | 53,477 | 1,020 | 1.91% | 54,291 | 969 | 1.78% | 40,575 | 629 | 1.55% | 72,018 | 1,457 | 2.02% |
| 10 | Aug-06 | | | | | | | | | | | | | 34,251 | 713 | 2.08% | 38,422 | 885 | 2.30% |
| 11 | Sep-04 | | | | | | | | | | 8,774 | 356 | 4.06% | 8,331 | 372 | 4.47% | 9,713 | 457 | 4.71% |
| 12 | Jun-05 | | | | | | | | | | | | | 33,928 | 498 | 1.47% | 34,653 | 725 | 2.09% |
| 13 | Dec-04 | | | | | | | 6,630 | 326 | 4.92% | 8,496 | 228 | 2.68% | 10,036 | 261 | 2.60% | 9,916 | 286 | 2.88% |
| 14 | Jun-07 | | | | | | | | | | 12,047 | 475 | 3.94% | 13,918 | 427 | 3.07% | 14,718 | 500 | 3.40% |
| TOTAL | | 107,811 | 2,981 | | 185,081 | 5,217 | | 292,289 | 7,106 | | 358,764 | 7,744 | | 482,034 | 9,503 | | 575,003 | 11,952 | |

**Before their lab started**
**After their lab started**

UROPATH COMPARISION OF PATIENTS BIOPSIED COMPARED TO TOTAL PATIENTS SEEN

| Combined Totals | Before Lab | After Opening of Lab |
|---|---|---|
| Patients Seen | 408,584 | 1,592,398 |
| Patients Biopsied | 10,327 | 34,176 |
| Percent Biopsied | 2.53% | 2.15% |
| | | |
| Percent Before Lab | 2.53% | |
| Percent After Lab | 2.15% | |



Percentage of Biopsied Patients to Total Patients Seen

# EXHIBIT 23

Urology Associates of North Texas
Analysis of Biopsies Based on Patient Age and Select Diagnosis Codes
For the Years 2001 through 2006

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|
| **Unique Patients** | | | | | | |
| Total Biopsies | 1,813 | 2,119 | 1,987 | 1,688 | 2,034 | 2,591 |
| | | | | | | |
| Total Men Ages 50+ | 11,897 | 12,873 | 13,744 | 15,087 | 21,991 | 24,685 |
| Ratio of Total Biopsies to Men Ages 50+ | 15.24% | 16.46% | 14.46% | 11.19% | 9.25% | 10.50% |
| | | | | | | |
| Total Men with Selected Diagnosis Codes* | 7,573 | 8,431 | 8,892 | 8,826 | 13,362 | 15,502 |
| Ratio of Total Biopsies to Men with Selected Diagnosis Code | 23.94% | 25.13% | 22.35% | 19.13% | 15.22% | 16.71% |
| | | | | | | |
| Total Men over 50 with selected Diagnosis Code* | 7,295 | 8,046 | 8,430 | 8,464 | 12,928 | 14,928 |
| Ratio of Total Biopsies to Men Ages 50+ and with Selected C | 24.85% | 26.34% | 23.57% | 19.94% | 15.73% | 17.36% |
| | | | | | | |
| **Total Patient Encounters** | | | | | | |
| Total Biopsies | 1,880 | 2,222 | 2,079 | 1,773 | 2,121 | 2,700 |
| | | | | | | |
| Total Men Ages 50+ | 32,023 | 36,380 | 42,919 | 48,928 | 69,504 | 84,799 |
| Ratio of total biopsies to men over 50 | 5.87% | 6.11% | 4.84% | 3.62% | 3.05% | 3.18% |
| | | | | | | |
| Total Men with Selected Diagnosis Codes* | 16,922 | 19,884 | 22,895 | 22,695 | 33,566 | 42,945 |
| Ratio of total biopsies to men with selected diagnosis codes | 11.11% | 11.17% | 9.08% | 7.81% | 6.32% | 6.29% |
| | | | | | | |
| Total Men over 50 with selected Diagnosis Code* | 16,438 | 19,210 | 21,843 | 21,865 | 32,612 | 41,509 |
| Ratio of total biopsies to men over 50 and with selected diag | 11.44% | 11.57% | 9.52% | 8.11% | 6.50% | 6.50% |

| | | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|
| * Selected ICD9 Codes include the Following | | | | | | | |
| 790.93 | Elevated PSA | 1590 | 1781 | 1620 | 1297 | 1523 | 2044 |
| 185 | Carcinoma Prostate | 42 | 176 | 188 | 203 | 135 | 126 |
| 236.5 | Prostate/Neoplasm Of Uncertain Behav | 5 | 8 | 83 | 142 | 215 | 235 |
| 600 | Hyperplasia Of Prostate | 3 | | | | | |
| 600.0 | Hypertrophy (benign) Prostate | 61 | 60 | 40 | 1 | | |
| 600.00 | Hypertrophy/benignOf Prostate W/O U | | | 1 | 3 | 18 | 18 |
| 600.01 | Hypertrophy/benignof Prostate Wth | | | | 20 | 46 | 85 |
| 600.1 | Prostate Nodule | 123 | 146 | 95 | 5 | | |
| 600.10 | Nodular Prostate W/O Urinary Obst. | | | | 40 | 62 | 64 |
| 600.11 | Nodular Prostate With Urinary Obst. | | | | 6 | 17 | 20 |
| 600.20 | Benign Localized Hyperplasia Of Pros | | | | 1 | 5 | 17 |
| 602.3 | Dysplasia Of Prostate | | | 2 | 14 | 20 | 20 |



Analysis of Total Biopsies Based on Age of Patients and Select ICD9 Codes

Legend:
- Ratio of Total Biopsies to Men Ages 50+
- Ratio of Total Biopsies to Men with Selected Diagnosis Codes
- Ratio of Total Biopsies to Men Ages 50+ and with Selected Diagnosis Codes

# Prostate Biopsy Rate

## Urology San Antonio

|  | Year | Total Visits with Physicians | Total Biopsies | Biopsy Rate/1000 Visits |
|---|---|---|---|---|
| Pre-UroPath | 2000 | 46,870 | 1,387 | 29.59 |
|  | 2001 | 51,330 | 1,663 | 32.40 |
|  | 2002 | 53,052 | 1,735 | 32.70 |
| Opened Lab | 2003 | 53,988 | 1,508 | 27.93 |
| July 2003 | 2004 | 54,917 | 1,430 | 26.04 |
|  | 2005 | 55,822 | 1,595 | 28.57 |
|  | 2006 | 65,541 | 1,400 | 21.36 |

Total Visits include all patient visits seen by a USA physician

USA opened its Uropath Lab in July of 2003.

