# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| Atlantic Urological Associates et al., | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) |
|  | ) |
| Michael O. Leavitt, as Secretary of | ) |
| United States Department of Health and | ) |
| Human Services, | ) |
| Defendant. | ) |

**No. 08-CV-00141-RMC**

_____

## DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

Defendant requests that the Court dismiss Plaintiff's Complaint, in its entirety.

Dated: February 20, 2008

Respectfully Submitted:

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

Sheila M. Lieber
Deputy Branch Director

_/s/ Peter T. Wechsler_
Peter T. Wechsler (MA 550339)
Trial Attorney
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Tel.: (202) 514-2705
Fax: (202) 616-8470
Email: peter.wechsler@usdoj.gov
 _Attorneys for Defendant_

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **Atlantic Urological Associates et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 08-CV-00141-RMC** |
| **v.** | ) | |
| | ) | |
| **Michael O. Leavitt, as Secretary of** | ) | |
| **United States Department of Health and** | ) | |
| **Human Services,** | ) | |
| **Defendant.** | ) | |

_____)

**PROPOSED ORDER ON DEFENDANT'S MOTION**
**TO DISMISS THE COMPLAINT**

Having reviewed Defendants' Motion to Dismiss the Complaint, and plaintiffs' response,

the Court hereby ORDERS as follows:

1. Plaintiffs' application for preliminary injunction is denied.

2. Plaintiffs' Complaint is dismissed, in its entirety.

SO ORDERED on this __ day of _____, 2008.

_____
Rosemary M. Collyer
United States District Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

———————————————————— )
| )
**Atlantic Urological Associates et al.,** )
| )
    **Plaintiffs,** )
| )    **No. 08-CV-00141-RMC**
  **v.** )
| )
**Michael O. Leavitt, as Secretary of** )
**United States Department of Health and** )
**Human Services,** )
    **Defendant.** )
———————————————————— )

## <u>MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS</u>

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

Sheila M. Lieber
Deputy Branch Director
Peter T. Wechsler (MA 550339)
Trial Attorney
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Tel.: (202) 514-2705
Fax: (202) 616-8470
Email: peter.wechsler@usdoj.gov
 *Attorneys for Defendant*

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ........................................................................................................ 1

THE MEDICARE STATUTE, THE RULES, AND PLAINTIFFS' CLAIMS ........................... 4

    A.    The Medicare Program ................................................................... 4

    B.    The Anti-Markup Rule .................................................................... 5

    C.    Plaintiffs' Claims ........................................................................... 7

    D.    The Interim Agreement .................................................................. 8

ARGUMENT ............................................................................................................. 9

I.    THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER
PLAINTIFFS' CLAIMS UNDER THE MEDICARE ACT AND THE APA ................ 9

    A.    The Medicare Act Requires that Providers Exhaust Administrative
Remedies Prior to Seeking Judicial Review ........................................ 9

    B.    The Physician Groups Failed to Exhaust Administrative Remedies
Under the Medicare Act ................................................................. 11

    C.    Subject-Matter Jurisdiction Is Not Available Under 28 U.S.C. § 1331 ............. 13

    D.    Uropath Lacks Standing to Challenge the Final Anti-Markup Rule
Because It Does Not Provide Diagnostic Testing Services ............................... 15

II.    THE COURT SHOULD DEFER TO CMS'S REASONABLE
INTERPRETATION OF THE MEDICARE ACT AS AUTHORIZING
CMS TO APPLY THE ANTI-MARKUP RULE TO ANATOMIC
PATHOLOGY TESTING SERVICES ....................................................... 19

    A.    Chevron Deference Applies to the Secretary's Interpretation
of the Provisions of the Medicare Act that Apply to Diagnostic
Testing Services ........................................................................... 19

    B.    The Final Anti-Markup Rule Does not Conflict with the
Anti-Markup Statute ...................................................................... 21

C.      The Final Anti-Markup Rule Is Consistent with the Stark Law .......................... 25

D.      The Final Anti-Markup Rule Is Consistent with the
Physician-Fee-Schedule Statute .......................................................................... 27

III.    BECAUSE CMS'S DECISION TO APPLY THE NOVEMBER 2007
FINAL ANTI-MARKUP RULE TO ANATOMIC PATHOLOGY
DIAGNOSTIC TESTING SERVICES IS REASONABLE, THE COURT
SHOULD DEFER TO THAT DECISION AND REJECT PLAINTIFFS'
APA CHALLENGE ............................................................................................... 28

A.      The Standard of Review of Agency Action Under the APA ............................... 28

B.      Because CMS's Decision to Apply the Final Anti-Markup Rule
to Anatomic Pathology Claims Is Reasonable, the Court Should
Defer to that Decision .......................................................................................... 29

IV.    IN ISSUING THE FINAL ANTI-MARKUP RULE AS APPLIED TO
ANATOMIC PATHOLOGY DIAGNOSTIC TESTING SERVICES,
CMS COMPLIED WITH THE APA'S NOTICE-AND-COMMENT
PROVISION ........................................................................................................... 34

A.      Because the Anatomic Pathology Diagnostic Testing Services
Provided by the Physician Groups Are Subject to the
November 2007 Final Anti-Markup Rule, Plaintiffs Lack
Standing to Challenge the January 2008 Rule, Which Does
Not Apply to Such Services ................................................................................. 34

B.      CMS Complied with the APA's Notice and Comment Provision
in Issuing the Final Anti-Markup Rule on November 27, 2007 .......................... 35

C.      In Issuing the Rule on January 3, 2008, CMS Properly Invoked
the Good-Cause Exception to the APA's Notice and Comment
Provision .............................................................................................................. 36

D.      Because the January 2008 Rule Was the "Logical Outgrowth"
of the July 2007 Proposed Anti-Markup Rule, the APA Did
Not Require Additional Notice and Comment ..................................................... 37

V.    IN ISSUING THE FINAL ANTI-MARKUP RULE AS APPLIED TO
      ANATOMIC PATHOLOGY DIAGNOSTIC TESTING SERVICES,
      CMS COMPLIED WITH THE REGULATORY FLEXIBILITY ACT ........................ 38

      A.    Because Anatomic Pathology Diagnostic Testing Services
            Are Subject to the Final Anti-Markup Rule Issued in
            November of 2007, Plaintiffs Lack Standing to Challenge
            the Issuance of the January 2008 Rule, Which Does Not
            Apply to Such Services ...................................................................................... 39

      B.    Even if Urology Care Had Standing to Assert a Claim under the
            RFA as to January 2008 Rule, the Company Fails to State a Claim .................. 40

VI.   PLAINTIFFS DO NOT MEET ANY OF THE REQUIREMENTS FOR
      ISSUANCE OF A PRELIMINARY INJUNCTION ....................................................... 41

      A.    The Requirements for a Preliminary Injunction ................................................. 41

      B.    Plaintiffs Are Unlikely to Succeed on the Merits .............................................. 42

      C.    The Balance of Harms, Including the Lack of Irreparable Harm to
            Plaintiffs and the Public Interest Served by the November 2007
            Regulation, Warrants Denial of Preliminary Injunctive Relief ......................... 43

CONCLUSION ....................................................................................................................... 45

# TABLE OF CASES

**CASE**            **PAGE(S)**

AFL-CIO v. Chao, 496 F. Supp. 2d 76 (D.D.C. 2007) ............................................................... 37

Abbey v. Sullivan, 978 F.2d 37 (2d Cir. 1992) ........................................................................ 12

Action Alliance of Senior Citizens v. Leavitt, 2007 WL 1119646
    (D.C. Cir. Apr. 17, 2007) ................................................................................... 11

Am. Chiropractic Ass'n v. Leavitt, 431 F.3d 812 (D.C. Cir. 2005) ........................................... 14

American Lithrtripsy Soc'y v. Thompson, 215 F. Supp. 2d 23 (D.D.C. 2002) ......................... 14

American Wildlands v. Kempthorne, 478 F. Supp. 2d at 100 .................................................... 33

Associated Fisheries, Inc. v. Daley, 127 F.3d 104 (1st Cir. 1997) ............................................ 40

Babbitt v. Sweet Home Chapter of Communities, 515 U.S. 687 (1995) .................................... 20

Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87 (1983) ............ 28, 29

Barton v. District of Columbia, 131 F. Supp.2d 236 (D.D.C. 2001) ......................................... 42

Borg-Warner Protective Serv. Corp. v. EEOC, 245 F.3d 831 (D.C. Cir. 2001) ........................ 17

Bristol-Myers Squibb v. Shalala, 923 F. Supp. 212 (D.D.C. 1996) .............................. 29, 41, 43

Bryant v. Cheney, 924 F.2d 525 (4th Cir. 1991) ....................................................................... 16

Califano v. Yamasaki, 442 U.S. 682 (1979) .............................................................................. 11

Cement Kiln Recycling Coal. v. EPA, 255 F.3d 855 (D.C. Cir. 2001) ...................................... 39

Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,
    467 U.S. 837 (1984) ............................................................................. 2, 19, 20

Chocolate Mfrs. Ass'n v. Block, 755 F.2d 1098 (4th Cir. 1985) .................................... 35, 37, 38

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971) ....................... 28, 29, 33

City of Los Angeles v. Lyons, 461 U.S. 95 (1983) ............................................................... 16, 18

City of Waukesha v. EPA, 320 F.3d 228 (D.C. Cir. 2003) .............................................. 37, 38

<u>Community Care Found. v. Thompson</u>, 318 F. 3d 219 (D.C. Cir. 2003) ............................ 29, 32

<u>Community Health Ctr. v. Wilson-Coker</u>, 311 F.3d 132 (2d Cir. 2002) ................................... 21

<u>Consolidated Edison v. NLRB</u>, 305 U.S. 197 (1938) ................................................................. 28

<u>DaimlerChrysler Corp. v. Cuno</u>, 126 S. Ct. 1854 (2006) .......................................................... 15

<u>Davenport v. Int'l Bhd. of Teamsters</u>, 166 F.3d 356 (D.C. Cir. 1999) ....................................... 42

<u>Diamond v. Charles</u>, 476 U.S. 54 (1986) .................................................................................. 18

<u>Ethicon, Inc. V. FDA</u>, 762 F. Supp. 382 (D.D.C. 1991) .............................................................. 28

<u>Ethyl Corp. v. EPA</u>, 541 F.2d 1 (D.C. Cir. 1976) ...................................................................... 28

<u>Ex Parte McCardle</u>, 7 Wall. 506 (1868) .................................................................................... 42

<u>Fulani v. Brady</u>, 935 F.2d 1324 (D.C. Cir. 1991) ...................................................................... 18

<u>Good Samaritan Hosp. v. Shalala</u>, 508 U.S. 402 (1993) ........................................................... 20

<u>Heckler v. Ringer</u>, 466 U.S. 602 (1984) ............................................................................. <u>passim</u>

<u>Hudson v. FAA</u>, 192 F.3d 1031 (D.C. Cir. 1999) ...................................................................... 33

<u>IAM v. NMB</u>, 180 F. Supp. 2d 188 (D.D.C. 2002) .................................................................... 42

<u>INS v. Jong Ha Wang</u>, 450 U.S. 139 (1981) ............................................................................. 21

<u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555 (1992) ........................................................ <u>passim</u>

<u>Marsh v. Oregon Natural Res. Council</u>, 490 U.S. 360 (1989) ....................................... 28, 29, 33

<u>Mathews v. Eldridge</u>, 424 U.S. 319 (1976) ........................................................................ 10, 12

