# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ATLANTIC UROLOGICAL ASSOCIATES, P.A.; SAM MICHAELS, M.D.; REBECCA PAGE; UROLOGY CARE, INC.; UROLOGY CENTER OF ALABAMA, P.C.; and UROPATH, LLC, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 1:08-cv-00141-RMC |
| MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Services, | ) ) ) ) |
| Defendant. | ) ) ) |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND REPLY TO DEFENDANT'S OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

This matter is before the Court on Plaintiffs' Application for Preliminary Injunction and Defendant's motion to dismiss. Plaintiffs' lawsuit challenges a final rule published by the Secretary on January 3, 2008[1] ("January 2008 Final Rule") that was issued without the opportunity for public notice and comment. Plaintiffs also challenge the anti-markup regulation (42 C.F.R. § 414.50), as revised on November 27, 2007 ("November 2007 Final Rule"),[2] which was applied by the January 2008 Final Rule to a newly-formulated category of diagnostic testing services and locations. These rules, if allowed to go into effect, would cause the destruction of the existing business of Plaintiff Uropath, LLC ("Uropath"), the closure of numerous physician-

---

[1] 73 Fed. Reg. 404 (Jan. 3, 2008).
[2] 72 Fed. Reg. 66,222, 66,401 (Nov. 27, 2007).

owned laboratories, the loss of employment by 91 individuals, and other severe and irreparable harm.

Plaintiffs filed their Complaint on January 24, 2008, and their application to preliminarily enjoin the Secretary's action was filed on January 25, 2008. Defendant thereafter filed a motion for extension of time to respond to Plaintiffs' Complaint and Application for Preliminary Injunction, and proposed not to apply the anti-markup rule that is the subject of Plaintiffs' lawsuit to claims submitted between February 1 and April 1, 2008, to anatomic pathology diagnostic testing services furnished in a centralized building that does not qualify as the "same building" under 42 C.F.R. § 411.355(b), and not to seek recoupment of Medicare payments made for such claims on that basis if the anti-markup rule as applied to anatomic pathology diagnostic testing services was ultimately upheld by the Court. Following a hearing, the Court adopted this proposal by Order dated February 8, 2008.

On February 20, 2008, Defendant filed his Consolidated Memorandum in Support of Defendant's Motion to Dismiss and in Opposition to Plaintiffs' Application for Preliminary Injunction ("Def. Br."). Defendant challenges the Court's subject matter jurisdiction over Plaintiffs' claims, contests the standing of some Plaintiffs to raise some of the claims at issue in this case, and argues, presumably pursuant to Federal Rule of Civil Procedure 12(b)(6), against the merits of Plaintiffs' claims. Defendant also responds briefly to Plaintiffs' Application for Preliminary Injunction.

In this Opposition and Reply, Plaintiffs must first correct some incorrect statements by Defendant regarding the terms and the effect of the January 2008 Final Rule and November 2007 Final Rule, and regarding Plaintiffs' contentions concerning those rules. Plaintiffs then set out the standard of review for Defendant's arguments.

Section I of this brief addresses Counts I, II, and III of the Complaint, all of which relate principally to the invalidity of the January 2008 Final Rule, either substantively or procedurally. Section II demonstrates that the November 2008 anti-markup rule is contrary to the Stark Law, Physician Fee Schedule Statute, and the Anti-Markup Statute, and that Defendant's motion to dismiss on the grounds that the Secretary's interpretation of these laws is "reasonable" lacks merit.

Section III shows that Plaintiffs are entitled to a preliminary injunction. In Section IV, Plaintiffs demonstrate that the Court has subject matter jurisdiction in this case. In Section V, Plaintiffs refute Defendant's challenge to Uropath's standing.

**EFFECT OF FINAL RULES AND CONTENTIONS BY PLAINTIFFS**

In a number of places in its brief, Defendant has incorrectly described the terms and effects of the January 2008 Final Rule and November 2007 Final Rule, and has misidentified the provisions that Plaintiffs are challenging. For example, the opening page of Defendant's Brief states that in November of 2007 the Secretary issued the final anti-markup rule "limiting Medicare payment for the professional component of diagnostic testing services provided in a 'centralized building' that does not qualify as the 'same building' under the physician self-referral exception at 42 C.F.R. § 411.355(b)" (citing 72 Fed. Reg. 66,222, at 66,306) (emphasis added throughout this discussion). This statement is erroneous in two respects.

First, the final anti-markup rule published in November 2007 (42 C.F.R. § 414.50) did not state that it applied to services provided in a "centralized building" that is not "the same building" under the Stark Law. Rather, it applied an anti-markup (as relevant to this case) if the test was "performed at a site other than the office of the billing physician or other supplier . . . ." regardless of whether that location was a "centralized building" or a "same building" as those terms are defined in the Stark regulations. See revised 42 C.F.R. § 414.50, published at 72 Fed.

Reg. 66,401 (Nov. 27, 2007).   Second, the November 2007 expansion ot the anti-markup provision was not limited to the professional component of a diagnostic test.  On the contrary, the November 2007 Final Rule also applied the anti-markup provisions for the first time to the technical component of a diagnostic test provided by a group practice itself in its own space.  See id. (anti-markup test applies when "a physician or other supplier bills for the technical component or professional component of a diagnostic test that was ordered by the physician or other supplier. . . .")

Defendant further states that the January 2008 rule delayed applicability of the anti-markup rule "except as to the technical component of a diagnostic test, and except as to the professional component of any anatomic pathology diagnostic services furnished in a 'centralized building' that does not qualify as the 'same building' under the physician self-referral exception . . . ."  Def. Br. at 6.  Once again, there are two errors here.

First, the statement that the anti-markup rule was delayed "except as to the technical component of a diagnostic test" is incorrect.  Plaintiffs agree that the rule was not delayed for purchased technical components, which are not at issue here and which have historically been subject to the anti-markup provisions.  But the anti-markup rule was also not delayed for non-purchased technical components, if they are for anatomic pathology diagnostic testing services furnished in a centralized building.  The anti-markup rule was delayed for non-purchased technical components if they are for services other than anatomic pathology diagnostic testing services furnished in a "centralized building."

Second, regarding the same statement in Def. Br. at 6, it is not accurate that the anti-markup rule was delayed "except as to the professional component of any anatomic pathology diagnostic testing services furnished in a 'centralized building.'"  The January 2008 Final Rule

did not distinguish between the professional component and non-purchased technical components for anatomic pathology diagnostic testing services furnished in a "centralized building," and the anti-markup was not delayed for either of them.  A similar error is made in Def. Br. at 7, where it is stated that the January 2008 rule "thus did not delay the effective date for application of the final anti-markup rule to the <u>professional component</u> of anatomic pathology diagnostic testing services."

Again in Def. Br. at 7, it is stated that the "anti-markup rule limits payments for the <u>professional component</u> of anatomic pathology testing services," as described in the remainder of that sentence.  But, as stated above, for anatomic pathology diagnostic testing services performed by the billing provider  in a centralized building, it is not just the professional component which is affected, but any technical component as well.  A similar statement is made in Def. Br. at 32, where it is said that the January 2008 rule delayed "the applicability of the anti-markup rule to the <u>professional component</u> of diagnostic testing services, except as to anatomic pathology diagnostic testing services furnished in a centralized building . . . ."  But in fact, the January 2008 rule delayed the applicability of the anti-markup rule for non-purchased technical components as well, for services other than anatomic pathology diagnostic testing furnished in a centralized building.

These errors are important, because Defendant then contends that "Plaintiffs' claims are directed solely to the application of the anti-markup rule to the professional component of anatomic pathology diagnostic testing services.  <u>See</u> Comp. ¶ 66."  Def. Br. at 9.  However, Paragraph 66 of Plaintiffs' Complaint is not limited to application of the anti-markup rule to the professional component.  Paragraph 66 states that Plaintiffs are only "contesting the Final Rule's immediate application of the 'anti-markup' rule <u>with respect to anatomic pathology diagnostic</u>

<u>testing services furnished in a 'centralized building' that is not 'same building' under Stark definitions</u>." (emphasis added).  Plaintiffs have not limited their challenge to the application of the revised anti-markup rule to professional component only, but rather its application to both the professional and technical components (except purchased technical components).  Neither the Counts in the Complaint, nor the Prayer for Relief, limit Plaintiffs' challenge to application of the anti-markup rule to the professional component only.

Thus, it is important for the Court to be clear that, despite Defendant's statements:

1.     The November 2007 Final Rule applies to both "the technical component <u>or</u> professional component of a diagnostic test that was ordered by the physician," and applies the anti-markup to diagnostic tests "performed at a site other than the office of the billing physician or other supplier," rather than using a "centralized building" test.

2.     The January 2008 rule did not apply the revised anti-markup rule only to the professional component of anatomic pathology diagnostic testing services, but to both the professional and technical components of such tests; and

3.     Plaintiffs challenge the validity of the revised anti-markup imposed on both components, not just the professional component.

## STANDARD OF REVIEW

The standard of review for granting a preliminary injunction is set forth at pages 8-10 of Plaintiffs' brief ("Pl. P.I. Br.").

Neither in his motion to dismiss, nor in his Brief, does Defendant state the Federal Rule of Civil Procedure under which his motion is filed.  Presumably, the contentions regarding subject matter jurisdiction are made under Fed. R. Civ. P. 12(b)(1), and Defendant's requests that the Court dismiss the various Counts in the Complaint are made under Fed. R. Civ. P. 12(b)(6).

Under both of these rules, courts construe the Complaint liberally in favor of plaintiffs. In "[r]eviewing the district court's dismissal of the complaint for lack of subject matter jurisdiction and failure to state a claim, see Fed. R. Civ. P. 12(b)(1), (6), '[courts] construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'" Thomas v. Principi, 394 F.3d 970, 972 (D.C. Cir. 2005) (quoting Barr v. Clinton, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (internal quotation marks omitted)).

