## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                )
**Atlantic Urological Associates et al.,**       )
                                                )
                      **Plaintiffs,**            )
                                                )          **No. 08-CV-00141-RMC**
            **v.**                               )
                                                )
**Michael O. Leavitt, as Secretary of**          )
**United States Department of Health and**       )
**Human Services,**                              )
                      **Defendant.**             )
_____)

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

## INTRODUCTION

For reasons known only to plaintiffs, they continue to challenge the January 2008 rule,

73 Fed.. Reg. 404 (Jan 3, 2008), which has absolutely no effect on them.  That rule merely leaves

in place the November 2007 final "anti-markup" rule, 72 Fed. Reg. 66,222, 66,306 (Nov. 27,

2007), regarding anatomic pathology diagnostic testing services furnished in a "centralized

building" outside the physician's office.  The January 2008 rule does not harm plaintiffs, and

invalidation of that rule would offer them cold comfort.  Plaintiffs' "me too" arguments

notwithstanding, this court could not, at plaintiffs' behest, rewrite the January 2008 rule to

extend to anatomic pathology diagnostic testing the one-year delay in implementation of the

November 2007 anti-markup rule which the January rule provided for other types of diagnostic

testing.  Nor was the Secretary of Health and Human Services required to go through additional

notice and comment rulemaking merely to leave intact the application of the November 2007

rule (which was preceded by notice and comment) to anatomic pathology diagnostic testing.

Plaintiffs lack standing and fail to state a claim as to the January 3, rule.  Moreover, plaintiff

Uropath lacks standing as to <u>both</u> the January 3, 2008 and November 2007 rules. Since it is neither protected nor regulated by the Medicare Act, Uropath also lacks prudential standing to assert the claims in the Complaint.

Subject-matter jurisdiction is also lacking as to the November 2007 rule, which is the only rule properly at issue. The physician group plaintiffs' failure to exhaust administrative remedies under the Medicare Act, 42 U.S. C. §1395-1395hhh, deprives the Court of subject-matter jurisdiction, as the Supreme Court has repeatedly held. Plaintiffs rely largely on lower-court decisions that are outdated or easily distinguished, in an attempt to evade the Supreme Court's seminal decision in <u>Shalala v. Illinois Council on Long term Care, Inc.</u>, 529 U.S. 1 (2000), as to both the scope and impact of the exhaustion requirement.

Because Uropath does not participate in the Medicare program, it has no right to invoke administrative remedies under the Medicare Act. That fact does not give Uropath a right to leap-frog over the Act's jurisdictional requirements. The Medicare Act's carefully reticulated requirements for administrative and judicial review indicate the clear intent of Congress to limit to beneficiaries and providers the right to challenge the Secretary's determinations, and to require that they exhaust administrative remedies prior to filing suit. That Uropath, as an outsider to the Medicare scheme, has not been provided with such rights indicates Congress' intent to limit review to recognized program participants. At a minimum, Congress did not intend for Uropath to jump to the head of the line, cutting in front of beneficiaries and service providers, who are directly involved in the program. <u>See</u> <u>Block v. Community Nutrition Inst.</u>, 467 U.S. 340 (1984).

2

Plaintiffs' statutory arguments fare no better.  First, the Anti-Markup Statute, 42 U.S.C. §1395u(n)(1), prohibits the markup of a diagnostic test that is not personally performed or supervised by the billing physician or a physician with whom he or she "shares a practice." CMS construed the term "shares a practice" as providing it with authority to regulate not only tests that are purchased, but also tests for which payment is reassigned, and CMS determined that, in order to effectuate the Congressional intent to curb unnecessary tests, it was necessary to regulate both the technical and professional components of tests.  At a minimum, because the Anti-Markup Statute does not prevent CMS from applying the rule to reassigned tests, or from regulating the professional component of tests, the rule does not conflict with that statute.

The Stark Law, 42 U.S.C. §1395nn, which prohibits physicians from making certain self-referrals, also provides no solace for plaintiffs.  Although one provision of Stark cretaes an exception that allows a physician to *bill* for diagnostic testing performed in a "centralized building" outside the physician's office building without violating Stark's self-referral restrictions, Stark in no way dictates the *amounts* physicians are to be *paid* by Medicare for such services, much less guarantees that the continued use of these "centralized building" arrangements will remain economically advantageous for Uropath.

In addition, there is no conflict between the challenged rule and 42 U.S.C. § 1395w-4, the Fee Schedule Statute.  Under that statute, the Secretary is broadly authorized to "develop a methodology," id. § 1395w-4(c)(2)(A)(i), for combining a "practice expense component," id. § 1395w-4(c)(1)(B), with other relative-value elements, id. § 1395w-4(c)(2)(A)(i), in establishing the physician fee schedule, and he is even more broadly authorized to establish such "ancillary policies" as he determines "may be necessary to implement" the fee schedule properly.

