## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ATLANTIC UROLOGICAL ASSOCIATES et al., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>Michael O. Leavitt, as Secretary of )<br>United States Department of Health and )<br>Human Services, )<br>)<br>Defendant. ) | No. 08-CV-00141-RMC |

## MOTION OF THE COLLEGE OF AMERICAN PATHOLOGISTS FOR LEAVE TO FILE BRIEF AS *AMICUS CURIAE* IN SUPPORT OF THE DEFENDANT'S MOTION TO DISMISS

The College of American Pathologists ("CAP"), through its undersigned counsel, respectfully moves this Court for leave to file, as *amicus curiae*, the attached brief with regard to the government's motion to dismiss in this matter.

The Court has discretion to determine whether participation of an *amicus* is appropriate, and a court "may grant leave to appear as an *amicus* if the information offered is timely and useful." (*see Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841, 846 (D.D.C. 1996) (internal quotations and citations omitted)). Participation of an *amicus* is appropriate when the *amicus* "has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *Ryan v. CFTC*, 125 F.3d 1062, 1063 (7th Cir. 1997) (Posner, C.J., in chambers). CAP is well-qualified to assist the Court in its consideration of the legal and public policy issues implicated by the regulation of and reimbursement for pathology services

provided at so-called "pod laboratories" like those managed and operated by Plaintiffs in this matter.    With more than 17,000 physician members, CAP is the leading organization of board-certified pathologists, and the organization serves patients, pathologists, and the public by advocating excellence in the practice of pathology and laboratory medicine and cost-effective medical care.  CAP has carefully reviewed the proposed reimbursement change contained in the anti-markup provision on anatomic pathology services and can comment on how this change would affect the practice of pathology at the national level.

CAP can attest to the detrimental impact of pod laboratory billing arrangements on the cost-effectiveness of pathology services that are billed to the Medicare program, as well as on the quality of care that is provided to patients.  In the accompanying brief, CAP provides its perspective on the negative impact of laboratory arrangements like those established by Uropath on the cost of care.  CAP also addresses Plaintiff's assertion that its "pod laboratory" arrangements allow its participating physician practice groups to provide higher quality patient care and provides objective evidence from the Office of Inspector General to the contrary.  As an organization that advocates for high-quality and cost-effective medical care in the pathology field, CAP has a significant stake in the outcome of this litigation.

The purpose of CAP's *amicus* brief is to aid the Court concerning several issues raised by Plaintiffs' Complaint.  CAP is able to address these issues from the perspective of pathologists who are interested in ensuring that their profession provides high-quality, cost-effective medical care. The particular issues addressed in CAP's brief are: (1) why pod laboratory arrangements, including those established by the Plaintiffs,

2

do not comply with the intent of the in-office ancillary services exception to the Stark Act prohibition on physician self-referrals; (2) an explanation of how pod laboratory arrangements like those of Plaintiffs lead to overutilization; and (3) an explanation of why the immediate implementation of the 2008 Physician Fee Schedule Final Rule and the anti-markup provision is necessary to address abusive pod laboratory arrangements.

CAP respectfully suggests that its *amicus* brief on these points could be of value to the Court, and respectfully requests that the Court grant CAP leave to file the brief.

Dated: March 19, 2008

Respectfully submitted,

FOR *AMICUS CURIAE*
COLLEGE OF AMERICAN PATHOLOGISTS

KEVIN M. HENRY
D.C. Bar Number: 472167
Sidley Austin LLP
1501 K Street, N.W.
Washington D.C. 20005
(202) 736-8385

JAMES C. DECHENE
LARA LENITON LISS
Sidley Austin LLP
One S. Dearborn Street
Chicago, IL 60603
(312) 853-7000

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ATLANTIC UROLOGICAL ASSOCIATES et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>Michael O. Leavitt, as Secretary of )<br>United States Department of Health and )<br>Human Services, )<br><br>Defendant. ) | No. 08-CV-00141-RMC |

## [PROPOSED] ORDER

The motion of the College of American Pathologists for leave to file a brief as

*amicus curiae* is GRANTED.

_____

Judge Rosemary M. Collyer

DATED:      March _____, 2008

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true copies of the foregoing Motion of the College of American Pathologists for Leave to File Brief as *Amicus Curiae* in Support of the Defendant's Motion to Dismiss, and Proposed Order were furnished via Federal Express on March 19, 2008 to:

DAN MARK PETERSON
Fulbright & Jaworski, LLP
801 Pennsylvania Avenue, NW
Suite 500
Washington, DC 20004

PETER T. WECHSLER
Trial Attorney
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530

Kevin M. Henry

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ATLANTIC UROLOGICAL ASSOCIATES
et al.,

        Plaintiffs,

        v.

Michael O. Leavitt, as Secretary of
United States Department of Health and
Human Services,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

No. 08-CV-00141-RMC

## BRIEF OF *AMICUS CURIAE* THE COLLEGE OF AMERICAN PATHOLOGISTS IN SUPPORT OF DEFENDANT

KEVIN M. HENRY
Sidley Austin LLP
1501 K Street, N.W.
Washington D.C. 20005
(202) 736-8385

JAMES C. DECHENE
LARA LENITON LISS
Sidley Austin LLP
One S. Dearborn Street
Chicago, IL 60068
(312) 853-7000

Attorneys for *Amicus Curiae*
College of American Pathologists

## Table of Contents

Page

I.    "POD LABORATORY" ARRANGEMENTS DO NOT COMPLY WITH THE INTENT OF THE IN-OFFICE ANCILLARY SERVICES EXCEPTION TO THE STARK ACT PROHIBITION ON SELF-REFERRALS .................................... 2

      A.    Background on Pod Laboratories ............................................................................ 2

      B.    Uropath Arrangements are "In-Office Ancillary Services" in Name Only ............. 6

II.   PHYSICIAN FINANCIAL RELATIONSHIPS WITH POD LABORATORY TESTING FACILITIES LEAD TO OVERUTILIZATION OF PATHOLOGY SERVICES ..................................................................................................................... 13

      A.    Number Of Specimens Per Patient Processed By Uropath Laboratories (1) Was Uniformly Higher Than The Average Of Other Providers  And (2) Increased After The Uropath Arrangement Was Established ................................. 14

      B.    Uropath's Ad Hoc Statements Do Not Refute Concerns Regarding Overutilization ...................................................................................................... 16

III.  IMMEDIATE IMPLEMENTATION OF THE REVISED ANTI-MARKUP RULE IS NECESSARY TO ADDRESS ABUSIVE POD LABORATORY ARRANGEMENTS ............................................................................................................. 18

## Table of Authorities

Page

**Federal Cases**

*Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841, 846 (D.D.C. 1996)............1

*Ryan v. CFTC*, 125 F.3d 1062, 1063 (7th Cir. 1997) (Posner, C.J., in chambers).......1-2

**Federal Statutes**

Stark Act, 42 U.S.C. § 1395nn...........................................................1, 3, 6, 8, 11

**Federal Regulations**

42 C.F.R. § 414.50..................................................................................2, 7

**Federal Register**

Revisions to Payment Policies Under the Physician Fee Schedule, and Other Part B
Payment Policies for CY 2008; Delay of the Date of Applicability of the Revised Anti-
Markup Provisions for Certain Services Furnished in Certain Locations (§ 414.50), 73
Fed. Reg. 404 (final rule, Jan. 3, 2008)..............................................................12

Revisions to Payment Policies Under the Physician Fee Schedule, and Other Part B
Payment Policies for CY 2008, 72 Fed. Reg. 66,222 (final rule with comment period,
November 27, 2007)...........................................................................2, 7, 12-13

Revisions to Payment Policies Under the Physician Fee Schedule for CY 2007 and
Other Changes to Payment Under Part B, 71 Fed. Reg. 49,054 (proposed rule, Aug. 22,
2006)....................................................................................................7

Physicians' Referrals to Health Care Entities With Which They Have Financial
Relationships, 66 Fed. Reg. 856 (final rule with comment period, Jan. 4,
2001)..................................................................................................7, 19

**Other Materials**

Office of Inspector General "Audit of Pathology Laboratory Services Claimed by Atlantic
Urological Associates, P.A. for Calendar Year 2004," (A-04-05-03002) (June 28, 2007)
available at http://oig.hhs.gov/oas/reports/region4/40503002.htm.......................9, 13-16

Table of Authorities

Page

Office of Inspector General "Audit of Pathology Laboratory Services Claimed by Florida
Urology Physicians, P.A., for the Period September Through December 2004," (A-04-
05-03005) (June 28, 2007) available at
http://oig.hhs.gov/oas/reports/region4/40503005.htm..............................................13-16

Office of Inspector General "Review of Pathology Services Claimed by Urology Tyler,
P.A., Tyler, Texas, From May Through December, 2004" (A-05-05-0037) (June 28,
2007) available at http://oig.hhs.gov/oas/reports/region5/50500037.htm..................13-16

## INTRODUCTION AND INTEREST OF THE *AMICUS*

This brief *amicus curiae* in support of defendant is submitted on behalf of the College of American Pathologists ("CAP"). CAP is a national medical specialty society representing more than 17,000 physicians who practice anatomic and/or clinical pathology. Pathologists are physicians who obtain and interpret data as the result of examination of tissues, blood and other bodily fluids for diagnosis and patient care. CAP members practice their specialty in clinical laboratories, academic medical centers, research laboratories, community hospitals and federal and state health facilities. CAP is the world's largest association composed exclusively of pathologists and is widely considered the leader in laboratory quality assurance. CAP has a long-standing interest in the implementation of the Stark Act (42 U.S.C. § 1395nn) and related Medicare regulations to address abusive physician self-referral arrangements relating to pathology. CAP has submitted comments in support of CMS rulemaking efforts in this regard, including comments supporting CMS's anti-markup regulations that are the subject of this lawsuit. CAP believes that the immediate implementation and enforcement of CMS regulations, particularly as they relate to anatomic pathology "pod laboratory" arrangements like those implemented by Plaintiffs in this case, are crucial to ensure the integrity of pathology services.

The Court has discretion to determine whether participation of an *amicus* is appropriate, and a court "may grant leave to appear as an *amicus* if the information offered is timely and useful." *Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841, 846 (D.D.C. 1996) (internal quotations and citations omitted). Participation of an *amicus* is appropriate when the *amicus* "has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *Ryan v.*

*CFTC*, 125 F.3d 1062, 1063 (7th Cir. 1997) (Posner, C.J., in chambers).  As the leading

national organization of pathologists, CAP is able to provide the Court with the unique

perspective of the need for and practical impact of CMS's anti-markup provision relating

to anatomic pathology (42 C.F.R. § 414.50), that was included in the 2008 Physician

Fee Schedule Final Rule published November 27, 2007  (Revisions to Payment Policies

Under the Physician Fee Schedule, and Other Part B Payment Policies for CY 2008, 72

Fed. Reg. 66,222) (final rule with comment period).  CAP seeks to participate in this

case as an *amicus curiae* to provide the Court with the perspective of pathologists on

the arrangements Plaintiffs seek to perpetuate by delaying the effective date of CMS's

final rules.

Section I discusses why pod laboratory arrangements, including those

established by the Plaintiffs, do not comply with the intent of the in-office ancillary

services exception to the Stark Act prohibition on physician self-referrals.

Section II explains how pod laboratory arrangements like those of

Plaintiffs lead to overutilization of pathology services.

Section III articulates CAP's position that immediate implementation of the

2008 Physician Fee Schedule Final Rule and the anti-markup provision is necessary to

address abusive pod lab arrangements.

## **ARGUMENT**

## I.    **"POD LABORATORY" ARRANGEMENTS DO NOT COMPLY WITH THE INTENT OF THE IN-OFFICE ANCILLARY SERVICES EXCEPTION TO THE STARK ACT PROHIBITION ON SELF-REFERRALS**

### A.    **Background on Pod Laboratories**

Plaintiff physician groups in this case are urology groups that contract with

Plaintiff Uropath to develop and manage "pod laboratories" that each group leases from

Uropath. The principal reason for the pod laboratories is financial: pods provide the referring urologists a financial stake in pathology services the urology groups order for their patients. Referring physicians seek such a financial arrangement so they can earn additional income from the work that results from their medical referrals. The CMS final rule that is the subject of this action is a reasonable attempt to remove from anatomic pathology the referring physician's profit motive that can corrupt medical decisions.

Congress passed the initial Stark Act (42 U.S.C. § 1395nn) as part of the Omnibus Budget Reconciliation Act of 1989 (Pub. L. 101-239) to prohibit physicians with a financial interest in pathology laboratories from making referrals to, and prohibit the laboratories from billing Medicare for, services ordered by physicians with a financial interest in the laboratory. The Stark Act contained an exception for a physician practice that directly performed its own pathology services as part of its group practice. In recent years, however, the exception for in-office ancillary services (42 U.S.C. § 1395nn(b)(2)) has become a loophole exploited by laboratory operators to claim that a remote facility that has no connection with the other aspects of the physicians' practice somehow provides "in-office" ancillary services.

