IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ATLANTIC UROLOGICAL ASSOCIATES, P.A.; SAM MICHAELS, M.D.; REBECCA PAGE; UROLOGY CARE, INC.; UROLOGY CENTER OF ALABAMA, P.C.; and UROPATH, LLC,<br><br>    Plaintiffs,<br><br>    v.<br><br>MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Services,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 1:08-cv-00141-RMC<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' REPLY TO COLLEGE OF
<u>AMERICAN PATHOLOGISTS <i>AMICUS CURIAE</i> BRIEF</u>**

On March 21, 2008, the College of American Pathologists ("CAP") filed an <u>amicus curiae</u> brief ("CAP Br.") in support of the Secretary's Motion to Dismiss. In Plaintiffs' Motion for Reconsideration of Order Granting Leave to File <u>Amicus Curiae</u> Brief ("Mtn. Reconsider") Plaintiffs pointed out that CAP's arguments were entirely irrelevant to the issues raised by the Motion to Dismiss. On March 28, 2008, CAP responded that its brief was filed also in support of the Secretary's Opposition to the Plaintiffs' Application for a Preliminary Injunction. Because the preliminary injunction was granted by the Court by order dated March 31, 2008, CAP's <u>amicus curiae</u> brief is irrelevant to any motion remaining before this Court.

Even though the CAP brief is now plainly irrelevant, it contains a number of erroneous arguments and statements regarding physician owned anatomic pathology laboratories, and in particular regarding labs that are managed by Uropath, such as those owned by the Plaintiff Physician Groups in this case. At the hearing on March 28, 2008, the Court granted Plaintiffs the

opportunity to respond to the CAP Brief's arguments. Accordingly, Plaintiffs will address some of the erroneous points raised by CAP, even though they are not pertinent to the matters presently before the Court.

## ARGUMENT

I.  THE ARGUMENT THAT "CENTRALIZED BUILDING" ARRANGEMENTS FOR ANATOMIC PATHOLOGY SERVICES DO NOT COMPLY WITH THE "INTENT" OF THE IN-OFFICE ANCILLARY SERVICES EXCEPTION TO THE STARK LAW IS BOTH IRRELEVANT AND ERRONEOUS.

Because the Court has granted a preliminary injunction in this case, the only motion presently pending is the Defendant's Motion to Dismiss. That Motion raises issues of jurisdiction, standing, and the legal sufficiency of Plaintiffs' allegations in their Complaint. See especially Counts I-VI of Plaintiffs' Compl., and Compl. at 42-44.

The CAP brief does not address any of these issues. It does not discuss jurisdiction or standing, and does not address the substantive merits of the six legal theories set forth by Plaintiffs in their Complaint. Instead, it relies largely on unsupported assertions, and citation to matters outside the pleadings (including the Administrative Record – see below).

A court may not grant a motion to dismiss under Rule 12(b)(6) unless "it meets the stringent standard for dismissal without regard to matters outside the pleadings[.]" Gordon v. Nat'l Youth Work Alliance, 675 F.2d 356, 361 (D.C. Cir. 1982). A motion to dismiss cannot be granted "unless it appears beyond doubt that a plaintiff will be unable to prove any set of facts that support his claim entitling him to relief." Tabb v. District of Columbia, 477 F. Supp. 2d 185, 188 (D.D.C. 2007). "In deciding a motion to dismiss for failure to state a claim, of course, the Court is limited to the four corners of the complaint." Id. at 187.

Plaintiffs mention this because they are placed in the unusual position of responding to a brief that is not only irrelevant to the issues presented by the pending Motion to Dismiss, but also

relies on evidence outside the four corners of the Complaint, including entirely unsupported factual allegations.

As this Court is aware, administrative law cases are generally decided on their merits on motions for summary judgment. Plaintiffs have abstained from citing to the Administrative Record in their Opposition to Defendant's Motion to Dismiss, in adherence to that principle, because such evidence is not within the four corners of the Complaint.

On the day that this Response is being filed, Defendant has served on Plaintiffs a "Supplemental Rulemaking Record" which for the first time presents to Plaintiffs and this Court the "informal comments" on which Defendant allegedly based the January 2008 Final Rule. Obviously, neither side has had the opportunity to brief whether that supplemental record supports the agency's actions taken in the January 3, 2008 Final Rule.[1]

Therefore, although Plaintiffs must necessarily refer to certain factual evidence in responding to the CAP Brief, by this response to an amicus brief Plaintiffs most emphatically do not consent to turn the Motion to Dismiss into a Motion for Summary Judgment. See Plaintiffs' Opposition to Defendant's Motion to Dismiss and Reply to Defendant's Opposition to Application for Preliminary Injunction at n.11.

