IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
                                    )
ATLANTIC UROLOGICAL ASSOCIATES et al.,  )
                                    )
            Plaintiffs,             )
                                    )
      v.                            )   No. 08-CV-00141-RMC
                                    )
Michael O. Leavitt, as Secretary of )
United States Department of Health and )
Human Services,                     )
                                    )
            Defendant.              )
_____)

**MEMORANDUM OF *AMICUS* THE COLLEGE OF AMERICAN PATHOLOGISTS RESPONDING TO PLAINTIFFS' REPLY TO *AMICUS CURIAE* BRIEF**

*Amicus Curiae* the College of American Pathologists ("CAP") respectfully submits this response to Plaintiffs' April 4, 2008 reply to the CAP's *amicus brief*. CAP submitted its initial *amicus curiae* brief both in support of Defendant's opposition to Plaintiffs' motion for a preliminary injunction and in support of Defendant's motion to dismiss.

Contrary to Plaintiffs' assertion, the points raised by CAP are relevant to the resolution of the various matters at issue in this litigation. These include issues raised by Plaintiffs in their opposition to Defendant's motion to dismiss. Thus, CAP's *amicus* brief addresses "Plaintiffs' assertions in their opposition to Defendant's motion to dismiss concerning 'evidence regarding any alleged overutilization with respect to laboratories performing anatomic pathology diagnostic testing in centralized buildings.'" CAP's Mem. Responding to Pls.' Motion for Reconsideration at 2 (quoting Pls.'

Opposition to Defendant's Motion to Dismiss and Reply to Defendant's Opposition to Application for Preliminary Injunction at 15).

CAP's interest in participating as *amicus* is in promoting quality medicine free of the taint of self-referrals. CAP did not file its *amicus* brief out of economic self interest for itself or its members. CAP has members on both sides of the "pod laboratory" issue, including members who profit from their participation in pod laboratory arrangements. CAP supports the efforts of the Centers for Medicare and Medicaid Services ("CMS") to implement Stark Act limitations on pod labs in the interests of reducing the overutilization and self-referrals that the Stark Act was intended to stop.

CAP's *amicus* brief made three essential points. First, the pod laboratory arrangements established by Uropath do not comply with the requirements of the in-office ancillary services exception to the Stark Act. Second, referring physicians' financial relationships with pod labs leads to overutilization of pathology services. Third, immediate implementation of the revised anti-markup rule is necessary to address abusive pod laboratory arrangements.

Plaintiffs' reply claims that Congress passed an absolute exception for any facility that is "owned" by a physician practice, regardless of whether the facility is integrated into the practice, or is a facility in a distant state operated by Uropath. Plaintiffs suggest concerns regarding overutilization are "irrelevant in light of Congress' mandated exception for all in-office ancillary services that satisfy 42 U.S.C. § 1395nn(b)(2), including anatomic pathology diagnostic testing services such as those performed in Uropath-managed labs." (Pls.' Reply at 7.) Indeed, Plaintiffs seek to turn overutilization on its head. In Plaintiffs' view, more utilization is better.

Notably, Plaintiffs have no reply to CAP's fundamental criticism of the Uropath arrangements. These include:

- "The principal reason for the pod laboratories is financial: pods provide the referring urologists a financial stake in pathology services the urology groups order for their patients." (CAP Brief at 3.)

- "The pod laboratory concept attempts to evade the Stark Act prohibition on physician self-referrals to laboratory entities in which they have a financial interest." (CAP Brief at 3.)

- "[Pod laboratories] are not part of, or directly operated by, the practice that claims to own them." (CAP Brief at 6.)

- "[T]hese pod laboratories are turn-key operations set up and run by Uropath remotely from the ordering practice." (CAP Brief at 9.)

- "The physician groups do little, if anything, to operate and control the laboratory." (CAP Brief at 9.)

- "Most of these practices are located hundreds or even thousands of miles from the laboratory they claim as an in-office laboratory." (CAP Brief at 10.)

- "[L]abs located hundreds of miles away from a practice, frequently in a distant state, are not integrated into the practices in the way Congress contemplated when it created an exception under the Stark Act for 'in-office ancillary labs.'" (CAP Brief at 10.)

