**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ATLANTIC UROLOGICAL ASSOCIATES, P.A.; SAM MICHAELS, M.D.; REBECCA PAGE; UROLOGY CARE, INC.; UROLOGY CENTER OF ALABAMA, P.C.; and UROPATH, LLC, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Civil Action No. 1:08-cv-00141-RMC |
| MICHAEL O. LEAVITT, in his official capacity as Secretary, United States Department of Health and Human Services, | ) ) ) ) ) | |
| Defendant. | ) ) ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR RECONSIDERATION
OF ORDER GRANTING PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE,
TO REQUIRE THE POSTING OF SECURITY UNDER RULE 65(c)**

On April 8, 2008, the Defendant Secretary of Health and Human Services ("Secretary" or "Defendant") filed a motion for reconsideration of this Court's Order granting a preliminary injunction or, in the alternative, to require the posting of security under Rule 65(c) ("Motion to Reconsider"). Defendant contends that this Court did not have jurisdiction to enter its Order granting the preliminary injunction (March 31, 2008) under the All Writs Act, 28 U.S.C. § 1651, or under the D.C. Circuit's recent decision in Belbacha v. Bush, No. 07-5258, 2008 WL 680637, (D.C. Cir. Mar. 14, 2008). Defendant contends that the Court made a number of "critical errors," and then "compounded" its errors when the Court failed to order posting of security under Rule 65(c) of the Federal Rules of Civil Procedure. Motion to Reconsider at 2.

Although Defendant recognizes that the Court's order prevents him from later recouping Medicare payments made while the injunction is in effect, and indeed recognizes that that is the

reason the Court entered the preliminary injunction (Motion to Reconsider at 2), he nevertheless insists that he is "entitled" (Motion to Reconsider at 8) to recoup if Plaintiffs do not prevail, and requests that security be posted to facilitate his ability to do so.  See discussions in Parts I.D. and II.A., below.

First, this Court plainly has jurisdiction to issue an injunction under the All Writs Act while considering the issue of federal question jurisdiction.  As noted in Belbacha, 2008 WL 680637, at *2, "if a case presents a "substantial" jurisdictional question, then under All Writs Act, 28 U.S.C. § 1651, a district court may act to preserve its jurisdiction while it determines whether it has jurisdiction."  The Belbacha case states a rule that is the law of this Circuit, and Defendant's attempts to distinguish it are unavailing.  The Court has jurisdiction under the All Writs Act, at minimum, and the preliminary injunction was properly issued.  See Parts I.A., B., and C., below.

Second, no security need be posted for this preliminary injunction.  Because the preliminary injunction enjoins enforcement and application of the revised anti-markup rule pending further order of the Court, Defendant has no right after expiration of the injunction (if that occurs) to treat the revised anti-markup rule as if it had been in effect during the span covered by the injunction, and thereafter to recoup payments.  See Part II.A., below.  It is also well established that when a court issues an injunction in order to preserve its jurisdiction, the posting of bond or other security is not required.  See Part II.B., below.

Furthermore, CMS has not suffered any damages by the issuance of the preliminary injunction.  The Secretary imagines that if an injunction were not issued, physician owned labs providing anatomic pathology diagnostic testing services in a centralized building would bill Medicare at a "net charge" under the revised anti-markup rule.  The Secretary seeks posting of

security for the difference between the "net charge" for these tests and the physician fee schedule amount. However, physician groups will not bill at a "net charge" that causes them to sustain an actual loss on every test, and if the anti-markup rule is implemented they will instead send specimens to an outside laboratory. Thus, even if an injunction had not issued, CMS would be paying the physician fee schedule amount for the tests at issue. It would just pay that amount to other pathologists and laboratories rather than to physician owned labs in a "centralized building." CMS will not, therefore, sustain any loss or damage for which security is required. The Secretary's own actions in delaying the revised anti-markup rule for other services and locations through the January 3, 2008, Final Rule, and the Court's February 8 order proposed by Defendant also demonstrate the lack of damage to the Secretary from the issuance of the preliminary injunction. See Part II.C., below.

In addition, for reasons set forth in Part II.D., below, the amount of any bond or security in this case would be completely speculative.

I.    **THE COURT PLAINLY HAS JURISDICTION UNDER THE ALL WRITS ACT TO PRESERVE ITS JURISDICTION TO DECIDE THIS CASE.**

    A.    **The <u>Belbacha</u> Case Provides Controlling Authority Authorizing Issuance of an Injunction in this Case.**

As the Court noted during oral argument on March 28, 2008, the D. C. Circuit's recent decision in <u>Belbacha</u> plainly establishes that even when there has been an appellate determination that the District Court lacks subject matter jurisdiction over a particular type of case, the District Court and Court of Appeals both have jurisdiction under the All Writs Act to issue an injunction to preserve their ability to decide the case later if subject matter jurisdiction may ultimately be found to exist. Tr. at 58-61. In issuing the preliminary injunction, the Court in its Memorandum Opinion expressly relied on <u>Belbacha.</u> Mem. Op. at 5-6.

In <u>Belbacha,</u> the petitioner was an Algerian national detained at Guantanamo Bay, who petitioned this Court for a writ of habeas corpus challenging his detention. He also sought an order enjoining his transfer to back to Algeria. <u>Belbacha</u>, 2008 WL 680637, at *1. However, a recent statute, the Military Commissions Act of 2006 ("MCA"), purported to withdraw jurisdiction from the federal courts in such cases. The constitutionality of the MCA had been upheld by the D.C. Circuit in <u>Boumediene v. Bush</u>, 476 F. 3d 981 (D.C. Cir. 2007). <u>Id</u>. Accordingly, the District Court declined to bar the transfer on grounds that it lacked jurisdiction to do so. <u>Id</u>.

The Supreme Court had initially denied a petition for certiorari in <u>Boumediene</u>, but on rehearing granted certiorari. On expedited appeal, the D.C. Circuit temporarily enjoined Belbacha's transfer while the constitutionality of the MCA was reviewed by the Supreme Court in the <u>Boumediene</u> case. <u>Id</u>., at *2. The D.C. Circuit stated that it "temporarily enjoined his transfer in order to preserve our jurisdiction over the appeal." <u>Id</u>., at *1.

