# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ATLANTIC UROLOGICAL ASSOCIATES, P.A., *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 08-141 (RMC) |
| MICHAEL O. LEAVITT, Secretary, Department of Health and Human Services, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION

Plaintiffs sue Michael O. Leavitt, in his official capacity as Secretary of the Department of Health and Human Services ("the Secretary" or "HHS"), to challenge HHS's final rule, 73 Fed. Reg. 404 (Jan. 3, 2008) (the "Final Order") and its final rule, 72 Fed. Reg. 66222 (Nov. 27, 2007) (the "Anti-Markup Rule"), both of which relate to Medicare payment for laboratory testing services.[1] Plaintiffs include: (1) three urology physician group practices (the "Physician Groups")[2] that own pathology laboratories; (2) Dr. Sam Michaels, a self-employed pathologist who performs testing services for other physician groups; (3) Uropath, LLC, a limited liability company that

---

[1] Both the Final Order and the Anti-Markup Rule are final rules but the Final Order is much shorter than and less formal than the Anti-Markup Rule. The Court notes that the Final Order was based on "informal comments" that HHS did not file with the Court when it filed the administrative record for the Final Rule. That hole has now been filed. *See* Supplemental Administrative Record ("Supp. A.R.") (notice of filing hard copy [Dkt. #28] Apr. 7, 2008).

[2] The Physician Groups are Atlantic Urological Associates, P.A.; Urology Center of Alabama, P.C.; and Urology Care, Inc.

manages various pathology laboratories; and (4) Uropath's Director of Clinical Operations, Rebecca

Page.  Plaintiffs seek to invalidate the Final Order and the Anti-Markup Rule;  HHS moves to

dismiss for lack of jurisdiction.

## I. FACTS

This litigation was only recently filed in court but has a long administrative history.

The Centers for Medicare and Medicaid Services[3] ("CMS") have been publically concerned since

at least 2004 about a growing tendency of physician groups to utilize so-called "pod" laboratories

for lab work, miles from the physicians' offices, and then to claim that doctors in both locations are

"sharing a practice" for purposes of billing Medicare.  *See* 69 Fed. Reg. 66236, 66316 (Nov. 15,

2004).  From the perspective of CMS, these arrangements violate the spirit, if not the exact language,

of the anti self-referral provisions of the law and regulations.  The administrative record ("A.R.")

indicates that many physicians also believe that "pod" laboratories are inappropriate ways for doctors

to refer lab work to a business they own and from which they profit.  *See, e.g.*, A.R. at 204-21, Cmts.

of the Am. Clinical Lab. Ass'n (notice of filing hard copy [Dkt. #14] Feb. 22, 2008).

> The principal reason for the pod laboratories is financial: pods
> provide the referring urologists a financial stake in pathology services
> the urology groups order for their patients.  Referring physicians seek
> such a financial arrangement so they can earn additional income from
> the work that results from their medical referrals.  The CMS final rule
> that is the subject of this action [*i.e.* the Anti-Markup Rule] is a
> reasonable attempt to remove from anatomic pathology the referring
> physician's profit motive that can corrupt medical decisions.

Amicus Brief filed by College of Am. Pathologists [Dkt. #19] at 3.

---

[3] CMS administers the Medicare program on behalf of the Secretary.  The Medicare program
is the federal health insurance program for individuals age 65 and older and for the disabled.  *See*
42 U.S.C. §§ 1395-1395hhh.

By way of background, Congress passed the Stark Act, 42 U.S.C. § 1395nn, to prohibit physicians from making referrals to, and prohibit laboratories from billing Medicare for, services ordered by physicians who have a financial interest in the laboratory.  *See* 42 U.S.C. § 1395nn(a).  The Stark Act contains an exception for a physician practice that directly performs its own clinical laboratory services as part of its group practice.  *See* 42 U.S.C. § 1395nn(b)(2).  The exception allows Medicare to be billed for services that are furnished personally by the referring physician or a member of the same group practice:

> (I) in a building in which the referring physician (or another physician who is a member of the same group practice) furnishes physicians' services unrelated to the furnishing of designated health services [lab work], or
>
> (II) in the case of a referring physician who is a member of a group practice, in another building which is used by the group practice –
>
>> (aa) for the provision of some or all of the group's clinical laboratory services, or
>>
>> (bb) for the centralized provision of the group's designated health services (other than clinical laboratory services),
>
> unless the Secretary determines other terms and conditions under which the provision of such services does not present a risk of program or patient abuse . . . .