Biopsy rate per thousand visits has dropped by nearly 35% since establishing
our own UroPath Lab due to consistent Pathologist specializing
in interpreting prostate tissue and the decrease of repeat biopsies

Claims that groups are overutilizing in order to maximize profit are erroneous
as in USA's case the actual biopsy rate has decreased in the face of both
a growing practice, a population increase in SA and an aging population

# EXHIBIT 24

## DECLARATION OF REBECCA PAGE

NOW COMES Rebecca Page and pursuant to 28 U.S.C. § 1746 declares under oath as follows:

1.      My name is Rebecca Page.  I am over twenty-one years of age, and am fully competent to make this Declaration.

2.      I am currently employed as Director of Clinical Operations by Uropath L.L.C.  I perform these services at the Uropath headquarters in Arlington, Texas.

3.      I have worked in the medical field for approximately fifteen years.  Prior to that, I had business experience in the areas of finance, human resources, and procurement.  I attended some college, but do not have a college degree.  In health care, my managerial experience began as a Manager of Medical Records.  I later managed a hospice/home health agency.  I was afforded the opportunity to work for Uropath, which I joined as Laboratory Administrator in Florida in September 2003.  I was promoted to my current position as national Director of Clinical Operations in 2006, and relocated to Texas to assume that new position.

4.      My position is very specialized and specific to Uropath.  I help set up the medical office buildings in which Uropath managed labs will operate.  I handle ongoing communication with the practices to ensure smooth lab openings and continued operations.  I hire and train staff for new facilities, create and update job descriptions, policies, and procedures, and work to achieve full standardization and compliance with all local, state and federal regulations. Another of my responsibilities is the monitoring of Quality Assurance and sharing of information with all locations to give optimal quality for the patient.  I travel to each location and work with staff to facilitate providing high quality patient care.

5.      Uropath currently employs five people at its headquarters in Arlington.    In addition, it employs 86 individuals at the four centers in which Uropath managed laboratories are located.    There are 32 employees in Leesburg, Florida; 23 in Sarasota, Florida; 23 in San Antonio, Texas; and 8 in Collegeville, Pennsylvania.    Altogether, Uropath provides employment to    91    individuals.    The    personnel    at    the    four    centers    consist    of    histotechnologists, cytotechnologists, medical technologists, lab administrators, lab assistants, clerical personnel and transcriptionists.

6.      As described in materials that I understand are being submitted in this case, Uropath's existing business will be destroyed if the January 3, 2008, final rule is not enjoined. That will cause these 91 people to lose their jobs either immediately or in very short order, myself included.

7.      In accepting my current position I relocated from Florida to Texas in December 2006.    Loss of my job would result in loss of my home, vehicle and the loss of my A-1 established credit rating.    I am the sole means of support of myself, and have no family in Texas or the surrounding area.

8.      I believe that the harm to me caused by the January 3, 2008, rule and to other individuals who are employed by Uropath, is irreparable.    I know of no way in which CMS will compensate me for the loss of my job and loss of income, if the January 3, 2008, rule remains in effect.    Uropath is one of few companies that acknowledges experience in lieu of a college degree.    Because of that policy, it afforded me the opportunity to move up in the corporate structure of Uropath.    Because I do not have a college degree, which most companies require at my level of income and responsibility, it would be extremely difficult to find a comparable

position in the health care field. My income will most likely be drastically reduced, if I am able to find a job at all, and I will still face the issue of loss of my home.

9.      In the summer of 2007, I requested that the physician groups which at that time had laboratories managed by Uropath submit certain data regarding the overall number of patients seen in their practice, and the number of patients biopsied for potential prostate disease. This request was made to all of the physician practices. I asked them for data regarding patients seen and patients biopsied in the calendar year prior to the opening of their Uropath-managed lab, and for all years after the opening of their lab. Fourteen physician groups responded with data. Their responses are summarized on Exhibit 22, which is a true copy of a document prepared by me.

10.      The shaded areas of Exhibit 22 represent years in which the practices had a Uropath-managed lab. The data for the year prior to lab opening is not highlighted. The percentage of patients biopsied includes all patients biopsied, not just those whose samples were sent to the Uropath-managed, physician owned labs. (Some HMOs, for example, require biopsies for HMO patients to be sent to a lab with which the HMO has a contract).

11.      The results are summarized on the second page of Exhibit 22. As can be seen from that chart, the percentage of patients biopsied in the year prior to the opening of their Uropath-managed labs was 2.53% for the fourteen practices combined. After their labs were opened, the overall percentage of patients biopsied was 2.15%. Thus, the percentage of patients who were biopsied actually decreased somewhat for these fourteen physician practice groups combined, in the years after they opened their own laboratories.

I declare under penalties of perjury that the foregoing is true and correct.