<u>Microwave Acquisition Corp. v. FCC</u>, 145 F.3d 1410 (D.C. Cir. 1998) .................................... 18

<u>Mid-Tex Elec. Coop. v. FERC</u>, 773 F.2d 327 (D.C. Cir. 1985) ................................................. 39

<u>Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut.</u>
   <u>Auto. Ins. Co.</u>, 463 U.S. 29 (1983) ............................................................................... 28

<u>Nat'l Kidney Patients Ass'n v. Sullivan</u>, 958 F.2d 1127 (D.C. Cir. 1992) ............................ 10, 11

<u>National Ass'n of Psychiatric Health Sys. v. Shalala,</u>, 120 F. Supp. 2d 33
    (D.D.C. 2000) ................................................................................................................ 14, 41

<u>National Athletic Trainers' Ass'n, v. HHS</u>, 455 F.3d. 500 (5th Cir. 2006) ................................ 15

<u>National Coal. for Marine Conservation</u>, 231 F. Supp. 2d. 119 (D.D.C. 2002) ........................ 40

<u>National Tour Brokers Ass'n v. United States</u>, 591 F.2d 896 (D.C. Cir. 1978) ........................ 35

<u>National Wrestling Coaches Ass'n v. Department of Educ.</u>,
    366 F.3d 930 (D.C. Cir. 2004) ........................................................................................ 18

<u>NationsBank Corp. v. Herman</u>, 174 F.3d 424 (4th Cir. 1999) .................................................... 43

<u>Newdow v. Bush</u>, 355 F. Supp.2d 265 (D.D.C. 2005) .......................................................... 42, 44

<u>O'Shea v. Littleton</u>, 414 U.S. 488 (1974) ................................................................................ 16

<u>Pavano v. Shalala</u>, 95 F.3d 147 (2d Cir. 1996) ........................................................................ 12

<u>Raines v. Byrd</u>, 521 U.S. 811 (1997) ...................................................................................... 16

<u>Sampson v. Murray</u>, 415 U.S. 61 (1974) ................................................................................ 12

<u>Securities Indus. Ass'n v. Board of Governors of Fed. Res. Sys.</u>,
    628 F. Supp. 1438 (D.D.C. 1986) .................................................................................. 44

<u>Shalala v. Illinois Council on Long Term Care, Inc.</u>, 529 U.S. 1 (2000) ............................ <u>passim</u>

<u>Shell Oil Co. v. EPA</u>, 950 F.2d 741 (D.C. Cir. 1991) ................................................................ 38

<u>Simon v. Eastern Ky. Welfare Rights Org.</u>, 426 U.S. 26 (1976) .............................................. 17

<u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83 (1998) .......................................... 16, 42, 43

<u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504 (1994) ........................................................ 21

<u>U.S. Cellular Corp. v. FCC</u>, 254 F.3d 78 (D.C. Cir. 2001) ...................................................... 40

<u>US Ecology, Inc. v. Dept. of Interior</u>, 231 F.3d 20 (D.C. Cir. 2000) ........................................ 16

<u>Weinberger v. Romeo-Barcelo</u>, 465 U.S. 305 (1982) .................................................. 44

<u>Weinberger v. Salfi</u>, 422 U.S. 749 (1975) ...................................................... 10, 13, 14

<u>Whitmore v. Arkansas</u>, 495 U.S. 149 (1990) ............................................... 16, 17, 18

<u>Yakus v. United States</u>, 321 U.S. 414 (1944) ......................................................... 44

<u>Your Home Visiting Nurse Servs., Inc. v. Shalala</u>, 525 U.S. 449 (1999) .................................. 13

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| Atlantic Urological Associates et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | )    **No. 08-CV-00141-RMC** |
| v. | ) |
| | ) |
| Michael O. Leavitt, as Secretary of | ) |
| United States Department of Health and | ) |
| Human Services, | ) |
| Defendant. | ) |

_____

**CONSOLIDATED MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO**
**DISMISS AND IN OPPOSITION TO PLAINTIFFS' APPLICATION**
**FOR PRELIMINARY INJUNCTION**

Plaintiffs' Complaint challenges the application of an "anti-markup rule" governing

payment under the Medicare program to anatomic pathology diagnostic testing services.

**INTRODUCTION**

In November of 2007, after notice and comment, the Centers for Medicare & Medicaid

Services ("CMS"), acting on behalf of the Secretary of Health and Human Services

("Secretary"), issued the final anti-markup rule limiting Medicare payment for the professional

component of diagnostic testing services provided in a "centralized building" that does not

qualify as the "same building" under the physician self-referral exception at 42 C.F.R.

§ 411.355(b).  72 Fed. Reg. 66,222, at 66,306.  That rule was effective for services provided after

January 1, 2008.  Shortly after that anti-markup rule was set to take effect, CMS issued another

rule that delayed for one year the application of the November 2007 rule to services other than

anatomic pathology diagnostic testing services.  73 Fed. Reg. 404 (Jan. 3, 2008).  Plaintiffs

challenge the January 2008 rule even though it does not affect Medicare payment for any

services provided by them.  Plaintiffs seek to enjoin and invalidate the January 2008 rule merely because it does not delay for one year the application of the November 2007 anti-markup rule to anatomic pathology diagnostic testing services.

The Court should deny plaintiffs' application for a preliminary injunction and dismiss their claims challenging the continued application of the November 2007 anti-markup rule. Plaintiffs assert claims under Title XVIII of the Social Security Act of 1935, 42 U.S.C. §1395-1395hhh ("Medicare Act"); the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"); and the Regulatory Flexibility Act, 5 U.S.C. § 604.

First, the Court lacks subject-matter jurisdiction because the plaintiff physician groups have not exhausted administrative remedies as required to bring a claim under the Medicare Act, see Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 12-14 (2000), and the potential availability of judicial review under that statute precludes judicial review under 28 U.S.C. § 1331.  The physician groups do not meet the requirements for an exception to the exhaustion requirement, because their claims are essentially claims for Medicare benefits, and a demand for money does not implicate any plausible claim of irreparable injury.  Plaintiff Uropath LLC lacks standing to assert claims under the Medicare Act because the company, which manages laboratories in centralized buildings where diagnostic testing services are provided for physician groups in such a manner as to increase such groups' profits, does not itself perform testing services or participate in the Medicare program.  Uropath's allegations of possible future injury are entirely speculative and do not confer the company with standing. (Part I).

Second, CMS determined that application of the final anti-markup rule to anatomic pathology diagnostic testing services was necessary in order for CMS to implement the goals of the Medicare program, and that the rule does not conflict with, and is not barred by, three parts of the Medicare Act: the Anti-Markup Statute, 42 U.S.C. § 1395u(n)(1); the Stark Law, 42 U.S.C. § 1395nn; and the Physician Fee Schedule Statute, 42 U.S.C. § 1395w-4(c)(2)(A). Under the test established in Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984), the Court should defer to CMS's reasonable interpretation of the Medicare Act and should dismiss Counts IV to VI of the Complaint. (Part III).

Third, even if the Court had subject-matter jurisdiction, CMS's decision to apply the anti-markup rule to anatomic pathology diagnostic testing services was based on a consideration of the relevant factors, including the concern that allowing physician group practices to realize excessive profit when billing Medicare for services provided in a centralized building that does not qualify as the same building may lead to patient and program abuse in the form of overutilization of services and may result in higher costs to the Medicare program. Because CMS's decision is not arbitrary or capricious, the Court should dismiss Count I of the Complaint. (Part II).

Fourth, plaintiffs lack standing to challenge the lack of notice and an opportunity for comment under the APA, 5 U.S.C. § 553(b)(3)(B), regarding the issuance of the January 2008 rule, because that rule does not in any way affect Medicare payment for anatomic pathology diagnostic testing services. Instead, payment for such services is governed by the final anti-markup rule that was issued in November of 2007, and the notice of proposed rulemaking issued in July of 2007 contained an adequate description of the subjects and issues involved. In

addition, when CMS issued the January 2008 rule (which does not affect Medicare payments to plaintiffs), CMS properly invoked the good-cause exception to notice and comment under the APA, based upon the agency's finding that seeking further public comment on the action was impracticable and contrary to the public interest.  404 Fed. Reg. at 405.  Furthermore, the anti-markup rule, as issued in November of 2007 and as modified in January of 2008, meets the "logical outgrowth" test applied by courts in reviewing procedural challenges regarding the APA's notice-and-comment provision.  The Court should therefore dismiss Count II of the Complaint. (Part IV).

Fifth, in issuing the January 2008 rule, CMS expressly determined that this rule would not result in any significant economic impact on a substantial number of small entities.  73 Fed. Reg. at 406.  Because that rule had no impact at all on plaintiffs, they lack standing to challenge CMS's determination.  Thus, even if plaintiffs were deemed to have standing to challenge the manner in which that rule was issued, CMS complied with the Regulatory Flexibility Act, 5 U.S.C. § 604.  The Court should therefore dismiss Count III of the Complaint.  (Part III).

Sixth, the Court should deny plaintiffs' application for preliminary injunction.  Apart from the absence of subject-matter jurisdiction, even if one or more of plaintiffs' claims is not dismissed at this stage, the issues raised by CMS establish, at a bare minimum, that plaintiffs are unlikely to succeed on the merits.  In addition, the balance of harms warrants denial of injunctive relief.  The public interest in preventing patient and program abuse in the form of overutilization of services and avoiding higher costs to the Medicare program far outweighs the provider groups' claims for additional payment.

### THE MEDICARE STATUTE, THE RULES, AND PLAINTIFFS' CLAIMS

**A.     The Medicare Program**

The Medicare program, established by Title XVIII of the Social Security Act of 1935, 42 U.S.C. §1395-1395hhh ("Act"), is the federal health insurance program for people who are 65 and older or disabled.  Medicare is administered by CMS on behalf of the Secretary, who is ultimately responsible for the program.  Part B of the Medicare program provides voluntary supplementary insurance coverage for physicians' services, outpatient hospital services, and other medical and healthcare services, id. § 1395k(a), including "diagnostic laboratory tests."

42 U.S.C. § 1395x(s)(3).  In the Act, Congress authorized the Secretary to prescribe "such regulations as may be necessary to carry out the administration" of the Medicare program.  See 42 U.S.C. § 1395hh.  The Secretary contracts with "Medicare administrative contractors" to act as his agent in processing Part B payments.  See 42 U.S.C. § 1395u(a).

**B.     The Anti-Markup Rule**

Payment under Medicare Part B for diagnostic testing services consists of a "technical component," which is the amount paid to the individual or entity that performs the test, and a "professional component," which is the amount paid for a physician's interpretation of the test results.  Since 1992, CMS has limited Medicare payment for the technical component of any "purchased" diagnostic test ordered by the treating physician.  See 42 C.F.R. § 414.50; see also 56 Fed. Reg. 59,502, at 59,629 (Nov. 25, 1991); 73 Fed. Reg. at 405.

On July 12, 2007, CMS published a notice of proposed rulemaking, 72 Fed. Reg. 38,122 (July 12, 2007), that included an "anti-markup rule" governing payment under Medicare Part B for the technical and professional components of diagnostic testing services purchased from an

outside supplier or provided at a site other than the office of the billing entity, including a "centralized building" that does not qualify as the "same building" under the physician self-referral exception at 42 C.F.R. § 411.355(b).  At that time, CMS "expressed concern about certain arrangements" by which physician group practices "bill for certain services furnished by a contractor physician in a 'centralized building.'"  72 Fed. Reg. at 38,179; <u>see</u> <u>also</u> 72 Fed. Reg. 66,222, at 66,307 (Nov. 20, 2007).  CMS "expressed concern" that such arrangements "may lead to patient and program abuse in the form of overutilization of services and result in higher costs to the Medicare program."  <u>Id</u>.