"In evaluating a motion to dismiss for lack of subject-matter jurisdiction, the court must accept the complaint's well-pled factual allegations as true and construe all reasonable inferences in the plaintiff's favor." Liu v. Novak, 509 F. Supp. 2d 1, 3 (D.D.C. 2007) (citation omitted). Similarly, on a motion to dismiss under Rule 12(b)(6), the Court must "accept as true all factual allegations in the complaint, and give the plaintiff the benefit of all inferences that can be drawn from the facts alleged." Liu, 509 F. Supp. 2d at 4 (citation omitted); accord Tabb v. District of Columbia, 477 F. Supp. 2d 185, 188 (D.D.C. 2007); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002).

Moreover, a Court may not grant a motion to dismiss under Rule 12(b)(6) unless "it meets the stringent standard for dismissal without regard to matters outside the pleadings[.]" Gordon v. Nat'l Youth Work Alliance, 675 F.2d 356, 361 (D.C. Cir. 1982). That is, the Court cannot grant the motion "unless it appears beyond doubt that a plaintiff will be unable to prove any set of facts that supports his claim entitling him to relief." Tabb, 477 F. Supp. 2d at 188. "In deciding a motion to dismiss for failure to state a claim, of course, the Court is limited to the four corners of the complaint." Id. at 187.

I.    **THE JANUARY 2008 FINAL RULE IS INVALID UNDER THE APA AND THE COUNTS CHALLENGING THAT RULE STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED**

A.    **Plaintiffs Have Standing To Challenge The January 2008 Final Rule**

The Secretary's argument that Plaintiffs do not have standing to challenge the January 2008 Final Rule, see Def. Br. at 35, is incorrect.[3]  The Secretary does not dispute that the January 2008 Final Rule was a substantive rule subject to the notice and comment requirements of the APA.  And for good reason.  An agency engages in substantive "rulemaking" when it formulates, amends, or repeals a rule.  See 5 U.S.C. § 551(5); see also, e.g., Environmental Def. Fund, Inc. v. Gorsuch, 713 F.2d 802, 816 (D.C. Cir. 1983) ("[A]n agency action which has the effect of suspending a duly promulgated regulation is normally subject to APA rulemaking requirements."); Nat'l Wildlife Fed'n v. Clark, 577 F. Supp. 825, 828 (D.D.C. 1984) ("The Supreme Court and our Court of Appeals have repeatedly set aside department and agency attempts to amend or rescind outstanding regulations without strict adherence to a process of reasoning on the record with the benefit of informed suggestions from those affected by the proposed rescission or amendment.") (citations omitted); Nat'l Res. Def. Council, Inc. v. EPA, 683 F.2d 752, 761 (3d Cir. 1982) ("EPA's action in indefinitely postponing the effective date of the amendments fit the definition of 'rule' in the APA, and, as such, was subject to the APA's rulemaking requirements.")  The January 2008 Final Rule was identified by CMS itself as a "final rule."  73 Fed. Reg. 404.

The January 2008 Final Rule, therefore, was a new rule imposing new standards and obligations, and Plaintiffs will suffer direct injury once the rule is applied.  See Complaint ¶ 111.

---

[3]  Indeed, the only conclusion to reach from the Secretary's arguments is that no party would be able to challenge the January 2008 Final Rule.  Under the Secretary's logic, physicians and suppliers who were exempted from the rule would lack standing to challenge the rule based on lack of injury, and those harmed by it (like Plaintiffs) also would lack standing.  Such logic would allow an agency to dramatically alter the effect of regulations while insulating itself from any judicial review of its actions.

The Secretary's argument that the rule "does not affect Medicare payment for anatomic pathology diagnostic testing services" is simply incorrect.  Def. Br. at 35.  Anatomic pathology diagnostic testing services are the specific subject of the January 2008 Final Rule.  The January 2008 Final Rule states, in part:

> [W]e are delaying until January 1, 2009, the applicability of the revised anti-markup provisions in Section 414.50, except for <u>anatomic pathology diagnostic testing services</u> furnished in space that: (1) Is utilized by a physician group practice as a "centralized building" . . . for purposes of complying with the physician self-referral rules; and (2) does not qualify as a "same building" . . . . During the next 12 months, we plan to issue clarifying guidance as to what constitutes the "office of the billing physician or other supplier" or propose additional rulemaking, or both.  Because <u>anatomic pathology diagnostic testing arrangements</u> precipitated our proposal for revision of the anti-markup provisions and remain our core concern, we are not delaying the date of applicability with respect to <u>anatomic pathology diagnostic testing services</u> furnished in space that: (1) is utilized by a physician group practice as a "centralized building" . . . for purposes of complying with the physician self-referral rules; and (2) does not qualify as a "same building" . . . .

73 Fed. Reg. at 405 (emphasis added).  The January 2008 Final Rule reflects two decisions made by CMS subsequent to the publication of the November 2007 Final Rule: the anti-markup provision <u>would</u> apply to 1) physicians billing for anatomic pathology diagnostic testing services where 2) those services were furnished in space that is a "centralized building" and not the "same building."  See Complaint ¶ 65.  Physicians providing all other types of diagnostic testing services, in any other location, would be able to bill at the regular fee schedule amount.  The Plaintiffs therefore will suffer injury if this rule takes effect, because they will not be able to bill for services performed in their own, Uropath-managed laboratories without billing Medicare at a loss.  <u>See</u> Complaint ¶ 5.  The resulting damage to Plaintiffs will be direct, substantial, and irreversible.  <u>See</u> Complaint ¶¶ 108-111. Plaintiffs therefore have a concrete interest in challenging the January 2008 Final Rule, and have been injured by the Secretary's unlawful action. <u>See</u> case law discussing standing in Section V, below.

The Secretary does not dispute that the January 2008 Final Rule was published without notice and comment. Thus, contrary to the Secretary's contention, see Def. Br. at 35, Plaintiffs have suffered "procedural injury" and also have standing to challenge the lack of notice and comment. See Gray Panthers Advocacy Comm. v. Sullivan, No. 89-0605, 1989 U.S. Dist. LEXIS 9870, at *4 (D.D.C. July 24, 1989) ("Plaintiffs include current nursing home residents whose facilities participate in Medicare and Medicaid and are governed by the final rule. They certainly have an interest in commenting on the rules implementing OBRA 87. Moreover, the Court agrees with plaintiffs that the denial of a procedural right to participate in APA rulemaking—if rulemaking is required—confers on plaintiffs standing to challenge the procedural deficiencies in the agency's action.") (citation omitted); see also City of Dania Beach v. FAA, 485 F.3d 1181, 1185 (D.C. Cir. 2007) (stating a "violation of the procedural requirements of a statute is sufficient to grant a plaintiff standing to sue, so long as the procedural requirement was designed to protect some threatened concrete interest of the plaintiff.") (citation omitted); Defenders of Wildlife v. Kempthorne, No. 04-1230, 2006 U.S. Dist. LEXIS 71137, at *48-49 (D.D.C. Sept. 29, 2006) (explaining that plaintiffs "need only show that Defendants 'omitted some procedural requirement' and 'that it is substantially probable' that such omission will 'cause [an] essential injury to the plaintiff's . . . interest.'") (citation omitted). Accordingly, Plaintiffs have standing to challenge both the substance of the January 2008 Final Rule and the procedures used by Defendant in adopting it.

> **B.    The Secretary Has Not Provided An Adequate Statement Of Reasons For Imposing The Anatomic Pathology Prohibition Immediately, And The January 2008 Final Rule Is Arbitrary And Capricious**

In Count I of their Complaint, Plaintiffs alleged that the January 2008 Final Rule must be set aside pursuant to 5 U.S.C. § 706 because it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. Plaintiffs identified a number of specific ways in which

CMS had not stated an adequate basis under 5 U.S.C. § 553(c) for adopting the January 2008 Final Rule.

- CMS stated no adequate basis for immediately imposing the revised "anti-markup" provision on anatomic pathology diagnostic testing services while deferring such provision for all other services.

- CMS had stated no adequate basis for immediately imposing the revised anti-markup provision on anatomic pathology diagnostic testing services performed in a "centralized building" under Stark definitions.

- CMS stated no basis for concluding that anatomic pathology diagnostic testing services performed in a "centralized building" present a greater risk of overutilization than all other types of diagnostic services, or services performed in other locations, for which the application of the anti-markup rule is deferred.

- In fact, evidence known to CMS demonstrated that overutilization by Uropath-managed laboratories in a "centralized building" was not present, and that the anatomic pathology diagnostic testing services furnished in those locations were medically necessary.

- It is arbitrary and capricious to require that physician groups performing anatomic pathology diagnostic testing services in a "centralized building" be forced to bill at a "net charge" for these services, when physicians performing identical services in other locations will still receive the full physician fee schedule amount for the same services.

- CMS recognized in the January 2008 Final Rule that immediate application of the revised anti-markup provision would likely result in disruption of patient care for

the provision of diagnostic services generally, but provided no explanation why patient care would not be similarly disrupted for anatomic pathology diagnostic testing services to which it immediately applied the anti-markup rule.

- CMS stated in the January 2008 Final Rule that the definition of "office of the billing physician or other supplier" in the November 2007 Final Rule may "not be clear" and may have "unintended consequences." CMS provided no explanation why it was imposing an admittedly unclear rule on anatomic pathology diagnostic testing services in a "centralized building" while allowing time for clarification for all other diagnostic services and locations.

Plaintiffs supplied legal authority and further elaboration on these points at Pl. P.I. Br. 10-18.

The Secretary has moved to dismiss Count I on grounds that the January 2008 Final Rule is "reasonable" and therefore the Court should defer to that decision. Def. Br. at 30-34.