Id. § 1395w-4(c)(4).  It is perfectly appropriate for the Secretary to implement the fee schedule in a manner that reduces "the risk of overutilization and abuse of the Medicare program" that would otherwise result if "physicians, physician group practices, and medical groups" were not prevented "from profiting through the ordering of [diagnostic] tests."  72 Fed. Reg. at 66,308.

Finally, the Secretary's decision in the November 2007 rule to extend the pre-existing anti-markup rule to diagnostic testing performed at a centralized building, as a means of decreasing incentives for over-utilization of tests and reducing excessive charges to the Medicare program, is entirely reasonable.  The Secretary concluded that the increased use of "centralized building" laboratory arrangements as a means for physicians to obtain an additional markup on diagnostic tests had the potential, by exploiting a regulatory loophole, to circumvent the pre-existing anti-markup rule that was directed at diagnostic tests "purchased" by physicians from outside suppliers.  The Secretary determined that this new arrangement, by which physician groups contracted with "pod labs" located in centralized buildings, posed a risk to both the financial integrity of the Medicare program and to patient care, by encouraging overutilization of tests by physicians and by offering an otherwise unavailable source of profits tied directly to the volume of tests.  In fashioning a Medicare rule of nationwide scope, the Secretary was not required to determine whether the specific laboratories owned or managed by Uropath or the physician group plaintiffs engaged in overutilization.

For these reasons, the Complaint should be dismissed for lact of subject-matter jurisdiction and failure to state a claim.

4

**ARGUMENT**

**I.     THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS**

Uropath LLC, which does not participate in the Medicare program, lacks Article III standing due to the absence of a cognizable injury in fact, and lacks prudential standing because its interests in maximizing its test revenue are outside the zone of interests sought to be protected by the Act. Because the plaintiff physician groups did not present their claims to the Secretary and exhaust administrative remedies, as required by the Medicare Act, and no exception to the exhaustion requirement applies, the Court lacks subject-matter jurisdiction over their claims.

**A.     Uropath Lacks Standing to Assert any Claims in the Complaint**

Uropath does not provide diagnostic testing services or participate in the Medicare program. Flowers Dec. ¶ 5; Complaint ("Comp.") ¶ 3. Instead, Uropath assists physician practices in developing, constructing, managing and operating the labs. Flowers Dec. ¶ 4. Uropath leases the premises for the lab, subleases the space to the physician group, and manages the lab. Flowers Dec. ¶¶ 4-6; Sorrells Dec. ¶ 4; Creggar Dec. ¶ 4; Severance Dec. ¶ 3. As with the physician groups, Uropath lacks Article III standing to challenge the January 2008 rule because it cannot demonstrate injury in fact, causation, or redressability. Moreover, Uropath lacks prudential standing because its financial interests do not fall within the zone of interests sought to be protected under the Medicare Act.

Plaintiffs contend that, if CMS is permitted to apply the anti-markup rule to anatomic pathology diagnostic tests, "Uropath will suffer a certain and devastating injury . . . : Uropath's existing business will be destroyed." See Plaintiffs' Opposition to Defendant's Motion to Dismiss and Reply to Defendant's Opposition to Application for Preliminary Injunction ("Pl.

Opp.") at 40; Comp. ¶ 111(a), (i); Memorandum in Support of Plaintiffs' Application for

Preliminary Injunction ("Pl. PI Memo.") at 2, 43. But, aside from the speculative nature of this

claim, which depends upon the actions of provider groups that allegedly lack knowledge how to

bill Medicare under the rule, Uropath, which does not provide diagnostic testing services or

participate in the Medicare program, has no colorable claim that it "suffered 'an invasion of a

legally protected interest which is . . . concrete and particularized.'" Raines v. Byrd, 521 U.S.

811, 818 (1997) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). Because

Uropath has no "legally protected interest" in a physician group's receipt of Medicare payments

for testing services, its allegations of harm regarding application of the anti-markup rule are not

"legally and judicially cognizable" and thus do not qualify as an injury in fact. See Raines,

521 U.S. at 819.

        More specifically, Uropath's interest in maximizing its financial gain by marking up the

cost of testing services furnished at labs that it manages does not fall within the zone of interests

sought to be protected under the Medicare Act. See TAP Pharmaceuticals v. HHS, 163 F.3d 139

(4th Cir. 1998) (holding that a drug manufacturer lacked prudential standing to challenge a CMS

rule that reduced the amount of reimbursement for that company's drug to the amount paid for a

competing drug). Because Uropath does not participate in the Medicare program, it was not

intended to be protected or regulated by the Medicare Act. See TAP Pharmaceuticals, 163 F.3d

at 208. The financial interests of Uropath that are affected by the anti-markup rule do not

coincide with the interests furthered by the Medicare Act. See TAP Pharmaceuticals, 163 F.3d

at 205, 208. Because Uropath's interests are "marginally related to or inconsistent with" the

statutory intersts, see Amgen, Inc. v. Smith, 357 F.3d 103, 110 (D.C. Cir. 2004), Uropath lacks

prudential standing.