The pod laboratory concept attempts to evade the Stark Act prohibition on physician self-referrals to laboratory entities in which they have a financial interest. Pod laboratory arrangements usually are entered into by certain physician groups that order a significant number of patient biopsies—typically dermatology, gastroenterology, or, as is the case here, urology groups. Independent entities that operate the pod laboratories contract with physician groups which claim that the remote pathology laboratory is an in-office laboratory operated as part of their group practices.

The reality is that the only connection between the group practice and the pod laboratory is the revenue generated by group physicians ordering pathology services from the pod laboratory for the group's patients. Such arrangements are called "pod" or "condominium" laboratories because the third party developer (here Uropath) establishes a centralized collection of numerous small laboratories that are housed in adjacent cubicles (the "pods") in a building subdivided and leased to several unrelated medical practices. Each of these cubicle "pods" ostensibly constitutes a separately licensed laboratory nominally leased by one of these medical practices.

A single pathologist who has no prior relationship with any of the "owning" physician groups enters into several agreements as an independent contractor with several diverse practices. The pathologist and staff then rotate among the various "pods," performing pathology services while in each pod on the patient specimens referred by the out of area group that owns each pod. Each of the owner physician groups claims the pathologist as a "member" of their group practice while the pathologist is performing services in the "pod" for the "owning" group – even though the pathologist's practice is separate and distinct from the remote referring physician group. The pathologist thus is simultaneously claimed as a "member" of several different and geographically remote practices. These "pod" arrangements are economically indistinguishable from laboratory joint ventures that are prohibited under the Stark Act, as they allow the remote referring physicians to share in the profit generated by their own referrals for pathology services.

The exhibits attached to Uropath's memorandum confirm the abusive nature of the Uropath "pod" structure. Thus, Urology Centers of Alabama, P.C., an Alabama medical practice with no other connection to Florida, "operates a Uropath-

managed pathology laboratory located in Leesburg, Florida" that provides "an opportunity to recover the income for the tests and interpretation" of specimens that the practice sends out to Florida. (Sorrells Decl., Pls.' Ex. 4 at ¶ 4 and ¶ 7, Doc. 5-7.) Urology Care, Inc., a four physician Jefferson City, Missouri urology practice, earned $314,000 in 2007 by sending its specimens to "a Uropath-managed pathology lab located in San Antonio, Texas." (Severance Decl., Pls.' Ex. 6 at ¶ 3 and ¶ 10, Doc. 5-9.) The group fears it will have a more difficult time recruiting urologists unless it can offer them the "additional income" from being "able to have their own laboratories" in a remote state *Id* at ¶ 9.

Although the Plaintiff urology practices claim that the Uropath-managed laboratories are the urology practices' individual laboratories, the exhibits attached to the Complaint tell a far different story. Thus, Plaintiffs Exhibit 7 is labeled "Uropath lab locations" and the description of each of the four Uropath laboratory sites is clearly labeled "Uropath", with no mention of any individual urology practices. (*See* Pls.' Ex. 7, Doc. 5-10.) The listing of pathologists shows only their affiliation with Uropath, and does not list any individual practices in which these pathologists are supposedly "members." (Pls.' Ex. 29, Doc. 5-33.) One of the Uropath pathologists who practices in Florida provides services for two Colorado urology groups, an Indiana urology group, a Kansas urology group, and a Florida urology group, which "all have management agreements with Uropath, L.L.C. to manage the labs." (Michaels Decl., Pls.' Ex. 27 at ¶ 3 and ¶ 4, Doc. 5-31.) There is no indication that the pathologist has ever set foot inside those practices which claim the pathologist as a member. The pathologist does not claim to be a member of any of the urology groups (which is required to comply with the Stark Act), but rather talks about "my medical practice," which "depends upon the

5

existing business relationships which I have established with the five physician groups."
(*Id.* at ¶ 5.)

Pod laboratories claim to satisfy the Stark Act in-office ancillary services
exception to the Stark Act self-referral prohibition. In reality, these ventures are not part
of, or directly operated by, the practice that claims to own them. They are a group of
several separate laboratories operated at each site by an operator which hires
personnel, directs operations, and rotates the common personnel through each of the
laboratories set up inside of a single building. This structure creates the very same
economic conflict of interest for referring physicians that the Stark Act sought to prohibit.

## B.    Uropath Arrangements are "In-Office Ancillary Services" in Name Only

The Stark Act prohibits physicians from referring Medicare patients for
designated health services to entities with which they have a financial relationship
unless the arrangement qualifies for an exception. 42 U.S.C. § 1395nn(a)(1). Pod
laboratory arrangements such as Plaintiffs' seek to submit claims to the Medicare
program under the in-office ancillary services exception to the Stark Act. Under that
exception, in-office ancillary services must be provided either (1) "in a building in which
the referring physician (or another physician who is a member of the same group
practice) furnishes physicians' services unrelated to the furnishing of designed health
services"; or (2) "...in another building which is used by the group practice for the
provision of some or all of the group's clinical laboratory services." 42 U.S.C.
§ 1395nn(b)(2)(A)(ii).

Under the Final Rule for the 2008 Physician Fee Schedule, CMS added
an anti-markup provision to the technical component and professional component of

6

diagnostic tests. Under 42 C.F.R. § 414.50, if the diagnostic test is performed at a site other than the office of the billing physician, the payment to the billing physician or other supplier for the technical or professional component of the diagnostic test may not exceed the lowest of the following amounts: (1) the performing supplier's net charge to the billing physician or other supplier; (2) the billing physician or other supplier's actual charge; or (3) the fee schedule amount for the test that would be allowed if the performing supplier billed directly. 72 Fed. Reg. 66,222, 66,401. The anti-markup provision also provides that the "office of the billing physician" is medical office space where the physician provides substantially the full range of patient care services that the physician organization provides generally. 42 C.F.R. § 414.50(a)(2)(iii).

CMS has a long-standing concern about referring physicians abusing the in-office ancillary services exception, particularly for anatomic pathology. In 2006 and again in 2007, CMS "expressed concern about the existence of certain arrangements that we believe are not within the intended purpose of the physician self-referral exception for in-office ancillary services." 72 Fed. Reg. 66,222, 66,307; Revisions to Payment Policies Under the Physician Fee Schedule for CY 2007 and Other Changes to Payment Under Part B, 71 Fed. Reg. 49,054 (proposed rule, Aug. 22, 2006). CMS has attempted to "impose restrictions on a physician who makes a referral for a designated health service if he or she has a financial relationship with the ancillary services provider...thereby creating a risk that his or her referrals may be motivated, in part, by personal financial considerations." Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships, 66 Fed. Reg. 856, 861-62 (final rule with comment period, Jan. 4, 2001). CMS has invested extensive time and resources attempting to counter physicians' attempts to thwart the intent of the Stark Act's limited

through entities with minimal operational connection with the referring physicians. CMS's final regulation is a necessary and reasonable response to the pod lab problem. Without the anti-markup provision, physician groups will continue to structure practice arrangements with remote pod lab operators that continue to permit referring physicians to profit from their referrals.   See CAP Comments to CMS on the Physician Fee Schedule for CY 2008 at 5 (hereinafter "CAP Comments on 2008 Physician Fee Schedule") (Ex. A).

CAP has long shared CMS's concern about the abuse of the in-office ancillary services exception to the Stark self-referral prohibition. Indeed, CAP, in its comments on CMS's 2008 Physician Fee Schedule regulations, urged "CMS to exclude anatomic pathology from the in-office ancillary services exception to the physician self-referral regulations; this action is the best method of preventing self-referral abuses without risk of inadvertent consequences to pathology groups."   CAP Comments on 2008 Physician Fee Schedule at 1-2.   CAP believes it is necessary to completely exclude anatomic pathology services from the in-office ancillary services exception because the exception to avoid the abuse associated with referring physicians creating a profit center from anatomic pathology services. *Id.* at 5.   In these circumstances, the measured anti-markup provision is a necessary first step that should not be further delayed.

Plaintiffs claim that the anti-markup provision eliminates their ability to provide in-office ancillary services. To satisfy the in-office ancillary services, however, all services must be furnished "personally by the referring physician, personally by a physician who is a member of the same group practice as the referring physician, or personally by individuals who are directly supervised by the physician or another

8

physician in the group practice." 42 U.S.C. §1395nn(b)(2)(A). As demonstrated by Plaintiffs' own exhibits, however, Uropath's arrangements hardly constitute in-office services by the billing practice intended to be protected by the Stark Act's in-office ancillary services exception.

Plaintiffs claim the pathology laboratories managed by Plaintiff Uropath provide in-office ancillary services. That argument only works if there is a sufficient connection between the referring practice and the operations of laboratory. In reality, these pod laboratories are turn-key operations set up and run by Uropath remotely from the ordering practice. Plaintiff physician groups' only operational contact with the pod is through signing the management contract with Uropath and sending specimens from which the referring physician profits. The physician groups do little, if anything, to operate and control the laboratory. Rather, Uropath operates each lab on a turn-key basis. The practices do not evaluate and consult on the acquisition of capital equipment, determine the hours of operation, set the salary and fringe benefits levels for employees or contracted labor or participate in several other business decisions that are typical to running a group medical practice.[1]  Uropath's laboratory sites are located remotely from where the referring physician group practices – frequently in a wholly different state. Uropath operates four uropathology laboratories in three states: Leesburg, Florida; Sarasota, Florida; Philadelphia, Pennsylvania; and San Antonio, Texas. (Pls.' Compl. at ¶ 3). The 52 physician urology practices with whom Uropath

---

[1] *See. e.g.,* Office of Inspector General "Audit of Pathology Laboratory Services Claimed by Atlantic Urological Associates, P.A. for Calendar Year 2004," (A-04-05-03002) (June 28, 2007) at 2, available at http://oig.hhs.gov/oas/reports/region4/40503002.htm ("In July 2003, the Practice contracted with a management company to oversee the daily operations of its clinical laboratory, with responsibilities that included securing rental space, hiring non-physician personnel, purchasing laboratory supplies, and assisting in ordering furniture and equipment. The Practice's laboratory was one of 13 laboratories the management company operated within the same office building.")

9

contracts and who submit Medicare claims for "in-office ancillary services" for the most part practice in a wholly different state from where the Uropath laboratory with which they contract is located. Thus, Uropath identifies the practices with which it contracts as being located in seventeen different states: Alabama, Colorado, Connecticut, Florida, Indiana, Kansas, Massachusetts, Mississippi, Missouri, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, and Texas. (See Uropath website, http://www.uropathllc.com/locations.html, last visited Mar. 10, 2008.) Most of these practices are located hundreds or even thousands of miles from the laboratory they claim as an in-office laboratory.[2]

Plaintiffs claim that the Secretary's revised anti-markup rule is inconsistent with the Stark Act. The reality, however, is that labs located hundreds of miles away from a practice, frequently in a distant state, are not integrated into the practices in the way that Congress contemplated when it created an exception under the Stark Act for "in-office ancillary labs." Congress created the in-office ancillary services exception to allow for the provision of certain services necessary for the diagnosis or treatment of the medical condition that brought the patient to the physician's office -- a urine analysis or blood glucose test, which are collected and analyzed by the treating physician while the patient waits. See CAP Comments on 2008 Physician Fee Schedule at 4. However, anatomic pathology services are very different from the routine clinical lab tests that were originally anticipated under the exception. Id.

Because of the nature of the services, anatomic pathology cannot be furnished at the time of the office visit while the patient waits. Id. This is especially true

---

[2] Indeed, the Oregon Urology Institute in Springfield, Oregon is more than 2,200 miles from the nearest Uropath pod laboratory in San Antonio, Texas. (See MapQuest website, http://www.mapquest.com/maps/Springfield+OR/San+Antonio+TX/?, last visited March 10, 2008.)

10

here where practices are sending the specimen hundreds of miles away for processing and analysis by a remote Uropath laboratory. Moreover, anatomic pathology specimens cannot be interpreted by most of the referring physicians because they lack the professional qualifications to furnish the service. *Id.* In contrast, the routine clinical lab tests anticipated by Congress in allowing the in-office ancillary services exception generate positive or negative, or high, normal or low, results that the treating physician can integrate with other clinical information to confirm a diagnostic or treatment plan during the patient's visit.

Unlike routine clinical lab tests, anatomic pathology involves high complexity testing that is subject to much greater quality and other requirements under the Clinical Laboratory Improvement Amendments. Most physicians, other than pathologists, are not qualified to furnish or supervise anatomic pathology testing services under these standards. For these reasons anatomic pathology services cannot be integrated into the group practice in the same manner as routine clinical lab services and are not the type of services intended to be protected under the in-office ancillary services exception. There is no operational reason to include anatomic pathology services as part of a group practice. Physicians do so only to profit from the self-referral of these services.

The anti-markup rule being attacked by Uropath is an attempt by CMS to address these abusive arrangements. Far from being inconsistent with the Stark Act, CMS's efforts are clearly permitted by the Stark Act's express language. Thus, the Stark Act explicitly provides the Secretary with authority to impose further conditions on in-office ancillary laboratories "as needed to protect against program or patient abuse."