Turning to the substance of CAP's contentions, CAP offers its view that when anatomic pathology diagnostic testing services are provided in a centralized building such arrangements are not consistent with the "intent" of the Stark Law. CAP is entitled to its views as to the intent of Congress. However, the language of the statute itself is the best, most reliable, and indeed conclusive expression of Congress' intent. See Holloway v. United States, 526 U.S. 1, 6 (1999). Congress, and CMS through regulations implementing the Stark Law, have clearly permitted the provision of anatomic pathology diagnostic testing services in a centralized building, such as has

---

[1] Nor, as noted, has Plaintiff done so with respect to the rulemaking record for the November 2007 rule.

been done by the Plaintiff Physician Groups and other physician groups with Uropath-managed laboratories. 42 U.S.C. § 1395nn(b)(2)(A); 42 C.F.R. § 411.355(b)(2)(iii).

Most importantly, the compliance by the Plaintiff Physician Groups and other Uropath-managed labs with either the express provisions of the Stark Law and implementing regulations, or with the "intent" of the Stark Law, are not questions that this Court is called upon to decide. They are not raised by the pleadings, and are not before the Court. Hence, CAP's views on these issues are not pertinent to this lawsuit.

CAP argues that without the anti-markup provision, physician groups will continue to utilize Uropath-managed laboratories "that continue to permit referring physicians to profit from their referrals." See CAP Br. at 8. What CAP fails to acknowledge is that the Stark Law expressly permits many types of referrals from which physicians benefit, including all ancillary services which satisfy the requirements of the in-office ancillary services exception. Congress has determined which referrals should be permitted, and CAP's views, differing as they do from Congress's view, carry little weight.

First, it should be noted that Congress defined the exception's scope: the in-office ancillary services exception covers all designated health services under Stark. The exception is not, as CAP implies, limited to pathology services, see CAP Br. at 3, although anatomic pathology services clearly fall within its terms. See 42 U.S.C. § 1395nn(b)(2)(A). If Congress intended to exclude anatomic pathology services from the exception, it would have done so. It did not.

CAP believes it "is necessary to completely exclude anatomic pathology services from the in-office ancillary services exception . . ." CAP Br. at 8. In its comments to the 2008 Physician Fee Schedule regulations, CAP indeed urged CMS to exclude <u>all</u> anatomic pathology

services from the in-office ancillary services exception.  See CAP Br. at 8 (quoting CAP Comments on 2008 Physician Fee Schedule at 1-2).  In other words, CAP does not want any physician group to have an anatomic pathology laboratory, whether or not that laboratory is located centrally, in the same building as the physician group, or within the physician's main office space itself.  It is doubtless true that many of CAP's members would like to avoid competition from efficient, high quality, physician-owned pathology labs.  But CAP's quarrel in this regard is with Congress, and certainly has nothing to do with the issues before this Court.

CAP would like to distinguish between clinical laboratory services and anatomic pathology services (requiring the services of its members), and states that anatomic pathology services "are not the type of services intended to be protected under the in-office ancillary services exception."  CAP Br. at 11.  Once again, CAP should address its concerns to Congress, not this Court.

CAP's assertions that provision of anatomic pathology services in a centralized building are "abusive" because the centralized building is not located in or near a physician's main office are similarly misplaced.  Nothing in the Stark Law requires that a "centralized building" be in any certain place or within any certain distance from the physician group's primary practice location.  See 42 U.S.C. § 1395nn(b)(2); 42 C.F.R. § 411.351.  And, as noted in the Declaration of Ken Flowers, it is not at all unusual for laboratory samples to be sent across state lines to national reference laboratories to be processed and interpreted by pathologists.  See Flowers Decl. ¶ 25.  If Congress had intended that there be a specific distance limit on services furnished in a centralized building, it would have specified such a limit.  It didn't.

CAP misconstrues the language of the Stark Law by contending that the statute grants the Secretary the power to "impose further conditions on in-office ancillary laboratories."  CAP Br.

at 11.  42 U.S.C. § 1395nn(b)(2)(B).  The Stark Law does not contain any such grant of power.  In fact, it specifically provides that the Secretary may <u>expand</u> the in-office ancillary services exception upon a determination that there are "other terms and conditions under which the provision of such services does <u>not</u> present a risk of program or patient abuse."  42 U.S.C. § 1395nn(b)(2)(A) (emphasis added).  The Law does not contain a parallel provision that would allow the Secretary to <u>limit</u> the scope of the exception.