Rather, Plaintiffs argue that none of these criticisms are relevant. They contend that all that a physician group needs to do is claim the Uropath operation is part of the group practice, notwithstanding the total lack of indicia of practice control over the operation or integration of the lab into the group practice.

Thus, the principal difference between Plaintiffs and *amicus* CAP turns on whether the Stark Act in-office ancillary services exception is so broad as to swallow the whole Stark Act prohibition on self-referrals. CAP believes that to qualify for the in-office ancillary services exception, the lab must be in sufficient proximity to the practice and have direct practice control over every aspect of the lab. CAP's view, which is

3

consistent with CMS attempts to limit the abuses of pod labs, is amply supported by statutory language, subsequently promulgated regulations, and the Stark Act rulemaking record. As discussed below, Plaintiffs' argument is devoid of any reference to these interpretative guides, and, in all events, contrary to reasonable statutory interpretation.

**I. PLAINTIFFS' CLAIM THAT THE IN-OFFICE ANCILLARY SERVICES EXCEPTION COVERS UROPATH'S OPERATIONS IS DEMONSTRABLY FALSE.**

The thrust of Plaintiffs' argument is that the in-office ancillary services exception contained in the Stark Act provides an absolute prohibition on any CMS regulations limiting the operations of pod labs or the reimbursement paid to pod labs. The error of Plaintiffs' position is clearly demonstrated by the statutory language, regulatory language, and CMS's rulemaking record in adopting and modifying Stark Law regulations. Initially, the in-office ancillary services exception is only available if the operation is part of a "group practice." "Group practice" is defined in the statute as an entity which must meet a number of conditions, including "such other standards as the Secretary may impose by regulation." 42 U.S.C. §1395nn(h)(4)(vi).

The Secretary's regulation imposing additional standards on group practices is set forth at 42 C.F.R. § 411.352. That regulation suggests that "the States in which the group practice is operating are contiguous." 42 C.F.R. § 411.352 (a)(1). Clearly, most of the separate practices that have contracted with Uropath are not located either in the three states where Uropath operates (Florida, Texas and Pennsylvania) or contiguous to those states. Thus, Plaintiffs assertion that "[n]othing in the Stark law requires that a 'centralized building' be in any certain place or within any certain distance from the physician group's primary practice location" (Pls.' Reply Br. at

4

5) is simply wrong. While Plaintiff is correct that "it is not at all unusual for laboratory samples to be sent across state lines to national reference laboratories to be interpreted and processed by pathologists" (Pls.' Brief at 5), national reference laboratories are not owned by referring physicians. Samples sent across state lines for analysis should not be viewed as part of the same group practice, which is an essential requirement under the Stark Act's in-office ancillary services exception.

The extensive Stark Act regulatory record makes clear that clinical laboratories in centralized buildings located in states far removed from the physician group practice should not qualify as "in-office ancillary services." In the final rule to the in-office ancillary services exception regulations, CMS stated that

> [w]e regard the building requirement of the in-office ancillary services exception, in combination with the supervision and billing requirements, as the Congress's attempt to circumscribe the exception so that it applies only to services provided *within the referring physician's actual sphere of practice*. Without these requirements, physicians could refer to, and profit from, almost any entity, with the claim that somehow the referred services are 'in-office' services that are being supervised from some remote place.

Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships (final rule) 66 Fed. Reg. 856, 889 (Jan. 4, 2001) (emphasis added).

The Secretary's group practice regulation also requires "centralized decision-making by a body representative of the group practice that maintains effective control over the group's assets and liabilities (including, but not limited to, budgets, compensation, and salaries)." 42 C.F.R. § 411.352(f)(i). The urology practices that have delegated all of the management and control over the Uropath labs to Uropath clearly do not satisfy these requirements. Thus, whether the Uropath labs are located in

5

a "centralized building" or not, they clearly cannot be considered to be a part of the urology "group practices" that are claiming and billing for those services. The suggestion that the Stark Act in-office ancillary services exception provides a blanket exception that CMS cannot constrain with appropriate regulations simply is not credible.