The D.C. Circuit also held that the District Court had jurisdiction to issue an injunction under the All Writs Act. The Court stated:

> If a case presents a "substantial" jurisdictional question, then under the All Writs Act, 28 U.S.C. § 1651, a district court may act to preserve its jurisdiction while it determines whether it has jurisdiction."

<u>Id</u>., at *2 (citations omitted).

The Court noted that it there must be only a "colorable" claim of jurisdiction, though it cannot be merely an "insubstantial" one. <u>Id</u>. The Court also found it important that the MCA did not purport to strip the federal courts of their remedial powers. It noted that some statutes not only deprive the courts of subject matter jurisdiction, but also take away the "remedial powers of the courts." <u>Id</u>., at *4 n.3 (citing the Emergency Price Control Act, which deprived the

courts not only of jurisdiction or power to consider the validity of certain regulations, orders, and schedules, but also of the power to "restrain" or "enjoin" such provisions). The Court noted "'In the absence of explicit direction from Congress,' [a] court retains authority pursuant to the All Writs Act to preserve [the] status quo when 'necessary to protect its own jurisdiction.'" Belbacha, 2008 WL 680637, at *4 (summarizing holding in FTC v. Dean Foods Co., 384 U.S. 597, 608 (1966)). The MCA did not purport to strip the court of its remedial powers, so an injunction under the All Writs Act remained appropriate.

> **B.     Plaintiffs Have Raised a Colorable Claim of Subject Matter Jurisdiction as Required by Belbacha.**

In the case at bar, Plaintiffs have raised a jurisdictional claim which is, at the very least, "colorable" and not "insubstantial." The Illinois Council case expressly recognizes that the federal courts have direct federal question jurisdiction over Medicare regulatory challenges when an agency practice could amount to the "practical equivalent of a total denial of judicial review." Shalala v. Illinois Council on Long Term Care, 529 U.S. 1, 20, 22 (2000). Plaintiffs have previously set forth in their Complaint, their Statement of Points and Authorities in Support of their Application for Preliminary Injunction, and the Declarations filed therewith, facts showing that as a practical matter there will be a total denial of judicial review unless the merits of Plaintiffs' regulatory challenges are reviewed by the Court now. See Compl., ¶¶ 9-10, 108-111, Pl. PI Memo at 29-38, 40-43; Pl. Opp. To Def. Mtn. to Dismiss at 34-39. As noted in those filings, allowing the revised anti-markup rule to go into effect would immediately cause the Uropath business model to begin to unwind, because the rule requires physician groups with anatomic pathology labs in centralized buildings to bill Medicare at an actual loss for those services, and Medicare is the majority of the business for those labs. See Flowers Decl., ¶ 26. Instead of billing for years at a loss on each claim, physician groups would be forced to send

specimens for Medicare patients to outside labs instead, where they would at least not actually lose money. The ultimate result would be a huge loss of business for Uropath, departure of pathologists, a move by some physician groups to try to establish labs in buildings in that are the "same building" under Stark definitions, and a continued downward spiral resulting in destruction of business. Absent court review now, there will thus be no Medicare billings to appeal administratively, and neither this court nor any other court will ever have effective jurisdiction to review the validity of the revised anti-markup rule, as applied to Plaintiffs by the January 2008 Final Rule. There will be no claims to appeal administratively or for a court to review.

As discussed during the March 28 oral argument, approximately 400,000 specimens per year are processed through Uropath-managed laboratories alone. See Flowers Decl., ¶ 7; Tr. 24. Even if 52 physician groups could somehow be induced to bill at a loss for each diagnostic test, all of these claims would have to be appealed. Each Medicare claim for a specific specimen and interpretation is a separate appealable item. It is not possible to simply submit a "test" case, and then have all other claims follow suit. Each claim must be appealed to preserve the physician group's rights to obtain full reimbursement for that claim. As noted during the March 28 oral argument, Tr. 67, the multi-level appeal process for Part B claims under 42 C.F.R. §§ 405.900-1140 would probably take a couple of years at minimum to complete for even the first batch of claims, and multiple appeals by all physician groups would have to be submitted in a continuous stream thereafter as claims are denied.[1]

---

[1]  As noted during oral argument, it is not at all clear that claims for the physician fee schedule amount would even be denied by the Medicare contractor. Tr. 68-69. The current Medicare Form 1500 which is used to bill for physician Part B services, contains no box or coding option to indicate that the service was performed in a "centralized building" that is not the "same building" under Stark definitions. These forms are widely available online. A sample Form 1500 is attached as Exhibit A.

To preserve rights to appeal, the claims would have to be submitted for the full physician fee schedule amounts. As noted during oral argument, there is no mechanism under Medicare Part B, unlike Medicare Part A, to submit claims as "protested items," thereby preserving appeal rights while avoiding potential false claims liability. See Tr. at pp. 68-69; see also Provider Reimbursement Manual – Part 2, Ch. 1, Sec. 115, for provisions relating to Medicare Part A protested items. To appeal, Plaintiffs would thus have to risk liability under the False Claims Act and other civil and criminal statutes. See, e.g., 18 U.S.C. § 287 (mandating imprisonment and a fine for all "knowing" submissions of false claims); 31 U.S.C. § 3729 (permitting recoveries of three times the amount of damages sustained by the government plus $5,500 to $11,000 per false claim); 42 U.S.C. § 1320a-7b(a) (up to five years imprisonment and $25,000 fine per false claim for benefit or payment under federally-funded program providing health benefits; 42 U.S.C. § 1320a-7a(a) (imposing civil penalties of up to $10,000 for each false claim submitted and three times the amount for each item or service); 31 U.S.C. § 3802 (imposing civil penalties of $5,500 per claim plus assessments of double the amount of the false claim). The Form 1500 itself twice references criminal and civil penalties that may be imposed for any misrepresentation, or false, incomplete, or misleading information on the claim form. See Exhibit A.