42 U.S.C. § 1395nn (b)(2)(A)(ii) (I) & (II).

Never say the American entrepreneurial spirit is dead.  Faced with this exception to the anti-referral provisions of the Stark Act, certain physician groups that order a significant number of patient biopsies —  typically dermatology, gastroenterology, and urology groups — began to develop what are called "pod" laboratories.[4]  Plaintiff Physician Groups are urology practice groups

---

[4] A "pod" laboratory constitutes a centralized collection of numerous small laboratories that are housed in adjacent cubicles (the "pods") in a building subdivided and leased to several unrelated

that regularly order prostate biopsies. They formed Plaintiff Uropath to manage pod laboratories for them and other practice groups. Uropath operates pod laboratories in Arlington, Texas; Leesburg, Florida; San Antonio, Texas; Sarasota, Florida; and Philadelphia, Pennsylvania. *See* Pls.' Motion for a Preliminary Injunction ("Pls.' Motion"), Ex. 7. Uropath has "fifteen labs, three pathologists, and a full and part time staff totaling thirty employees. [Its] customers represent nine states and one hundred sixty-two urologists." *Id.* The Sarasota facility was started by physician groups in Florida but now services physician groups from North Carolina, Colorado, Kansas, Texas, Connecticut, Indiana, and Ohio. The laboratories operated by Uropath are an extension of, and are owned and controlled by, the Physician Groups. Pl.'s Mot. at 6. This is clearly a successful business model: Urology Care, Inc., a four-physician urology practice in Jefferson City, Missouri, earned $314,000 in 2007 by sending its specimens to the Uropath-managed lab in San Antonio, Texas, in which Urology Care has a partial ownership interest. *See* Pls.' Mot., Ex. 6, Declaration of Michael S. Severance, M.D. ("Severance Decl.") ¶¶ 3 & 10.

On July 12, 2007, CMS published the Physician Fee Schedule Proposed Rule for 2008. *See* 72 Fed. Reg. 38122 (July 12, 2007). "In the Proposed Rule, CMS propose[d] to complete the multi-year process that began in 2004 when CMS expressed concern about possible exploitation by some providers of loopholes in Medicare billing and self-referral provisions." A.R. at 204, Cmts. of the Am. Clinical Lab. Ass'n. After receiving over a thousand comments, CMS issued the Anti-Markup Rule on November 27, 2007. The Anti-Markup Rule, intended to be effective for services

---

medical practices. Each cubicle contains the necessary medical equipment for performing the relevant lab work. The equipment in each pod is separately owned by each physician group practice that refers specimens to the centralized location. A single pathologist and staff then rotate among the various pods, performing pathology services while in each pod on the patient specimens referred by the physician group that owns the medical equipment.

rendered after January 1, 2008, limited Medicare payment for diagnostic testing services provided in a "centralized building" that does not qualify as the "same building" under the physician self-referral exception in the Stark Law. *See* 72 Fed. Reg. 66222, 66308-9; *see also* 42 C.F.R. § 411.355(b).

Shortly thereafter, CMS received "informal comments" and published the Final Order. The Final Order delayed until January 1, 2009, the applicability of the Anti-Markup Rule *except as to* (1) the technical component of a diagnostic test,[5] and (2) the professional component of anatomic pathology diagnostic testing services furnished in a centralized building. Under the Final Order, payment for anatomic pathology diagnostic testing services performed at a "site other than the office of the billing physician or other supplier" is to be limited to the lesser of: (1) the performing supplier's net charge to the billing physician or other supplier; (2) the billing physician or other supplier's actual charge; or (3) the fee schedule amount for the test that would be allowed if the performing supplier billed directly. 73 Fed. Reg. at 405; 42 C.F.R. § 414.50(a)(1). In English, this approach basically omits Medicare payment of any overhead associated with the use of a lab owned by a physician group when the lab is not located in the group's practice offices. CMS indicated that "[b]ecause anatomic pathology diagnostic testing arrangements precipitated our

---

[5] Payment for diagnostic testing consists of a "technical component," the amount paid to the person or entity that performs the test, and a "professional component," the amount paid to the physician for interpreting the test. A limitation on payment for purchased technical components of diagnostic tests has been in effect since 1992 under 42 C.F.R. § 414.50. Thus, CMS contends that the Final Order did not delay implementation of the Anti-Markup Rule as it applies to the professional component and non-purchased technical components of anatomic pathology diagnostic testing services. Plaintiffs make it clear that they challenge the Final Order with respect to its anti-markup provisions applicable to both the professional and non-purchased technical components of anatomic pathology diagnostic testing services. Pls.' Opp'n to Def.'s Mot. to Dismiss ("Pls.' Opp'n") at 5 - 6. They do not challenge the application of the Anti-Markup Rule as applied to the technical component of a diagnostic test that is purchased from an outside lab.

proposal for revision of the anti-markup provisions and remain our core concern, we are not delaying the date of applicability [of the Anti-Markup Rule] with respect to anatomic pathology diagnostic testing services." 73 Fed. Reg. at 405.