Executed on _____/_____, 2008

_____
Rebecca Page

70192797.1

# EXHIBIT 25

MEDICARE REIMBURSEMENT RATES 2007

## 2007 MEDICARE REIMBURSEMENT RATES

| | 88305 Prostate Biopsy | 88342 Stain | 88108 Cytology | 88302 Vas Sterilization | 88304 Foreskin | 88307 Bladder Cancer | 88309 Testis |
|---|---|---|---|---|---|---|---|
| SANTA CLARA, CA | $144.27 | $125.88 | $95.69 | $69.93 | $89.00 | $264.89 | $390.78 |
| SAN FRANCISCO, CA | $144.03 | $125.49 | $95.46 | $70.00 | $89.03 | $264.25 | $389.37 |
| SAN MATEO, CA | $143.81 | $125.42 | $95.36 | $69.75 | $88.75 | $263.98 | $389.27 |
| OAKLAND/BERKELEY, CA | $130.97 | $114.82 | $87.02 | $62.76 | $80.00 | $241.11 | $356.94 |
| MARIN/NAPA/SOLANO, CA | $128.17 | $112.40 | $85.17 | $61.38 | $78.25 | $235.99 | $349.41 |
| MANHATTAN, NY | $128.02 | $112.31 | $84.99 | $60.72 | $77.25 | $235.89 | $349.00 |
| METROPOLITAN BOSTON | $127.67 | $111.91 | $84.81 | $61.09 | $77.83 | $235.04 | $347.81 |
| NYC SUBURBS/LONG I, NY | $127.16 | $111.42 | $84.35 | $60.27 | $76.58 | $234.20 | $346.09 |
| DC + MD/VA SUBURBS | $122.50 | $107.83 | $81.50 | $57.99 | $73.98 | $226.06 | $335.51 |
| QUEENS, NY | $122.50 | $107.49 | $81.30 | $57.88 | $73.60 | $225.79 | $334.03 |
| ANAHEIM/SANTA ANA, CA | $121.17 | $106.63 | $80.60 | $57.38 | $73.18 | $223.58 | $331.75 |
| NORTHERN NJ | $120.64 | $106.39 | $80.31 | $56.84 | $72.55 | $222.85 | $331.19 |
| VENTURA, CA | $116.22 | $102.61 | $77.43 | $54.74 | $69.94 | $214.79 | $319.58 |
| CONNECTICUT | $116.21 | $102.64 | $77.42 | $54.59 | $69.72 | $214.85 | $319.69 |
| LOS ANGELES, CA | $115.38 | $101.98 | $76.88 | $54.08 | $69.08 | $213.41 | $317.68 |
| CHICAGO, IL | $115.11 | $101.40 | $76.50 | $53.77 | $68.42 | $212.67 | $315.39 |
| SUBURBAN CHICAGO, IL | $113.55 | $100.13 | $75.52 | $53.04 | $67.56 | $209.88 | $311.58 |
| REST OF NEW JERSEY | $112.72 | $99.83 | $75.17 | $52.56 | $67.20 | $208.72 | $311.16 |
| SEATTLE (KING CNTY), WA | $112.47 | $99.43 | $74.97 | $52.76 | $67.43 | $208.04 | $309.79 |
| DETROIT, MI | $112.33 | $99.02 | $74.57 | $51.81 | $65.76 | $207.75 | $307.86 |
| METROPOLITAN PHILADELPHIA | $111.99 | $98.91 | $74.55 | $52.28 | $66.67 | $207.13 | $307.97 |
| ALASKA | $111.01 | $98.21 | $73.99 | $51.84 | $66.23 | $205.45 | $306.02 |
| HAWAII/GUAM | $110.70 | $97.93 | $73.81 | $51.86 | $66.30 | $204.83 | $305.15 |
| REST OF MASSACHUSETTS | $110.22 | $97.54 | $73.49 | $51.56 | $65.92 | $203.99 | $303.99 |
| ATLANTA, GA | $109.62 | $97.04 | $73.09 | $51.15 | $65.38 | $202.94 | $302.44 |
| MIAMI, FL | $109.56 | $96.58 | $72.77 | $50.77 | $64.53 | $202.56 | $300.37 |
| POUGHKPSIE/N NYC SUBURBS | $109.12 | $96.62 | $72.74 | $50.77 | $64.86 | $202.08 | $301.11 |
| BALTIMORE/SURR. CNTYS, MD | $108.80 | $96.40 | $72.57 | $50.68 | $64.80 | $201.52 | $300.51 |
| DALLAS, TX | $107.83 | $95.56 | $71.91 | $50.13 | $64.08 | $199.75 | $297.87 |
| NEVADA | $106.27 | $94.24 | $70.89 | $49.32 | $63.05 | $196.95 | $293.83 |

# EXHIBIT 26

**Authority:** Secs. 1102 and 1871 of the Social Security Act (42 U.S.C. 1302 and 1395(hh)) unless otherwise indicated.

§ 484.4   [Amended]

■ 9. Amend § 484.4 by—
■ A. Revising paragraph (e) of the definition of "Occupational therapist".
■ B. Revising paragraph (a)(1) of the definition of "Occupational therapy assistant."
■ C. Revising paragraphs (a)(1) introductory text, (a)(1)(iii), and (e) of the definition of "Physical therapist."
■ D. Revising the introductory text of the definition of "Physical therapist assistant."
■ E. Redesignating paragraphs (a)(1)(i) and (a)(1)(ii) as paragraphs (a)(1) and (a)(2) of the definition of "Physical therapist assistant."
■ F. Revising paragraph (b)(2) of the definition of "Physical therapist assistant."

The revisions read as follows:

§ 484.4   Personnel qualifications.

*   *   *   *   *

*Occupational therapist.*

*   *   *   *   *

(e) If educated outside the United States, must meet all of the following:
(1) Graduated after successful completion of an occupational therapist education program accredited as substantially equivalent to occupational therapist entry level education in the United States by one of the following:
(i) The Accreditation Council for Occupational Therapy Education (ACOTE).
(ii) Successor organizations of ACOTE.
(iii) The World Federation of Occupational Therapists.
(iv) A credentialing body approved by the American Occupational Therapy Association.
(2) Successfully completed the entry-level certification examination for occupational therapists developed and administered by the National Board for Certification in Occupational Therapy, Inc. (NBCOT).
(3) On or before December 31, 2009, is licensed or otherwise regulated, if applicable, as an occupational therapist by the State in which practicing.
*Occupational therapy assistant.*
*   *   *   *
(a) *   *   *
(1) Is licensed, unless licensure does not apply, or otherwise regulated, if applicable, as an occupational therapy assistant by the State in which practicing.
*   *   *   *   *
*Physical therapist.* *   *   *
(a)(1) Graduated after successful completion of a physical therapist

education program approved by one of the following:
*   *   *   *   *
(iii) An education program outside the United States determined to be substantially equivalent to physical therapist entry-level education in the United States by a credentials evaluation organization approved by the American Physical Therapy Association or an organization identified in 8 CFR 212.15(e) as it relates to physical therapists; and
*   *   *   *   *
(e) Before January 1, 1966—
(1) Was admitted to membership by the American Physical Therapy Association; or
(2) Was admitted to registration by the American Registry of Physical Therapists; or
(3) Has graduated from a physical therapy curriculum in a 4-year college or university approved by a State department of education.
*   *   *   *   *
*Physical therapist assistant.* A person who is licensed, unless licensure does not apply, registered, or certified as a physical therapist assistant, if applicable, by the State in which practicing, and meets one of the following requirements:
*   *   *   *   *
(b) *   *   *
(2) In States where licensure or other regulations do not apply, graduated on or before December 31, 2009, from a 2-year college-level program approved by the American Physical Therapy Association and, effective January 1, 2010 meets the requirements of paragraph (a) of this definition.
*   *   *   *   *
(Catalog of Federal Domestic Assistance Program No. 93.774, Medicare— Supplementary Medical Insurance Program)

Dated: January 10, 2008.