On November 27, 2007, CMS published the final anti-markup rule, to be effective January 1, 2008, after it received and reviewed "approximately 1100 pieces of timely correspondence in response to these proposals," many of which were in favor of the proposal and many of which were opposed to it.  72 Fed. Reg. 66,222, 66,306; <u>see</u> <u>also</u> 42 C.F.R. § 414.50.

On January 3, 2008, after CMS received informal comments from various stakeholders, the Secretary published another rule, 73 Fed. Reg. 404 (Jan. 3, 2008), that delayed until January 1, 2009, the applicability of the anti-markup rule, except as to the technical component of a diagnostic test, and except as to the professional component of any anatomic pathology diagnostic testing services furnished in a "centralized building" that does not qualify as the "same building" under the physician self-referral exception at 42 C.F.R. § 411.355(b).  CMS stated that application of the anti-markup rule "will remain applicable to the technical component of any purchased diagnostic test" because that application of the rule "is longstanding" and previously appeared at 42 C.F.R. § 414.50.  73 Fed. Reg. at 405.  CMS also stated: "Because anatomic pathology diagnostic testing arrangements precipitated our proposal

for revision of the anti-markup provisions and remain our core concern, we are not delaying the date of applicability with respect to anatomic pathology diagnostic testing services." <u>Id</u>.  In issuing the January 2008 rule, CMS invoked the good-cause exception to the APA's notice and comment provision, based upon its finding that seeking further public comment on this action would be "impracticable and contrary to the public interest."  <u>See</u> 404 Fed. Reg. at 405, citing 5 U.S.C. § 553(b)(3)(B).  The January 2008 rule thus did not delay the effective date for application of the final-anti-markup rule to the professional component of anatomic pathology diagnostic testing services.

The anti-markup rule limits payment for the professional component of anatomic pathology diagnostic testing services to the lesser of the performing supplier's net charge to the billing physician or other supplier, the billing physician or other supplier's actual charge, or the fee schedule amount for the test that would be allowed if the performing supplier billed directly. 73 Fed. Reg. at 405; 42 C.F.R. § 4.14.50(a)(1).

### C.     <u>Plaintiffs' Claims</u>

On January 24, 2008, plaintiffs filed their Complaint against the Secretary (Civil Action No. 08-00141-RMC), seeking declaratory and injunctive relief, including a request to delay for one year the application of the anti-markup rule to anatomic pathology diagnostic testing services.  <u>See</u> Complaint ("Comp.") ¶¶ 2-5, 64, 65, and p. 43 (Prayer for Relief, ¶ 10).  Plaintiffs include: (a) Atlantic Urological Associates, Urology Care, Inc., and Urology Center of Alabama, P.C., three physician groups that participate in the Medicare program and submit claims for reimbursement under Part B of the Medicare program for anatomic pathology diagnostic services provided to patients; (b) Sam Michaels M.D., a pathologist who performs such testing services

7

for five other physician groups; and (c) Uropath, LLC, a company that manages urology

pathology laboratories for physician groups and does not perform services or participate in the

Medicare program, and Rebecca Page, the director of that company's clinical operations.  See

Comp. ¶¶ 2, 3, 14-19, 23, 44; Statement of Points and Authorities in Support of Plaintiffs'

Application for a Preliminary Injunction ("Pl. PI Memo."), Exh. 27 ¶ 3.

Plaintiffs allege that they will suffer harm if CMS is not enjoined, preliminarily and

permanently, from applying the anti-markup rule to claims involving anatomic pathology

diagnostic testing services furnished in a "centralized building" that does not qualify as the

"same building" under the physician self-referral exception at  42 C.F.R. § 411.355(b).  See

Comp. ¶ 111; PI Memo. at 30-38.  Plaintiffs' allegations of harm are based upon their assertion

that the Medicare payments for claims submitted by physician groups involving anatomic

pathology diagnostic testing services will be reduced if CMS were to apply the anti-markup rule

to such services.  Id.  Plaintiff allege that the anti-markup rule is contrary to law and violates

three statutory provisions governing Medicare reimbursement: (a) the Stark Law, 42 U.S.C. §

1395nn; (b) the Physician Fee Schedule Statute, 42 U.S.C. § 1395w-4(c)(2)(A); and (c) the Anti-

Markup Statute, 42 U.S.C. § 1395u(n)(1).  Comp. ¶¶ 115-55 (Counts II to VI).  Plaintiffs also

allege that CMS's decision to apply the anti-markup rule to such claims for anatomic pathology

diagnostic testing services is arbitrary and capricious, an abuse of discretion, or otherwise not in

accordance with the law, in violation of the APA.  Comp. ¶¶ 112-14 (Count I).  Plaintiffs further

allege that CMS's issuance of the January 3, 2008 rule violates the notice and comment

provision of the APA, 5 U.S.C. § 553; and the Regulatory Flexibility Act, 5 U.S.C. § 604.

Plaintiffs' claims are directed solely to application of the anti-markup rule to the professional component of anatomic pathology diagnostic testing services.  <u>See</u> Comp. ¶ 66.  First, plaintiffs do not challenge CMS's decision (73 Fed. Reg. 404) to delay until January 1, 2009, application of the anti-markup rule to other types of diagnostic testing services.  Comp. ¶ 66.  Instead, plaintiffs seek to obtain the same delay for application of the anti-markup rule to anatomic pathology diagnostic testing services.  <u>Id</u>.  Second, plaintiffs do not challenge the anti-markup rule as applied to the technical component of a diagnostic test purchased from an outside supplier.  <u>Id</u>. ¶ 65 n.2.  Physician groups with labs managed by Uropath perform diagnostic testing at off-site locations,  and do not "purchase" diagnostic tests from Uropath.  <u>Id</u>. ¶¶ 57, 59.

**D.     The Interim Agreement**

In order to negate any arguable claim of irreparable harm prior to a hearing on Plaintiffs' Preliminary Injunction Application and the Secretary's dispositive motion, CMS agreed not to apply the anti-markup rule to claims submitted between February 1 and April 1, 2008, for anatomic pathology diagnostic testing services furnished in a centralized building that does not qualify as the "same building" under the physician self-referral exception at 42 C.F.R. § 411.355(b).  <u>See</u> Order dated February 8, 2008 on Defendant's Motion to Endorse Interim Proposal (Docket No. 12).

**ARGUMENT**

I.    **THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS UNDER THE MEDICARE ACT AND THE APA**

Plaintiffs assert claims against the Secretary under the Medicare Act and the APA, challenging CMS's application of the anti-markup rule to anatomic pathology testing services. See Comp. ¶¶ 112-24, 136-55. As discussed below, the Court lacks subject-matter jurisdiction because the plaintiff physician groups have not exhausted administrative remedies, and the potential availability of judicial review under that statute precludes judicial review under 28 U.S.C. § 1331. Uropath lacks standing because the company, which manages labs operated by physician groups, does not perform testing services or participate in the Medicare program.

A.    **The Medicare Act Requires that Providers Exhaust Administrative Remedies Prior to Seeking Judicial Review**

Plaintiffs include three physician groups that participate in the Medicare program and submit claims for Medicare reimbursement of anatomic pathology diagnostic testing services provided to patients, and a pathologist who performs such testing services for five other physician groups. See Comp. ¶¶ 2, 3, 15-17. Because none of these physician groups have exhausted administrative remedies under the Medicare Act, see Pl. PI Memo. at 40, the Court lacks subject-mater jurisdiction over their claims.

The Medicare Act generally conditions federal jurisdiction over claims "arising under" the Act on presentment of a claim to the Secretary and exhaustion of statutorily-prescribed administrative remedies. See 42 U.S.C. §§ 405(g), 405(h), 1395ii; Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 12-14 (2000) (the Act "demands the 'channeling' of virtually all legal attacks through the agency" before a claimant may seek judicial review of a claim

10

arising under the Act); <u>Heckler v. Ringer</u>, 466 U.S. 602, 614-15 (1984) (Medicare review scheme applies to "all 'claim[s] arising under 'the Medicare Act") (alteration in original); <u>see also</u> <u>Nat'l Kidney Patients Ass'n v. Sullivan</u>, 958 F.2d 1127, 1130 (D.C. Cir. 1992) (requiring exhaustion of remedies for challenges to a change in payment policies concerning Part B claims for kidney dialysis).[1]  Adherence to the exhaustion requirement serves the twin policy purposes of allowing the Secretary "to apply, interpret, or revise policies," <u>Illinois Council</u>, 529 U.S. at 13, without "overly casual or premature judicial intervention," <u>Ringer</u>, 466 U.S. at 627, and "to compile a record which is adequate for judicial review," <u>id</u>. at 619 n.12 (quoting <u>Weinberger v.</u> <u>Salfi</u>,     422 U.S. 749, 765 (1975)).  Exhaustion generally applies even though administrative remedies may not, standing alone, afford a means of redress for constitutional claims, or for claims that challenge the validity of a statute or agency regulation.  See <u>Illinois Council</u>, 529 U.S. at 23.

The exhaustion requirement "consists of a nonwaivable requirement that a 'claim for benefits shall have been presented to the Secretary,'" <u>Ringer</u>, 466 U.S. at 617 (quoting <u>Mathews</u> <u>v. Eldridge</u>, 424 U.S. 319, 328 (1976)), and "a waivable requirement that the administrative remedies prescribed by the Secretary be pursued fully by the claimant." <u>Id</u>.  Presentment is an "absolute prerequisite," and exhaustion is "a prerequisite that may excused only under rather limited conditions," <u>Nat'l Kidney Patients</u>, 958 F.2d at 1130, where the plaintiff's claim is

---

[1] The exhaustion requirement arises through several interlocking provisions of the Social Security Act.  Briefly, 42 U.S.C. § 405(b) establishes administrative hearing rights; 42 U.S.C. § 405(g) provides that "final decision[s]" of the Secretary "made after a hearing" are subject to judicial review; and 42 U.S.C. § 405(h) channels virtually all claims through this administrative process, such that exhaustion of administrative remedies is the exclusive means of obtaining judicial review of the Secretary's final decision.  These provisions apply to Medicare Part B claims arising under the Medicare statute by virtue of 42 U.S.C. §§ 1395ff(b), 1395ii.

"wholly collateral to his claim for benefits" and he makes a "colorable showing that his injury could not be remedied by the retroactive payment of benefits after exhaustion of his administrative remedies." Ringer, 466 U.S. at 618 (internal quotation marks omitted).

**B.    The Physician Groups Failed to Exhaust Administrative Remedies Under the Medicare Act**

The three plaintiff physician groups concede that they have not exhausted administrative remedies under the Medicare Act. See Pl. PI Memo. at 40. As explained above, exhaustion is a jurisdictional prerequisite to maintaining a suit under the Medicare Act. See Illinois Council, 529 U.S. at 13; Ringer, 466 U.S. at 614-17. The Court lacks jurisdiction over the claims of these physician groups because they have not exhausted administrative remedies. See Califano v. Yamasaki, 442 U.S. 682, 701, 704 (1979). The Secretary has agreed, on an interim basis, not to apply the anti-markup rule to claims involving anatomic pathology diagnostic services that are submitted between February 1 and April 1, 2008. With respect to reimbursement of any claims that may be submitted before or after April 1, 2008, the plaintiff physician groups do not meet even the non-waivable presentment requirement, and clearly do not meet the stringent criteria for judicial waiver of the exhaustion requirement. See, e.g., Illinois Council, 529 U.S. at 10-21; Ringer, 466 U.S. at 619-20; Action Alliance of Senior Citizens v. Leavitt, 2007 WL 1119646 at * 4-5 (D.C. Cir. Apr. 17, 2007); Nat'l Kidney Patients, 958 F.2d at 1130-34.