These specific contentions by Plaintiff, which remain unanswered, all state a legally cognizable claim for relief under the Administrative Procedure Act, 5 U.S.C. § 553(c) and § 706. The only basis stated by CMS in the January 2008 Final Rule for the imposition of the Anatomic Pathology Prohibition is that these services "precipitated" its proposal for revision of the anti-markup rule and remain its "core concern." That is a completely inadequate justification for the distinctions drawn and the actions taken in the January 2008 Final Rule. And, in the context of a motion to dismiss, Defendant is barred from offering other reasons to the Court. Courts "may not accept appellate counsel's post hoc rationalizations for agency action," but instead, an agency's order may only "be upheld, if at all, on the same basis articulated in the order by the agency itself." KN Energy, Inc. v. FERC, 968 F.2d 1295, 1303 (D.C. Cir. 1992) (citations omitted).

As Defendant himself admits, in reviewing agency action there must be "'a rational connection between the facts found and the choice made.'"  <u>Motor Vehicle Manufacturers Assn. of the United States, Inc. v. State Farm Mutual Auto Insurance Co.</u>, 463 U.S. 29, 43 (1983) (citations omitted).  Moreover, "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance."  <u>Id</u>. at 42.  Here the January 2008 Final Rule stated no facts that the agency found or relied upon.  Much less did it articulate any connection between those facts and the decision to carve out anatomic pathology diagnostic testing services furnished in a centralized building from all other services and locations, and immediately impose a punitive anti-markup provision on those services.

Defendant attempts to justify the choices made in the January 2008 Final Rule by reference to the rulemaking proceedings that produced the November 2007 Final Rule.  Def. Br. at 31-33.  However, the November 2007 Final Rule by its terms applied to all diagnostic testing services, not just the subset of anatomic pathology diagnostic testing services.  Furthermore it employed a different location standard ("office of the billing physician," as opposed to "centralized building" that is not the "same building" as defined in the Stark Law).  As noted above the January 2008 Final Rule is a substantive rule, that makes far different distinctions than those made in the November 2007 Final Rule.  As a substantive rule, it must be supported by an adequate statement of its basis and purpose, and there must be an adequate record of the factual findings and legal reasons relied upon by the agency for the choices made.  As noted, those were entirely lacking in the published rule itself.

In this regard, Plaintiffs note that the Defendant filed the certified administrative record in this case on February 22, 2008.  However, that record, comprising approximately 1100 pages,

contains no materials dated after September 2007.  By letter dated March 6, 2008, counsel for Plaintiffs requested counsel for Defendant to file the administrative record for the January 2008 Final Rule.  At the time the present brief is filed, it is unknown whether Defendant will do so.

It thus remains to be seen whether there will be anything in that administrative record sufficient to support the choices made in the January 2008 Final Rule.  That must await the filing of the record, and cross-motions for summary judgment or other merits proceedings ordinarily followed in review of an agency determination.[4]  However, as matters now stand, Defendant has offered virtually no justification for the choices made in the January 2008 Final Rule.  Much less has he so conclusively refuted Plaintiffs detailed APA allegations that granting of a motion to dismiss would be appropriate.

The Secretary's fundamental approach is to assume that since the November 2007 Final Rule included all services (including anatomic pathology diagnostic testing services), and the location test in that rule may have been broader than the "centralized building" test employed in the January 2008 Final Rule, that somehow comments received during the 2007 rulemaking justify the January 2008 Final Rule.

However, the arguments offered by Defendant with respect to the rulemaking proceedings resulting in the November 2007 Final Rule[5] do not and cannot justify the choices made in the January 2008 Final Rule.  Defendant describes a comment summarized in the November 2007 Final Rule which proposed that the "anti-markup provisions should apply exclusively to physician groups in urology and two other specialties."  Def. Br. at 31.  But as Defendant notes, CMS stated that it "decline[d] to adopt" that approach and that the "final anti-markup rule would apply to physician groups 'regardless of specialty.'"  Def. Br. at 32.  Far from

---

[4]  Defendant states that "in reviewing a challenge to agency action under the APA, the court's review must be conducted upon the administrative record as assembled by the agency. . . ."  Def. Br. at 29.
[5]  The reasons why the November 2007 Final Rule is itself invalid are set forth Section II of this brief.

justifying Defendant's choices made in the January 2008 Final Rule, this abrupt about-face by CMS shows the arbitrary and unsupported nature of the actions taken in the January 2008 Final Rule. Originally, CMS stated that it would apply the anti-markup rule to all specialties. Slightly more than a month later, it applied it only to a single sub-specialty, and then only in a certain location, with no specific justification for this choice.

The Secretary asserts that some commenters supported the anti-markup, citing overutilization as a concern and that such commenters made reference to several studies that allegedly supported their position. The Secretary notes that other commenters opposed the proposal and "denied that contractual arrangements for pathology services lead to overutilization." Def. Br. at 31. He notes that several commenters mentioned the 2007 OIG studies of three Uropath-managed urology practices. Def. Br. at 31. As noted by Defendant in Def. Br. at 31, n.7, Plaintiffs have asserted (and Plaintiffs believe they have shown, see Pl. P.I. Br. at 13-17) that the "OIG audits for Uropath-managed laboratories did not indicate that anatomic pathology diagnostic testing services were overutilized. . . ." Defendant then goes on to state that that assertion is immaterial, because the final anti-markup rule is not limited to services provided by Uropath-managed laboratories, and "CMS was not required to make findings as to Plaintiffs." Two points are in order in response to these contentions.

First, Defendant has pointed to no other evidence regarding any alleged overutilization with respect to laboratories performing anatomic pathology diagnostic testing in centralized buildings – the very distinction Defendant employs for the first time in the January 2008 Final Rule.

Second, whatever evidence might have been in the November 2007 rulemaking record, Defendant cites nothing in his January 2008 Final Rule to justify a sudden switch from

application of the anti-markup rule to all specialties to application of the anti-markup only to anatomic pathology diagnostic testing services.

In any event, whatever facts or reasoning Defendant relied upon to produce the November 2007 Final Rule cannot legitimately produce a nearly opposite result one month later. Furthermore, examination of the particulars of the November 2007 rulemaking record must await summary judgment proceedings or other disposition on the merits in this case.  In brief, Plaintiff's Count I states particularized legal allegations regarding why the January 2008 Final Rule does not state an adequate basis and purpose under 5 U.S.C. § 553(c), and is arbitrary and capricious under the standards of 5 U.S.C. § 706.  Defendant has not refuted them, and has not shown that, when the administrative records are examined, there will be no possibility that the Court will not find his actions to be arbitrary and capricious under APA standards.  Defendant's motion to dismiss must accordingly be denied.

## C.   The Secretary Violated § 553 Of The APA By Promulgating The January 2008 Final Rule Without Notice and Comment

Faced with the obvious failure to conform to the procedural requirements of the APA, the Secretary offers three arguments why Plaintiffs' challenge in Count II of their Complaint must nevertheless be dismissed:  (1) CMS complied with its notice and comment obligations through the November 2007 Final Rule; (2) CMS invoked the good-cause exception to the APA's notice and comment requirements in promulgating the January 2008 Final Rule; and (3) notice and comment was not required for the January 2008 Final Rule because it was the "logical outgrowth" of the July 2007 proposed rule.  See Def. Br. at 35-39.  None of these arguments has merit.

      *1.    Defendant's purported compliance with notice and comment requirements in connection with the November 2007 Final Rule is irrelevant*

The Secretary does not contest that CMS failed to provide for notice and comment with respect to the January 2008 Final Rule.  Rather, the Secretary curiously argues that the Court should dismiss Count II of Plaintiffs' Complaint, which challenges CMS's failure to comply with the notice and comment requirements of the APA with respect to the <u>January 2008 Final Rule</u>, because CMS complied with notice and comment procedures in connection with the <u>November 2007 Final Rule</u>.  <u>See</u> Def. Br. at 36-37.  This argument is nothing more than a smokescreen.

As described in Section I.A., above, the January 2008 Final Rule is a new, substantive rule.  It applies to different entities than did the November 2007 Final Rule.  It substitutes a different location test.  Instead of applying to all specialties, it applies only to one.  It determines whether access for diagnostic tests may be "significantly disrupted" by the November 2007 Final Rule.  73 Fed. Reg. at 405-06.  It is this <u>new</u> analysis and decision-making by CMS in connection with the January 2008 Final Rule that has injured Plaintiffs, because CMS, without notice and comment, unilaterally concluded that none of the significant concerns that justified delayed application of the anti-markup provision to other diagnostic testing services was relevant to anatomic pathology diagnostic testing services.  Plaintiffs were denied the opportunity to influence CMS's decision in the January 2008 Final Rule with respect to anatomic pathology diagnostic testing services.  The Secretary violated the APA in failing to allow them to do so.

      *2.    Defendant was not excused from notice and comment rulemaking by the APA's "good cause" exception*

The Secretary's attempt to rely on the "good cause" exception to notice and comment rulemaking cannot withstand scrutiny.  "Agency attempts to avoid the notice and comment procedure under the APA are closely scrutinized."  <u>Nat'l Women, Infants, and Children Grocers</u>

-17-

Ass'n v. Food & Nutrition Serv., 416 F. Supp. 2d 92, 104 (D.D.C. 2006) (citations omitted); cf. Nat'l Res. Def. Council, 683 F.2d at 760 (noting the "exacting standard applicable in determining whether an agency has failed to comply with the procedural requirements for its action" and commenting that "it makes sense to scrutinize the procedures employed by the agency all the more closely where the agency has acted, within a compressed time frame, to reverse itself by the procedure under challenge.") As the D.C. Circuit has made clear, "the 'good cause' exception is to be 'narrowly construed and only reluctantly countenanced.'" Utility Solid Waste Activities Group v. EPA, 236 F.3d 749, 754 (D.C. Cir. 2001) (citations omitted). "The exception is not an 'escape clause'; its use 'should be limited to emergency situations.'" Id. (citation omitted); see also, e.g., Tennessee Gas Pipeline Co. v. FERC, 969 F.2d 1141, 1144 (D.C. Cir. 1992) ("'[U]se of the[ ] exception[ ] by administrative agencies should be limited to emergency situations[.]") (citation omitted). The agency's finding of good cause, and a statement of the reasons therefore, must be included in the rule. 5 U.S.C. § 553(b).