Congress likely intended to preclude a non-participant in the Medicare program from asserting claims against the Secretary.  By carefully setting forth a process for Medicare beneficiaries and program participants to assert administrative and judicial claims, Congress intended to foreclose alternative routes to review of such claims.  At a minimum, Congress did not intend non-participants such as Uropath to jump to the front of the line in asserting claims.

**B.      Plaintiffs Lack Standing to Challenge the January 2008 Rule, Because that Rule Does Not Affect Payment for their Services**

Payment for anatomic pathology diagnostic tests performed by the physician groups is governed by the final anti-markup rule that was issued by CMS on November 27, 2007.  See 72 Fed. Reg. at 66,306.  Plaintiffs lacks standing to challenge the rule issued by CMS in January 2008, because that rule does not in any way affect Medicare payment for the tests at issue.  The fact that the January 2008 rule delayed for one year the effective date for application of the anti-markup rule to *other* types of diagnostic testis is not material, because plaintiffs neither seek payment for other tests nor contest the Secretary's decision to defer that implementation of the anti-markup rule as to those tests.  See Comp. ¶ 66.

Plaintiffs appear to contend (Pl. Opp. at 9, 17) that they were affected by the January 2008 rule because that rule did *not* delay the effective date for application of the November 2007 final anti-markup rule to anatomic pathology diagnostic tests furnished in a centralized building.  Because the January 2008 rule did not delay the anti-markup rule's effective date with respect to these services, that rule had no impact on plaintiffs and obviously did not did not cause an "essential injury" to a "concrete interest" of plaintiffs.  The cases cited by plaintiff (Pl. Opp. at 9) regarding the doctrine of standing are not on point.  Any injury alleged by plaintiff would result

from November 2007 anti-markup rule, rather than the January 2008 rule.

       **C.**     **The Physician Groups Did Not Exhaust Administrative Remedies**

       The Court lacks subject-matter jurisdiction over the claims of the three plaintiff physician groups, because these groups failed to present their claims to the Secretary and did not exhaust administrative remedies. No exception to the exhaustion requirement applies, because: (a) plaintiffs did not present their claims to the Secretary, (b) review of plaintiffs' claims is channeled through the administrative process under the Medicare Act, followed by the availability of subsequent judicial review, rather than being eliminated, (c) plaintiffs' claims are not wholly collateral to a claim for benefits, and (d) plaintiffs have not made a colorable showing that they would suffer irreparable injury absent immediate judicial review.

       **1.**     **The Physician Groups Did Not Present their Claims to the Secretary**

       Although the physician group plaintiffs make passing reference to "the administrative 'exhaustion' or 'channeling' requirement," they assert that "the unique facts of this case" warrant a waiver of this requirement. Pl. Opp. at 34, 36. As plaintiffs acknowledge (id. at 40), the Medicare Act's statutory scheme "generally requires exhaustion of administrative remedies for all claims 'arising under' the Medicare Act before a court can assert jurisdiction over the claims . . . ." The exhaustion doctrine includes "a nonwaivable requirement that a 'claim for benefits shall have been presented to the Secretary,'" Heckler v. Ringer, 466 U.S. 602, 617 (1984) (quoting Mathews v. Eldridge, 424 U.S. 319, 328 (1976)).

       Plaintiffs fail to appreciate the significance of the presentment requirement and appear to contend that it does not apply. Pl. Opp. at 39. But as the Supreme Court stated in Illinois Council, the Court "long ago . . . held that Congress, in both the Social Security Act and the

8

Medicare Act, insisted upon an initial presentation of the matter to the agency." <u>Illinois Council</u>, 529 U.S. at 20 (citing <u>Ringer</u>, 466 U.S. at 627; <u>Salfi</u>, 422 U.S. at 762). "At a minimum," a claim under the Medicare Act must be presented to the Secretary "prior to review in a federal court." <u>Illinois Council</u>, 529 U.S. at 24. Where a claimant "has not given the Secretary an opportunity to rule on a concrete claim for reimbursement, he has not satisfied the nonwaivable exhaustion requirement," and "the District Court, therefore, ha[s] no jurisdiction" over his claims. <u>Ringer</u>, 466 U.S. at 622. Because plaintiffs did not present their claims to the Secretary, <u>see</u> Pl. Opp. at 39, the Court lacks jurisdiction over plaintiffs' claims. <u>See</u> <u>Ringer</u>, 466 U.S. at 622; <u>Illinois Council</u>, 529 U.S. at 24. This principle applies regardless of whether the claim challenges a regulation or an individual decision.