11

42 U.S.C. § 1395nn(b)(2). The anti-markup regulation challenged by Plaintiffs is exactly the type of further condition to prevent abuse contemplated by this provision.

CAP consistently has advocated in its comments to CMS rulemaking proceedings that the Secretary utilize this authority to prohibit laboratory arrangements like Uropath's which are located far from the sponsoring physician practice. The referring physicians have no oversight or role in managing or controlling the laboratory services. *See* CAP Comments on 2008 Physician Fee Schedule at 4; CAP Comments to CMS on the Physician Fee Schedule for CY 2007 (Oct. 10, 2006) (Ex. B). As CMS noted when it published the Final Rule for the 2008 Physician Fee Schedule, it did not delay the date of the applicability of the anti-markup provision with respect to anatomic pathology services provided remotely "[b]ecause anatomic pathology precipitated our proposal for revision of the anti-markup provision and remain our core concern." Revisions to Payment Policies Under the Physician Fee Schedule, and Other Part B Payment Policies for CY 2008; Delay of the Date of Applicability of the Revised Anti-Markup Provisions for Certain Services Furnished in Certain Locations (§ 414.50) 73 Fed. Reg. 404, 405 (final rule, Jan. 3, 2008).

There is no basis for Uropath's argument that CMS does not have the authority to impose an anti-markup provision. The Stark Act clearly directs CMS to impose whatever further conditions might be necessary to protect against program or patient abuse. It is hard to find something more abusive than an "in-office ancillary service" that is provided in a wholly different state than where a urology group practices, nominally supervised by a physician who has no day to day contact with the referring practice other than the performance of pathology services at the remote location.

## II.    PHYSICIAN FINANCIAL RELATIONSHIPS WITH POD LABORATORY TESTING FACILITIES LEAD TO OVERUTILIZATION OF PATHOLOGY SERVICES

The underlying premise behind the Stark Act has always been that referrals by physicians having a financial interest in a lab lead to overutilization. There is an undeniable temptation for physicians at the margins to order additional tests where they have a financial interest in the performance of the tests. *See* 72 Fed. Reg. 66,222, 66,313 (CMS states "studies have shown that, in the aggregate, utilization of diagnostic tests increases in the case of physician self-referral.")    Here, Uropath and the participating urology practices have made it quite clear that the financial motivation is crucial to these arrangements. The practices decry the loss of hundreds of thousands in reimbursement if they are not able to mark-up the tests that they refer to Uropath. Under these circumstances, it is very likely that the financial conflicts of interest created by these arrangements lead to overutilization.

Recognizing the potential for overutilization inherent in the Uropath structure, Plaintiffs claim that "the anatomical pathology arrangements between Uropath and the Plaintiff Physician Groups have been demonstrated not to result in overutilization of laboratory services." (Pls.' Compl. at ¶8 (emphasis original)).    The reality of the Office of Inspector General's ("OIG") audit reports is much different.    In fact, the OIG's audit reports for three Uropath managed laboratories[3] specifically found that there was a substantial *increase* in the number of pathology services requested and performed after urology practices contracted with Uropath to open and operate distant laboratories on behalf of the practices. These increases in pathology services increased

---

[3] OIG's audits covered only three of the 52 practices that have entered into arrangements with Uropath managed laboratories.  The OIG's audits do not provide any information regarding the utilization of the other 49 Uropath practices.

costs to the Medicare program. For the three Uropath-affiliated practices audited, the OIG found that (1) all three had a substantial increase in the average number of specimens per patient submitted for testing after they switched from an independent laboratory to Uropath (see OIG Audit Reports[4], each at 4), and (2) the number of specimens per patient was significantly higher at Uropath pod laboratories. Id.

## A.   Number Of Specimens Per Patient Processed By Uropath Laboratories (1) Was Uniformly Higher Than The Average Of Other Providers And (2) Increased After The Uropath Arrangement Was Established

In each of the three OIG audit reports of Uropath laboratories, the OIG found both that (1) Medicare reimbursed the Uropath laboratory for more tissue specimens examined per claim, on average, than it reimbursed other providers; and (2) there was a dramatic increase in specimens billed after each practice acquired its remote lab. See OIG Audit Reports, each at 4. Thus, for Florida Urology Physicians, P.A., the average number of tissue samples billed per patient increased eightfold: from 1.09 before opening its own laboratory to 8.71 after opening a Uropath laboratory, compared with the Medicare region average of 5.50. See Florida OIG Audit Report at 4. Urology Tyler, P.A., more than tripled the average units of tissue samples billed per patient, from 3.57 before opening its own laboratory to 11.79 after opening a Uropath laboratory, compared with the Medicare region average of 5.26 units of tissue sampled per patient. See Tyler OIG Report at 4. Similarly, Atlantic Urological Associates, P.C.

---

[4] "OIG Audit Reports" refers collectively to the following three OIG Audit Reports of Uropath-affiliated practices: "Audit of Pathology Laboratory Services Claimed by Atlantic Urological Associates, P.A. for Calendar Year 2004," (A-04-05-03002) (June 28, 2007) (hereinafter "Atlantic OIG Report") available at http://oig.hhs.gov/oas/reports/region4/40503002.htm; "Audit of Pathology Laboratory Services Claimed by Florida Urology Physicians, P.A., for the Period September Through December 2004," (A-04-05-03005) (June 28, 2007) (hereinafter "Florida OIG Report"), available at http://oig.hhs.gov/oas/reports/region4/40503005.htm; "Review of Pathology Services Claimed by Urology Tyler, P.A., Tyler, Texas, From May Through December, 2004" (A-05-05-0037) (June 28, 2007) (hereinafter "Tyler OIG Report"), available at http://oig.hhs.gov/oas/reports/region5/50500037.htm.

14

also submitted increased claims, moving from 7.09 average units of tissue samples processed per patient to 8.90, compared with the Medicare region average of 5.40. *See* Atlantic OIG Audit Report at 4. These findings are summarized in Table 1 below:

**Table 1: Summary of Findings from OIG Audit Reports**

|  | Atlantic Urological Associates, P.A. | Florida Urology Physicians, P.A. | Urology Tyler, P.A. |
|---|---|---|---|
| Average units of CPT 88305 requested *before* opening its own laboratory and claiming reimbursement for services | 7.09 | 1.09 | 3.57 |
| Average units of CPT 88305 requested *after* opening its own laboratory and claiming reimbursement for services | 8.90 | 8.71 | 11.79 |
| Average units of CPT 88305 local Medicare carrier paid to all other providers | 5.40 | 5.50 | 5.26 |

Source: OIG Audit Reports

The high number of specimens processed per patient in the Uropath-managed laboratories is consistent with a report in the Wall Street Journal that noted critics of pod laboratories complain "by enticing doctors to order many tests, [pod laboratory] arrangements drive up the nation's health care bill." *See* David Armstrong, *How Some Doctors Turn a $79 Profit From a $30 Test*, WALL STREET JOURNAL, Sept. 30, 2005, at 1 (Ex. C).

The urology practices conceded to OIG that they "had increased the number of tissue examination requests from earlier years" before they had a financial interest in the laboratory but suggested there is "some industry literature in support of its contention that an increased number of tissue examinations may improve patient outcomes." Atlantic OIG Report at 4; Florida OIG Report at 4; see also Tyler OIG Audit Report at 4. What the Uropath practices failed to point out is that the number of cores removed by a urologist for diagnostic reasons does not necessarily translate into separate billable specimens. Medicare provides for a separate charge for "specimens." A urology practice without a financial interest could submit twelve separate cores in as little as one specimen, leading to one billable unit of service. A urology practice with a financial interest in anatomic pathology may submit the twelve cores as twelve separate specimens, dramatically increasing Medicare reimbursement.

The literature cited by Uropath about the number of cores for a diagnosis thus is no answer to the increased utilization found at urologist-owned facilities. Urologists who send their specimens to independent laboratories generally provide the same standard of care with respect to core samples. The only difference is how many cores are included in the "specimen" that is the Medicare unit of billing. What is beyond dispute is that the Uropath structure has clearly increased the number of "specimens" that are billed to Medicare. This high number of specimens billed per patient resulted in higher charges to the Medicare program.

## B.    Uropath's Ad Hoc Statements Do Not Refute Concerns Regarding Overutilization

Uropath's efforts to refute overutilization concerns is limited to selective reference to ad hoc observations. Despite the fact that Uropath operates labs for 52

separate urology practices, it is only able to cite limited support from a handful of those laboratories in support of its claim that Uropath's structure does not lead to overutilization. For example, Uropath claims that data for a "substantial number of physician practices with Uropath-managed labs" show a decrease in percentage of patients biopsied. (Pls.' Br. at 17, Doc. 5.) The underlying support for that statement is a reference to the Declaration of Plaintiff Rebecca Page, which makes clear that the "substantial number" is only 14 of the 52 practices associated with Uropath, or less than 30 percent. (Pls.' Ex. 24 at ¶ 9.) Uropath is noticeably silent on the issue of the utilization rate of the remaining more than 70 percent of participating practices. Moreover, data on the number of patients biopsied does not indicate anything about total utilization. If the number of specimens taken per patient increased dramatically after a practice began its Uropath affiliation, overall utilization would increase. Uropath cleverly did not submit any information on the total number of specimens billed. The OIG studies, of course, showed a significant increase in each of the three practices OIG studied.

Similarly, Declarant Grable, a Board member of Uropath, states he is aware of a variety of measures and data collected by Uropath for its 52 contracting practices. (Pls.' Ex. 9, Doc. 5-12). Among all of those studies, he is only able to cite a study for Urology Associates of North Texas that showed the biopsy rate for a certain subset of patients may have declined, and for another, Urology San Antonio, which had a significant decline in the number of biopsies per patient visits. The fact that Uropath could cite only two limited examples out of all the data that it apparently collects for the 52 contracting practices – and does not provide overall Uropath data -- hardly makes

17

the case that the financial relationships that Uropath fosters with referring physicians do not increase utilization.

Uropath also claims "[t]here is copious additional data to show that over utilization (that is, the performance of unnecessary biopsies) does not occur at the physician owned labs managed by Uropath." (Pls.' Br. at 16). In fact, the "copious data" turns out to be isolated anecdotal data for a small fraction of the 52 Uropath managed laboratories. The actual exhibits suggest that Uropath can readily obtain this information for each of the 52 practices that utilize a Uropath laboratory. (See, e.g., Pls.' Ex. 23, Doc. 5-27). The fact that the best that Uropath can come up with is anecdotal information for a small handful of those 52 laboratories is suggestive that the complete Uropath picture may be quite different than the isolated experience of Urology Associates of North Texas and Urology San Antonio. Uropath either did not attempt to gather, or deliberately chose not to share data for such practices as Atlantic Urological Associates, Florida Urology Physicians, and Urology Tyler, P.A.—practices where the limited OIG audit expressly found a substantial increase in utilization associated with the Uropath arrangement.

Similarly, Uropath states that the use of special stains is "below the industry standard," (Pls.' Br. at 16), based on the declaration of Uropath Board Member Grable. In fact, neither Uropath nor Grable is able to provide an "industry standard." Grable only has an "impression" that the special stain rate is in the area of 20% or more. CAP is unaware of any such "industry standard" for the use of special stains in the practice of primary prostate diagnosis. Indeed, CAP members have reported to CAP special stain rates of well below 5%. Uropath's own data show that at least one Uropath facility has a dramatically higher special stain rate: the Sarasota facility had a

18

special stain rate of 14.14%. (Pls.' Ex. 21, Doc. 5-25.) Once again, the anecdotal reports that Uropath puts forward in an attempt to rebut CMS's over-utilization concerns are unavailing.

## III.    IMMEDIATE IMPLEMENTATION OF THE REVISED ANTI-MARKUP RULE IS NECESSARY TO ADDRESS ABUSIVE POD LABORATORY ARRANGEMENTS.

CMS, OIG and CAP have been aware of the abuses associated with pod laboratories for years. The Anti-Markup Provision is an appropriate way to address these concerns. Given the years of study that have been devoted to this issue, further delay will only increase costs to the Medicare program with no corresponding benefit.

Plaintiffs assert that "[t]he Final Rule will also disrupt business relationships that exist between the Plaintiff Physician Groups, their pathologists and Uropath, which promote efficient, high quality patient care" (Pls.' Compl. at ¶ 9). The reality is the prompt implementation of the final rule will not disrupt patient care. As CAP noted in its comments on the 2008 Physician Fee Schedule, CMS has recognized that "the imposition of a restriction on who can or cannot have a financial interest in the provision of a service does not act as a restriction on access to such services." CAP Comments on 2008 Physician Fee Schedule at 6. CMS itself concluded "If a physician determines not to provide access to such services in the absence of personal profit, the decision is the physician's...Nothing in [the Stark Law] restricts patient access to those services." 66 Fed. Reg. 855, 861.

Plaintiffs' business structure does not have any efficiency or quality advantages over a physician group that uses independent pathologists operating a CLIA certified anatomic pathology laboratory. Indeed, it is more efficient to send specimens to the nearest qualified pathologist than it is to ship them to a remote state.