The provision quoted by CAP on page 11 of its brief, 42 U.S.C. § 1395nn(b)(2)(B), does not grant the Secretary power to amend or limit the in-office ancillary services exception's location requirement.  The statute provides that the self-referral prohibition shall not apply to in-office ancillary services that are billed "by an entity that is wholly owned by such physician or such group practice" as long as "the <u>ownership</u> or <u>investment</u> interest in such services meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse." (emphasis added).  By its own terms, that provision permits the Secretary to prescribe additional requirements relating to the "ownership or investment interest" necessary to satisfy the in-office ancillary services exception when the services are billed by the wholly-owned entity.  This provision is wholly unrelated to the in-office ancillary services' location requirement, and does not provide the Secretary with the authority to use the anti-markup rule to prevent services from being performed in a "centralized building."

The in-office ancillary services exception has been part of the Stark Law since its enactment.  42 U.S.C. § 1395nn(b)(2)(A).  It is mandatory in its terms:  the prohibition on referrals "<u>shall not apply</u>" if the terms of the exception are met. 42 U.S.C. § 1395nn(b)(2).  The exception is one of only three exceptions specified in the Stark Law that applies to both ownership and compensation arrangements.  <u>See</u> Comments of U.S. Oncology, Admin. R. at 600

(discussing the history of the Stark Law).  According to articles written by individuals serving as Inspector General of the Department of Health and Human Services and Chief Counsel to the Office of the Inspector General at the time the Stark Law was enacted, and who were personally involved in developing the legislation, Congress deliberately included provisions that would give physicians latitude to furnish ancillary services as they saw fit.  The in-office ancillary services exception was meant to ensure that physicians could determine how best to provide care and to permit Medicare beneficiaries to receive the most efficient and effective services.  See id. at 600-601, n. 16 (citing Richard P. Kusserow and Harvey A. Yampolsky, The Stark Law: Using Its History to Craft Its Future, J. of Health Care Compliance, vol. 7, at 5-12 (Nov. 2005) and Kusserow and Yampolsky, A Look Back at the Origin of the Stark Self-Referral Law, J. of Health Care Compliance, vol. 7, at 51-52, 81-82 (Nov. 2005)).  Plaintiffs have already demonstrated that Uropath-managed laboratories create efficiencies and benefits that are in the best interests of patients.  See, e.g., Compl. at ¶¶ 48-51; Pl. P.I. Br. at 6-8, Exs. 3-6, 8-9, 24.

## II. THERE IS NO EVIDENCE OF OVERUTILIZATION OF PATHOLOGY SERVICES BY UROPATH-MANAGED LABORATORIES.

CAP begins by quoting CMS's statement that "studies have shown that, in the aggregate, utilization of diagnostic tests increases in the case of physician self-referral."  CAP Br. at 13 (quoting 72 Fed. Reg. 66,222, 66,313).  Regardless of whether that statement is true, it is irrelevant in light of Congress' mandated exception for all in-office ancillary services that satisfy 42 U.S.C. § 1395nn(b)(2), including anatomic pathology diagnostic testing services such as those performed in Uropath-managed labs.  Moreover, a statement that self-referrals lead to overutilization of all diagnostic tests provides no basis to single out anatomic pathology testing services conducted in centralized buildings.

Contrary to CAP's apparent belief, Plaintiffs are not obligated to provide evidence that they do <u>not</u> overutilize services. The Secretary's Final Rule applied the revised anti-markup rule only to anatomic pathology, and it was CMS's duty to provide a sufficient, properly-supported explanation of its regulatory actions. <u>See</u> Compl. at ¶¶ 75-78, 83-85, 104-107, 113, 119-123, 129-134.

CAP's review of the three OIG reports conducted on Uropath-managed laboratories gets the findings of those reports exactly backwards. When the Office of Inspector General, together with a Medicare Program Safeguard contractor (whose very purpose is to find overutilization, unnecessary services, or other program abuse) conducted audits they found that the rate of medical necessity of the prostate biopsies performed by these three physician groups was astonishingly high. For Atlantic Urological Associates, a Plaintiff in this case, the OIG selected a random sample of 100 Medicare claims that had been paid during calendar year 2004, after establishment of AUA's Uropath-managed lab. The OIG found that medical necessity was established for 96 of the 100 sample claims, and that for four claims it could not "rule out" the appropriateness of the biopsy, and therefore did not recommend that these claims be denied. <u>See</u> Exhibit 11.