The statutory provision establishing the in-office ancillary services exception also contains an express authorization for the Secretary to impose other restrictions on these arrangements. Thus, the statute permits the use of a centralized building for the exception "unless the Secretary determines other terms and conditions under which the provision of such services does not present a risk of program or patient abuse." 42 U.S.C. § 1395nn(b)(2)(A)(ii). This provision provides ample support for the Secretary's anti-markup regulation, notwithstanding the in-office ancillary services exception.

By promulgating regulations that limit centralized building in-office ancillary laboratories, the Secretary has emphasized the need for such operations to be *bona fide* portions of the sponsoring group practice. In the final rule for the Stark regulations on the in-office ancillary services exception, CMS stated that "[t]hese [centralized] building rules are designed to give physicians and group practices a meaningful opportunity to provide *bona fide* in-office ancillary DHS to their patients, while preventing group practices from using the in-office ancillary services exception to operate enterprises *that are functionally nothing more than self-referred DHS enterprises*…" 66 Fed. Reg. 856, 889 (emphasis added). Clearly, the Uropath arrangements are not *bona fide* portions of any of the urology practices. Accordingly,

they should not be protected by the in-offices ancillary services exception to the Stark Act.

Furthermore, the purpose of allowing physician groups to use a centralized building for providing in-office ancillary services was not intended to allow the in-office ancillary services exception to swallow the self-referral prohibition. CMS stated in an earlier final Stark rulemaking proceeding that the statutory provision allowing group practices to have off-site DHS locations in a centralized building "was intended to accommodate the concerns of group practices with multiple office locations that wanted to consolidate DHS operations for cost containment purposes. However, in permitting group practices to provide centralized DHS, the Congress did not intend to eviscerate the 'in-office' element of the exception." 66 Fed. Reg. 856, 888-89.

In sum, the regulation that Plaintiffs attack is clearly authorized by two separate provisions of the Stark Act that expressly give the Secretary the authority to promulgate more restrictive regulations. One provision is contained in the description of the in-office ancillary services exception. The other provision is contained in the definition of "group practice" which must be satisfied for the in-office ancillary services exception to apply. There simply is no basis for the argument that the Secretary's regulation being challenged by Plaintiffs is prohibited by the statute.

**II.  PLAINTIFFS' UTILIZATION ARGUMENTS DO NOT SUPPORT ANY INJUNCTION DELAYING THE EFFECTIVE DATE OF THE ANTI-MARKUP RULE.**

Plaintiffs' position with respect to utilization is, to say the least, inconsistent. At various places, Plaintiffs claim that: (1) concerns about utilization are "irrelevant in light of Congress' mandated exception for all in-office ancillary services"

7

(Pls.' Br. at 7); (2) "Plaintiffs are not obligated to provide evidence that they do not overutilize services" (Pls'. Br. at 8); (3) "the number of 'cores' typically taken from each patient during a prostate biopsy has increased greatly in recent years" (Pls.' Br. at 9); (4) a higher rate of utilization "may be indicative, if anything, of a higher standard of practice" (Pls.' Br. at 10); and (5) for a subset of 14 of the 52 Uropath practices, "the overall number of biopsies performed by physician groups decreased after the groups opened Uropath-managed laboratories" [with no mention of the number of specimens taken] (Pls.' Br. at 11).

What Plaintiffs do not and cannot dispute is that in each of the three OIG audit reports of Uropath laboratories, the OIG found that Medicare reimbursed the Uropath laboratory for substantially more tissue specimens examined per claim, on average, than it reimbursed other providers. *See* OIG Audit Reports[1], each at 4. The comparisons are depicted on the following chart.