Under Defendant's theory that there is an adequate administrative process available, with judicial review following thereafter, these appeals would have to be pursued by every physician group in the country that wished to obtain relief from the revised anti-markup rule. Defendant, in fact, in this case complains that the "Court also erred in framing the Preliminary Injunction so that it would apply to all anatomic pathology diagnostic testing services, rather than being directed solely to those services furnished by plaintiffs." It should be emphasized that the

scenario envisioned by Defendant simply will not occur, due to both the legal risks and the heavy financial losses to physician groups. Instead, the revised anti-markup rule will have its desired effect, physician groups with labs in centralized buildings will be forced to stop billing Medicare, labs will be shut down, and there will be no claims for physician groups to appeal, because of the flagrant departure of the Secretary from the Congressional mandate that these tests be reimbursed under the Medicare physician fee schedule.

The Secretary's reliance on <u>Action Alliance of Senior Citizens v. Leavitt</u>, 483 F.3d 852 (D.C. Cir. 2007) is not relevant here. Defendant cites that case for the proposition that a portion of a preliminary injunction was vacated because the district court lacked jurisdiction to entertain a claim that had not first been presented to the Secretary of HHS. Motion to Reconsider at 7. Defendant also contends that "plaintiffs fail even to meet the non-waivable presentment requirement." Motion to Reconsider at 4, n.2.

First, <u>Action Alliance</u> had nothing to do with jurisdiction under the All Writs Act.

Second, that case underscores the fact that "presentment" is <u>not</u> required in a case such as the one at bar. There were two separate statutory claims asserted in <u>Action Alliance</u>. As to the first, the plaintiffs had not presented a claim to the Commissioner of Social Security under 42 U.S.C. § 405(g). Because "<u>that route was fully available</u>" to plaintiffs, failure to do so deprived the court of jurisdiction under other jurisdictional statutes. <u>Action Alliance</u>, 43 F.3d at 856. Here, Plaintiffs have alleged (and shown) that pursuing any putative administrative remedies would in practice preclude rather than allow judicial review.

But for the other statutory claim for relief in <u>Action Alliance</u>, there was no adequate administrative remedy. Accordingly, the D.C. Circuit did not require "presentment" to the Secretary. Instead, it invoked the exception enunciated in <u>Illinois Council</u> where application of

channeling provisions "would not lead to a channeling of review through the agency, but would mean no review at all." Action Alliance, 483 F.3d at 859. On that basis, the D.C. Circuit found that the District Court had jurisdiction under 28 U.S.C. § 1331.[2]

Finally, as with the MCA in Belbacha, 42 U.S.C. §§ 405(g) and (h) do not purport to strip the federal courts of their remedial powers. Therefore, the Court retains the power under the All Writs Act to issue injunctions to preserve its jurisdiction.

### C.    Defendant's Attempts to Distinguish Belbacha Are Unavailing.

The Defendant argues that "Belbacha has no application to this case." He contends that this "Court is not being asked to enter injunctive relief to prevent action by the government that would altogether defeat arguable jurisdiction," and that "Plaintiffs' Application for Preliminary Injunction fails to identify any proposed action by the Secretary that would deprive this Court of jurisdiction to hear the merits of plaintiffs' claims if a preliminary injunction were not issued." Motion to Reconsider at 6.

Of course, Plaintiffs have alleged in their Complaint, and described in their Application for Preliminary Injunction, the precise action by the government that would defeat the Court's jurisdiction:  namely, if the Secretary's November 2007 revised anti-markup rule, as applied selectively to Plaintiffs by the Secretary's January 2008 Final Rule, were to go into effect. See Compl., ¶¶ 9-10, 108-111; Pl. PI Memo at 29-38; see also discussion in Part I.B., above.

Defendant further attempts to distinguish Belbacha on grounds that the Court is not being asked to enter injunctive relief to prevent governmental action that would result in "grave physical harm." Motion to Reconsider at 6. Although that potential existed on the specific facts of Belbacha, nothing in the Court's opinion suggests that "grave physical harm" is a requirement

---

[2]  As the Court noted in the oral argument of this case, "presentment" has not even been possible at this point, since the revised anti-markup rule has yet to go into effect. Tr. 34-35.

in all cases for issuance of a preliminary injunction under the All Writs Act. Instead, the analysis turns on whether failure to issue an injunction would defeat the court's jurisdiction. The allegation that, absent an immediate order, Belbacha would be transferred to Algeria, and subjected to possible torture, would certainly adversely affect the Court's ability to review the merits of Belbacha's claims.

Defendant contends that "the Court is required to rule on the issue of subject-matter jurisdiction – or at least on the likelihood that the Court has subject matter jurisdiction – before considering Plaintiffs' Application for Preliminary Injunction." Motion to Reconsider at 6-7. That contention is misplaced. If such were the rule, issuance of an injunction under the All Writs Act in aid of the Court's potential jurisdiction would almost never come into play, because the court would have already decided the issue of jurisdiction. But there are circumstances, as in the case at bar, where an injunction is necessary to preserve the status quo lest the court's potential jurisdiction be defeated by intervening events.

As noted above, the jurisdictional claim need not be certain. It must only be "colorable" and not "insubstantial." Belbacha illustrates how low this "colorability" threshold is. In that case, the injunction was necessary to preserve the courts' jurisdiction while the Supreme Court determined whether the lower courts in fact had jurisdiction. The D.C. Circuit thus issued the injunction barring the government from transferring Belbacha even though that very court had previously found that it did not have jurisdiction under those circumstances. Here, the Court is in the process of determining the jurisdictional issue, and an injunction under the All Writs Act to prevent irreparable harm, and intervening destruction of Plaintiffs' ability to pursue this action, is warranted and appropriate.