Because it fails to suspend application of the Anti-Markup Rule to anatomic pathology diagnostic testing services, Dr. Severance of Missouri predicts that the Final Order will have dire consequences.

> If the January 3, 2008, final rule is not enjoined, we will be forced to shut down our laboratory. We cannot afford to lose money on every Medicare pathology test, as the January 3, 2008, rule requires us to do. Without being able to refer tissue samples for Medicare patients, which represent about 64% of our case mix, operation of our lab would not be financially feasible.
>
> Accordingly, if the final rule is not enjoined, we will have to immediately start sending all pathology specimens to outside labs rather than to our own lab. This means that those laboratories will bill Medicare for the physician fee schedule amount, rather than having our urology group be able to bill for those amounts. Thus, enforcement of the final rule will result in a permanent and ongoing loss of income that we will have no way to recover.

Severance Decl. ¶¶ 6 & 7.

Plaintiffs filed this suit on January 25, 2008. The Complaint alleges a number of counts as follows:

> (1) In Count I, Plaintiffs assert that the Final Order must be set aside as arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706;
>
> (2) In Count II, Plaintiffs allege that the Final Order is invalid because it was issued without notice and comment as required by 5 U.S.C. § 553 and 42 U.S.C. § 1395hh;

(3) In Count III, Plaintiffs contend that the Final Order violates the Regulatory Flexibility Act, 5 U.S.C. § 604(a)(3), because the Secretary failed to prepare a final regulatory flexibility analysis;

(4) In Count IV, Plaintiffs allege that the Final Order and the Anti-Markup Rule are arbitrary and in excess of authority because they attempt to administratively "eliminate" the Stark Law, 42 U.S.C. § 1395nn;

(5) In Count V, Plaintiffs assert that the Final Order and the Anti-Markup Rule are unlawful and must be set aside because they violate the Physician Fee Schedule Statute, 42 U.S.C. § 1395w-4(c)(2)(A); and

(6) In Count VI, Plaintiffs allege that the Final Order and the Anti-Markup Rule improperly extend anti-markup regulations contrary to 42 U.S.C. § 1395u(n)(1).

The Complaint requests that the Court declare both the Final Order and the Anti-Markup Rule contrary to law. *See* Compl., Prayer for Relief at 42-43.

The same date that they filed suit, January 25, 2008, Plaintiffs also filed a motion for preliminary injunction. After a status conference concerning scheduling, the Secretary agreed to withhold implementation of the Anti-Markup Rule, as amended by the Final Order, until the end of March 2008, so that the parties could fully brief the issues. *See* Order on Def.'s Mot. to Endorse Interim Proposal [Dkt. #12]. That briefing was completed on March 19, and the Court held a motions hearing on March 28, 2008. At the motions hearing, the Court noted that the Secretary had not filed the administrative record behind the Final Order and ordered him to do so. At the end of the argument, the Court asked the Secretary to withhold implementation of the Anti-Markup Rule for a further 30-day period so that the Court could fully consider the parties' written and oral arguments before issuing its opinion. Counsel for the Secretary committed to responding to the Court's request by noon on Monday, March 31, 2008. That response indicated that the Secretary

would not deny Medicare payments for work at pod labs under the prior payment schedule during the month of April but that he reserved the right to demand repayment if the Court's decision were in his favor. *See* Def.'s Proposal to Extend Interim Agreement [Dkt. #23]. Since the Secretary could only have the right to demand such repayments if the Anti-Markup Rule went into effect on April 1, 2008, and since the Court had not decided whether it had jurisdiction over the case and the Plaintiffs otherwise met the standard for a preliminary injunction, an injunction was issued on the afternoon of March 31, 2008, to maintain the status quo while the Court considered the issues. *See* Mem. Op. [Dkt. #25] and Order [Dkt. #26].