**Ann C. Agnew,**
*Executive Secretary to the Department.*
[FR Doc. E8–576 Filed 1–14–08; 8:45 am]
**BILLING CODE 4120–01–P**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Medicare & Medicaid Services**

**42 CFR Part 414**

**[CMS–1385–CN3]**

**RIN 0938–AO65**

**Medicare Program; Revisions to Payment Policies Under the Physician Fee Schedule, and Other Part B Payment Policies for CY 2008; Delay of the Date of Applicability of the Revised Anti-Markup Provisions for Certain Services Furnished in Certain Locations (§ 414.50); Correction**

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), HHS.
**ACTION:** Final rule; correction.

**SUMMARY:** This document corrects typographical errors identified in the final rule that appeared in the January 3, 2008 **Federal Register** (73 FR 404). The final rule delayed until January 1, 2009 the applicability of the anti-markup provisions in § 414.50, as revised at 72 FR 66222, except with respect to the technical component of a purchased diagnostic test and with respect to any anatomic pathology diagnostic testing services furnished in space that is utilized by a physician group practice as a "centralized building" (as defined at § 411.351) for purposes of complying with the physician self-referral rules and does not qualify as a "same building" under § 411.355(b)(2)(i) of this chapter.
**DATES:** *Effective Date:* This correction notice is effective January 1, 2008.
**FOR FURTHER INFORMATION CONTACT:** Donald Romano, (410) 786–1401.
**SUPPLEMENTARY INFORMATION:**

**I. Background**

In FR Doc. 07–6280 (73 FR 404), the final rule entitled "Revisions to Payment Policies Under the Physician Fee Schedule, and Other Part B Payment Policies for CY 2008; Delay of the Date of Applicability of the Revised Anti-Markup Provisions for Certain Services Furnished in Certain Locations (§ 414.50)," there were typographical errors in the preamble that were identified and corrected in this correction notice. The provisions of this correction notice are effective January 1, 2008.

**II. Summary of Errors**

On page 406, we are correcting a typographical error in section III., Waiver of Proposed Rulemaking, to clarify that the delay of the applicability

**2434**     **Federal Register** / Vol. 73, No. 10 / Tuesday, January 15, 2008 / Rules and Regulations

date for revised § 414.50 excludes any anatomic pathology diagnostic testing services furnished in space that is utilized by a physician group practice as a "centralized building" (as defined at § 411.351) for purposes of complying with the physician self-referral rules and does not qualify as a "same building" under § 411.355(b)(2)(i). We are also correcting a typographical error in section IV., Collection of Information Requirements, by correcting the U.S.C. citation of the Paperwork Reduction Act of 1995.

**III. Correction of Errors**

On page 406, in the 1st column;

a. The 1st partial paragraph, line 2, the phrase "revised § 414.50 with respect to" is corrected to read "revised § 414.50 except with respect to."

b. The 1st full paragraph, line 8, the phrase "(44 U.S.C. 35)" is corrected read "(44 U.S.C. 3501)"

**IV. Waiver of Proposed Rulemaking**

We ordinarily publish a notice of proposed rulemaking and invite public comment on the proposed rule. The notice and comment rulemaking procedure is not required, however, if the rule is interpretive or procedural in nature, and it may be waived if there is good cause that it is impracticable, unnecessary, or contrary to the public interest and we incorporate in the rule a statement of such a finding and the reasons supporting that finding. Likewise, we ordinarily provide for a delayed effective date of a final rule, but we are not required to do so if the rule is procedural or interpretive. Where a delayed effective date is required, this requirement may be waived for good cause. We set forth below our finding of good cause for the waiver of notice and comment rulemaking and the waiver of a delayed effective date.

Our implementation of this action without opportunity for public comment and without a delayed effective date is based on the good cause exceptions in 5 U.S.C. 553(b)(3)(B) and (d), respectively. We find that seeking public comment on this action is impracticable and contrary to the public interest. We issued the delay in applicability notice as a result of our review of the informal comments on the final rule with comment period from various stakeholders. We are correcting typographical errors from that notice, and therefore, do not believe that further notice and comment is necessary at this time.

**Authority:** (Catalog of Federal Domestic Assistance Program No. 93.773, Medicare—Hospital Insurance; and Program No. 93.774, Medicare—Supplementary Medical Insurance Program)

Dated: January 10, 2008.

**Ann C. Agnew,**
*Executive Secretary to the Department.*
[FR Doc. E8–561 Filed 1–14–08; 8:45 am]
**BILLING CODE 4120–01–P**

# EXHIBIT 27

## DECLARATION OF SAM MICHAELS, M.D.

NOW COMES Sam Michaels, M.D. and pursuant to 28 U.S.C. § 1746 declares under oath as follows:

1.     My name is Sam Michaels.  I am over twenty-one years of age, and am fully competent to make this Declaration.

2.     I am a medical doctor, licensed to practice in the States of Florida, Ohio, Indiana, Kansas, Colorado, Texas and North Carolina.  I received my M.D. degree in 1988 from Damascus University; Faculty of Medicine.  I am a practicing pathologist, and have three separate board certifications by the American Board of Pathology in Anatomic Pathology, Clinical Pathology, and Cytopathology.  I completed a five year residency in Pathology and Laboratory Medicine program at the University of Cincinnati; College of Medicine.  I have completed two fellowships in pathology sub-disciplines, one in kidney pathology at the Armed Forces Institute of Pathology (AFIP) at Walter Reed Medical Center, and another in Cytopathology at Upstate Medical University in Syracuse, New York (part of the SUNY system).  I was in private pathology practice in Texas for approximately five years before moving to Florida.