As noted above, the alleged "futility" of Medicare's administrative remedies ordinarily is not sufficient to waive exhaustion requirements. See Illinois Council, 529 U.S. at 23; Pavano v. Shalala, 95 F.3d 147, 150 (2d Cir. 1996) ("'[e]xhaustion is the rule, waiver the exception'") (internal citation omitted) (alteration in original). The Supreme Court has recognized, however, that, once a claim is presented to the Secretary, an administrative decision may be deemed

"final" for purposes of 42 U.S.C. § 405(g) and subject to immediate review "in special cases," see Ringer, 466 U.S. at 618, in which: (1) exhaustion would be futile; (2) the claim is collateral to a substantive claim of entitlement to benefits; and (3) the claimant would suffer irreparable injury absent immediate judicial review.  See, e.g., Mathews v. Eldridge, 424 U.S. 319, 330-32 & n.11 (1976); Illinois Council, 529 U.S. at 24 (citing Eldridge); Pavano, 95 F.3d at 151-52 (noting, as well, that no one factor is critical and that application of the factors should be "guided by the policies underlying the exhaustion requirement") (citation omitted).

The three physician groups cannot satisfy the second and third requirements for an exception to the exhaustion requirement because they will not suffer any irreparable harm if they are required  to exhaust administrative remedies.  They are seeking higher Medicare payments for services than they are entitled to receive under the anti-markup rule.  Such claims are essentially claims for benefits, rather than claims that are "wholly collateral to [a] claim for benefits," see Ringer, 466 U.S. at 618, and a demand for money does not implicate any plausible claim of irreparable injury.  See Sampson v. Murray, 415 U.S. 61, 90-91 (1974) (recoverable monetary loss does not usually constitute irreparable injury).  Moreover, the inconvenience and expense associated with administrative proceedings do not excuse a failure to exhaust.  See Pavano,     95 F.3d at 151 (parenthetical summarizing Abbey v. Sullivan, 978 F.2d 37, 46 (2d Cir. 1992)).

For all of these reasons, the Court lacks subject-matter jurisdiction over the claims of the plaintiff physician groups due to their failure to exhaust administrative remedies.

**C.**     **Subject-Matter Jurisdiction Is Not Available Under 28 U.S.C. § 1331**

Plaintiffs err in asserting that the Court has subject-matter jurisdiction over the Complaint under 28 U.S.C. § 1331. See Comp. ¶ 11; Plaintiffs' PI Memo. at 40. The potential availability of judicial review to the physician groups under the Medicare Act, 42 U.S.C. § 1395ff(b)(1)(A), after the exhaustion of administrative remedies, precludes judicial review under any other jurisdictional statute, including 28 U.S.C. § 1331. Under 42 U.S.C. § 1395ii (which incorporates 42 U.S.C. § 405(h)), "the sole avenue for judicial review for all 'claim[s] arising under' the Medicare Act," is 42 U.S.C. § 1395ff(b)(1)(A) (incorporating 42 U.S.C. § 405(g)), "to the exclusion of 28 U.S.C. § 1331." Ringer, 466 U.S. at 615; see also Illinois Council, 529 U.S. at 10; Your Home Visiting Nurse Servs., Inc. v. Shalala, 525 U.S. 449, 457 (1999); Salfi, 422 U.S. at 756.[2] The "claim arising under" language must be construed broadly to include any claims in which both the standing and the substantive basis for the presentation of the claims is the Medicare Act. See Ringer, 466 U.S. at 615 (quoting Salfi, 422 U.S. at 760-61).

Thus, where a beneficiary seeks "payment for some medical procedure," and "the individual challenges the lawfulness of th[e] denial" of that claim, federal-question jurisdiction is "plainly" barred, "irrespective of whether the individual challenges the agency's denial on

---

[2] The statute incorporated into the Medicare Act provides as follows:

The findings and decisions of the [Secretary of Health and Human Services] after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the [Secretary] shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the [Secretary], or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28 to recover on any claim arising under this subchapter.

42 U.S.C. § 405(h), as incorporated by 42 U.S.C. § 1395ii.

evidentiary, rule-related, statutory, constitutional, or other legal grounds." Illinois Council, 529 U.S. at 10. So long as the substantive basis for the claim is the Medicare Act, federal-question jurisdiction under 28 U.S.C. § 1331 is precluded. See Ringer, 466 U.S. at 615; Salfi, 422 U.S. at 760-61; Am. Chiropractic Ass'n v. Leavitt, 431 F.3d 812, 815-16 (D.C. Cir. 2005). The only possible exception – where preclusion "would not simply channel review through the agency, but would mean no review at all," Illinois Council, 529 U.S. at 19 – does not apply.[3]

The cases cited by plaintiffs (see Pl. PI Memo. at 40-42) are not on point. In National Ass'n of Psychiatric Health Sys. v. Shalala,, 120 F. Supp. 2d 33 (D.D.C. 2000), a failure to comply with the rule at issue allegedly subjected plaintiff to possible termination from the Medicare program. Id. at 38. In this case, by contrast, the challenged rule affects only the amount of payment, rather than continued participation in the program. Similarly, plaintiffs have submitted no evidence that the physician groups, by submitting claims, noting their disagreement with application of the anti-markup rule, and pursuing administrative remedies available under the Medicare Act, would face statutory penalties or criminal sanctions, such as were involved in American Lithotripsy Soc'y v. Thompson, 215 F. Supp. 2d 23, 29-30 (D.D.C. 2002). See Pl. PI Memo. at 42. Plaintiffs have not alleged that any of the three physician groups attempted to submit claims, were threatened with penalties or sanctions, or inquired of their Medicare contractor how they might submit claims without risking liability.[4]

---

[3] See n. 4 below.

[4] The Part B billing instructions issued by CMS state that item 24D on the claim form can accommodate a narrative statement, and that it is possible for a claimant to attach a supplemental statement to a claim when submitting it. See Medicare Claims Processing Manual, Chapter 26, § 10.4. (The Medicare Claims Processing Manual is available online at https://www.cms.hhs.gov/Manuals/IOM). Such procedures would enable physician groups to

15

Because judicial review is potentially available to the plaintiff physician groups under the Medicare Act after they exhaust administrative remedies, the Court lacks subject-matter jurisdiction over their claims under 28 U.S.C. § 1331.

### D.    Uropath Lacks Standing to Challenge the Final Anti-Markup Rule Because It Does Not Provide Diagnostic Testing Services

"[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  To satisfy the "irreducible constitutional minimum" of standing, a plaintiff must show: (1) that he suffered an "injury in fact"; (2) that there is a causal connection between the injury complained of, such that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  Id. at 560-61.  See also DaimlerChrysler Corp. v. Cuno, 126 S. Ct. 1854, 1861 (2006).  "This triad . . . constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence."  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103-04 (1998).  A "deficiency on any one of the three prongs suffices to defeat standing."  US Ecology, Inc. v. Dept. of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).

---

submit claims containing a statement explaining that they were doing so not to request higher payment than that permitted by the Secretary's policies, but instead as a means to exhaust their administrative remedies to challenge those policies.  Such a statement would likely demonstrate that a physician group lacked the intent to defraud the program, removing any potential liability the group might have otherwise incurred by filing the claims. See National Athletic Trainers' Ass'n v. HHS, 455 F.3d 500, 505-07 (5th Cir. 2006) (finding that claimants could submit claims in such a manner as to insulate themselves from potential civil and criminal liability).

The "injury-in-fact" component of standing is the "[f]irst and foremost" requirement of the doctrine.  Steel Co. v. Citizens, 523 U.S. at 104.  To qualify as an injury in fact, an "alleged injury must be legally and judicially cognizable."  Raines v. Byrd, 521 U.S. 811, 819 (1997).  "This requires, among other things, that the plaintiff have suffered 'an invasion of a legally protected interest which is . . . concrete and particularized.'"  Id. at 818, quoting Lujan v. Defenders of Wildlife, 504 U.S. at 560.  In addition, the injury or threat must be "both 'real and immediate,' not 'conjectural' or 'hypothetical.'"  City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983); O'Shea v. Littleton, 414 U.S. 488, 494 (1974) (internal citations omitted); Bryant v. Cheney, 924 F.2d 525, 529 (4th Cir. 1991) (quoting same).  "A threatened injury must be 'certainly impending' to constitute injury in fact."  Whitmore v. Arkansas, 495 U.S. 149, 158 (1990).

Uropath, a company that manages urological pathology laboratories for physician groups, does not provide diagnostic testing services or participate in the Medicare program.  See Comp. ¶¶ 2, 3, 44; Pl. Pl Memo. at 43.  Because Uropath "does not bill the Medicare program" for testing services, Comp. ¶ 3, the company lacks standing to assert a claim against the Secretary under the Medicare Act.  Uropath alleges in a conclusory manner that, if CMS is permitted to apply the anti-markup rule to anatomic pathology diagnostic testing services, "the existing business of Uropath will be destroyed," and its clinical director and other employees will lose their jobs."  Comp. ¶ 111(a), (i); PI. PI Memo. at 2, 43.

Uropath speculates that the application of the anti-markup rules to such testing services will set in motion a lengthy chain of events: (1) the reduced level of Medicare reimbursement to physician groups for testing services under the anti-markup rules would require each Uropath-

managed lab either (a) to bill Medicare at a loss or (b) to send its business to an outside lab; (2)

operation of the Uropath-operated labs would be rendered "uneconomical;" (3) some of the labs

would eventually close; (3) pathologists who work for the labs would "[a] experience a large

drop in income, [b] see the handwriting on the wall, and [c] begin to depart in very short order;"

(4) "[q]ualified pathologists will become virtually impossible to recruit;" and, finally, (5)

"Uropath, [a] left with substantial fixed expenses, [b] will begin to bleed money, and [c] it will

be forced to shut down as quickly as possible." See Pl. PI Memo. at 43.

To begin with, Uropath has no "legally protected interest" in the receipt by physician

groups of Medicare payments for diagnostic testing services.  As a management company,

Uropath has not cited to any Medicare statute or regulation that would create an enforceable

right to receive payments for services provided by physicians.  See Lujan, 504 U.S. at 560.  In

addition, Uropath's allegations of "possible future injury" fail to confer it with standing.  See

Whitmore, 495 U.S. at 158.  Uropatth's "[u]nadorned speculation" regarding possible future

actions of physician groups and pathologists "will not suffice to invoke the judicial power."

Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 44 (1976).  For these reasons, Uropath

has not alleged an "injury for which it is entitled to redress."  Borg-Warner Protective Serv.

Corp. v. EEOC, 245 F.3d 831, 834 (D.C. Cir. 2001).  The Supreme Court has consistently held

that claims of threatened injury that were too speculative failed to support Article III standing.