CMS may have provided a statement of reasons why it needed to dispense with notice and comment rulemaking insofar as it delayed application of the anti-markup to other specialties, the January 2008 Final Rule, it made no finding of good cause and provided no statement of reasons for its decision to impose the anti-markup on anatomic pathology diagnostic testing services immediately. See 73 Fed. Reg. at 405-06. Having failed to provide the requisite finding and statements in the January 2008 Final Rule, the Secretary cannot rely on the "good cause" exception now.

### 3. The January 2008 Final Rule is not a "logical outgrowth" of the July 2007 proposed rule

In his final attempt to salvage the procedurally deficient January 2008 Final Rule, the Secretary argues that "the anti-markup rule, as issued in November 2007 and as modified in

January of 2008, meets the 'logical outgrowth' test . . . ." Def. Br. at 37-38. "While an agency may promulgate final rules that differ from the proposed rule, . . . a final rule is a 'logical outgrowth' of a proposed rule only if interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period.[.]" Int'l Union, United Mine Workers of Amer. v. Mine Safety & Health Admin., 407 F.3d 1250, 1259 (D.C. Cir. 2005) (internal quotation marks omitted; internal citation and citations omitted). This argument is unavailing.

Indeed, this is not a traditional "logical outgrowth" case. "The logical-outgrowth doctrine typically applies where an agency publishes a notice of proposed rulemaking ('NPRM'), receives comments, and issues a final rule whose contours differ substantially from those described in the NPRM." AFL-CIO v. Chao, 496 F. Supp. 2d 76, 86 (D.D.C. 2007) (citation omitted). Here, CMS published a notice of proposed rulemaking, received comments, and issued a final rule—the November 2007 Final Rule. But CMS then took another step—it changed its mind after issuing the November 2007 Final Rule, and issued a new final rule, the January 2008 Final Rule, which differed remarkably from the November 2007 Final Rule, without allowing for notice and comment. "This flip-flop complies with the APA only if preceded by adequate notice and opportunity for public comment." Environmental Integrity Project v. EPA, 425 F.3d 992, 997 (D.C. Cir. 2005) (discussing final rule that "not only did not adopt the proposed interim rule but also adopted a 'reinterpretation' of the unamended text"); see also Environmental Defense Fund, Inc. v. Gorsuch, 713 F.2d 802, 816 (D.C. Cir. 1983) ("[A]n agency action which has the effect of suspending a duly promulgated regulation is normally subject to APA rulemaking requirements."). Thus, the "logical outgrowth" test does not even apply here. Cf. AFL-CIO, 496 F. Supp. 2d at 86 (discussing rule that was issued without notice and comment rulemaking after

prior rule, on which parties had commented, was struck down by court, and noting that no authority cited "supports extending the logical-outgrowth doctrine to the present circumstances involving issuance of a modified rule").

Even if the "logical outgrowth" test somehow applied, when a new rule reflects a "shift in strategy," it is not a logical outgrowth of the original proposed rule. See Shell Oil Co. v. EPA, 950 F.2d 741, 751-52 (D.C. Cir. 1991); see also, e.g., AFL-CIO v. Donovan, 757 F.2d 330, 338 (D.C. Cir. 1985) ("If the final rule deviates too sharply from the proposal, affected parties will be deprived of notice and an opportunity to respond to the proposal.") (citation omitted). The January 2008 Final Rule represented a "shift in strategy" for CMS. In this rule, CMS determined that the anti-markup provision should not apply to certain entities, based on considerations that were never addressed in the July 2007 proposed rule. This was not, therefore, simply a "final rule that differs in some particulars from [the] proposed rule." Def. Br. at 38 (citation omitted; emphasis added).

The Secretary's failure to comply with the APA is not saved by the "logical outgrowth" test or any other excuse. His motion to dismiss Count II of the Complaint should be denied.

As a final point, the Secretary argues that, even if the January 2008 Final Rule were invalidated, the November 2007 Final Rule would remain in effect. See Def. Br. at 39. The November 2007 Final Rule, however, is also directly challenged in this lawsuit. See Complaint ¶¶ 136-135 (Counts IV-VI); Complaint at Prayer for Relief nos. 6-8. Both rules should be enjoined.

### D.    The Final Rule Violates The Regulatory Flexibility Act

The Secretary first seeks to avoid Plaintiffs' challenge to CMS's failure to comply with the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 601 et seq., in its promulgation of the January 2008 Final Rule by arguing that "[p]laintiffs lack standing to assert that claim with

respect to the issuance of that rule, which does not affect the application of the November 2007 final anti-markup rule to the services provided by Urology Care." Def. Br. at 39.

The Secretary's "standing" argument fails here for the same reasons discussed in section I.A. Plaintiff Urology Care, like the other Plaintiffs, is specifically subject to the January 2008 Final Rule, and can challenge CMS's failure to comply with the RFA. The Secretary's views regarding the interpretation of the RFA and whether Urology Care is an entity subject to the January 2008 Final Rule for RFA purposes are not entitled to deference. See Aeronautical Repair Station Ass'n v. FAA, 494 F.3d 161, 176 (D.C. Cir. 2007) ("[W]e do not defer to the FAA's interpretation of the RFA – and specifically whether contractors and subcontractors are 'regulated' entities directly affected by the regulations – because the FAA does not administer the RFA.") (citation omitted). Urology Care, like other anatomic pathology diagnostic testing providers, is subject to the January 2008 Final Rule, which applies the anti-markup provision to Urology Care while delaying application of the anti-markup provision for other diagnostic testing providers. The January 2008 Final Rule imposes responsibilities on Urology Care and Urology Care is directly affected and regulated by the rule. It therefore may challenge the Secretary's failure to conduct an adequate RFA analysis. See Aeronautical Repair Station Ass'n, 494 F.3d at 177; 5 U.S.C. § 611(a).[6]

CMS did not comply with the RFA in the January 2008 Final Rule. Rather, CMS stated in conclusory fashion that "[w]e do not believe that this delay in the date of applicability will result in any significant economic impact on any small entity . . . [because] [u]ntil January 1, 2009, the majority of billing suppliers affected by the revised § 414.50 do not have to comply

---

[6] Cement Kiln Recycling Coalition v. EPA, 255 F.3d 855 (D.C. Cir. 2001) and Mid-Tex Elec. Coop. v. FERC, 733 F.2d 327 (D.C. Cir. 1985) two cases relied on by the Secretary, see Def. Br. at 40, are therefore distinguishable. In those cases, the entities challenging the agency's failure to comply with the RFA were not subject to the regulation at issue. Urology Care is subject to the January 2008 Final Rule, and may assert its challenge here. See Aeronautical Repair Station Ass'n, 494 F.3d at 176 (distinguishing Mid-Tex and Cement Kiln).

with the revised requirements in § 414.50." 73 Fed. Reg. at 406. The RFA excuses the Secretary from providing a final regulatory flexibility analysis (FRFA) if the Secretary publishes a certification in the Federal Register that the rule will not have a significant economic impact on a substantial number of small entities, along with a statement providing the factual basis for such certification. See 5 U.S.C. § 605(b). The Secretary's certification and statement of factual basis reveals that the Secretary gave no consideration of the impact of the January 2008 Final Rule on entities that would actually be subject to the rule – suppliers of anatomic pathology diagnostic testing services, including Urology Care. As explained in Plaintiffs' Application for Preliminary Injunction, "[t]he Secretary's truncated analysis in the Final Rule is backwards—the impact to be addressed is not the impact on small entities that will not be adversely affected by the regulatory action, but on the small entities, such as Plaintiff Urology Care, Inc., that will be affected by imposing an anti-markup rule on anatomic pathology diagnostic testing services in a 'centralized building.'" Pl. P.I. Br. at 27.[7]

The proper remedy, therefore, is to remand the January 2008 Final Rule to the agency and enjoin its application against small entities, including plaintiff Urology Care. See United States Telecom Ass'n, 400 F.3d 29, 42 (D.C. Cir. 2005).

## II. THE NOVEMBER 2007 ANTI-MARKUP FINAL RULE IS CONTRARY TO STATUTE, AND THE COUNTS CHALLENGING THAT RULE STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED

The Secretary argues that "[t]he Court should accord significant deference to the Secretary's broad rulemaking authority under the Medicare Act and dismiss Counts IV to VI of the Complaint." Def. Br. at 20. However, the Secretary's interpretations of the Stark Law,

---

[7] Thus, this case is distinguishable from U.S. Cellular Corp. v. FCC, 254 F.3d 78 (D.C. Cir. 2001) where the agency did prepare an FRFA pursuant to the RFA, National Coalition for Marine Conservation v. Evans, 231 F. Supp. 2d 119 (D.D.C. 2002) where the agency gave explicit consideration to alternatives to the rule at issue, and Associated Fisheries of Maine v. Daley, 127 F.3d 104 (1st Cir. 1997) where the agency also fully complied with the then-applicable RFA through its FRFA. Def. Br. at 14.