<strong>2.    No Exception to the Exhaustion Requirement Applies, Because Judicial Review of the Physician Groups' Claims is Merely Postponed, Rather than Being Eliminated</strong>

In addition to the "nonwaivable" presentment requirement, the statutory scheme also imposes "a waivable requirement that the administrative remedies prescribed by the Secretary be pursued fully by the claimant." <u>Ringer</u>, 466 U.S. at 617 (quoting <u>Eldridge</u>, 424 U.S. at 328). The physician group plaintiffs, having failed even to present their claims to CMS, obviously did not exhaust administrative remedies, and the Secretary did not waive the exhaustion requirement, which is a jurisdictional prerequisite "that may excused only under rather limited conditions," <u>Nat'l Kidney Patients Ass'n v. Sullivan</u>, 958 F.2d 1127, 1130 (D.C. Cir. 1992). The Supreme Court has recognized that, once a claim is presented to the Secretary, an administrative decision may be deemed "final" for purposes of 42 U.S.C. § 405(g) and subject to immediate review "in special cases," <u>id</u>., in which: (1) exhaustion would be futile; (2) the claim is collateral to a

9

substantive claim of entitlement to benefits; and (3) the claimant would suffer irreparable injury absent immediate judicial review.  See, e.g., Eldridge, 424 U.S. at 330-32 & n.11; Illinois Council, 529 U.S. at 24 (citing same); Ringer, 466 U.S. at 618.  As discussed below, plaintiffs do not meet these requirements.

This is not such a special case.  Instead, it is a routine challenge to a regulation that sets forth the methodology applicable to payment of claims for covered services.  That challenge can and must be made only after the services have been rendered, the claims have been presented, and the administrative process has been completed.  In discussing the exhaustion requirement (Pl. Opp. at 34-39), plaintiffs fail to recognize the "distinction that this [Supreme] Court has often drawn between a total preclusion of review and postponement of review."  Illinois Council, 529 U.S. at 19.  As the Supreme Court noted, the "strong presumption against preclusion of judicial review is not implicated by [a] provision postponing review."  Id. (citations omitted).  Plaintiffs miss this fundamental point in asserting (Pl. Opp. at 34) that the Secretary bears the burden "of showing that judicial review is unavailable here."  Plaintiffs bear the burden of establishing subject-matter jurisdiction over their claims.  Because section 1395ff of the Medicare Act postpones judicial review of plaintiffs' claims challenging the application of the anti-markup rule, rather than precluding review of such claims entirely, no exception to the exhaustion requirement applies.

a.     **The Physician Groups' Claims Are Not Wholly Collateral to Claims for Benefits**

The three physician groups cannot satisfy the second requirement for an exception to the exhaustion requirement because their claims for increased Medicare payments are not "entirely collateral to [their] substantive claim of entitlement" to benefits.  Eldridge, 424 U.S. at 330; see

also <u>Ringer</u>, 466 U.S. at 618 (citing same).  The Complaint seeks to defeat or delay application

of the anti-markup rule to anatomic pathology diagnostic testing services.  If plaintiffs were to

succeed on this claim, only "ministerial details [would] remain" before they received the

additional reimbursement that would otherwise be precluded by the rule.  <u>Id</u>. at 615.  Therefore,

"regardless of any arguably procedural components," plaintiffs' claims under the Medicare Act

and the APA are "essentially . . .  [claims] requesting the payment of benefits," and their claims

thus do not constitute claims "wholly collateral to claims for benefits."  <u>Id</u>. at 620.  On this basis

alone, plaintiffs' argument as to waiver of the exhaustion requirement fails.

> **b.     The Physician Groups Have Not Made a Colorable Showing that they Would Suffer Irreparable Injury Absent Immediate Judicial Review**

The three physician groups cannot satisfy the third requirement for an exception to the

exhaustion requirement, because they fail to establish that they would suffer irreparable harm

absent immediate judicial review.  <u>See</u> <u>Illinois Council</u>, 529 U.S. at 24.  They have not made a

"colorable showing that [their] injury could not be remedied by the retroactive payment of

benefits after exhaustion of [their] administrative remedies."  <u>See</u> <u>Ringer</u>, 466 U.S.  at 618.

First, their demand for increased Medicare payments does not in itself constitute any

plausible claim of irreparable injury.  <u>See</u> <u>Sampson v. Murray</u>, 415 U.S. 61, 90-91 (1974).  It is

"well settled that economic loss does not, in and of itself, constitute irreparable harm."

<u>Wisconsin Gas v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985).  The same point applies to the

physician groups' assertion that application of the anti-markup rule will, in the short term, injure

their "competitive position" relative to physician groups that have a lab in their own building.