19

Furthermore, pod laboratory arrangements arguably decrease the quality of care provided because a physician group practice is financially locked in to working with the pod laboratory pathologist who often specializes in one or two areas of pathology, rather than being able to select the pathologist whose specialty best fits the needs of the patient. For example, a urology group that uses a pod laboratory arrangement may contract with a pathologist who focuses on diagnosing prostate cancer but who may not have extensive experience with other uropathology areas, such as bladder and kidney cancer. If the referring physician group were not constrained by its financial relationship with the pod laboratory, its physicians could select the pathologist with the greatest expertise in the specific pathology specialty needed for the individual patient. Independent laboratories provide quality patient care without the conflict of interest in the Plaintiffs' arrangements. Restrictions on physician self-referrals are an imperative program safeguard to ensure that clinical decisions are determined solely on the basis of quality. *See* CAP Comments on 2008 Physician Fee Schedule at 5.

All of the alleged quality benefits that Plaintiffs cite to justify their pod laboratory arrangements (minimizing inconsistencies in grading, hiring specialized pathologists, forming a consultative relationship between the group practice and the pathologist, prioritizing special requests and samplings sent from the practice), (*see* Pls.' Compl. at ¶ 49) are not unique to the pod laboratory arrangement. Each of these benefits can be readily achieved by urologists sending all of their specimens to an independent pathologist and anatomic pathology laboratory.      Uropath suggests, through Kenneth Flowers, its CEO, that the Uropath model is necessary to avoid the requirements of some payers to use designated laboratories. (Pls.' Ex. 3 at ¶ 9, Doc. 5-6).   What Flowers neglects to mention, however, is that there are no Medicare

requirements limiting the lab or pathologists that a urologist might choose to utilize for Medicare patients. There is nothing under Medicare that prohibits or interferes with a urologist establishing an exclusive arrangement with any specific pathologist or laboratory of the urologist's choice. Urology practices choose to affiliate with Uropath not to select their pathologist, since they can already do that under Medicare with no restriction. The real motivation, made clear in a number of statements attached to Plaintiff's brief, is to seize control of the economics of pathology testing so urologists can make money off the specimens that they refer to Uropath facilities.

As several individual pathologists expressed in their comments to CMS on the 2008 Physician Fee Schedule regulations, permitting Plaintiffs to delay implementation of the revised anti-markup provision would adversely impact patient care. For example, as Dr. Gregory Skarulis of Manatee Pathology Associates stated in his comments to CMS, "[t]he current self-referral abuses in the billing and payment of pathology services is directly adversely affecting our ability to continue to practice and find qualified pathologists." See Dr. Gregory Skarulis's comments to CMS on CMS-1385-P-13656 (Aug. 31, 2007) (Ex. D). CAP urges this Court not to take any action to delay imposition of CMS's final rules prohibiting referring physicians from marking up anatomic pathology services that are not provided in the office where those physicians provide direct patient care services.

## CONCLUSION

Accordingly, this court should deny Plaintiff's request to delay the effective date of CMS rules prohibiting referring physicians from marking up anatomic pathology services performed outside of their offices and dismiss Plaintiff's Complaint.

Dated:  March 19, 2008

Respectfully submitted,

Kevin M. Henry (DC Bar No. 472167)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

James C. Dechene
Lara Leniton Liss
SIDLEY AUSTIN LLP
One S. Dearborn Street
Chicago, IL 60603
(312) 853-7000

Attorneys for *Amicus Curiae*
College of American Pathologists

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true copies of the foregoing Brief of *Amicus Curiae* the College of American Pathologists in Support of the Defendant's Motion to Dismiss, were sent via Federal Express on March 19, 2008 to:

DAN MARK PETERSON
Fulbright & Jaworski, LLP
801 Pennsylvania Avenue, NW
Suite 500
Washington, DC 20004

PETER T. WECHSLER
Trial Attorney
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530

Kevin M. Henry

A

August 31, 2007

Herb B. Kuhn
Acting Deputy Administrator
Centers for Medicare and Medicaid Services
Department of Health and Human Services
Hubert H. Humphrey Building
Room 445-G
200 Independence Avenue
Washington, DC 20201                    Attention CMS-1385-P

Dear Mr. Kuhn:

The College of American Pathologists (CAP) appreciates the opportunity to comment on the proposed rule CMS-1385-P entitled "*Medicare Program; Proposed Revisions to Payment Policies Under the Physician Fee Schedule for Calendar Year 2008.*" The CAP is a national medical specialty society representing more than 16,000 physicians who practice anatomic and/or clinical pathology. CAP members practice their specialty in clinical laboratories, academic medical centers, research laboratories, community hospitals and federal and state health facilities.

This letter provides comments on the physician self-referral provisions contained in the CMS-1385-P. Comments on other provisions included in this rule will be addressed in a separate letter.

The CAP applauds CMS for considering substantive changes to the Reassignment Rule and Physician Self-Referral Regulations to stop abuses in the billing and payment for pathology services. The CAP is an advocate for high-quality and cost-effective medical care and has alerted CMS about the proliferation of laboratory schemes that allow physician groups to profit from their self-referrals for anatomic pathology services. These arrangements take advantage of ambiguities in the Medicare rules and represent the type of self-referral enterprises that the Stark Law intended to prohibit.

The CAP supports the establishment of an anti-markup provision on purchased interpretations; however, the CAP wants to ensure that the approach does not hinder legitimate pathology practice arrangements that do not raise the specter of abuse. Consequently the CAP supports an exception for independent laboratories and single specialty pathology physician groups. The CAP also urges CMS to exclude anatomic pathology from the in-office ancillary services exception to the physician self-referral regulations; this action is the best method of preventing self-referral abuses without risk

*Herb B. Kuhn*
*August 31, 2007*
*Page 2*

of inadvertent consequences to pathology groups. These recommendations are discussed below.

## Physician Self-Referral Provisions

### A. Changes to Reassignment and Physician Self-Referral Rules Relating to Diagnostic Tests (Anti-Markup Provision)

In last year's physician fee schedule proposed rule, CMS stated that previous changes to the rules on reassignment led to confusion as to whether the anti-markup provision on purchased diagnostic tests and conditions for billing for purchased interpretations apply where a reassignment has occurred under a contractual arrangement. Program safeguards, including the anti-markup provision and conditions for purchased interpretations, were built into the purchased diagnostic testing service rule to prevent physician groups from billing for diagnostic testing services furnished by another physician or supplier at a profit to the billing physician group.

Physician groups are circumventing these safeguards by entering into contractual arrangements with physicians and suppliers of diagnostic testing services and then billing for the services at a markup from the charge for the service. CMS has long recognized that allowing physicians who order diagnostic testing services to purchase or otherwise contract for the provision of such services and to then realize a profit when billing Medicare may lead to patient and program abuse and result in higher costs to the Medicare program. Because of ambiguities in the current regulations, physicians are entering into arrangements to bill for and receive a profit from the provision of pathology services they order for their patients but are furnished by pathologists and other suppliers. To stop these abusive billing practices CMS proposes to extend the requirements for purchased diagnostic tests and interpretations to all reassignments, unless the performing physician or supplier is a full-time employee of the billing physician or group.

The CAP supports the establishment of additional program safeguards to prevent physician groups from circumventing the rules for purchased diagnostic tests and interpretations by exploitation of the rules for reassignment. Among CMS' proposals, the CAP supports the extension of the anti-markup provision to both the technical and professional components of pathology services. However, the CAP also cautions CMS that some of its proposals will preclude longstanding and legitimate billing practices by pathology groups. Many pathology groups depend on the reassignment rules to bill for services performed by independent and part-time pathologists; however, these arrangements among pathology groups do not raise the same threat of abuse because the vast majority of pathology services are initiated by a request for a consultation from a referring physician. Because CMS' proposal to incorporate the billing rules for purchased diagnostic testing services to all reassigned services, unless performed by a full-time employee of the group, could adversely affect these longstanding and legitimate

*College of American Pathologists*

*Herb B. Kuhn*
*August 31, 2007*
*Page 3*

billing practices among pathologists and pathology groups, the CAP recommends an exception for single specialty pathology physician groups and independent laboratories.

The CAP believes that it is necessary to extend restrictions on billing and payment for pathology services to prevent abusive billing arrangements by physicians who seek to profit from the services that they order for their patients but are not capable of personally performing or supervising. However, it is also important to allow pathology groups to retain flexibility in their practice arrangements with other pathologists. Because the pathologist is not in a position to influence the referrals from ordering physicians, these billing arrangements are not susceptible to the same abuses and do not require imposition of the same program safeguards. In fact, the application of the CMS proposal could have devastating results to some pathology practices. For instance, pathology groups that are hospital-based usually bill only the professional component and the hospital bills the technical component. Under the proposal to expand the application of the rules for purchased diagnostic tests and interpretations to all reassignments, these pathology groups would not be able to bill for the interpretations performed by an independent contractor or part-time employee pathologist and reassigned to the group because the group did not perform the technical component, which is proposed as a condition for billing a purchased interpretation. An exception is needed to allow single specialty pathology physician groups and independent laboratories to bill for services performed or supervised by other pathologists, whether independent contractors or full-time or part-time employees, without these additional requirements.

The CAP asks for an exception for single specialty pathology physician groups and independent laboratories from the application of the proposed rules for purchased diagnostic tests and interpretations. CMS already recognizes an exception for independent laboratories that purchase and bill for the technical component of a pathology service. A broader exception for single specialty pathology physician groups and independent labs that covers both the professional and technical components of a pathology service is also supported by the existing rules under the Stark Law. The Stark Law has special rules for referrals made by pathologists for clinical diagnostic laboratory tests and pathological examination services. In developing the restrictions against certain physician self-referrals, Congress recognized that certain physicians, specifically pathologists, diagnostic radiologists and radiation oncologists, who order certain services pursuant to a consultation with another physician do not have the same risk for abuse and; consequently, will not be treated as having made a restricted referral to an entity with which they have a financial interest. For the same policy reasons we ask CMS to recognize an exception for single specialty pathology physician groups and independent laboratories that bill for pathology services performed or supervised by another pathologist, whether an independent contractor or full-time or part-time employee.

CMS is also soliciting comments on how to implement the anti-markup provision for purchased diagnostic tests and interpretations. The CAP concurs with the proposal to

*College of American Pathologists*

*Herb B. Kuhn*
*August 31, 2007*
*Page 4*

limit payment to the net charge for the service by the performing physician or supplier. The CAP also agrees with the proposal to calculate the net charge exclusive of any amount that takes into account the cost of equipment or space that is leased to the performing physician or supplier by the purchasing physician or group.

The CAP also believes that it is necessary to mandate that the parties to the reassignment arrangement agree to the net charge for each unit of service. Because some physician groups arrange for pathologists to perform services on a per diem or other time basis, it may be difficult to determine the net charge to assess what constitutes a markup of the professional component. Consequently, it is recommended that CMS require as a condition for reassignment of a purchased interpretation that the parties define a net charge for the service, as is required already for purchased diagnostic tests. Under this condition, per diem or other time-based arrangements, which are more susceptible to markups, would not be permitted under the reassignment rule for purchased interpretations. Because the net charge payment limitation has been an effective program safeguard for purchased tests, a similar requirement for purchased interpretations is likely to be the most effective mechanism to prevent markups. Also, by imposing a bright line test based on a net charge, contractors will have a greater ability to monitor and sanction abusive markup practices

## B. In-Office Ancillary Services Exception

In comments to last year's physician fee schedule proposed rule, the CAP proposed the exclusion of anatomic pathology services from the in-office ancillary services exception. The CAP is pleased that CMS is soliciting comments on this change. CMS recognizes that Congress created the in-office ancillary services exception to allow for the provision of certain services necessary to the diagnosis or treatment of the medical condition that brought the patient to the physician's office, such as a urine analysis or blood glucose test, which are collected and analyzed by the treating physician while the patient waits. However, anatomic pathology services are very different from the routine clinical lab tests that were originally anticipated under the exception.

First, because of the nature of the services, anatomic pathology cannot be furnished at the time of the office visit while the patient waits. Second, anatomic pathology specimens cannot be interpreted by most of the referring physicians because they lack the professional qualifications to furnish the service. The routine clinical lab tests anticipated under the exception generate positive or negative results that the treating physician can integrate with other clinical information to confirm a diagnostic or treatment plan during the patient's visit. Unlike routine clinical lab tests, anatomic pathology involves high complexity testing that is subject to quality and other standards of the Clinical Laboratory Improvement Amendments. Most physicians, other than pathologists, are not qualified to furnish or supervise the testing services under these standards. For these reasons anatomic pathology services cannot be integrated into the group practice in the same

*College of American Pathologists*

*Herb B. Kuhn*
*August 31, 2007*
*Page 5*

manner as routine clinical lab services and are not the type of services intended to be protected under the exception; rather, the introduction of anatomic pathology into a group practice is merely to allow for profiting from the self-referral of these services.