For Florida Urology Physicians, P.A., 51 claims were examined to determine "whether the pathology services billed for were reasonable, necessary, and in accordance with Medicare Part B requirements." The OIG report found that medical necessity for the biopsy procedure was established for 100 percent of the 51 claims reviewed. <u>See</u> Exhibit 12.

An audit at Urology Tyler, P.A., by the OIG found that the physician group's "claims for pathology laboratory services generally complied with Medicare Part B medical necessity and documentation requirements for 99 of 100 reviewed claims." The sole exception was for a claim

that was improperly billed and paid due to a clerical error which was corrected during the audit. See Exhibit 13.

Ignoring these extraordinary high levels of medical necessity found, CAP attempts to make an issue out of the number of units billed per patient. However, as explained in the Declaration of Michael Grable, MD, the average number of cores taken per patient has been increasing from a six core standard to a twelve core standard, and that change was taking place around the time of these audits. See Exhibit 9. The OIG reports state that there were no "national standards or local coverage determinations for the number of tissue samples that are to be obtained . . . ." See Exhibit 11, p. 4. The OIG noted that, in the case of AUA, the practice "had increased the number of tissue examination requests from earlier years in an attempt to more fully meet the needs of its patients." The OIG further noted that the practice had provided medical literature to support the contention that an increased number of tissue examinations may improve patient outcomes. See Exhibit 11.

In fact, medical literature submitted in this case shows that the twelve core standard is now widely accepted in urology practice. Grable Decl. ¶ 13; Pl. P.I. Br. At Exs. 15, 19, 20.

Accordingly in each case, the OIG made no finding of overutilization or improper billing, and for all three groups the OIG reports contained "no recommendations."

CAP spends a great deal of time discussing the number of specimens per patient processed by Uropath. As indicated in the OIG audit reports and borne out by medical literature, the number of "cores" typically taken from each patient during a prostate biopsy has increased greatly in recent years. See Pl. P.I. Br. at Exs. 11-13, 15, 17-20. However, for each group the average number of specimens per patient was less than twelve, even though a twelve-core biopsy was the recognized industry standard.

CAP urges that the groups utilizing Uropath-managed laboratories should have combined each core sample from the same patient into a single specimen. See CAP Br. at 16. It is entirely possible that some of the other providers whose numbers were reflected in the OIG audit reports followed such a practice, thereby decreasing significantly their "average units of CPT 88305" per patient. However, the better medical practice is to separately store and label each core from the same patient as a single specimen. When the pathologist is able to determine which core specimen is which, and from which specific area in the prostate it was taken, he or she has a far greater ability to pinpoint the location of any cancer detected. By keeping each core from a single patient as a separate specimen, the physicians maximize the ability to detect cancer and help their patients. This better medical practice is supported by the American Medical Association's Principles of CPT Coding, which state that a specimen is tissue "submitted for individual and separate attention, requiring individual examination and pathologic diagnosis. Two or more such specimens from the same patient . . . are each appropriately assigned an individual code reflective of its proper level of service." AMA Principles of CPT Coding (CPT 2008) at 369.

Whether there was any change in the manner of labeling specimens is not reflected in the GAO studies. However, if Uropath-managed laboratories processed a higher number of specimens per patient it does not mean that the physicians were overutilizing CPT 88305, as CAP would have it. That may be indicative, if anything, of a higher standard of practice.

CAP attempts to dismiss the evidence in Exhibit 22 to the Plaintiffs' Application for a Preliminary Injunction, which shows that the percentage of patients biopsied by physician groups who opened Uropath-managed laboratories slightly decreased from the period before the groups opened their labs. See Pl. P.I. Br. at Ex. 22; see also id. at Ex. 24, Page Decl. at ¶¶ 9-11.

However, CAP's only criticisms are that the study, conducted by Plaintiff Rebecca Page on behalf of Uropath, did not include numbers for more of the physician practices using Uropath-managed laboratories, and that the study did not look at the total number of specimens per patient. See CAP Br. at 17.