---

[1] "OIG Audit Reports" refers collectively to the following three OIG Audit Reports of Uropath-affiliated practices: "Audit of Pathology Laboratory Services Claimed by Atlantic Urological Associates, P.A. for Calendar Year 2004," (A-04-05-03002) (June 28, 2007) (hereinafter "Atlantic OIG Report") available at http://oig.hhs.gov/oas/reports/region4/40503002.htm; "Audit of Pathology Laboratory Services Claimed by Florida Urology Physicians, P.A., for the Period September Through December 2004," (A-04-05-03005) (June 28, 2007) (hereinafter "Florida OIG Report"), available at http://oig.hhs.gov/oas/reports/region4/40503005.htm; "Review of Pathology Services Claimed by Urology Tyler, P.A., Tyler, Texas, From May Through December, 2004" (A-05-05-0037) (June 28, 2007) (hereinafter "Tyler OIG Report"), available at http://oig.hhs.gov/oas/reports/region5/50500037.htm.

8

**Table 1: Summary of Findings from OIG Audit Reports**

|  | Atlantic Urological Associates, P.A. | Florida Urology Physicians, P.A. | Urology Tyler, P.A. |
|---|---|---|---|
| Average units of CPT 88305 requested *before* opening its own laboratory and claiming reimbursement for services | 7.09 | 1.09 | 3.57 |
| Average units of CPT 88305 requested *after* opening its own laboratory and claiming reimbursement for services | 8.90 | 8.71 | 11.79 |
| Average units of CPT 88305 local Medicare carrier paid to all other providers | 5.40 | 5.50 | 5.26 |

Source: OIG Audit Reports

Plaintiffs do not dispute that the Secretary's rulemaking record leading up to the 2008 Medicare Physician Fee Schedule Final Rule, 72 Fed. Reg. 66,222 (Nov. 27, 2007) contained ample support regarding overutilization concerns, including but not limited to the comments cited in CAP's *amicus* brief. Indeed, the issue of self-referrals to pod labs was the subject of comments and proposals in the last several CMS annual Medicare Physician Fee Schedule rulemaking efforts. Nor do Plaintiffs provide any rationale why the Secretary cannot take all of that extensive rulemaking record into account in deciding not to delay the effective date of the anti-markup provision applied to anatomic pathology services.

Rather, the Plaintiffs' position appears to be that the voluminous rulemaking record relating to anatomic pathology overutilization and abusive anatomic

pathology pod lab arrangements is irrelevant here. Plaintiffs would have this Court look only at the rulemaking record associated with the announcement of the delay in the final rule for non-anatomic pathology services, ignoring the record volumes developed in several earlier rulemaking efforts under the Medicare Physician Fee Schedule. It is CAP's position that in determining whether a rule is arbitrary and capricious, this Court should look at the *entire* record and history of the development of the rule, and not just the announcement of the delay of the final rule for non-anatomic pathology services.

## CONCLUSION

There is an extensive CMS rulemaking record highlighting the overutilization and abusive aspects of pod labs. This record extends over several Medicare Physician Fee Schedule annual rulemaking cycles, as well as a number of Stark Act Regulations rulemaking cycles. The Secretary's anti-markup provision was not a surprise and should not be subject to dismissive treatment. Rather, it was based on both the extended rulemaking record and the Secretary's own comments. Accordingly, CAP urges this Court to permit implementation of the Secretary's anti-markup rule, at least as it applies to anatomic pathology services.

Dated: April 11, 2008

Respectfully submitted,

FOR *AMICUS CURIAE*
COLLEGE OF AMERICAN PATHOLOGISTS

/s/ [Chantel L. Febus]
CHANTEL L. FEBUS
D.C. Bar Number: D00242

Sidley Austin LLP
1501 K Street, N.W.
Washington D.C. 20005
(202) 736-8987

JAMES C. DECHENE
LARA LENITON LISS
Sidley Austin LLP
One S. Dearborn Street
Chicago, IL 60603
(312) 853-7000

11

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that true copies of the foregoing Memorandum of *Amicus* the College of American Pathologists Responding to Plaintiffs' Reply to *Amicus Curiae* Brief were sent via Federal Express on April 11, 2008, to:

DAN MARK PETERSON
Fulbright & Jaworski, LLP
801 Pennsylvania Avenue, N.W.
Suite 500
Washington, D.C. 20004

PETER T. WECHSLER
Trial Attorney
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530

/s/ [Chantel L. Febus]