**D.      The Court's Decision and Order Preventing Recoupment of Medicare Payments Made During the Period the Injunction is in Effect is Warranted and Appropriate.**

Defendant also contends that "the Court erred in implicitly requiring the Secretary to waive his right to recover any excess payments made under the preliminary injunction in the event Plaintiffs do not ultimately prevail."  Motion to Reconsider at 7 (capitalization revised). This argument is erroneous for several reasons.

It should first be noted that the Interim Proposal, made by the Secretary himself, had the effect of delaying implementation of the revised anti-markup rule as applied to anatomic pathology diagnostic testing services furnished in a centralized building.  The Order entered by the Court on February 8, which was drafted and proposed by Defendant, stated that the Secretary "will not apply the final anti-markup rule" to claims submitted between February 1 and April 1. One reason that this proposal was acceptable to Plaintiffs, and presumably to the Court, was that it maintained the status quo, prevented the irreparable harm that would otherwise have occurred to Plaintiffs, and thus preserved the Court's ability to decide the case before Plaintiffs were deprived of the opportunity for any judicial review.  The statement that the Secretary "will not apply" the rule to those claims is absolute, and by itself does not permit later recoupment (although the Secretary included an express statement regarding non-recoupment as well).

But Defendant's March 31 proposal that the Secretary "will not <u>at this time</u>" apply the anti-markup rule, while reserving the ability to do so retroactively through recoupment, is (as the Court recognized) completely illusory.  As the Court observed, "[i]n other words, the Secretary would have the Final Rule take effect."  Mem. Op. at 3.  And that is precisely what Defendant's March 31 proposal would have done.   The Court's preliminary injunction Order and Memorandum Opinion make it clear that the Court entered the Order so that this retroactive recoupment would not be permitted, that the Final Rule will not take effect, and that the

"injunction will … maintain the status quo." Mem. Op. at 9. It does not permit the Secretary to later make the Final Rule take effect retroactively on April 1.

But a key reason for entering a preliminary injunction that delays the application of the anti-markup rule, and does not permit recoupment, is that the "recoupment" envisioned by the Secretary would actually make the Plaintiffs worse off than if an injunction had never issued, and would unjustly enrich the Medicare program. The Secretary believes that if Plaintiffs do not ultimately prevail, he is "entitled" to recoup the difference between the physician fee schedule amount for each test and the "net charge" amount determined under the revised anti-markup rule during the time the injunction is in effect.[3] However, if the Court's orders of February 8 and March 31 had not delayed the implementation of the revised anti-markup rule, and that rule had gone into effect, the Plaintiff Physician Groups would not have billed Medicare at a "net charge." Doing so would have required them to continuously lose money on every single Medicare test, which is generally half or more of the labs' business. Instead, they would have mitigated their damages and begun to send specimens for Medicare patients to outside labs. Sorrells Decl. at ¶¶ 7, 10, 11; Creggar Decl. at ¶¶ 6, 9, 10; Severance Decl. at ¶¶ 6, 7. By doing so, they would not make any money, but at least they would not be required to bill each test at an actual financial loss. Thus, there would have been no claims submitted by the Plaintiff Physician Groups, and no "difference" to recoup.

Thus, the Court's order which does not permit later recoupment by Defendant even if Plaintiffs should not ultimately prevail, is warranted and appropriate. As noted by the Court, it

---

[3]   Referring to his March 31 proposal, the Secretary declares that "Even if the Court had already entered a preliminary injunction on its own (as happened later that day), the Secretary would be entitled to recoup any excess payments under that injunction unless plaintiffs ultimately prevail on the merits." Motion to Reconsider at 8 (emphasis in original). He goes on to assert that "in the event the Preliminary Injunction entered by this Court is eventually dissolved, the Secretary will be entitled to recoup overpayments during the months that the injunction was in effect." Id.

preserves the status quo (that had existed for many years prior to Defendant's attempt to change the rules). Defendant is not harmed, because Medicare is paying the same fee schedule amount during the injunction period as it would have paid (to outside labs) if the revised anti-markup had gone into effect and forced the Plaintiff Physician Groups to send specimens to outside labs for testing. Finally, it prevents "recoupment" from Plaintiffs of amounts based on claims they would never have submitted had the revised anti-markup rule been in effect, and thereby prevents the Medicare program from "recovering" funds beyond what it would have actually paid had the revised anti-markup rule gone into effect.

## II.    THE COURT SHOULD DETERMINE THAT PLAINTIFFS NEED NOT POST SECURITY UNDER RULE 65(c).

Defendant takes the Court to task for "failure to require security" and contends that "this failure alone is reversible error." Motion to Reconsider at 11. Before faulting the Court for this alleged failure, it might have behooved Defendant to at least mention the subject in the extensive briefing in this case, or during oral argument on the preliminary injunction.

However, no security should be required because the Court's Memorandum Opinion and Order delay the implementation of the revised anti-markup rule, and do not allow Defendant to recoup at any time amounts paid while the injunction is in effect. Thus, there is no potential recovery by Defendant that would require security to ensure its collection. See Part II.A., below.

Furthermore, posting of bond or security pursuant to Rule 65(c) is not required where an injunction is issued to preserve the Court's jurisdiction. See Part II.B., below.

CMS has not and will not suffer any damages because of the preliminary injunction. Under the preliminary injunction it is continuing to pay the fee schedule amount to physician groups who have anatomic pathology labs in a centralized building. Had the Court's February 8 and March 31 orders not issued, these groups would have stopping billing Medicare for those

tests and sent the specimens to outside labs which are themselves reimbursed at the physician fee schedule amounts. <u>See</u> Part II.C., below.

In addition, even if Defendant had a right to recoup, and even if the theoretical measure of security proposed by Defendant were to be considered correct (which it is not), it is literally impossible to calculate the difference between the "net charge" and the fee schedule amount for all claims submitted while the preliminary injunction is in effect. <u>See</u> Part II.D., below.

Finally, security is not required when the suit is brought to vindicate a public interest. <u>See</u> Part II.E., below.