## II. STANDARD OF REVIEW

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Because subject matter jurisdiction is an Article III as well as a statutory requirement, "no action of the parties can confer subject[]matter jurisdiction upon a federal court." *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003). On a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject matter jurisdiction. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999); *see also McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 182-83 (1936).

Because subject matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim. *Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003). Moreover, the court is not limited to the allegations contained in the complaint. *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir.

1986), *vacated on other grounds*, 482 U.S. 64 (1987).   Instead, to determine whether it has jurisdiction over the claim, the court may consider materials outside the pleadings. *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

## III.  ANALYSIS

### A.  Standing

As a matter of basic constitutional law, federal courts are limited to deciding cases and controversies, and the issue of standing is one feature of such limitation.  *Am. Legal Found. v. FCC*, 808 F.2d 84, 88 (D.C. Cir. 1987) (citing *Valley Forge Christian College v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982)).  A plaintiff's standing under Article III of the United States Constitution must be determined first in order to establish the jurisdiction of the Court to hear the case and reach the merits.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998); *Grand Council of the Crees v. FERC*, 198 F.3d 950, 954 (D.C. Cir. 2000).   "Standing focuses on the complaining party to determine 'whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'"  *Am. Legal Found.*, 808 F.2d at 88 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).   "[T]he decision to seek review must be placed in the hands of those who have a direct stake in the outcome, not in the hands of concerned bystanders, who will use it simply as a vehicle for the vindication of value interests."  *Id.* at 91 (internal quotation marks omitted) (quoting *Diamond v. Charles*, 476 U.S. 54, 61 (1986)).   "The focus is on the qualifications and status of the party seeking to bring his complaint before a federal court and not on the issues he wishes to have resolved."  *McKinney v. U.S. Dep't of Treasury*, 799 F.2d 1544, 1549 (Fed. Cir. 1986) (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 28 (1976)).

To withstand a motion to dismiss for lack of standing, a plaintiff must allege facts

"demonstrating that he is a proper party to invoke judicial resolution of the dispute." *FW/PBS, Inc.
v. City of Dallas*, 493 U.S. 215, 231 (1990). The facts alleged "must be enough to raise a right to
relief above the speculative level." *Twombly*, 127 S. Ct. at 1965. To assert standing, a plaintiff must
allege: (1) an actual or imminent injury in fact; (2) fairly traceable to the challenged action of the
defendant; that is (3) likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*,
504 U.S. 555, 560-61 (1992). The injury alleged cannot be conjectural, hypothetical, remote,
speculative or abstract; it must be certainly impending. *Nat'l Treasury Employees Union v. United
States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996). To demonstrate an injury in fact, a plaintiff must have
suffered an invasion of a legally protected interest, an interest which is concrete and particularized.
*Raines v. Byrd*, 521 U.S. 811, 819 (1997).

### 1. All Plaintiffs Lack Standing to Challenge the Final Order

The Secretary challenges Plaintiffs' standing to contest the Final Order because, he
argues, it does not affect them. The Final Order delayed for one year the application of the Anti-
Markup Rule to services *other than* anatomic pathology diagnostic testing. 73 Fed. Reg. 404. The
Final Order references anatomic pathology diagnostic testing only to state that the delay does *not*
apply to such testing, *i.e*, the status quo as before January 2, 2008, remained in place.

Plaintiffs insist that they have proper standing to challenge the Final Order. They
argue that an agency engages in substantive "rulemaking" when it formulates, amends, or repeals a
rule. *See* 5 U.S.C. § 551(5); *see also Envtl. Def. Fund, Inc. v. Gorsuch*, 713 F.2d 802, 816 (D.C. Cir.
1983) (noting that "an agency action which has the effect of suspending a duly promulgated
regulation is normally subject to APA rulemaking requirements"); *Nat'l Wildlife Fed'n v. Clark*, 577
F. Supp. 825, 828 (D.D.C. 1984) ("The Supreme Court and our Court of Appeals have repeatedly

set aside department and agency attempts to amend or rescind outstanding regulations without strict adherence to a process of reasoning on the record with the benefit of informed suggestions from those affected by the proposed rescission or amendment."). The Secretary issued the Final Order without formal notice and comment. And, as Plaintiffs point out, the Final Order was identified by CMS as a "final rule." 73 Fed. Reg. 404.