3.     My full-time medical practice consists of providing pathology services for five urology practices at their pathology laboratories in Sarasota, Florida.  I am also the Medical Director for these five labs.  The five physician groups for which I perform pathology services, and the principal locations of their medical group practices are:  Advanced Urology, P.C., in Aurora, Colorado; Florida Urology Specialists, in Sarasota, Florida; NorthEast Indiana Urology, P.C., in Fort Wayne, Indiana; Urology Associates, P.C., in Denver, Colorado; and Urology Associates of Topeka, P.A., in Topeka, Kansas.

4.     The five labs owned and operated by these physician groups all have management agreements with Uropath, L.L.C. to manage the labs.

5.     If the January 3, 2008 rule is not enjoined, and as a result these labs are closed, my entire present medical practice will be destroyed.  My medical practice depends upon the existing business relationships which I have established with the five physician groups listed above.  Because the vast majority of my pathology work is for labs owned by physician groups from out of state, it will be impossible for me to continue my business relationships with those groups if their labs in Sarasota are closed.

6.     I believe that the harm to me from the January 3, 2008 rule, and to other pathologists who contract with physician-owned labs that are managed by Uropath, is irreparable.  I know of no way in which CMS will compensate me for the destruction of my medical practice and the loss of business and income that will be suffered by me, and by the other pathologists, if the January 3, 2008, rule is not enjoined.

I declare under penalties of perjury that the foregoing is true and correct.

Executed on _Jan, 15 th_, 2008


_Sam Michaels_

Sam Michaels, M.D.

# EXHIBIT 28

**CMS 2008 FINANCIAL IMPACT**
**PRACTICE NAMES LISTED**

| PRACTICE NAME | % MEDICARE | % PPO/ PRIVATE | % HMO |
|---|---|---|---|
| Associates for Urology Care, PA | 60% | 20% | 20% |
| Citrus Urology Associates, PA | 82% | 5% | 13% |
| Atlantic Urological Associates, PA | 67% | 23% | 10% |
| Advanced Urology Associates of Florida | 81% | 10% | 9% |
| Urology Group of Western New England, PC | 54% | 36% | 10% |
| Kansas City Urology Care, PA | 53% | 30% | 17% |
| Conrad Pearson Clinic | 50% | 30% | 20% |
| McIver Urologic Clinic | 55% | 36% | 10% |
| Urology Associates of North Texas, LLP | 50% | 30% | 20% |
| Urology Professionals, L.L.L.P. | 80% | 10% | 10% |
| Atlantic Urology Clinics, L.L.C. | 67% | 33% | 0% |
| Lowcountry Urology Clinics, P.A. | 70% | 20% | 10% |
| Urology Center of Alabama, P.C. | 38% | 40% | 23% |
| Urological Associates of Lancaster, Ltd. | 54% | 32% | 14% |
| Oregon Urology Institute | 46% | 54% | 0% |
| Urology Clinics of North Texas, P.A. | 65% | 20% | 15% |
| Central Texas Urologic Associates, PA | 50% | 47% | 3% |
| The Urology Team | 30% | 70% | 0% |
| Urology Specialists of Austin, L.L.P. | 48% | 47% | 5% |
| Urology Tyler, P.A. | 70% | 25% | 5% |
| Urology San Antonio, PA | 34% | 45% | 21% |
| Memorial Urology Associates | 55% | 45% | 0% |
| Lubbock Urology Clinic, LLP | 50% | 40% | 10% |
| Urology Care, Inc. | 64% | 26% | 10% |
| Midwest Urology Center | 45% | 35% | 20% |
| Northwoods Urology Associates | 50% | 35% | 15% |
| Collom-Carney Clinics | 100% | 0% | 0% |
| Urology Associates of South Texas | 70% | 25% | 5% |
| Houston Metro Urology, P.A. | 30% | 70% | 0% |
| Amarillo Urology Associates, LLP | 38% | 31% | 32% |
| Specialists in Urology, PA | 75% | 25% | 0% |
| Urology Consultants, Inc. | 54% | 36% | 10% |
| Urology Specialists of the Carolinas | 70% | 30% | 0% |
| Urology Partners, PA | 85% | 13% | 2% |
| Florida Urology Specialists | 70% | 30% | 0% |
| Urology Associates, PC | 23% | 48% | 29% |
| Northeast Indiana Urology, PC | 59% | 41% | 0% |
| Advanced Urology, P.C.* | 22% | 60% | 18% |
| Urology Associates of Topeka, PA | 65% | 35% | 0% |
| Panama City Urological Center, PA | 80% | 20% | 0% |
| The Urology Center, P.C. | 33% | 33% | 34% |
| Urology Care of Central Florida, P.A. | 70% | 15% | 15% |
| Southeastern Urology | 80% | 15% | 5% |
| Western Kansas Urological Associates, PA | 80% | 10% | 10% |
| Yorktowne Urology, P.C. | 54% | 43% | 3% |
| Wayne Urological Associates, P.A. | 65% | 30% | 5% |
| Urology Professional Association | 60% | 40% | 0% |
| Surgical Specialists of Oklahoma, PLLC d/b/a/ Urology Centers of Oklahoma | 60% | 30% | 10% |
| Urology Specialists of New England, LLC* | 55% | 20% | 25% |
| Urology Associates of Southern Arizona* | 40% | 40% | 20% |
| Triangle Urology Group* | 65% | 30% | 5% |
| * = Practices that have not started operations | 58% | 32% | 10% |

# EXHIBIT 29





# PATHOLOGISTS

WHO WE ARE
PATHOLOGISTS
PHYSICIAN SERVICES
LOCATIONS
CONTACT US
NEWS
CAREERS
WHY UROPATH



**William M. Murphy, MD**
**Pathologist, Leesburg**

Dr. William M. Murphy is a graduate of Harvard Medical School and the residency program of Case-Western Reserve University. He is an internationally recognized expert in urological pathology with practical experience in both private and academic settings. Among his extensive publications are a textbook (Urological Pathology), a monograph (Urinary Cytopathology), and the 1st of the 4th series AFIP Fascicles (Tumors of the Kidney, Bladder, and Related Urinary Structures). Dr. Murphy is a popular speaker whose talents have been enjoyed by audiences in more than 15 countries worldwide. He has conducted educational courses in urologic pathology for the American Society of Cytopathology, the United States-Canadian Academy of Pathology, and currently for the American Society for Clinical Pathology.