See, e.g., Lujan, 504 U.S. at 563-64; Whitmore, 495 U.S. at 156-57; Diamond v. Charles,

476 U.S. 54, 66 (1986); Lyons, 461 U.S. at 105-08.

Moreover, Uropath cannot demonstrate that any alleged future injuries are fairly traceable to CMS's conduct. See Microwave Acquisition Corp. v. FCC, 145 F.3d 1410, 1412 (D.C. Cir. 1998) (explaining that the causation element "examines whether it is substantially probable that the challenged acts of the defendant, not some absent third party, will cause the particularized injury of the plaintiff"). Because Uropath's business arrangements are subject to the intervening decisions of physicians and physician groups, and its negotiations with these providers occur without any government involvement, Uropath fails to make allegations sufficient to demonstrate its standing. See Fulani v. Brady, 935 F.2d 1324, 1329 (D.C. Cir. 1991) ("an injury will not be "fairly traceable" to the defendants' challenged conduct . . . where the injury depends not only on that conduct, but on independent intervening or additional causal factors"); National Wrestling Coaches Ass'n v. Department of Educ., 366 F.3d 930, 938 (D.C. Cir. 2004) (where the elements of causation and redressability "hinge on the independent choices of the regulated third part[ies]," plaintiff must "adduce facts showing that those choices have been or will be made in such manner" as to satisfy these elements).

Uropath thus lacks standing to assert claims against the Secretary under the Medicare Act.

## II.    THE COURT SHOULD DEFER TO CMS'S REASONABLE INTERPRETATION OF THE MEDICARE ACT AS AUTHORIZING CMS TO APPLY THE ANTI-MARKUP RULE TO ANATOMIC PATHOLOGY TESTING SERVICES

Plaintiffs assert that CMS's application of the November 2007 final anti-markup rule to anatomic pathology diagnostic testing services exceeds the Secretary's statutory authority and is contrary to law, in violation of the APA, 5 U.S.C. § 706. In particular, plaintiffs assert that this application of the rule violates three parts of the Medicare Act: the Anti-Markup Statute,

42 U.S.C. § 1395u(n)(1); the Stark Law, 42 U.S.C. § 1395nn; and the Physician Fee Schedule Statute, 42 U.S.C. § 1395w-4(c)(2)(A).  <u>See</u> Comp. ¶¶ 115-55 (Counts IV to VI).  The Court should accord significant deference to the Secretary's broad rulemaking authority under the Medicare Act and dismiss Counts IV to VI of the Complaint.

A.    <u>**Chevron** Deference Applies to the Secretary's Interpretation of the Provisions of the Medicare Act that Apply to Diagnostic Testing Services</u>

The APA limits judicial review of agency action to those claims brought by persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."  5 U.S.C. § 702.  For such persons, the APA authorizes judicial review of "agency action made reviewable by statute" and  of "final agency action for which there is no other adequate remedy in a court."  <u>Id</u>. § 704.  Such agency action may be set aside only if it is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, or if the action fails to meet statutory, procedural, or constitutional requirements.  <u>Id</u>. § 706(2).

Congress authorized the Secretary to prescribe "such regulations as may be necessary to carry out the administration" of the Medicare program.  42 U.S.C. § 1395hh.  Review of the Secretary's interpretation of the Medicare Act is governed by the test established in <u>Chevron U.S.A. Inc. v. Natural Re. Def. Council, Inc</u>., 467 U.S. 837, 843-44 (1984).  Under the first step of the <u>Chevron</u> test, the reviewing court determines whether Congress has directly addressed the question at issue in such a manner as to compel only one permissible interpretation of the statute. <u>Chevron</u>, 467 U.S. at 843.  If so, then "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  <u>Id</u>., 467 U.S. at 842-43; <u>see</u> <u>also</u> <u>Good Samaritan Hosp. v. Shalala</u>, 508 U.S. 402, 409 (1993) (quoting <u>Chevron</u>).

20

As discussed below, plaintiffs do not meet step one of the <u>Chevron</u> test because they cannot establish that the Act unambiguously compels their interpretation.[5]

Under the second step of the <u>Chevron</u> analysis, if the reviewing court determines that the statutory provision does not directly address the question, the reviewing court may reverse an agency's interpretation only if that interpretation is "arbitrary, capricious, or manifestly contrary to the statute." <u>Chevron</u>, 467 U.S. at 844. In order to uphold the agency's interpretation of the statute, the court need not conclude that the agency's interpretation is the only permissible interpretation or the one that the court would have reached if the question initially had arisen in a judicial proceeding. <u>Id</u>. at 843 n.11, 844. The reviewing court "may not substitute its own construction of a statutory provision for a reasonable interpretation made by . . . an agency." <u>Id</u>. at 844 (citing <u>INS v. Jong Ha Wang</u>, 450 U.S. 139, 144 (1981)). In this context, courts "take care not lightly to disrupt the informed judgments of those who must labor daily in the minefield of often arcane policy, especially given the substantive complexities" of statutes such as the Medicare program. <u>Community Health Ctr. v. Wilson-Coker</u>, 311 F.3d 132, 139 (2d Cir. 2002). An agency's power to administer a congressionally created program "necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." <u>Long Island Care v. Coke</u>, 127 S. Ct. 2339, 2345 (2007), quoting <u>Chevron</u>, 467 U.S. at 843. These principles apply here.

---

[5] The Secretary need not establish that the Act "unambiguously "compels his interpretation," provided that the Court's conclusion that his interpretation is reasonable suffice[s] to decide [the] case." <u>Babbitt v. Sweet Home Chapter of Communities</u>, 515 U.S. 687, 703 (1995).

In determining whether agency action is authorized, the task of the reviewing court "is not to decide which among several competing interpretations best serves the regulatory purpose," Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994), but rather "the agency's interpretation must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Id. (citation omitted).  And "[t]his broad deference" to the administrative agency "is all the more warranted when" the provision at issue concerns "a 'complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" Id. (citation omitted).

### B.    The Final Anti-Markup Rule Does not Conflict with the Anti-Markup Statute

After CMS issued the proposed anti-markup rule in July of 2007, it received several comments that raised questions regarding the nature and extent of CMS's statutory authority to apply the proposed anti-markup to the technical and professional components of diagnostic testing services.  See 72 Fed. Reg. at 66,308 - 309.  When CMS issued the final anti-markup rule in November of 2007, it responded to these comments and determined that the Medicare Act provided it with authority to apply the anti-markup rule to diagnostic testing services.  Id.

Count VI of the Complaint asserts that CMS's application of the final anti-markup rule to the professional component of anatomic pathology diagnostic testing services violates the anti-markup provisions of the Medicare Act, 42 U.S.C. § 1395u(n)(1) ("Anti-Markup Statute").  See Comp. ¶¶ 152-55; see also Pl. PI Memo. at 28-29.  That statute provides that, if a diagnostic test was not performed or supervised by the billing physician or by a physician with whom the billing physician "shares a practice," the Medicare payment is the lower of the costs (net of any

22

discount) charged by the performing supplier physician to the billing physician, or the

performing supplier's reasonable charge (or other applicable limit).  Prior to issuance of the final

anti-markup rule in November of 2007, CMS initially applied the anti-markup rule to the

technical component of any purchased diagnostic test ordered by the treating physician or other

supplier.  Plaintiffs contend that the Anti-Markup Statute prevents CMS from applying the anti-

markup rule to pathology services performed by a group practice in a centralized building

outside the physician's office (such as a Uropath-managed lab) "because the technical

component of these diagnostic tests are supervised by a pathologist who 'shares a practice' with

the referring physician."  See Pl. PI Memo. at 28.

CMS considered and rejected these contentions regarding the effect of the Anti-Markup

Statute when it issued the final anti-markup rule in November of 2007.  CMS stated in the final

rule that, although it had initially applied the anti-markup rule to the technical component of any

purchased diagnostic test ordered by the treating physician, see 73 Fed. Reg. at 405, CMS later

determined that "subsequent events blurred the distinction between tests that are outright

purchased and tests for which payment is reassigned," such that "reassigned tests are

functionally the equivalent of purchased tests," 72 Fed. Reg. at 66,314, and that CMS "[saw] no

reason to distinguish between" the technical and professional components of diagnostic testing

services "for purposes of the anti-markup provisions."  Id. at 66,315.  CMS "believe[d] that, in

order to fully effectuate the Congress' intent to prevent or limit the ordering of unnecessary

diagnostic tests, it is necessary to impose an anti-markup provision on the PC [professional

component] of diagnostic tests."  Id.

The Anti-Markup Statute does not define the term "shares a practice."  In issuing the final anti-markup rule, CMS stated that it construed this term as providing it with authority to apply the anti-markup rule to the technical component not only of "tests that are outright purchased, but also of tests for which payment is reassigned to the billing supplier."  72 Fed. Reg. at 66,308 - 309.  CMS also stated that, in the intervening time since CMS issued the regulation, changes in the Medicare program "created incentives for conduct that [CMS] believe[s] increases the risk of overutilization and abuse of the Medicare program."  CMS stated that the statutory grant of general rulemaking authority (42 U.S.C. § 1395hh) authorized CMS to impose anti-markup rules on the technical and professional components of diagnostic tests "in order to fully effectuate Congress' intent" in enacting the Anti-Markup Statute.  72 Fed. Reg. at 66,309.  CMS stated that it found additional statutory authority for the rule in that provision of the Medicare Act that prohibits payment to anyone other than the Medicare beneficiary or the physician or other person who furnished the item or service to the beneficiary.  Id.; see also 42 U.S.C. § 1395u(b)(6).  While the Act contains a provision that provides an exception to that general rule, that provision allows, but does not require, CMS to make such payment.  Id.  Although CMS allowed a physician to bill for tests and test interpretations provided by an outside supplier because CMS deemed such tests to be performed by the billing supplier, CMS was authorized, but was not required, to do so, and in particular was not required to do so without placing limits on the amount the purchasing supplier may bill.  Id.

CMS noted that, while Congress authorized it to pay a physician for an item or service as a result of a reassignment created pursuant to a contractual arrangement, regardless of the site of service, CMS was also specifically authorized to subject such arrangements to "such program

24

integrity and other safeguards as [CMS] may determine to be appropriate."  72 Fed. Reg.

at 66,309.  CMS therefore determined that it had authority to place restrictions on the billing of

tests and interpretations performed by someone other than the billing supplier, "particularly with

respect to situations in which there is the potential for overutilization."  Id. at 66,309.

Based upon its analysis of the applicable provisions of the Medicare Act and the agency's

regulations, CMS determined that its application of the anti-markup rule to the professional

component of diagnostic testing services was within the Secretary's authority under the

Medicare Act and was not based solely upon the Anti-Markup Statute.  Although the Anti-

Markup Statute "does outline how physician services will be paid in the typical situation," it

does not preclude CMS from "setting conditions on physician payment" or departing from that

general payment methodology "where a physician or other supplier is seeking to take advantage

of a special situation" made available by CMS, such as the purchased-test and reassignment rules

that allow an entity to bill Medicare for services the entity did not perform directly.  Id. at

66,309.  Where a physician chooses to take advantage of such options rather than receiving

payment only for tests that were personally performed, CMS has authority under the Medicare

Act to promulgate rules "to ensure that these options do not increase the likelihood of Medicare

program abuse."  Id.

### C.     The Final Anti-Markup Rule Is Consistent with the Stark Law

Count IV of the Complaint asserts that CMS's application of the final anti-markup rule to

the professional component of anatomic pathology diagnostic testing services violates the Stark

Law, 42 U.S.C. § 1395nn.  See Comp. ¶¶ 24-31, 136-41; see also Pl. PI Memo. at 24-26.