Physician Fee Schedule Statute, and Anti-Markup Statute, as reflected in the November 2007 Final Rule and January 2008 Final Rule, are not entitled to "significant deference." As discussed below, the Secretary's interpretation is contrary to the language and purpose of the statutes at issue, and agency decisions cannot be sustained when they are based on an erroneous view of the law. See Phillips Petroleum Co. v. FERC, 792 F.2d 1165, 1169-70 (D.C. Cir. 1989); Prill v. NLRB, 755 F.2d 941, 942 (D.C. Cir. 1985); Sea-Land Serv. Inc. v. DOT, 137 F.3d 640, 646 (D.C. Cir. 1997). Moreover, the Secretary utterly failed to provide a "reasoned analysis" to support CMS's revised interpretation of these statutes between the November 2007 Final Rule and the January 2008 Final Rule. "When an agency adopts a materially changed interpretation of a statute, it must in addition provide a 'reasoned analysis' supporting its decision to revise its interpretation." Ala. Educ. Ass'n v. Chao, 455 F.3d 386, 392 (D.C. Cir. 2006) (quoting Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 57 (1983)).[8] Furthermore, the November 2007 Final Rule itself changed CMS's longstanding regulatory interpretation of each of these statutes. See INS v. Cardoza-Fonseca, 480 U.S. 421, 447 n.30 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view.") (citations omitted).

Ultimately, "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." Chevron U.S.A. Inc. v. Nat'l Res. Def. Council, Inc., 467 US. 837, 843 n.9 (1984). As explained

---

[8] "[T]his Circuit has noted that 'a permissible statutory construction under Chevron is not always reasonable under State Farm: 'we might determine that although not barred by statute, an agency's action is arbitrary and capricious because the agency has not considered certain relevant factors or articulated any rationale for its choice.'" Shays v. U.S. Fed'l Election Comm'n, 508 F. Supp. 2d 10, 31 (D.D.C. 2007) (citations omitted).

below, the Secretary's construction of the three statutes at issue are contrary to clear congressional intent, and cannot be upheld.

### A.    The Anti-Markup Rule Violates the Stark Law

Plaintiffs have set out the terms of the Stark Law's "in-office ancillary services exception" and implementing regulations in its Application for Preliminary Injunction.  See Pl. P.I. Br. at 24-26.

In brief, Congress has provided an exception to the Stark Law allowing physicians to bill for ancillary services (including laboratory services) if the physician meets certain billing and performance requirements and furnishes the services either:  "(1) in a building in which the referring physician (or another physician who is a member of the same group practice) furnishes physicians' services unrelated to the furnishing of designated health services; or (2) . . . in another building which is used by the group practice for the centralized provision of the group's designated health services (other than clinical laboratory services)."   42 U.S.C. § 1395nn(b)(2)(A)(ii) (emphasis added).  In so doing, Congress determined that certain ancillary services that are self-referred do not pose a risk of overutilization or otherwise threaten the fiscal integrity of the Medicare program.   Otherwise, Congress would have included such services within the scope of the Stark Law's self-referral prohibition, rather than specifically excluding them.

CMS, however, has apparently reached the opposite conclusion, and has issued an anti-markup rule that effectively prohibits physicians from performing and billing for anatomic pathology diagnostic testing services performed in a "centralized building," thereby destroying the ability of physicians to continue to avail themselves of the centralized building provision established by Congress.   The Secretary contends that because the revised anti-markup rule

-24-

merely "restricts reimbursement" for services in a centralized building it does not "create an impermissible conflict with the Stark Law." Def. Br. at 27.

However, the practical, and indeed desired, effect of the anti-markup rule is to eliminate a physician group's ability to bill Medicare for anatomic pathology diagnostic testing services in a centralized building. Under the November 2007 Final Rule, physician groups that perform such services would have to accept Medicare payment equal to the lower of: (1) the performing supplier's "net charge" to the billing physician or other supplier; (2) the billing physician or other supplier's actual charge; or (3) the fee schedule amount for the test that would be allowed if the billing supplier billed directly. 42 C.F.R. § 414.50(a)(1) (as revised on November 27, 2007). The "net charge" excludes any and all overhead expenses incurred by the billing practice in performing the service. 42 C.F.R. § 414.50(a)(2)(i) (as revised on November 27, 2007). The exclusion of overhead expenses guarantees that the "net charge" will be the lowest of the three amounts. By forcing physicians to accept reimbursement which does not cover the overhead expenses associated with performing the testing service, the November 2007 Final Rule would effectively prevent physicians from providing anatomic pathology services in a "centralized building." Performing anatomic pathology diagnostic testing services in an centralized building will, under the January 2008 and November 2007 Final Rules, require the physician to lose money with each service performed, a scenario that is clearly unsustainable.

It makes no difference that CMS has not explicitly amended the in-office ancillary services exception. Def. Br. at 27. It is instructive to imagine the form that such a rulemaking would take. Could CMS issue a proposed rule, noting the "centralized building" provision passed by Congress, and then propose a rule to eliminate the ability to bill for services performed in a centralized building? Such a rule would be directly contrary to the statutory language and

plainly void. Here, CMS is seeking to accomplish the same result by a back door method, because doing so directly would be obviously and flatly contrary to statute.[9]

Contrary to the Secretary's contention, see Def. Br. at 27 n.6, the Stark Law does not provide the Secretary with the authority to narrow the in-office ancillary services exception's location requirement. Congress has provided two avenues for satisfying the in-office ancillary services' location requirement: physicians can furnish ancillary services in a "same building" or a "centralized building." It has also explicitly prohibited the Secretary from deviating from this statutory requirement "unless the Secretary determines other terms and conditions under which the provision of such services does not prevent a risk of program or patient abuse." 42 U.S.C. § 1395nn(b)(2)(A) (emphasis added). Congress has thereby allowed the Secretary to expand the exception's location requirement. However, that language does not allow the Secretary to place greater restrictions on the location requirement than those set forth in the statutory exception itself.[10]

The Secretary has used the anti-markup rule to prevent Plaintiffs from furnishing anatomic pathology diagnostic testing services in a "centralized building." This action destroys a portion of the Stark Law's in-office ancillary services exception, and is therefore contrary to the Stark Law. Accordingly, the Secretary's motion to dismiss Count IV of the Complaint should be denied.

---

[9] The fact that CMS uses terminology from the Stark Law to craft the anti-markup prohibition in the January 2008 Final Rule, and bases much of its reasoning for implementing the November 2007 Final Rule on concerns that undergirded the passage of the Stark Law, underscores the point that CMS' intent throughout this entire rulemaking process was to narrow the scope of the Stark Law's in-office ancillary services exception.

[10] The Secretary's contention that the Stark Law permits the Secretary to promulgate additional requirements with regard to the in-office ancillary services exception "as needed to protect against program and patient abuse" is not on point. This provision actually addresses the Stark Law exception's "billing" requirement, which states that the services must be billed by either: (1) the physician performing or supervising the services; (2) a group practice of which such physician is a member; or (3) by an entity that is wholly owned by such physician or such group practice, "if the ownership or investment interest in such services meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse." 42 U.S.C. § 1395nn(b)(2)(B). This provision does not relate to and does not give the Secretary any authority to eliminate the "centralized building" portion of the exception.

**B.    The Final Rule Is Contrary To The Physician Fee Schedule Statute**

The Secretary argues, albeit barely, that the November 2008 Final Rule does not violate the Fee Schedule Statute.

Defendant first notes, and does not dispute, Plaintiffs' argument that the Physician Fee Schedule Statute requires that the fee schedule amount for a physician service shall include reimbursement for a physician's "practice expenses component" (which includes rent, equipment and other overhead expenses) and that Defendant's anti-markup rule's "net charge" does not allow reimbursement for such expenses. See Def. Br. at 27-28. Then, Defendant the Secretary simply states that the fee schedule established under the Physician Fee Schedule Statute, 42 U.S.C. § 1395w-4, is the "starting point" for determining the appropriate amount of reimbursement for physicians' services. See Def. Br. at 28.

However, the Secretary fails to direct the Court to any other provisions of the Medicare Act that would prevent physician reimbursement from including an amount for overhead expenses. What is clear is that the Physician Fee Schedule Statute requires that the Secretary make payment under a Medicare fee schedule for "all physicians' services (as defined in subsection (j)(3) . . . ." 42 U.S.C. § 1395w-4(a)(1) (emphasis added). These physicians' services include anatomic pathology diagnostic testing services. See 42 U.S.C. § 1395w-4(j)(3); 42 U.S.C. § 1395x(s)(3). Congress directed the Secretary to provide reimbursement for physicians' services at the lower of:  (1) the physician's actual charge for the service; or (2) the amount determined under the physician fee schedule ("fee schedule amount").  Therefore, the plain language of the statute demonstrates that Medicare reimbursement for physicians' services must always include an amount for the practice expenses incurred by the physician in the performance of the service.  Rather than a mere "starting point," the Physician Fee Schedule Statute provides

the final word on whether physicians should receive reimbursement under Medicare Part B for their overhead expenses.

The Secretary quotes comments by CMS in the discussion of the November 2007 Final Rule, to the effect that "[n]othing in this final rule . . . require practices to pay for [diagnostic testing of] Medicare patients one per procedure basis or using any particular payment method." (citing 72 Fed. Reg. at 66,318).  This statement is completely irrelevant to Plaintiff's contentions.  The issue here is not what a physician <u>practice</u> pays for a test, but rather what Medicare pays to the physician practice.  Plaintiffs contend that the payment by Medicare should be the statutorily required amount, <u>i.e.</u>, the fee schedule amount.  <u>See</u> Def. Br. at 28.

The Secretary has cited no authority and made no argument whatsoever to show that the November 2007 Final Rule does not directly violate the Physician Fee Schedule Statute by eliminating the practice expenses component.  Plaintiffs have stated a claim for relief under Rule 12(b)(6), and Defendant's motion to dismiss Count V of the Complaint should be denied.

### C.    The Final Rule Violates The Anti-Markup Statute

The Secretary offers three arguments for why Plaintiffs' challenge in Count IV of their Complaint must be dismissed:  (1) the Anti-Markup Statute, 42 U.S.C. § 1395u(n)(1), does not preclude the Secretary's challenged modification of the anti-markup rule; (2) the grant of general rulemaking authority in 42 U.S.C. § 1395hh authorizes such an action; and (3) the reassignment provisions set forth in 42 U.S.C. § 1395u(b)(6) authorize such an action.  <u>See</u> Def. Br. at 22-25.  None of these arguments has merit.