<u>See</u> David Sorrells Dec. (Pl. PI Memo., Ex. 4) ¶ 18.  While the rule may reduce the amount of

profit to be received by the physician groups with respect to tests sent to Uropath-managed labs, the groups do not establish that the rule will cause the loss of patients, and the Medicare Act does not immunize providers from a reduction in revenue or profit.

Second, contrary to their assertion (Pl. Opp. at 32-33), the physician groups and Uropath do not establish "legally cognizable forms of irreparable harm." A claim of irreparable injury "must be both certain and great; it must be actual and not theoretical." Wisconsin Gas v. FERC, 758 F.2d at 674 (D.C. Cir. 1985); see also Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297, 298 (D.C. Cir. 2006). Plaintiffs include three physician groups, Urology Centers of Alabama ("UCA"), Atlantic Urological Associates ("AUA"), and Urology Care, Inc. ("UCI"), that provide urology services. These groups assert that the Secretary's application of the anti-markup rule to anatomic pathology diagnostic tests will "immediately" require them to send all tests to outside labs. See Sorrells Dec. ¶¶ 9, 11; Creggar Dec. ¶¶ 9-10; Severance Dec. ¶¶ 6-7.

The anti-markup rule does not require physician groups to send tests to any particular location, and the declarations submitted by plaintiffs do not support their assertion to the contrary. For example, the physician group UCA asserts merely that, if the anti-markup rule applied, "we do not know how to calculate the net charge," that CMS hasn't provided any directions on how to report the net charge, and that "there is no place on the Form" to report a net charge. Sorrells Dec. ¶ 10. Similarly, plaintiff AUA asserts that "CMS has not provided specific instructions as to how to calculate the net charge." Creggar Dec. ¶ 9. The physician groups' expressed concerns do not constitute irreparable harm, and such concerns involve the

type of issues that require completion of the administrative process.[1]

The physician groups thus fail to establish that the Secretary's application of the anti-markup rule would necessarily prevent them from continuing to perform tests at the Uropath-managed labs.  Notably, the physician groups do not allege that they ever contacted CMS to raise issues regarding how to calculate and report the net charge, that they ever submitted a claim with a net charge, or that CMS ever rejected any such claim.  Plaintiffs assert (Pl. Opp. at 38) that, if they had submitted a claim to CMS after the anti-markup rule took effect, they would have faced potential statutory penalties or criminal sanctions, such as were involved in American Lithotripsy Soc'y v. Thompson, 215 F. Supp. 2d 23, 29-30 (D.D.C. 2002).  But plaintiffs have not provided any support for this contention.  As the Secretary pointed out in his opening brief (id. at 15 & n.4), the claim forms and the administrative process would allow plaintiffs to submit claims, noting their disagreement with application of the anti-markup rule, and to pursue administrative remedies available under the Medicare Act, without any likelihood of incurring statutory penalties or criminal sanctions.  Because the physician groups thus fail to establish that immediate judicial review is required to avoid irreparable harm, they do not meet the requirements for an exception to the exhaustion requirement.  See National Athletic Trainers Ass'n v. HHS, 455 F.3d 500, 505-07 (5th Cir. 2006).

---

[1] In the administrative process, after the physician groups provide testing services that are subject to the anti-markup rule, they can submit a bill and discuss with their Medicare carrier any issues they may have regarding proper billing protocol.  Once they receive payment, they can challenge the carrier's determinations and, if they remain dissatisfied at the end of this process, they can seek judicial review of their claims at that time.

The physician groups make the conclusory assertion that, under the anti-markup rule, they would necessarily "lose money on every test" they perform.  <u>See</u> Sorrells Dec. ¶ 10. Because the physician groups assert that they do not know how to calculate the net charge, and that they never submitted a claim under the new rule, the groups cannot establish the effect of the new rule on their future revenue and profit margin (which, in any event, is not a subject the Medicare Act and the Secretary's regulations were intended to protect).

For similar reasons, the physician groups fail to establish that the Secretary's application of the anti-markup rule will necessarily require them to shut down the testing labs.  For example, UCA asserts that, <u>if</u> it closes its lab, then it will still retain some contractual obligations to Uropath.  <u>See</u> Sorrells Dec. ¶ 10 (emphasis added).  UCA also asserts that, <i>if</i> it elects to shut down the lab, "it is not known at present" whether it could build a lab in its principal building, that "the ability to obtain a qualified pathologist to serve as lab director . . . is, at best, <i>doubtful</i>," that UCA was unable to reach a satisfactory agreement with one pathology group to provide services on site, and that it would take <i>six months</i> to build such a lab.  <u>Id</u>. ¶¶ 15, 16 (emphasis added); <u>see</u> <u>also</u> Creggar Dec. ¶ 13 (AUA asserts that the creation of a new lab at one of its current locations "is subject to substantial delay, expense and uncertainty").