Last year CMS proposed changes to the in-office ancillary services exception that focused on certain characteristics of pod labs as a means of restricting abusive self-referral arrangements; however, the narrowly defined changes would not necessarily impact captive laboratories. CMS has now recognized that pod labs and in-house captive laboratories are economically indistinguishable and raise the same concerns for patient and program abuse. Attempting to stop the proliferation of these self-referral enterprises by imposing restrictions in the building, equipment or personnel requirements will only have marginal effect. Moreover, physician groups will continue to create new arrangements structured around any technical requirements to retain the ability to profit from pathology services ordered from their captive referral pool of patients. Because the exception enables physician groups to create a profit center from anatomic pathology services, it is imperative that CMS remove anatomic pathology from the exception.

CMS also recognizes in the proposed rule that the in-office ancillary services exception allows physician groups to potentially mark-up charges for the technical component of diagnostic tests. The CAP alerted CMS to the proliferation of in-house captive laboratories that allow physician groups to bill for the technical component of the pathology services ordered for the group's patients. The physician group engages a technician to furnish the service in a laboratory that is owned or leased by the physician group. The anti-markup provision of the reassignment rule may not apply to these situations, whether the physician group engages the technician as an independent contractor or employee, because the service is considered to be furnished on the group's premises. This loophole allows physician groups to profit from a markup of the technical component. An exclusion of anatomic pathology from the in-office ancillary services exception is the most effective means of preventing program abuses due to the limitations in the reach of the Medicare reassignment rule. Without the exclusion physician groups will continue to structure in-office practice arrangements that allow markups for pathology services under the guise of technical compliance with Medicare billing rules.

Opponents to these proposed changes assert that their captive pathology arrangements enhance patient care. The CAP believes that program safeguards are intended to ensure that providers furnish care in the best interests of their patients, and, restrictions on physician self-referrals are an imperative program safeguard to ensure that clinical decisions are determined solely on the basis of quality. A categorical exclusion from the in-office ancillary services exception would prevent physicians from having a financial interest in the referrals for the excluded services but would not prevent physicians or group practices from furnishing the services for their patients as a purchased service under the program integrity safeguards or under other available statutory exceptions.

*College of American Pathologists*

*Herb B. Kuhn*
*August 31, 2007*
*Page 6*

The distinction between the delivery of a health care service and the financial interest in the referral of the service is paramount to the original intent of the Stark Law. CMS previously clarified this distinction as follows:

> "The [Stark Law] only imposes restrictions on a physician who makes a referral for a designated health service (DHS) if he or she has a financial relationship with the ancillary services provider... However, nothing in the law prevents physicians from making available convenient ancillary services when the physician has no financial interest in the provision of the services. For example, a physician may arrange for a diagnostic services provider to perform diagnostic tests in the physician's office for which the diagnostic services provider bills."

66 Fed. Reg. 861-862 (Jan. 4, 2001). CMS also recognized that the imposition of a restriction on who can or cannot have a financial interest in the provision of a service does not act as a restriction on access to such services. CMS noted: "If a physician determines not to provide access to such services in the absence of personal profit, the decision is the physician's... Nothing in [the Stark Law] restricts patient access to those services," *See id.* at 861.

The exclusion of anatomic pathology services from the in-office ancillary services exception will not impact the delivery of pathology services as determined to be in the best interests of the patient; rather, the exclusion will only remove the financial conflict of interest from the referral. The exclusion would ensure that physicians order pathology services based on the best interests of their patients without any influence, even in part, from personal financial interests.

Also, as noted above, financial relationships between physicians and laboratories will continue to be permissible if they satisfy another statutory exception. As CMS noted in the proposed rule, the in-office ancillary services exception has a unique distinction from other compensation exceptions in that it allows a referring physician to receive a share of the profits for his/her referred ancillary services while other compensation exceptions require that the compensation be set in advance, be consistent with fair market value, and not be determined in a manner that takes into account the volume or value of referrals. By requiring physicians to comply with the requirements of the other compensation exceptions, CMS will be imposing additional program safeguards for physicians seeking to retain a financial interest in a laboratory to which they refer.

## C. Summary of CAP Comments

The CAP supports CMS' efforts to end abusive markup practices for pathology services by extending the anti-markup provision to both the professional and technical component of the service and applying the conditions purchased diagnostic tests and interpretations

*College of American Pathologists*

*Herb B. Kuhn*
*August 31, 2007*
*Page 7*

to all reassignments, unless the performing physician or supplier is a full-time employee of the billing physician or group. To protect against inadvertent harm to legitimate pathology practice arrangements, the CAP supports an exception for single specialty pathology physician groups and independent laboratories. The new program safeguards should prevent ordering physicians from profiting from the work of other physicians and suppliers but should not prevent pathology groups from billing for the services of other pathologists, whether engaged on a full-time, part-time or contractual basis.

The CAP also urges CMS to exclude anatomic pathology from the in-office ancillary services exception because it is the best method for removing the taint of financial conflicts of interest from self-referrals without adversely affecting the delivery or quality of pathology services. The exclusion will not interfere with the establishment of alternative delivery models that compete on the basis of quality, reliability, turn-around time, communication, and customer service but will exclude profit motivations from the choice of provider. The exclusion is also is consistent with the original intent of the Stark Law to impose "restrictions on a physician who makes a referral for a designated health service if he or she has a financial relationship with the ancillary services provider...thereby creating a risk that his or her referrals may be motivated, in part, by personal financial considerations" (*See* 66 Fed. Reg. 861-862 (Jan. 4, 2001)). So while the exclusion of anatomic pathology from the in-office ancillary services exception will not prevent the delivery of the services, it will ensure that clinical decisions are determined solely on the basis of quality and in the best interests of the patient.

The College of American Pathologists is pleased to have the opportunity to comment on these regulations and appreciates your consideration of these comments. Any questions regarding proposed changes should be directed to Donna Meyer at 202-354-7112 (dmeyer@cap.org).

Sincerely,


Thomas M. Sodeman, MD, FCAP
President

Cc:   Joanne Sinsheimer, Centers for Medicare and Medicaid Services
      Lisa Ohrin, Centers for Medicare and Medicaid Services
      Don Romano, Centers for Medicare and Medicaid Services
      David Walczak, Centers for Medicare and Medicaid Services


*College of American Pathologists*

B



**College of American Pathologists**
325 Waukegan Road, Northfield, Illinois 60093-2750
800-323-4040 • http://www.cap.org

*Advancing Excellence*

Direct Response To:
**DIVISION OF GOVERNMENT
AND PROFESSIONAL AFFAIRS**
1350 I Street, NW, Suite 590
Washington, DC 20005-3305
202-354-7100 Fax: 202-354-7155
800-392-9994 • http://www.cap.org

October 10, 2006

Mark B. McClellan, MD, PhD
Administrator
Centers for Medicare and Medicaid Services
Department of Health and Human Services
Hubert H. Humphrey Building
Room 445-G
200 Independence Avenue
Washington, DC 20201                    Attention CMS-1321-P

Dear Dr. McClellan:

The College of American Pathologists (CAP) appreciates the opportunity to comment on the
reassignment and physician self-referral provisions included in the proposed rule CMS-1321-P
entitled *"Medicare Program; Revisions to Payment Policies Under the Physician Fee Schedule
for Calendar Year 2007 and Other Changes to Payment Under Part B."* We are also submitting
comments on other issues contained in the proposed rule in a separate letter. The CAP is a
national medical specialty society representing more than 16,000 physicians who practice
anatomic and/or clinical pathology. College members practice their specialty in clinical
laboratories, academic medical centers, research laboratories, community hospitals and federal
and state health facilities.

The CAP applauds CMS for undertaking the initiative to end certain abuses in the billing and
payment for diagnostic testing services by amending the regulations on Reassignment and
Physician Self-referral in this Notice of Proposed Rulemaking (NPRM). The CAP also
welcomes the opportunity to provide comments to CMS on possible additional program
safeguards.

**Reassignment And Physician Self-Referral**

<u>A</u>.     <u>Background</u>

The proposed changes in the NPRM are intended by CMS to address its concern that
"allowing physician group practices or other suppliers to purchase or otherwise contract for the
provision of diagnostic tests and then to realize a profit when billing Medicare may lead to
patient and program abuse." We applaud CMS for recognizing "pod" laboratories as one type of
questionable business arrangement that is susceptible to this abuse and needs to be prevented.

*College of American Pathologists*

And while the CAP supports efforts to end pod labs, we also encourage CMS to adopt safeguards to prevent other prevalent abusive arrangements involving diagnostic testing services. Specifically, certain specialty physician groups are being marketed a variety of laboratory models that are designed to take advantage of the Medicare reassignment rule and the in-office ancillary services exception to the physician self-referral law. The sole purpose of these arrangements is for the physician group to profit from their self-referrals for anatomic pathology services.

As an example, certain specialty physician practices, primarily dermatology, gastroenterology and urology, are encouraged to develop captive laboratories to capture the revenue from tests ordered by the group. A typical captive laboratory arrangement involves a group practice that owns or leases the laboratory space and equipment. The physicians order anatomic pathology services for the biopsies and specimens collected from their patients. Because anatomic pathology involves high complexity testing, the laboratory must comply with the requirements of the Clinical Laboratory Improvement Amendments and a pathologist must be engaged to furnish the testing service. While developers of these captive laboratories have maneuvered around the technical requirements of the physician self-referral law, the arrangements represent the precise manipulation that CMS sought to avert by creating rules to prevent "group practices from using the in-office ancillary services exception to operate enterprises that are functionally nothing more than self-referred [designated health services] enterprises." *See* 66 Fed. Reg. 889 (Jan. 4, 2001).

While CMS recognizes the fraud and abuse vulnerabilities from pod labs, captive laboratories are economically indistinguishable and pose the same potential for abuse. Both types of arrangements create the same financial conflict of interest that the physician self-referral law sought to prohibit. In both types of arrangements the physician group is engaging a pathologist to perform services that the other members of the group are not qualified to perform. In both types of arrangements the referring physicians share in the revenue from their self-referrals of pathology services. In both types of arrangements the physician group engages a pathologist on a fractional basis to maximize profits. The CAP urges CMS to incorporate changes in the regulations that will prevent abuses from self-referrals of pathology services, regardless of the structure of the group practice arrangement.

B.    Discussion of Proposed Changes

1.    Stop the Use of the Reassignment Rules for Services Performed Under a Contractual Arrangement to Circumvent the Rules for Purchased Diagnostic Tests and Interpretations

As CMS notes in the NPRM, current Medicare rules attempt to curb billing abuses for diagnostic services with several program safeguards. Specifically, CMS prohibits markups on claims submitted for payment for purchased diagnostic tests, and requires that those submitting a claim for payment for a purchased interpretation must have performed or supplied the test and must be independent of the physician or medical group that ordered the test. Despite these rules, CMS notes that there is confusion as to whether physicians and groups can avoid the program

*Mark B. McClellan, MD, PhD*
*October 10, 2006*
*Page 3*

safeguards if the testing services are performed under a contractual arrangement with formal reassignment of the right to payment. The CAP concurs with CMS that attempts made by physician groups to circumvent the existing rules for diagnostic tests and interpretations by exploitation of the reassignment exception for services performed under a contractual arrangement are suspect; however, we also caution CMS that some of its proposals will preclude longstanding and legitimate billing practices within the pathology industry.

The CAP is aware of physician groups that order a significant amount of biopsies for their patients and bill for the tests performed by independent pathologists and suppliers. The CAP believes that these physician groups should not be able to circumvent the rules for purchased tests and interpretations by claiming the right to payment as a service performed under a contractual arrangement. However, many pathology groups depend on the reassignment rule to bill for services performed by independent pathologists under a contractual arrangement with the group, but without the specter of abuse because pathology services are generally initiated by a request for a consultation from a referring physician. Because CMS' proposal to incorporate the billing rules for purchased diagnostic tests to all services performed under a contractual arrangement could adversely affect these longstanding and legitimate billing practices among pathologists and pathology groups, the CAP opposes the proposal. In its place the CAP recommends making the rules for purchased services compulsory for a physician or group that bills for a diagnostic test or interpretation that the physician or group ordered if the physician or group is not the supplier of the service and if the physician or the group sees the patient. This alternative will prevent abusive markup practices by referring physicians without unintended consequences against legitimate billing arrangements.

### 2.    Impose an Anti-Markup Rule for Purchased Interpretations and Incorporate Program Safeguards for Purchased Diagnostic Tests

An important program safeguard is the limitation on the amount of payment that can be received by a billing physician or group when submitting a claim for payment for a diagnostic test furnished by an independent physician or supplier. This rule, known as the anti-markup rule, prohibits submitting a claim for payment for the technical component of a purchased test at a markup from the net charge for the test. CMS is soliciting comments on a payment limitation for purchased interpretations. The CAP supports CMS adopting a similar anti-markup rule for purchased interpretations.

In Publication 100-04, Section 20.2.4.2 of the Medicare Claims Processing Manual, CMS expresses its concern with "attempts may be made by the medical diagnostic community to adjust or establish arrangements which continue to allow physicians to profit from other's work." The potential for program abuse exists whether the referring physician or group is purchasing the technical or professional component of the test. Consequently, we recommend a similar test for purchased interpretations that would limit payment to the lower of (1) the net charge to the billing physician or group from the physician or supplier who performed the service, (2) the actual charge of the billing physician or group, or (3) the Physician Fee Schedule for the service had the performing physician or supplier billed directly.