As Rebecca Page explained in her Declaration, data was sought from all fifty-two physician groups. See Page Decl. at ¶ 9. Fourteen groups responded. The numbers obtained from the practice groups able to participate clearly showed that the percentage of patients biopsied in the year prior to the groups' opening of their labs was 2.53%, while the percentage of patients biopsied after these same groups opened Uropath-managed laboratories was only 2.15%. Id. at ¶ 11. That is significant evidence of lack of overutilization – and Uropath is not required to perform studies that CAP may wish for, after the fact.

CAP also tries to discount the two studies discussed in Dr. Michael Grable's declaration. These studies, conducted at the Urology Associates of North Texas ("UANT") and Urology San Antonio, respectively, also reveal that the overall number of biopsies performed by physician groups decreased after the groups opened Uropath-managed laboratories. At UANT, the ratio of biopsies performed to the number of men over the age of fifty seen by the physician group dropped from 16.46% in the year before the large practice opened its Uropath-managed lab to just 14.46% in 2003, the first year that the group owned its laboratory. In the following three years the ratio went down even more, to 11.19% in 2004, 9.25% in 2005, and 10.50% in 2006. See Pl. P.I. Br. at Ex. 23; see also id. at Ex. 9, Grable Decl. at ¶ 19. At Urology San Antonio, the biopsy rate per 1000 patients declined from 32.70 in 2002, the last year before the practice opened its Uropath-managed lab, to 27.93 in 2003, the year when the practice opened its lab, to 21.36 in 2006. In each year since opening its laboratory, the group's biopsy rate has remained

lower than its rates in the years prior to opening its lab.  See id. at Ex. 23; see also Grable Decl. at ¶ 20.  Once again, this is significant evidence, whereas CAP offers nothing but speculation in return.

In addition, evidence provided by Plaintiffs shows that the practices using Uropath-managed laboratories have a higher percentage of biopsy results that are positive for cancer.  See Pl. P.I. Br. at Ex. 21; Compl. at ¶ 93(a).  The study in Plaintiffs' Exhibit 21 includes statistics for all of the Uropath-managed laboratories in existence at the time of the study.  Across every physician group using a Uropath-managed lab, the positive rate for cancer in the biopsies performed was 40.90%.  See Pl. P.I. Br. at Ex. 21.  The national average is in the low- to mid-thirties.  See id. at Ex. 3, Grable Decl. at ¶ 11; Compl. at ¶ 93(a).  Far from showing overutilization, this data demonstrates that the physician groups with Uropath-managed labs are conservative and accurate in determining which patients should be biopsied.

CAP also points to the Plaintiffs' supposed failure to provide adequate evidence regarding special stains.  See CAP Br. at 18-19.  As already discussed, the Plaintiffs were not required to provide any evidence related to utilization.  However, the fact that the special stain rate was extraordinarily low in Uropath-managed laboratories is yet another indication that the pathologists working with Plaintiff physician groups are highly specialized and able to provide more efficient services.  The pathologists in Sarasota, the location CAP highlights as having a higher special stain rate, were general pathologists (like those in the outside laboratories favored by CAP).  They had not yet developed the same level of expertise and efficiency found in other Uropath-managed laboratories.

Any disputes regarding whether there was an adequate basis for CMS's regulatory actions will be determined after briefing on the evidence contained in the administrative record.

CAP's attempts to place the burden on Plaintiffs to show a lack of overutilization are unwarranted on the Motion to Dismiss.

### III. CAP'S ARGUMENT THAT IMMEDIATE IMPLEMENTATION OF THE REVISED ANTI-MARKUP RULE IS NECESSARY IS MOOT.

The Court has determined, by granting a preliminary injunction, that immediate implementation of the anti-markup rule is not necessary. CAP's contention to the contrary is now moot.

April 4, 2008                                  Respectfully submitted,

                                               FULBRIGHT & JAWORSKI, L.L.P.


                                               /s/ Dan M. Peterson
                                               Dan M. Peterson
                                               D.C. Bar No. 418360
                                               Ashley E. Seuell
                                               D.C. Bar No. 494170
                                               Caroline Mew
                                               D.C. Bar No. 467354
                                               801 Pennsylvania Avenue N.W.
                                               Washington, D.C. 20004
                                               Telephone:  (202) 662-0200
                                               Facsimile:  (202) 662-4643
                                               Attorneys for Plaintiffs

                                               Greg A. Cardenas
                                               Byrne, Cardenas & Smitherman, LLP
                                               5400 LBJ Freeway, Suite 1325
                                               Dallas, TX 75240
                                               Telephone:  (972) 371-5264
                                               Facsimile:  (972) 371-5270
                                               Of Counsel