> **A.**    **Security is Not Required Because Defendant Has No Ability to Recover Payments Made While the Preliminary Injunction is in effect.**

No security should be required because there is no potential "recovery" by Defendant for which security would be needed. On multiple occasions (<u>see</u> discussion in Part II.B., below), the Court indicated to Defendant that additional time would be required for the Court to consider and issue a full opinion following the March 28 hearing. On March 31, Defendant filed a "Proposal to Extend Interim Agreement." That Proposal stated that the Secretary "will not at this time" apply the anti-markup rule, but reserved "the right to recoup any Medicare payments in excess of the amounts that would be permissible under the anti-markup rule" for claims submitted during a one month period.

The Court correctly recognized that, "In other words, the Secretary would have the Final Rule take effect." Mem. Op. at 3. The Court accordingly issued a preliminary injunction the same day prohibiting enforcement and application of the revised anti-markup rule.

Defendant recognizes that the effect of the preliminary injunction is to prevent recoupment. He complains that the "Court erred in implicitly requiring the Secretary to waive his right to recover any excess payments made under the preliminary injunction in the event

Plaintiffs do not prevail." Motion to Reconsider at 7. Defendant notes that "the Court rejected the Secretary's proposal . . . because the Secretary did not relinquish his right to be made whole in the event Plaintiffs did not ultimately succeed on their claims." Motion to Reconsider at 2. He further decries "the Court's implicit conclusion that the Secretary should not be allowed to seek restitution of any overpayments made by the Medicare trust fund pursuant to the Preliminary Injunction in the event Plaintiffs do not ultimately prevail." He recognizes that the challenged rule has not yet been "implemented." Motion to Reconsider at 11.

Since the effect of the Court's order is to essentially delay implementation of the rule until such time as the Court makes a decision, Defendant has no right to recoup payments during a time the rule was not in effect. Accordingly, no security should be required to guarantee a "recovery" to which Defendant is not entitled.

### B. Security is Not Necessary Where an Injunction is Issued to Preserve the Court's Jurisdiction.

It is firmly established that bond is not required when an injunction is issued in aid of the court's jurisdiction. "[I]t has been held proper for the court to require no bond where . . . the injunctive order was issued to aid and preserve the court's jurisdiction over the subject matter involved." Doctor's Assocs. v. Stuart, 85 F.3d 975, 985 (2d Cir. 1996) (internal quotation and citation omitted). "Despite the mandatory language of Rule 65(c) . . . if the injunction is designed to aid and preserve the court's jurisdiction over the subject matter involved, security is not required." ProBatter Sports, LLC v. Joyner Techs., Inc., 463 F. Supp. 2d 949, 958 (D. Iowa 2006) (internal quotation marks omitted).

It has specifically been held that this principle applies in cases where the injunction issues pursuant to the All Writs Act. As described in Zenith Radio Corp. v. United States, 518 F. Supp. 1347, 1348-49 (Ct. Int'l Trade 1981):

> It is established that 28 U.S.C. § 1651 -- the All Writs Act -- authorizes federal courts to issue injunctions needed to prevent a controversy from becoming moot in order to preserve their jurisdiction over a case. . . .  And where a federal court issues a preliminary injunction in aid of and in preservation of its jurisdiction, no security need be required pursuant to rule 65(c).

Among other reasons, courts have offered the following rationale for this principle:

> We further note if the district court were required to comply with Rule 65(c)'s bond requirement as a prerequisite to an All Writs Act injunction, its ability to protect its own jurisdiction would be tied to a party's ability to post a bond. As a result, the district court would be rendered powerless to protect its own jurisdiction where the party is unable to post a bond.

Scardelletti v. Debarr, 265 F.3d 195, 212 n.19 (4th Cir. 2001) rev'd on other grounds sub nom.

Devlin v. Scardelletti, 536 U.S. 1 (2002).  See also John Nuveen & Co. v. N.Y.C. Hous. Dev. Corp., 1986 U.S. Dist. LEXIS 25782, *21 (D. Ill. 1986) (recognizing that relief under the All Writs Act does not require a bond).

An example on point is Powelton Civic Home Owners Ass'n v. Dept. of Housing and Urban Dev., 284 F. Supp. 809, 839 (E.D. Pa. 1968).  In that case, residents of a residential neighborhood in Philadelphia sought and obtained an injunction to prevent HUD from disbursing certain funds while their action was pending.  If HUD had disbursed the funds, the underlying action would have become moot.  In procedural circumstances remarkably similar to those of the instant case, the court granted a preliminary injunction, and the defendants then moved for reconsideration and argued that the court should require bond.  The court refused the request for bond because:

> [I]t has been held that F.R.Civ.P. 65(c) is not applicable when the preliminary injunction has been issued in order to preserve the court's subject matter jurisdiction. . . .  In the case sub judice, we granted the preliminary injunction because disbursement of the funds . . . would have rendered the controverted issues moot.

The court went on to explain that if it required a bond in the amount claimed by HUD (several million dollars), the amount would be so high that the plaintiffs could not post it. This, in turn, would mean that disbursement would occur and the case would be moot, effectively preventing judicial review of HUD's actions. Id. at 840. Similarly, in the case at bar, the absence of a preliminary injunction would have allowed the revised anti-markup rule to go into effect for anatomic pathology services furnished in a centralized building, thereby causing the immediate cessation of Medicare billing for those services and the disintegration of the Uropath-managed laboratories, thereby effectively preventing judicial review.

In addition, security is required under Rule 65(c) only for "costs and damages incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Since the preliminary injunction was necessary for the court to preserve its ability to decide this case, Defendant has not been "wrongfully" enjoined. It is entirely proper that the Court maintain the status quo while reviewing the rather complex regulatory and administrative law issues presented by this case. Even if the injunction should ultimately be dissolved, or the case dismissed, it cannot have been a "wrongful" act for the Court to preserve its jurisdiction to make determinations on the merits of the issues presented, including the issue of subject matter jurisdiction.