HHS did not propose the Final Order and allow public comment before adopting it because it found "good cause for the waiver of notice and comment rulemaking and the waiver of a delayed effective date." Supp A.R. at 2; *see* 5 U.S.C. § 553(b)(3)(B) & (d). HHS found that seeking public comment would be impracticable and contrary to the public interest. Supp A.R. at 2. It stated that it was implementing the delay of the effective date because the informal comments had shown that "patient access for common diagnostic tests may be significantly disrupted." *Id.* For these reasons of good cause, the Secretary issued its Final Order announcing and immediately implementing the one year delay of the Anti-Markup Rule, except for certain anatomic pathology tests.[6] Plaintiffs contend that they had a right to participate in the rulemaking that preceded the Final

---

[6] The Secretary in fact said two, contradictory, things. Explaining the "Provisions of the Final Regulations," he clearly said "[b]ecause anatomic pathology diagnostic testing arrangements precipitated our proposal for revisions of the anti-markup provisions and remain our core concern, we are not delaying the date of applicability with respect to anatomic pathology diagnostic testing services furnished in space that: (1) is utilized by a physician group practice as a 'centralized building' (as defined at § 411.351 of this chapter) for purposes of complying with the physician self-referral rules; and (2) does not qualify as a 'same building' under § 411.355(b)(2)(I) of this chapter." Supp. A.R. at 2. However, explaining why there was good cause to proceed without notice and comment, he said: "[W]e understand from those comments that patient access for common diagnostic tests may be significantly disrupted unless we delay the effective date of revised § 414.50 [the Anti-Markup Rule] *with respect to anatomic pathology diagnostic testing services* furnished in space" that is a centralized building and not the same building. *Id.* at 2-2A (emphasis added). Given the ferocity of this litigation, the Court assumes that the word "except" was omitted from this latter statement in error.

Order and that the Final Order imposed new standards and obligations from which Plaintiffs allege

they will suffer a direct injury.

> The January 2008 Final [Order] reflects two decisions made
> by CMS subsequent to the publication of the November
> 2007 [Anti-Markup] Rule: the anti-markup provision *would*
> apply to 1) physicians billing for anatomic pathology
> diagnostic testing services where 2) those services were
> furnished in space that is a "centralized building" and not
> the "same building." *See* Complaint ¶ 65. Physicians
> providing all other types of diagnostic testing services, in
> any other location, would be able to bill at the regular fee
> schedule amount. The Plaintiffs therefore will suffer injury
> if [the Anti-Markup Rule] takes effect, because they will not
> be able to bill for services performed in their own, Uropath-
> managed laboratories without billing Medicare at a loss.
> *See* Complaint § 5.

Pls.' Opp'n at 9.[7]

The exact language of the Anti-Markup Rule and the Final Order is not identical but

the impact on these Plaintiffs is the same: they cannot mark up the technical or professional

components of pathology tests performed in their own laboratories if the labs are not in the "same

building" as their practices. The Anti-Markup Rule that issued in November 2007, after multi-year

consideration and a full blown administrative process, is what changed the Medicare billing

landscape for pod laboratories, including those managed by Uropath. The Final Order did nothing

to alter that new landscape as it affected Uropath and its associated physician practices. Since the

Final Order did not change anything for these Plaintiffs, invalidating it would not afford them any

---

[7] One of the reasons given by the Secretary for delaying applicability of the Anti-Markup
Rule to non-pathology testing is because certain physician groups wrote to CMS, complaining about
the Anti-Markup Rule, "because they will not be able to realize a profit and will not be able to
recoup their overhead costs." 73 Fed. Reg. at 405.

relief.[8] And because Plaintiffs cannot demonstrate that the Final Order caused them an injury "likely to be redressed by a favorable decision," *Lujan*, 504 U.S. at 560-61, Plaintiffs lack standing to challenge the Final Order.

### 2. Uropath and Director Page Lack Standing

With respect to Uropath and its clinical director, Rebecca Page, they do not have an interest in the receipt of Medicare payment for services provided by other physicians and thus they lack standing to challenge either the Final Order or the Anti-Markup Rule. Uropath is a management company that "assists physician practices in developing, implementing, managing and operating urology pathology laboratories," Compl. ¶ 44, but is not a Medicare provider or supplier and does not itself perform or bill for any laboratory tests or interpretations. *See* Pls.' Mot. at 6. Because Uropath does not render services under the Medicare program, it does not and cannot seek payment under the Medicare program. Uropath and Director Page do not themselves have a legally protected interest in the receipt of payment for services provided by other physicians. Because Uropath and Director Page cannot point to a concrete and certain impeding injury to their own legally protected interests caused by the Final Order or the Anti-Markup Rule's limits on Medicare billing of laboratory testing services, Uropath and Director Page lack standing to challenge the Final Order or the Anti-Markup Rule.[9]

_____

[8] To the extent that Plaintiffs seek modification of the Final Order so that it applies to them as well as all other diagnostic testing services, it is unclear whether this Court has such modification authority. The Court could invalidate the Final Order if it were improperly promulgated or violated the APA but Plaintiffs provide no authority for modification of its terms. Given the Secretary's extensive consideration over many years of how to corral pod laboratories, the Court cannot say that his action was either arbitrary or capricious.