Home | Back

WHO WE ARE | PATHOLOGISTS | PHYSICIAN SERVICES | LOCATIONS | NEWS | CAREERS
HOME | WHY UROPATH | ©2007 UROPATH LLC. | PRIVACY & TERMS | CONTACT US





## PATHOLOGISTS

WHO WE ARE
PATHOLOGISTS
PHYSICIAN SERVICES
LOCATIONS
CONTACT US
NEWS
CAREERS
WHY UROPATH



**Nick Maruniak, MD**
**Pathologist, Leesburg**

Nick Maruniak, MD has a broad knowledge of pathology settings as he has worked in each over the last sixteen years. He has experience as a hospital, private reference laboratory, large national reference laboratory and forensic pathologist, but he has spent the last nine years dedicated to urologic pathology. He is a native Floridian that attended college at Florida State University and medical school at the University of Florida. He completed a pathology residency at Brown University in Rhode Island.

After residency, he joined a Leesburg pathology group whose practice included hospital pathology, an independent reference laboratory and the Medical Examiner's Office. After five years of hospital and forensic pathology, Dr. Maruniak started doing locum tenens work and became Regional Medical Director for a large national laboratory.

Several years later, he joined a urology group in Ocala, Florida to provide pathology services to their patients and developed a reference laboratory specializing in urologic, gastroenterologic and gynecologic pathology. Prior to this, his experience with urologic pathology was as a general pathologist, seeing 5-10 prostate biopsies a week and an occasional bladder and testicular tumor.

In order to sharpen his skills in urologic pathology, he made frequent consultations with Dr. William Murphy at the University of Florida. He also collaborated with Dr. Murphy in writing and publishing several papers in urology and urologic pathology journals. Dr. Maruniak left that position in 2001, in order to help establish what has become UroPath.

Home | Back

WHO WE ARE | PATHOLOGISTS | PHYSICIAN SERVICES | LOCATIONS | NEWS | CAREERS
HOME | WHY UROPATH | ©2007 UROPATH LLC. | PRIVACY & TERMS | CONTACT US





## PATHOLOGISTS

WHO WE ARE
PATHOLOGISTS
PHYSICIAN SERVICES
LOCATIONS
CONTACT US
NEWS
CAREERS
WHY UROPATH



**Brian Schnell, MD**
**Pathologist, Leesburg**

Brian Schnell, M.D. received his medical training at The Medical College of Georgia then, finished his residency at the University of Washington Medical Center. Dr. Schnell did his fellowship in Cytopathology at Summa Health Systems in Akron, OH. Dr. Schnell has practiced pathology for more than eleven years. He is Board Certified for Anatomic and Clinical Pathology. Dr. Schnell currently resides in Orlando, FL and he works with labs from South Carolina and Florida.

Home | Back
WHO WE ARE | PATHOLOGISTS | PHYSICIAN SERVICES | LOCATIONS | NEWS | CAREERS
HOME | WHY UROPATH | ©2007 UROPATH LLC. | PRIVACY & TERMS | CONTACT US





# PATHOLOGISTS

WHO WE ARE
PATHOLOGISTS
PHYSICIAN SERVICES
LOCATIONS
CONTACT US
NEWS
CAREERS
WHY UROPATH



**Salah Antar, MD**
**Pathologist, Sarasota**

Dr. Antar comes to Uropath from the Veteran's Administration. He spent five years for the VA in Chicago as Staff Pathologist, Cytology Director and Blood Bank Director, followed by 6 years in Milwaukee as Staff Pathologist, Blood Bank Director, and Autopsy Director. While in Chicago he also served as Clinical Assistant Professor of Pathology at the University of Illinois.

Dr. Antar is Board Certified in Anatomic and Clinical Pathology, a member of the American Society of Clinical Pathologists and a Fellow of the College of American Pathologists.

Salah Antar, MD, obtained his medical degree with Honors and his Masters in Clinical Pathology at Al-Azhar University College of Medicine in Cairo, the oldest established university in the world. After four years internship and residency in Pathology at El Hossain University Hospital in Cairo; he spent four years in residency in Pathology in the University of Illinois's residency program at Mercy Hospital and Medical Center in Chicago. He stayed for a fifth year as a Cytology and Surgical Pathology resident.

Home | Back

WHO WE ARE | PATHOLOGISTS | PHYSICIAN SERVICES | LOCATIONS | NEWS | CAREERS
HOME | WHY UROPATH | ©2007 UROPATH LLC. | PRIVACY & TERMS | CONTACT US





## PATHOLOGISTS

WHO WE ARE
PATHOLOGISTS
PHYSICIAN SERVICES
LOCATIONS
CONTACT US
NEWS
CAREERS
WHY UROPATH



**Sam Michaels, MD**
**Pathologist, Sarasota**

Dr. Sam Michaels is both Anatomic/Clinical Pathology board certified (1999) and Cytopathology board certified (2000). He also holds certification in Nephropathology from the Armed Forces Institute of Pathology (AFIP).

Dr. Michaels was born and raised in Damascus, Syria where he went to medical school. He was one of the top graduates of his class in 1988. He came to the United States in pursuit of higher education and medical technology. He successfully completed a five years residency program in Pathology and laboratory medicine at the University of Cincinnati College of Medicine, Cincinnati, Ohio (1992-1997) followed by a fellowship training in Nephropathology at the AFIP, Washington, D.C. (1998-99) and fellowship training in Cytopathology at Upstate Medical University (SUNY) Syracuse, New York (1999-2000).

Throughout his residency and fellowship training Dr. Michaels was involved in many teaching activities to include Resident's Cytopathology Monthly Conference, Oncology/ Pathology Bi-Weekly Conference, Cytotechnology School Lecturer, Cincinnati Pathology Society Speaker, Resident's Conference and Journal Club Presenter, Medical School Pathology/Laboratory Course Instructor and Medical Technology Course Lecturer.