The Stark Law was designed to protect the fiscal integrity of the Medicare program as well as the integrity of physicians' medical judgments.  Prior to its passage, academic studies had shown that when physicians had a financial relationship with a facility, the existence of this relationship led them to refer more patients for more services to that facility than otherwise would have been referred in the absence of such a relationship, resulting in higher costs to the Medicare program.  See 66 Fed. Reg. 856, 859 (Jan. 4, 2001).  The Stark Law was enacted to prevent the doctor's personal financial interests from influencing medical decision-making and thus to ensure that such decisions were based solely on the best interests of the patient and would not result in excessive cost to the Medicare program.  To that end, the Stark Law sets out explicit prohibitions intended to prevent physicians from profiting excessively from their own referrals. See  42 U.S.C. § 1395nn.  The final anti-markup rule is similarly intended to prevent the doctor's personal financial interests from influencing medical decision-making, to ensure that such decisions were based solely on the best interests of the patient, to avoid overutilization of services, and to curb excessive costs to the Medicare program.  See 72 Fed. Reg. at 38,179.

The Stark Law prohibits referrals for certain designated health services, prohibits billing for those services, and prohibits payment by Medicare for such services, when the referring physician has a financial relationship with the entity providing the service and that relationship does not fall within one of the specified statutory or regulatory exceptions.  See  42 U.S.C. § 1395nn(a), (g).  The in-office ancillary services exception permits physicians and their groups to bill for certain ancillary services, such as diagnostic lab tests, that are furnished in a separate building and in a manner that satisfies various conditions.  Id. § 1395nn(b)(2).  Plaintiffs contend

that CMS's application of the final anti-markup rule to diagnostic testing services violates the

Stark Law, and is in excess of the Secretary's statutory authority because it ignores the Stark

Law's exception.  <u>See</u> Comp. ¶¶ 137-40.

But neither the prohibitions nor the exceptions set forth in the Stark Law prevent CMS

from placing <u>other</u> restrictions on the amount of payment for specific services, where such

restrictions are intended to prevent over-billing, overutilization of services, and the likelihood of

Medicare abuse.[6]  Although the exception cited by plaintiffs may permit physicians to bill for

certain services that would otherwise be deemed to be prohibited "self-referrals," the Stark Law

does not purport to determine the specific amount of payment under Medicare for services that

comply with its terms.  In issuing the final anti-markup rule, CMS noted that the rule did not

alter the in-office ancillary services exception.  <u>See</u> 72 Fed. Reg. at 66,320.  Plaintiffs

acknowledge that the anti-markup rule "does not explicitly amend the Stark-in-office ancillary

service exception."  Pl. PI Memo. at 25.  The mere fact that the anti-markup rule, which was not

issued under the Stark Law, restricts reimbursement for services provided in a central office does

not create an impermissible conflict with the Stark Law.

### D.    The Final Anti-Markup Rule Is Consistent with the Physician-Fee-Schedule Statute

Count V of the Complaint asserts that CMS's application of the final anti-markup rule to

the professional component of anatomic pathology diagnostic testing services violates the

physician fee schedule provisions of the Medicare Act, 42 U.S.C. § 1395w-4(c)(2)(A)

("Physician Fee Schedule Statute").  <u>See</u> Comp. ¶¶ 143-50; <u>see also</u> Pl. PI Memo. at 26-27.  That

---

[6] We note that the Stark Law permits the Secretary to promulgate additional requirements with regard to the in-office ancillary services exception "as needed to protect against program or patient abuse."  42 U.S.C. § 1395nn(b)(2).

statute provides that the fee schedule amount payments are to be based in part upon a service's "practice expense component," which includes items such as office rent and employee wages. Plaintiffs assert that the final anti-markup rule, by limiting reimbursement to the lesser of the performing supplier's net charge to the billing physician or other supplier, the billing physician's actual charge, or the fee schedule amount for the test that would be allowed if the performing supplier billed directly, fails to assure that payment will include the service's practice expense component.  See Pl. PI Memo. at 27.

But the fee schedule established under that statute is merely the starting point under the Medicare Act for CMS to determine the amount of payment for services.  In issuing the final anti-markup rule, CMS did not violate the Fee Schedule Statute or any other statutory provisions that may apply to Medicare payment for particular services.  As CMS stated, "[n]othing in this final rule . . . requires practices to pay for [diagnostic testing of] Medicare patients on a per-procedure basis or using any particular payment method."  72 Fed. Reg. at 66,318.

## III.    BECAUSE CMS'S DECISION TO APPLY THE NOVEMBER 2007 FINAL ANTI-MARKUP RULE TO ANATOMIC PATHOLOGY DIAGNOSTIC TESTING SERVICES IS REASONABLE, THE COURT SHOULD DEFER TO THAT DECISION AND REJECT PLAINTIFFS' APA CHALLENGE

Count I of the Complaint asserts that CMS's decision to apply the anti-markup rule to the professional component of anatomic-pathology diagnostic testing services is arbitrary and capricious in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).  See Comp. ¶¶ 112-14.  Even if the Court had subject-matter jurisdiction over that claim (which the Secretary denies), the Court should defer to CMS's determinations, and should dismiss Count I.

A.    <u>The Standard of Review of Agency Action Under the APA</u>

To determine whether agency action is arbitrary or capricious, the court must consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," <u>Marsh v. Oregon Natural Res. Council</u>, 490 U.S. 360, 378 (1989), or the absence of "a rational connection between the facts found and the choice made." <u>Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983); <u>see also</u> <u>Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.</u>, 462 U.S. 87, 105 (1983). A factual finding satisfies the substantial evidence standard if the record contains such relevant evidence as a reasonable mind might accept as adequate to support the finding. <u>Consolidated Edison v. NLRB</u>, 305 U.S. 197, 229 (1938)).

Under these "highly deferential" standards for review of claims brought under the APA, <u>see</u> <u>Ethyl Corp. v. EPA</u>, 541 F.2d 1, 34 (D.C. Cir. 1976), the agency's decision is entitled to a presumption of validity and must be upheld if rationally based. <u>Motor Vehicles Mfrs. Ass'n</u>, 463 U.S. at 43; <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 415 (1971); <u>Ethicon, Inc. V. FDA</u>, 762 F. Supp. 382 (D.D.C. 1991). The court's sole task is to determine whether the agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. <u>Marsh</u>, 490 U.S. at 378; <u>see also</u> <u>Baltimore Gas & Elec.</u>, 462 U.S. at 105. In reviewing a challenge to agency action under the APA, the court's review must be conducted upon the administrative record as assembled by the agency, <u>see</u> <u>Bristol-Myers Squibb v. Shalala</u>, 923 F. Supp. 212, 216 (D.D.C. 1996), and "the court is not empowered to substitute its judgment for that of the agency." <u>Overon Park</u>, 401 U.S. at 824.

Given the "tremendous complexity of the Medicare program," an "enhanced" level of deference is due to the Secretary's judgment.  See Community Care Found. v. Thompson, 318 F. 3d 219, 225 (D.C. Cir. 2003).

**B.    Because CMS's Decision to Apply the Final Anti-Markup Rule to Anatomic Pathology Claims Is Reasonable, the Court Should Defer to that Decision**

The Complaint challenges CMS's application of the final anti-markup rule to the professional component of anatomic pathology diagnostic services.  Comp. ¶ 66.  The anti-markup rule limits reimbursement for any such services that are furnished in a "centralized building" that does not qualify as the "same building" under the physician self-referral exception at 42 C.F.R. § 411.355(b) to the lesser of the performing supplier's net charge to the billing physician, the billing physician or other supplier's actual charge, or the fee schedule amount for the test that would be allowed if the performing supplier billed directly.  73 Fed. Reg. at 405; 42 C.F.R. § 4.14.50(a)(1).

Historically, the anti-markup rule was applied only to the technical component of any purchased diagnostic test ordered by the treating physician.  42 C.F.R. § 414.50 (1993).  In July of 2007, when CMS initially proposed to apply the anti-markup rule to the technical and professional components of all diagnostic testing services furnished in a centralized building that does not qualify as the same building where the physician provides direct patient services (such as examinations), CMS "expressed concern about certain arrangements" by which physician group practices "bill for certain services furnished by a contractor physician in a 'centralized building'" outside the physician's office.  In particular, CMS expressed concern that these arrangements "may lead to patient and program abuse in the form of overutilization of services and result in higher costs to the Medicare program."  72 Fed. Reg. at 38,179; see also

30

72 Fed. Reg. 66,222, at 66,307.

CMS received "approximately 1100 pieces of timely correspondence in response to these proposals." 72 Fed. Reg. at 66,306. As CMS noted when the final rule was issued in November 2007, commenters were divided on this proposed rule. While "many commenters supported [these] proposals to prohibit the markup of the TC and PC of diagnostic tests in order to prevent physicians, physician group practices, and medical groups from profiting through the ordering of such tests," other commenters "were opposed" to these proposals. 72 Fed. Reg. at 66,306. Many commenters in favor of the proposal "cited overutilization as a concern in the existing billing and payment environment," and such commenters made reference to several studies" that support their position, while commenters opposed to the proposal "denied that contractual arrangements for pathology services lead to overutilization." Id. at 66,311 - 12.

In particular, several commenters who supported the proposal "mentioned the 2007 OIG [Office of Inspector General] studies of three urology practices, which the commenters described as finding that all three practices substantially increased the number of biopsies ordered per patient after entering into an arrangement for contracted pathology services," and finding that these practices "billed significantly more biopsies than what their respective carriers paid on average to other suppliers." Id. at 66,312.[7] One commenter suggested that "at least initially," the anti-markup provisions should apply exclusively to physician groups in urology and two other specialties "because those specialties order a significant number of pathology tests." Id.

_____

[7] Although plaintiffs assert that OIG audits for Uropath-managed laboratories did not indicate that anatomic pathology diagnostic testing services were overutilized, see Comp. ¶ 92; Pl. PI Memo. at 13-15, that assertion is immaterial because the final anti-markup rule is not limited to services provided by Uropath-managed laboratories, but instead applies to all anatomic pathology diagnostic testing services. CMS was not required to make findings as to plaintiffs.

at 66,309.  That commenter suggested that the Secretary could "subsequently broaden application of the anti-markup provisions to the extent that 'new abusive' arrangements develop."  Id.  In response to that comment, CMS stated that it "decline[d] to adopt" the approaches suggested by that commenter, and that the final anti-markup rule would apply to physician groups "regardless of specialty."  Id.

CMS issued the final anti-markup rule on November 27, 2007 (with some modifications to the proposed rule), to be effective on January 1, 2008.  72 Fed. Reg. 66,222, at 66,306; see also 42 C.F.R. § 414.50.  In issuing the rule, CMS determined that "reassigned tests are functionally the equivalent of purchased tests."  72 Fed. Reg. at 66,314.  CMS also stated that it "[saw] no reason to distinguish between" the technical and professional components of diagnostic testing services "for purposes of the anti-markup provisions."  Id. at 66,315.  CMS "believe[d] that, in order to fully effectuate the Congress' intent to prevent or limit the ordering of unnecessary diagnostic tests, it is necessary to impose an anti-markup provision on the PC [professional component] of diagnostic tests."  Id.

After the final rule was issued, CMS "received informal comments from various stakeholders," some of whom asserted that "patient access may be significantly disrupted" due to the impact of the final rule on them.  See 73 Fed. Reg. 404, 405 (Jan. 3, 2008).  On January 3, 2008, two days after the final anti-markup rule was scheduled to take effect, CMS, in the exercise of its discretion, issued another rule, 73 Fed. Reg. 404, that delayed until January 1, 2009, the applicability of the anti-markup rule to the professional component of diagnostic testing services, except as to anatomic pathology diagnostic testing services furnished in a centralized building that does not qualify as the same building (as the physician's office) under

the physician self-referral exception at 42 C.F.R. § 411.355(b).  42 C.F.R. at 404-05.  In issuing

that rule, CMS stated: "Because anatomic pathology diagnostic testing arrangements precipitated

our proposal for revision of the anti-markup provisions and remain our core concern, we are not

delaying the date of applicability with respect to anatomic pathology diagnostic testing services."