First, the Secretary's argument that nothing in the Anti-Markup Statute precludes the application of the anti-markup rule, 42 C.F.R. § 414.50, to anatomic pathology diagnostic testing services performed in a "centralized building" is contrary to the statute itself.  The Anti-Markup Statute exempts diagnostic tests that are performed personally by, or supervised by, the billing

-28-

physician <u>or</u> "another physician with whom the physician shares a practice" from the anti-markup prohibition.  42 U.S.C. § 1395u(n)(1).  The tests here are performed by physicians sharing a practice with the Plaintiff Physician Groups, <u>see</u> Complaint ¶¶ 45, 49, and the Secretary has not contended otherwise.  The Anti-Markup Statute makes no mention of the test's location, and does not provide the Secretary with the authority to impose the anti-markup prohibition on the basis of the testing service's location.  Instead, the Statute exempts <u>all</u> tests if done by a physician with whom the billing physician shares a practice.  Neither the November 2007 Final Rule nor the January 2008 Final Rule purports to define or redefine the term "shares a practice."  Instead, the Secretary's interpretation ignores this language entirely, and would produce the bizarre result of imposing an anti-markup rule on tests and interpretations that the physician group performs itself using its own laboratory.

The Secretary's action also runs counter to the original intent of the Anti-Markup Statute, as interpreted by CMS itself.  The agency has asserted that "[t]he objective of (the Anti-Markup Statute) is two-fold:  (1) to save program costs by eliminating the profit when a physician buys a diagnostic service from an outside supplier, and (2) to reduce provision of unnecessary services by taking away the mark-up.  56 Fed. Reg. at 25,840.  Thus, since the inception of the Anti-Markup Statute and for a period of fifteen years, the anti-markup rule only applied to the technical component of a purchased diagnostic test from an outside supplier.  <u>See</u> 72 Fed. Reg. at 66,308; Def. Br. at 23.  Now, however, the Secretary argues that the statutory grant of general rulemaking authority, 42 U.S.C. § 1395hh, provides the Secretary with the authority to extend the anti-markup rule "in order to fully effectuate Congress' intent" in enacting the Anti-Markup Statute.  <u>See</u> Def. Br. at 24.

However, "(t)he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of the drafters[.]'" Financial Planning Ass'n v. SEC, 482 F.3d 481, 488 (D.C. Cir. 2007) (citations omitted). Here, Congress has provided no indication that it intended anything other than the plain meaning of the Anti-Markup Statute, or that CMS should deviate from the plain meaning of the statute because of subsequent developments in Medicare payment rules. Indeed, for fifteen years, CMS thought an anti-markup rule that applied only to the technical component of purchased diagnostic tests satisfied Congress' intent behind the Anti-Markup Statute. Accordingly, the plain meaning of the statute controls.

The Secretary's attempt to seek refuge in the reassignment provisions contained in 42 U.S.C. § 1395u(b)(6) is of no avail. The Secretary argues that, while Congress authorized the Secretary to pay a physician for an item or service as a result of a reassignment created pursuant to a contractual arrangement, regardless of the site of service, CMS is also authorized to subject such arrangements to "such program integrity and other safeguards as [CMS] may determine to be appropriate." See Def. Br. at 24-25. The Secretary further contends that "[a]lthough CMS allowed a physician to bill for tests and test interpretations provided by an outside supplier because CMS deemed such tests to be performed by the billing supplier, CMS was authorized, but was not required, to do so, and in particular was not required to do so without placing limits on the amount the purchasing supplier may bill." Id.

However, the reassignment provisions cited by the Secretary only address who may receive Medicare reimbursement for a Medicare Part B service; they do not provide the Secretary with the authority to limit the level of reimbursement such party receives under Medicare Part B. See 42 U.S.C. § 1395u(b)(6)(A). Further, the reassignment provision only authorizes the

-30-

Secretary to implement safeguards and program integrity measures with regard to the <u>contractual arrangement</u> between a physician and the entity receiving payment. <u>See</u> 42 U.S.C. § 1395u(b)(6)(A). Contrary to the Secretary's assertion, this provision does not provide a blanket authorization to impose an anti-markup rule or another provisions affecting the amount of payment provided by Medicare, nor does it allow for actions, which directly contradict another statute, including the Anti-Markup Statute. Accordingly, the reassignment provisions do not authorize the decision to impose the anti-markup rule upon Plaintiffs. The Secretary's motion to dismiss Count VI of the Complaint should be denied.

## III.    PLAINTIFFS HAVE MET THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION.

### A.    Plaintiffs have shown a strong likelihood of success on the merits.

As demonstrated both in its Application for Preliminary Injunction and in its brief, Plaintiffs have demonstrated a strong likelihood of success on the merits of this case. As discussed in Part II.B., above, Defendant has provided virtually no explanation for the actions taken in the January 2008 Final Rule, which is a new, substantive rule. The January 2008 Final Rule cannot withstand scrutiny under either 5 U.S.C. § 553(c) or 5 U.S.C. § 706.

As discussed in Part II.C., Defendant provided no opportunity for notice and comment on the January 2008 Final Rule and failed to justify his actions under the "good cause" exception. As discussed in Part II.D., Defendant failed to conduct a Regulatory Flexibility Analysis regarding the January 2008 Final Rule, and Plaintiff Urology Care, Inc. is an affected small entity with standing to challenge that failure.

Similarly, the anti-markup rule promulgated in November 2007, and applied by the January 2008 Final Rule to the Plaintiff Physician Groups, is a thinly disguised attempt to negate a provision of the in-office ancillary services exception expressly provided by Congress in the

Stark Law (Part III.A., above). The November 2007 Final Rule also flatly violates the Medicare Physician Fee Schedule Statute, and Defendant has offered virtually no response to that argument (Part III.B., above). In addition, the November 2007 Final Rule, as applied by the January 2008 Final Rule, exceeds the Secretary's authority and violates the Anti-Markup Statute (III.C., above).

The Secretary states that the alleged absence of subject matter jurisdiction precludes any possibility of success on the merits. Def. Br. at 44. However, this Court has subject matter jurisdiction under a clear exception established by the Supreme Court more than twenty years ago, and recently affirmed in Illinois Council. See Section IV, below. That exception has been applied in appropriate cases, like this one, to permit direct review where administrative remedies are not, in a practical sense, available.

### B. Plaintiffs Will Suffer Irreparable Injury If The Anatomic Pathology Prohibition Is Not Preliminarily Enjoined.

Defendant makes no substantive, fact-based argument to demonstrate that Plaintiffs will not suffer irreparable harm. Instead, Defendant contends only that Plaintiffs' alleged "claim for higher payments" does not establish irreparable harm.

Of course, that is not the irreparable harm claimed by Plaintiffs. Plaintiffs have clearly demonstrated by eight sworn Declarations and other exhibits submitted into the record that irreparable harm will occur. That harm includes

- Destruction of the existing business of Uropath.

- Immediate loss of income by Plaintiff Physician Groups due to closure of their laboratories and inability to bill in the future, which cannot be recovered in any appeal or action for damages.

-32-

- Loss by the Plaintiff Physician Groups of their initial investment in the laboratories, because those laboratories will have to be closed.

- Loss by Plaintiff Physician Groups of equity in the ownership of Uropath, and incurring additional expenses of approximately $1.2 to 3.5 million which will be assessed against the owners of Uropath including two of the Plaintiff Physician Groups in this case.

- Loss of high-quality patient care services and business relationships.

- Destruction of or severe injury to the medical practices of twelve pathologists, including Plaintiff Sam Michaels, M.D.

- Damage to the competitive position of the Plaintiff Physician Groups.

- Loss of employment by 91 individuals, including Plaintiff Rebecca Page, employed by Uropath.

Defendant neither makes a factual showing that these things will not occur, nor does he state that these are not legally cognizable forms of irreparable harm.

### C.    Delaying Enforcement Of The Anatomic Pathology Prohibition Pending A Hearing On The Merits Will Not Cause Harm To The Secretary.

Defendant has not directly alleged any harm to the Secretary or to the Medicare program if injunctive relief is granted. Indeed, the Secretary has implicitly admitted that delay in enforcement of the anti-markup rule against anatomical pathology diagnostic testing services provided in a centralized building will not cause harm, by proposing and agreeing to the Order signed by this Court on February 8, 2008, delaying enforcement until April 1, 2008.

### D.    Issuance Of A Preliminary Injunction Is In The Public Interest.

Defendant argues that there is a strong public interest relating to the integrity of physicians' medical decision-making avoiding overutilization, curbing excess cost to the

Medicare program, and maintaining the fiscal integrity of the Medicare program. However, the provision of anatomic pathology diagnostic testing services in a centralized building has not been demonstrated in any factual way to cause any ill effects in those respects. In fact, the evidence submitted by Plaintiffs in connection with their Application for Preliminary Injunction shows that the services provided by them are medically necessary, and that overutilization is not occurring, as demonstrated by the government's own reports.

## IV.    THE COURT HAS SUBJECT MATTER JURISDICTION IN THIS CASE

"There is a strong presumption that Congress intends judicial review of administrative action[,]" Bowen v. Michigan Academy of Family Phys., 476 U.S. 667, 670 (1986), and review should be allowed absent "'clear and convincing evidence' of a contrary legislative intent." Abbott Labs. v. Gardner, 387 U.S. 136, 141 (1967) (citation omitted). The Secretary has not overcome his "heavy burden" of showing that judicial review is unavailable here. See Michigan Academy, 476 U.S. at 672 (discussing "the heavy burden of overcoming the strong presumption that Congress did not mean to prohibit all judicial review of [the Secretary's] decision") (citation omitted).