After the physician groups submit claims and exhaust administrative remedies, they will be entitled to pursue their claims in court and, if successful, they will receive payment of any additional amounts that are found to be due.  By seeking a preliminary injunction, the physician groups attempt to circumvent this process and immunize Uropath's business model from any temporary reduction in payments, even though they would recover such amounts if they ultimately prevail.  Plaintiffs fail to establish that any harm allegedly resulting from application

14

of the anti-markup rule "could not be remedied by the retroactive payment of benefits after exhaustion of [their] administrative remedies." Ringer, 466 U.S. at 618.[2]

        **5.**        **The Physician Groups Are Not Allowed to Circumvent the Exhaustion Requirement Merely by Adding Uropath as a Plaintiff**

Allowing Uropath to assert a claim against the Secretary for immediate judicial review would "severely disrupt" the Medicare Act's complex administrative scheme. See Block v. Community Nutrition, 467 U.S. 348 (1984). The physician groups should not be permitted, merely by adding Uropath as a plaintiff, to circumvent the exhaustion requirements. Id. For this reason, the Court should dismiss the claims brought by the physician groups, as well as Uropath's claims. Preclusion of Uropath's claims against the Secretary "does not pose any threat to the realization of the statutory objectives," but means only that such objectives must be realized through the remedies provided by Congress and at the behest of the parties directly affected by the statutory scheme. Id. at 352-53.

**III.**    **THE COURT SHOULD DISMISS PLAINTIFFS' SUBSTANTIVE CLAIMS, BECAUSE THE ANTI-MARKUP RULE IS CONSISTENT WITH THE MEDICARE ACT AND IS A REASONABLE MEANS FOR THE SECRETARY TO PROTECT THE INTEGRITY OF THE MEDICARE PROGRAM**

Plaintiffs err is asserting (Pl. Opp. at 12-14) that their substantive claims in this case are directed to the January 2008 rule, and that the Secretary must "justify the choices made" in that rule. As discussed above, the January 2008 rule does not affect Medicare payment for anatomic pathology diagnostic tests, which are instead governed by the final anti-markup rule that was

---

[2] Unlike the situation in Eldridge, this is not a case where the claimant makes a "colorable claim" that his "physical condition and dependency upon the disability benefits" were such that "an erroneous determination would damage him in a way not recompensable through retroactive payments." 424 U.S. at 331.

issued in November of 2007.  Count I must be evaluated based upon that final rule.[3]

The Complaint is directed to the services provided by the Uropath-managed centralized labs.[4]  As discussed in the Secretary's principal brief, the anti-markup rule is consistent with the three provisions of the Medicare Act cited by plaintiffs, namely the Anti-Markup Statute, 42 U.S.C. § 1395u(1); the Stark Law, 42 U.S.C. § 1395nn; and the Physician Fee Schedule Statute, 42 U.S.C. § 1395w-4(c)(2)(A).  Congress authorized the Secretary to prescribe "such regulations as may be necessary to carry out the administration" of the Medicare program.   42 U.S.C. § 1395hh.  The Court should accord significant deference to the Secretary's exercise of his broad rulemaking authority under the Medicare Act and dismiss plaintiffs' statutory claims.

The Anti-Markup Statute, 42 U.S.C. § 1395u(n)(1), prohibits the markup of a "diagnostic test" that is not personally performed or supervised by the billing physician or a physician with whom the billing physician "shares a practice."  Although CMS had historically interpreted that statute as applying only to the technical component of a diagnostic test, that statute does not

---

[3] As plaintiffs note (Pl. Opp. at 13-14), the Secretary submitted an administrative record regarding its issuance of the November 2007 rule.  Plaintiffs err in asserting (id. at 14) that the Secretary is obligated to submit an "administrative record" for the January 2008 rule, which is not at issue in the case.

[4] Plaintiffs miss the point in noting (Pl . Opp. at 4) that the January 2008 rule delayed for one year the application of the anti-markup rule to the technical component of a (non-purchased) diagnostic test for services other than anatomic pathology diagnostic testing services.  The Secretary stated in his principal brief (id. at 6) that the case involves application of the anti-markup rule to services furnished in a "centralized building" that does not qualify as the "same building" under the physician self-referral exception at 42 C.F.R. § 411.355(b).  Although plaintiffs now dispute that statement (Pl. Opp. at 3), they nonetheless acknowledge (id. at 5-6 (citing Comp. ¶ 66)) that they "are only 'contesting the Final Rule's immediate application of the anti-markup rule *with respect to anatomic pathology diagnostic testing services furnished in a centralized building that is not the same building under Stark definitions*.'" (emphasis added).  Plaintiffs cannot challenge application of the anti-markup rule with respect to services provided at other locations.