*College of American Pathologists*

An anti-markup rule removes any financial incentive for a referring physician to order unnecessary tests by eliminating the profit potential in billing for services performed by an outside supplier. Arrangements between physician groups with captive laboratories and pathologists to perform the interpretations may be negotiated on a per diem or other time basis, or on a specimen or per unit charge. Under a per diem or time-charge it is difficult to determine the "net charge" for the purchased service; consequently, it is recommended that CMS require as a condition for reassignment of the right to receive payment for a purchased interpretation that the parties define a net charge for the service. Under this condition, per diem or other time-based arrangements, which are more susceptible to markups, would not be permitted as an exception to the reassignment rule for purchased interpretations. However, a per diem and time-based arrangement may be appropriate as the basis for reassignment as a condition of employment. Because the net charge payment limitation for purchased tests has been an effective program safeguard, a similar requirement for purchased interpretations is likely to be the most effective mechanism to prevent markups. Also, by imposing a bright line test based on a net charge, contractors will have a greater ability to monitor and sanction abusive markup practices.

While the anti-markup rule is needed to prevent referring physicians from profiting from diagnostic testing services that they order, it should not restrain longstanding practice arrangements that do not raise similar concerns for abuse. The CAP also recommends an exception for purchased interpretations billed by an independent laboratory, similar to the existing exception for payment limitations for purchased tests under Section 40.2 of Chapter 16, Laboratory Services in the Medicare Claims Processing Manual. Pathology groups may also engage an independent pathologist to perform professional services for the group and should retain flexibility to structure the arrangement. Because neither the laboratory nor the pathologist is in a position to influence the referrals from ordering physicians, these billing arrangements are not susceptible to the same abuses.

Because of the fraud and abuse vulnerabilities for purchased services, the CAP proposes additional program safeguards. Specifically, the CAP recommends incorporating the program safeguards for services performed under a contractual arrangement into the conditions of payment for purchased diagnostic tests and interpretations. CMS imposes joint and several liability for any overpayments to parties to a contractual arrangement pursuant to which formal reassignment for the right to payment is made. Similarly, we recommend that purchasing physicians and medical groups, and physicians and suppliers of purchased services, would share joint and several liability for overpayments in contravention of the anti-markup rule. The physicians and suppliers of the purchased services would also be granted unrestricted access to billings submitted for the purchased services by the entity receiving reassigned payments. These changes ensure that both parties to the transaction are fiscally accountable to the Medicare program by making both parties liable for overpayments and ensuring that both parties have the ability to monitor for compliance with the billing rules.

3.    Protect Against Sham Employment Arrangements

As discussed above, the CAP has learned that physician groups are using part-time employment arrangements to circumvent the program safeguards. Physician groups may engage

an independent pathologist on a part-time basis to perform testing services and rely on the reassignment exception for employment to avoid the billing restrictions for purchased interpretations. Because of this potential manipulation of the rules, the CAP recommends that CMS acknowledge in the regulations that part-time employment arrangements for furnishing diagnostic testing services may be considered the functional equivalent of a purchased service if the billing physician or group that ordered the test is a different medical specialty than the part-time employee who reassigns payment for diagnostic testing services. The CAP does not want to disrupt legitimate part-time employment arrangements among other providers and asks CMS to work with the diagnostic provider community to develop appropriate safeguards against circumvention schemes by referring physicians that order and bill for diagnostic tests performed by other providers. The CAP also asks CMS to implement an audit program with its contractors to investigate suspect employment arrangements between referring physicians and pathologists that circumvent the rules for purchased interpretations. CMS should instruct contractors to consider as suspect part-time arrangements that (1) do not have written agreements between the employer and employee, (2) do not have fixed hours of work, (3) require only "on-call" availability or define hours of work "as needed," and (4) compensate the employee for his or her services on a per unit or charge basis rather than based on intervals of time.

> ### 4.   Change Physician Self-Referral Definitions to Prevent Abusive Independent Contractor and Employment Arrangements

The CAP shares CMS' concern about the existence of certain arrangements that are not within the intended purpose of our physician self-referral rules, including pod labs in which a "group practice [bills] Medicare for the entire pathology service, typically at a markup from what the group practice paid the pathologist for the professional service and the entity for its services." To stop abusive pod lab arrangements, the CAP supports CMS' proposed change to the definition of a "physician in the group practice" to ensure that the independent contractor arrangements comply with the Medicare reassignment rules, including the anti-markup rule for purchased interpretations, as proposed above.

However, while this and other proposed changes, as further described below, are designed specifically to prevent pod labs, pod labs represent only one type of pathology arrangement that is susceptible to abuse. As described above, another prevalent practice is for physician groups that order a significant amount of biopsies, including dermatologists, gastroenterologists and urologists, to develop captive laboratories to profit from their self-referrals for anatomic pathology services. Captive laboratories raise the same self-referral concerns as pod labs. In both the pod and captive lab models, the physician group controls the amount of pathology services being ordered and, hence, the revenues received by the physician group from self-referrals of diagnostic testing. The arrangements may result in program abuse, whether the group engages a pathologist as an independent contractor or part-time employee. While many of the proposed changes will likely prevent abuses under independent contractor arrangements, the rules will not deter abusive practices that rely on part-time employment to circumvent the rules. Therefore, in addition to addressing abusive independent contractor arrangements as are common in pod labs, the CAP urges CMS to recognize the exploitation of part-time employment arrangements and impose additional program safeguards.

*Mark B. McClellan, MD, PhD*
*October 10, 2006*
*Page 6*

While part-time employment may offer flexibility to pathologists, the arrangement is exploited when a physician group engages a pathologist to perform services on an intermittent basis. By engaging the pathologist as a part-time employee who will perform services for the group for only a few hours or during one day a week, the group practice can minimize costs associated with the service by accumulating patient specimens to be interpreted during a single office visit by the pathologist. These arrangements are even more susceptible to abuse when multiple physician groups share a single pathologist, with each group employing the pathologist on a fractional basis. While each arrangement may be structured to satisfy the requirements of the in-office ancillary services exception, we believe that the structure is not a bona fide employment arrangement, but is an artifice designed solely to avail an exemption in the rules and allow for a markup on a purchased service.

The purpose and intent of the physician self-referral law was to recognize exemptions only for group practices that function as an "integrated whole." Specifically, CMS noted the intent only to protect self-referrals among a group practice "if the group practice is a bona fide group practice and not a loose confederation of individual physicians bound together primarily to profit from [designated health service] referrals." *See* 66 Fed. Reg. at 895 (Jan. 4, 2001). The CAP believes that group practices that rely on part-time, intermittent employees to perform all of the designated health services for which the group practice is seeking an exception are not operating a fully integrated medical practice. In the case of captive laboratories, the group practice is not fully integrating the performance of the anatomic pathology services into the group by furnishing the services on an intermittent basis. To be fully integrated into the medical practice of the group, an ancillary service should be furnished by the group on a full-time basis, or at least as frequently as it provides physician services unrelated to the performance of the designated health services for which an exception to the ban on self-referrals is sought.

To deter abusive fractional time-sharing arrangements we propose a revision to the definition of a "member of the group." Specifically, the CAP recommends limiting the number of group practices that may count a pathologist as a "member of the group" at any one time. While there are some legitimate examples where a pathologist is a part-time employee and member of two group practices, we do not believe that as a practical matter a single pathologist can realistically be considered to be a bona fide member of more than two groups at the same time unless the services are being furnished on an intermittent basis and are not fully integrated into the medical practice of the group. The CAP also recommends that for purposes of meeting the unified business requirements for the in-office ancillary services exception that a group practice must furnish the designated health services, for which the exception is sought, on substantially the same terms as it provides unrelated physician services. This test should also prevent intermittent arrangements and ensure that the ancillary service is fully integrated and not a separate business enterprise.

5.    Change Building Requirements for the Performance of In-Office Ancillary Services

*College of American Pathologists*

*Mark B. McClellan, MD, PhD*
*October 10, 2006*
*Page 7*

The CAP supports CMS' proposal to eliminate pod labs by imposing a variety of restrictions on when group practices can bill for services it furnishes in a "centralized building." Many aspects of the "centralized building" exception were intended to prevent suspect space-sharing arrangements, and we agree with CMS that equipment-sharing arrangements pose the same concerns. The CAP supports CMS' proposed changes to require that a centralized building of a group practice must contain on a permanent basis all of the necessary equipment to perform substantially all of the services to be performed in the space by the group practice. To ensure the highest level of program integrity, we believe that "substantially all" should be defined as no less than 90% of the group's services. Any other services should be furnished under a contractual arrangement, subject to the anti-markup rule and other billing conditions.

CMS also proposes a minimum space requirement to qualify as a centralized building to deter pod labs that typically reside in a subdivided space, or a cubicle, that is part of a larger space that is shared by multiple physician groups. CMS states that the purpose of the square foot minimum "is to prevent abusive arrangements such as pod labs, while not disqualifying legitimate, stand-alone physician offices that are unusually small. While the CAP concurs with a minimum square footage requirement and believes that 350 square feet is a reasonable limitation; the CAP does not agree with CMS' proposal to tie a minimum square foot requirement with time-sharing arrangements.

CMS' is proposing that an office of a group practice in a centralized building must be at least 350 square feet, but would not apply "to space owned or rented in a building in which no more than three group practices own or lease space in the "same building," as defined in §411.351 (that is, in a building with the same street address) and share the same "physician in the group practice" (as defined in §411.351)." This 3-prong test for (1) square footage, (2) same building with multiple groups, and (3) personnel sharing, prevents a typical pod lab arrangement as described by CMS in the NPRM but may not prevent other types of abusive arrangements. To prevent a greater number of abusive referral arrangements, the CAP proposes adopting the minimum square footage requirement as a separate test for qualifying as a centralized building. An exception could be created for "stand-alone physician offices that are unusually small." The exception should be based on the nature of the designated health services provided by the group practice at the centralized building. A legitimate stand-alone physician office of a group practice should be an office at which the group practice furnishes substantially all of the same services as the group practice furnishes at an office at which the group provides physician-patient encounters.

CMS also announced its consideration of a requirement for group practices to engage a non-physician employee or independent contractor who will perform designated health services for the group for at least 35 hours per week. The CAP supports this requirement and also believes that it should apply whether the services are furnished in a location of the group practice under either the "same building" or a "centralized building" option. If a group practice could not satisfy the personnel standards, the group would still have the ability to furnish the services as a purchased diagnostic testing service, subject to the anti-markup rule and other program safeguards.

*College of American Pathologists*

*Mark B. McClellan, MD, PhD*
*October 10, 2006*
*Page 8*

CMS is also asking for comments on whether a group practice should be allowed to maintain a "centralized building" in a different State from an office at which the group provides physician-patient encounters, and whether space in a different State must be located within a maximum mileage limitation. The CAP believes that a group practice has no legitimate purpose to operate an office at a location that is greater than 25 miles from any other medical office of the group solely to furnish pathology services, whether the centralized building is located in the same State or a different State(s). CAP believes that a 25-mile limitation will comport with typical and reasonable distances in the contemporaneous practice of medicine and would still enable a group to provide adequate supervision and control over the satellite location.

### 6.    Prevent Self-Referral Abuses Through Restrictions on Profit Sharing

As noted above, the anti-markup rule under Medicare reassignment policies prevents abuse by removing the ability of a physician to profit from their self-referrals for services performed by another physician. The ability of physician groups to share in the profits from the furnishing of anatomic pathology services by a pathologist under the in-office ancillary services exception presents the same financial conflict of interest. To remove the conflict, the CAP believes that there must be a restriction on profit sharing in the revenues from anatomic pathology services.

In comments to the final rule for the physician self-referral law, CMS noted that the law only imposes the restrictions on financial relationships and does not regulate the delivery of services. Specifically:

> "The law only imposes restrictions on a physician who makes a referral for a designated health service if he or she has a financial relationship with the ancillary services provider, such as an employment agreement, an office space lease, or an ownership interest. Depending on the structure of the financial relationship, the physician may be able to profit from referring ancillary services, thereby creating a risk that his or her referrals may be motivated, in part, by personal financial considerations... However, nothing in the law prevents physicians from making available convenient ancillary services when the physician has no financial interest in the provision of the services. For example, a physician may arrange for a diagnostic services provider to perform diagnostic tests in the physician's office for which the diagnostic services provider bills."
> *See* 66 Fed. Reg. 861-862 (Jan. 4, 2001).

A restriction on profit sharing from the revenue for anatomic pathology services strikes the policy balance to constrain potential abuses from financial incentives from the actual delivery of ancillary services for the convenience of patients.