In this regard, it is also worth noting that the time periods for the duration of the initial interim agreement, the briefing schedule by the parties, and hearing by the Court were all proposed by Defendant himself. By his Motion to Endorse Interim Proposal, Postpone Hearing on Plaintiffs' Application for Preliminary Injunction, and Set Consolidated Briefing Schedule, the Defendant on February 4 requested that the preliminary injunction hearing set for February 7 be postponed, that a briefing schedule ending on March 19 be adopted, and that a hearing be held

on the preliminary injunction application and Defendant's dispositive motion (Motion to Dismiss) during the week of March 24. The Court adopted the Defendant's proposed order verbatim (with one minor change of an interim briefing date agreed to by the parties) and set the hearing during the week of March 24, as requested by Defendant.

The Interim Proposal prepared by Defendant provided that the delay in the effectiveness of the revised anti-markup rule would extend until April 1. At the Scheduling Conference held on February 7, the Court advised counsel for Defendant that 30 to 60 days after the hearing date would be required by the Court to decide this matter, and that the hearing date was too close to April 1 to allow enough time to decide the issues presented. Defendant refused to extend the April 1 date at the Scheduling Conference, and in a follow up telephone conference with the Court again refused. Defendant refused again to do so at the March 28 hearing, and on March 31 filed the Proposal previously described.

In short, the schedule proposed by Defendant did not allow adequate time for the Court to make a decision. The Court sought the voluntary cooperation of Defendant to preserve the status quo while the Court reviewed the pending motions, including the jurisdictional argument made by Defendant, but voluntary cooperation was not forthcoming. When the Court issued the preliminary injunction to preserve the Court's jurisdiction while considering the pending motions, Defendant was not "wrongfully" enjoined or restrained, and the Plaintiffs should not have to post security where the necessity for an immediate injunction arose from time needed by the Court due to the schedule proposed by Defendant, and from Defendant's refusal to agree to even a brief extension of the Interim Proposal.

**C.     CMS Has Not and Will Not Suffer Any Damages by the Issuance of a Preliminary Injunction to Preserve the Status Quo.**

Rule 65(c) states that security is only required for "the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." But CMS has not suffered and will not suffer any "costs or damages" as the result of the Court's March 31 preliminary injunction.

CMS believes it is entitled to have security posted for the difference between the "net charge" allegedly allowable by the revised anti-markup rule and the physician fee schedule amount that Congress has mandated be paid for anatomic pathology services. Motion to Reconsider at 8-11. Even if this amount could somehow be calculated (which it cannot—see below), such a measure is irrelevant. That is because physician groups simply will not bill Medicare for lab services under the revised anti-markup rule, which requires them to lose money on every test. Instead of continuing to perform anatomic pathology testing in a centralized building, and billing Medicare at a loss, physician groups will at least avoid <u>losing</u> money on each test by sending those tests to an outside laboratory. Sorrells Decl. at ¶¶ 7, 10, 11; Creggar Decl. at ¶¶ 6, 9, 10; Severance Decl. at ¶¶ 6, 7. Those outside laboratories will then bill Medicare for the full physician fee schedule amount. That is the same amount that physician groups with anatomic pathology labs in a centralized building are being paid while the Final Rule is enjoined. Medicare pays the same amount in both scenarios, whether the Final Rule is enjoined or not.[4] The notion that physician groups would continuously bill Medicare at a "net charge" that does not even reimburse them for their out of pocket costs is a figment of the imagination.

---

[4] <u>National Kidney Patients Ass'n v. Sullivan</u>, 958 F.2d 1127 (D.C. Cir. 1992), cited by Defendant, is thus irrelevant. In that case, actual damages were shown. Here there are none.

CMS's own actions also demonstrate that it is not being damaged by the brief delay of the revised anti-markup rule needed for the Court to make a decision on the pending motions. CMS issued the revised anti-markup rule on November 27, 2007. That revised anti-markup rule would have applied to all diagnostic testing services (including, for example, x-rays, MRIs, CT scans, EKGs, echocardiograms, ultrasound testing, and numerous other high volume tests), that are furnished in any location that is not the "office of the billing physician," as newly defined in that regulation. Because, by CMS's own admission, the revised anti-markup rule was "unclear," could have "unintended consequences," and would "significantly disrupt" patient care, CMS delayed the implementation of the rule for a full year for all services, and for all locations, except anatomic pathology diagnostic testing services performed in a centralized building that is not the same building under Stark definitions. See 73 Fed. Reg. at 405-06. CMS's willingness to delay voluntarily the application of the revised anti-markup rule for all other services is inconsistent with a claim that it is suffering "damages" from a much briefer delay for a small subset of services.

Furthermore, after this suit was filed, the Secretary did not just agree to allow billing at the fee schedule amount for services billed during February and March of this year (which would include services rendered in January, if billed during the February/March window), he is the party that actually proposed that agreement. Again, one would not expect the Defendant to make such a proposal, and implement it, if by doing so he incurred great "costs" or "damages." But now, Defendant claims he is damaged by a further delay of a few weeks while the Court makes a decision. Such a claim is implausible, and no security should be required.

**D.    The Amount of any Bond would be Wholly Speculative.**

The Secretary insists that the Court's issuance of the Preliminary Injunction without "the giving of security by the applicant" violates Rule 65(c), the purpose of which, according to the

Secretary, is to enable the enjoined party to secure indemnification for costs and pecuniary injury that may accrue during the period in which a wrongfully issued injunction remains in effect. <u>See</u> Motion to Reconsider at 8-9. Presumably, the Secretary desires Plaintiffs to post security in an amount equal to all "excess payments" that would be made by CMS to providers of anatomic pathology services in a "centralized building" during the period the preliminary injunction is in effect. However, the Secretary fails to request a specific amount that Plaintiffs should provide as security. In fact, such an amount is impossible to calculate.

Where alleged damages to a governmental entity are speculative, bond should not be required. The case of <u>Bass v. Richardson</u>, 338 F. Supp. 478 (S.D.N.Y. 1971), involved a suit against the Secretary of the Department of Health and the State of New York seeking an injunction to stop cutbacks in benefits. The Court observed that:

> [T]here is no allegation or showing of the amount of such . . . damage to the State. Any such costs and damages during the temporary delay occasioned by the preliminary injunction are therefore wholly speculative and thus present no sound basis for a bond.