[9] Further, Uropath's alleged future injury is speculative as it depends upon the occurrence of a chain of events. Uropath alleges that it would be injured as follows: first, the Anti-Markup Rule

**B.  No Jurisdiction to Review Claims Arising Under the Medicare Act**

Even if Plaintiffs had standing, this case must be dismissed because the Court lacks jurisdiction to hear Plaintiffs' claims.  Congress expressly has precluded federal question jurisdiction (under 28 U.S.C. § 1331) over claims "arising under" the Medicare Act.  42 U.S.C. § 405(h) (incorporated into the Medicare Act by 42 U.S.C. § 3595ii) ("[n]o action against . . . the [Secretary] shall be brought under Section 1331 . . . of title 28 to recover on any claim arising under [the Medicare Act]").  A claim arises under the Medicare Act when both the plaintiff's standing and the basis for the claim are dependent on the Act.  *Your Home Visiting Servs., Inc. v. Shalala*, 525 U.S. 449, 456 (1999).

The Supreme Court recently addressed this provision in *Shalala v. Illinois Council on Long Term Care*, 529 U.S. 1 (1999).  In *Illinois Council*, an association of nursing homes challenged HHS regulations that imposed penalties and sanctions for violating Medicare Act standards.  The association invoked Section 1331 federal question jurisdiction.  The Court held that Section 405(h) of the Medicare Act precluded review under the general federal question jurisdiction of Section 1331 and required that the claim be exhausted through HHS's administrative claims process before it could be heard in federal court.  *Id*. at 13.  In other words, Section 405(h) mandates the " 'channeling' of virtually all legal attacks through the agency."  *Id*.  In so holding, the Court noted that the nursing homes could test the lawfulness of the regulations by violating Medicare Act

would reduce Medicare reimbursement payments to physician groups and make the Uropath-operated labs uneconomical; second, the pathologists who work at the pod labs would lose income and leave their employment; third, Uropath would be unable to hire pathologists; and fourth, left with fixed expenses and an inability to hire pathologists, Uropath would "bleed money and . . . be forced to shut down as quickly as possible."  *See* Pls.' Mot. at 43.  Without an actual or imminent injury in fact, Uropath and Director Page lack standing to bring this suit.  *See Lujan*, 504 U.S. at 560-61.

standards and only incurring a minor penalty. *Id.* at 22.

Plaintiffs contend that the rule requiring Medicare Act claims to be channeled first through the Secretary does not apply here. Plaintiffs assert that the channeling rule only applies to "amount" determinations and they do not merely challenge the amount of reimbursement that they would receive, they advance statutory challenges to the Final Order and the Anti-Markup Rule.

In *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 681 n.12 (1986), the Supreme Court set forth an exception to the channeling rule. In that case, an association of physicians challenged the validity of a regulation authorizing payment of benefits in different amounts for similar physician's services. The regulation at issue was promulgated under Part B of the Medicare Act. The Court held that the channeling rule did not apply and permitted the plaintiffs to bring their claim directly to district court without first exhausting administrative remedies. The Court found that judicial review of determinations regarding the *amount* of benefits was precluded but that judicial review of challenges to the *method* by which such amounts were determined was not precluded. *Id.* at 675-77. Subsequently, however, the Supreme Court in *Illinois Council* limited the *Michigan Academy* exception, noting that a party may file immediately in district court *only* where the application of section 405(h) would not lead to review through the agency but instead would result in no review at all. *Illinois Council*, 529 U.S. at 19. The *Illinois Council* Court expressly disavowed the "amount" versus "method" dichotomy adopted in *Michigan Academy*:

> Claims for money, claims for other benefits, claims of program eligibility, and claims that contest a sanction or remedy may all similarly rest upon individual fact-related circumstances, may all similarly dispute agency policy determinations, or may all similarly involve the application, interpretation, or constitutionality of interrelated regulations or statutory provisions. There is no reason to distinguish among them in terms of the language of § 405(h). Section

> 1395ii's blanket incorporation of that provision into the Medicare Act
> as a whole certainly contains no such distinction.  Nor for similar
> reasons can we here limit those provisions to claims that involve
> "amounts."