He was also involved in many research projects and publications to include "Clinical Significance of the Pap Smear Diagnosis of LSIL Cannot Exclude HSIL", "Renal Sarcoidosis with Superimposed Post- Infectious Glomerulonephritis Presenting as Acute Renal Failure", "von Willebrand's Disease; Practical Approach to Diagnosis and Treatment", "Amitotic Nuclear Division of Hepatocytes in Acute Liver Necrosis and Liver Transplantation"

and "Malignant Melanoma in Syria, Treatment and Prognosis" as a Doctoral Thesis.

After his last fellowship training post, Dr. Michaels went into private practice and worked primarily for Southwest Anatomic Pathology Services (SWAP) in El Paso, Texas. Dr. Michaels is currently an active member in many organizations to include Fellow, West Texas Medical Society, American Society of Cytopathology and College of American Pathologists. He holds full active medical licenses in several states to include, Texas, New Mexico, Indiana and Florida.

Home | Back
WHO WE ARE | PATHOLOGISTS | PHYSICIAN SERVICES | LOCATIONS | NEWS | CAREERS
HOME | WHY UROPATH | ©2007 UROPATH LLC. | PRIVACY & TERMS | CONTACT US





# PATHOLOGISTS



WHO WE ARE
PATHOLOGISTS
PHYSICIAN SERVICES
LOCATIONS
CONTACT US
NEWS
CAREERS
WHY UROPATH

**Melissa Blount , M.D.
Pathologist, Sarasota**

Dr. Blount received her undergraduate education at Brown University and obtained her medical degree from the University of California, San Francisco. She completed her internship at Montefiore Medical Center and pathology residency at State University of New York at Stony Brook and Emory University. She subsequently finished a cytopathology fellowship at Jackson Memorial Hospital/University of Miami.

Dr. Blount is board certified in Anatomic and Clinical Pathology as well as Cytopathology. She is a member of the College of American Pathologists and American Society of Cytopathology.

In her over ten year career, she has worked in both hospital-based practices and reference laboratories. Some of the latter include high-volume urological centers which have provided a broad exposure to this specialty.

Home | Back
WHO WE ARE | PATHOLOGISTS | PHYSICIAN SERVICES | LOCATIONS | NEWS | CAREERS
HOME | WHY UROPATH | ©2007 UROPATH LLC. | PRIVACY & TERMS | CONTACT US





PATHOLOGISTS

WHO WE ARE
PATHOLOGISTS
PHYSICIAN SERVICES
LOCATIONS
CONTACT US
NEWS
CAREERS
WHY UROPATH



**Jaime Furman, MD**
**Pathologist, San Antonio**

I was born in Colombia, South America and I did my medical studies in Bogota, Colombia at the Pontifical Universidad Javeriana. After graduation, I did my social medical service as a physician with the Colombian army in the rain forest at the south part of Colombia. Soon after coming to the United States in 1988, I started my residency in Anatomic Pathology at Washington University in St. Louis. I also did a Surgical Pathology fellowship in St. Louis. Later, I went to the University of Florida in Gainesville where I completed a fellowship in Urologic Pathology under the supervision of Dr. William Murphy.

I was an Assistant Professor in Pathology at the University of Florida until 1991 and then, an Associate Professor at the University of Texas Health Science Center at San Antonio. I have a great interest in teaching Pathology and currently I am an Adjunct Associate Professor at the Health Science Center in San Antonio where I teach Urologic pathology to medical students, urology and pathology residents.

I have been fortunate to receive several awards in teaching including: Faculty Recognition Award, Department of Pathology,

University of Florida (1999); The Peter M. Banks, M.D. Excellence in Pathology Teaching Award, University of Texas (2002); and The Excellence Teaching Award, Division of Urology, University of Texas (2004). My primary research interest is Urologic neoplasms including prostate, urinary bladder and renal neoplasms. I collaborated for the last three years with the multidisciplinary research effort at The San Antonio Center for Biomarkers of Risk for Prostate Cancer (SABOR) to study prostate carcinomas. I have presented several abstracts and I have published papers and book chapters in topics related to surgical and Urologic Pathology. I have a great interest in Urologic Pathology and since July 2004, I have been associated with Uropath in San Antonio, Texas.

Home | Back
WHO WE ARE | PATHOLOGISTS | PHYSICIAN SERVICES | LOCATIONS | NEWS | CAREERS
HOME | WHY UROPATH | ©2007 UROPATH LLC. | PRIVACY & TERMS | CONTACT US





# PATHOLOGISTS

WHO WE ARE
PATHOLOGISTS
PHYSICIAN SERVICES
LOCATIONS
CONTACT US
NEWS
CAREERS
WHY UROPATH



**Rita Tibbs, M.D.**
**Pathologist, San Antonio**

Dr. Rita Tibbs received her medical degree from St. Louis University, College of Medicine, Baguio City, Philippines. She completed residency training in anatomic and clinical pathology at the University of Texas Medical Branch, Galveston, Texas followed by a fellowship in genitourinary pathology at the University of Texas MD Anderson Cancer Center in Houston. Prior to joining Uropath, she held the position as Assistant Professor in the Genitourinary Pathology Section at UT MD Anderson Cancer Center where she worked alongside her mentors Dr. Patricia Troncoso, Dr. Bogdan Czerniak and Dr. Alberto Ayala among others who shared their expertise in prostate, bladder, kidney and testicular pathology. Her professional memberships include the American Society of Clinical Pathologists, United States and Canadian Academy of Pathology, Houston Society of Clinical Pathologists and the Texas Medical Association.

Home | Back

WHO WE ARE | PATHOLOGISTS | PHYSICIAN SERVICES | LOCATIONS | NEWS | CAREERS
HOME | WHY UROPATH | ©2007 UROPATH LLC. | PRIVACY & TERMS | CONTACT US







**Adriana Olivares , MD**
**Pathologist, San Antonio**

Dr. Olivares was born and raised in Venezuela. She obtained her medical degree at the University of Monterrey in Monterrey, Mexico.

She completed a residency program in Anatomic Pathology at Barnes Hospital, Washington University in St. Louis, Missouri and a residency in clinical Pathology at the University of Texas Medical School in Houston.