73 Fed. Reg. at 405.

CMS's decision to apply the final anti-markup rule issued in November of 2007 to

anatomic pathology diagnostic testing services commencing on January 1, 2008, as planned,

while deferring for one year that rule's implementation as to other diagnostic testing services, is

well within the Secretary's discretion.  See Community Care Found. v. Thompson, 318 F. 3d

219, 225 (D.C. Cir. 2003).[8]

CMS's extensive discussion in the proposed and final anti-markup rule establish that its

decision to apply the rule to the professional component of anatomic pathology diagnostic

testing services was based on a consideration of the relevant factors, including CMS's view that

allowing physician group practices to realize a profit when billing Medicare for services

provided in a centralized building that does not qualify as the same building may lead to patient

and program abuse in the form of overutilization of services and may result in higher costs to the

Medicare program.  In addition, CMS's view that anatomic pathology diagnostic testing

arrangements are its core concern is a sufficient basis for CMS to apply the rule to such services

as scheduled, while deferring for one year its implementation to other types of diagnostic testing

services.

_____

[8] And, as stated previously, plaintiffs are not harmed by (and do not challenge) CMS's
decision to defer for one year the implementation of the anti-markup rule to other types of
diagnostic testing services.

In evaluating the competing views of commenters regarding such factors, as well as the agency's expertise, CMS did not make a "clear error of judgment."  See Marsh v. Oregon Council, 490 U.S. at 378.  Given the commenters' conflicting views as to the proper scope of the rule, this "is not a case where the agency failed to consider an important aspect of its decision or offered an explanation that runs counter to the evidence."  See American Wildlands v. Kempthorne, 478 F. Supp. 2d at 100.  Plaintiffs' disagreement with the agency's decision to delay application of the anti-markup rules as to some testing services while continuing to apply the rules as to anatomic pathology diagnostic testing services is insufficient to establish a valid claim under the APA.  See Hudson v. FAA, 192 F.3d 1031, 1037 (D.C. Cir. 1999) (in an APA challenge, the fact that some commenters disagreed with FAA's policy shift "[wa]s of no moment").  Plaintiffs fail to meet their heavy burden of proof under the rational-basis standard for challenging agency action under the APA.  See Overton Park, 401 U.S. at 415.

For these reasons, the Court should defer to CMS's decisions, and should therefore dismiss Count I of the Complaint.

## IV.    IN ISSUING THE FINAL ANTI-MARKUP RULE AS APPLIED TO ANATOMIC PATHOLOGY DIAGNOSTIC TESTING SERVICES, CMS COMPLIED WITH THE APA'S NOTICE-AND-COMMENT PROVISION

Count II of the Complaint challenges CMS's compliance with the notice-and-comment provision of the APA, 5 U.S.C. § 553, in issuing the January 3, 2008, rule.  See Comp. ¶¶ 64-67, 116-35 (challenging 73 Fed. Reg. 404).  That rule merely continued to apply the November 2007 final anti-markup rule to anatomic pathology diagnostic testing services, while delaying for one year its effective date for other types of diagnostic testing services.

34

A.   **Because the Anatomic Pathology Diagnostic Testing Services Provided by the Physician Groups Are Subject to the November 2007 Final Anti-Markup Rule, Plaintiffs Lack Standing to Challenge the January 2008 Rule, Which Does Not Apply to Such Services**

Plaintiffs miss the mark in challenging CMS's issuance of the rule on January 3, 2008, see Comp. ¶¶ 4-10, 64-67, 113 (citing 73 Fed. Reg. 404), because that rule does not affect Medicare payment for anatomic pathology diagnostic testing services.  Instead, payment for those services is governed by the final anti-markup rule that was proposed on July 12, 2007, see 72 Fed. Reg. 38,122, and was issued on November 27, 2007, with an effective date of January 1, 2008.  72 Fed. Reg. at 66,306.  The fact that the January 3, 2008 rule delayed for one year the effective date for implementation of the anti-markup rule to other types of diagnostic testing services is not material, because plaintiffs do not seek reimbursement for those other services and do not contest the Secretary's decision to defer that implementation of the anti-markup rule. See Comp. ¶ 66.

Plaintiffs lack standing to challenge the January 3, 2008 rule or the manner in which CMS issued that rule.  Instead, any procedural claims plaintiffs may raise must be based upon the final anti-markup rule that was issued by CMS in November of 2007.  In addition, an alleged violation of a procedural requirement does not permit any and all persons to sue the government, and procedural injury alone, in the absence of a threat to a "concrete interest" of plaintiffs, is insufficient to establish standing.  See Lujan, 504 U.S. at 572-73.  Here, any injury alleged by plaintiff would result from November 2007 final anti-markup rule, rather than the January 2008 rule.  The Court should therefore dismiss Count II of the Complaint.

**B.     CMS Complied with the APA's Notice and Comment Provision in Issuing the Final Anti-Markup Rule on November 27, 2007**

The APA requires that the notice of a proposed rulemaking contain "either the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b)(3).  The notice-and-comment provision enables the agency to benefit from the input of commenters while permitting the agency to maintain a "flexible and open-minded attitude towards its own rules."  See National Tour Brokers Ass'n v. United States, 591 F.2d 896, 902 (D.C. Cir. 1978); see also Chocolate Mfrs. Ass'n v. Block, 755 F.2d 1098, 1103 (4th Cir. 1985).

The Court should dismiss Count II of the Complaint because CMS complied with the notice-and-comment provision of the APA, 5 U.S.C. § 553.  The proposed anti-markup rule that was issued in July of 2007 contained an adequate description of the subjects and issues involved.  CMS expressed concern about arrangements by which physician group practices "bill for certain services furnished by a contractor physician in a 'centralized building.'"  72 Fed. Reg. at 38,179.  CMS also expressed concern that such arrangements, by allowing physician groups to bill for certain services and to then realize a profit when billing Medicare, "may lead to patient and program abuse in the form of overutilization of services and result in higher costs to the Medicare program."  Id.

The statements made by CMS in the final anti-markup rule in November of 2007 demonstrate that the agency provided adequate notice of the scope of the proposal and the subjects to be addressed in the final anti-markup rule, and that public participation ensured informed agency decisionmaking.  Because the proposed rule would have applied to all types of diagnostic testing services, the comments received by the agency included, but were not limited to, anatomic pathology diagnostic testing services.  CMS therefore received and considered a

36

wide range of views as to the proposed rule. Some commenters supported the proposed rule, while others opposed it. See 72 Fed. Reg. at 66,306.

For these reasons, plaintiffs cannot properly dispute that CMS complied with the APA's notice-and-comment provision when CMS issued the final anti-markup rule in November of 2007.

**C.     In Issuing the Rule on January 3, 2008, CMS Properly Invoked the Good-Cause Exception to the APA's Notice and Comment Provision**

Even if plaintiffs were deemed to have standing to challenge CMS's compliance with the APA's notice-and-comment rulemaking requirements as to the rule issued in January of 2008, that challenge must fail. When CMS issued that rule, delaying for one year the implementation of the anti-markup rule to services other than anatomic pathology diagnostic testing services, CMS invoked the good-cause exception to notice and comment under the APA, based upon the agency's finding that seeking further public comment on this action was "impracticable and contrary to the public interest." See 404 Fed. Reg. at 405, citing 5 U.S.C. § 553(b)(3)(B). In making this determination, CMS cited to the comments received by the agency asserting that "patient access for common diagnostic tests may be significantly disrupted" unless the agency delayed the effective date of the proposed anti-markup rule as applied to diagnostic testing services in areas other than anatomic pathology. Id. at 405-06.

**D.     Because the Anti-Markup Rule, as Modified in January of 2008, Was the "Logical Outgrowth" of the July 2007 Proposal, the APA Did Not Require Additional Notice and Comment**

Finally, even if the exception to the APA's notice-and-comment provision invoked by CMS were deemed not to apply, the anti-markup rule, as issued in November of 2007 and as modified in January of 2008, meets the "logical outgrowth" test applied by courts in reviewing

procedural challenges regarding the notice-and-comment provision.  See City of Waukesha v. EPA, 320 F.3d 228, 245 (D.C. Cir. 2003); Chocolate Mfrs. Ass'n, 755 F.2d at 1105 (summarizing cases).  Under that test, the "key question" is whether the purposes of the notice-and-comment provision have been served, see AFL-CIO v. Chao, 496 F. Supp. 2d 76, 87 (D.D.C. 2007), or, in other words, whether, when the agency issued the proposed anti-markup rule in July of 2007, commenters should have anticipated that the agency might limit the proposal to a subgroup of diagnostic testing services.  See Waukesha v. EPA, 320 F.3d at 245.

Commenters did anticipate that possible outcome, given that the agency received extensive comments that were specifically directed to whether the anti-markup rule should apply to urology services, as discussed in Part II B above.  This is not a case where there was no initial notice of a proposed change, or the initial notice given by the agency was inadequate, such that the proposal was met with "total silence" concerning the rule ultimately adopted by the agency. See AFL-CIO v. Chao, 496 F. Supp. 2d at 87; Chocolate Mfrs. Ass'n, 755 F.2d at 1107.

Under the logical-outgrowth test, where the initial notice is adequate, an agency "undoubtedly has authority to promulgate a final rule that differs in some particulars from its proposed rule."  Id. at 245 (citation omitted).  "A contrary rule would lead to the absurdity that . . . the agency can learn from the comments on its proposal only at the peril of starting a new procedural round of commentary."  Id. (citation omitted).  Based upon the notice and comment provided after CMS issued the proposed anti-markup rule in July of 2007, CMS had discretion to determine, either when it issued the November 2007 final rule or when it issued the January 2008 rule, the scope of professional services subject to the anti-markup rule.  There is no basis for plaintiffs to contend that, had additional notice been provided prior to the issuance of the rule

in January of 2008, "they would have submitted additional comments that could have invalidated the rationale for the revised rule." Id. at 246, citing <u>Shell Oil Co. v. EPA</u>, 950 F.2d 741, 752 (D.C. Cir. 1991). That rule "falls within the range of alternatives" addressed in the agency's proposed rule in November of 2007. Id., 320 F.3d at 246.

Moreover, even if the good-cause exception were deemed not to apply, and even if the January 2008 rule were invalidated on that basis, the November 2007 final anti-markup rule, which applies to the anatomic pathology diagnostic testing services provided by plaintiffs, would remain in effect.

## V.    IN ISSUING THE FINAL ANTI-MARKUP RULE AS APPLIED TO ANATOMIC PATHOLOGY DIAGNOSTIC TESTING SERVICES, CMS COMPLIED WITH THE REGULATORY FLEXIBILITY ACT

Count III of the Complaint asserts that CMS violated the Regulatory Flexibility Act, 5 U.S.C. § 604 ("RFA"), in issuing the January 3, 2008 rule, and that plaintiff Urology Care, a physician group that provides anatomic pathology diagnostic services, is a small business subject to the RFA. See Comp. ¶¶ 98-107, 125-35 (challenging 73 Fed. Reg. 404). Plaintiffs lack standing to assert that claim with respect to the issuance of that rule, which does not affect the application of the November 2007 final anti-markup rule to the services provided by Urology Care. In the alternative, the Court should dismiss Count III because CMS complied with the RFA in connection with its decision to apply the final anti-markup rule to such services.