Defendant nevertheless contends that this Court:

> lacks subject-matter jurisdiction because the plaintiff physician groups have not exhausted administrative remedies as required to bring a claim under the Medicare Act, see Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 12-14 (2000), and the potential availability of judicial review under that statute precludes judicial review under 28 U.S.C. § 1331. The physician groups do not meet the requirements for an exception to the exhaustion requirement, because their claims are essentially claims for Medicare benefits, and a demand for money does not implicate any plausible claim of irreparable injury.

Def. Br. 2. However, the very case cited by Defendant, Illinois Council, affirms a clear, long-standing exception to the administrative "exhaustion" or "channeling" requirements. That

exception has been applied by the U.S. Supreme Court, was reiterated in the <u>Illinois Council</u> case, and has been employed by numerous courts, including this Court, to allow judicial review without administrative exhaustion.  Under the exception, as reaffirmed by <u>Illinois Council</u>, federal courts have subject matter jurisdiction to hear a challenge to Medicare regulations if requiring administrative exhaustion would amount to the "practical equivalent of a total denial of judicial review," or where the exhaustion requirement "would not simply channel review through the agency, but would mean no review at all."  529 U.S. at 22, 20.  That exception is met in the case at bar.

     <u>Illinois Council</u> was a facial challenge to regulations brought by a trade association on behalf of its members.  There was no party before the court who was being threatened with enforcement action.  The Court held that the regulatory challenge in that particular case would have to go through an administrative appeal process in the context of a particular enforcement proceeding prior to being heard in federal court.  If action were to be taken against one of the nursing homes represented by the Council, the nursing home could "incur[ ] a minor penalty" and appeal through administrative channels.  <u>Id</u>. at 22.  Then, after the action had been so channeled, "the court will consider the contention when it later reviews the action."  <u>Id</u>. at 23.

     The Secretary asserts that 42 U.S.C. § 405(h), as incorporated by 42 U.S.C. § 1395ii, precludes any action against the Secretary under 28 U.S.C. § 1331.  Def. Br. at 14.  He contends that this Court cannot hear this case because of the "potential availability of judicial review to the physician groups under the Medicare Act, 42 U.S.C. § 1395ff(b)(1)(A), after the exhaustion of administrative remedies. . . ."  Def. Br. at 14.  That is, he contends that judicial review must be postponed until after that process is completed.

Michigan Academy involved a dispute under Part B of Medicare, in which Plaintiffs proceeded directly to court to challenge the validity of a Medicare regulation. In Illinois Council, the Supreme Court explicitly affirmed Michigan Academy, stating that it would read "Michigan Academy as holding that § 1395ii does not apply § 405(h) where application of § 405(h) would not simply channel review through the agency, but would mean no review at all." Illinois Council, 529 U.S. at 19.

Under the unique facts of this case, judicial review will not be "postponed" if Defendant's position is accepted. Instead, there would be "no review at all." That is because, simply put, there will be no claims to review. If judicial review is not obtained now, Uropath will be put out of business by Defendant's regulations and the physician owned laboratories will be closed. Without their own laboratories, there will be no Medicare laboratory billings for the physician groups to appeal. Instead they will have to use outside laboratories, which will independently bill Medicare for their own services, not for any services provided by the physician groups. See Complaint ¶ 10.

To survive a motion to dismiss, the Plaintiff Physician Groups have more than adequately alleged in the Complaint that there will be no judicial review available if Defendant is not enjoined now by this Court from enforcing the Anatomic Pathology Prohibition. Paragraph 110 of the Complaint states:

> [N]o administrative remedy is available to the Plaintiff Physician Groups because, if the Anatomic Pathology Prohibition is not enjoined, Uropath will have its existing business destroyed almost immediately, and the physician group labs will have to be dismantled. Tissue specimens will have to be sent to outside labs, and the outside labs, not the physician groups, will bill for those services. Thus, there will be nothing for the Plaintiff Physician

Groups to appeal.  The effect will be the practical equivalent of a total denial of judicial review.[11]

The regulations implementing 42 U.S.C. § 1395ff(b)(1)(a) provide for a multi-layer review of individual claims for services, potentially lasting for years.  42 C.F.R. §§ 405.900-.1140.  But Plaintiffs will not have the chance to avail themselves of this lengthy appeals process, because they will have no claims to submit.

For Uropath to stay afloat, approximately 52 physician groups who own Uropath managed labs would have to continue using Uropath's services, submit tens of thousands of claims at an actual loss on each bill for a period of probably at least a year or two, and then appeal all of those tens of thousands of claims through a five-tier appeal process.  This will not occur.  Instead, the labs will be closed and there will be no claims to appeal.

Defendant's attempts to distinguish decisions by this Court expressly applying the Michigan Academy exception that was confirmed in Illinois Council, are unavailing.  In National Ass'n of Psychiatric Health Systems v. Shalala, 120 F. Supp. 2d 33 (D.D.C. 2000), the United States District Court for the District of Columbia reviewed the Illinois Council case and the Michigan Academy case, and allowed a direct challenge to a Medicare rule to proceed.  In that case, in order to exhaust administrative remedies, the hospital would have had to incur the "draconian sanction" of termination from the Medicare program in order to exhaust administrative remedies.  Defendant attempts to distinguish this case by stating that in the case at bar "the challenged rule affects only the amount of payment, rather than continued participation in the program."  Def. Br. at 15.  However, the effect of the revised anti-markup rule will be to

---

[11]  Although Plaintiffs do not consent to turn Defendant's motion to dismiss into a Motion for Summary Judgment, Plaintiff notes that this quote from the Complaint is not simply a conclusory allegation.  In demonstrating irreparable harm for purposes of their Application for Preliminary Injunction, Plaintiffs have supplied Declarations and other evidence that show that these consequences will, in fact, occur.

require the labs to close down, and thereby lose the ability to participate in the Medicare program for all laboratory services.

The Court in <u>National Association</u> found that that case presented "precisely the issue" left open in <u>Illinois Council</u>; that is "whether a general agency practice that forced [hospitals] to abandon legitimate challenges to agency regulations could amount to the 'practical equivalent of a total denial of judicial review.'" <u>National Association</u>, 120 F. Supp. 2d at 38 (citing <u>Illinois Council</u>). Because the hospitals in that case, unlike the nursing homes in <u>Illinois Council</u>, did not "as a practical matter" have "the option of incurring a minor penalty and receiving an administrative hearing before proceeding to federal court," the <u>National Association</u> court found that it had jurisdiction under 28 U.S.C. § 1331. In the case at bar, as a practical matter, the physician groups will not have the option of going through an administrative appeals process before proceeding to federal court, because their labs will be gone, unable to bill, and therefore unable to appeal those non-existent bills.

Similarly, Defendant's attempt to distinguish <u>American Lithotripsy Soc'y v. Thompson</u>, 215 F. Supp. 2d 23 (D.D.C. 2002), is without merit. In <u>American Lithotripsy</u>, the court noted that, under <u>Illinois Council</u>, "the relevant question is whether applying 405(h) in the instant case would have the practical effect of denying plaintiffs judicial review." 215 F. Supp. 2d at 29. It found in that case that the probative factors were "the severity of the penalty incurred by a violation and the ability of plaintiffs' members to access administrative review." <u>Id</u>. Similar types of penalties for false claims would apply in this case. <u>See</u> <u>e.g.</u>, 18 U.S.C. § 287 (mandating imprisonment and a fine for all "knowing" submissions of false claims). Plaintiffs alleged that these fines alone could subject a center to financial ruin, in addition to criminal penalties and exclusion from participating in any federal healthcare program.

As in <u>American Lithotripsy</u>, the Secretary in the case at bar "has not contested the plaintiffs' allegations of potential financial ruin . . . ." 215 F. Supp. 2d at 30. Defendant has offered no evidence or reasoning here that the revised anti-markup rule would not have the effect CMS evidently intended – namely, to make it financially prohibitive to provide anatomic pathology diagnostic services in a "centralized building," by requiring such services to be billed at a loss.

Defendant's assertion that there is always a "non-waivable requirement" that a claim for benefits shall have been presented to the Secretary, and that presentment is an "absolute prerequisite," is misplaced. Def. Br. at 11. In the two cases relied upon by Defendant (<u>Heckler v. Ringer</u>, 466 U.S. 602 (1984) and <u>National Kidney Patient's Assn. v. Sullivan</u>, 958 F.2d 1127 (D.C. Cir. 1992)) the Court found that there was an administrative avenue open to plaintiffs for their appeals. In cases where, as here, requiring administrative review would amount to the "practical equivalent" of a denial of judicial review, courts do not require presentment. <u>See, e.g.</u>, <u>Michigan Academy</u>, <u>National Association</u>, and <u>American Lithotripsy</u>, all of which involved direct challenges to regulations without any presentment or exhaustion. The Court has subject matter jurisdiction, and Defendant's motion to dismiss must be denied.

## V.    UROPATH HAS STANDING TO CHALLENGE THE ANTI-MARKUP RULE AND THE JANUARY 2008 FINAL RULE

The Secretary's challenge to Uropath's Article III standing to pursue this litigation cannot succeed. <u>See</u> Def. Br. at 16-19. The allegations of the Complaint plainly establish Uropath's Article III standing. Uropath has shown that, if the January 2008 Final Rule is allowed to go into effect, it will suffer injury in fact that is "concrete and particularized" and "actual and imminent, not 'conjectural or hypothetical.'" <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992)

(citations omitted). Uropath also has shown that its injury is traceable to the Secretary's unlawful actions and is likely to be "redressed by a favorable decision." Id. at 560-61.