16

prevent the agency from regulating the test's professional component, nor does the statute prevent the agency from regulating reassigned tests. See 72 Fed. Reg. at 66,308. In issuing the anti-markup rule in November 2007, CMS construed the term "shares a practice" as providing it with authority to apply the rule to the technical component not only of "tests that are outright purchased, but also of tests for which payment is reassigned to the billing supplier." 72 Fed. Reg. at 66,308 - 309.

In CMS's view, the independent contractor pathologist in a pod lab arrangement who interprets tests sent by physicians from distant locations does not have a "sufficient nexus" with the billing physicians to be deemed to "share a practice" with them. Id. In addition, CMS deemed reassigned tests to be "functionally the equivalent of purchased tests," and "[saw] no reason to distinguish between" the technical and professional components of diagnostic testing services "for purposes of the anti-markup provisions." Id. at 66,314 - 315. CMS "believe[d] that, in order to fully effectuate the Congress' intent to prevent or limit the ordering of unnecessary diagnostic tests, it [was] necessary to impose an anti-markup provision" on the professional component of diagnostic tests. Id. at 66,315. Indeed, the failure to take a more expansive view of the Anti-Markup Statute's scope had led to the emergence of the very problem that the statute had been designed to address because, as CMS has learned, the ability to add a markup to the professional component of a diagnostic test offers enough financial incentive to encourage overutilization and other abuse. Accordingly, CMS is well within the bounds of § 1395u(1) in expanding the application of the anti-markup rule to the professional component of a purchased or reassigned diagnostic test. Although the purchased-test and reassignment rules allow an entity to bill for services that the entity did not perform directly, CMS is authorized to subject

17

such arrangements to "such program integrity and other safeguards as [CMS] may determine to be appropriate." Id. at 66,309; see also 42 U.S.C. § 1395u(b)(6). While the Anti-Markup Statute does not specifically *mandate* application of the anti-markup rule to the professional component of reassigned tests, neither does the statute prohibit that application. The anti-markup rule thus does not conflict with the Anti-Markup Statute.

The Stark Law, 42 U.S.C. § 1395nn, prohibits any payment for services rendered in violation of the physician self-referral prohibition, but Stark does not purport to affect payment of claims that are subject to other coverage, billing, or payment requirements. Although the in-office ancillary services exception to the Stark Law, 42 U.S.C. § 1395nn(b)(2), permits physician groups to bill for diagnostic lab tests that are furnished in a separate building and in a manner that satisfies various conditions, Stark does not prevent CMS from imposing restrictions on the amount of payment to be made for specific test services in order to protect the Medicare program's integrity. See, e.g., 42 U.S.C. § 1395nn(b)(2). Given that the anti-markup rule leaves in place the Stark-in-office ancillary service exception, see 72 Fed. Reg. at 66,320, the rule does not create a conflict with Stark.

The Physician Fee Schedule Act, 42 U.S.C. § 1395w, which states that payment is to be based in part upon a service's "practice expense component," is merely the starting point under the Medicare Act for CMS to determine the amount of payment to be made for a particular service. The anti-markup rule's restriction on payment for anatomic pathology diagnostic tests provided in a centralized office does not require physicians to furnish services in any particular location or require physicians to use any "particular payment method." 72 Fed. Reg. at 66,318. In any event, 42 U.S.C. § 1395w-4, merely requires the Secretary to make payment for physician

18

services on the basis of the lesser of the actual charge or the fee schedule amount. In determining the fee schedule amount, the Secretary is broadly authorized to "develop a methodology" for combining a "practice expense component" with other relative-value elements, and to establish "such ancillary policies" as he deems necessary to implement the fee schedule. 42 U.S.C. §§ 1395w-4(c) ((1)(B), (2)(A)(i), (4)). That is precisely what the Secretary has done in applying the anti-markup rule.

The Court should reject plaintiffs' assertion that the Secretary's decision to apply the anti-markup rule to anatomic pathology diagnostic tests was arbitrary and capricious and an abuse of discretion in violation of the APA. Under the "highly deferential" standards for review of claims brought under the APA, see Ethyl Corp. v. EPA, 541 F.2d 1, 34 (D.C. Cir. 1976), the Secretary's decision is entitled to a presumption of validity and must be upheld if rationally based. See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971). Given the "tremendous complexity of the Medicare program," an "enhanced" level of deference is due to the Secretary's judgment. See Community Care Found. v. Thompson, 318 F. 3d 219, 225 (D.C. Cir. 2003).

As plaintiffs note (Pl. Opp. at 4, 29-30), the anti-markup rule was historically applied only to the technical component of any "purchased" diagnostic test ordered by the treating physician. 42 C.F.R. § 414.50 (1993); see also 56 Fed. Reg. 59,502, at 59,629 (Nov. 25, 1991); 73 Fed. Reg. at 405. Plaintiffs challenge the Secretary's decision to apply the anti-markup rule to anatomic pathology diagnostic tests furnished in a centralized building that does not qualify as the same building where the physician provides direct patient services (such as examinations). The Secretary based that decision upon CMS's observation of changed circumstances in which a

19

physician group sends tests to a centralized lab outside the physician's office, asserts that the physician group "shares a practice" with that lab and that the tests are "reassigned" rather than "purchased," and marks up the cost of certain testing services.