The CAP proposes a 2-prong test that would prevent a physician in a group practice that did not personally perform any of the anatomic pathology services billed by the group from sharing in the revenues if (1) the members of the group belonging to one medical specialty account for at least 75% of the revenues of the group, and (2) at least 75% of the referrals for the

*College of American Pathologists*

anatomic pathology services involve referrals from the members of the group. The first prong directs the restriction to a single specialty group practice that incorporates pathology as the only other specialty from profiting from their self-referrals; the intent is not to proscribe multidisciplinary practices that offer truly integrated models of patient care. The second prong focuses the restriction on captive laboratories that are more susceptible to abuse because of direct correlation between profit and the group's self-referrals. The CAP proposes making this restriction on profit-sharing specific to anatomic pathology services to avoid any unintended consequences for other diagnostic specialties. The critical issue under the physician self-referral law is that clinical decisions should be free of any financial conflict of interest. The CAP believes that inappropriate financial incentives should be eliminated, so that the clinical decision-making process remains untainted by profit motivation, which is in the best interest of beneficiaries and of program integrity.

> 7.    Exclude Anatomic Pathology from the In-Office Ancillary Services Exception

Pod labs and other abusive referral arrangements discussed above are the result of physician groups structuring their practices around the technical requirements of the in-office ancillary services exception to exploit the ambiguities and retain the revenue from their self-referrals. Even as CMS attempts to close the ambiguities to deter pod labs, physician groups are converting their practice structures to take advantage of other loopholes in the rules. No matter the technical structure of the practice, the intent by physician groups is to create a profit center from anatomic pathology services "that are functionally nothing more than self-referred [designated health services] enterprises," which CMS specifically sought to prevent. *See* 66 Fed. Reg. 889 (Jan. 4, 2001). For this reason CAP supports exclusion of anatomic pathology from protection under the in-office ancillary services exception.

A categorical exclusion would prevent physicians from having a financial interest in the referrals for the excluded services but would not prevent physicians or group practices from furnishing the services for their patients as a purchased service under the program integrity safeguards or under other available statutory exceptions. The CAP believes that the potential for abuse is prevalent only for certain specialty physicians that order anatomic pathology services for the biopsies and specimens collected from their patients but not for multidisciplinary practices that operate under a clinic model offering a wide range of clinical services. We ask CMS to work with the CAP and other members of the diagnostic provider community to develop an exclusion from the in-office ancillary service exception with appropriate exceptions for multidisciplinary practices but that will bar referring physicians from profiting from their self-referrals for anatomic pathology services.

> C.    Summary of CAP Comments

> > 1.    Stop the Use of the Reassignment Rules for Services Performed Under a Contractual Arrangement to Circumvent the Rules for Purchased Diagnostic Tests and Interpretations

*Mark B. McClellan, MD, PhD*
*October 10, 2006*
*Page 10*

The CAP does not support CMS' proposal to incorporate the program safeguards under §414.50 for purchased tests and interpretations into §424.80(d)(2) for reassignment for services performed under a contractual arrangement but does recommend the following changes:

- Clarify under §424.80(d)(2) that reassignment of payment for diagnostic testing services is permitted under this exception if neither the billing nor the performing physician or group ordered the test or sees the patient.

- Clarify under §414.50 that payment for a diagnostic test or interpretation is subject to the payment conditions whether or not the services were performed under a contractual arrangement if the billing physician or group also ordered the test and sees the patient.

- Amend §414.50 to require as a condition for physician billing of a purchased diagnostic test interpretation that (i) the test is ordered by a physician or group that is independent of the person or entity performing the technical component of the test, and also of the physician or medical group performing the interpretation, (ii) the physician or group performing the interpretation does not see the patient, and (iii) the purchaser performs the technical component of the test.

2.   Impose an Anti-Markup Rule for Purchased Interpretations and Incorporate Additional Program Safeguards

The CAP proposes amending §414.50 to apply the anti-markup rule to both the technical and professional components of a purchased diagnostic test and to incorporate additional program safeguards as follows:

(a) General rule. For services covered under section 1861(s)(3) of the Act and paid for under this part 414 subpart A, if a physician bills for a diagnostic test or professional interpretation performed by an outside supplier, the payment to the physician less the applicable deductibles and coinsurance may not exceed the lowest of the following amounts:

(1) The supplier's net charge to the physician.

(2) The physician's actual charge.

(3) The fee schedule amount for the test that would be allowed if the supplier billed directly.

(b) Restriction on payment. The physician must identify the supplier and indicate the supplier's net charge for the purchased test or interpretation. If the physician fails to provide this information, CMS makes no payment to the physician and the physician may not bill the beneficiary.

(c) Conditions and limitations. (1) Liability of the parties. A physician that receives payment under paragraph (a) and the supplier that otherwise receives payment are jointly and severally responsible for any Medicare overpayment. (2) Access to records. The supplier furnishing the service has unrestricted access to claims submitted by a physician for services provided by that supplier.

3.    Protect Against Sham Employment Arrangements

The CAP asks CMS to instruct contractors to monitor for and investigate suspect part-time employment arrangements.  In Publication 100-04, under Section 30.2.6, Payment to Employer of Physician – Carrier Claims Only, carriers should be instructed to investigate suspect arrangements for the reassignment of payment for diagnostic testing services performed by a part-time employee if the employee, as identified on the 855-R for the billing physician or group, is performing a pathology service and the billing physician or group is identified as a different medical specialty.  Reassignment of payment for a diagnostic testing service ordered by the billing physician or group may be considered suspect if (i) there is no written agreement between the employer and employee, (ii) the employment agreement does not set fixed hours of work, (iii) the employment agreement only requires the physician to be available "on-call" or "as needed," and (iv) the employment agreement sets compensation on a per unit or charge basis. For suspect part-time employment agreements, the carrier should treat the claim as a claim for payment for a purchased diagnostic test and apply the requirements under Sections 30.2.9 and 30.2.9.1, and 30.30.7 for payment limitations.

4.    Change Physician Self-Referral Definitions to Prevent Abusive Independent Contractor and Employment Arrangements

The CAP supports changes at §411.351 to the definition of a "physician in the group" as proposed by CMS and proposes the following additional definition changes:

> *Member of the group or member of a group practice* ... A physician providing anatomic pathology services for a group practice cannot be considered a physician employee of more than two group practices at any one time for purposes of paragraphs (a) and (b) of Section 411.354.

> *Unified business.* (1) the group practice must be a unified business having at least the following features ... (iii) DHS furnished under the group, if performed by members of the group, must be performed on substantially the same terms as physician services unrelated to the DHS are furnished by the group (including by maintenance of substantially similar operating hours for the DHS services as provided by the group for unrelated physician services).

5.    Change Building Requirements for the Performance of In-Office Ancillary Services

The CAP also supports changes to the building requirements for in-office ancillary services under §411.355 to require:

- A group practice to maintain a minimum space of 350 square feet for the furnishing of DHS in the same building or a centralized building.

*Mark B. McClellan, MD, PhD*
*October 10, 2006*
*Page 12*

- A group practice to maintain in the space on a permanent basis the necessary equipment to be used exclusively by the group practice to perform substantially all (meaning at least 90%) of the DHS that are performed in the space by the group.
- A group practice to employ a non-physician employee or independent contractor who will perform DHS in the space exclusively for the group for at least 35 hours per week.
- A "centralized building" may not be located more than 25 miles from an office of the group practice that meets the criteria of §411.355(b)(2)(i).

6.    Prevent Self-Referral Abuses Through Restrictions on Profit Sharing

The CAP recommends an amendment to §411.352(i) to restrict profit-sharing in profits derived from anatomic pathology services as follows:

> *Special rule for productivity bonuses and profit shares. ... (5)* A physician in a group practice may not be paid a share of the group's profits derived from anatomic pathology services payable by Medicare or Medicaid unless the physician personally performed the services (including services "incident to" those personally performed services as defined in §411.351) if the following conditions apply: (i) the members of the group practice belonging to one medical specialty account for at least 75% of the revenues of the group practice, and (ii) at least 75% of the anatomic pathology services furnished by the group are referrals from the members of the group.

7.    Exclusion of Anatomic Pathology from In-Office Ancillary Services Exception

CAP supports exclusion of anatomic pathology services from the description of in-office ancillary services under paragraph (b) of Section 411.355.

The College of American Pathologists is pleased to have the opportunity to comment on these regulations and appreciates your consideration of these comments. Any questions regarding proposed changes should be directed to Donna Meyer at 202-354-7112 (dmeyer@cap.org).

Sincerely,

*Thomas Sodeman MD FCAP*

Thomas M. Sodeman, MD, FCAP
President

Cc:    Lisa M. Ohrin, JD, Centers for Medicare and Medicaid Services
       Don Romano, Centers for Medicare and Medicaid Services
       David Walczak, Centers for Medicare and Medicaid Services

C

1 of 100 DOCUMENTS

Copyright 2005 Factiva, a Dow Jones and Reuters Company
All Rights Reserved



**factiva**

(Copyright (c) 2005, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL.

The Wall Street Journal

September 30, 2005 Friday

**SECTION:** Pg. A1

**LENGTH:** 2726 words

**HEADLINE:** Lucrative Operation: How Some Doctors Turn a $90 Profit From a $17 Test --- Physician Groups Add Markup To Work Done by Others, Despite Ethics Concerns --- Administrative Costs Cited

**BYLINE:** By David Armstrong

**BODY:**

After her mother was diagnosed with skin cancer, Lori Hansen went to a local dermatologist in North Carolina to have her skin tested. When she got the results -- with a worrisome mention of "atypical" levels -- she was surprised to learn her doctor had sent the samples across the country to California.

Even more surprising: Her doctor stood to make nearly $200 on the test, she says. Ms. Hansen later learned her skin biopsies weren't abnormal. Also, the California testing center's owner had once directed a lab that the state called a threat to public health.

Arrangements such as the one between Ms. Hansen's North Carolina doctor and the California operation -- sometimes called referral deals -- are common in the more than $40 billion medical laboratory business.

It works like this: A doctor sends a patient sample to an outside lab for testing. The lab charges the doctor a discounted price -- say, $30 for a skin biopsy. The doctor then gets reimbursed by the patient's insurer for a much higher amount, say $100. The difference, $70, is profit for the doctor.

Typically the doctor doesn't tell the insurer that an outside lab did the work for a steep discount. Insurers could put a stop to the practice by refusing to pay the inflated reimbursement, but they are often unaware of the arrangements.

Critics say referral deals are harmful because doctors have an incentive to send work to the cheapest lab, not necessarily the best one, to maximize their profit margins. Also, by enticing doctors to order many tests, the arrangements drive up the nation's health-care bill.

"Patients should wonder if this dermatologist is doing this biopsy because I need it or he is going to make money from it," says Lisa Lerner, a Boston-area dermatopathologist.

While referral deals aren't new, people in the industry say they have grown rapidly in recent years as doctors seek new sources of income and demand grows for expensive lab work to detect diseases such as prostate cancer. "Five years ago, no one was interested in this," says Bernie Ness, the owner of a laboratory industry consulting firm in Toledo, Ohio. "That has changed dramatically. I get calls every week from people who want to get in on the billing."

One of the few private insurers to block doctors from profiting on outside lab work is Blue Cross Blue Shield of Georgia. Starting Aug. 1, it required those performing lab tests to do the billing themselves, a practice known as direct

Lucrative Operation: How Some Doctors Turn a $90 Profit From a $17 Test --- Physician Groups Add Markup To Work Done by Others, Despite Ethics Concerns --- Administrative Costs Cited The Wall Street J

billing. That eliminated deals where doctors bill for work they didn't perform. It isn't clear why other insurers don't do the same. Several of the biggest ones declined to comment.

Medicare requires direct billing, as do a few states. In some other states, doctors and local medical societies upset at the prospect of losing revenue have thwarted such legislation. Some doctors still bill Medicare for lab work performed off-site by owning "condo" labs within a larger facility.

The American Medical Association's code of ethics says under the heading of laboratory services that a "physician should not charge a markup, commission, or profit on the services rendered by others." It adds, however, that doctors can levy a processing charge on such services. The AMA code says that a doctor "who chooses a laboratory solely because it provides low-cost laboratory services on which the patient is charged a profit is not acting in the best interest of the patient."

Federal laws broadly prohibit doctors from receiving inducements for referrals or engaging in "self-dealing" -- referring patients for services in which they have a financial interest. Doctors and companies involved in lab referrals say what they do is legal. Companies say they're just offering a service for a price, and that doesn't add up to illegal inducement. In general doctors don't own a stake in the outside labs, which they say clears them of any charge of self-dealing. They say they're entitled to mark up work farmed out to a contractor to cover costs such as billing for the work and delivering results to patients.

Last year, the U.S. attorney in Oklahoma City indicted three former executives of a lab, UroCor Inc. The indictment says UroCor charged discount prices to doctors who turned around and billed private insurance companies at a much higher rate for the lab work. Doctors were charged as little as $2.75 for a common analysis to detect prostate cancer, called the PSA test, and got reimbursement of $25 and up, the indictment says. It says the discount was a kickback to induce the doctors to also refer work covered by Medicare, which was billed directly by the lab.

UroCor is now a division of Laboratory Corp. of America Holdings, known as LabCorp. The illegal activity alleged in the indictment occurred before UroCor was sold and none of the three executives named in the indictment still work for UroCor, according to LabCorp. The case is scheduled for trial next June. The executives have denied wrongdoing.