<u>Bass</u>, 338 F. Supp. at 490. The Court went on to note:

> Absent any measure of the amount the intervenors should provide in a bond, it might well be an abuse of our discretion in making a serious determination as to what is "proper" to arbitrarily set some figure. While mere difficulty of determination in no way relieves a Court of its duty under Rule 65(c), we do not believe it our function to establish sums which are wholly speculative.

<u>Bass</u>, 338 F. Supp. at 491.

There are several reasons why any such amount in this case would be wholly speculative. First, a physician practice's "net charge" for providing an anatomic pathology diagnostic testing service and will vary among physician practice groups, since it is apparently based on the

specific costs incurred by each group. Neither Plaintiffs, Defendant, nor the Court are privy to the costs incurred by various physician practices around the country in providing such services.

Equally important, no one knows how to calculate a physician practice's "net charge" for a testing service even if sufficient cost data were readily available. This is because CMS has refused to provide specific guidance on how to calculate the net charge, other than to say that it must be determined "without regard to any charge that is intended to reflect the cost of equipment or space leased to the performing supplier by or through the billing physician or other supplier." See 42 C.F.R. § 414.50(a)(2)(i). Indeed, the preamble to the November 2007 Physician Fee Schedule Rule simply directs physicians to calculate the net charge "in a reasonable manner . . . that yields an accurate net charge." See 72 Fed. Reg. at 66,318. Because of the dearth of guidance on this subject, and lack of data, it would be impossible for the Court to calculate the difference between the net charge and the fee schedule amount for anatomic pathology testing services performed in centralized buildings.

Neither could the Court determine the volume of anatomic pathology claims that will be submitted to Medicare during the time the injunction is in effect. Most physician groups that will be affected by the Secretary's revised anti-markup rule are not before this Court. Because the billing forms employed by CMS do not collect such information, there is no method of which Plaintiffs are aware to determine the identity of each physician group across the country that performs anatomic pathology testing services in a "centralized building" as defined by the Stark Law. See Tr. 68; see also Exhibit A. Similarly, the volume of claims submitted by physician groups that would be subject to the revised anti-markup rule's "net charge" requirement is unknown, and probably unknowable. (As noted previously, if the revised anti-markup rule

actually took effect, the volume of claims submitted on a "net charge" basis would probably be zero, or close to it.)

The time horizon for such a calculation also is unknown.  The duration of a preliminary injunction could last from a matter of days, to the beginning of 2009, or any point in between.  Adding to this uncertainty is CMS's stated intention to issue further guidance or propose additional rulemaking, or both, with respect to the anti-markup rule sometime in 2008.  73 Fed. Reg. 405 (Jan. 3, 2008).

In short, there is simply no way to identify the number of claims for anatomic pathology diagnostic testing services performed in a "centralized building" that will be submitted to Medicare while the preliminary injunction is in effect, or the monetary effect (if any) associated with those.

### E.    Security is Not Required Where a Suit Seeks to Enforce Compliance by a Governmental Agency with Matters Affecting the Public Interest.

The Secretary apparently would like the Court to require Plaintiffs to post security based on the entire universe of physician groups that would be affected by CMS' revised anti-markup rule.  Such an amount, if calculated based on the difference between the "net charge" and physician fee schedule amount, would be more than could be borne by three physician practices, two individuals, and a small company, and should not be required.  "It is well settled that Rule 65(c) gives the Court wide discretion in the matter of requiring security. . . .  It should be noted that courts have held that security is not necessary where requiring security would have the effect of denying the plaintiffs their right to judicial review of administrative action."  Natural Resources Defense Council, Inc. v. Morton, 337 F. Supp. 167, 168 (D.D.C. 1971).  Were this court to require Plaintiffs to post a bond in an amount that only reflected Plaintiffs' claims, such a decision would serve only to selectively burden Plaintiffs, while all other physician groups

could continue billing for anatomic pathology services performed in a "centralized building" without incurring a similar cost.

Defendant argues, however, that Plaintiffs are not "indigent citizen enforcers of a public interest law" for whom bond might not be required.  Motion to Reconsider at 10 (citing <u>Natural Res. Def. Council v. Morton</u>, 337 F. Supp. 167 (D.D.C. 1971).  But the "public interest" test is broader than that enunciated by Defendant.  As stated in <u>Pharmaceutical Soc'y of the State of N.Y. v. N.Y. State Dept. of Social Servs.</u>, 50 F.3d 1168, 1174 (2d Cir. 1995):  "Although the rule speaks in mandatory terms, an exception to the bond requirement has been crafted for, <u>inter alia</u>, cases involving the enforcement of 'public interests' arising out of 'comprehensive federal health and welfare statutes.'"  The Second Circuit noted that "While the district court found that the Society was unlike a traditional public interest group because it was pursuing its pecuniary interests, we believe that the nature of the rights being enforced, rather than the nature of the entity enforcing them, is the central consideration in determining whether the bond requirement should be waived under this exception."  <u>Id</u>. at 1175.  As already noted by the Court in the Case at bar, "with regard to the public interest, public policy favors fair and open agency rulemaking," which is one of the interests Plaintiffs seek to enforce.  <u>See also</u> <u>Malcolm v. Reno</u>, 129 F. Supp. 2d 1, 11-12 (D.D.C. 2000) (where bond amount could be calculated, "relevant considerations include the hardship the posting of security would impose on the applicant, the public interest in the litigation, and the likelihood of success on the merits, at least where it is extraordinarily high.").

## <u>CONCLUSION</u>

Defendant's Motion for Reconsideration of Order Granting Preliminary Injunction Or, in the Alternative, to Require the Posting of Security Under Rule 65(c) should be denied.

Plaintiffs request that a hearing be held on Defendant's motion to require the posting of security under Rule 65(c) prior to the imposition of any requirement that security be posted.