*Id*. at 14.

Recently, in *Puerto Rican Association of Physical Medicine and Rehabilitation, Inc. v. United States*, 521 F.3d 46 (1st Cir. 2008), the First Circuit explained the context within which *Michigan Academy* was decided, and hence the limited nature of the exception.  At the time *Michigan Academy* was decided, the Medicare Act did not provide for any judicial review of determinations made under Part B.  The Supreme Court in *Michigan Academy* refused to assume that Congress intended that there be no review of statutory and constitutional challenges under Part B. *Id*. at 48.  "Invoking the canon of constitutional avoidance, the Court distinguished 'amount' challenges (*i.e.*, fact-based challenges to particular decisions) from 'methodology' challenges (*i.e.*, legal attacks on statutes, regulations and the like), and permitted the latter to proceed directly to court." *Id*.  Subsequently, Congress expressly provided that Part B determinations may be reviewed in court after exhaustion of administrative remedies. *Id*.  Afterwards, the Supreme Court in *Illinois Council* made it clear — the channeling rule applies to virtually all claims arising under the Medicare Act unless channeling would result in no review at all.  529 U.S. at 19.

The doctors and patients in *Puerto Rican Association of Physical Medicine* challenged a regulation restricting Medicare reimbursement for physical therapy services.  The Secretary had adopted a new regulation permitting reimbursement for physical therapy "furnished as an incident to a physician's professional service" only if the individual providing the therapy met certain educational and training requirements.  521 F.3d at 47.  The regulation meant that doctors

could no longer bill Medicare for physical therapy services provided in their offices by, for example, athletic trainers. *Id*. The plaintiffs challenged the regulation as arbitrary, unauthorized by statute, and contrary to law. *Id*. The district court dismissed the suit, finding that the plaintiffs' claims had to be channeled first through the administrative process. The First Circuit affirmed, noting that although the plaintiffs' suit "challenges a regulation and does not directly request payment for a specific service, it seeks at its heart the extension of Medicare benefits; accordingly, it would appear barred by section 405(h) as construed by the Supreme Court." *Id*. at 48.

Plaintiffs in this case assert that they should not be required to exhaust their administrative remedies first because to do so would mean effectively that there would be no review of their claims at all. They allege that requiring them to first assert an administrative challenge will drive them out of the diagnostic testing business. In making this argument, Plaintiffs point to *National Association of Psychiatric Health Systems v. Shalala*, 120 F. Supp. 2d 33 (D.D.C. 2000). There, the plaintiffs were private psychiatric hospitals and hospital organizations who challenged an HHS interim final rule that required physicians to evaluate patients face-to-face within one hour of the time that a psychiatric patient was placed in seclusion or in restraints. The *National Association* plaintiffs alleged:

> [I]n order to contest the validity of the one-hour rule a hospital must violate a condition of participation [in Medicare] or face the draconian sanction of termination from the Medicare program. Unlike the nursing homes in *Illinois Council*, Plaintiff's members, as a practical matter, do not have the option of incurring a minor penalty and receiving an administrative hearing before proceeding to federal court.

*Id*. at 38. The psychiatric hospitals and hospital organizations asserted that termination from the Medicare program would amount to "economic suicide." *Id*. at 38 n.4. The Secretary did not contest

the accuracy of this description.  Thus, the district court applied the *Michigan Academy* exception and found that section 405(h) did not prevent recourse to federal court immediately because application of the channeling rule would amount to a total denial of judicial review.  *Id*.

Plaintiffs allege that they are similarly situated to the plaintiffs in *National Association*, that the impact of the Anti-Markup Rule would be tantamount to termination of their participation in Medicare.

> [I]f the Anatomic Pathology Prohibition is not enjoined, Uropath will have its existing business destroyed almost immediately, and the physician group labs will have to be dismantled.  Tissue specimens will have to be sent to outside labs, and the outside labs, not the [P]hysician [G]roups, will bill for those services.  Thus, there will be nothing for the Plaintiff Physician Groups to appeal.  The effect will be the practical equivalent of a total denial of judicial review.

Compl. ¶ 110 (quoted in Pls.' Opp'n at 36-37).  Plaintiffs explain further:

> For Uropath to stay afloat, approximately 52 physician groups who own Uropath managed labs would have to continue using Uropath's services, submit tens of thousands of claims at an actual loss on each bill for a period of probably at least a year or two, and then appeal all of those tens of thousands of claims through a five-tier appeal process. This will not occur.  Instead the labs will be closed and there will be no claims to appeal.