Dr. Olivares also completed a Fellowship in Surgical Pathology at the University of Texas M.D. Anderson Cancer Center in Houston. After her residency and fellowship training she joined the UT M.D. Anderson Cancer Center staff as an Assistant Professor and Surgical Pathologist in the genitourinary subspecialty.

At M.D. Anderson Cancer Center she worked for 5 years exclusively as a Urologic Pathologist until she joined the Uropath team last November. Dr. Olivares is Board Certified in Anatomic Pathology and is a member of the American Medical Association, Texas Medical Association, American Society of Clinical Pathology, College of American Pathologists, and United States and Canadian Academy of Pathology.

Home | Back





## PATHOLOGISTS

WHO WE ARE
PATHOLOGISTS
PHYSICIAN SERVICES
LOCATIONS
CONTACT US
NEWS
CAREERS
WHY UROPATH



**Junyi Lei ,M.D.,Ph.D.**
**Pathologist, Philadelphia**

Dr. Junyi Lei is board certified in anatomic pathology by the American Board of Pathology. He received his M.D. degree from Henan Medical College, Zhengzhou, China and his Ph.D. from Emory University, Atlanta, Georgia. Dr. Lei completed his residency in anatomic pathology at the National Cancer Institute, NIH, Bethesda, Maryland, as well as a fellowship in genitourinary pathology at Brigham and Women's Hospital, Harvard Medical School, Boston, Massachusetts. He served as an instructor in the Department of Pathology at the Henan Medical College and most recently as Assistant Professor in the Department of Pathology at the University of Rochester Medical Center where he was responsible for genitourinary pathology. Dr. Lei is a recipient of 2 national research awards as well as the Arthur Purdy Stout Society of Surgical Pathologists Study Award. He has published several papers related to genitourinary disease and has presented regularly at annual meetings for the American Association of Cancer Research, the United States and Canadian Academy of Pathology and the College of American Pathologists. Dr. Lei is a member of the American Association of Cancer Research, the United States and Canadian Academy of Pathology, the College of American Pathology, the American Society of Clinical Pathologists and the American Foundation of Pathology.

Home | Back

# EXHIBIT 30

Lease Term and Amount Due
as of 01/10/2008

|  | Rent per month | Expires | Balance |
|---|---|---|---|
| Corporate Location | $1,592.07 | 09/30/2010 | $59,030.52 |
| Leesburg | $5,398.41 | 04/30/2012 | $323,904.60 |
| San Antonio | $13,429.00 | 10/01/2008 | $107,432.00 |
| Sarasota | $16,228.52 | 02/18/2013 | $973,711.20 |
| Philly | $24,266.66 | 05/31/2012 | $1,164,799.68 |

01/10/2008

# EXHIBIT 31

**Uropath, LLC**
**Year to Date Income Statement**
**For the Twelve Months Ending December 31, 2007**

**LABORATORY REVENUE**                                                    7,529,310.40

**EXPENSES**
    Direct Expenses                          2,341,594.80
    Indirect Expenses                        3,824,905.10
    General & Administrative Expenses        1,316,364.11
                        --------------------

                                                      7,482,864.01
                                                      ---------------------

**NET GAIN( LOSS) FROM OPERATIONS**                                       46,446.39

**OTHER INCOME AND (EXPENSES)**
    Interest Expense                          (9,693.75)
                        ---------------------
                                                      (9,693.75)
                                                      ---------------------

**NET GAIN(LOSS)**                                                        36,752.64

**BEGINNING MEMBERS' EQUITY**                                             961,430.31

                                                       ----------------------

**ENDING MEMBERS' EQUITY**                                                998,182.95
                                                       ============

# EXHIBIT 32

In the event that Uropath LLC, Board of Managers decide to close the doors, creating a "Doomsday effect" the following expenses need to recognized:

| | | |
|---|---|---|
| Terminal Wages, PTO and Severence as of 11/16/2007 | $621,563.29 | |
| Total Wages | | $621,563.29 |
| Accounts Payable (excluding PA) | $496,740.92 | |
| Philadelphia-remaining construction and buildout | $386,864.83 | |
| Philadelphia lab in process | $74,411.95 | |
| Total Accounts Payable | | $958,017.70 |
| Rents: (assumption made of 6 month buyout) | | |
| Leesburg | $39,600.00 | |
| San Antonio | $81,450.00 | |
| Sarasota | $96,000.00 | |
| Philadelphia | $144,000.00 | |
| Total Rent Buyout (does not include building conversions) | | $361,050.00 |
| Line of Credit | $291,000.00 | |
| Total of Line of Credit | | $291,000.00 |
| Equipment Leases: | | |
| San Antonio Copies | $4,000.00 | |
| Sarasota Copier | $7,700.00 | |
| Leesburg copier | $1,800.00 | |
| Total Equipment Leases | | $13,500.00 |
| Anticapted initial cost of closing Uropath | | $2,245,130.99 |

# EXHIBIT 33

In the event that Uropath LLC, Board of Managers decide to close the doors, creating a "Doomsday effect" the following expenses need to recognized:

| | | |
|---|---|---|
| Terminal Wages, PTO and Severence as of 11/16/2007 | $621,563.29 | |
| Total Wages | | $621,563.29 |
| Accounts Payable (excluding PA) | $496,740.92 | |
| Philadelphia-remaining construction and buildout | $386,864.83 | |
| Philadelphia lab in process | $74,411.95 | |
| Total Accounts Payable | | $958,017.70 |
| Rents: | | |
| Corporate Office | $59,030.52 | |
| Leesburg | $323,904.60 | |
| San Antonio | $107,432.00 | |
| Sarasota | $973,711.20 | |
| Philadelphia | $1,164,799.68 | |
| Total Rent Buyout (does not include building conversions) | | $2,628,878.00 |
| Line of Credit | $291,000.00 | |
| Total of Line of Credit | | $291,000.00 |
| Equipment Leases: | | |
| San Antonio Copies | $4,000.00 | |
| Sarasota Copier | $7,700.00 | |
| Leesburg copier | $1,800.00 | |
| Total Equipment Leases | | $13,500.00 |
| Anticapted initial cost of closing Uropath | | $4,512,958.99 |