**A.** **Because Anatomic Pathology Diagnostic Testing Services Are Subject to the Final Anti-Markup Rule Issued in November of 2007, Plaintiffs Lack Standing to Challenge the Issuance of the January 2008 Rule, Which Does Not Apply to Such Services**

Plaintiffs lack standing to challenge the manner in which CMS issued the January 3, 2008 rule, because Urology Care provided anatomic pathology diagnostic testing services, and the company's substantive and procedural claims must be based upon the anti-markup rule that was issued by CMS in November 2007, which governs payment for such services. See Comp. ¶ 66.

The RFA requires that, when an agency promulgates a final rule, it must prepare a final regulatory flexibility analysis that contains "a description of the steps the agency has taken to minimize the significant economic impact on small entities" and reasons why the other "significant alternatives" to the rule were rejected. 5 U.S.C. 604(a) (emphasis added). The RFA requires that an agency "conduct the relevant analysis or certify 'no impact' [only] for those small businesses that are 'subject to' the regulation." Cement Kiln Recycling Coal. v. EPA, 255 F.3d 855, 869 (D.C. Cir. 2001). It does not apply to "small businesses indirectly affected by the regulation of other entities," even if the indirectly affected businesses are the "targets" of the given rule, id. For that reason, courts routinely dismiss RFA claims in situations where, as here, the claimants are not subject to the newly promulgated rule. See, e.g., id.; Mid-Tex Elec. Coop. v. FERC, 773 F.2d 327, 342 (D.C. Cir. 1985). Because Urology Care is subject to the November 2007 anti-markup rule, and is unaffected by the January 2008 rule, the Court should dismiss Count III.

**B.     Even if Urology Care Had Standing to Assert a Claim under the RFA as to January 3, 2008 Rule, the Company Fails to State a Claim**

When CMS issued the January 3, 2008 rule, it expressly determined that this rule would not "result in any significant economic impact on any small entity." 73 Fed. Reg. at 406. Thus, even if Urology Care were found to have standing to challenge the manner in which that rule was issued, CMS complied with the RFA.

The RFA requires that, when an agency promulgates a final rule, it must prepare a final regulatory flexibility analysis that contains "a description of the steps the agency has taken to minimize the significant economic impact on small entities" and reasons why the other "significant alternatives" to the rule were rejected. 5 U.S.C. 604(a). Because the RFA is purely procedural in nature, see U.S. Cellular Corp. v. FCC, 254 F.3d 78, 88 (D.C. Cir. 2001), the RFA does not impose a substantive mandate on federal agencies, see Associated Fisheries, Inc. v. Daley, 127 F.3d 104, 114 (1st Cir. 1997). The RFA does not provide plaintiffs with a remedy for defendant's "failure" to choose a different alternative. See National Coal. for Marine Conservation, 231 F. Supp. 2d 119, 143 (D.D.C. 2002) (stating that "the RFA does not give plaintiff the authority to determine which alternative best meets the agency's goals.").

Accordingly, the RFA requires only that agencies engage in a "reasonable" and "good faith" effort to comply with the Act. U.S. Cellular, 254 F.3d at 88. When an agency concludes that a full RFA analysis is not necessary, the agency is required to certify that conclusion, publish the conclusion in the Federal Register, and include a statement providing the factual basis for the conclusion. 5 U.S.C. § 605(b). Here, CMS expressly determined that the rule issued on January 3, 2008 would not have a significant economic impact on a substantial number

41

of small entities.  CMS published this conclusion in the Federal Register under a section entitled

"Regulatory Impact Statement," 73 Fed. Reg. at 406, and the agency provided a factual basis for

this certification.  Because the January 2008 rule delayed for one year the effective date for

application of the November 2007 anti-markup rule to some types of diagnostic testing services,

and did not alter the effective date of January 1, 2008 for application of the final anti-markup

rule to anatomic pathology diagnostic testing services, CMS reasonably determined that the

January 2008 rule would not have a significant economic impact on a substantial number of

small entities.  As a result of this certification, CMS was not required to conduct a Regulatory

Flexibility Analysis.  <u>See</u> 5 U.S.C. § 605(b) (explaining that certification eliminates requirement

to do analysis).[9]

## VI.    PLAINTIFFS DO NOT MEET ANY OF THE REQUIREMENTS FOR ISSUANCE OF A PRELIMINARY INJUNCTION

### A.    The Requirements for a Preliminary Injunction

"A preliminary injunction is not granted as a matter of right."  <u>Bristol-Myers Squibb Co.</u>

<u>v. Shalala</u>, 923 F. Supp. 2d 212, 215 (D.D.C. 1996).  "Injunctive relief is an extraordinary

remedy and must be sparingly granted."  <u>Id</u>.  In order to obtain preliminary injunctive relief, the

movant must carry the burden of persuasion as to four factors:

(1)    there is a substantial likelihood plaintiff will succeed on the merits;

(2)    plaintiff will be irreparably injured  if an injunction is not granted;

(3)    an injunction will not substantially injure the opposing party; and

---

[9] If the Court reaches the merits of the RFA analysis and concludes that the certification was inadequate, it should not enjoin enforcement of the rule because continued enforcement of the rule is in the public interest.  See <u>National Ass'n of Psychiatric Health Sys. v. Shalala</u>, 120 F.Supp. 2d 33, 44-45 (D.D.C. 2000).

(4) the public interest will be furthered by an injunction.

<u>Davenport v. Int'l Bhd. of Teamsters</u>, 166 F.3d 356, 361 (D.C. Cir. 1999).  The application of these factors requires that the Court deny plaintiffs' application for injunctive relief.  Accordingly, the Court should deny plaintiff's requests for a preliminary injunction.

The four factors must be considered together.  <u>See</u> <u>WMAT Comm'n v. Holiday Tours</u>, 559 F.2d 841, 844 (D.C. Cir. 1977) ("the necessary showing on the merits is governed by a balance of equities as revealed through an examination of the other three factors").  The first factor, a likelihood of success on the merits, is "particularly important" because a preliminary injunction "will not be granted unless a claimant can demonstrate a fair ground for litigation." <u>IAM v. NMB</u>, 180 F. Supp. 2d 188, 190 (D.D.C. 2002) (citations omitted).  A failure by the movant to demonstrate a likelihood of success on the merits is thus "dispositive."  <u>Id</u>.

A weak showing on any of the four factors may warrant denial of the application.  If the movant "makes a particularly weak showing on one factor," the other factors "may not be enough to 'compensate.'" <u>Barton v. District of Columbia</u>, 131 F. Supp.2d 236, 242 (D.D.C. 2001) (citing cases).  In particular, "consideration of the public interest is particularly crucial in a suit seeking to enjoin governmental action being carried out pursuant to a statute."  <u>Newdow v. Bush</u>, 355 F. Supp.2d 265, 293 (D.D.C. 2005) (citations omitted).  Preliminary injunctive relief thus "may be withheld if contrary to the public interest, even if other factors support such relief."  <u>Id</u>.  In this case, plaintiffs fail to satisfy <u>any</u> of these factors for issuance of an injunction.  As explained below, each of the factors weighs heavily against the issuance of injunctive relief.

**B.**     <u>**Plaintiffs Are Unlikely to Succeed on the Merits**</u>

As discussed in Part I above, the Court lacks subject-matter over plaintiffs' claims.  As a result, plaintiffs' application for a preliminary injunction must be denied.  It is firmly established that "[w]ithout jurisdiction the court cannot proceed at all in any cause."  <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. at 94 (quoting <u>Ex Parte McCardle</u>, 7 Wall. 506, 514 (1868)).  When jurisdiction "ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  <u>Steel Co.</u>, 523 U.S. at 94.  Plaintiffs' lack of standing and the absence of subject-matter jurisdiction preclude any possibility – let alone a likelihood  –  of success on the merits.  With respect to these claims, "a party cannot prevail on the merits of a suit that it does not (yet) have the right to bring."  <u>NationsBank Corp. v. Herman</u>, 174 F.3d 424, 427(4th Cir. 1999) (preliminary injunction was improper because bank was required to exhaust administrative remedies before bringing suit against agency).

As discussed in Parts II through V above, even if the Court has subject-matter jurisdiction over any of plaintiffs' claims, the Court should dismiss each such claim as a matter of law.  Even if one or more of these claims is not dismissed at this stage, the issues raised in Parts II through V establish that plaintiffs cannot establish any likelihood (let alone a substantial one) of success on the merits.

C.    **The Balance of Harms, Including the Lack of Irreparable Harm to Plaintiffs and the Public Interest Served by the November 2007 Regulation, Warrants Denial of Preliminary Injunctive Relief**

"Irreparablility of injury is a very high standard."  Bristol-Myers Squibb Co. V. Shalala, 923 F. Supp. at 220 (citation omitted).  Plaintiffs fail to establish irreparable harm.  To the extent that the plaintiff physician groups challenge the rate of Medicare reimbursement for services under the final anti-markup rule, their claim for higher payments from the federal government does not establish irreparable harm.  Uropath's allegations of possible future injury fall outside the zone of interest protected by the Medicare Act and are entirely speculative.

The damage to the public interest that would arise from an injunction far outweighs any alleged injury to plaintiffs that would result from the denial of its application.  Even where the movant has made the required showing of irreparable injury, preliminary relief may be withheld where its issuance would be contrary to the public interest.  While the public interest is a critical factor to weigh in evaluating any application for preliminary relief, it is especially crucial, when, as here, the suit seeks to restrain governmental action taken pursuant to a statute designed for the public interest.  See Weinberger v. Romeo-Barcelo, 465 U.S. 305, 312-13 (1982); Yakus v. United States, 321 U.S. 414, 440-41 (1944); Newdow v. Bush, 355 F. Supp.2d at 293.  In Yakus, the Supreme Court emphasized that the public interest may predominate over the interests of a private party in determining whether to grant injunctive relief:

> where an injunction is asked which will adversely affect a public interest for
> whose impairment, even temporarily, an injunction bond cannot compensate, the
> court may in the public interest withhold relief until a final determination of the
> rights of the parties, though the postponement may be burdensome to the plaintiff

45

> . . . . Courts of equity may, and frequently do, go much further both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.

321 U.S. at 440-41 (citations omitted); see also Securities Indus. Ass'n v. Board of Governors of Fed. Res. Sys., 628 F. Supp. 1438, 1543 (D.D.C. 1986) (where enforcement of statute was at issue, "the equities to be balanced are not simply those of the private litigants, but also the interest of the public as defined by Congress.").

Here, there is a strong public interest in preventing a doctor's personal financial interests from influencing medical decision-making, to ensure that such decisions are based solely on the best interests of the patient, to avoid overutilization of services, and to curb excess costs to the Medicare program. See 72 Fed. Reg. at 38,179. Maintaining the fiscal integrity of the Medicare program and the integrity of physicians' medical decisionmaking is a far more significant interest than protecting Uropath's business model and any expected future profits. The balance of equities therefore warrants denial of plaintiffs' application.

For all of these reasons, the Court should deny plaintiffs' application for a preliminary injunction.

## CONCLUSION

**WHEREFORE**, the Secretary requests that the Court dismiss the Complaint, in its entirety, and deny plaintiffs' application for a preliminary injunction.

46

Dated: February 20, 2008

Respectfully Submitted:

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

Sheila M. Lieber
Deputy Branch Director

_/s/ Peter T. Wechsler_
Peter T. Wechsler (MA 550339)
Trial Attorney
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Tel.: (202) 514-2705
Fax: (202) 616-8470
Email: peter.wechsler@usdoj.gov
 _Attorneys for Defendant_

47