The allegations of the Complaint—which must be considered in the light most favorable to Uropath on the Secretary's motion to dismiss—show that Uropath will suffer a certain and devastating injury if the January 2008 Final Rule takes effect: Uropath's existing business will be destroyed. Complaint ¶¶ 110, 111. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presume that general allegations embrace those specific facts that are necessary to support the claim.'" Lujan, 504 U.S. at 561 (citation omitted); see also In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig., 501 F. Supp. 2d 34, 40 (D.D.C. 2007) ("If a defendant mounts a 'facial' challenge to the legal sufficiency of the plaintiff's jurisdictional allegations, the court must accept as true the allegations in the Complaint and consider the factual allegations of the complaint in the light most favorable to the non-moving party.") (citations omitted). As Plaintiffs have alleged, "[u]nless enforcement of the Anatomic Pathology Prohibition is enjoined, the Final Rule will destroy the existing business of Uropath . . . ." Complaint ¶ 9; see also Complaint ¶¶ 11(a), 110, 111.

Uropath's injury from CMS's unlawful actions is far from speculative, as the Secretary argues. See Def. Br. at 18. Uropath "can satisfy the injury-in-fact requirement by alleging facts that 'demonstrate a realistic danger of . . . sustaining a direct injury.'" Bristol-Myers Squibb Co. v. Shalala, 91 F.3d 1493, 1497 (D.C. Cir. 1996) (citations omitted). The Plaintiffs, including Uropath, allege that application of the "Anatomic Pathology Prohibition" in the January 2008 Final Rule will restrict the physicians rendering the services from billing the traditional fee schedule amount, and would "require[ ] them to instead bill only at an actual loss." Complaint

-40-

¶ 66; see also Complaint ¶¶ 55-65.  Thus, "[t]he Final Rule's effect in practice is to deny Medicare reimbursement for arrangements such as those that exist for the three Plaintiff Physician Groups, and for the other 49 Uropath-managed physician group laboratories, which are located in a 'centralized building' apart from the main physician group practice building." Complaint ¶ 5.  If forced to operate at a loss, it would be "impossible for [the Plaintiff Physician Groups] to continuing providing [anatomic pathology] services to Medicare beneficiaries" through the Uropath service model.  Complaint ¶ 62.  Thus, "if the Anatomic Pathology Prohibition is not enjoined, Uropath will have its existing business destroyed almost immediately, and the physician group labs will have to be dismantled.  Tissue specimens will have to be sent to outside labs, and the outside labs, not the physician groups, will bill for those services."  Complaint ¶ 110.

The injury facing Uropath due to the imposition of the January 2008 Final Rule is therefore a concrete and recognizable injury—the destruction of its business.  See, e.g., Motor & Equip. Mfgrs. Ass'n v. Nichols, 142 F.3d 449, 457 (D.C. Cir. 1998) ("'When a challenged agency action authorizes allegedly illegal [activity] that will almost surely cause [a] petitioner to lose business,' that petitioner has standing to make a claim.") (citations omitted); North Carolina Fisheries Ass'n, Inc. v. Gutierrez, 518 F. Supp. 2d 62, 82 (D.D.C. 2007) (identifying "economic harm" as a "canonical example of injury in fact sufficient to establish standing") (citation omitted).  CMS's acts affect Uropath "personally in a concrete way."  Block v. Meese, 793 F.2d 1303, 1307 (D.C. Cir. 1986) (citation omitted).[12]

---

[12]  The "injury" cases cited by Defendant are not just distinguishable, but utterly unlike the injuries alleged in the case at bar.  See Def. Br. at 17.  This is not a case like City of Los Angeles v. Lyons, 461 U.S. 95 (1983), where the plaintiff's standing depended on showing a real and immediate threat of being stopped and illegally choked by police officers in the future.  Nor is the injury in this case similar to O'Shea v. Littleton, 414 U.S. 488 (1974), where plaintiff's standing depended on showing a real and immediate threat of future arrest and subjection to criminal proceedings.  The current case is totally unlike Whitman v. Arkansas, 495 U.S. 149 (1990) where the plaintiff's standing depended on securing habeas corpus review in the future after already receiving a final conviction and

The Secretary's argument that "Uropath cannot demonstrate that any alleged future injuries are fairly traceable to CMS's conduct" borders on the frivolous. <u>See</u> Def. Br. at 19. Uropath's threatened injury is <u>directly</u> traceable to CMS's unlawful actions. Uropath is challenging a rule promulgated by CMS. The evident purpose of the rule is to make it financially infeasible for physician groups to bill Medicare for tests performed in anatomic pathology labs in a centralized building. Physician groups will therefore cease using Uropath's services, to Uropath's direct, immediate, and complete injury.

The Secretary cannot successfully argue that Uropath's injury comes at the hands of third parties—<u>i.e.</u>, the physicians and physician groups that will make the decision whether to continue to use their own Uropath-managed laboratories—and thus wipe his hands of responsibility for Uropath's guaranteed losses. <u>See</u> Def. Br. at 19. This Circuit has "never applied a 'tort' standard of causation to the question of traceability. Where, as here, the alleged injury flows not directly from the challenged agency action, but rather from independent actions of third parties, we have required only a showing that 'the agency action is at least a substantial factor motivating the third parties' actions.'" <u>Tozzi v. HHS</u>, 271 F.3d 301, 308 (D.C. Cir. 2001) (citation omitted). The anti-markup rule would not just be a "substantial factor" motivating physician group decisions not to use the Uropath managed laboratories, it would likely be the sole factor, since the groups already own those very labs, and it is the physician groups' billings that will be affected by the anti-markup provision. The Secretary's redressability argument also fails. <u>See</u> Def. Br. at 18 ("Uropath has not alleged an injury for which it is entitled to redress."). Uropath's injury would be fully redressed by the relief it seeks in this lawsuit:  an injunction

---

sentence.  Nor is this a case of legislative standing, as in <u>Raines v. Byrd</u>, 521 U.S. 811 (1997).  Finally, the issue in <u>Steel Co. v. Citizens</u>, 523 U.S. 83 (1998), was whether failure to provide information could constitute injury, unlike the direct economic injury to be suffered by Uropath, and the case was decided on the grounds of redressability, not injury.

against the Secretary's enforcement of the revised "anti-markup" rule to anatomic diagnostic pathology services furnished in a centralized building.  With this regulatory threat removed, physician groups will continue to use their own, Uropath-managed labs as they did when the threat was not present.  Cf. Abigail Alliance for Better Access to Developmental Drugs v. Von Eschenbach, 469 F.3d 129, 135 (D.C. Cir. 2006) ("Here, it would be in the drug companies' pecuniary interests to expand access to experimental drugs and thereby develop a market, particularly if the FDA allows them to charge market prices.  This makes the question of redressability a hardly-speculative exercise in naked capitalism. . . .").  The allegations of the Complaint establish Uropath's Article III standing to pursue this lawsuit.

The Secretary also mistakenly argues that, "[b]ecause Uropath 'does not bill the Medicare program' for testing services, . . . the company lacks standing to assert a claim against the Secretary under the Medicare Act."  Def. Br. at 17; see also Def. Br. at 18 ("As a management company, Uropath has not cited to any Medicare statute or regulation that would create an enforceable right to receive payments for services provided by physicians.").  The Secretary appears to be making a "prudential standing" argument, although he does not identify it as such.  Prudential standing "concerns, apart from the 'case' or 'controversy' test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute . . . in question."  Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970).  "The 'zone of interest' test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision."  Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399 (1987).  The "test is not meant to be especially demanding[.]"  Id. at 399-400 (citation omitted).

-43-

Uropath has prudential standing to assert its claims in this lawsuit, regardless of the fact that it is not a "supplier" under the Medicare program. Uropath's interests are directly aligned with the Plaintiff Physician Groups. See Complaint ¶¶ 2-10. Physician groups, including the Plaintiff Physician Groups, plainly have an interest in enforcing the Stark Law, Physician Fee Schedule Statute, and Anti-Markup Statute in order to continue to receive adequate, proper and non-discriminatory Medicare reimbursement in accordance with the statutes' terms. Uropath is wholly owned by 23 of the 52 physician group practices that own and operate pathology laboratories under management agreements with Uropath. See Complaint ¶ 46. Uropath's interests are therefore congruent with providers who are directly regulated by Medicare. Uropath's interest in this lawsuit may, indeed, be even more compelling than that of the physician groups', because application of the regulation at issue here will put Uropath out of business. See Complaint ¶¶ 9, 111. Uropath's interests are "not 'so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" Amgen, Inc. v. Smith, 357 F.3d 103, 108 (D.C. Cir. 2004) (quoting Clarke, 479 U.S. at 399); see also, e.g., Mova Pharmaceutical Corp. v. Shalala, 140 F.3d 1060, 1075 (D.C. Cir. 1998) ("[A] plaintiff only needs to show that its interest is among those 'arguably . . . to be protected' by the statute."). Cf. Amer. Lithotripsy Soc'y v. Thompson, 215 F. Supp. 2d 23, 30 (D.D.C. 2002) (recognizing interest of association plaintiff to pursue litigation where individual members did not have standing to challenge regulations before agency because not considered "providers" under Medicare statute).

## CONCLUSION

For the foregoing reasons, and those stated in the Statement of Points and Authorities in Support of Plaintiffs' Application for Preliminary Injunction, Plaintiffs respectfully request that

this Court deny Defendant's Motion to Dismiss, grant Plaintiffs' Application for Preliminary Injunction, and award Plaintiffs such other and further relief to which they may be entitled.

March 7, 2008

Respectfully submitted,

FULBRIGHT & JAWORSKI, L.L.P.


/s/ Dan M. Peterson
Dan M. Peterson
D.C. Bar No. 418360
Wendy Butler Curtis
D.C. Bar No. 475464
Caroline Mew
D.C. Bar No. 467354
801 Pennsylvania Avenue N.W.
Washington, D.C. 20004
Telephone:  (202) 662-0200
Facsimile:  (202) 662-4643
Attorneys for Plaintiffs

Greg A. Cardenas
Byrne, Cardenas & Smitherman, LLP
5400 LBJ Freeway, Suite 1325
Dallas, TX 75240
Telephone:  (972) 371-5264
Facsimile:  (972) 371-5270
Of Counsel