CMS has been concerned for some time regarding the potential for program abuse in such arrangements. CMS first proposed to combat the proliferation of pod labs through changes to the reassignment rules and the definition of the term "centralized building" in the Stark regulations. See 71 Fed. Reg. 48,982, 49,054 (Aug. 22, 2006). CMS did not implement these proposals, which were presented in the August 2006 rulemaking proposal for the physician fee schedule, stating that CMS preferred to study the issue more closely, but "remain[ed] committed to addressing revenue-driven arrangements that may be facilitating overutilization of diagnostic services." 72 Fed. Reg. 69,624, 69,688 (Dec. 1, 2006).

In issuing the anti-markup rulemaking proposal in July of 2007, CMS "expressed concern about certain arrangements" by which physician group practices "bill for certain services furnished by a contractor physician in a 'centralized building'" outside the physician's office. 72 Fed. Reg. at 38,179; see also 72 Fed. Reg. 66,222, at 66,307.[5] CMS stated that these arrangements "may lead to patient and program abuse in the form of overutilization of services and result in higher costs to the Medicare program." 72 Fed. Reg. at 38,179. As CMS stated in issuing the final anti-markup rule in November of 2007, events that occurred after CMS initially

---

[5] See also 69 Fed. Reg. 66,235 at 66,315-16 (Nov. 15, 2004) (noting the concerns expressed by commenters over the recent growth of "pod labs" that perform diagnostic testing in a centralized location owned by a group practice and that market their services to specialists in urology and other disciplines that rely on a high volume of anatomic pathology services, as well as the commenters' agreement with CMS that safeguards are necessary to prevent the increased incidence of fraudulent and abusive billing practices resulting from the new reassignment exception for contractual arrangements).

applied the anti-markup rule to the technical component of purchased tests "blurred the distinction between tests that are outright purchased and tests for which payment is reassigned," such that reassigned tests are functionally the equivalent of purchased tests. 72 Fed. Reg. at 66,314. CMS therefore decided to apply the anti-markup rule to the technical *and* professional components of diagnostic tests in order "to prevent or limit the ordering of unnecessary diagnostic tests." Id. at 66,315.

After CMS received extensive comments, the Secretary issued the final anti-markup rule in November 2007, limiting reimbursement for diagnostic testing services to the lowest amount of: (a) the performing supplier's net charge to the billing physician, (b) the billing physician or other supplier's actual charge, or the fee schedule amount for the test that would be allowed if the performing supplier billed directly. 73 Fed. Reg. at 405; 42 C.F.R. § 4.14.50(a)(1). At that time, CMS noted that several commenters who supported the proposal discussed a study of three urology practices conducted in 2007 by the Office of Inspector General, which, according to the commenters, found that "all three practices substantially increased the number of biopsies ordered per patient after entering into an arrangement for contracted pathology services," and found that these practices "billed significantly more biopsies than what their respective carriers paid on average to other suppliers." 72 Fed. Reg. at 66,312.[6] The Secretary was legitimately concerned with the possibility that the centralized lab arrangement would subject Medicare beneficiaries to unnecessary tests and would impose excessive costs on the program.

---

[6] The Secretary, in order to issue a Medicare rule that applies nationally, need not specifically find that any Uropath-managed labs provided excessive testing services.

In light of these changed circumstances noted by CMS, the Secretary's decision in the November 2007 anti-markup rule to eliminate excessive markup on certain testing services furnished in a centralized building, and thereby to maintain the fiscal integrity of the Medicare program and the integrity of physicians' medical decisionmaking, is well within the Secretary's discretion.  See Community Care Found. v. Thompson, 318 F. 3d 219, 225 (D.C. Cir. 2003).[7]

## CONCLUSION

**WHEREFORE**, the Secretary requests that the Court dismiss the Complaint, in its entirety, and deny plaintiffs' application for a preliminary injunction.

Dated: March 19, 2008

Respectfully Submitted:

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

Sheila M. Lieber
Deputy Branch Director

 _/s/ Peter T. Wechsler_
Peter T. Wechsler (MA 550339)
Trial Attorney
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
   _Attorneys for Defendant_

---

[7] Moreover, the Secretary's decision in the January 2008 rule *not to defer* for one year application of the anti-markup rule to anatomic pathology diagnostic tests, was reasonable because the abuses inherent in pod lab arrangements for these tests precipitated the proposals in August 2006 and August 2007 and remained the Secretary's core concern.