The Oklahoma case is an exception. Most of the referral arrangements never get authorities' attention.

In 2004 LabCorp gave a Tennessee dermatologist a document marked "confidential special client fees." It said LabCorp would charge the doctor $30 to analyze a skin biopsy. Blue Cross Blue Shield of Tennessee says it reimburses an average of $109 per biopsy interpretation. That would allow the doctor to realize a profit of 263%. Fees for other lab services on the document allowed for a markup of more than 700%.

LabCorp Executive Vice President Bradford T. Smith says the company has a policy of not discussing specific billing arrangements. He says another case in which a Nashville doctor group was charged only $17 for a biopsy analysis appears to be an "outlier." That doctor group could yield a profit of more than $90. About 10% of LabCorp's business comes from "client billing," or arrangements in which LabCorp bills the doctor and the doctor then bills the patient or an insurer, Mr. Smith says.

LabCorp, with sales of $3 billion last year, is the country's second-largest lab company. The biggest is Quest Diagnostics Inc. of Lyndhurst, N.J., with revenue of $5.1 billion last year. Quest says client billing accounts for 6% to 7% of its revenue.

At a recent conference of the American Urological Association in San Antonio, doctors took seats at the exhibition booth of Lakewood Pathology Associates of Lakewood, N.J., as the firm touted its "revenue share" model. If urologists send their tests to Lakewood, the company's marketing director said, they could generate up to $35,000 per year. Lakewood's chief executive, Raza Bokhari, says the lab is careful to obey federal laws barring kickbacks to doctors, in part by making sure that doctors don't get a discount based on the volume of referrals.

Some of the labs engaged in client billing say they have no choice. "A lot of labs do it and if you got out of it the other guys will take you to the cleaners," says Clay Cockerell, a Dallas dermatopathologist who is on the board of Ameripath Inc., a national lab based in Palm Beach Gardens, Fla.

Dr. Cockerell, who is also the president of the American Academy of Dermatology, concedes the practice raises ethical issues. "Is the physician billing for it the one looking at the slide? No," he says. "From that perspective, does it totally pass the smell test? Maybe not."

Lucrative Operation: How Some Doctors Turn a $90 Profit From a $17 Test --- Physician Groups Add Markup To Work Done by Others, Despite Ethics Concerns --- Administrative Costs Cited The Wall Street J

Several studies have shown physicians are more likely to order services for patients if they have a financial incentive. A 1993 study compared states where doctors are allowed to bill for outside lab work and states where they aren't. It found doctors in the former ordered 28% more tests. The study was conducted by the Center for Health Policy Studies, a consulting group, for the American Clinical Laboratory Association, an industry group.

The study's author, economist Zachary Dyckman, says he would expect the same results today. The extra testing, he says, "appears to be done exclusively to earn more revenue and increase profits."

Ms. Hansen, the North Carolinian who was worried about skin cancer, had her skin biopsies analyzed by National Dermatopathology Laboratory of Lake Balboa, Calif. Ms. Hansen, of Cary, N.C., says she asked a local pathologist, Keith Nance, to review her biopsies after hearing that they were "atypical." Dr. Nance found no abnormalities.

Dr. Nance, who considers client billing unethical and pushed an unsuccessful effort to ban the practice in North Carolina, urged her to report the situation to the state medical board and helped write a complaint. He helped her find out how much the California lab was charging doctors by contacting the lab and pretending to be a potential customer.

In her October 2003 complaint to the medical board, Ms. Hansen cites an email in which National Dermatopathology quoted Dr. Nance a rate of $35 to analyze a biopsy. Ms. Hansen, who had four biopsies analyzed, says in the complaint that the lab must have charged her dermatologist, William Ketcham, no more than $140 for her lab work. Insurance records show Dr. Ketcham was paid $328 for the work by her insurance company.

Dr. Ketcham declined to discuss dollar figures but says his deals with labs are appropriate and don't cost patients anything. He says paperwork is easier when he doesn't have to exchange patient information with the lab. The North Carolina Medical Society has said that "markups are a legitimate business practice" for lab services.

Dr. Ketcham says he has stopped using National Dermatopathology because the state medical board told him he must send his biopsies to pathologists licensed by North Carolina. The board took no disciplinary action against Dr. Ketcham. He now sends his lab work to Dermatopathology Laboratory of Central States in Dayton, Ohio.

Central States won't say what it charges doctors for lab work. But a 2003 fee schedule from the lab states that doctors were charged $25 for the first biopsy and $15 for each additional specimen. The same fee schedule indicates that when Central States billed insurers directly for biopsy interpretations it charged a rate of $95.

The owner of National Dermatopathology Laboratory, Cyrus Milani, was banned from performing certain laboratory work by the state of California in 1989 after state officials accused a lab he directed of operating "in a manner which poses a threat of injury to public health." The state said the lab had an error rate of 21.2%.

Dr. Milani says the charges were "totally false." He acknowledged a settlement barred him from serving as medical director of any lab conducting pap smear tests "for a year or two." California authorities couldn't find a copy of the settlement.

For several years after the ban, Dr. Milani says he had "a very meager income." Even now, he says, his life is one of "simple living." Los Angeles County real-estate records show him as the owner of a home assessed at $4.1 million on the same street in Bel Air where the actress Elizabeth Taylor lives.

According to a court filing, the pathologist who analyzed Ms. Hansen's biopsies was Hong Li, who worked at National Dermatopathology between July and December 2003. Dr. Milani is suing Dr. Li, accusing her of breaking a one-year employment contract. In the court filing, Dr. Li says her daily volume "far exceeded the generally accepted workload" in her specialty and "directly affected the quality of patient care." She says she quit from fatigue. Dr. Milani says Dr. Li's allegations are false.

Although Medicare refuses to pay doctors for work performed by others, some companies have figured out a way to let doctors bill Medicare for off-site lab work. It involves doctor groups creating a "condo" or "pod" lab within a building that also houses labs for many other practices. Since the doctors own their "condo" lab, they believe they can bill Medicare for work performed there.

One such facility is operated by Uropath LLC at a medical office building in San Antonio. The door of the building lists the names of 15 urology practices from as far away as Missouri. Inside, there is a long hallway with a series of doors that open into small rooms with labels such as "Lab F -- Urologic Associates of South Texas." Technicians and pathologists in white lab coats move in and out of the small rooms conducting tests.

Lucrative Operation: How Some Doctors Turn a $90 Profit From a $17 Test --- Physician Groups Add Markup To Work Done by Others, Despite Ethics Concerns --- Administrative Costs Cited The Wall Street J

Each doctor group buys the microscope and other supplies used in its lab. Uropath is paid a management fee by the doctor groups and is reimbursed for rent, personnel costs and other expenses. The doctor groups pay pathologists for their work on a per-case basis. The doctor group does all of the insurance billing, including for patients on Medicare.

The inspector general for the U.S. Department of Health and Human Services evaluated a somewhat different condo arrangement last December. In that case, the lab company provided the pathologists and equipment while receiving a monthly management fee from the referring doctors, who did the billing and kept any profit. The inspector general said the deal could constitute a violation of antikickback laws since the lab company was giving the doctors an opportunity for near-certain profits in exchange for the business.

A lawyer for Uropath, Greg Cardenas, says the company has carefully constructed its dealings with doctor groups to comply with federal laws including the antikickback law.

Another company offering doctors a chance to profit from lab work for both Medicare and privately insured patients is PathOptions of Hollywood, Fla. It solicited business from Edward Coles, a gastroenterologist in New Braunfels, Texas, saying he could bill insurance companies for four times what tests cost him. A financial "snapshot" attached to the letter claimed Dr. Coles could boost revenue for his small practice by a quarter million dollars. Dr. Coles says the proposal "didn't sound kosher" and he declined to participate.

But dozens of other doctors have signed up with PathOptions, says company co-founder Daniel Karten. Mr. Karten says lawyers have reviewed the company's model to make sure it is legal.

Getting a cut of lab revenue is attractive to gastroenterologists, who specialize in stomach and intestinal diseases. One of their cash cows used to be endoscopy, in which the doctor puts a tube down the patient's throat to examine the digestive tract, but Medicare reimbursement for that procedure fell more than 50% in the five-year period ended in 2002, according to a government study.

At an April 2004 seminar in Knoxville, Tenn., sponsored by the American Society for Gastrointestinal Endoscopy, gastroenterologist Bergein Overholt began with a review of reimbursement cuts before dangling some big numbers in front of the audience.

Dr. Overholt showed how his practice of 12 doctors, Gastrointestinal Associates in Knoxville, netted $643,000 by sending its lab work to GI Pathology Partners in Memphis, Tenn. According to information presented at the seminar, Dr. Overholt's group paid $52.55 to GI Pathology Partners for each biopsy the lab examined and then billed insurance companies an average of $94.55 for the work.

Dr. Overholt has presented the material at similar seminars, including some underwritten by GI Pathology Partners. He says he typically receives a $1,000 honorarium for such talks. Dr. Overholt was among those who fought a bill in Tennessee last year to ban client billing. The legislature eventually approved a watered-down measure.

In an interview, Dr. Overholt says the $643,000 figure he cited at the 2004 meeting doesn't include "significant administrative" costs in billing patients and losses from patients who don't pay. He says the profit to his practice from billing on lab work is about 10% to 20%.

GI Pathology Partners says it does work for doctors in 14 states. Pat Dean, a pathologist and lab co-founder, says his company has a "business model of focused, factory efficiency," which along with client billing has "been a real boon for us."

Some doctors who send lab work to Dr. Dean, however, eschew client billing.

"We are a little old-fashioned," says one of them, Michael Freeman of Cape Girardeau, Mo. "It's one of those ethical things. Pat is doing the work. We just assume that Pat does the billing."

(See related letters: "Letters to the Editor: When Pathology Work Becomes Too Profitable" -- WSJ Oct. 18, 2005)

Lucrative Operation: How Some Doctors Turn a $90 Profit From a $17 Test --- Physician Groups Add Markup To
Work Done by Others, Despite Ethics Concerns --- Administrative Costs Cited The Wall Street J





**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** October 18, 2005

D

CMS-1385-P-13656

| | | |
|---|---|---|
| **Submitter :** | **Dr. GREGORY SKARULIS** | Date: 08/31/2007 |
| **Organization :** | **MANATEE PATHOLOGY ASSOCIATES** | |
| **Category :** | **Physician** | |

**Issue Areas/Comments**

### Physician Self-Referral Provisions

Physician Self-Referral Provisions

I am a board-certified pathologist and member of the College of American Pathologists. I practice in Bradenton,Florida and am the Medical Director for two hospitals Manatee Memorial Hospital and Lakewood Ranch Medical Center. Our group consists of three pathologists with two more soon to be added. The current self-referral abuses in the billing and payment of pathology services is directly adversley affecting our ability to continue to practice and find qualified pathologists. I am aware of arrangements in my practice area that give physician groups a share of the revenues from pathology services ordered and performed for the group's patients. I believe these arrangements are an abuse of the Stark law prohibition against physician self referrals and I support the revisions to close the loopholes that allow physicians to profit from patholgy services that pathologists have spent so much investment in time and education to achive and perfect.

Specifically I support the expansion of the anti-markup rule to purchased pathology interpretations and the exclusion of anatomic pathology from the in-office ancillary services exception to the Stark law. These revisions to the Medicare reassignment rule and physician self-referral provisions are necessary to eliminate financial self-interest in clinical decision making. I believe that
physicians should not be able to profit from the providing of pathology services unless the physician is capable of personally performing or directly supervising the service.

In addition to providing hospital based pathology services our group provides independent pathology services to several outpatient facilities and physician's ofices. Earlier this year, we were approached by a small group of gastroenterologists for whom we provided significant anatomic pathology services. The gastroenterologists informed us that they had begun negotiations with a company called EndoSoft to institute, among other things, electronic medical records (EMR) for their office and soon-to-be-opened outpatient surgery/endoscopy center. On EndoSoft's recommendation, the gastroenterologists then offered us the opportunity to pay 85% of the installation costs and yearly maintenance fees for their EMR hardware and software, in return for our keeping their anatomic pathology business. Considering the financial impact ($50,000.00 initially, followed by $4,000.00 yearly) and the legal ramifications (our lawyer interpreted this practice as a "kick-back"), we chose to not participate in these proceedings. Since then, we receive no specimens from these physicians from their outpatient surgery/endoscopy center. The estimated loss to our practice is $70,000.00 annually. Last week, a separate gastroenterologist called me personally to warn me that word of this has spread and that we should be prepared for other gastroenterology groups, including his, to follow suit. All of this is due to their own lowering rate of reimbursement for procedures performed by them.

In closing how is a practicing Pathologist supposed to encourage young physicians to spend years of training and sacrifice to enter a specialty which is continually being eroded by governmental laws which allow other specialties to pick and choose how they can infringe on Pathologist's practices without proper training, experience,or responsibility. The future looks bleak for the practicing private pathologist if the government continues to refuse to acknowledge the high degree of training and responsibility which pathologists provide behind the scenes of medicine.

Sincerely,

Gregory J. Skarulis MD
Medical Director,Manatee Pathology Associates
Bradenton,Florida