Respectfully submitted,

FULBRIGHT & JAWORSKI, L.L.P.

April 21, 2008

/s/ Dan M. Peterson
Dan M. Peterson
D.C. Bar No. 418360
Ashley E. Seuell
D.C. Bar No. 494170
Caroline Mew
D.C. Bar No. 467354
801 Pennsylvania Avenue N.W.
Washington, D.C. 20004
Telephone:  (202) 662-0200
Facsimile:  (202) 662-4643
Attorneys for Plaintiffs

Greg A. Cardenas
Byrne, Cardenas & Smitherman, LLP
5400 LBJ Freeway, Suite 1325
Dallas, TX 75240
Telephone:  (972) 371-5264
Facsimile:  (972) 371-5270
Of Counsel

# EXHIBIT A

CARRIER

1500
**HEALTH INSURANCE CLAIM FORM**
APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE 08/05

☐☐☐ PICA

| 1. MEDICARE | MEDICAID | TRICARE CHAMPUS | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER | (For Program in Item 1) |
|---|---|---|---|---|---|---|---|---|
| (Medicare #) | (Medicaid #) | (Sponsor's SSN) | (Member ID#) | (SSN or ID) | (SSN) | (ID) | | |

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)

3. PATIENT'S BIRTH DATE   MM DD YY   SEX  M ☐ F ☐

4. INSURED'S NAME (Last Name, First Name, Middle Initial)

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED   Self ☐ Spouse ☐ Child ☐ Other ☐

7. INSURED'S ADDRESS (No., Street)

CITY    STATE

8. PATIENT STATUS   Single ☐ Married ☐ Other ☐

CITY    STATE

ZIP CODE    TELEPHONE (Include Area Code)  (    )

Employed ☐  Full-Time Student ☐  Part-Time Student ☐

ZIP CODE    TELEPHONE (Include Area Code)  (    )

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)   YES ☐ NO ☐

a. INSURED'S DATE OF BIRTH   MM DD YY   SEX  M ☐ F ☐

b. OTHER INSURED'S DATE OF BIRTH   MM DD YY   SEX  M ☐ F ☐

b. AUTO ACCIDENT?   YES ☐ NO ☐   PLACE (State)

b. EMPLOYER'S NAME OR SCHOOL NAME

c. EMPLOYER'S NAME OR SCHOOL NAME

c. OTHER ACCIDENT?   YES ☐ NO ☐

c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. RESERVED FOR LOCAL USE

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?   YES ☐ NO ☐   If yes, return to and complete item 9 a-d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE   I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED_____   DATE_____

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE   I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED_____

14. DATE OF CURRENT:   MM DD YY   ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY(LMP)

15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS GIVE FIRST DATE   MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION   FROM    TO

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE

17a.
17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES   FROM    TO

19. RESERVED FOR LOCAL USE

20. OUTSIDE LAB?   YES ☐ NO ☐   $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY (Relate Items 1, 2, 3 or 4 to Item 24E by Line)
1. _____   3. _____
2. _____   4. _____

22. MEDICAID RESUBMISSION   CODE    ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE | | | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS    MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| From MM DD YY | | To MM DD YY | | | | | | | | | | | |
| 1 | | | | | | | | | | | | NPI | |
| 2 | | | | | | | | | | | | NPI | |
| 3 | | | | | | | | | | | | NPI | |
| 4 | | | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER   SSN ☐ EIN ☐

26. PATIENT'S ACCOUNT NO.

27. ACCEPT ASSIGNMENT? (For govt. claims, see back)   YES ☐ NO ☐

28. TOTAL CHARGE   $

29. AMOUNT PAID   $

30. BALANCE DUE   $

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

SIGNED_____   DATE_____

32. SERVICE FACILITY LOCATION INFORMATION

a.    b.

33. BILLING PROVIDER INFO & PH #  (    )

a.    b.

NUCC Instruction Manual available at: www.nucc.org

**PLEASE PRINT OR TYPE**

APPROVED OMB-0938-0999 FORM CMS-1500 (08-05)

PATIENT AND INSURED INFORMATION

PHYSICIAN OR SUPPLIER INFORMATION

SAMPLE

BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

### REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND CHAMPUS PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information, including employment status, and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or CHAMPUS participation cases, the physician agrees to accept the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary as the full charge, and the patient is responsible only for the deductible, coinsurance and noncovered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary. If a is less than the charge submitted. CHAMPUS is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured", i.e., items 1a, 4, 6, 7, 9, and 11.

### BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

### SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, CHAMPUS, FECA AND BLACK LUNG)

I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

For services to be considered as "incident" to a physician's professional service, 1) they must be rendered under the physician's immediate personal supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician's service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of nonphysicians must be included on the physician's bills.

For CHAMPUS claims, I further certify that I (or any employee) who rendered services are not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black Lung claims, I further certify that the services performed were for a Black Lung related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon demand be subject to fine and imprisonment under applicable Federal laws.

### NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, CHAMPUS, FECA, AND BLACK LUNG INFORMATION

(PRIVACY ACT STATEMENT)

We are authorized by CMS, CHAMPUS and OWCP to ask you for information needed in the administration of the Medicare, CHAMPUS, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101 et seq and 101 et seq and 10 USC 1079 and 1086, 5 USC 8101 et seq, and 30 USC 901 et seq, 38 USC 613, E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to the providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, "Carrier Medicare Claims Record," published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40 Wed Feb. 28 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30 or as updated and republished.

FOR CHAMPUS CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health, and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under CHAMPUS/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third party liability, coordination of benefits, and civil and criminal litigation related to the operation of CHAMPUS.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988" permits the government to verify information by way of computer matches.

### MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0999. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, Attn: PRA Reports Clearance Officer, 7500 Security Boulevard, Baltimore, Maryland 21244-1850. This address is for comments and/or suggestions only. DO NOT MAIL COMPLETED CLAIM FORMS TO THIS ADDRESS.