Pls.' Opp'n at 37.  In short, Plaintiffs allege that implementation of the Anti-Markup Rule will cause the Physician Groups' labs to shut down and there will be no claims to submit for Medicare payment.

Plaintiffs overstate their case.  Unlike the plaintiffs in *National Association of Psychiatric Health Systems*, Plaintiffs are not required to violate a regulation (and thus be subject to termination from participating in Medicare) in order to challenge the regulation.  The Physician Groups and Dr. Michaels can submit their claims for reimbursement, noting their disagreement with the application of the Anti-Markup Rule, and then pursue an administrative challenge.

-18-

> The Part B billing instructions issued by CMS state that item 24D on the claim form can accommodate a narrative statement, and that it is possible for a claimant to attach a supplemental statement to a claim when submitting it. Such procedures would enable physician groups to submit claims containing a statement explaining that they were doing so not to request higher payment than that permitted by the Secretary's policies, but instead as a means to exhaust their administrative remedies to challenge those policies. Such a statement would likely demonstrate that a physician group lacked intent to defraud the program, removing any potential liability the group might have otherwise incurred by filing the claims.

Def.'s Mot. at 15-16 n.4 (citations omitted). The Anti-Markup Rule merely limits Medicare reimbursement for anatomic pathology diagnostic services performed at a site other than the office of the billing physician; the application of the Anti-Markup Rule will not terminate the Plaintiffs' participation in Medicare.

Plaintiffs' claim of hardship caused by the delay entailed by the channeling requirement is insufficient to demonstrate complete preclusion of judicial review. The Supreme Court acknowledged that the price of Congress's choice to channel all Medicare claims through administrative proceedings is "occasional individual delay related hardship." *Illinois Council*, 529 U.S. at 13.

> [Channeling] assures the agency greater opportunity to apply, interpret, or revise policies, regulations, or statutes without possibly premature interference by different individual courts applying "ripeness" and "exhaustion" exceptions case by case. But this assurance comes at a price, namely, occasional individual, delay-related hardship. In the context of a massive, complex health and safety program such as Medicare, embodied in hundreds of pages of statutes and thousands of pages of often interrelated regulations, any of which may become the subject of a legal challenge in any of several different courts, paying this price may seem justified.

*Id*. "[W]e do not hold that an individual party could circumvent [the Medicare Act's] channeling

requirement simply because that party shows that postponement would mean added inconvenience or cost in an isolated, particular case. Rather, the question is whether, as applied generally to those covered by a particular statutory provisions, hardship likely found in many cases turns what appears to be simply a channeling requirement into *complete* preclusion of judicial review." *Id*. at 22-23. "A plaintiff must show a systemic deprivation of review — not an individual hardship based on delay." *Triad Jeffersonville I, LLC v. Leavitt*, No. 08-329, 2008 WL 1777404, at *9 (D.D.C. Apr. 21, 2008). Plaintiffs' argument that administrative review will be costly and time-consuming does not transform their claim into one where judicial review is essentially precluded. *See id*.

In sum, Plaintiffs first must channel their claims against the payment scheme of the Anti-Markup Rule through the Secretary before they can file in district court. Application of section 405(h) in this case would lead to channeling of review through the agency, not to no review at all. Thus, the Court lacks federal question jurisdiction to review Plaintiffs' claims.

## IV. CONCLUSION

Because Plaintiffs do not have standing to challenge the Final Order issued by HHS in January 2008, the claims challenging the Final Order must be dismissed. In addition, Plaintiffs Uropath and Director Page do not participate in Medicare and have no standing to challenge the Anti-Markup Rule. Because Plaintiff Physician Groups and Dr. Michaels must channel their objections to the Anti-Markup Rule issued by HHS in November 2007 through the administrative process before coming to court, the claims challenging the Anti-Markup Rule must be dismissed for lack of jurisdiction. Accordingly, the Secretary's motion to dismiss [Dkt. #13] will be granted and the preliminary injunction [Dkt. #26] will be vacated. Further, the Secretary's motion for reconsideration [Dkt. #29] of the order granting preliminary injunction will be denied as moot. A

memorializing order accompanies this Memorandum Opinion.


Date:  May 5, 2008                    _____/s/_____
                                      ROSEMARY M. COLLYER
                                      United States District Judge